## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF WASHINGTON, et al.,

                      Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, and ERIC SCOTT
TURNER, in His Official Capacity as
Secretary of the United States Department of
Housing and Urban Development,

                      Defendants.

C.A. No. 1:25-cv-00626-MSM-AEM

**PLAINTIFF STATES' MOTION FOR PRELIMINARY INJUNCTION**

**REQUEST FOR EMERGENCY RELIEF**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................ 1

II.   FACTS ...................................................................................................... 4

      A.    Congress Created the Continuum of Care Program to
            Address the Unprecedented Crisis of Homelessness
            by Funding Housing Solutions ................................................. 4

      B.    Through the CoC Program, HUD Has Consistently
            Promoted Permanent Housing as Part of a
            Housing First Approach to Reducing Homelessness ............................. 6

      C.    Through the CoC Program, HUD Has
            Sought to Address the Needs of the Diverse Population it Serves ...................... 10

      D.    The Trump Administration Reverses HUD's
            Decades-Long Policy of Housing First ................................................. 11

      E.    The Administration Takes Actions to
            Target So-Called "Gender Ideology" .................................................... 12

      F.    HUD Reissues a Fiscal Year 2025 NOFO that
            Now Includes Unlawful Conditions and Policies
            Concerning Permanent Supportive Housing,
            Gender Identity, Public Safety, Disabilities, and Funding Amounts .................. 14

            1.    Ending Housing First .................................................15

            2.    Tier 1 Cap ............................................................17

            3.    Gender Ideology Conditions ............................................18

            4.    Disability Condition ...................................................19

            5.    Geographic Discrimination Conditions ....................................19

      G.    Plaintiff States Rely on Federal CoC Funding to Address Homelessness ........... 21

III.  ARGUMENT ............................................................................................ 23

      A.    Legal Standard ................................................................................. 23

      B.    The States' Claims are Likely to Succeed on the Merits ...................................... 23

            1.    The Challenged Conditions are final agency action .................................25

            2.    Imposing the challenged conditions is not
                  committed to agency discretion ................................................26

            3.    The challenged conditions are contrary to law ...............................27

                  a.    HUD lacked authority to implement its own conditions on
                        congressionally authorized funding ............................... 27

i

b.     The challenged conditions violate the McKinney-Vento Act and HUD regulations in multiple respects............................................ 28

4.     The challenged conditions are arbitrary and capricious ...........................31

5.     The challenged conditions were unlawfully promulgated without notice-and-comment ...................................................................................37

6.     The challenged conditions violate separation of powers ..........................38

C.     The States Will Suffer Irreparable Harm Absent Injunctive Relief ....................................................................... 40

D.     The Equities and Public Interest Weigh Strongly in the States' Favor ...................................................... 46

E.     The Court Should Enter a Preliminary Injunction on a Plaintiff-States-Wide Basis..................................... 47

IV.  CONCLUSION.................................................................................................. 48

**PLAINTIFF STATES' MOTION
FOR PRELIMINARY INJUNCTION**

## I.    INTRODUCTION

Congress created the Continuum of Care (CoC) Program recognizing that homelessness is a crisis of instability, and that effective intervention requires immediate stabilization and uninterrupted support. For decades, the CoC Program has operated with the continuity and predictability mandated by statute: through the CoC Program, the Department of Housing and Urban Development (HUD) distributes billions of dollars each year to state, local, and non-profit entities to provide housing and services to families and individuals facing homelessness, with the vast majority of funding directed to renewing permanent housing, rental assistance, and supportive service projects that have been shown to work. Congress designed the program to preserve stability so providers can reliably serve people whose lives depend on it.

Earlier this month, however, the Trump Administration threw the CoC Program into chaos. At the last moment, HUD rescinded the CoC Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2025 that had been issued the prior year. Then, in a new NOFO for FY 2025, HUD adopted policies that threaten to cancel thousands of existing projects, require funding recipients to fundamentally reshape their programs on an impossible timeline, and essentially guarantee that tens of thousands of formerly homeless individuals and families will be evicted back into homelessness. To start, in a reversal of HUD's decades-long preference for "Housing First" policies—that is, providing housing without preconditions like sobriety or minimum income—the new NOFO sets a cap under which only thirty percent of CoC funds may be used for permanent housing. This is a massive reduction from nearly ninety percent for CoC funds set to expire in 2026, and this abrupt change will jeopardize stable, long-term housing options for tens of thousands of our most vulnerable residents. HUD has paired this cap with a new policy in which Tier 1 funding—essentially guaranteed funding for renewals—is slashed from ninety percent of available funding to thirty percent, meaning projects that would otherwise be slated for renewal will be canceled and formerly homeless individuals and families left without housing. If carried

1

out, this policy change would violate statutory requirements to renew funding for existing projects, the vast majority of which provide permanent housing.

Making matters worse, HUD's NOFO adopts a spate of new funding conditions and scoring criteria—which Congress never authorized. First, HUD has adopted new scoring criteria that push applicants to require program participants to engage in services in exchange for housing. Second, HUD has adopted a condition that would categorically deny funding to any organization that has, or has ever, acknowledged the existence of transgender and gender-diverse people. Third, HUD has adopted a new criterion that excludes mental health disabilities and substance use disorder as qualifying disabilities for permanent supporting housing. And fourth, HUD has adopted new scoring criteria that punish applicants who are in a locality whose approach to homelessness differs from this Administration's. In short, the Administration is now holding CoC funding hostage, threatening to cut off funds that provide housing for people with disabilities, seniors, families with children, veterans, LGBTQ+ Americans, and others facing homelessness, all to coerce states, local governments, and non-profits to adopt the Administration's preferred policies, in contravention of Congressional intent. This is unlawful many times over.

Congress has not authorized Defendants to impose *any* of these new policies. Indeed, each of these conditions is contrary to either the CoC's authorizing statute, HUD's regulations, or both. The CoC statute requires HUD to prioritize renewals and to fund permanent housing as part of an effective housing strategy. HUD's regulations likewise require renewals in most cases and require HUD grantees to provide services to individuals in accordance with their gender identity. The new policies are flatly inconsistent with these requirements.

On top of that, these new policies are blatantly arbitrary and capricious. Defendants have made no effort whatsoever to explain their complete reversal on Housing First policies and sudden cap on permanent housing and Tier 1 funding, their ban on funding for organizations that recognize the existence of transgender or gender-diverse Americans, their reclassification of qualifying disabilities to exclude mental health disabilities and substance use disorders, or their plan to discriminate against localities with whose policies the Administration disagrees. This is

particularly problematic in light of HUD's longstanding policies, reiterated as recently as last year, that explicitly encouraged CoC applicants to implement Housing First policies like permanent supportive housing and rapid rehousing and to focus in particular on the needs of LGBTQ+ Americans, a population that disproportionally experiences homelessness. Worse yet, HUD makes no mention whatsoever of the downside of any of these policies—including the very real likelihood that many of these projects will lose funding, resulting in tens of thousands of formerly homeless individuals and families being evicted back to homelessness.

Finally, these new funding conditions run afoul of bedrock Separation of Powers principles. Congress makes laws and holds the power of the purse. The Administration cannot simply override Congress's clear intent and implement its own agenda.

Each of these policies is harmful on its own. Taken together, they fundamentally upend the CoC program, with disastrous results. Plaintiff States—as well as other states, localities, and non-profits—rely on CoC funding to house their residents. They have built programs over years based on HUD's longstanding, but now abandoned, guidance. These programs are now facing unprecedented upheaval. They have less than two months to radically reshape fundamental aspects of their programs, and even if they are able to meet that timeline, face a very real risk of interruption or loss of federal funding, with potentially catastrophic results for the States, service providers, and vulnerable residents. To avoid this irreparable harm caused by Defendants' unlawful actions, the Plaintiff States request that this Court enter an order preliminarily enjoining the FY 2025 NOFO and reinstating the prior FY 2024–2025 NOFO or, alternatively, preliminarily enjoining the Challenged Conditions and directing Defendants to process CoC application renewals consistent with 42 U.S.C. § 11386c and 24 C.F.R. § 578.33. Plaintiff States seek expedited relief by December 12, 2025, in light of the January 14, 2026, NOFO application deadline and consequent local CoC application deadlines as early as Sunday, December 14, 2025.

## II.    FACTS

**A.    Congress Created the Continuum of Care Program to Address the Unprecedented Crisis of Homelessness by Funding Housing Solutions**

Congress passed the McKinney-Vento Homeless Assistance Act to address the "immediate and unprecedented crisis" of homelessness. 42 U.S.C. § 11301(a)(1). Through the Act, Congress aimed "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b)(3). The purpose of the CoC program is "to promote community-wide commitment to the goal of ending homelessness"; "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[]"; "to promote access to, and effective utilization of, mainstream programs" for individuals and families experiencing homelessness"; and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

The CoC program "provide[s] funding for efforts by nonprofit providers, states, Indian Tribes or tribally designated housing entities . . . and local governments to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness."[1] To this end, Congress has directed that CoC funding "shall be used to carry out projects that serve homeless individuals or families[,]" including permanent housing, permanent supportive housing for individuals with disabilities (including mental health and substance use issues), rapid rehousing, supportive services, the Homeless Management Information System, and homelessness prevention. *See* 42 U.S.C. § 11383; 24 C.F.R. § 578.37.

HUD issues grants to local coalitions—known as "Continuums of Care"—pursuant to a NOFO. Each Continuum represents a "geographic area," for example, a county or multi-county

---

[1] U.S. Department of Housing and Urban Development, *Continuum of Care Program*, https://www.hud.gov/hud-partners/community-coc (last visited Nov. 25, 2025).

region within a state. 24 C.F.R § 578.3. CoC funding is distributed among geographic areas via a hybrid of a formula and competitive process. By statute, the selection criteria for awards "shall . . . include the need within the geographic area for homeless services, determined . . . by a formula, which shall be developed by the Secretary[.]" 42 U.S.C. § 11386a(b). This formula, called the Preliminary Pro Rata Need, allocates certain percentages to each geographic area, based primarily on the Community Development Block Grant formula, with adjustments made to ensure, as far as possible, that all CoC projects eligible for renewal can be renewed. 24 C.F.R. § 578.17. "HUD *will* apply th[is] formula . . . to the amount of funds being made available under the NOF[O]." 24 C.F.R. § 578.17(a)(2) (emphasis added). The formula thus acts as a minimum allocation for each Continuum.

The statute additionally directs HUD to renew existing projects. It provides that "[t]he sums made available" under the CoC program "shall be available for the renewal of contracts . . . at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations[.]" 42 U.S.C. § 11386c(b). The HUD "Secretary shall determine whether to renew a contract for [] a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary." *Id.* By prioritizing renewals of existing projects, Congress wrote the statute to ensure that programs can continue to provide stable housing to formerly homeless individuals, and that tens of thousands of formerly chronically homeless individuals and families are not evicted back to homelessness.

On top of this formula funding and funding earmarked for renewals, CoC funding is competitive in two respects. First, HUD awards grants competitively to applicants within a Continuum. That is, when a Continuum applies to the NOFO, it will rank projects within its geographic area, and HUD will select projects for awards within each Continuum's application up to at least the formula amount. WA-Mondau Decl. ¶¶ 12-17. Second, HUD awards "bonuses [and] other incentives to geographic areas for using funding . . . for activities that have been proven to

5

be effective at reducing homelessness . . . or achieving homeless prevention and independent living goals . . . set forth in" the CoC statutes. 42 U.S.C. §11386b(d)(1).

