UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>                     Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>                     Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM<br><br>DECLARATION OF NICHOLAS MONDAU |

## DECLARATION OF NICHOLAS MONDAU

I, Nicholas Mondau, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am over the age of 18 and competent to testify.

2. I am the Federal Programs Manager in the Homelessness Assistance Unit at the Washington State Department of Commerce ("Commerce").

3. I have managed state and federal programs at Commerce, including the Continuum of Care Program, since 2006.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Commerce staff, or from my review of relevant documents and information.

**Commerce's Role in the Continuum of Care Program**

5. The Continuum of Care Program is a formula-based and competitive grant program operated by the U.S. Department of Housing and Urban Development ("HUD"). Commerce serves as the Collaborative Applicant for the Washington Balance of State Continuum of Care ("BoS CoC"), which covers a geographic region including 34 small and medium-sized counties in Washington. The BoS CoC is a broad membership body of organizations—governmental, non-profit, faith-based, tribal, and formerly-homeless people—that work together to prevent and end homelessness. Commerce is the "Collaborative Applicant" under 24 C.F.R. § 578.15(b), that is, the entity designated to apply for CoC Program funds on behalf of the entire Continuum of Project Applicants and to submit the consolidated application that includes all new and renewal project applications.

6. As the Collaborative Applicant, Commerce is responsible for administering the local CoC competition by establishing and implementing local ranking, review, and selection procedures; coordinating system-level planning across the 34 Balance of State counties; submitting the consolidated application to HUD; ensuring compliance with HUD requirements; and carrying out the governance and administrative functions required under 24 C.F.R. part 578. Through this role, Commerce provides the administrative and organizational capacity that enables the BoS CoC's diverse rural and small-county partners to participate effectively in the CoC Program.

7. As part of its responsibilities under 24 C.F.R. § 578.7(b), Commerce oversees several core data-collection activities, including ensuring accurate operation of the Homeless Management Information System (HMIS), coordinating the annual Point-in-Time (PIT) count, and maintaining required system-wide performance measures. These data responsibilities are essential to the functioning of the BoS CoC: HMIS provides the only comprehensive source of client-level information across the 34 participating counties, PIT count data informs systemwide planning and resource allocation, and performance metrics affect the BoS CoC's competitiveness in HUD's annual funding process.

8. I supervise a team that throughout the year carries out all Collaborative Applicant Responsibilities for the BoS CoC. The team consists of a data manager, responsible for all data collection, analysis, performance measurement and reporting for individual projects and CoC-wide system performance; a program manager, responsible for providing training, technical assistance and monitoring for all projects; and an operations manager, responsible for running CoC meetings and membership, updating the CoC policies and procedures, completing the annual application and monitoring progress toward CoC goals.

9. Project Applicants rely on CoC funds to provide permanent supportive housing, rapid re-housing, transitional housing, joint TH/RRH, supportive services only, coordinated entry, and data collection. These projects serve individuals and families experiencing chronic homelessness who need long-term supportive housing; survivors of domestic violence seeking safe, confidential housing options; youth and young adults exiting crisis situations; people leaving institutions such as hospitals, treatment facilities, or the foster care system; and households experiencing short-term economic crises who can stabilize with rapid rehousing assistance. Many projects focus specifically on vulnerable populations, including people with disabling conditions, veterans, and seniors.

10. For Fiscal Year ("FY") 2024, Washington's BoS CoC received approximately $17.6 million, the maximum award it was eligible to receive. For FY 2025, the BoS CoC received approximately $22 million. Of that amount, approximately $900,000 consists of a planning grant that funds Commerce's work as the Collaborative Applicant.

**The Structure of the CoC Program and Grant Cycle**

11. The CoC Program is structured to promote continuity of housing and services for people experiencing homelessness. The program's authorizing statute identifies as a core purpose the provision of "long-term homeless assistance solutions," 42 U.S.C. § 11381, and 24 C.F.R. § 578.33 establishes a dedicated renewal process for expiring grants specifically so that existing projects may continue operating without interruption. HUD has in the past allowed CoC's the option to guarantee funding for most of their renewal demand before allocating funds to new or bonus projects in each year's competition, ensuring that individuals and families already receiving assistance do not lose housing or services due solely to the annual grant cycle.

4

12. Historically, HUD has typically opened CoC Registration in the spring, usually in April or May, and issues the Grant Inventory Worksheet shortly thereafter to confirm the list of renewal projects for the upcoming competition. HUD then releases the annual Notice of Funding Opportunity (NOFO) in the summer, most often in July or August, which begins the competitive portion of the cycle. Once the NOFO is published, each CoC must complete its local competition and assemble its Consolidated Application before HUD's submission deadline, which typically falls in late September or October. After HUD reviews and scores submissions, it announces conditional awards in the winter, usually December through February, and executes grant agreements ahead of each project's next operating year.

