## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No.1:25-cv-00626-MSM-AEM <br><br><br> DECLARATION OF RICHARD UMHOLTZ |

## DECLARATION OF RICHARD UMHOLTZ

I, Richard Umholtz, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a Deputy Commissioner at the Office of Temporary and Disability Assistance (OTDA) for the State of New York.

2. I am the Deputy Commissioner of Housing and Refugee Services, which administers housing-related programs targeted to individuals and families experiencing homelessness as well as programs for refugees, repatriated American citizens, and survivors of human trafficking. Previously, I was the Director of the Bureau of Housing and Support Services, providing oversight to an array of programs serving homeless, at-risk, and low-income households and oversaw several initiatives designed to assist localities to develop individualized, coordinated approaches toward addressing homelessness.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with OTDA staff, or from my review of relevant documents and information.

4. OTDA is the Collaborative Applicant for the New York State Balance of State Continuum of Care (NYS BoS CoC).

5. I provide oversight over the work of the NYS BoS CoC activities including review and direction of the response to the U.S. Department of Housing and Urban Development (HUD), Notice of Funding Opportunity (NOFO).

6. A Continuum of Care (CoC) is a communitywide planning approach to promote the goal of ending homelessness. The CoC provides the basis for communities to plan for and provide housing resources to address the needs of homeless families and individuals in the community.

The CoC is tasked with planning and submitting an application for CoC program funding through HUD's annual Program Competition. A Balance of State CoC typically covers a large geographic area, sometimes rural and non-contiguous jurisdictions. The NYS BoS CoC was established in October 2018 and currently covers nine counties.

7. The NYS BoS CoC covers Cattaraugus, Clinton, Fulton, Herkimer, Montgomery, Otsego, Putnam, Schoharie and Sullivan Counties. Members are representatives from all sectors directly or indirectly involved with addressing homelessness, including non-profit homelessness providers, victim service providers, faith-based organizations, local and state governments, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, county public health departments, healthcare partners, people with lived experience of homelessness, colleges, local elected officials, affordable housing developers, and law enforcement. Until the formation of the NYS BoS CoC, New York was one of few states without full CoC coverage.

8. The NYS BoS CoC was formed in 2018 to provide coverage for five counties that had no CoC, therefore excluding any program in those counties from independently accessing federal funding to address homelessness. Four additional counties since then have elected to merge with the NYS BoS CoC. The NYS BoS CoC has grown from operating with no funding to receiving over $3 million in annual awards. Apart from the newest county for which the NYS BoS CoC has not had the opportunity to apply, each county has at least one Permanent Supported Housing, Rapid-Rehousing or Domestic Violence – Rapid Rehousing (DV-RRH) project.

9. OTDA, as the Collaborative Applicant, is responsible for preparing the consolidated application. The consolidated application requests information ranging from CoC membership representation, adherence to federal priorities, coordination with healthcare partners

and provision of services. Each non-profit seeking funding through the CoC is required to attach a project application to the consolidated application. The project applications are reviewed and ranked in accordance with CoC policy. The ranking and reviewing are referred to as the "local competition." The project applications describe the population to be served, how services will be provided and a programmatic budget. Most project applications include funding for tenant based rental assistance and supportive services staff.

10. As the Collaborative Applicant for the NYS BoS CoC, OTDA performs a variety of necessary functions such as oversight of Homeless Management Information System (HMIS) administration, conducting program monitoring, engagement and education of stakeholders, and submission of HUD funding applications. OTDA provides staff to support the various committees and work groups that constitute the NYS BoS CoC. OTDA is also the state agency responsible for administering federal Emergency Solutions Grant (ESG) funds and state homeless program funds. In this role, OTDA works to align state and federal program requirements and ensure coordinated community planning across funding streams. OTDA's specific responsibilities include the following: staffing the Steering Committee; producing planning materials; collecting and reporting on performance data; monitoring program performance; coordinating resources, integrating activities, and facilitating collaboration; preparing the Consolidated Application for CoC funds; recruiting stakeholders; and coordinating HMIS activities.

11. OTDA is also responsible for the timely and accurate submission to HUD of the annual Consolidated CoC Program Application. OTDA provides CoC staff support for all tasks associated with completion of the annual CoC Consolidated Application. OTDA facilitates HMIS activities for HUD compliance in coordination with the HMIS administrator to ensure all HMIS activities are carried out in accordance with the Homeless Emergency Assistance and Rapid

Transition to Housing (HEARTH) Act. All agencies within the NYS BoS CoC must comply with HMIS requirements for CoC funding, state homeless service funding, and any additional requirements outlined in HMIS policies and procedures. OTDA ensures that the HMIS administrator maintains written HMIS Agency Agreements with each organization that participates in and contributes data to the HMIS and a user agreement with each authorized user of HMIS. User fees related to HMIS are supported with funds from OTDA. OTDA also reviews HMIS policies and procedures including functionality, data quality, privacy, and security standards, and OTDA makes updates as needed.

