## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF WASHINGTON, et al.,

                   Plaintiffs,

     v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN DEVELOPMENT,
et al.,

                   Defendants.

C.A. No.1:25-cv-00626-MSM-AEM

DECLARATION OF RICHARD JOHNS

Pursuant to 28 U.S.C. § 1746(2), I, Richard Johns, declare as follows:

1.      I am the Chief Program Performance and Financial Officer at the New York City Department of Social Services (NYC DSS) and have served in this role since 2025. Prior to that, I was the Chief Operating Officer at Settlement Housing Fund, a not-for-profit that specializes in permanent affordable housing developments. I also worked at the New York City Department of Housing Preservation & Development (NYC HPD) for eight years in various roles, including as the Deputy Commissioner of Financial Management.

2.      NYC DSS is a department of the City of New York (NYC). It is an oversight agency that is comprised of two sub-agencies: the Department of Homeless Services (NYC DHS) and the Human Resources Administration (NYC HRA). NYC DHS's mission is to prevent homelessness, when possible; address street homelessness; provide safe temporary shelter; and connect New Yorkers experiencing homelessness to suitable housing. NYC HRA administers public benefits for NYC, such as Food Assistance and Emergency Rental Assistance, to fight poverty and income inequality.

3.      I make this declaration in my capacity as the Chief Program Performance and Financial Officer at NYC DSS, based on my personal knowledge and observations, conversations with my staff and other officials of NYC, and NYC DSS's documents and records. I respectfully submit this Declaration in order to place before the Court certain testimony and documents relevant to the relief requested in the plaintiffs' motion. I am familiar with the matters set forth herein.

### NYC CoC

4.      The mission of the NYC Continuum of Care (NYC CoC) is to provide a leadership role in local planning and coordination to prevent and eradicate homelessness in New York City, while effectively implementing the U.S. Department of Housing and Urban

Development's (HUD) Continuum of Care program. The Continuum of Care was authorized by Congress via the HEARTH Act and was implemented by HUD in FY 2011.[1]

5.      NYC DSS, on behalf of NYC DHS, currently serves as the lead agency for the NYC Continuum of Care and as such is the Collaborative Applicant for the NYC CoC. NYC DSS also serves as the Homeless Management Information System (HMIS) lead agency for the NYC CoC to comply with HUD's data collection, management, and reporting standards. HUD requires a designated lead agency for each CoC to ensure both continuity in relationships and to apply a systemic approach to ending homelessness.

6.      As the lead agency, NYC DSS prepares and submits the collaborative application to HUD for federal CoC program funding as part of the annual CoC Program Notice of Funding Opportunity (CoC NOFO) to support the operation of homeless assistance projects throughout NYC. These projects include Permanent Supportive Housing, Rapid Re-Housing, Transitional Housing, Joint Transitional-Rapid Re-Housing, Homeless Management Information System, Coordinated Entry, Supportive Services Only, and CoC Planning activities. DSS also engages in consolidated planning as it relates to homelessness and Emergency Solutions Grant (ESG) reporting. HUD requires NYC CoC to submit reporting for CoC NOFO funded grants as well as other grants like ESG through HMIS.

7.      As lead agency for the NYC CoC, DSS receives a CoC Planning Grant to provide technical and administrative support to all of the projects in the NYC CoC. This grant ensures, among other things, that NYC DSS is able to submit the required CoC application to the annual NOFO and individual renewal and new project applications for all NYC CoC grantees, which is currently approximately $176 million. DSS also receives an HMIS Grant to operate the HUD mandated HMIS data system and generate and submit CoC reporting required by HUD. Finally, NYC HRA receives funding for Coordinated Entry (CE) that systematically assesses and

---

[1] The HUD Homeless Assistance Grants: Programs Authorized by the HEARTH Act | Congress.gov | Library of Congress, available at https://www.congress.gov/crs-product/RL33764 (Aug. 30, 2017).

prioritizes households for housing and services. HUD requires that all CoC grantees rely on their local CE for referrals and housing placements.

8.      The NYC CoC's primary decision-making body is its steering committee, of which DSS is the co-chair. The NYC CoC steering committee provides overall leadership to ensure the CoC carries out its vision and meets all HUD mandates and requirements. Among other things, the steering committee provides direction to, and coordinates the efforts of CoC committees, approves and sets policy priorities, and communicates with the public and external stakeholders to build their understanding of homelessness and the solutions required to prevent and eradicate it.

