UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>          Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>          Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM<br><br>DECLARATION OF ALEXANDRA WARREN |

1

Pursuant to 28 U.S.C. § 1746(2), I, Alexandra Warren, declare as follows:

1. I am the Assistant Commissioner for Housing Stability at the New York City Department of Housing Preservation and Development ("NYC HPD") and have served in this role since March 2023. NYC HPD is a department of the City of New York ("NYC"). Previously, I served as NYC HPD's Chief of Staff, Office of Neighborhood Strategies from January 2016 through March 2023; Director of Strategic Planning from April 2010 through December 2015; and Director of Budget, Policy, and Special Programs from July 2005 until April 2010.

2. I make this declaration in my capacity as Assistant Commissioner for Housing Stability at NYC HPD based on my personal knowledge and observations, conversations with my staff and other officials of NYC, and NYC HPD's documents and records. I respectfully submit this Declaration in order to place before the Court certain testimony and documents relevant to the relief requested by the plaintiffs. I am familiar with the matters set forth herein.

## CoC Grants in New York City

3. NYC HPD depends on federal funding, among other funding, to support critical programs to transition individuals and families experiencing chronic homelessness into permanent housing.

4. A significant portion of this funding comes through the Continuum of Care ("CoC") program administered by the U.S. Department of Housing and Urban Development ("HUD").

5. NYC HPD is a member of the NYC Continuum of Care ("NYC CoC"). The goals of the NYC CoC include promoting communitywide commitment to ending homelessness; providing funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless households; and optimizing self-sufficiency among households experiencing homelessness.

6. Membership in the NYC CoC is open to all stakeholders, including nonprofit homeless assistance providers, victim service providers, faith-based organizations, government

agencies, businesses, advocates, public housing agencies, school districts, social service providers, mental health agencies, hospitals, universities, philanthropies, affordable housing developers, law enforcement, and individuals currently or formerly experiencing homelessness in New York City. *See generally* https://www.nyc.gov/site/nycccoc/about/about-the-nyc-coc.page

7. In my capacity as Assistant Commissioner for Housing Stability of NYC HPD, I am responsible for overseeing a team of 9 that administers 40 CoC grants in collaboration with 30 different subrecipients, covering approximately 70 supportive housing developments (some developments are consolidated under single grants). The subrecipients are nonprofit housing providers, with whom HPD enters contracts paired to each CoC grant, and with whom HPD has worked over decades to create, preserve, and maintain affordable and supportive housing through its development and asset management efforts. My team's work on CoC grant administration includes preparing the renewal funding applications, signing grant agreements with HUD, signing contracts with providers, monitoring and supporting grant performance and compliance, and supplying required performance evaluations. I also serve on the Steering Committee of the NYC CoC and the subcommittee for Survivors of Domestic Violence.

8. HPD's CoC grants are used to provide rental assistance to more than 3,000 chronically homeless individuals, including 200 children and 950 elderly people, to place and sustain them in approximately 2,700 apartments with on-site supportive services. Tenants hold rent-stabilized leases in these apartments.

9. The individuals and families served by HPD's CoC grants are some of the most vulnerable residents of New York City, all of whom struggle with disabilities, HIV/AIDS, mental health, substance abuse issues, family trauma, and/or other challenges, and require additional and ongoing support and services to help ensure that they can maintain housing stability.

10. To move into an HPD subsidized unit, tenants must be referred by the Department of Homeless Services, through the CoC's Coordinated Entry system, managed by the Human Resources Administration. Tenants pay 30% of their adjusted income to the provider each month to cover part of a pre-established contract rent. HPD subsidizes the remainder of the rent directly

to the provider. The CoC renewing funding amount determines how annual contract rents in the HPD portfolio are set. The contract rents are, on average, 80% of Fair Market rent. As individual tenant leases come up for renewal, the provider can request a rent increase up to the pre-established contract rent, while the tenant continues to pay a share equal to 30% of their income.

11. Tenants are generally protected under HPD regulatory agreements tied to other financing, which permit them to pay 30% of their income in rent regardless of subsidy. In addition, rent stabilization accords them the right to renew their leases so long as they remain compliant with them. NYC HPD has been awarded, and has relied upon, funding from CoC grants for at least 12 years.

### CoC Funding for FY 2024

12. In response to the Notice of Funding Opportunity ("NOFO") for CoC grants for FY 2024, posted by HUD in July 2024, NYC, through NYC HPD, sought renewal funding for each of the 44 CoC programs that NYC HPD was operating at the time. It was relayed by HUD at the time that funding for FY25 renewal grants would be granted through a non-competitive process in mid-2025.

