## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| | C.A. No.1:25-cv-00626-MSM-AEM |
| v. | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF PASCALE LEONE |
| Defendants. | |

## DECLARATION OF PASCALE LEONE

I, Pascale Leone, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Executive Director of the Supportive Housing Network of New York (the "Network"), a non-profit membership organization representing more than 200 organizations that operate and develop supportive housing in New York.  I have served in this role for the past three years, since 2022.

2.      I am familiar with the statements set forth herein based on either my personal knowledge, consultation with Network staff and service providers, or from my review of relevant documents and information.

3.      I have over twenty years of nonprofit experience, focusing on housing justice, reproductive rights, public health, and healthy aging.  For the past twelve years, my work has centered on supportive and affordable housing, driving transformative change for historically marginalized and disadvantaged communities.

4.       Under my leadership as Executive Director, the Network launched its first-ever *State of Supportive Housing* report, providing an unprecedented, comprehensive overview of New York State's supportive housing landscape and developed the Safety and Wellbeing Training Series, a three-year program to enhance staff skills and foster community.

5.      Prior to my work with the Network, I spent nine years at the Corporation for Supportive Housing.

6.      I earned my Bachelor of Arts degree in Africana Studies and Political Science from SUNY Albany and I hold a Master's degree in Public Policy from Rockefeller College.

## Supportive Housing Network of New York

7.      The Supportive Housing Network of New York is a nonprofit membership organization representing over 200 nonprofits across the state that develop, own, operate, and provide services in supportive housing, alongside over 170 corporate and affiliate members.

8.      Founded in 1988, the Network uses advocacy, public education, training, technical assistance, research and policy analysis to: promote the growth and effectiveness of supportive housing, increase the public's understanding of supportive housing, share best practices, and foster

community – all with the goal of creating enough supportive housing to end homelessness across New York.

## Overview of the Continuum of Care in New York

9.    There are 24 Continuums of Care ("CoC") across New York State, which serve as local planning bodies that coordinate their community's response to homelessness, prioritize local needs for federal funding, collect data, and track project performance. Each CoC is a geographic area, such as a county or group of contiguous counties, except for the Balance of State CoC, which comprises nine mostly rural counties and is managed by the New York State Office of Temporary and Disability Assistance.

10.    The CoC is a cornerstone of New York's housing infrastructure. Currently, $326.6 million of CoC funding comes into New York State through these 24 Continuums. This funding supports housing opportunities for 13,861 households, in addition to planning, data collection, and coordinated entry systems that help connect people experiencing homelessness to housing.

11.    94% of project funding statewide is dedicated to permanent housing, a category HUD defines as including permanent supportive housing (PSH), rapid re-housing (RRH), and joint transitional housing/rapid re-housing (TH-RRH).

12.    We estimate that more than 8,000 of these households are in the scattered site model, where nonprofits rent units on the private market and bring services to the tenants in the community. Between 3,000 – 6,000 households are in a congregate setting.  However, limitations in data collection and reporting make it difficult to provide an exact breakdown. For example, the Network tracks only permanent supportive housing units, whereas HUD combines all three housing models (PSH, RRH, TH-RRH) and does not distinguish between congregate and scattered site.

13.    Continuum of care funded units are present in at least 110 buildings that were publicly financed with state and local sources in order to serve as supportive and affordable housing. In this context, the CoC contracts provide rental assistance or operating funding, which anchors these mixed-finance developments that combine at least $1.46 billion in state and local capital subsidy, Low-Income Housing Tax Credits (LIHTC), and private investment. CoC funding in New York leverages:

- $876.2 million in public capital subsidy from state and local sources
- $511 million in equity raised from LIHTC

- $73.8 million in other private investment and debt

14.     These 110 properties statewide collectively contain 8,016 units – including at least 3,000 CoC-funded supportive housing units, as well as state- or locally-funded supportive housing and affordable units open to low-income members of the community.  While not all of the 8,016 units receive CoC support, the buildings themselves rely on CoC funding to remain stable and operational.

