**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br>  Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br>  Defendants. | C.A. No.1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF CAROL VENTURA |

## DECLARATION OF RIHOUSING

I, Carol Ventura, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Executive Director at Rhode Island Housing and Mortgage Finance Corporation ("RIHousing"). Established in 1973 by an act of the Rhode Island General Assembly, RIHousing is a quasi-public corporation and instrumentality of the State of Rhode Island that works to ensure that all people who live and work in Rhode Island can afford a home that meets their needs. To date, we have administered over $503 million in housing development resources and have served more than 17,000 rental households.

2. I have served as Executive Director of RIHousing since 2019 and have 30 years of experience within the field of affordable housing, including housing finance, HUD programming, homeownership, and development of affordable housing.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with RIHousing staff, or from my review of relevant documents and information.

4. RIHousing is the recipient of funding in connection with the Rhode Island Statewide Continuum of Care Program (RI-500) ("CoC") as a grantee.

5. RIHousing's CoC grant (identifier RI0031) currently supports permanent housing for at least 273 people in 216 households annually. RIHousing's FY 24 grant is valued at $4,964,705. Populations served include youth aging out of the foster care system and individuals requiring supportive services such as case management. Additionally, RIHousing receives a planning grant as the designated Collaborative Applicant for the Rhode Island CoC. The

Collaborative Applicant is responsible for conducting annual funding competitions, implementing compliance processes, and fulfilling other administrative responsibilities for the RICoC. The planning grant is calculated at 5% of the RICoC's Annual Renewal Demand (ARD), which is the total value of all renewal projects.

6. The Rhode Island Continuum of Care covers the entire geographical area of the State of Rhode Island and includes a broad range of state agencies, community partners including behavioral health-care providers, non-profit organizations assisting victims of domestic violence, and individuals who volunteer to serve on the CoC Board of Directors and the Youth Advisory Board, all working together to build a statewide system to prevent and end homelessness.

7. RIHousing has received Continuum of Care grant funding, on an annual basis, since the program's inception, and prior to that received grant funding under predecessor McKinney-Vento programs.

8. As the Collaborative Applicant on behalf of the RICoC, RIHousing is responsible for initiating a local funding competition in order to gather applications from interested parties for the purposes of submitting an overall statewide funding application and project ranking for HUD's review.

9. Since 2009, HUD has prioritized Permanent Housing. Historically, CoCs were permitted, as a whole, to apply for the renewal of 100% of their funding for Permanent Housing projects. RIHousing relies on the publication of reasonably predictable and consistent NOFOs so that we can continue to pay rental assistance and associated service costs in order to support clients in maintaining their permanent housing in a manner that is in accordance with HUD regulations. This includes the payment of monthly Housing Assistance Payments towards the rental amount and covering the cost of case management services as needed for housing stability.

10. I understand that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from past practices and could cause serious harm. Shifting the funding to deprioritize Permanent Housing and instead increase funding for transitional housing could destabilize households and families that have been established in their respective communities for years. Specifically, the Nov. 13 NOFO places a cap of 30% on the total amount of Permanent Housing grants that a CoC is permitted to apply for renewal. Currently, 84% of the Rhode Island CoC's overall funding is for Permanent Housing projects, including RIHousing's FY24 contract for $4,964,705 (for the period covering January 1, 2026 - December 31, 2026). That amount covers Rental Assistance ($4,664,184), Supportive Services ($102,370), HMIS ($2,220), and Administrative Costs ($195,931). The new cap of 30% would reduce the available amount to a maximum of $4,975,784 for the entire state of Rhode Island. Considering this limited funding cap, RIHousing stands to have its grant funding significantly reduced or eliminated, and the assisted families left unsupported or dislocated altogether.

11. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

    a. RIHousing's understanding from the announcement of the FY 2024 and FY 2025 Continuum of Care Competition and Renewal was that there was authorization for two (2) years of funding available via the Consolidated Appropriations Act, 2024, and any FY 2025 funding would be authorized by a FY 2025 Congressional Appropriation, respectively. It was RIHousing's expectation that there would be level funding for projects, with a possible

    adjustment based on HUD's Fair Market Rental rates for FY25. The term would have covered the period from January 1, 2027, to December 31, 2027, for the FY25 contract RIHousing expected to receive. Staff estimates that if renewal funding for permanent housing is pared back to the extent indicated in the NOFO, 273 people currently served under RIHousing's permanent housing grant could experience a disruption in their rental assistance. Staff believes the figure to be closer to 1000 statewide. This affects the assisted families and also the landlords who depend on rental income.

