# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF TYLER JAECKEL |

**DECLARATION OF TYLER JAECKEL**

I, Tyler Jaeckel, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Director of the Division of Housing at the Department of Local Affairs for the State of Colorado.

2. I am an executive with over two decades of experience in housing policy, development, and program implementation at local, state, and federal levels. I have worked on creating innovative housing solutions and leveraging data-driven strategies. Notably, I have led the launch of Denver's Supportive Housing Social Impact Bond Initiative, the city's largest supportive housing program which provides stable homes and services for hundreds of chronically homeless individuals. I have also engaged in housing policy through the U.S. Senate Subcommittee on Housing, Transportation, and Community Development, and oversaw the implementation of federal funds as Chief of the Office of Federal Funds and Strategic Initiatives for the Governor of Colorado.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Colorado Department of Local Affairs staff, or from my review of relevant documents and information.

4. The Colorado Department of Local Affairs (DOLA), Division of Housing (DOH) serves as the Colorado Balance of State Continuum of Care's ("BoS CoC") Collaborative Applicant and has served in this role since 2023. DOLA as the Collaborative Applicant or Lead Agency, coordinates, prepares and submits the annual consolidated CoC application. DOLA staff support the operations of the BoS CoC including providing operational support to the BoS CoC Governing Board and its committees, workgroups and CoC-wide member meetings. DOLA also

serves as the Homeless Management Information System (HMIS) Lead agency and a recipient of CoC funds through the other three CoCs in the State.

5. As the Director of Housing, I oversee the Division responsible for overseeing housing funding for the State of Colorado. This includes funds for homelessness and our team that implements the Colorado BoS CoC.

6. The Colorado BoS CoC is made up of Colorado's 54 rural and non-metro counties. The 54-county region is organized into ten subregion CoC Planning Groups. The BoS CoC Governing Board is the governing body of the BoS CoC and is authorized by BoS CoC members to make decisions on behalf of the BoS CoC. The Board includes up to 25 members who serve on a volunteer basis. The Board is not incorporated as a 501(c)(3) nonprofit organization and it is not a legal entity. The Board membership is comprised of two representatives from each of the subregions within the BoS CoC (Pueblo, Grand Valley, Northeastern Plains, Las Animas/Huerfano, Upper Arkansas Valley, San Luis Valley, Western Slope, Southwest Colorado, and Roaring Fork/Eagle Valleys), at least one individual with lived experience of homelessness, and at-large members nominated and voted on by regional coalitions and/or Board Members. Up to one regional representative may be a CoC-funded service provider.

7. The BoS CoC Board meets at least monthly. Due to the size and geography of the CoC, Governing Board meetings are conducted virtually with one in-person annual Board meeting.

8. Colorado is organized into four HUD-designated CoCs: the Metro Denver CoC, which includes seven counties (Adams, Arapahoe, Boulder, Broomfield, Denver, Douglas, and Jefferson); the Northern Colorado CoC, which includes Larimer and Weld counties; the Pikes Peak CoC, which includes El Paso county; and the BoS CoC, which includes Colorado's remaining 54 non-metro and rural counties. Each CoC designates a Collaborative Applicant under 24 C.F.R.

Part 578, responsible for community-wide planning, project ranking, and application for competitive HUD funding. Through these entities, organizations and governments within Colorado receive significant federal allocations—totaling over $43.6 million in FY 2024—to support Permanent Supportive Housing, Rapid Re-Housing, Transitional Housing, and Coordinated Entry Systems across the state.

9. Colorado relies on CoCs as a principal source of federal funding and coordination for homelessness assistance. According to HUD's award making data, since the CoC program began in 2005, CoCs in Colorado have received a total of $427,829,015 in CoC funding, with the BoS CoC receiving $50,048,120.

10. The goal of the BoS CoC is to promote a community-wide commitment to the goal of ending homelessness in the 54 small and medium-populated counties in Colorado. Through the BoS CoC, a wide range of local service providers, including non-profit organizations, city, county and state governments, and regional housing authorities receive access to funding. The BoS CoC has access to about $3 million annually through the annual HUD CoC competition; approximately 84% of that funding went to permanent housing projects during the previous grant cycle.

