# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>                Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>                Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM<br><br>DECLARATION OF NANCY NAVARRETTA |

## DECLARATION OF NANCY NAVARRETTA

I, Nancy Navarretta, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the State of Connecticut. I am over the age of 18, competent to testify as to the matters herein, and make this declaration based on my personal knowledge.

2. I am the Commissioner of the State of Connecticut Department of Mental Health and Addiction Services ("DMHAS").

3. As the Commissioner I am responsible for leading DMHAS in its role in promoting and administering comprehensive, recovery-oriented services in the areas of mental health treatment and substance abuse prevention and treatment throughout Connecticut.

4. Through the Continuum of Care Program, the U.S. Department of Housing and Urban Development ("HUD") issues grants to coalitions pursuant to a Notice of Funding Opportunity. Each coalition is known as a Continuum of Care ("CoC").

5. A CoC is organized to carry out the responsibilities prescribed in the CoC Program for a defined geographic area and is composed of representatives of organizations including but not limited to governments, public housing agencies, and various services providers.

6. Responsibilities of a CoC include operating the CoC, designating and operating a Housing Management Information System (HMIS), planning for the CoC (including coordinating the implementation of a housing and service system within its geographic area that meets the needs of the individuals and families who experience homelessness there), and designing and implementing the process associated with applying for CoC Program funds.

7. There are two CoC's in the State of Connecticut. The Connecticut Balance of State ("CT BOS") CoC covers cities, towns and counties, except for Fairfield County. DMHAS serves

as the Collaborative Applicant and is a grantee under the CT BOS CoC. The Opening Doors Fairfield County ("ODFC") CoC is the second CoC within Connecticut and covers all towns and cities in Fairfield County. DMHAS is a grantee under the ODFC CoC.

8. As the Collaborative Applicant for the CT BOS CoC, DMHAS is the eligible applicant designated by the CoC to collect and submit the CoC Registration and CoC Consolidated Application (which includes the CoC Application and CoC Priority Listing), and to apply for CoC planning funds on behalf of the CoC during the CoC Program Competition.

9. Many CoC members receive funding directly from HUD or receive HUD funding via DMHAS. Each applicant responds to Notice of Funding Opportunity ("NOFO") questions for each renewal or for new funding. The questions are based on HUD goals as outlined in the NOFO. Agencies provide a narrative and an annual budget for each grant. As the Collaborative Applicant, DMHAS collates all NOFO responses, assists with ranking the applications to ensure high performing programs have a higher probability for renewal, and submits the entire NOFO response on behalf of the CT BOS CoC. DMHAS is the lead applicant for over 50 grant applications annually.

10. DMHAS has been the Collaborative Applicant, had a representative on the CT BOS CoC, and been a co-chair of the CT BOS CoC since the 1990s. DMHAS and the other applicants have been consistently awarded funding since the 1990s. For example, DMHAS was awarded approximately $24 million in 2016, $28 million in 2020, and $42 million in 2024. DMHAS has fostered positive relationships with landlords and service providers as evidenced by consistent funding over the past several decades, and the State has increased the housing subsidy stock and housing portfolio during that period.

11. On November 13, 2025, HUD released the FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO. This NOFO represents a significant departure from past practices and will cause serious harm.

12. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

    a. Beginning with the FY 2024 CoC Competition, CoC funding was to be approved and provided on a two-year cycle, decreasing the burden of an annual renewal application and providing two years of funding to applicants.

    b. The NOFO application is a lengthy, detailed and time-intensive process. Given the late release of the FY 2025 NOFO and the rescission of "any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024," grants scheduled to begin between January 1, 2026, and June 30, 2026, will likely not be funded during that six-month timeframe. Those grants total more than $17 million.

    c. Without that funding, subsidies will end, and people will face returning to homelessness. Landlords will also lose rental income and may need to evict persons residing in subsidized units, resulting in increased administrative burdens for courts due to court filings and subsequent trials.