The McKinney-Vento Act includes lengthy "Required Criteria" for assessing grant applications, such as "the previous performance of the recipient regarding homelessness" with respect to the length of time individuals remain homeless and related factors, whether the recipient will incorporate "comprehensive strategies for reducing homelessness" such as permanent supportive housing, and many other specific factors. 42 U.S.C. § 11386a. Similarly, the Act already specifies what information HUD should require project sponsors to certify in order to receive CoC funding. *Id.* § 11386(b)(4). For example, project sponsors must certify their compliance with certain confidentiality and privacy terms and that children in family programs are enrolled in school and connected to certain services. *Id*. Notably absent from these requirements are any of the funding conditions at issue in this litigation.

**B.      Through the CoC Program, HUD Has Consistently Promoted Permanent Housing as Part of a Housing First Approach to Reducing Homelessness**

For at least two decades, HUD has implemented the CoC Program to further its stated policy of "implement[ing] a Housing First approach to reducing homelessness, and driv[ing] equitable community development." Declaration of Andrew Hughes (Hughes), Ex. 1 (HUD FY 2022–2026 Strategic Plan) at 18; *see also* Alap Dave, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

In its FY 2024–2025 CoC NOFO, HUD described Housing First as "[a] model of housing assistance that prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services." Hughes Ex. 2 (FY 2024–2025 NOFO) at 17. HUD adopted its Housing First approach in recognition of the fact that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success." Hughes Ex. 1 at 25. As detailed in HUD's most recent strategic plan, a "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." *Id.* at 26.

Similarly, the United States Interagency Council on Homelessness has recognized that Housing First policy "is based on overwhelming evidence that people experiencing homelessness can achieve stability in permanent housing if provided with the appropriate level of services. Study after study has shown that Housing First yields higher housing retention rates, drives significant reductions in the use of costly crisis services and institutions, and helps people achieve better health and social outcomes." United States Interagency Council on Homelessness, *Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation* 3 n.1 (2016), https://www.usich.gov/sites/default/files/document/Housing_First_Checklist_FINAL.pdf.

The core Housing First intervention is "permanent housing"—including "permanent supportive housing" and "rapid rehousing"—in which individuals are provided stable housing "without a designated length of stay." 24 C.F.R § 578.37(a)(1). The McKinney-Vento Act supports permanent housing by providing that CoC funds may be used for, among other things, new construction, acquisition or rehabilitation of existing structures, leasing, rental assistance, operating costs, and supportive services, including for individuals or families in permanent supportive housing. 42 U.S.C. § 11383(a). Both the statute and HUD's regulations identify various options for permanent housing. For example, permanent supportive housing is available for

"individuals with disabilities and families in which one adult or child has a disability[]" and pairs housing with "[s]upportive services designed to meet the needs of the program participants[.]" 24 C.F.R § 578.37(a)(1)(i). For rapid rehousing, CoC "funds may provide supportive services[]" and/or "tenant-based rental assistance . . . as necessary to help a homeless individual or family, with or without disabilities, move as quickly as possible into permanent housing and achieve stability in that housing." 24 C.F.R § 578.37(a)(1)(ii).

The McKinney-Vento Act specifically incorporates a Housing First approach. For example, as noted above, the law specifically directs HUD to fund "activities that have been proven to be effective at reducing homelessness," which the statute itself defines to include "permanent supportive housing for chronically homeless individuals and families" and "rapid rehousing services[.]" 42 U.S.C. § 11386(b)(d). The Act also makes clear in various provisions that sobriety, mental health treatment, employment, and the like are not to be treated as preconditions to permanent housing, but rather as issues to be addressed once individuals and families are stably housed. *See* 42 U.S.C. § 11385(a) ("To the extent practicable, each project shall provide supportive services for residents of the project and homeless persons using the project[.]"); 42 U.S.C. § 11386a(b)(1)(F) (noting that "independent living in permanent housing" can "includ[e] assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[]"). Taken together, these provisions "entrench federal support for Housing First" by "expand[ing] the availability of permanent housing" and "authoriz[ing] funds for rapid re-housing assistance to help people move into permanent housing."[2]

Consistent with these provisions of the McKinney-Vento Act, HUD has employed a Housing First and permanent supportive housing approach for over two decades.[3] As one recent

---

[2]  Josh Leopold, *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (2019), https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance.

[3]  Alap Dave, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

HUD document explained: "For 20 years, HUD has prioritized permanent supportive housing, which serves people with the highest levels of housing and service needs, especially people experiencing chronic homelessness."[4] Prior NOFOs and Funding Opportunity Descriptions from 2004 to the present reflect HUD's longstanding commitment to "permanent supportive housing" to "meet the long-term needs of homeless individuals and families" and "Housing First" as one of HUD's "Policy Priorities."[5] And HUD's current strategic plan, covering Fiscal Years 2022–2026, explicitly provides that HUD will "implement a Housing First approach to reducing homelessness." Hughes Ex. 1 at 18.

Accordingly, HUD's recent CoC NOFO for FY 2024–2025 encourages applicants to "[u]se a Housing First Approach," explaining:

> Housing First prioritizes rapid placement and stabilization in permanent housing and utilizes housing as a platform for providing supportive services that improve a person's health and well-being. CoC Program funded projects should help individuals and families move quickly into permanent housing without preconditions and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing. Additionally, CoCs should engage landlords and property owners to identify housing units available for rapid rehousing and permanent supportive housing participants, remove barriers to entry, and adopt client-centered service practices. HUD encourages CoCs to assess how well Housing First approaches are being implemented in their communities.

---

[4] HUD, *Office of Community Planning and Development Homeless Assistance Grants*, (https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf (last visited Nov. 25, 2025).

[5] *See, e.g.*, Continuum of Care Homelessness Assistance Programs, 69 Fed. Reg. 27495, 27498 (May 14, 2004), https://archives.hud.gov/funding/2004/cocpsec.pdf (Fiscal Year 2004 Continuum of Care Homeless Assistance Programs Funding Opportunity Description states that one of the "basic components" of the "CoC system" is "Permanent housing, or permanent supportive housing, to help meet the long-term needs of homeless individuals and families"); *see also, e.g.*, Grants.gov, Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*, https://grants.gov/search-results-detail/265408 (last visited Nov. 25, 2025) (Fiscal Year 2014 Notice of Funding Availability for Continuum of Care Program awards applications "up to 10 points" for following a "Housing First" model and defines "Housing First" as one of HUD's "Policy Priorities"); *see also, e.g.*, HUD, *Community Planning and Development Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (Fiscal Year 2018 NOFO includes the same provisions); *see also, e.g.*, Grants.gov, Related Documents, *2021 Continuum of Care* (2021), https://grants.gov/search-results-detail/335322 (last visited Nov. 25, 2025) (Fiscal Year 2021 NOFO includes the same provisions).

Hughes Ex. 2 at 8. The FY 2024–2025 NOFO also states that HUD would award "bonus projects" in part based on an applicant's "[c]ommitment to Housing First," providing "[u]p to 10 points based on the project application's commitment to follow a Housing First approach[.]" *Id.* at 29-30.

## C. Through the CoC Program, HUD Has Sought to Address the Needs of the Diverse Population it Serves

In addition to Housing First, HUD has also prioritized funding to address specific populations disproportionately impacted by homelessness, including LGBTQ+ people. As HUD and many others have recognized, "LGBTQ+ people experience homelessness at rates significantly higher than their representation in the general population." Hughes Ex. 1 at 18.[6]

To that end, HUD's "Equal access" regulation, which applies to the "Continuum of Care program," requires that funding recipients ensure that "[e]qual access to CPD programs, shelters . . . services, and accommodations is provided to an individual in accordance with the individual's gender identity," that "[a]n individual is placed, served, and accommodated in accordance with the gender identity of the individual," that "[a]n individual is not subjected to intrusive questioning or asked to provide . . . evidence of the individual's gender identity[,]" and that "[p]lacement and accommodation of an individual in temporary, emergency shelters and other buildings . . . shall be made in accordance with the individual's gender identity." 24 C.F.R. § 5.106.

And for over a decade, HUD's NOFOs for the Continuum of Care have consistently required that CoC funding recipients provide "Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity."[7] Prior NOFOs have also regularly awarded

---

[6] *See also* Senate Hum. Servs. Comm. Pub. Hr'g on ESSB 5599 (Feb. 6, 2023), at 1:19:15–1:19:40, video recording by TVW, https://tvw.org/video/senate-human-services-2023021142/?eventID=2023021142 (testimony noting LGBTQ+ youth account for at least forty percent of youth experiencing homelessness in King County); *see also* The Trevor Project, *Homelessness and Housing Instability Among LGBTQ Youth*, https://www.thetrevorproject.org/wp-content/uploads/2022/02/Trevor-Project-Homelessness-Report.pdf (last visited Nov. 25, 2025) (thirty-five percent to thirty-nine percent of transgender or nonbinary youth have experienced housing instability).

[7] *See, e.g.*, https://grants.gov/search-results-detail/206173 (FY 2012 Notice of Funding Availability for Continuum of Care); *see also, e.g.*, Grants.gov, Related Documents, *FY 2019 Notice of Funding Opportunity for Continuum of Care*, https://grants.gov/search-results-detail/318022 (last visited Nov. 25, 2025) (FY 2019 Notice of Funding Opportunity for Continuum of Care).

points to CoC applicants for "Addressing the Needs of LGBT Individuals."[8] Most recently, the FY 2024–2025 CoC NOFO emphasized the need to address the specific challenges of transgender and gender-diverse people. For example, its scoring system encouraged CoCs to "address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes," "ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation," and "partner with organizations with expertise in serving LGBTQ+ populations." Hughes Ex. 2 at 9. The FY 2024–2025 NOFO further required that "[a]pplicants must identify the steps they will take to ensure that traditionally underserved populations," including "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons . . . will be able to meaningfully participate in the planning process" for projects. *Id.* at 66. Likewise, HUD's most recent strategic plan, which includes the current fiscal year (FY 2026), specifically "focused on underserved populations to ensure equitable and fair access to housing and to Federal programs" and defined underserved populations to include, for example, "members of the lesbian, gay bisexual, transgender, and queer (LGBTQ+) community." Hughes Ex. 1 at 20.

### D.    The Trump Administration Reverses HUD's Decades-Long Policy of Housing First

Since the Inauguration, the Administration has worked heedlessly to reverse HUD's longstanding commitments to Housing First and equal access.

On July 24, 2025, the President signed an Executive Order addressing homelessness. The Order is called "Ending Crime and Disorder on America's Streets," but here will be called by the more fitting Anti-Homeless Order. Exec. Order No. 14321, 90 Fed. Reg. 35817 (2025). The primary thrust of the Anti-Homeless Order is an effort to expand civil commitment of those experiencing homelessness—to incentivize states and local governments to adopt a "maximally flexible" approach to locking up people who lack a safe or reliable place to sleep. *See* EO 14321 §§ 1-2.

---

[8] *E.g.*, HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (FY 2018 Notice of Funding Availability for Continuum of Care).

In addition, the Anti-Homeless Order directs HUD to "end[] support for 'housing first' policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency." EO 14321 § 5(a). The Order further directs HUD to "take steps to require recipients of Federal housing and homelessness assistance to increase requirements that persons participating in the recipients' programs who suffer from substance use disorder or serious mental illness use substance abuse treatment or mental health services as a condition of participation." *Id.* § 5(b). This is directly contrary to HUD's conclusion—in its still-operative strategic plan—that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success." Hughes Ex. 1 at 25.

The Anti-Homeless Order further directs the Attorney General, HHS, HUD, and the Department of Transportation to "[f]ight[] [v]agrancy" by *"*tak[ing] immediate steps to" to prioritize grants for "States and municipalities that actively . . . enforce prohibitions on open illicit drug use; []enforce prohibitions on urban camping and loitering; [and] enforce prohibitions on urban squatting." EO 14321 § 3.

As detailed below, HUD has now taken steps to implement the Anti-Homeless Order through the new FY 2025 NOFO.