13. Once HUD releases the NOFO, Commerce initiates the local Balance of State CoC application process. Commerce publishes the local competition calendar, application materials, scoring tools, and guidance, and provides technical assistance to eligible organizations. Project applicants—such as nonprofit providers, victim-service organizations, and housing authorities—prepare and submit their new or renewal applications to Commerce, including budgets, match commitments, performance data, and documentation demonstrating compliance with HUD's requirements.

14. Commerce then reviews all project applications using the objective rating and ranking process required under 24 C.F.R. § 578.7(a)(6). This includes verifying eligibility, evaluating performance, confirming match, scoring projects against locally adopted criteria, and placing them into HUD's required Tier 1 and Tier 2 structure. For more than a decade, HUD's CoC Program NOFOs have used the same two-tier structure to allocate funding, with Tier 1 covering the vast majority—typically 85 to 94 percent—of a CoC's Annual Renewal Demand and receiving priority for funding, and Tier 2 containing the remaining renewal and new projects that

must compete nationally. The BoS CoC has typically received funding for all eligible projects placed in Tier 1, and most projects placed in Tier 2.

15.  Commerce works closely with applicants during this period to identify and correct errors, provide technical assistance, and ensure that applications are complete and competitive.

16.  As the Collaborative Applicant, Commerce is responsible for preparing and submitting the entire Consolidated Application to HUD by the NOFO deadline. This includes the CoC Application (which contains system-level data, governance information, HMIS performance, and coordinated entry compliance), the Priority Listing, and all individual project applications. Commerce also produces the systemwide data and documentation needed for the application and provides technical assistance that most rural and small-county providers rely on.

17.  HUD's annual CoC Program NOFO typically changes very little from year to year, with only minor adjustments in scoring priorities or emphasis areas. Nonetheless, the amount of work required of project applicants and the Collaborative Applicant remains substantial each cycle. Every NOFO initiates a full competitive process in which applicants must prepare detailed project submissions, update budgets and match commitments, and document compliance with HUD's evolving technical requirements. Commerce provides assistance to these applicants, evaluates and ranks all applications, verifies eligibility and performance, and prepares the entire Consolidated Application on behalf of the CoC. Even with minimal year-to-year changes, the annual competition demands extensive coordination, data collection, and administrative capacity to ensure that all projects and the CoC as a whole remain eligible and competitive for federal funding.

18.  In 2024, Washington's BoS CoC received a total of $22,631,077 in CoC funds. $1.1 million of that money is used by Commerce to manage the BoS CoC by supporting local partners, managing HMIS, running the application and ranking process, handling compliance, and guiding

6

the region's homelessness-response strategy. The remaining $21.5 million goes directly to providers to spend implementing the projects that HUD approved. Of that money, roughly $20 million went to renewal projects and about $1.5 million (around 7%) funded new projects or expansions of existing projects that providers were already operating. Permanent housing programs made up the large majority of the funding: roughly $18.7 million (about 87%) went to PSH, RRH, and Joint TH-RRH, while the remaining ~$2.9 million (about 13%) supported other activities like transitional housing and supportive services.

**The November 13, 2025 NOFO**

19.     Following the reopening of the federal government, on November 13, 2025 HUD released its 2025 CoC NOFO (the "2025 NOFO"), making available $3.9 billion in awards. This NOFO represents a significant departure from past practices and will cause serious harm to Washington's BoS CoC and the providers and service recipients who rely on this program.

20.     For one, the 2025 NOFO covers FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

21.     The July 2024 NOFO provided instructions and expectations for both FY 2024 and FY 2025, including guidance for the renewal or replacement of Continuum of Care Program projects including Youth Homelessness Demonstration Program (YHDP) projects and other CoC activities in the 2025 cycle. CoCs had been relying on this guidance to continue important operations in 2025 and begin planning and preparing their local competition processes for 2026. By rescinding that guidance and replacing it with a new and materially different NOFO in November 2025, HUD reset the rules and instructed CoCs to disregard the prior instructions.

7

22. Other specific terms in the 2025 NOFO introduce major changes to long-standing CoC rules, including creating new funding caps, new eligibility and scoring requirements, and radically altering the competitive structure. These sudden and significant changes to the CoC program threaten to impose significant disruption, cost, and confusion on the CoC and the people it serves.

23. For example, the 2025 NOFO sets Tier 1 at only 30 percent of the CoC's Annual Renewal Demand (ARD), which is a major departure from past NOFOs where Tier 1 typically covered 85–94 percent of a CoC's renewal portfolio. By shrinking Tier 1 to 30 percent, HUD is placing the vast majority of a CoC's long-standing, previously stable renewal projects into Tier 2, where they must compete nationally and can be defunded based on scoring formulas and policy priorities outside the CoC's control. Dozens of rural and small-county providers rely on Tier 1 protection to maintain continuity of services. With only 30 percent of renewal funding safeguarded, Commerce must now rank and justify nearly its entire portfolio under Tier 2 competition—even projects that have performed well for years—and applicants face a much higher risk of losing essential funding for housing and services.