12. OTDA staff work with non-profits to ensure understanding of funding available through the NOFO, assist with strategic planning and write the consolidated application. OTDA ensures that all project applications are submitted and provides technical assistance to the non-profits. Typically, this work occurs over several months. OTDA is also responsible for managing the Point-In-Time (PIT) Count, the federally required and prescribed count of people who are experiencing homelessness in January, as well as the Homeless Inventory Count (HIC), the count of any bed available in the CoC for people experiencing homelessness. OTDA also works closely with the HMIS Administrator to submit the HUD required System Performance Measures (SPM) and Longitudinal System Analysis (LSA). The PIT, HIC, SPMs and LSAs are all required as part of annual data collection for HUD that is used as part of the scoring and submission of the NOFO. OTDA also ensures that all grantees submit their Annual Performance Reports (APRs) to HUD as their submission timeliness and quality is also reviewed and scored as part of the rank and review process for the local competition.

13. OTDA has been the Collaborative Applicant for the CoC since the CoC's formation in October 2018.

14. All funding that is competitively awarded to the NYS BoS CoC is administered through direct contracts between HUD and the non-profit. OTDA currently receives $147,370 for planning and administrative activities through a non-competitive grant. Ninety-nine percent of competitively awarded funding in the NYS BoS CoC supports permanent housing (not including the planning grant). According to the National Alliance to End Homelessness, 85% of CoC funding nationwide is used for permanent housing.

15. The NYS BoS CoC resources fund rental assistance for apartments in the community in which the program participant is the leaseholder. Rent is paid directly from the non-profit to the landlord. A consistent NOFO ensures continuity for households in receipt of this rental assistance. Shifting priorities away from permanent housing is destabilizing for tenants and creates volatility around rental assistance that will erode the confidence that local landlords have in the ability of the non-profit to pay the rent consistently at a time when housing is scarce and finding units for households experiencing homelessness is already incredibly difficult. Tenants also have a lease with the landlord and gaps in rental assistance will violate the lease, resulting in loss of stable housing and an increase in homelessness.

16. Because services are connected to housing, a loss of permanent housing programs will equate in a loss of necessary services like mental health and substance use, vital services for long-term stability. Additionally, without stable housing and supportive services, participants are more likely to experience worsening health conditions, substance use disorders, and food insecurity. Loss of housing can also lead to unemployment, as participants may lack a stable place to live or work from. Most notably, participants will be at a higher risk of experiencing violence and other harms that are common for those experiencing homelessness.

17. I understand that the HUD CoC NOFO released on November 13, 2025, represents a significant departure from past practices and will cause serious harm.

18. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

19. There is significant strategic planning, system analysis and policy work that takes place in preparation for the HUD NOFO. CoCs were previously informed that a NOFO would not be issued until 2026 and as such, certain aspects of the planning work necessary to adequately prepare for the NOFO, as well as to prepare communities, tenants, and other stakeholders for the dramatic priority shifts, were not yet undertaken or prioritized.

20. Non-profits were not expecting that they would need to compete for funding until 2026. The sudden change to competing in 2025 will prevent programs from hiring staff and placing households in permanent housing.

21. The cap on permanent supportive housing will also negatively impact other New York State homeless programs which include but are not limited to the New York State Supportive Housing Program (NYSSHP) and Homeless Housing and Assistance Program (HHAP). CoC funding that is used in projects which receive NYSSHP and HHAP funding may be contractually required to provide permanent housing. This change in the NOFO priorities impacts housed individuals, private landlords, non-profit service providers, local businesses and local emergency services if people are evicted because they no longer have rental assistance.

22. On page 15 of the NOFO, HUD states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."

a. During the NOFO process, CoCs must rank projects into two tiers. HUD selects projects for funding based on how they are ranked and whether they are in Tier 1 or 2. Depending on a CoC's overall score, a CoC could lose some or all of its projects ranked in Tier 2. This year, only 30% of existing projects are safe from potential cuts, making the competition significantly harder and jeopardizing housing stability for hundreds of households.

b. In FY2024, Tier 1 was set at 90%. In FY2023, Tier 1 was set at 93%. In FY2022, Tier 1 was set at 95%, and in FY2021, Tier 1 was set at 100%.

c. Tier 1 ranked projects and the service recipients for whom the rent is paid will not have to participate in the competitive funding round. This is especially important for those residing in units paid for by permanent supported housing programs, which are intended to pay for case management and rental assistance for chronically homeless households with a documented disability for as long as needed.

d. Because the requirements for a project ranked in Tier 2 differ so drastically from previous years and the requirements to qualify for funding are not in line with previous federal priorities, it is unlikely that current grantees will be competitive enough to receive an award.