9.      The projects in the NYC CoC provide both permanent and transitional housing dedicated to persons experiencing homelessness in NYC. There are over 150 units of transitional housing in addition to the approximately 8,000 units of permanent housing. The permanent housing units are divided between permanent supportive housing, which has approximately 7,000 units, and Rapid Rehousing, which has approximately 1000 units. The NYC CoC works together to maximize federal funding to meet the needs of homeless and at-risk New Yorkers. Through Coordinated Entry, NYC CoC streamlines and improves the assessment, prioritization, housing matching, and placement system for homeless and at-risk households through a coordinated, community-informed process.

### CoC Funding for FY 2024

10.      In response to the FY 2024 NOFO for CoC grants appropriated by Congress for FYs 2024 and 2025, which HUD posted in July 2024, NYC DSS submitted the collaborative application for the NYC CoC. Along with individual project applications for all of the other grantees of the NYC CoC, the collaborative application included individual project applications on behalf of NYC DSS and NYC HPD.

11.      As the collaborative lead for the CoC, DSS leads the effort to prepare the application. This involves soliciting and evaluating newly proposed projects and reviewing all

existing projects listed in the Annual Renewal Demand (ARD) provided by HUD. The ARD is the total amount of funding HUD sets for all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments.

12.     As a required component of the overall application, the CoC must also determine and submit a project ranking. This project ranking puts all individual projects in rank order for funding consideration by HUD. Since 2012, HUD has implemented a two-tiered ranking system. Each year, HUD sets Tier 1 as an identified percentage of the CoC's ARD, and Tier 2 includes all projects ranked below that Tier 1 threshold. Projects that are ranked in Tier 2 are at risk of not receiving a funding award. The percentages of projects that could be designated Tier 1 have varied between 90% and 100% of the Annual Renewal Demand in each of the past thirteen years with the exception of one year, FY 2015, when it was 85%. For that NOFO, HUD was encouraging significant investment in new projects that were focused on providing permanent housing. For the FY 2024 NOFO, Tier 1 encompassed 90% of the ARD.

13.     On January 17, 2025, HUD released a notification of FY 2024 CoC project awards. HUD awarded approximately $174 million to NYC CoC projects pursuant to that FY 2024 NOFO, including projects administered by NYC agencies and projects administered by non-profit organizations. NYC CoC was awarded 165 projects. HUD did not fund seven renewal programs that were ranked in Tier 2. This process was similar to prior years.

14.     NYC HPD was awarded $53,559,574 for 40 permanent supportive housing projects. Individuals and families served by these grants are some of the most vulnerable residents of New York City, all of whom struggle with disabilities, HIV/AIDS, mental health, substance abuse issues, family trauma, and/or other challenges, and require additional and ongoing support and services in order to help ensure that they can maintain housing stability. Forty-five percent of the households are elderly.

15.     NYC DSS was awarded approximately $6.7 million. The grants awarded to NYC DSS included two grants to operate and enhance the NYC CoC's "coordinated entry" programs, totaling $ 3,081,368, which help households move from homelessness into permanent housing.

Coordinated entry is a requirement for all CoCs nationwide to streamline the way people move out of homelessness and into stable permanent housing and ensure the most vulnerable households are prioritized for scarce resources. HUD's coordinated entry grants provide critical funding that enables NYC DSS to refer and place households experiencing homelessness into permanent housing. One of the coordinated entry grants provides funding to support, prioritize, refer, and place survivors of Domestic Violence (DV) into permanent housing as quickly as possible. The grant also provides training and training materials on housing resources and subsidies available for survivors.

16.     NYC DSS also received a grant to operate HMIS for the NYC CoC (through a contract with the HMIS vendor), in the amount of $2,177,136. This grant supports the preparation and submission of all mandated HUD reports for the NYC CoC, including, among other things, the Point-in-Time Count (HIC-PIT) – an annual count of all the homeless persons in NYC. The funds from this grant also support other data reporting, training, compliance, and data quality for all NYC CoC grantees as well as ESG reporting.

17.     Finally, NYC DSS received a planning grant for $1,500,000. This noncompetitive award supports the work that NYC DSS does to operate and oversee the NYC CoC, including submitting the collaborative application; conducting project monitoring, provider training and technical assistance; and serving as point of contact for HUD for all CoC operation and project support.