13. On January 17, 2025, HUD released a notification of FY 2024 CoC project awards, including 40 of the 44 renewal projects for which NYC HPD had applied, totaling about $53,559,574 dollars for rental assistance and administrative fees. *See* https://www.hud.gov/sites/dfiles/CPD/documents/CoC/CoC-2024-NY Press.pdf. NYC HPD operates these programs through 30 nonprofit partner organizations that are CoC grant subrecipients.

14. On March 20, 2025 and May 30, 2025, HUD provided NYC HPD with renewal agreements for the 40 renewed projects (three in March and 37 in May), which NYC HPD executed and returned. Pursuant to a court order issued in the case *King County, et al. v. Turner, et al.*, 2:25-cv-00814-BJR (W.D. Wash.), certain terms and conditions originally included in those agreements are preliminarily enjoined. NYC HPD objected to and/or excised certain terms and conditions from the agreements.

**CoC Funding for FY 2025**

15. On November 13, 2025, contrary to previously communicated plans that the FY25 NOFO would be non-competitive, HUD announced a new NOFO for CoC grants appropriated by Congress for FY 2025. The performance period of HPD's portfolio of grants under the new NOFO spans from May 1, 2026 until December 31, 2027.

16. The new NOFO made numerous significant changes to the CoC Program. The changes made in the NOFO inject massive uncertainty and risk into the competition which will have a significant and severe impact on NYC HPD's programs.

17. The new NOFO states that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects." Permanent Housing is defined as permanent supportive housing (the entirety of HPD's grants), rapid rehousing, and joint Transitional-Rapid Rehousing Projects. Annual Renewal Demand (ARD) is calculated by summing the budgets of all existing projects within a CoC that are eligible to be renewed in the upcoming competition.

18. Previously, over 90% of New York City's CoC's funding was dedicated to Permanent Housing, a figure that has grown steadily over the prior decade. This growth reflected HUD's policy priority of increasing the supply of Permanent Housing as a proven, cost-effective strategy for housing chronically homeless individuals with disabilities. A 30% cap on Permanent Housing therefore constitutes a massive reduction in New York City's CoC eligible funding for this category.

19. In addition to the cap on Permanent Housing, this NOFO has up-ended the system of funding tiers in the guise of increasing competition. Previously, Tier 1 covered the vast majority of the funding – 90% of the ARD for FY 2024 – and projects listed in Tier 1 were funded so long as they met threshold criteria. The remaining projects were at some risk for losing funding, based on a review by HUD that included review of the relevant CoC's overall score. Under the new NOFO, Tier 1 only covers 30% of the funding, with the remaining 70% (Tier 2) subject to partial or complete defunding depending on a "Merit Review," a redefined measure of

5

the CoC overall's performance which includes factors tied to local and state laws outside of the CoC's control. Finally, HUD has introduced a "risk review" that includes "history of subsidizing or facilitating activities that conflict with the purposes of this NOFO," which is divorced from actual performance outcomes relating to homelessness response and could allow HUD to target any organization it deems unaligned with the Administration.

**Irreparable Harm from Loss of CoC Funding**

20. As previously stated, NYC HPD's CoC grants provide rental subsidies on behalf of more than 2,700 chronically homeless households with disabilities (over 3,000 people), some of the most vulnerable people in our city. New NOFO priorities expressed through funding caps for permanent housing, as well as dramatically increased competition and the introduction of requirements and scoring criteria that are in stark contrast and in some cases direct opposition to previous policy priorities or requirements place HPD subrecipients and the tenants they serve at grave risk of losing funding and the housing stability it provides.

21. HPD's share of CoC funding, all of which is dedicated to permanent supportive housing (a subset of "Permanent Housing"), accounts for a significant portion of the total CoC funding received by New York City. Because of the cap on permanent housing funding and the changes to programs that qualify as Tier 1, HPD will be forced to compete with other providers for a drastically reduced pool of funding.

22. Loss of NYC HPD's CoC funds would destabilize the residents of CoC-funded units. Beyond that, however, CoC funding also anchors HPD mixed-finance developments that leverage hundreds of millions in state and local capital subsidy, Low-Income Housing Tax Credit equity, and private investment. HUD's abrupt shift threatens to collapse decades of carefully structured financing, force *already* cash-strapped nonprofit providers facing exponential increases to their expenses to walk away from buildings they have operated for generations, and trigger widespread layoffs of direct service staff who have kept thousands of formerly homeless New Yorkers stably housed.

23. HPD subrecipients also operate affordable "community units" in the supportive

6

housing developments subsidized with CoC funds. While these units are not supportive housing or funded directly by CoC, they do serve low-income households who would naturally be affected by a loss of the nonprofit owner's ability to maintain building operations.

I declare under penalty of perjury that the foregoing is true and correct.

*[signature: Alexandra W.]*

_____

Alexandra Warren

Dated: November 24, 2025