## 30% Cap on Permanent Housing

15.     Due to the newly imposed 30% cap on permanent housing contained in the NOFO, New York would lose funding for at least 9,339 households. Below is a breakdown of units lost based on the CoC:

| CoC Number | CoC Name | Minimum Units Lost |
| --- | --- | --- |
| NY-500 | Rochester, Irondequoit, Greece/Monroe County CoC | 424 |
| NY-501 | Elmira/Steuben, Allegany, Livingston, Chemung, Schuyler Counties CoC | 115 |
| NY-503 | Albany City & County CoC | 278 |
| NY-505 | Syracuse, Auburn/Onondaga, Oswego, Cayuga Counties CoC | 507 |
| NY-507 | Schenectady City & County CoC | 248 |
| NY-508 | Buffalo, Niagara Falls/Erie, Niagara, Orleans, Genesee, Wyoming Counties CoC | 720 |
| NY-510 | Ithaca/Tompkins County CoC | 48 |
| NY-511 | Binghamton, Union Town/Broome, Otsego, Chenango, Delaware, Cortland, Tioga Counties CoC | 196 |
| NY-512 | Troy/Rensselaer County CoC | 176 |
| NY-513 | Wayne, Ontario, Seneca, Yates Counties CoC | 10 |
| NY-514 | Jamestown, Dunkirk/Chautauqua County CoC | 11 |
| NY-518 | Utica, Rome/Oneida, Madison Counties CoC | 158 |
| NY-519 | Columbia, Greene Counties CoC | 20 |
| NY-520 | Franklin, Essex Counties CoC | 22 |
| NY-522 | Jefferson, Lewis, St. Lawrence Counties CoC | 110 |

| NY-523 | Glens Falls, Saratoga Springs/Saratoga, Washington, Warren, Hamilton Counties CoC | 99 |
|---|---|---|
| NY-525 | New York Balance of State CoC | 79 |
| NY-600 | New York City CoC | 4,964 |
| NY-601 | Poughkeepsie/Dutchess County CoC | 39 |
| NY-602 | Newburgh, Middletown/Orange County CoC | 125 |
| NY-603 | Nassau, Suffolk Counties CoC | 292 |
| NY-604 | Yonkers, Mount Vernon/Westchester County CoC | 617 |
| NY-606 | Rockland County CoC | 29 |
| NY-608 | Kingston/Ulster County CoC | 52 |

## Shifting Ratio of Tier 1 and Tier 2

16.     Previously, HUD required 10% of annual renewal demand to be placed in Tier 2, which was subject to a national competition. This current NOFO places 70% of annual renewal demand in Tier 2. Tier 1 projects, previously comprising 90% of annual renewal demand, were generally considered safe, providing stable sources of housing and support for communities across New York. Below is a comparison of annual renewal demand in the previous structure (90% in Tier 1) and the new structure (30% in Tier 1), broken down by CoC[1]:

[1] Data in this chart is collected and calculated as of June 2025.

| CoC Number | CoC Name | Previous Structure: $ in Tier I (90%) | New Structure: $ in Tier I (30%) |
|---|---|---|---|
| NY-500 | Rochester, Irondequoit, Greece/Monroe County CoC | $12,300,472 | $4,100,157 |
| NY-501 | Elmira/Steuben, Allegany, Livingston, Chemung, Schuyler Counties CoC | $1,955,503 | $651,834 |
| NY-503 | Albany City & County CoC | $6,480,169 | $2,160,056 |
| NY-505 | Syracuse, Auburn/Onondaga, Oswego, Cayuga Counties CoC | $10,467,089 | $3,489,030 |
| NY-507 | Schenectady City & County CoC | $5,328,122 | $1,776,041 |
| NY-508 | Buffalo, Niagara Falls/Erie, Niagara, Orleans, Genesee, Wyoming Counties CoC | $16,682,099 | $5,560,700 |
| NY-510 | Ithaca/Tompkins County CoC | $1,456,999 | $485,666 |
| NY-511 | Binghamton, Union Town/Broome, Otsego, Chenango, Delaware, Cortland, Tioga Counties CoC | $2,930,362 | $976,787 |
| NY-512 | Troy/Rensselaer County CoC | $3,747,180 | $1,249,060 |
| NY-513 | Wayne, Ontario, Seneca, Yates Counties CoC | $327,859 | $109,286 |
| NY-514 | Jamestown, Dunkirk/Chautauqua County CoC | $286,651 | $95,550 |
| NY-518 | Utica, Rome/Oneida, Madison Counties CoC | $3,486,346 | $1,162,115 |
| NY-519 | Columbia, Greene Counties CoC | $558,432 | $186,144 |
| NY-520 | Franklin, Essex Counties CoC | $354,700 | $118,233 |
| NY-522 | Jefferson, Lewis, St. Lawrence Counties CoC | $1,765,410 | $588,470 |
| NY-523 | Glens Falls, Saratoga Springs/Saratoga, Washington, Warren, Hamilton Counties CoC | $2,356,291 | $785,430 |
| NY-525 | New York Balance of State CoC | $1,992,416 | $664,139 |
| NY-600 | New York City CoC | $148,237,176 | $49,412,392 |
| NY-601 | Poughkeepsie/Dutchess County CoC | $2,043,918 | $681,306 |
| NY-602 | Newburgh, Middletown/Orange County CoC | $3,617,942 | $1,205,981 |
| NY-603 | Nassau, Suffolk Counties CoC | $15,298,563 | $5,099,521 |
| NY-604 | Yonkers, Mount Vernon/Westchester County CoC | $24,266,670 | $8,088,890 |
| NY-606 | Rockland County CoC | $1,628,436 | $542,812 |
| NY-608 | Kingston/Ulster County CoC | $1,411,729 | $470,576 |