12.   This NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

  a.   Historically, RIHousing's funding as a CoC grantee has been included in Tier 1 (90-95% of funding received each year). Year after year, this has been viewed as secure funding for existing households in our programs.

  b.   Adjusting this metric downward to 30% would force drastic changes to program operations on a short timeframe, given HUD's January application deadline; or, if grantees are not able to redesign their programs to fit the NOFO's new criteria, could result in funding gaps. Existing grant-funded programs, such as RIHousing's, could be crowded out.

  c.   What has traditionally been reliable, non-competitive funding would now be reduced, and the resulting uncertainty of our ability to subsidize households dependent on this funding could result in unfunded households facing evictions.

  d.   To the extent that RIHousing could attempt to adapt its program into a shorter-term transitional program favored under the NOFO, there is insufficient time

    prior to HUD's January 14 grant application deadline to do so thoughtfully and without risking displacement of tenants.

13. This NOFO states that:

 a. "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently ... conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." Pg. 55

 b. "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons ... (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." Pg. 65.

 c. "Awards made under this NOFO will not be used to ... conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." Pg. 108

 d. "You must comply with these applicable provIs10ns ... Implementing Presidential Executive Actions" like EO "14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government") Pg. 108

   e. This condition appears to be in direct conflict with HUD's Equal Access Rule and, as such, leaves RIHousing in the impossible position of having to choose to comply with the funding conditions as stated or HUD's own regulation.

14. Regarding Geographic Discrimination/"Public Safety" terms:

  a. Bonus points are awarded under the Merit Review process for. .. (Pg. 86-87):

   i. Prohibiting public illicit drug use

   ii. Prohibiting public camping or loitering

   iii. Involuntary commitment

   iv. Implementing SORNA registration and notification, and mapping the location of homeless sex offenders

   v. Cooperating with law enforcement to connect violators with services

  b. ""HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons ... (b) evidence that the project operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'" Pg. 55

15. The NOFO includes, within the Merit Review section, terms indicating that up to 3 points may be awarded for a state that "substantially implements and is compliant with the registration and notification obligations of the Sex Offender Registry and Notification Act ("SORNA").

7

16. Even if these conditions were not themselves problematic, compliance with dramatically different conditions would require a complete overhaul of our processes and those of our applicants. Furthermore, as RIHousing is located in the State of Rhode Island, it is our understanding that, with regard to the new interpretation of PRWORA, HUD is currently enjoined from requiring Rhode Island recipients to use the SAVE system in a manner consistent with the conditions in the new NOFO. *(See New York v. US. Dep't of Justice, 1:25-CV-00345-MSM-PAS, 2025 WL 2618023 (D.R.I. Sept. 10, 2025).* Additionally, the conditions listed above and contained within the Merit Review are objectively impossible for RIHousing to achieve, given that Rhode Island is not a state that "substantially implements" SORNA, nor is any other state in the New England area to my knowledge. Further, Rhode Island law authorizes "harm reduction centers" as reflected in R.I. Gen Laws § 23-12.10. As such, RIHousing, being located in the State of Rhode Island, runs the very real risk of being penalized during the Merit Review process for factors outside of its control.

17. If the status quo prevails, RIHousing will not receive the funding it was counting on, and long-term efforts to reduce homelessness will be derailed.

18. Consequences for program participants could be severe. Program participants are among the most vulnerable people in our state and often face other challenges in addition to being without a home. Overall, there is the very real potential for at least 1,020 formerly homeless and vulnerable Rhode Islanders to again be unhoused if current permanent housing subsidies are terminated. Given the lack of affordable housing opportunities in Rhode Island, there would be few alternatives for people forced to leave their established homes and begin searching for new rental units.

19. Terminating programs that rely on CoC grants will therefore increase burdens on other health, safety, and support services located within the State of Rhode Island.

[signature on following page]

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __21__ day of November 2025

*/s/ Carol Ventura*

Carol Ventura
Executive Director
Rhode Island Housing and Mortgage Finance Corporation ("RIHousing")

10