11. DOLA is the Collaborative Applicant for the BoS CoC. As the Collaborative Applicant for the BoS CoC, DOLA is responsible for preparing and submitting the consolidated CoC Program application to HUD and ensuring that the application complies with all regulatory requirements under 24 C.F.R. part 578. It oversees system governance, establishes required policies and procedures, and administers CoC grants on behalf of participating counties and service providers.

12. DOLA receives funding directly from the CoC Program, some of which it passes through to providers and some of which it administers.

13. The annual competition for project applicants requires significant effort to ensure high-quality, community-informed applications. This work includes, but is not limited to: 1) identifying and documenting community needs for new or expanded projects; 2) recruiting and securing commitment from program partners, including service providers and housing partners; 3) developing a sound project budget including required 25% match; 4) securing necessary organizational buy-in on the proposed project and budget; 5) reading and interpreting the CoC Notice of Funding Opportunity (NOFO); 6) writing the project application; 7) compiling all required supporting materials and attachments; 8) reviewing the application internally for accuracy and compliance; 9) submitting the completed project application to the Collaborative Applicant; and 10) answering any follow-up questions from the Collaborative Applicant or the Project Ranking Committee as needed.

14. The Collaborative Applicant's role in coordinating with and advising member applicants in normal circumstances involves a comprehensive process before and during the competition cycle, as well as ongoing support. This work includes, but is not limited to:

- Grant Performance and Recruitment: Working with current grant recipients to strengthen their performance throughout the course of the award and actively recruiting new potential applicants from across the Balance of State.

- NOFO Review and Communication: Reviewing the NOFO once released and alerting all current and prospective applicants to any changes made to the application materials, process, or timeline.

- Publicizing Competition Information: Posting information regarding the NOFO and the Balance of State funding competition on our website (including providing screenshots to HUD with our consolidated application).

- Applicant Technical Assistance: Sending a newsletter to our entire listserv regarding the NOFO release, publicizing an informational webinar, and hosting the webinar to review the NOFO process and timeline. We also answer technical application process questions from applicants during the competition window.

- Application Processing and Submission: Coordinating the ranking and rating committee and supporting members with technical assistance. Alerting applicants of their ranking after the rating and ranking committee's review, and collecting any other necessary materials from applicants prior to submitting the consolidated application to HUD.

- Facilitating Governing Board Approval: Informing the Governing Board of the proposed project ranking for their review, answering any technical questions, facilitating and documenting a vote of approval, as required by HUD.

15. DOLA, in its role as the Collaborative Applicant, manages and prepares the consolidated application and submits the application to HUD. The annual competition includes the following activities: 1) review and approve HUD's Grant Inventory Worksheet; 2) read and interpret HUD's Notices about CoC registration and other topics; 3) complete the CoC registration process; 4) review and interpret the CoC NOFO; 5) plan for and prepare all three parts of the consolidated application (Project Rankings, Attachments and CoC Application); 6) provide technical assistance on HUD CoC funding and the application process to project applicants; 7) support the local competition; 8) complete the first draft of the CoC application; 9) serve on the Project Ranking Committee and compile ranking data; 10) notify applicants of ranking; 11) facilitate and prepare attachments; 12) distribute draft application materials to Board; and 13) submit Board approved application to HUD.

16. DOLA has been serving as the Collaborative Applicant for the BoS CoC since 2023. The BoS CoC has been a recipient of CoC (formally known as Shelter Plus Care) funding for over two decades.

17. DOLA, as the Collaborative Applicant for the BoS CoC, relies upon reasonably predictable and consistent NOFOs to make strategic progress in developing and sustaining a homeless response system that serves the 54 counties within the BoS geography. The BoS CoC makes data-informed funding decisions that respond to the specific community needs. Many BoS CoC providers operate permanent housing programs with long-term lease commitments and service staffing models that depend on stable annual HUD renewals for rental obligations, service contracts, and personnel costs. Because providers in the BoS CoC serve rural counties with limited local revenue or philanthropic support, they are reliant on HUD grant money and have little capacity to replace lost federal dollars.