13. The FY 2025 NOFO also provides that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."

    a.    Connecticut's CoCs will be limited to applying for approximately $30 million that would be protected if the applications are placed in Tier 1. All other projects in Tier 2, approximately $70 million, will be subject to a national competition with more than 400 other projects. As a result, Connecticut's CoCs may be awarded only a portion of the $70 million, with no guarantee of any projects being funded.

    b.    Over the past decade Tier 1 has equaled approximately 94% of the CT BOS CoC's Annual Renewal Demand. The current NOFO demonstrates a substantially reduced portion protected in Tier 1 resulting in the majority of available funds being in jeopardy.

    c.    Without this funding, subsidies will end and people will face returning to homelessness. Landlords will also lose rental income and may need to evict persons residing in subsidized units, resulting in increased administrative burdens for courts due to court filings and subsequent trials.

14.    The FY 2025 NOFO further provides that, "[i]n order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects."

    a.    In prior CoC Program NOFOs, there has not been a cap on the amount of funding that could be used to support Permanent Housing ("PH") projects. After the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act of 2009, and in the early years of the CoC program, HUD took a strongly critical stance toward most forms of Transitional Housing ("TH").

        HUD viewed TH as low performing, and multiple forms of HUD guidance emphasized that TH showed higher costs per household than Rapid Rehousing ("RRH"), lower exits to PH compared to RRH, and limited evidence of improved long-term outcomes. In recent years, HUD has strongly encouraged and scored programs based on using the PH model rather than TH or Support Services Only.

    b.    CoC Program funding in Connecticut is primarily used for PH projects including PH-PSH, PH-RRH and Joint TH and PH-RRH projects. For example, 85% of the CT BOS CoC's allocation funds PH, with 61% funding PH-PSH, 22% funding PH-RRH and 2% funding Joint TH/PH-RRH projects. Therefore, the 30% PH cap will drastically reduce the amount of funding that Connecticut entities receive to support PH projects.

    c.    The 30% PH cap will harm individuals, communities, providers, participants, and landlords. Subsidies will end and people will face returning to homelessness. Landlords will also lose rental income and may need to evict persons residing in subsidized units, resulting in increased administrative burdens for courts due to court filings and subsequent trials.

15.    DMHAS and various Connecticut entities have applied for and received CoC Program funding for over 30 years. The prevailing goals have been to provide permanent housing along with supportive services to decrease homelessness and increase participants' community involvement. The new conditions set forth in the FY 2025 NOFO are a stark contrast to and departure from previous NOFO requirements, goals, and outcomes. Implementing these changes will result in severe disruptions across Connecticut.

16. These new conditions will require DMHAS to completely re-operationalize policies, processes, and procedures currently in place regarding who receives housing subsidies and supportive services.

17. The new conditions, including the 30% PH cap, will result in applicants losing significant HUD-funded operating and service dollars. This will derail long-term projects and force applicants to scale back or eliminate essential housing and behavioral health services. This funding reduction will also destabilize applicant budgets and limit their ability to retain qualified staff or meet evidence-based practice standards.

18. The loss of CoC funding will weaken DMHAS' capacity to respond to homelessness in an integrated and coordinated manner. Entire communities will be affected by the limitations on funding. There will be a reduction in the number of available housing units, worsening unsheltered homelessness and creating negative impacts to healthcare systems and public safety. The reductions will directly affect citizens with the highest needs and create human and financial cost for Connecticut.

19. Program participants are among the most vulnerable people in Connecticut and often face other challenges in addition to being without a home, such as mental health and substance use disorders, physical health issues, and extreme poverty. The increased homelessness resulting from these new conditions will therefore increase burdens on other state health, safety, and support services, including those services provided by DMHAS.

20. The conditions set forth in the FY 2025 NOFO will result in many people returning to homelessness and will have devastating consequences for DMHAS and entities across Connecticut.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of November 2025.

_____
Nancy Navarretta, M.A., LPC
Commissioner
Connecticut Department of Mental Health and Addiction Services