**E.    The Administration Takes Actions to Target So-Called "Gender Ideology"**

The Administration has likewise sought to reverse HUD's longstanding commitment to serving all people.

On January 20, 2025, the President's first day in office, he issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender Ideology Order). The purpose and effect of the Gender Ideology Order is to deny the existence of transgender and gender-diverse individuals. The Gender Ideology Order declares "[i]t is the policy of the United States to recognize two sexes, male and female." EO 14168 § 2. Section 2(a) defines "sex" to mean "an individual's immutable biological classification as either male or female," which is "not a synonym for and does not include the concept of 'gender identity.'" Section 2(d) defines "female" as "a person belonging, at conception,

12

to the sex that produces the large reproductive cell," and Section 2(e) defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell." To effectuate the Gender Ideology Order, Section 3(e) directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) likewise commands that "[f]ederal funds shall not be used to promote gender ideology." Under the Order, "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.*

To implement the Gender Ideology Order, on February 7, 2025, HUD Secretary Scott Turner announced that HUD will stop enforcing this "Equal Access" rule.[9] But the regulation remains in effect. Later, on March 13, 2025, Secretary Turner announced in a post on X that CoC funds "will not promote DEI, enforce 'gender ideology,' [or] support abortion" Amended Complaint at 21, *Rhode Island Coal. Against Domestic Violence v. Kennedy*, No. 1:25-cv-00342-MRD-PAS (D.R.I. Sept. 15, 2025), ECF. No. 60. In response, HUD began presenting CoC grantees with grant agreements requiring grantees to certify that they would not use grant funds to promote 'gender ideology,' as defined in" the Gender Ideology Order. Complaint at 22–23, *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814-BJR (W.D. Wash. May 2, 2025), ECF. No. 1.

The Gender Ideology Order is rooted in anti-transgender animus and lacks any scientific basis. It also flouts HUD's Equal Access Rule by forcing agencies to no longer recognize transgender or intersex people by restricting funding that promotes "gender ideology." Nonetheless, as detailed below, HUD has now taken steps to implement the Gender Ideology Order through the new FY 2025 NOFO.

---

[9] HUD, *Secretary Scott Turner Halts Enforcement Actions of HUD's Gender Identity Rule*, https://www.hud.gov/news/hud-no-25-026#close (last visited Nov. 5, 2025).

**F.    HUD Reissues a Fiscal Year 2025 NOFO that Now Includes Unlawful Conditions and Policies Concerning Permanent Supportive Housing, Gender Identity, Public Safety, Disabilities, and Funding Amounts**

The Administration has now brought its anti-homeless and anti-transgender agendas together in an effort to fundamentally alter the CoC program.

On November 13, 2025, HUD issued a "FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO" with an application due date of January 14, 2026 (the "Challenged NOFO"). Hughes Ex. 3.

The Challenged NOFO states that "FY 2025 CoC awards will be made through this NOFO." *Id.* at 15. But HUD already issued the FY 2025 NOFO on July 31, 2024, as part of a combined FY 2024–2025 NOFO. Hughes Ex. 2. As the FY 2024–2025 NOFO explained, "HUD's authority to issue a 2-year NOFO [is] authorized by the Consolidated Appropriations Act, 2024 and any FY 2025 funding will be authorized by a FY 2025 Congressional Appropriation." *Id.* at 3–4. To streamline matters, the FY 2024–2025 NOFO told applicants that "[p]rojects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds." *Id.* at 4. As described above, the FY 2024–2025 NOFO required and endorsed a Housing First approach and encouraged CoCs to address the specific needs of transgender, gender non-conforming, and non-binary individuals and families, among other requirements.

Despite CoCs undergoing a two-year planning process pursuant to the FY 2024–2025 NOFO, HUD belatedly announced on July 3, 2025 that it intended to publish a new NOFO for 2025 CoC awards. Declaration of Nicholas Mondau, Ex. 1. In making this announcement, HUD failed to provide any explanation as to why it was issuing a new FY 2025 NOFO when a NOFO for FY 2024–2025 had already been issued. Due to this announcement by HUD on July 3, 2025, no FY 2025 funds were awarded under the FY 2024–2025 NOFO before it was replaced by the Challenged NOFO.

The new Challenged NOFO now claims to "rescind[] and supersede[]" the prior NOFO with respect to FY 2025. Hughes Ex. 3 at 15. And in so doing, it adds a passel of unlawful

conditions pursuant to the Anti-Homeless and Gender Ideology EOs. *Id.* at 12 (noting that NOFO implements Anti-Homeless EO); 108 (noting that NOFO implements Gender Ideology EO). These new conditions were not authorized by Congress, are neither reasonable nor reasonably explained, and flout the significant reliance interests of CoC applicants.

### 1.     Ending Housing First

First, the Challenged NOFO abruptly reverses HUD's decades-long Housing First policy by placing an unauthorized and arbitrary cap on the funding of permanent housing projects. The Challenged NOFO provides that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects" (the "Permanent Housing Cap"). Hughes Ex. 3 at 15.

The "Annual Renewal Demand" is defined in the NOFO as "[t]he total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items . . . based on [fair market rent] changes." *Id.* at 125. In other words, ARD is "the total amount of funds requested by eligible renewal projects in each FY funding opportunity." *Id.* at 124. "PH" here refers to Permanent Housing, "PSH" to Permanent Supportive Housing, and "RRH" to Rapid Rehousing. Thus, the Permanent Housing Cap mandates that only thirty percent of funding for project renewals may go to permanent housing.

The Permanent Housing Cap, if allowed to go into effect, will drastically cut funding for permanent housing projects. "Currently, 87 percent of all CoC program funds ending in 2026 are slated to support permanent housing in some capacity. Under the policy change, only 30 percent of the funds will be allowed to be used for that purpose." Katherine Hapgood, *Trump admin looks at deep cuts to homeless housing program*, Politico (Sept. 29, 2025), https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-housing-program-00585770?nid=0000014f-1646-d88f-a1cf-5f46b7bd0000&nname=playbook&nrid=0000015d-4ff3-d6d3-a75d-4ff30bd80000.

This "shift" is the "most consequential in a generation." Jason Deparle, *Trump Administration Proposes a Drastic Cut in Housing Grants* (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html. "In limiting spending on long-term housing to just 30 percent of the $3.9 billion in aid—from about 90 percent this year—the [Permanent Housing Cap] could deal a crippling blow to" HUD's longstanding policy of "Housing First[.]" *Id.* According to the New York Times, the Permanent Housing Cap could "quickly place as many as 170,000 formerly homeless people at risk of returning to the streets." *Id.*

According to news reporting, this change was not vetted by "HUD's attorneys to ensure it complied with the McKinney-Vento Homeless Assistance Act"; in fact, employees reported "they were forbidden from speaking with the agency's attorneys, and there is concern that the funding cap raises legal questions about its compliance with the law." Katherine Hapgood, *Trump admin looks at deep cuts to homeless housing program*, Politico (Sept. 29, 2025), https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-housing-program-00585770?nid=0000014f-1646-d88f-a1cf-5f46b7bd0000&nname=playbook&nrid=0000015d-4ff3-d6d3-a75d-4ff30bd80000.

In addition to imposing the Cap, the Challenged NOFO reverses HUD's longstanding Housing First policy via new scoring criteria aimed at forcing applicants to require participants to enroll in services to receive housing (the "Service Requirement Conditions"). For example, the Challenged NOFO awards up to 16 points (out of a maximum of 130) for "Availability of Treatment and Recovery Services" which includes substance abuse treatment services in which "program participants are *required* to take part in such services as a condition of continued participation in the program" and the demonstration of "the *requirement* for participation in substance abuse treatment." Hughes Ex. 3 at 77–78 (emphasis added).

Likewise, the Challenged NOFO awards up to ten points if a CoC can "demonstrate that projects *require* program participants to take part in supportive services . . . in line with 24 CFR 578.75(h)." *Id.* at 80. Yet, 24 C.F.R § 578.75(h) only says that programs "may" require program

participants to participate in services, not that they are required or incentivized to do so. Instead, the statute requires incentives for permanent supportive housing, as described above. And as recently as last year, HUD explicitly encouraged applicants *not* to require services as a condition for stable housing. *See* Hughes Ex. 2 at 87 (to receive full points, applicants "must [d]emonstrate at least 75 percent of all project applications that include housing . . . are using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing nor participation in supportive services . . . and prioritize rapid placement and stabilization in permanent housing.").

Most glaringly, the new scoring system effectively eliminates funding for rapid rehousing without supportive services. The scoring system establishes a "project quality threshold" such that "Permanent Housing projects must receive at least 6 out of the 8 points available" to be considered for funding. Three of the available eight points are for "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)" and "[d]emonstrat[ing] that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment)." Hughes Decl. Ex. 2 at 55, 62; *see also id.* at 64 (providing that these thresholds apply to renewals as well as new projects). An applicant that does not earn the three points for providing supportive services cannot meet the six-point minimum threshold and cannot qualify for funding.

### 2. Tier 1 Cap

Second, the Challenged NOFO further undermines the statutory and regulatory requirements prioritizing renewals by slashing the amount of projects CoCs may designate as "Tier 1" projects. Historically, HUD has permitted CoCs to designate certain projects as Tier 1, meaning they were essentially guaranteed funding so long as they met threshold criteria. *See* Hughes Ex. 3 at 91 ("HUD will . . . select all projects in Tier 1 that pass project quality and project eligibility thresholds[.]"). This ensured CoCs could budget around a steady stream of funding and ensured stability for individuals and families living in CoC-funded housing or receiving

CoC-funded services. Tier 1 is set as a percentage of Annual Renewal Demand. And consistent with statutory and regulatory mandates for renewals, Tier 1 is generally set at a percentage commensurate with the amount of projects up for renewal. So, in FY 2024, "Tier 1 [wa]s set at 90 percent of the CoC's Annual Renewal Demand (ARD)." Hughes Ex. 2 at 4.

The Challenged NOFO drastically slashes that amount. Under the NOFO, "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Hughes Ex. 3 at 15. Although the upshot of this new condition—the "Tier 1 Cap"—is not entirely clear (since HUD's obligation to fund renewals arises independently of the NOFO's tiering system), HUD put this condition under the heading "Increase in Competition." *Id.* It appears, then, that HUD intends to create a new national competition for previously renewed projects. Thus, the Tier 1 Cap is another effort by HUD to steer funding away from renewals, and stability, in violation of congressional directive and its own regulations.

### 3.    Gender Ideology Conditions

Third, the Challenged NOFO includes conditions that purport to cut off funding for any applicant that addresses—or ever has addressed—the particular needs of transgender, gender non-conforming, and intersex individuals (the "Gender Identity Conditions").

The Challenged NOFO provides that "[a]wards made under this NOFO will not be used to . . . conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." *Id.* at 108. Moreover, under the NOFO, "HUD reserves the right to reduce or reject a project application" if it concludes there is any "evidence that the project has previously or currently . . . conduct[ed/s] activities that rely on or otherwise use a definition of sex other than as binary in humans." *Id.* at 65; *see also id.* at 55.

Critically, these are threshold conditions, not scoring criteria. That is, any applicants who "rely on or otherwise" acknowledge the identities of transgender and gender-diverse Americans may now be categorically barred from funding under the CoC program. The effects are simultaneously sweeping and vague. Presumably anyone who provides shelter particularly to transgender or non-binary individuals would flunk the Administration's test. But the test would

also seemingly sweep in any applicant who provides (or has ever provided) shelter to transgender women in a women-only shelter, or even an applicant that asks a participant's gender identity or treats non-cisgender individuals consistent with their gender identity in any respect.