24. In another dramatic change, HUD is capping the amount of funding a CoC may allocate to permanent housing projects, including Permanent Supportive Housing (PSH), Rapid Re-Housing (RRH), and Joint Transitional Housing/Rapid Re-Housing (TH/RRH), at no more than 30 percent of the CoC's Annual Renewal Demand (ARD). This is an extreme and potentially catastrophic requirement for Washington's BoS CoC. The overwhelming majority of the CoC's existing portfolio consists of these permanent housing models, which HUD itself has long promoted as core Housing First interventions and which research has repeatedly shown to be the most effective strategies for reducing homelessness and improving long-term stability. By

8

imposing a 30 percent cap, HUD is effectively forcing CoCs to abandon or dramatically shrink the very types of projects that have historically achieved the strongest outcomes. This would mean turning out formerly homeless people back onto the streets in huge numbers. By our estimates, reducing our permanent housing to 30 percent would eliminate approximately 550 beds in the BoS CoC counties.

25. To meet this condition, Commerce would have to completely overhaul its ranking and selection process, push providers toward project types that are less aligned with evidence-based Housing First principles, and redirect millions of dollars away from proven permanent housing programs simply to comply with this new federal limit. Many of the BoS CoC's rural counties rely almost entirely on PSH and RRH as their primary homeless-response interventions; capping these models at 30 percent would destabilize, eviscerate, or outright eliminate a majority of the programs that have consistently demonstrated the best outcomes for people experiencing homelessness across Washington's rural regions.

26. The 2025 NOFO also includes new scoring criteria that award additional points to applicants who require participants to enroll in services (such as substance abuse treatment) in order to receive housing. However, as recently as last year in the FY 2024 NOFO, HUD awarded additional points to applicants when they did not require services as a condition for stable housing.

27. It is not clear that it is even possible to provide services in the manner laid out in this NOFO. The NOFO directs applicants to adopt a mandatory 40 hours per week service requirement. But providers have limited capacity as is, and this 40-hour requirement introduces a significant burden on service providers with already strained budgets and limited resources and case management staff, especially in rural communities.

28. Together, these changes undermine the program's traditional emphasis on stability, continuity, and the Housing First policy consensus, and force Commerce to undertake a far more costly, complex and potentially contentious ranking process with dramatically higher stakes for rural communities.

29. The 2025 NOFO also contains unprecedented conditions on sex and gender, stating that CoC-funded activities may not currently or have previously "use[d] a definition of sex other than binary," which is a sharp departure from HUD's long-standing approach. For more than a decade, HUD guidance and technical assistance materials explicitly required CoC-funded programs to serve transgender, non-binary, and gender-nonconforming individuals consistent with their gender identity. The new FY 2025 language reverses this prior policy direction by conditioning eligibility on adherence to a binary definition of sex, which conflicts with program practices that CoCs and providers have relied on for years.

30. Many Washington BoS CoC providers serve transgender and non-binary clients, use inclusive gender-identity practices, and have built their programs around HUD's previous Equal Access guidance. Under the new NOFO, these providers may now face disqualification or be forced to alter documentation, intake procedures, facility policies, and service delivery models on very short notice. Transgender and non-binary people are a significant percentage of the population that has experienced homelessness, and this condition will increase the stigma that they encounter in many areas.

31. The 2025 NOFO also introduces several new "public safety" provisions that award points based on state and local policies unrelated to homeless-service performance, including whether a jurisdiction prohibits public drug use or public camping, bans or discourages safe-consumption sites, authorizes involuntary commitment, and implements specific sex-offender

registration and mapping requirements. These conditions are unprecedented in the CoC Program and tie the competitive scoring to state or local criminalization measures and to policies that CoCs and service providers cannot control.

32. For BoS CoCs, including Washington's, these new conditions are especially problematic. The 34 counties that make up the BoS CoC have widely varying public health and/or criminal enforcement policies that reflect local issues and priorities. Because Commerce has no authority to direct counties to ban public camping, prohibit public drug use, or impose additional sex-offender mapping rules, the BoS CoC cannot meaningfully influence these new scoring factors. This places the entire CoC at a structural disadvantage in the national competition, regardless of provider performance or need. It also forces on Commerce the burden to explain and administer federal scoring criteria that may conflict with Washington State law, local public-health strategies, or longstanding best practices in homelessness and behavioral-health services.