e. Additionally, the new NOFO repeatedly emphasizes physical and developmental disabilities and mobility impairments as the primary disability category for "priority" or "weighted" funding decisions. This fails to account for psychiatric, cognitive, and chronic health disabilities. Funding rules that favor physical disability categories or deprioritize supportive housing for

psychiatric disabilities violates the New York State Human Rights Law (NYSHRL) requirement that all disability types be treated equally. The new requirements in the NOFO would necessitate that applicants in New York disregard NYSHRL's broad definition of disability to be competitive. NYSHRL explicitly prohibits policies that value one type of disability over another. The requirement of a physical disability conflicts with the epidemiology of homelessness in NYS. In NYS, the majority of homeless individuals with disabilities have: serious mental illness; Post Traumatic Stress Disorder (PTSD) or other trauma-related disabilities; Intellectual/developmental disabilities; Chronic substance-use disabilities; or Traumatic Brain Injury (TBI) or cognitive impairments. By prioritizing only "physical disabilities," the NOFO allocates funds away from the populations that need supportive housing the most. Additionally, it may create a disparate impact on psychiatric and cognitive disabilities, which pressures NYS providers to adopt eligibility criteria or prioritization rules that would violate NYS law.

23. Also on page 15 of the NOFO, HUD states that "[i]n order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects."

    a. The NYS BoS CoC devotes almost all—approximately 99%—of its competitive CoC funding to permanent housing. According to the most recently submitted program reports, 370 people were served with permanent housing in the NYS BoS CoC.

9

b. Previous NOFOs prioritized voluntary service participation and required housing first practices. However, the current NOFO imposes service requirements which conflicts with previous priorities.

c. The service requirements state that projects should provide 40 hours of service per program participant per week. Not only will this require significant staffing, but it is not sustainable. Such a requirement is more in line with in-patient treatment versus housing, a service level which housing providers are not permitted to provide without state licensure. Becoming a licensed mental health or substance use provider will take much longer than two months and is outside the scope of a CoC funded supportive housing provider. In addition, the NYS BoS CoC does not have the properties to quickly pivot to a transitional housing model after focusing so long on permanent housing. The NYS Bos CoC only has one site-based project, all of the remaining permanent housing are community apartments with private landlords. Typically, developing such projects relies on gathering funding from many sources to cover the costs of building or rehabbing such properties to be suitable for housing.

d. Studies show that permanent supported housing is the best, least expensive intervention for households experiencing homelessness. Transitional housing has been proven to be expensive and less effective than permanent supported housing and does not solve homelessness as the tenant still needs to find housing at the end of 24 months. HUD's own Family Options Study proved that transitional housing is less effective and more expensive than subsidy-only housing vouchers or tenant based RRH. Site based transitional housing also

requires property acquisition, community planning board approval, and often encounters local opposition. Permanent supported housing, including rapid rehousing, is cost effective and successful at ending a household's homeless episode.

24. On page 55 of the NOFO, HUD states that "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans."

   a. Because priorities drastically differ from previous years and the requirements for qualifying for funding are not in line with previous Federal priorities, current grantees may not be able to qualify to receive an award. The NYS BoS CoC has indicated on previous NOFOs, in response to previous NOFO priorities, that the CoC assists providers in developing project level policies ensuring that LGBTQ+ individuals and families receive supportive services, shelter, and housing free from discrimination.

   b. Transgender, gender nonconforming, and non-binary (TGNCNB) people experience homelessness at much higher rates than the general public because of frequent discrimination and abuse based on their gender identity and presentation, and can also face barriers to receipt of emergency shelter services. Members of the TGNCNB community are over-represented among people who are homeless, and discrimination or the fear of discrimination impacts their ability to access vital services and, more specifically, to obtain safe and stable

11

        housing. Requiring TGNCNB individuals be placed into shelters or other temporary or permanent housing situations based on their genders assigned at birth rather than their self-identified gender identities can put them at risk for degrading treatment and abuse, including harassment and sexual assault. The result of this treatment and the perceived risk is that many TGNCNB individuals elect to remain unsheltered.

    c.    By implementing TGNCNB-inclusive policies to address their needs, New York can reduce the instances in which TGNCNB individuals are homeless.

25.    On pages 86-87 of the NOFO, HUD requires applicants to confirm that jurisdictions comply with various of the current administration's enforcement priorities, all of which are outside the CoC's control.

    a.    Prohibiting public illicit drug use. Prohibiting public illicit drug use is not within the CoCs authority or control. Previous NOFOs solicited information or prioritized the advocacy work done by CoC members against the criminalization of homelessness. This NOFO is prioritizing action in places and procedures that were never intended to carry out such laws.

    b.    Prohibiting public camping or loitering. CoCs have no control over public camping bans or loitering bans. Previous NOFOs solicited information or prioritized the advocacy work around preventing the criminalization of homelessness. The current NOFO is prioritizing actual bans. This will be a disadvantage to CoCs in New York.