**HUD Issues the New NOFO**

18.     On November 13, 2025, despite the fact that the FY 2024 NOFO encompassed two years, HUD issued a new FY 2025 NOFO, claiming that this new NOFO supplanted the previously issued two-year NOFO ("New NOFO"). The new NOFO states that it "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

19.     For FY 2025, HUD set an ARD of $176 million for the NYC CoC. The 2025 ARD for NYC CoC is slightly higher (approximately $176 million) compared with the 2024 NOFO award (approximately $174 million) because some additional multi-year projects came up for renewal this year. Accordingly, under the new NOFO, NYC CoC is eligible to apply for approximately $176 million in project renewal funds for all individual projects that expire in calendar year 2026. However, the New NOFO made substantial changes to the CoC program that are a significant departure from past practices over the last decade that will cause serious harm, including the below examples.

20.     The New NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." In short, the New NOFO reduces Tier 1 funding from 90% of the ARD to 30% of the ARD, resulting in HUD only automatically renewing 30% of all prior spending (about $52,851,190) instead of automatically renewing 90% of prior spending (about $158,553,571). The remaining 70% of the ARD will be considered on a competitive basis in Tier 2. This is a sea change in the HUD CoC program, which has emphasized continuity and ensuring that successful programs remain funded year over year.

21.     The New NOFO states "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." In other words, the New NOFO will impose a 30% funding cap on permanent housing. A large proportion of NYC CoC funding has historically been allocated to permanent housing. Currently, 92% of the NYC CoC'S ARD is for projects that are designated as permanent housing.

22.     Since the inception of the CoC under the HEARTH Act, HUD has prioritized permanent housing. This New NOFO thus represents a 180-degree change from HUD's long-standing preference for funding permanent housing. Indeed, in accordance with HUD's preferences, the portfolio of CoC-funded permanent housing units has grown in NYC to over 8,000 units. The drastic cut to Tier 1 and the 30% cap on permanent housing will not accomplish

the stated goals of the program, particularly the goal of achieving self-sufficiency and could instead destabilize the housing of thousands of vulnerable households.

23.     A 30% cap on permanent housing constitutes a 67% reduction in New York's CoC eligible funding for this category, a proportional loss of more than $106,000,000. The impact on permanent supportive housing will be especially dramatic. NYC has approximately 38,000 supportive housing units in total, 18% of which are funded by the CoC. NYC already has approximately 7,000 people on a waiting list for supportive housing, so it is unlikely that all the residents of these lost units will be able to transfer to a non-CoC funded supportive housing unit and maintain their permanent housing status.

24.     The tenants of permanent supportive housing funded by the CoC are, by definition, those who have previously experienced chronic homelessness and have co-occurring conditions like physical or developmental disabilities, HIV/AIDS, mental health or substance use issues, family trauma, or are DV survivors. If evicted, these are individuals who are more likely to wind up homeless again, either by entering the NYC shelter system or becoming street homeless, putting additional strain on New York's street outreach, encampment cleanup, and shelter budgets.

25.     In addition, the 30% cap could have a destabilizing effect on affordable housing providers. While some permanent housing projects may be able to reapply as transitional housing, many permanent supportive housing projects are not able to support a change in service model. CoC funds for permanent supportive housing cover necessary program and operating costs, including maintenance and heating costs. Buildings with CoC funded units rely on this funding to make supportive housing viable. The consequences of such drastic cuts are clear: landlords will likely either have to let buildings go into decay or evict the supportive housing tenants. When there is insufficient operating revenue in a building, the quality of the building and the housing stock as a whole is likely to decline. The buildings may become unsafe and a blight on the neighborhood that will draw on resources like the City of New York's emergency repair program or require other city and state resources to be properly rehabilitated.

26.     The radical departure from the typical Tier 1 percentages also places the project partners in peril. Permanent supportive housing works when funding is consistent and grant renewals are predictable. This allows not-for-profits to enter into multi-year lease agreements or multi-year service agreements to manage the portfolio. The low Tier 1 renewal percentage will make it harder for not-for-profits to support projects because each project is at a significantly greater risk of not being automatically renewed. This increases the overall risk the not-for-profit will have to manage, including the potential for unfunded rental obligations, payroll shortfalls, and lack of funds to manage and run the buildings themselves. Hiring, financing, and other decisions by our not-for-profit project partners rely on consistent and typical NOFOs that are generally consistent across service models and expectations.