## New Provisions for Sex and Gender

17.     Prior to this year, HUD required the collection of gender data in the Homeless Management Information System (HMIS) in a format that acknowledges multiple options beyond the male/female binary assigned at birth. Any organizations that have previously received CoC funding would thus have participated in these practices.

18.     In the **FY 2023 HUD HMIS Data Standards,** both **gender** and **sexual orientation** were **required elements**:

- The transition guidance from FY 2024 clearly instructs systems to "back-enter" **Gender** and **Sexual Orientation** data for ongoing clients as of October 1, 2023, indicating both fields were required under the previous FY 2023 Standard.

- The FY 2024 standards list several federally required data elements being retired — including **Gender** and **Sexual Orientation** — which confirms they were previously mandated elements.

- **FY 2022:**
    - **Gender** was a Universal Data Element (required for all clients).
    - **Sexual Orientation** was required for certain program types (e.g., Runaway and Homeless Youth, RHY).

- **FY 2023:**
    - Both remained required in their respective categories.
    - HUD began signaling upcoming changes (retirement of Gender and Sexual Orientation in favor of a new **Sex** element for FY 2024).

19.     In the **FY 2022 HMIS Data Standards**, the **Gender** element (Universal Data Element 3.06) included the following response options:

- **Female**
- **Male**
- **Trans Female (Male to Female)**
- **Trans Male (Female to Male)**
- **Gender Non-Conforming (i.e., not exclusively male or female)**
- **Questioning**
- **Different Identity** *(with a write-in option for self-description)*

20.     State and local funding agencies also encourage and, in some cases, require training for staff in LGBTQIA+ cultural competence and inclusive policies.

## Public Camping Bans

21.     Public camping bans only cover a very small geographic area of New York. Supportive housing providers have no authority over the local laws governing these types of bans and no insight into enforcement priorities.

22.     The experience of many homeless services and housing providers is that camping bans make engagement with people experiencing homelessness more difficult, as those individuals fear involvement with the criminal legal system and are therefore more hesitant to seek assistance.

## Changes to Definition of Disability

23.     The CoC program, authorized by the McKinney Vento Act, has since its inception hewed to a framework where "disability" included serious mental illness and substance use disorder. The supportive housing model, which inspired state and local programs in New York in addition to the federal response outlined in the McKinney Vento Act, has often required a serious mental illness or substance use disorder diagnosis for program participants to be eligible.

24.     As of May 2025, there were 64,263 units of supportive housing in New York. Of those, at least 41,523 (65%) required tenants to be diagnosed with either a serious mental illness or substance use disorder to meet the disability criteria. Among the 13,861 CoC-funded units in New York, approximately 6,000 require a substance use disorder or serious mental illness as a condition of other state or local funding.

25.     It is extremely common for supportive housing program participants to have multiple co-occurring disabilities, including physical disability. However, we are not aware of a supportive housing program in New York that exists to serve a population whose exclusive eligibility criterion is a physical disability.

26.     Under the Empire State Supportive Housing Initiative (ESSHI), there is currently a category for seniors, under which the eligibility requires "Individuals who are age 55 and older, enrolled in Medicaid, and has either a chronic condition or physical disability." As of May 2025, there were 1,718 of those units (3% of the state's total supportive housing stock).

27.     We are not aware of any CoC-funded programs in New York where physical disability is the exclusive eligibility criteria.