18. DOLA is also a grant recipient of CoC funds administering tenant-based rental assistance for 80 of the 86 households in permanent supportive housing in the Balance of State. These programs are highly successful in keeping individuals out of homelessness and have been relied upon by communities for years.

19. The HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025 (the "Challenged NOFO") represents a significant departure from past practices and will cause serious harm.

A. **The Challenged NOFO's Rescission of FY 2025 CoC Funds**

20. The Challenged NOFO states that it "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and

7

Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." Challenged NOFO at 15.

21. HUD's FY 2024 NOFO provided that, "CoCs are only required to submit one CoC application that will be applicable to the FY 2024 and FY 2025 funds. HUD reserves the right to award available FY 2025 funds (the FY 2025 CoC program and YHDP funds) based on this NOFO competition." DOLA, as the Collaborative Applicant for the BoS CoC, received a CoC funding commitment of $2,914,544 from HUD for FY 2024, and expected at least that same amount for FY 2025 for these same applications, depending on the Annual Renewal Demand (ARD). The ARD for the BoS CoC was recently announced to be $4,083,405 for FY 2025. The State entered into commitments with our subrecipients for our projects based on this timeline.

22. Many of HUD's FY 2024 awards will expire in 2026, including many before May 2026 when the Challenged NOFO will take effect. For example, BoS CoC awards will start to expire on February 28, 2026. With the deadline to submit applications for FY 2025 funding now set for January 14, 2026, the earliest that awards will be executed is May 2026. As a result of this rescission of previously awarded FY 2025 funds and new CoC competition, HUD has manufactured a dangerous lapse in funding for homeless service providers, which will result in a gap in support and services for the individuals currently receiving housing assistance.

23. Across the State, CoC funding currently supports the housing of over 2,600 formerly homeless individuals, with the vast majority being individuals living with a disability and also including many children. Within the BoS, With the rescission of funding for 2025 and expected gap in support, many of these individuals risk loss of housing unless other funding can be found. This potential loss of housing for both disabled individuals and families would have profound health impacts, and also impact children's access to education.

24. Moreover, the sudden termination of project funding will force the State and providers to undertake expensive and rapid operational adjustments, including significant staff layoffs. This loss of personnel will directly result in fewer case managers and reduced service capacity, disrupting connections between case managers and their highly vulnerable clients, and also result in the loss of experienced, specialized staff (both project staff as well as BoS CoC), who are integral to long-term projects and a reliable homeless response system.

25. Colorado's emergency shelter system is an inadequate substitute for these services, and is not equipped to absorb the massive influx of people who may be evicted. The rescission of FY 2025 funds may very likely lead to a system-wide crisis and increased unsheltered homelessness, placing new burdens on emergency medical systems, state- and federally-funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs serving unhoused families. Rural counties in the BoS CoC—already operating with limited behavioral-health and emergency-response infrastructure—will experience disproportionate impacts and increased need for state funds.

26. Ultimately, any increase in homelessness will result in increased costs to Colorado, which can include the costs of arrests, days spent in jail, emergency medical services, and detoxification services (to name just a few), costs which permanent supportive housing have proven to reduce. The rescission provision destabilizes CoC's programming, and any increase in homelessness will significantly impact the State, which will need to bear portions of these costs.

**B. The Challenged NOFO's Caps on Tier 1 Projects and Permanent Housing**

27. Under the heading "Increase in Competition," the Challenged NOFO provides that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Challenged NOFO at 15. The Challenged NOFO further provides that "no more than 30 percent of a CoC's Annual

9

Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Challenged NOFO at 15. "PH" refers to Permanent Housing, "PSH" to Permanent Supportive Housing, and "RRH" to Rapid Rehousing.

28. These provisions are a significant departure from prior NOFOs that prioritized permanent housing. Prior NOFOs placed 90-95% of the CoC's ARD in Tier 1. This prior focus on Tier 1 allowed CoCs to renew permanent housing projects that are performing well and supporting community efforts to reduce homelessness. As a result, all four Colorado CoCs have prioritized their CoC funding for permanent housing projects for more than a decade, investing 89% of their current CoC funds in permanent housing interventions.