As detailed above, this is a reversal of (and contrary to) HUD's longstanding Equal Access policies. Moreover, as recently as last year, HUD was actively encouraging applicants to "[d]emonstrate efforts to address the needs of Lesbian, Gay, Bisexual, Transgender, and Queer . . . individuals and their families experiencing homelessness." Hughes Decl. Ex. 2 at 85. Now, any applicants who have done so will apparently find themselves ineligible for CoC funding, leaving their clients facing a loss of services or eviction.

### 4.  Disability Condition

Fourth, the new scoring system for transitional housing and permanent supportive housing illegally and arbitrarily disadvantages programs that provide supportive services for mental and substance-abuse-derived disabilities, as opposed to only physical disabilities. One out of an available 6 points each for TH and PH-PSH projects is awarded to projects that "serve . . . individuals with a physical disability/impairment or a developmental disability . . . not including substance abuse disorder." But the McKinney-Vento Act explicitly defines the term "homeless individual with a disability" to include an individual who "has a disability that . . . is a physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse[.]" 42 U.S.C. § 11360(10)(A)(i)(IV). HUD's own regulations incorporate this definition of disability into its definition of "chronically homeless." 24 C.F.R. § 578.3.

### 5.  Geographic Discrimination Conditions

Fifth, the Challenged NOFO includes various requirements purportedly related to "Public Safety." Broadly speaking, these conditions would put a thumb on the scale based on whether the state or local jurisdiction in which an applicant is located is, by this Administration's lights, sufficiently tough on "vagrancy"—something the applicant has no control over (the "Geographic Discrimination Conditions"). These include the following requirements, for which points are awarded:

a.    "CoCs must" cite "state or local law(s) that cover the CoC's entire geographic area" that prohibit "public illicit drug use" and "public camping or loitering" and cite state and local protocols that enforce these prohibitions;

b.    "CoCs must" demonstrate utilization of standards like "involuntary commitment," which are a matter of state and local law;

c.    "CoCs must" indicate that the state implements and is compliant with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); and

d.    "CoCs must" assist law enforcement in checking the location of homeless sex offenders, and cooperate with law enforcement in connecting violators of public camping or drug laws with services.

Hughes Ex. 3 at 86-87.

These conditions discriminate against applicants based on where they are located and, more precisely, based on the policy preferences of local voters. As detailed above, however, in creating the CoC program, Congress committed to funding *every* geographic area in America based on need and nothing else. *See* 42 U.S.C. § 11386a(b). HUD adopted regulations further implementing this Congressional direction. 24 C.F.R. § 578.17; *see also id.* §§ 578.5, .13.

* * *

Taken together, these conditions (the "Challenged Conditions") radically reshape the CoC Program. Indeed, each of these changes is bad on its own, and together they appear tailor-made to destroy the CoC Program as it has existed for decades, with devastating consequences for the most vulnerable Americans. And this is all contrary to Congress's intent and HUD's own regulations and without any reasoned explanation, let alone an explanation sufficient to explain HUD's profound change in position. As a result of the Challenged Conditions, services will be choked off and tens of thousands of Americans will soon face risk of eviction back to homelessness.

**G.      Plaintiff States Rely on Federal CoC Funding to Address Homelessness**

The Plaintiff States rely on the CoC Program as a principal source of federal funding and coordination for assistance with addressing homelessness. ME-Squirrell Decl. ¶¶ 10, 12, 15; PA-Vilello Decl. ¶¶ 4-6; *see also,* CA-CICH Marshall Decl. ¶¶ 13-16; NY-DSS Johns Decl. ¶¶ 2, 49. Within each State, CoC regions are locally defined geographies created by community stakeholders and recognized by HUD, reflecting historical collaboration patterns. CT-Navarretta Decl. ¶¶ 4-7; MA-Byron Decl. ¶¶ 3-5. Each CoC is organized around the specific housing and service needs of the population it serves, structuring its governance, priorities, and project portfolio in response to local factors such as homelessness patterns, provider capacity, geography, and demographic characteristics. KY-Kaye Smith Decl. ¶¶ 8-10; NY-Umholtz Decl. ¶¶ 6-7; VT-Sojourner Decl. ¶¶ 5-6. Washington, for example, is organized into several HUD-designated CoCs, some of which cover particular counties, and a Balance of State CoC that covers the 34 smaller counties in Washington. WA-Mondau Decl. ¶¶ 5-6. Rhode Island is coterminous with the Rhode Island Statewide Continuum of Care Program (RI-500), which serves homeless individuals across the State. RI Ventura Decl. ¶¶ 4-6. Each CoC has a designated Collaborative Applicant under 24 C.F.R. Part 578, responsible for communitywide planning, project ranking, and application for competitive HUD funding. KY-Kaye Smith Decl. ¶¶ 13-15, 18-23; PA-Vilello Decl. ¶¶ 6-8; WA-Mondau Decl. ¶¶ 5-8, 16-17. Through their respective CoCs, service organizations, agencies and local governments in the Plaintiff States receive funding to support permanent supportive housing, rapid rehousing, transitional housing, and coordinated entry systems across the state. DC-Miné Decl. ¶¶ 10-14; NY-HPD Warren Decl. ¶¶ 3-8; ME-Squirrell Decl. ¶ 4; MI-Van Dam Decl. ¶¶ 3-8; NJ Winter Decl. ¶¶ 4-12; VT-Sojourner Decl. ¶¶ 8-9.

CoC funds not only supply direct federal aid, but also leverage hundreds of millions in additional public and philanthropic funds essential for operations at publicly funded housing sites. IL-Haley Decl. ¶ 6 ("Illinois increased funding . . . by 154% to support the work of Home Illinois."); MN-Leimaile Ho Decl. ¶¶ 8-10; NY-HPD Warren Decl. ¶ 22; *see, e.g.*, KY-Kaye Smith Decl. ¶¶ 11-12 (detailing CoC funded projects). 24 C.F.R. § 578.73 requires that every CoC-funded

21

project must provide a 25% match for all eligible costs other than leasing, and CoC grants provide the backbone of funding that is supplemented by other public and private sources. Projects with guaranteed annual CoC renewals are able to attract other sources of funding, including state Housing Trust Fund dollars, Low-Income Housing Tax Credit (LIHTC) investment, and foundation-backed predevelopment loans. IL-Haley Decl. ¶¶ 8-9; OR-Jolin Decl. ¶¶ 20-23. The broader impact of federal cuts is therefore much greater than the direct funding loss alone.

In several Plaintiff States, state agencies operate as the Collaborative Applicant for the CoC. CO-Jaeckel Decl. ¶ 4; PA-Vilello Decl. ¶ 7; WA-Mondau Decl. ¶ 5. Agencies serving as the Collaborative Applicants are responsible for preparing and submitting the consolidated CoC Program application to HUD and ensuring that the application complies with all regulatory requirements under 24 C.F.R. part 578. MA-Byron Decl. ¶¶ 6-7; WA-Mondau Decl. ¶¶ 5-8. They oversee system governance, establish required policies and procedures, and administer CoC grants on behalf of participating localities and service providers. ME-Squirrell Decl. ¶¶ 10, 12; NY-Umholtz Decl. ¶¶ 9-12. Collaborative applicants receive direct federal funding to administer the program locally. MA-Byron Decl. ¶ 6; PA-Vilello Decl. ¶ 9; WA-Mondau Decl.¶ 9.

In addition to playing a direct role in CoCs, Plaintiff States organize their own homelessness responses around the CoC program. CA-CICH Marshall Decl. ¶¶ 2, 7; IL-Haley Decl. ¶¶ 6, 14; MN-Leimaile Ho Decl. ¶¶ 1-3, 7-10. For example, California makes many of its homelessness and housing grants, such as Homekey and Homekey+ grants, Homeless Housing, Assistance and Prevention (HHAP) and Encampment Resolution Funding Program grants, available to CoCs and CoC grantees for the purpose of reducing homelessness and providing the most vulnerable populations in California with permanent supportive housing. CA-Olmstead Decl. ¶¶ 10-14.  For instance, collectively, the 44 CoCs in California have been awarded a total of $982,849,999 in state HHAP grant funding over five awarded rounds, including $198,431,534 for permanent supportive housing projects. *Id*. ¶ 11. Additionally, California's Homekey Program has invested $3,555,211,382 to help individuals and families transition from homelessness, emergency shelter and/or transitional housing to permanent supportive housing through CoCs or in partnership

22

with local governments and nonprofit organizations. *Id*. ¶ 12. Some Homekey projects rely on CoC funding for ongoing operational costs. *Id*. ¶ 22.

Many states make substantial investments in homelessness and supportive housing that presuppose the existence of this CoC-funded capacity, using state dollars to supplement rental assistance, expand services, or meet match requirements that pair with federal awards. DE-Heckles Decl. ¶¶ 7-10, 12-13; MA-Byron Decl. ¶¶ 8-10; ME-Squirrell Decl. ¶ 19; WI-Staff Decl. ¶¶ 4-8. As a result, state and local expenditures rely on and are intertwined with the predictable funding, data systems, and structure of the federal CoC framework, and add up to billions of dollars worth of investments over time based on expectations that the CoCs would continue to operate as Congress prescribed. CO-Jaeckel Decl. ¶¶ 8-9; OR-Jolin Decl. ¶¶ 20-23; WA-Mondau Decl.¶¶ 9-10; WI-Staff Decl. ¶ 9.

## III.    ARGUMENT

### A.    Legal Standard

Plaintiff States satisfy each of the elements for issuance of a preliminary injunction. Under that standard, "[t]he district court must consider the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (cleaned up). The final two factors— the balance of hardships and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, each of these factors tips decisively in Plaintiffs' favor.

### B.    The States' Claims are Likely to Succeed on the Merits

The States are likely to succeed on the merits because the Challenged Conditions are unlawful. First, the Conditions are in excess of Defendants' authority and contrary to law. None of them have been authorized by Congress, which is reason enough to enjoin them. Moreover, the Challenged Conditions violate multiple provisions of the McKinney-Vento Act and HUD's own

23

regulations. For example, the Permanent Housing and Tier 1 Caps violate statutory provisions mandating that CoC funds "shall be available" for renewals "at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations[.]" 42 U.S.C. § 11386c(b). Yet each of the Caps would have the effect of terminating nearly *sixty percent* of projects eligible for renewal in the Plaintiff States. The Permanent Housing Cap (and the Service Requirement Conditions) also violate statutory provisions that specifically instruct HUD to fund strategies "proven to be effective at reducing homelessness"—namely "permanent supportive housing" and "rapid rehousing[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2). Similarly, the Gender Ideology Condition not only conflicts with Congress' direction that grants be renewed where practicable, it is also contrary to HUD's Equal Access rule, which, among other things, requires funding recipients to provide services "to an individual in accordance with the individual's gender identity[.]" 24 C.F.R. § 5.106. In the same vein, the Disability Condition penalizes applicants who provide services to people with mental or substance abuse-related disabilities, in violation of the McKinney-Vento Act's broad, inclusive definition of "disability." 42 U.S.C. § 11360(10)(A)(i)(IV). And the Geographic Discrimination Conditions cannot be squared with both statutory and regulatory provisions directing HUD to fund every geographic area based on need. 42 U.S.C. § 11386a(b); 24 C.F.R. § 578.17(a).

The Challenged Conditions are also arbitrary and capricious. HUD has failed to supply any rational explanation for these newly proposed conditions that are entirely unrelated to (and in some cases even inhibit) the statutory purpose of addressing homelessness. The Challenged Conditions represent a 180-degree reversal of HUD's long history of promoting Housing First policies, recognizing an individual's gender identity, and funding geographic areas based on need, not local politics. As just one example, consistent with its "Equal Access" rule, HUD has long directed applicants to provide services to individuals in accordance with the individual's gender identity. Now, however, the Challenged Conditions effectively punish applicants for listening to what HUD was telling them as recently as last year. Moreover, as detailed above, the Challenged Conditions mean that contracts will be cancelled and formerly homeless individuals left, again, without stable

housing. But HUD has failed to consider this problem whatsoever. On top of that, the Challenged Conditions weigh factors Congress has not authorized HUD to consider. For example, the Geographic Discrimination Conditions penalize applicants based on state and local laws related to camping, drug use, and similar things—factors that appear nowhere in the McKinney-Vento Act.