33. Even setting aside the substance of these new conditions, the sheer scope of the changes makes it impossible for the BoS CoC and its providers to revamp their entire program structure by HUD's January 14 submission deadline. The 2025 NOFO introduces sweeping new scoring factors, eligibility rules, and portfolio-level funding caps that would require rewriting local competition materials, retraining dozens of small rural providers, redesigning project models, and reworking data, policies, and governance documents — all on only a few weeks' notice. Commerce simply cannot overhaul a system of this size and complexity in that timeframe, and forcing such rapid changes greatly increases the risk of errors, incomplete applications, and the loss of critical housing and services across the 34-county Balance of State region.

34. Current CoC Program recipients are working with limited budgets and don't have necessary resources to fill gaps created with the loss of permanent housing. In addition, local and

state funding is already dedicated to existing projects, making an option to move county funding to fill this gap without leaving current program participants back outside unavailable. New mandatory service requirements would add additional burden to already strained case management budgets and would tie up local resources that could otherwise be strategically used for the most vulnerable and those facing the most barriers to housing. Recipients are additionally challenged by the extremely short time they have to make a decision about reallocating their current permanent housing project, due to the application deadline requirements in the NOFO.

35. In sum, the new NOFO will have a devastating impact on Washington's BoS CoC. The people we serve include individuals and families experiencing chronic and episodic homelessness, including many with serious mental health issues, substance use disorders, histories of trauma or domestic violence, and other compounding vulnerabilities. Terminating or substantially reducing programs would impose severe consequences for those vulnerable participants, many of whom rely on the continuity of housing stability, wrap-around services, and case-management supports that the funded projects provide.

36. Because many of the CoC-funded projects are part of coordinated service systems, disruption or termination of these grants will shift burdens onto the State's other health, behavioral-health, public-safety, and homelessness-response systems. For example, if a permanent supportive housing project ceases operations due to loss of HUD funding, formerly homeless individuals may re-enter emergency shelter, hospitals, jails, or behavioral health crisis systems—thereby increasing costs and strain on those systems that the State already supports through its own funding and contracted services.

37.     The State has articulated a clear framework for responding to homelessness: under the 2024-29 State Homeless Housing Strategic Plan,[1] the Department of Commerce adopted objectives such as "prevent episodes of homelessness whenever possible," "prioritize those with the most significant barriers to housing stability and the greatest risk of harm," and "seek to house everyone in a stable setting that meets their needs."  The 2025 NOFO's radical new terms undermine the State's goal of housing stability and threatens the implementation of that strategy across the State.

38.     Attached hereto as Exhibit 1 is a true and correct copy of an email I received from HUD on July 3, 2025.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of November 2025.

/s/ **Nicholas Mondau**
Nicholas Mondau
Federal Programs Manager
Homelessness Assistance Unit
Washington State Department of Commerce

---

[1] Commerce Reports_Housing Division_2024-29 State Homeless Housing Strategic Plan_Final.pdf | Powered by Box.

# Exhibit 1

| | |
|---|---|
| **From:** | SNAPS-COMPETITIONS |
| **To:** | SNAPS-COMPETITIONS-L@HUDLIS.HUD.GOV |
| **Subject:** | Important FY2025 CoC Competition Updates Thursday, |
| **Date:** | July 3, 2025 10:19:30 AM Outlook-ii01z5b3.png |
| **Attachments:** | |

---

> **External Email**

Dear Continuums of Care,

Thank you for your work to serve the most vulnerable Americans without housing. You, more than anyone, know that the nation's homelessness crisis is at a historic high, and that our communities shoulder the tragic impacts of this crisis every day. With 770,000 people experiencing homelessness — 275,000 people unsheltered on our streets — HUD is dedicated to supporting local solutions that reduce unsheltered homelessness and increase long term stability and self-sufficiency. The status quo is unacceptable for every American, with or without a home.

In response, HUD intends to publish a NOFO for 2025 Continuum of Care (CoC) awards. HUD invites CoCs to prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants.

The NOFO will seek to provide opportunities for new types of projects including street outreach and transitional housing programs. HUD encourages CoCs to evaluate the effectiveness of their projects at contributing to the community-wide goals above and to ensure that the most effective partners, including faith-based organizations, are involved.

We recognize this is a new application process for 2025 funding and are committed to providing CoCs the resources needed to serve their communities.

Alongside you, Secretary Turner and all of HUD recognize the inherent dignity of every man, woman, and child without a home. It is HUD's mission to steward resources so that no person is left to languish on our streets or to suffer in the grip of addiction. Thank you for your partnership to that end.

################################################################################
We hope that you will want to continue receiving information from HUD.
We safeguard our lists and do not rent, sell, or permit the use of our lists by others, at any time, for any reason.
If you wish to be added or removed from this mail list, please go here and follow the instructions to either subscribe or unsubscribe.