12

    c.    Involuntary commitment. The CoCs have no authority or control over laws surrounding involuntary commitment. There are very few mental health beds in the NYS BoS CoC coverage area.

    d.    Implementing SORNA registration and notification and mapping location of homeless sex offenders. NYS does not meet the minimum standards to be considered SORNA compliant. As such all NYS CoCs will be negatively impacted in scoring. SORNA compliance is also outside of the scope and control of the CoC.

26. On page 55 of the NOFO, HUD states that "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons … (b) evidence that the project operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control or conducts any of these activities under the pretext of 'harm reduction.'" Previous NOFOs have prioritized harm reduction and the FFY 2024 NYS BoS CoC consolidated application states an adherence to harm reduction practices.

27. Even if these conditions were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of our processes and those of our applicants. This will require more time, money, and effort to comply, and is not feasible to do by Jan. 14.

28. The NYS BoS CoC is concerned that the NOFO states that projects may be rejected for past activities such as harm reduction, addressing systemic racial disparities, and provision of services tailored to LGBTQAI service recipients. The current NOFO states that they may disallow

projects for adherence to priorities set by HUD in previous NOFOs. This does not give grantees any opportunity to change course to adhere to current Federal priorities.

29. The NOFO also states that the CoC must demonstrate it has a decision-making governance board that includes at least one person with a former experience of homelessness, at least 3 elected public officials, at least 1 representative of the business community and two representatives of law enforcement. A change to the governance structure will require not only significant outreach, but it also could force the removal of current governance board members and require a change to the NYS BoS CoC's governance charter. Again, this is a significant change that will require longer than two months to modify the governance charter, solicit new board members, vote in board members, train new representatives on the function of a CoC, and with instances of local officials, may require other local approvals to join the NYS BoS CoC.

30. If the current NOFO remains operative, applicants will not receive funding they were counting on, and long-term projects will be derailed. The current NOFO fails to address gaps in services for those projects that have contracts expiring before award announcements and also destabilizes the existing permanent housing projects with the restrictive cap. Non-profit providers are vulnerable for continued operations.

31. Consequences for program participants will be severe. Program participants are among the most vulnerable people in our State and often face other challenges in addition to being without a home.

32. Terminating programs that rely on CoC grants will therefore increase burdens on other state health, safety and support services.

33. New York State has a significant investment in permanent supportive housing and leverages federal funding to meet its housing goals. Site based programs that were built using state

capital dollars for permanent housing development must remain permanent for the duration of at least the 25-year contract with NYS. Projects including those in the NYS BoS CoC may not be able to convert to temporary or transitional housing due to the requirements set forth earlier by other funders.

34. The recently released NOFO has created confusion and concern among CoCs, non-profits, local governments and New York State. The NOFO stands to severely disrupt services to tenants throughout New York. Since the release of the NOFO, OTDA has received numerous inquiries from CoCs and agencies that operate permanent supportive housing that were constructed with state funding but rely on CoC funds to support the rents and staffing, asking if they can convert to transitional housing. These projects are contractually obligated to provide permanent housing with support services, many of which also have housing first principles. Pivoting to transitional housing would negatively impact tenants by imposing service agreements of up to 40 hours, generate fear and anxiety for tenants having to move in 24 months, and undermine New York State's Supportive Housing Plan.

35. New York State is in year nine of a fifteen-year plan to develop 20,000 units of supportive housing. Converting existing permanent housing units to transitional housing will have a negative impact on the state addressing the significant supportive housing needs. Should an existing permanent housing project convert to transitional housing it would be a lost resource to the State further exasperating the State's Permanent Supportive Housing need and not solving homelessness for households that would then reside in transitional housing. Additionally, any project developed with Low-Income Housing Tax Credits (LIHTC) must be permanent with annual leases in place. Any unit supported by CoC funds for rental subsidy, could be in jeopardy and result in both an increase in homelessness and financial risk to the overall LIHTC project.

36. The recently released NOFO will have a devastating impact to the communities covered under the NYS BoS CoC. The NYS BoS CoC has spent years developing stakeholder interest, landlord relationships, and developing real permanent housing solutions for homeless individuals in accordance with long-standing Federal priorities. Prioritizing transitional housing over permanent housing will erode housing stability for current households in the program, likely resulting in households once again experiencing homelessness, create restlessness and uncertainty for those households, and jeopardize the limited affordable housing relations that have been cultivated.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of November 2025.

_____
Richard Umholtz
Deputy Commissioner
New York State
Office of Temporary and Disability Assistance