27.     The New NOFO will place the supportive services employees of these projects in peril as well. Currently, 153 projects fall into the permanent housing category, and the New NOFO will only allow a maximum of approximately 45 projects to automatically continue as permanent housing, if the NYC CoC also decided to dedicate all of its Tier 1 funding to permanent housing. That leaves the employees of over 100 projects facing potential unemployment themselves. As many not-for-profits have often worked to hire people with lived experience and who are near peers, some of these employees may themselves be facing homelessness once again.

28.     The New NOFO also added new prohibitions that can disqualify Tier 1 or Tier 2 programs for using a definition of sex "other than binary," engaging in racial preferences, or conducting activities viewed as "harm reduction." The New NOFO also gives HUD total discretion to reduce or reject applications in which project applicants have previously engaged in these activities. For example, the New NOFO provides:

- "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." *See* New NOFO at p. 55.

- "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons … (h) evidence that the project has previously or currently conducts activities that … rely on or otherwise use a definition of sex other than as binary in humans." *See* New NOFO at p. 65.

- "Awards made under this NOFO will not be used to … conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." *See* New NOFO at p. 108.

- You must comply with these applicable provisions … Implementing Presidential Executive Actions" like EO "14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"). *See* New NOFO at p. 108.

29.    These components of the merit review are a radical departure from prior NOFOs. In fact, the FY 2024 NOFO for the CoC competition allowed CoCs to qualify for points by detailing how they planned to address racial disparities in the homeless population as well as address the needs of LGBTQ people experiencing homelessness. The NYC CoC response outlined how it addressed racial disparities and addressed the needs of LGBTQ people experiencing homelessness and was awarded points for these responses.

30.    Under the new criteria, NYC CoC's previous efforts to address the priorities of past administrations will give HUD the ability to eliminate funding for FY 2025 should they determine that addressing racial disparities or LGBTQ equity constitutes "engaging in racial preferences" or using a definition of sex "other than the binary." In addition to being included in the Threshold review, the New NOFO also includes a newly implemented "Risk Review" that all projects in both Tiers are required to undergo, and include "criteria" such as:

- "OMB-designated repositories of governmentwide data, as noted in 2 CFR 200.206(a)

- "Other public sources such as newspapers, Inspector general or Government Accountability Office reports or findings, or other complaints that have been proven to have merit."

- "History of subsidizing or facilitating activities that conflict with the purposes of this NOFO."

31.    The risk review section then goes on to state "HUD may use the results of the risk review to make funding decisions and to apply award conditions." *See* New NOFO at p. 89.

32.    The New NOFO also includes Geographic Discrimination terms that assign points to CoCs based on whether their geographic area has enacted certain laws to prohibit activities the federal administration disfavors. Merit points are awarded for CoCs in jurisdictions that can show they have laws prohibiting public illicit drug use; prohibiting public camping or loitering; supporting Involuntary commitment; implementing SORNA registration and notification and mapping location of homeless sex offenders; and cooperating with law enforcement to connect violators with services. *See* New NOFO at pp. 86-87.

33.    A CoC is not a legislative body with the power to enact or amend state or local laws. Nonetheless, the Geographic Discrimination term disadvantages CoCs and CoC members for laws in their jurisdictions.

34.    The New NOFO also made changes that new supportive housing programs may only serve persons that are elderly and physically or developmentally disabled; they may not assist persons with substance use disorders. A substantial number of supportive housing projects funded by the NYC CoC are currently designed to assist persons with substance use disorders and this was shown through our Coordinated Entry data to be an increasing area of need. The lack of new funding for substance use disorder based supportive housing, coupled with the overall 30% cap on permanent housing will only widen the gap between those who need substance use based supportive housing and the available units to support them. Research in NYC has demonstrated the value of permanent support housing in improving health outcomes for individuals with substance use disorder by reducing substance use-related hospitalization and Emergency Department use and increasing outpatient substance use treatment.[2]

---

[2] Sara A. Miller-Archie, Sarah C. Walters, Tejinder P. Singh, Sungwoo Lim, Impact of supportive housing on substance use–related health care utilization among homeless persons who are active substance users. Annals of Epidemiology, Volume 32, 2019 https://www.sciencedirect.com/science/article/pii/S1047279718310469 Last accessed: 11/23/2025.

35.     The New NOFO also requires new transitional housing projects to both "require program participants to take part in supportive services" and include "40 hours per week of customized services for each participant (e.g. case management, employment training, substance use treatment, etc.)" *See* New NOFO at pp. 56-57. Those components are worth 2 of the 10 points each, and as a threshold, a project must have 7 points to be awarded. Another point is awarded if a project can demonstrate that the "average cost per household is reasonable." *See* New NOFO at p. 57. This level of customized services is likely to be unduly cost prohibitive, and it is unlikely that NYC-based transitional housing projects will be competitive given the requirements for customized programming at the levels proposed and a requirement that costs be reasonable.