## New Requirements for Services

28.     The NOFO's new requirement to provide 40 hours per week of services to each program participant is excessively burdensome and unlikely to result in quality services within current budgetary frameworks.

29.     Depending on the program funding levels in supportive housing, case management ratios in New York's programs range from 1:15 to 1:50. Services are individualized to the tenants' needs and range from goal setting, care coordination, health and wellness education, connections to substance use and mental health treatment, job training and vocational services, connections to education, safety planning, counseling, tenancy support and assistance with financial management, managing peer support groups, positive socialization opportunities, and more. Nonprofit providers are required to assertively engage tenants in services, meaning that they must make regular and ongoing attempts to connect with tenants and customize their outreach according to the specific situation at hand.

30.     Because services are individualized to a tenant's needs, and because those needs may change over time, some tenants participate in services on a daily basis, while others are stable with one meeting per month with their case manager.

31.     Even in the best funded supportive housing program in New York, where services for single adults are funded at $17,500 per unit per year, there would not be sufficient staff capacity to program appropriate services for each tenant for 40 hours per week.

32.     Out of the 13,861 CoC funded units in New York, more than 8,000 are scattered site, meaning that nonprofits rent units on the private market for tenants and provide services to them in the community. In rural areas particularly, where large multifamily dwellings are uncommon and difficult to develop, scattered site is the prevailing model. Case managers can drive for an hour or more to meet clients and accessing reliable and affordable transportation for clients is a common challenge. Nonprofit providers in these communities would be unable to provide 40 hours per week of services for each client and thus are at a disadvantage in this NOFO.

## Public Cost of Losing CoC-Funded Permanent Housing

33.     Decades of studies have shown that supportive housing saves public spending on shelter, hospital use, jail and prison, and other emergency services. Recent analysis from the Corporation for Supportive Housing – based on national figures, shows that a state hospital costs

$750-$3,000 per person, jail costs $115 per person, and supportive housing costs $72 per person per day.

34.    The policy shift in this NOFO is extreme and abrupt. The NOFO itself is also too late. Contracts in New York will begin to expire on January 31, 2026. According to HUD, awards will not be announced until May 2026. According to previous trends, it takes another few months for contracts to be finalized and funds to start flowing, which would mean June or July.

35.    Even if existing programs somehow meet the new criteria for funding, they could have up to a six-month gap in funding. Starting at the end of January, nonprofit providers face a difficult choice: close programs or continue operations at their own financial risk, incurring costs that may never be reimbursed.

36.    Many CoC program participants are tenants with leases. After losing funding for rental assistance, they would be unable to pay their rent. Some will leave voluntarily, but many will stay and ultimately face eviction for nonpayment of rent. New York's Housing Courts would be overwhelmed with thousands of formerly homeless tenants.

37.    New York lacks the emergency shelter and transitional housing infrastructure to absorb newly homeless households, many of whom already deal with significant challenges. Shelters across the state are operating at or near capacity.

38.    In New York City, the right to shelter established under the *Callahan v. Carey* consent decree requires the City to provide shelter to anyone who seeks it.

39.    The NYC Mayor's Management Report shows that the average daily cost of shelter is $154.76 for a single adult and $270.22 for families with children.

40.    Outside New York City, localities are not mandated to provide shelter, except under Code Blue conditions, when the temperature is expected to drop below 32 degrees with wind chill for two consecutive hours. Since most communities do not have sufficient shelter capacity, they must rely on costly motels.

41.    As mentioned above, there are 110 residences across the state that receive CoC funding for rental assistance or operating support. Loss of this funding could result in extreme financial distress and inability to cover operating costs.

42.    Over several decades, New York City (through the NYC Department of Housing Preservation and Development) and New York State (through NYS Homes and Community Renewal and NYS Office of Temporary and Disability Assistance) have invested $876.2 million in capital costs in these buildings. The City and State have a financial interest not only in keeping

tenants housed, but also in ensuring that these buildings don't become abandoned and derelict, or sold and converted to market-rate housing. The destabilization of these assets could threaten compliance with the Low Income Housing Tax Credit (LIHTC) program, which is responsible for raising $511 million in equity for these properties, as well as undermine the confidence of private investors and lenders, introducing risk into a market that depends on predictability and stability. The ripple effects would jeopardize mortgages, property maintenance, and community stability, producing significant and measurable fiscal harm far beyond the homelessness sector itself.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of November 2025.

Pascale Leone
Executive Director
Supportive Housing Network of NY