29. HUD's 30% cap on Tier 1 and further 30% cap on permanent housing puts a significant amount of CoCs funding at risk of nonrenewal—across the State and based on FY 2024 allocations, Colorado's CoC investment in permanent housing programs was estimated to be $39.2 million for 2025. With HUD's new 30% cap, the maximum that could be awarded is $13.2 million, which will result in a $26 million reduction in permanent housing funding for 2025. These funds are not guaranteed to be redistributed within a CoC, and in any event they would not be available for permanent housing under the Challenged NOFO.

30. These caps risk an abrupt termination of funding for BoS CoC permanent housing programs. For example, the Colorado BoS CoC invested 84% of its ARD for 16 permanent housing projects (through 8 CoC awards) funded under the FY24 CoC competition. These projects serve over 250 individuals in rural and non-metro counties across Colorado.

31. DOLA is also a grant recipient of CoC funds, currently administering tenant-based rental assistance for 58 of the 63 households in permanent supportive housing in the Balance of

10

State. These programs are highly successful and have been funded for years. A sudden loss in these funds would result in many of these households becoming homeless.

32. Both 30 percent caps threaten to disrupt program structures that the State of Colorado and local partners built over years in alignment with HUD's prior emphasis on permanent supportive housing and Housing First approaches. Colorado's homelessness response system relies on a predictable pipeline of federally supported permanent housing. If these conditions take effect, existing coordinated-entry policies, performance measures, and regional housing plans that were made in reliance on previously available federal resources will be thrown into disarray. Providers that developed permanent supportive housing capacity based on prior federal guidance, through multi-year leasing arrangements, case-management teams, and supportive-services partnerships, would face expensive operational adjustments and, in some areas, the contraction or closure of housing programs.

33. The reduction in permanent supportive housing capacity would also shift significant costs to other Colorado state public services. Individuals with complex behavioral-health needs who previously stabilized in permanent supportive housing will experience increased housing instability and higher rates of crisis service use. This escalation places new burdens on emergency medical systems, state- and federally-funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs serving unhoused families. Rural counties in the BoS CoC—already operating with limited behavioral-health and emergency-response infrastructure—will experience disproportionate impacts and increased need for state funds. As a result, the challenged conditions will not only destabilize existing housing programs but will also increase expenditures and operational pressures across multiple Colorado state and local agencies.

34. These impacts are substantial. Across the State, CoC funding currently supports the housing of over 2,600 formerly homeless individuals across approximately 70 projects funded through 36 CoC awards. The sudden and dramatic cap of these expected funds would result in nearly 1,900 Colorado households at risk of losing their housing assistance. Over 775 children and youth are vulnerable to losing their housing, as are another 610 older adults (62+). In the BoS CoC, there are 254 people currently receiving housing assistance who would be vulnerable to losing their housing. Further, as described above and where these changes will increase homelessness, the State and the BoS CoC will be significantly impacted where the State and providers will need to undertake expensive and rapid operational adjustments, Colorado's emergency shelter system is an inadequate substitute for these services, and the State will necessarily face increased costs.

### C. The Challenged NOFO's Limits on Programs Administering or having Administered to HUD's Previous Standards

35. The Challenged NOFO has a "project quality threshold" in which "Permanent Housing projects must receive at least 6 out of the 8 points available" to be considered for funding. It further awards three points for offering "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)" and "[d]emonstrat[ing] that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment)," which means that applicants who do not mandate participation in supportive services as a precondition to receiving housing cannot meet the minimum threshold for funding. Challenged NOFO at 55, 62. The Challenged NOFO also awards up to 10 points for projects if a CoC can "demonstrate that projects require program participants to take part in supportive services . . . in line with 24 CFR 578.75(h)." Challenged NOFO at 80.

36. The Challenged NOFO is a reversal of HUD's decades-long Housing First policy. HUD previously required and endorsed a Housing First approach in the FY 2024-2025 NOFO and prior NOFOs. Consistent with prior HUD requirements, Colorado has aligned efforts with HUD's long-standing guidance to provide supportive services within housing while not mandating participation as a precondition for entering housing. The sudden reversal of this policy in the Challenged NOFO will cause significant negative impacts, specifically by rendering projects funded under previous NOFOs—including those that relied upon HUD guidance—ineligible for renewal. This change would result in the abrupt termination of funding for programs and housing assistance for current program participants, harming Colorado and the BoS CoC for the reasons described above.