The Challenged Conditions are likewise unlawful because HUD failed to vet them through notice-and-comment rulemaking. The APA requires agencies to follow their own binding regulations. HUD's regulations require it to proceed by notice-and-comment rulemaking for "matters that relate to . . . grants." 24 C.F.R. § 10.1. Nonetheless, HUD promulgated the Challenged Conditions without observing the notice-and-comment procedure required by its own rules. As a result, not only has HUD implemented rules that are substantively unlawful and unreasonable, but it has left applicants scrambling to fundamentally remake their programs in the new Administration's image in only sixty days or forego federal funding.

Finally, the Challenged Conditions violate the Separation of Powers. Congress alone wields the power of the purse and the power to make laws. Thus, an agency cannot "create qualification requirements unrelated to the grant program simply to advance its own policy priorities." *City of Providence v. Barr*, 954 F.3d 23, 39 (1st Cir. 2020). The Challenged Conditions do that in spades. Taken together, they systematically tear down the CoC Program Congress created and replace it with something well-nigh unrecognizable. Defendants lack the authority to do this.

### 1.    The Challenged Conditions are final agency action

The Challenged Conditions are "final agency action" reviewable under the APA. *See* 5 U.S.C. § 704; *see, e.g.*, *Rhode Island Coal. Against Domestic Violence v. Kennedy*, 1:25-cv-00342-MRD-PAS, 2025 WL 2988705, at *5 (D.R.I. Oct. 23, 2025) (challenged grant conditions were final agency action).

For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)

(cleaned up). The insertion of the Challenged Conditions into prospective HUD CoC grants mark the consummation of Defendants' decision-making process and represent a definitive legal position. *See Hous. Auth. of the City & Cnty. of San Francisco v. Turner*, No. 25-cv-08859-JST, 2025 WL 3187761, at *16 (N.D. Cal. Nov. 14, 2025). Moreover, Plaintiff States are effectively prevented from participating in the application process and from receiving funding Congress has appropriated if they decline to abide by the newly imposed conditions. The Challenged Conditions change the lawful scope of activities permitted with the grants and may lead to the termination of awards. *See id.* at *17.

### 2. Imposing the challenged conditions is not committed to agency discretion

Subjecting grantees to the Challenged Conditions is not an action committed to agency discretion by law; thus, imposition of the Challenged Conditions is reviewable under the APA. An action is "committed to agency discretion by law[]" only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 23 (2018) (quoting *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993)). Here, Congress did not appropriate funds in an undifferentiated lump sum with no conditions attached. To the contrary, the HUD CoC program is filled with specific statutory directives, including setting forth criteria for selecting recipients, prioritizing renewals of existing projects, and specifying the information HUD should require from project sponsors who receive CoC funding. *See, e.g.*, 42 U.S.C. §§ 11386a, 11386c(b), 11386(b)(4). Plaintiffs' claims are reviewable under the APA. *See Rhode Island. Coal. Against Domestic Violence v. Bondi*, No. 1:25-cv-00279-MRD-AEM, 2025 WL 2271867, at *7 (D.R.I. Aug. 8, 2025) (reviewing DOJ's decision to impose challenged conditions to grants and explaining "the determination of grant terms and conditions is not a category of decision traditionally committed to exclusive agency discretion[]"); *Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 884 (W.D. Wash. 2025) (contrasting the statute at issue in *Lincoln v. Vigil* with enabling statutes which "provide[] substantial guidance as to how the agencies'

discretion should be exercised in implementing these programs, and for the Court to evaluate whether that discretion is being exercised in a reasonable manner[]").

### 3.    The challenged conditions are contrary to law

#### a.    HUD lacked authority to implement its own conditions on congressionally authorized funding

As an agency, HUD's "power to act and how [it is] to act is authoritatively prescribed by Congress[.]" *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Accordingly, Defendants have "no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This is especially true when it concerns federal funding, as the Constitution assigns Congress the power to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires and violates the Administrative Procedure Act[.]" *Providence*, 954 F.3d at 31 (citations omitted); 5 U.S.C. § 706(2)(C).

Court after court has already concluded that HUD lacks the authority to add conditions like the ones challenged here to CoC funding. *See Nat'l All. to End Homelessness v. Turner*, No. 25-cv-00447-MSM-AEM, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025) (enjoining disbursement of Continuum of Care Builds funds due to conditions that the project be located in a jurisdiction that cooperates with federal immigration enforcement and that the applicant will not deny the sex binary or promote the notion that sex is a chosen or mutable characteristic); *Martin Luther King, Jr. Cnty.*, 785 F. Supp. 3d at 887 (finding that HUD was likely "acting in excess of statutory authority[]" and "run[ning] afoul of the Separation of Powers doctrine[]" when it "impose[d] . . . new funding conditions on recipients of the CoC funds," including Gender Ideology conditions); *City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905, at *6-9 (W.D. Wash. Oct. 31, 2025) (enjoining enforcement of Gender Ideology Order, including with respect to Continuum of Care funding). This is because the McKinney-Vento Act details what "required criteria" HUD must use in awarding CoC funds, 42 U.S.C. § 11386a, and which "certification[s]" are required from project sponsors, 42 U.S.C. § 11386(b)(4), but does not grant

HUD any authority to add additional terms, like a thirty percent cap on permanent housing, a ban on recognizing transgender people, or conditions discriminating based on the legislative and enforcement priorities of the locality in which a CoC sits. Although the Secretary is empowered to require applicants to "comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner[,]" 42 U.S.C. § 11386, this does not give Defendants the unilateral authority to add whatever "substantively distinct and extraneous objective[]" they want, "untethered from the statutory purpose of ensuring efficient program administration." *City of Seattle*, 2025 WL 3041905, at *8. Rather, as the First Circuit has explained, an agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39. Indeed, Defendants make no effort, anywhere in their NOFO, to identify a statutory basis for any of these conditions—because there is none. All they rely on are Executive Orders, but the President has no more power "to enact, to amend, or to repeal statutes[]" than do agencies. *Clinton v. City of New York*, 524 U.S. 417, 438, (1998). Accordingly, Defendants efforts to add conditions are "in excess of statutory . . . authority[.]" 5 U.S.C. §706(2)(C).

**b.    The challenged conditions violate the McKinney-Vento Act and HUD regulations in multiple respects**

"An agency may not . . . simply disregard rules that are still on the books." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). 5 U.S.C. § 706(2)(A) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). The Challenged Conditions violate multiple provisions of the McKinney-Vento Homeless Assistance Act and its implementing regulations and should therefore be enjoined.

To begin with, the Permanent Housing Cap and the Tier 1 Cap are "irreconcilable" with various provisions of the statute that require the majority of CoC funds to be used for renewal of permanent housing projects. *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1113 (9th Cir. 2020) (enjoining funding conditions

incompatible with statutory requirements as contrary to law.). Because eighty-seven percent of existing project funds eligible for renewal are permanent housing projects, the Permanent Housing Cap would preclude renewal of nearly two-thirds of those funds in plain violation of 42 U.S.C. § 11386c(b), which requires that renewal funds for existing projects "shall be available . . . at the discretion of the applicant or project sponsor." The Permanent Housing Cap would also override HUD's evaluation of projects based on statutorily "[r]equired [c]riteria" including "the extent to which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," which by statute includes strategies "proven to be effective at reducing homelessness" like "permanent supportive housing" and "rapid rehousing[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2); *see also* Consolidated Appropriations Act, 2024 (Public Law 118-42) at 138. ("[T]he Secretary shall provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services[.]"). To the extent that the Tier 1 Cap results in projects otherwise eligible for renewal losing funding through the competitive process, it also violates these provisions.

Likewise, the Service Requirement Conditions conflict with the statutory project selection criteria that prioritize projects that demonstrate success with rapid and permanent rehousing. "When Congress limits the purpose for which a grant can be made, it can be presumed that it intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (per curiam). Under the selection criteria codified at 42 U.S.C. § 11386a(b)(1), HUD "shall" evaluate projects based on "previous performance" of service providers, as measured by, *inter alia*, "(i) the length of time individuals and families remain homeless; (ii) the extent to which individuals and families who leave homelessness experience additional spells of homelessness; (iii) the thoroughness of grantees in the geographic area in reaching homeless individuals and families; [and the] (iv) overall reduction in the number of homeless individuals and families[.]" Congress thereby made its instructions clear: projects are to be evaluated by how quickly they can get people

housed and the extent to which they keep them housed. "In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions." *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 168 (1st Cir. 1987). Related provisions instruct that services and treatment are to be a complement, rather than a precondition, to housing placement. *See* 42 U.S.C. § 11385(a) ("*To the extent practicable*, each project shall provide supportive services for residents of the project and homeless persons using the project[.]"); 42 U.S.C. § 11386a(b)(1)(F) ("independent living in permanent housing" can "*includ[e]* assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[]") (emphases added).

The Gender Ideology Conditions, like the Service Requirement Conditions, disrupt the Congressionally mandated project selection criteria and are likewise contrary to the statutory scheme. And they are also unlawful because they violate HUD's own Equal Access regulation, which requires CoC funding recipients to provide services and accommodation in accordance with an individual's gender identity. *See* 24 C.F.R. § 5.106; *State of Maine v. Thomas*, 874 F.2d 883, 890 (1st Cir. 1989) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") (quoting *Morton v. Ruiz,* 415 U.S. 199, 235, (1974)); *see also Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025) (holding that agency action is "contrary to law" if it "disregard[s]" the agency's "own regulations and policies."). Courts have been quick to discard similarly misplaced ideological appendages to statutory grant conditions, *see, e.g.*, *State of Washington v. HHS*, No. 6:25-cv-01748-AA, 2025 WL 3002366 (D. Or. Oct. 27, 2025) (enjoining gender-ideology-related grant conditions that "run counter to statutory authority and directly undermine congressional purpose"); *Nat'l All. to End Homelessness*, 2025 WL 2638377, at *1 (enjoining disbursement of Continuum of Care Builds funds due to, *inter alia*, gender ideology conditions).

Furthermore, the Disability Condition's bias favoring programs that support participants with physical disabilities to the exclusion of those experiencing mental or substance-abuse-derived disabilities is likewise contrary to the plain language of the Act. The McKinney-Vento Act

explicitly defines the term "homeless individual with a disability" to include an individual who "has a disability that . . . is a physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse[.]" 42 U.S.C. § 11360(10)(A)(i)(IV). HUD's own regulations incorporate this definition of disability into its definition of "chronically homeless." 24 C.F.R. § 578.3.

Finally, the Geographic Discrimination Conditions cannot be squared with both statutory and regulatory provisions directing HUD to fund every geographic area based on need. *See* 42 U.S.C. § 11386a(b) ("the need within the geographic area for homeless services, [shall be] determined . . . by a formula, which shall be developed by the Secretary, by regulation."); 24 C.F.R. § 578.17(a) (describing formula for Preliminary Pro Rate Need for each geographic area.) The Geographic Discrimination Conditions "tak[e] irrelevant or impermissible factors into account[,]" *Robbins*, 780 F.2d at 48, thwarting Congress's design for the dispersal of funds first by region and then by demonstrated success according to statutory criteria.