### Irreparable Harm from the New NOFO

36.     The harm to New York City from the New NOFO is significant and irreparable.

37.     Over 10,000 New York City residents rely on permanent housing across 8,000 units funded through NYC CoC projects. The participants of the NYC CoC programs are among the most vulnerable people in New York State and would face other challenges in addition to being without a home. The 30% cap on permanent housing projects will end the majority of the very programs that keep these residents safely housed. Moving thousands of individuals out from permanent housing will likely increase pressure on homeless shelters. New York City will likely see an increase in its street homeless population, which has been associated with increased negative health impacts and pressures on the emergency care system. The reduction in permanent housing capacity would also shift significant costs to other New York State and City resources, placing further strain on outreach efforts, street medicine, encampment cleanup teams, state- and federally funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs serving unhoused families.

38.     The NYC CoC has over the past 13 years built up a project portfolio comprised of 92% permanent housing, diligently following the goals of each NOFO, which have generally

been complimentary of one another, even across administrations of differing politics. If this New NOFO is allowed to proceed, the funding of over 100 permanent housing projects will end due to the 30% funding cap, those not-for-profits will likely have to fire employees who were funded by those projects, and the permanent supportive housing stock of NYC will decrease by approximately 12%. This is because the pipeline for new CoC-funded permanent housing projects is in danger of drying up: the 30% Tier 1 percentage will make the financial viability of any one project too risky for any financial institution to loan money to not-for-profits for these proposals. Without support of the financial industry, these projects cannot get off the ground as these not-for-profit organizations do not have the ability to raise the money necessary for the projects or to self-fund them. Given the incredibly low percentage of projects that can be designated as Tier 1, the ability for applicants to competitively apply for funding through the new NOFO is in jeopardy, putting the financial futures of their employees and their organizations at risk.

39.    NYC DSS provides logistical, technical and administrative support to every single one of these projects, enabling them to function. The reduction in NYC CoC funding from the New NOFO will endanger the financial stability of dozens of CoC housing and service providers who will not have access to the dollars necessary to operate projects, such as those for rental assistance or supportive services, or pay operational costs for projects that are fully enrolled with formerly homeless clients and have been operating for years.

40.    By effectively terminating so many programs that rely on CoC funding all at once the burdens on other NYC and NY State resources will dramatically increase. The wait lists for other permanent supportive housing programs, particularly for substance use disorder would be expected to dramatically increase. Homelessness and unemployment will likely also increase, placing additional burdens on emergency shelter and outreach teams as well as job placement programs. The number of affordable units could also decline, either due to loss of habitability from deferred maintenance or because landlords would have to complete significant changes to units to make them appropriate for non-supportive housing tenants. This decline will place more

pressure on building renewal programs and affordable housing pipelines, further increasing the affordability crisis in a city whose vacancy rate is already 1.4%.

41.    The New NOFO marks a dramatic change in direction from the past thirteen years and will require an overhaul of DSS's and NYC CoC's processes and those of the NYC CoC applicants. The changes from the new NOFO, especially the 30% cap on permanent housing projects, will cause NYC CoC applicants to have to spend more time, money, and effort to comply and propose projects eligible for funding, and it is not feasible to do so by January 14, 2026.

42.    The New NOFO is flawed in that its design will not accomplish the stated goals. In fact, the New NOFO will actively interfere with New York City and New York State's homelessness goals, which have consistently emphasized the need for permanent housing, especially permanent supportive housing. As discussed above, the New NOFO will effectively eliminate 12% of the supportive housing stock in NYC alone. That will increase the waitlist for other supportive housing units and will lengthen the time a person in need of supportive housing remains homeless. The 30% cap will also drive down the rapid rehousing units available, which in NYC have often been tailored to support those experiencing street homelessness, increasing the amount of time a person in need of those services will spend on the street.

43.    The New NOFO will likely decrease the overall quality of life for all New Yorkers. Decreased placement options and funding will also likely decrease the cleanliness and safety of our city as outreach teams are stretched thinner and have to serve more individuals who were permanently housed.

I declare under penalty of perjury that the foregoing is true and correct.

_____

Richard Johns

Dated: November 24, 2025