37. The Challenged NOFO also provides that one out of an available six points each for TH and PH-PSH projects is awarded to projects that "serve . . . individuals with a physical disability/impairment or a developmental disability . . . not including substance abuse disorder." Challenged NOFO at 61. This is a significant change given that Congress defines the term "homeless individual with a disability" to include an individual who "has a disability that . . . is a physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse." 42 U.S.C. § 11360(10)(A)(i)(IV). HUD also incorporated this definition of disability into its definition of "chronically homeless." 24 C.F.R. § 578.3. Consistent with these definitions, Colorado and the BoS CoC has provided services and housing assistance to disabled individuals meeting this broader definition. The Challenged NOFO's awarding points for this narrowed definition will harm Colorado and BoS CoC by potentially creating a denial and gap in services for this critical population, in addition to uncertainty of how to navigate and score potential conflicts between this NOFO, Fair Housing laws and CoC Program regulations.

### D. The Challenged NOFO's Gender Ideology Provisions

38. The Challenged NOFO provides that "[a]wards made under this NOFO will not be used to . . . conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." Challenged NOFO at 55, 65, 108.

39. The Challenged NOFO's provisions, which bar funding for activities that "rely on or otherwise use a definition of sex as other than binary in humans," directly threaten the eligibility of service providers within the BoS CoC. These provisions appear to function as threshold criteria, meaning any applicant who has acknowledged or addressed the specific needs of transgender, gender-diverse, and non-binary individuals, as previously encouraged by HUD—either in the past or present—is now at risk of being categorically barred from CoC funding.

40. This change will affect the BoS CoC and its providers because prior NOFOs specifically encouraged providing services to these individuals. For example, the FY 2024-2025 NOFO explicitly encouraged CoCs to "address the specific needs of transgender, gender diverse, and non-binary individuals and families." Providers who followed this prior HUD guidance to build inclusive and tailored service models will now be punished for their compliance, by making projects funded under previous NOFOs ineligible for renewal under this NOFO and resulting in a fundamental breach of trust and consistency from the federal partner. This also creates a no-win scenario for the BoS CoC, forcing it to either abandon a vulnerable client population or lose critical federal funding.

41. I expect these provisions to significantly impact the State, its citizens, and the BoS CoC. Transgender, gender-diverse, and non-binary individuals are disproportionately represented in the unhoused population, and these new provisions will result in this vulnerable population losing access to life-saving housing and services, and forcing them back into homelessness where

they face increased risk of violence, exploitation, and poor health outcomes. I also expect that without HUD funding, service providers will suffer staff layoffs, and the dismantling of service models designed to be best practice, fundamentally destabilizing the network of care. In turn, the BoS CoC, as the Collaborative Applicant, will be unable to fulfill its mission to promote a community-wide commitment to ending homelessness for all populations in its 54-county region. The Challenged NOFO's policy creates a funding barrier that prevents the CoC from meeting the distinct needs of a demonstrably vulnerable subgroup of the homeless community.

### E. The Challenged NOFO's Public Safety Provisions

42. The Challenged NOFO awards points for the existence and enforcement of local protocols related to safety. Challenged NOFO at 86-87.

43. Past NOFOs did not connect HUDs funding decisions to a jurisdiction's adoptions of laws or practices that were not under the control of the organizations delivering services. As applied to the BoS CoC, the BoS covers 54 different counties which makes compliance and determination of this very difficult.

44. These provisions will cause significant harm to Colorado and the BoS CoC. The CoC will be forced to rank and fund projects not on their ability to deliver services, but on their location's laws. This will lead to the rejection of high-performing, established projects, weakening the overall service system and undermining the CoC's mission to promote a community-wide commitment to ending homelessness.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of November 2025.

_____
Tyler Jaeckel
Director of the Division of Housing at the
Department of Local Affairs for the State of
Colorado