Taken together, the Challenged Conditions would interfere with rather than promote "efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families" and therefore contravenes Congress's overall purpose in establishing the CoC program. 42 U.S.C. § 11381(2); *Penobscot Nation v. Frey*, 3 F.4th 484, 501 (1st Cir. 2021) ("[W]e cannot interpret … statutes to negate their own stated purposes." (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). This court should therefore enjoin those Conditions as contrary to law.

### 4. The challenged conditions are arbitrary and capricious

The Challenged Conditions are also arbitrary and capricious. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection

between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). In doing so, the agency cannot rely on "factors which Congress has not intended it to consider[.]" *Id*. The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy[,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30, 33 (2020).

An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before[]" it. *Regents*, 591 U.S. 1 at 25 (citation omitted); *see also id.* at 30. An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015).

As set forth below, the Challenged Conditions are arbitrary and capricious for each of these independent reasons: (1) Defendants failed to provide a reasoned basis or explanation; (2) Defendants rescinded a prior policy without considering alternatives within the ambit of the existing policy, assessing whether there were reliance interests, and weighing any such interests against competing policy concerns; and (3) Defendants failed to consider important aspects of their decision including the disadvantages of the decision, namely, what would happen when states and housing providers suddenly lost federal funding.

First, Defendants failed to provide any reasoned basis or explanation for the Challenged Conditions, which are entirely unrelated to (and in some cases even inhibit) the statutory purpose of addressing homelessness. Courts have previously analyzed this issue under very similar factual circumstances. For example, in a recent lawsuit challenging the imposition of CoC funding conditions—including those related to "gender ideology"—one court concluded that Defendants' actions were arbitrary and capricious because the "rote incorporation of executive orders—

especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relations to the agency's underlying action—does not constitute 'reasoned decisionmaking.'" *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814, 2025 WL 2322763, at *15 (W.D. Wash. Aug. 12, 2025); *see also Rhode Island Coal. Against Domestic Violence v. Kennedy*, No. 1:25-cv-342-MRD-PAS, 2025 WL 2988705, at *7 (D.R.I. Oct. 23, 2025) (finding likelihood of success on merits of arbitrary and capricious claim with respect to gender ideology and other conditions on Continuum of Care grants due to a failure to provide an explanation).

That is all Defendants have done here, however. They failed to provide any reasoned basis for the Challenged Conditions beyond glancingly mentioning that they are incorporating the Gender Ideology and Anti-Homeless Orders. *See* Hughes Ex. 3 at 12 (noting that NOFO implements Anti-Homeless EO); 108 (noting that NOFO implements Gender Ideology EO). This total failure to explain the Challenged Conditions is all the more baffling because several of the conditions—namely the Permanent Housing Cap and the Service Requirement Conditions— contradict HUD's statutory mandate to incentivize and provide bonuses for permanent housing and rapid rehousing services, and HUD's *own* recent analysis of data. For example, according to HUD's most recent strategic plan, "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." Hughes Ex. 1 at 26; *see also, e.g.*, National Low Income Housing Coalition, *The Evidence Is Clear: Housing First Works*, https://nlihc.org/sites/default/files/Housing-First-Evidence.pdf (last visited Nov. 25, 2025); National Alliance to End Homelessness, *Data Visualization: The Evidence on Housing First* (May 25, 2021), https://endhomelessness.org/resources/sharable-graphics/data-visualization-the-evidence-on-housing-first/. Where, as here, an agency's explanation "runs counter to the evidence[,]" it violates the APA's prohibition on arbitrary and capricious decision-making. *State Farm*, 463 U.S. at 43.

Defendants' failure to provide any reasoned explanation is also demonstrated by the fact that HUD relies on factors which "Congress ha[d] not intended it to consider[.]" *Id.* As discussed above, the McKinney-Vento Act already describes the "Required Criteria" that must be used to assess grant applications, directs HUD to fund every geographic area based on need, and explains which information HUD should require project sponsors to certify. Yet, rather than following these statutorily mandated and highly detailed criteria, Defendants have imposed the new Challenged Conditions. For example, the Challenged NOFO favors CoCs that are located in a state or local jurisdiction that enacted and enforces policies related to illicit drug use, public camping and loitering, and other "public safety" matters, which CoCs have no control over. These conditions are arbitrary and capricious, as Defendants did not "look to" nor "discuss" statutory "requirements" while imposing them. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 682 (2020). Rather than addressing any of the above statutory requirements, the Challenged NOFO's section on the Geographic Discrimination Conditions merely cites to the statute's general purposes, such as providing funding for efforts "to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[.]" 42 U.S.C. § 11381. The statute's purposes do not include the specific requirements imposed by the Geographic Conditions, nor do such general purposes justify Defendants' imposition of these Conditions.

Second, Defendants also acted arbitrarily and capriciously by rescinding prior policies without considering alternatives within the ambit of the existing policies, assessing whether there were reliance interests, and weighing any such interests against competing policy concerns. The Challenged Conditions are an extreme deviation from HUD's long history of applying a Housing First model, prioritizing renewals, recognizing an individual's gender identity, providing services aimed at a wide range of disabilities including mental health conditions and substance use disorder, and ensuring that all geographic areas are funded based on need, not politics. But Defendants "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30.

For years, Continuums, applicants, and service providers developed their programs along the lines that HUD repeatedly urged. Per HUD's guidance, applicants have built Housing First and gender-inclusive programs to provide long-term, stable housing and services for individuals and families to exit homelessness. Now, suddenly, these entities will be forced to fundamentally reshape their programs in the mere two months Defendants have given them to respond to the NOFO—or forego this critical funding. Nothing in the Challenged NOFO considers whether this is beneficial—or even possible. *See* WA-Mondau Decl. ¶ 27. Programs providing stable housing to formerly homeless individuals cannot simply turn on a dime to become transitional housing or suddenly develop relationships with service providers sufficient to meet the Service Requirement Conditions. Nor have Defendants apparently given any thought to whether there is sufficient supportive service capacity in any (let alone all) geographic areas to even meet their professed requirements. Given that it would be extremely difficult for programs to quickly implement these abrupt shifts, many programs are likely to lose out on funding, with their clients bearing the worst of it. Indeed, according to the New York Times, the Permanent Housing Cap could "quickly place as many as 170,000 formerly homeless people at risk of returning to the streets." Jason Deparle, *Trump Administration Proposes a Drastic Cut in Housing Grants* (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html; *see also* RI-Ventura Decl. ¶ 18; OR-Jolin Decl. ¶ 34; IL-Haley Decl. ¶ 21. The cuts in the Challenged NOFO would be "catastrophic" and "local governments and charities could not make up the aid." Jason Deparle, *Trump Administration Proposes a Drastic Cut in Housing Grants* (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html; *see also* NY-SHNNY Leone Decl. ¶¶ 15, 34-42; MI-MCAH Rennie Decl. ¶ 15; DE-Heckles Decl. ¶¶ 27-28. But the Challenged NOFO breathes not a word about the challenges or disadvantages of adopting these new funding conditions with little warning.

Moreover, it would also be impossible for many programs to comply with the Challenged Conditions because some conditions are beyond the applicants' control. The Geographic Discrimination Conditions punish applicants based solely on whether the jurisdictions in which

they happen to sit adopt and/or enforce certain laws. And the Gender Ideology Condition evaluates an applicant's *past* conduct. It provides that HUD could "reduce or reject" a project that has "previously" conducted activities that "rely on or otherwise use a definition of sex other than as binary in humans." Hughes Ex. 3 at 65. This is despite the fact that HUD consistently *required* applicants to recognize transgender, gender-diverse, and gender non-conforming identities as recently as last year and for many years prior. Disqualifying applicants for doing what you asked them to do is about as arbitrary as it gets. Defendants not only failed to "weigh" these substantial interests "against competing policy concerns"; they "ignored" them altogether. *Regents*, 591 U.S. at 30-33. Because the Challenged Conditions were adopted "with no regard for the [States'] reliance interests[,]" and Defendants "did not acknowledge—much less justify—[their] adoption" of the new conditions, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 179-80 (D.C. Cir. 2023).

Similarly, Defendants failed to consider the reliance interests of states who rely on CoC-funded projects as part of the homelessness response systems. Most notably the Permanent Housing and Tier 1 Caps threaten to destabilize existing CoC-funded permanent housing projects that receive state funding or other support. These projects rely on both the availability of both CoC and state funding to remain viable and serve participants. Further, HUD fails to consider how the disruption to and potential failure of these jointly funded projects will increase the population of unsheltered homeless persons, increase utilization of State-funded healthcare, crisis response, and shelter-avoidance systems. In turn, these increases will inevitably place financial strains to which they are not prepared to absorb and cannot readily address. Defendants fail to address or even mention these interests and likely impacts of these caps on Plaintiff States homelessness response systems. This failure is even more problematic given that States reasonably relied on HUD's prior federal directives promoting the development of permanent housing and rapid rehousing when developing their own homelessness response systems.

Finally, Defendants utterly failed to consider what is going to happen to the entities and, more importantly, people who will be cut off by the Challenged Conditions. There is simply no

way around it: capping permanent housing and Tier 1 funding—i.e., renewals—at thirty percent, and denying funding to organizations that have served transgender individuals or exist in jurisdictions who don't enforce anti-vagrancy laws means that organizations receiving funding, who reasonably expected to continue receiving funding, will lose that funding. And what will happen to the people living there? Defendants don't say. But almost certainly, tens of thousands of people, if not more, will end up being evicted back into homelessness. HUD's failure to consider, or even acknowledge, this basic reality is genuinely gobsmacking. The entire purpose of the Continuum of Care Program is to help those experiencing homelessness to find stable housing. 42 U.S.C. § 11381. In adopting policies that will evict untold number of Americans back into homelessness, Defendants have "entirely failed to consider an important aspect of the problem[.]" *State Farm*, 463 U.S. at 43; *see also Rhode Island Coal. Against Domestic Violence*, 2025 WL 2988705, at *7 (finding that Defendants failed to consider "the harmful impact their decision would have on the Coalitions and the vulnerable populations they serve[]").

### 5. The challenged conditions were unlawfully promulgated without notice-and-comment

Under the APA, government agencies are required to publish "general notice of proposed rule making" and provide "interested persons an opportunity to participate in the rule making" by submitting comments on the proposed agency rule. 5 U.S.C. § 553(b), (c). The provisions of § 553 do not apply to matters relating to "public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). But HUD's regulations have long "provide[d] for public participation in rulemaking with respect to *all* HUD programs and functions, *including* matters that relate to public property, loans, grants, benefits, or contracts *even though such matters would not otherwise be subject to rulemaking* by law or Executive policy." 24 C.F.R. § 10.1 (emphasis added).

The Challenged Conditions represent a sharply consequential shift in how HUD will prioritize nearly $4 billion in federal funds for homelessness—shifting away from long-term housing and towards transitional housing that requires work and addiction treatment. This administration's serious change in priorities includes restricting CoC funds for permanent housing

projects to 30% and imposing a host of conditions that override or are untethered to the statutory purpose of the program. Such substantive changes to the HUD CoC program must be made through notice-and-comment rulemaking—as required by HUD's own regulations—which HUD wholly failed to do.[10] As a result, not only has HUD implemented substantive rules that are unlawful and unreasonable, but HUD has left applicants scrambling to fundamentally remake their housing programs in the new Administration's image in only sixty days, or forego federal funding. *Cf. Comm. For Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992) (HUD's changed methods for calculating subsidies for public housing authorities were substantive or legislative rules and violated notice-and-comment); 81 Fed. Reg. 48366 (July 25, 2016) (HUD's own practice in seeking additional comment on the formula used to allocate CoC funds).

HUD's failure to follow procedure means the Challenged Conditions can and should be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(D).

### 6.     The challenged conditions violate separation of powers

Finally, all Challenged Conditions also independently violate the Administrative Procedure Act—and the Constitution—because they violate the separation of powers. The United States Constitution "exclusively grants the power of the purse to Congress, not the President." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (2018). "Congress may," of course, "attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206–07 (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). But "[t]here is no provision in the Constitution that authorizes the President"—or the agencies beneath him—"to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. Meaning: "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco*, 897 F.3d at 1235; *see also Providence*, 954 F.3d at 39 (an agency cannot "create

---

[10] Notice and public procedures may be omitted if HUD determines that, in a particular case or class of cases, notice and public comment procedures are "impracticable, unnecessary[,] or contrary to the public interest." 24 C.F.R. § 10.1. But to counsel's knowledge, HUD has not stated such a determination.

qualification requirements unrelated to the grant program simply to advance its own policy priorities[]").

The Challenged Conditions do just that. The Permanent Housing and Tier 1 Caps seek to withhold funding from projects that Congress has explicitly directed Defendants to fund— permanent housing and renewals (which amount to much the same thing)—to effectuate the Administration's goal of "ending support for 'housing first' policies[.]" Anti-Homeless Order § 5(a). Same with the Service Requirement Conditions. The Gender Ideology Condition, for its part, would blacklist certain service providers and force the termination contracts not because of any law Congress passed, but to execute the President's fiat that "[f]ederal funds shall not be used to promote gender ideology." Gender Ideology Order § 3(g). The Disability Condition amends Congress' statutory definition to prioritize certain disabilities over others for service delivery. And the Geographic Discrimination Conditions likewise chokes funding from geographic areas, over Congress's explicit direction, to coerce states and localities into, as the Administration puts it, "fighting vagrancy on America's streets." Anti-Homeless Order § 3 (capitalization omitted).

None of these conditions are authorized by Congress. Indeed, just as in *San Francisco*, Defendants do not even attempt to identify any federal law permitting them to impose the Challenged Conditions, resting instead entirely on the President's Executive Orders. But these are not law. And no such law exists, much less in unambiguous terms required for a valid exercise of congressional spending power. The Supreme Court has likened Congress's power to condition federal funds as "much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The "legitimacy" of such conditions "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id*. (citations omitted). As such, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id*.

Congress did not do so. To the contrary, as detailed above, these conditions violate Congress's statutory directives, both in the McKinney-Vento Act, and the overarching Congressional directive that agencies not act in a manner that is "arbitrary[ and] capricious."

39

5 U.S.C. § 706. By attaching conditions to federal funding that were not only unauthorized by Congress but that contravene Congress's directions, the Challenged Conditions usurp Congress's spending and legislative power. This Court should enjoin Defendants' implementation and enforcement of the Challenged Conditions.

## C.    The States Will Suffer Irreparable Harm Absent Injunctive Relief

This Court should enjoin the Challenged Conditions because Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief[.]" *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 19 (1st Cir. 1996). District courts "have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (citations omitted).

As an initial matter, Plaintiffs suffer irreparable harm because they "are facing a choice between two untenable options . . . [of] accepting conditions that they believe are unconstitutional and risking the loss of hundreds of millions of dollars in federal grant funding." *See, e.g.*, *Martin Luther King, Jr. Cnty.*, 2025 WL 2322763, at *16.

This NOFO, as it applies to State CoCs and non-state CoCs alike, will affect irreparable harm on the State. CO-Jaeckel Decl. ¶ 29 (estimating a $26 million reduction in PH funding); IL-Haley Decl. ¶ 14 (estimating a loss of $106 million in permanent housing resources); KY-Kaye Smith Decl. ¶ 17 ("[T]he terms of the FY 2025 NOFO represent the most significant philosophical and programmatic changes since the COC program took effect"); PA-Vilello Decl. ¶ 30 (estimating a loss of over $100 million in PH funding); VT-Sojourner Decl. ¶¶ 15-17, 23-27. The New York City CoC alone stands to lose approximately $106 million just due to the Permanent Housing Cap. NY-Johns Decl. ¶ 23. State agencies and their partners have spent years building programs in alignment with HUD's prior emphasis on permanent supportive housing and Housing First approaches. DC-Miné Decl. ¶¶ 5, 10-14; DE-Heckles Decl. ¶¶ 14-19, 23; CO-Jaeckel Decl.

¶¶ 9-10, 17-19; MA-Byron Decl. ¶¶ 4-5, 19-34; *see, e.g.,* NJ-NJHMFA Brewster Decl. ¶¶ 5-7, 12-16 (detailing development of a Homeless Management Information System (HMIS) consistent with HUD requirements); OR-Jolin Decl. ¶¶ 5-33 (same). The Challenged Conditions threaten to undermine all of that work.

Plaintiff States engaged in statewide planning regarding homelessness, which relies on a predictable pipeline of federally supported permanent housing. *See, e.g.*, WA-Mondau Decl.¶ 9, 23-25, 35; VT-Sojourner Decl. ¶¶ 12, 14; *see also* Wash. Rev. Code § 43.185C.045. If the Challenged Conditions take effect, existing coordinated-entry policies, performance measures, and regional housing plans that were made in reliance on previously available federal resources will be thrown into disarray. DC-Miné Decl. ¶¶ 13-14, 19; MA-Byron Decl. ¶¶ 36-43; MN-Leimaile Ho Decl. ¶ 17; OR-Jolin Decl. ¶¶ 7-11, 20-24; VT-Sojourner Decl. ¶¶ 18-22.

States' investments in the real estate that houses formerly homeless individuals are threatened by the loss of expected federal funds. IL-Haley Decl. ¶¶ 29-35. Plaintiff States often make loans to operators of permanent supporting housing projects, and the Challenged Conditions threaten the repayment of those loans. DE-Heckles Decl. ¶ NY-SHNNY Leone Decl. ¶ 42. For example, Oregon Housing and Community Services (OHCS), the state agency that finances affordable housing, provides millions of dollars in state loans to permanent supportive housing projects across the state based in part on whether projects leverage federal CoC funding for permanent supportive housing rental assistance and services. OR-Jolin Decl. ¶¶ 20-21. If the challenged conditions cause those funds to dry up, States' investments in outreach, shelter, rehousing, and homelessness prevention will be harmed and its loans less likely to be repaid. OR-Jolin Decl. ¶ 23; IL-Haley Decl. ¶¶ 29-35. As another example, California Department of Housing and Community Development (HCD) administers grants to permanent supportive housing projects, some of which rely on CoC funding for continued operations. CA-Olmstead Decl. ¶ 22. The challenged conditions undermine the continued viability of the projects in which HCD has invested. *Id.*

Providers that developed permanent supportive housing capacity based on prior federal guidance, through multi-year leasing arrangements, case-management teams, and supportive-services partnerships, would face expensive operational adjustments and, in some areas, the contraction or closure of housing programs. CT-Navarretta Decl. ¶¶ 11-14; DE-Heckles Decl. ¶ 27 ("DHSA is certain that at least 300 units of permanent housing serving our most vulnerable population will be eliminated if the NOFO proceeds as directed."); KY-Kaye Smith Decl. ¶¶ 28-30, 50-54; MA-Byron Decl. ¶¶ 49-52, 55. These organizations will face unfunded rental obligations, service contracts, and personnel costs. CO-Jaeckel Decl. ¶¶ 24-26; MD-Meister Decl. ¶ 9 ("Receiving an award or payment from HUD even one week late means that program staff may not be paid for work completed, rents may not be paid to landlords and program participants will face eviction, or that a nonprofit may have to pay interest on a line of credit if they have to borrow funds to meet these obligations."); MI- Kaiser Van Dam Decl. ¶ 8; NJ-Winter Decl. ¶¶ 22-24; *see, e.g.,* NJ-NJHMFA Brewster Decl. ¶ 12.

Historically, HUD has given CoCs at least one year of notice of shifting priorities that allow time to adopt and implement. *See* WA-Mondau Decl. ¶ 12. By radically altering the CoC NOFO and giving State agencies a mere two months to submit their Collaborative Applications, HUD has plunged the States and their local partners into chaos. DC-Miné Decl. ¶¶ 25-27; DE-Heckles Decl. ¶¶ 19-21, 28-33; ME-Payne Decl. ¶¶ 20, 27; MI- Kaiser Van Dam Decl. ¶¶ 12-15, 30; OR-Jolin Decl. ¶ 33.

At present, Collaborative Applicants, including State agencies, are devoting untold staffing hours and costs to effectuate the changes needed to comply with the terms of the NOFO. MD-Meister Decl. ¶¶ 12-17; MI-MCAH Rennie Decl. ¶¶ 5-15; PA-Vilello Decl. ¶¶ 12-30; *see, e.g.,* DE-HAD Stucker ¶¶ 14-18; RI-Ventura Decl. ¶¶ 10-13, 16-17. If they can't do it, these programs risk the interruption or loss of federal funding, with potentially catastrophic results for the States, service providers, and vulnerable residents. DC-Miné Decl. ¶¶ 19-23, 27; MA-Byron Decl. ¶¶ 23, 56-62; MD-Meister Decl. ¶ 10 ("For example, 31 projects totaling $20,803,765 in CoC awards across Maryland have grants that will expire between January 1, 2026 and

June 30, 2026."); ME-Squirrell Decl. ¶¶ 21-24; MN-Leimaile Ho Decl. ¶ 21 ("[T]hese conditions . . . will require more time, money and effort to comply, and is not feasible to do by January 14."); *see also,* NY-DSS Johns Decl. ¶ 23 ("A 30% cap on permanent housing constitutes . . . a proportional loss of more than $106,000.000."). State agencies that are not Collaborative Applicants are also scrambling to respond to the changes in the NOFO. CA-Olmstead Decl. ¶¶ 19-20. California's HCD has already been forced to redirect staff time away from core priorities to address questions regarding the NOFO's impact and will continue to divert resources to modify training and outreach materials, and conduct workshops and calls on the topic. *Id.*

The Challenged Conditions will harm Plaintiff States across the board by leading to statewide increases in homelessness, shifting enormous costs to other state public services. DE-Heckles Decl. ¶¶ 36-38; MA-Byron Decl. ¶¶ 5, 10, 56-62; ME-Payne Decl. ¶¶ 22, 29; MD-Meister Decl. ¶ 18; NJ-Winter Decl. ¶¶ 31-34; NY-DSS Johns Decl. ¶¶ 23-27; NY-Umholtz Decl. ¶¶ 19-21; WI-Staff Decl. ¶¶ 12-16; CA-Olmstead Decl. ¶ 29; CA-CICH Marshall Decl. ¶¶ 16-19; *see, e.g.*, *Martin Luther King, Jr. Cnty.*, 2025 WL 2322763, at *16 (finding that plaintiffs demonstrated irreparable harm from loss of CoC funding due to unlawful funding conditions, such as "destabilization of immediate and future budgets, reductions in workforce, [and] hundreds of shelter-unstable families losing access to housing[]"). As just one example, Kentucky is at a high risk of losing 70 percent of its current $15 million in funding for permanent housing in a matter of months due to the Challenged NOFO. Putting Kentucky's permanent housing projects that are already funded under the FY 2024 award will put nearly 700 households at risk of returning to homelessness, including families with children, seniors, and people with disabilities. Approximately 1,200 people would lose their current housing during the next year. KY-Smith Decl. ¶ 29.

This escalation places new burdens on emergency medical systems, state-funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs serving unhoused families. IL-Haley Decl. ¶ 28; KY-Kaye Smith Decl. ¶¶ 33-47; NJ-Winter Decl. ¶¶ 24, 32-34; NY-SHNNY Leone Decl. ¶ 33; OR-Jolin Decl. ¶¶ 15-16; PA-Meyer Decl. ¶ 9-13;

RI-Ventura Decl. ¶¶ 18-19; WI-Staff Decl. ¶¶ 11-13, 15. Individuals with complex behavioral-health needs who previously stabilized in permanent supportive housing will experience increased housing instability and higher rates of crisis service use. MA-Byron Decl. ¶¶ 59, 62; NJ-Winter Decl. ¶ 21 ("approximately 3,300 New Jerseyans—including medically fragile individuals, people with disabilities, survivors of domestic violence, children, seniors and veterans—will be displaced within one year"); NY-Umholtz Decl. ¶ 22(e); PA-Meyer Decl. ¶ 15 ("Nearly 48% of Medicaid-enrolled adults experiencing homelessness have a diagnosed serious mental illness"); *see, e.g.,* MI-MCAH Rennie Decl. ¶¶ 5-15; NY-Warren ¶ 9.

Creating and prolonging homelessness among families with school-aged children has additional consequences for State-funded public education. CO-Jaeckel Decl. ¶ 23; *see also,* NY-HPD Warren Decl. ¶¶ 3, 8-9, 20-23 (discussing impact on families and children). Children who experience homelessness are more likely to struggle in school and to require additional supportive services, many of which are paid for in part with State funds, which will further increase the harm to the Plaintiff States. *See, e.g.,* PA-Meyer Decl. ¶¶ 20-23 (discussing impact of CoC changes to child welfare services).

Many of the harms flowing from the Challenged Conditions are particularly acute for the more rural BoS CoCs given that their resources are spread across a large, mostly rural geographic area with limited infrastructure and institutional support relative to other CoCs. WA-Mondau Decl. ¶¶ 6, 23-28, 33. Many BoS providers operate permanent supportive housing programs with long-term lease commitments and service staffing models that depend on stable annual HUD renewals. CO-Jaeckel Decl. ¶17; DE-Heckles Decl. ¶¶ 29, 34 -35; MA-Byron Decl. ¶¶ 18-20, 56-57; OR-Jolin Decl. ¶¶ 14-19. These organizations will face unfunded rental obligations, service contracts, and personnel costs. Because providers in the BoS serve rural counties with limited local revenue or philanthropic support, they have little capacity to replace lost federal dollars. *See* WA-Mondau Decl. ¶ 25 ("Many of the BoS CoC's rural counties rely almost entirely on PSH and RRH as their primary homeless-response interventions; capping these models at 30 percent would

destabilize, eviscerate, or outright eliminate a majority of programs that have consistently demonstrates the best outcomes").

Even if funds are ultimately made available, the Challenged Conditions will significantly impede the ability of States and their service providers to engage and serve people experiencing homelessness. CT-Navarretta Decl. ¶¶ 1-20; DC-Miné Decl. ¶ 7-8; MA-Byron Decl. ¶¶ 58-62; *see, e.g.,* MI-MCAH Rennie Decl. ¶ 14 ("even for the CoCs that are the most agile and capable of such an overhaul . . . the best score that any Michigan CoC could achieve is 75/130-historically too low a score to be funded."); MN-Leimaile Ho Decl. ¶ 16 ("Minnesota CoCs are unlikely to score competitively based on criteria under this NOFO."); VT-Sojourner Decl. ¶ 11 ("The loss of these programs will put hundreds, if not thousands, of people at risk of returning to the streets and without the support they need to exit homelessness.") These conditions require CoCs and providers to overhaul intake processes, retrain staff, and redesign coordinated-entry workflows on an extremely short timelines, disrupting the delicate outreach relationships needed to reach individuals who are already distrustful of service systems. CO-Jaeckel Decl. ¶ 24 ("the sudden termination of project funding will force the State and providers to undertake expensive and rapid operational adjustments, including significant staff layoffs"); DC-Miné Decl. ¶¶ 30-32; NY-SHNNY Leone Decl. ¶¶ 28-32; WA-Mondau Decl. ¶ 27 ("It is not clear that it is even possible to provide services in the manner laid out in this NOFO.")

Imposing new requirements that conflict with existing state and local laws creates significant compliance challenges for providers. DC-Miné Decl. ¶ 28 ("Excluding substance use disorder from the rest of HUD-recognized disabilities runs counter to decades of federal law, HUD regulations, and District law."); IL-Haley Decl. ¶¶ 36-39; MA-Byron Decl. ¶¶ 52-53; MI- Kaiser Van Dam Decl. ¶¶ 23-31; NJ-Winter Decl. ¶¶ 25-30; OR-Jolin Decl. ¶¶ 25-30; *see, e.g.,* DE-HAD Stucker Decl. ¶ 17; NY-DSS Johns Decl. ¶ 33 ("A CoC is not a legislative body with the power to enact or amend state or local laws"); NY-SHNNY Leone Decl. ¶¶ 39-40; NY-Umholtz Decl. ¶ 25. And requiring individuals to meet sobriety or treatment benchmarks before accessing housing or basic services cuts off access for the very populations most at risk of unsheltered homelessness,

making outreach workers' jobs substantially harder and reducing the likelihood that people will accept assistance at all. DC-Miné Decl. ¶¶ 28-29; MI- Kaiser Van Dam Decl. ¶¶ 10, 16-20, 27-28.

Collectively, these new conditions threaten to destabilize the service network that the Continuum of Care model created and depends on, directly undermining providers' ability to identify, engage, and safely house the people with the greatest needs. DC-Miné Decl. ¶ 32; DE-Heckles Decl. ¶ 17 ("The NOFO requires our COC to . . . decide—based on new arbitrary and capricious rules—that some Delawareans' housing-and, indeed, their lives-mater more than others."); MA-Byron Decl. ¶ 58 ("Beyond the re-traumatization and destabilization the NOFO's knock-on effects will have on impacted individuals and families, people may end up on the streets, as nighttime temperatures . . . fall below freezing on most nights. Others—like survivors of domestic violence-may face the impossible choice of returning to an abuser or enduring unsheltered homelessness."); *see, e.g.*, MI-MCAH Rennie Decl. ¶ 15 ("Through over thirty-five years of operation and expertise, MCAH has never encountered a threat as devastating and extreme to persons in poverty. Not only will this application fracture the homeless service delivery infrastructure, which has taken decades to build, but lives will be lost.").

This type of harm "is irreparable and cannot be compensated by monetary damages." *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 877 (N.D. Ill. 2018), *aff'd and remanded sub nom. City of Chicago v. Barr*, 957 F.3d 772 (7th Cir. 2020), *opinion amended and superseded*, 961 F.3d 882 (7th Cir. 2020), and *aff'd and remanded sub nom. City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020).

## D.    The Equities and Public Interest Weigh Strongly in the States' Favor

The equities and the public interest strongly tip in the Plaintiff States' favor. The final two *Winter* factors merge when the government is a party. *Nken*, 556 U.S. at 435. "When weighing these factors, the Court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief paying particular regard for the public consequences that would result from granting the emergency relief sought." *Rhode Island*, 2025 WL 1303868, at *17 (quoting *Winter*, 555 U.S. at 24) (cleaned up).

While this litigation is pending, the Plaintiff States seek to preserve the longstanding status quo that existed before HUD abruptly imposed the Challenged Conditions. These Conditions fundamentally alter the requirements for federally funded programs on which Plaintiffs have long relied to serve their most vulnerable communities. HUD implemented these conditions without congressional authorization and in direct conflict with Congress's stated objective "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families[.]" 42 U.S.C. § 11381.

The balance of equities supports a preliminary injunction, and the Court should preserve the status quo (i.e., the original, lawful FY 2024–2025 NOFO) until the case can be decided on the merits.

**E.    The Court Should Enter a Preliminary Injunction on a Plaintiff-States-Wide Basis**

For the foregoing reasons, this Court should preliminarily enjoin the FY 2025 NOFO in its entirety, with the result that the FY 2024–2025 NOFO will be reinstated and govern the current CoC competition. In the alternative, the Court could enjoin the Challenged Conditions and order Defendants to process CoC application renewals from within the Plaintiff States as required by 42 U.S.C. § 11386c and 24 CFR 578.33. Either way, the Court should order full and complete relief for all of the Plaintiff States.

As the Supreme Court recently re-affirmed in *Trump v. CASA*, our Nation's "equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928) (emphasis in *CASA*). And because complete means *complete*, courts may order relief that, as a practical matter, "advantag[es] nonparties," since "they do so only incidentally." *Id.* (citing *Trump v. Hawaii*, 585 U.S. 667, 717 (2018) (Thomas, J., concurring)). Thus, while complete relief "is the maximum a court can provide[,]" the Court confirmed that "[t]he essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." *Id*. at 2558 (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944)).

Here, the local and statewide program infrastructure is interconnected, and the harms are state-wide, such that only a states-wide injunction will afford Plaintiff States complete relief. As detailed above, statewide homelessness planning and policy relies on a predictable and stable flow of CoC funding into the Plaintiff States. *Supra* at 38. This is true regardless of whether the ultimate grantee is a State entity or not. Indeed, Plaintiff States invest State funds into CoC-funded housing projects across their States, and the disruption of this funding anywhere within the state threatens those investments, no matter who the grantee is. *Supra* at 39. Moreover, slashing permanent housing and terminating projects anywhere in a Plaintiff State is going to shift significant costs to the State itself. Formerly homeless families and individuals who are suddenly cast back to the street will inevitably need more crisis services. This includes various services paid for by the States, such as behavioral health providers, long-term care facilities, child-welfare programs, and carceral facilities. *Supra* at 41. If the Challenged Conditions lead to increased homelessness anywhere within a state, that will cost the state. Accordingly, complete relief here requires a Plaintiff States-wide injunction.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff States respectfully request that this Court enter an order preliminarily enjoining the FY 2025 NOFO and reinstating the prior FY 2024–2025 NOFO or, alternatively, preliminarily enjoining the Challenged Conditions within the Plaintiff States, including as to their instrumentalities and subdivisions, and directing Defendants to process CoC application renewals consistent with 42 U.S.C. § 11386c and 24 CFR 578.33. Plaintiff States seek expedited relief and respectfully request a hearing no later than December 8, 2025.

DATED this 25th day of November 2025.

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ZANE MULLER*
ALIANA KNOEPFLER*
ANDREA ALEGRETT*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Zane.Muller@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Andrea.Alegrett@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON
Special Counsel
VICTORIA OCHOA
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov

*Counsel for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, Arizona 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
ALYSSA ZHANG*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Alyssa.Zhang@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for Plaintiff State of California*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov

*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov

*Attorneys for Plaintiff District of Columbia*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*

**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

/s/ S. Travis Mayo
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov
Laurac.Tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor
ex rel. Andy Beshear, in His Official Capacity as
Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General of Maine

/s/ Katherine W. Thompson
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ James C. Luh
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
Jluh@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ Michelle Pascucci
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
State Trial Counsel
ESME CARAMELLO
Director, Housing Affordability Unit
AARON DULLES*
LAUREN YAMAGUCHI*
Assistant Attorneys General
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

/s/ Brian S. Carter
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
651-300-7403
Brian.carter@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

_/s/  Daniel Resler_
DANIEL RESLER*
Deputy Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@law.njoag.gov

_Attorney for Plaintiff State of New Jersey_


**JENNIFER C. SELBER**
General Counsel

_/s/ Jacob B. Boyer_
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
Jacobboyer@pa.gov
717-460-6786

_Attorney for Plaintiff Governor Josh Shapiro, in His Official Capacity as Governor of the Commonwealth of Pennsylvania_


**JOSHUA L. KAUL**
Attorney General of Wisconsin

_/s/ Faye B. Hipsman_
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

_Counsel for Plaintiff State of Wisconsin_


**DAN RAYFIELD**
Attorney General of Oregon

_/s/ Scott P. Kennedy_
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov

_Attorneys for Plaintiff State of Oregon_


**CHARITY R. CLARK**
Attorney General of Vermont

_/s/ Jonathan T. Rose_
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov

_Attorney for Plaintiff State of Vermont_