UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF MATTHEW HECKLES |

## DECLARATION OF MATTHEW HECKLES

I, Matthew Heckles, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Director of the State Housing Authority for the State of Delaware.

2. I am Delaware's Housing Director and the Director of the Delaware State Housing Authority (DSHA) as of January 29, 2025.

3. I served in the Biden-Harris Administration as the Mid-Atlantic Regional Administrator for the U.S. Department of Housing and Urban Development (HUD), where I oversaw the delivery of federal housing programs across Delaware, Maryland, Pennsylvania, Virginia, Washington, D.C., and West Virginia. Prior to my service at HUD, I led the Community Development Administration in Maryland, overseeing a wide range of affordable housing and economic development programs. For more than a decade, I served DSHA as a legislative and policy advisor and then Director of Policy and Planning and Director of Housing Finance. During that time, I helped pass legislation to protect domestic violence victims, reconstitute the Council on Housing and created the State Rental Assistance Program. I was also responsible for all mortgage lending activities, multi-family bond financing, foreclosure prevention programs, and created innovative programs to support low- and moderate-income families. I earned a Bachelor of Arts in Economics and International Relations and a Master of Business Administration from the University of Delaware.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DSHA and Housing Alliance Delaware staff, or from my review of relevant documents and information.

5. On November 13, 2025, the United State Department of Housing and Urban Development ("HUD") issued a Notice of Funding Opportunity pertaining to [FY 2025] HUD Continuum of Care (CoC) grants (the "NOFO"), which are designed to promote community-wide commitment to the goal of ending homelessness.

6. The NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

7. As I discuss further below, enforcement of the NOFO would result in a reduction of upwards of 70% of Delaware CoC's previously awarded $11.8 million in federal CoC funding for Fiscal Year 2025. The reduction in federal CoC funding would significantly impair our ability to use state matching funds effectively. Delaware's state-level resources are already constrained, and state programs lack the capacity – and the funding necessary – to meet the needs of individuals with disabilities without the support of federal funds. A loss of $8 million in federal support would leave critical gaps in services that the state alone cannot fill. In addition, the NOFO purports to require changes in policy and other terms and conditions that would be impossible to implement on the required timeline and would unacceptably require Delaware's housing programs to value some Delawareans' lives more than others.

8. The Delaware Continuum of Care is a community-based collaborative that ensures a responsive, fair, and just approach to addressing homelessness, and strives to achieve housing for all. Housing Alliance Delaware (HAD) is the administrator of Delaware's CoC, which is the only CoC in the state. DSHA has an employee on the CoC's Board of Directors as well as its funding committee. DSHA works with the CoC to strategize increasing the number of housing units available for the most vulnerable of Delaware's population – the unhoused.

9. Delaware State Housing Authority is the state's housing finance agency, the department of housing, and one of Delaware's five public housing authorities. We are the conduit between government and constituents. I have been directed by Governor Matthew Meyer (D – DE) to implement the plan originally outlined in his State of the State address to Delaware's 153rd General Assembly on April 11, 2025, in which he stated, "... I will sign an Executive Order to reconstitute the Delaware Interagency Council on Homelessness. Director Matt Heckles will lead this body to deliver to our most vulnerable friends and neighbors the comprehensive support they need to get back on their feet."

10. The CoC is a statewide funding mechanism, serving all of Delaware and its three counties. The CoC prioritizes increasing the local affordable housing supply by:

- Prioritizing projects for CoC funding that create new/additional permanent housing units for people experiencing homelessness
- Working with Delaware's five (5) public housing authorities (including DSHA) to increase access to vouchers/subsidies for people experiencing homelessness and to develop move-on strategies to increase the number of permanent supportive housing (PSH) units available for the most vulnerable people experiencing homelessness
- Advocating for increased affordable housing funding, and
- Engaging local leaders around zoning and land use reform to increase the affordable housing supply

11. The Delaware CoC Board consists of 11-21 members elected by the CoC voting membership. CoC Board members are responsible for governing on behalf of the DE CoC, leading the process by which the CoC sets strategic goals and priorities to address homelessness throughout the state.

12. The Delaware State Housing Authority works closely with the CoC to meet the needs of the homeless community in our state. In FFY24, the CoC utilized 85% of their funding to support permanent housing programs ($11.8M). In 2023, that number was 83% ($10M) and, in 2022, that 82% ($9M). Permanent housing is the CoC's priority.

13. In support of and complementary to programs funded through the HUD CoC grant, DSHA and the State of Delaware deploy funding through Housing Development Fund (HDF), Home4Good program in partnership with the Federal Home Loan Bank of Pittsburgh, HUD's Emergency Solutions Grant (ESG), Housing Opportunities for People With Aids grant (HOPWA), Community Development Block Grant (CDBG), HOME ARP, and Delaware's Department of Health and Social Services Shelter and Transitional Housing Program, in addition to Medicaid and other programs for people with disabilities. We allocate a tremendous amount of resources into Delaware through programs we administer that support participants that will be affected through the actions of this NOFO.

14. Delaware State Housing Authority has been working in this role for 55 years. It was created in 1968 as a public corporation in the Delaware State Department of Housing. In 1970, DSHA became part of the Department of Community Affairs and later, in 1987, joined the Delaware Economic Development Office. Recognizing the critical services provided by DSHA, then-Governor Thomas R. Carper established DSHA as an independent authority in the Executive Department in 1998, with the Director reporting directly to the Governor as a member of the Cabinet. This historical step cemented the role of affordable housing as a key aspect of State policy. For more than five decades, DSHA has been working to house Delawareans, and has been working alongside other advocates on Delaware's CoC since its inception in 2015. From the 2025 CoC Annual Report, "Together, we work to address homelessness statewide while ensuring all the

requirements to receive federal homelessness assistance funding are met. On any given night, hundreds of households across Delaware are without stable and safe housing. This includes veterans, youth aging out of foster care, individuals with disabilities, and survivors of domestic violence. We hear the cry from our neighbors in need." Many in Delaware say that we are "a state of neighbors." That is symbolic of the relationship between DSHA and those working on the CoC.

15. Delaware is focused on ending homelessness in our state. The Delaware Interagency Council on Homelessness (DICH) was created in 2005 and only dissolved in 2018 by House Bill 422 (149th General Assembly), when "changes to the primary course of federal assistance for resources for homelessness required the establishment of a Continuum of Care. The similar goals, tasks, and membership of the CoC have made the DICH obsolete and duplicative." This action – more of a consolidation than a termination - demonstrates the duplication and overlay of work performed by the CoC and the legislatively authorized (DICH) body responsible for providing leadership on the issue of addressing homelessness in Delaware. The collaboration was so extensive that the two entities were collapsed into one resulting in a mutual delegation of responsibility between the State and the CoC. DSHA provides operational Housing Development Fund (HDF) funding to HAD (CoC lead applicant) specifically to support its role as the State's lead agency on homelessness and coordinator of the CoC. Given that this funding is intended to enable HAD to perform functions that could otherwise fall to the State, it is reasonable to conclude that DSHA has effectively delegated certain homelessness-related responsibilities to HAD. Accordingly, HAD and the CoC may be viewed as carrying out duties on behalf of DSHA when performing these functions.

16. DSHA was directed by Governor Meyer through Executive Order 8, issued April 17, 2025, to establish the Delaware Interagency Collaborative to End Homelessness (the

Collaborative), thereby creating a new statewide leadership body to coordinate policy, funding and service delivery for individuals and families experiencing homelessness. Comprising of 15 members, including Housing Alliance Delaware's Executive Director and the Chair of the Delaware Continuum of Care, meetings occur monthly, with progress being made on identifying funding sources and resources available for those confronting housing insecurity. The work of the Collaborative is focused on aligning state resources in ways that recognize Federal investments in the homelessness delivery system and leverage those programs in a to implement a more complete system of programs and services. The final report to Governor Meyer is due January 15, 2026. The Collaborative has performed a statewide review of all state agencies, non-profits and advocacy groups working to address homelessness. The findings include increased investments in homelessness prevention programs, supporting low-barrier entry into shelters with supportive services, and creating units of permanent supporting housing for the 44% of homeless Delawareans who require such.

17. Right now, there are 11 agencies and non-profits in Delaware that collectively provide 446 units of shelter, including transitional and permanent housing, through the CoC. These programs are primarily supported by federal funds, with additional co-funding support from the State of Delaware. The NOFO requires our CoC to choose between our current programs and people being served and decide – based on new arbitrary and capricious rules – that some Delawareans' housing - and, indeed, their lives - matter more than others.

18. Delaware – since 2009 – has steered and been steered by the HEARTH Act to provide stability for those that need it most by implementing fair and consistent policies for housing. Since approximately 2005, it has also adhered to a Housing First model, which views housing as the foundation for life improvement and enables access to permanent housing without

7

prerequisites or conditions beyond those of a typical renter. Housing First is a homeless assistance approach that prioritizes people getting basic necessities such as food and a place to live before finding a job, learning to budget, or addressing substance use issues. Expecting people to address employment, treatment, or recovery challenges without stable housing in place leads to far greater incidences of failure and recidivism. The model believes that client choice is valuable in housing selection and supportive services participation, and that choice is likely to make a client more successful in remaining housed and improving their life. According to a systematic review of 26 studies conducted by the National Low-Income Housing Coalition, Housing First programs decreased homelessness by 88% and improved housing stability by 41% compared to Treatment First programs, providing evidence that individuals experience increased quality of life outcomes. The Housing First approach is flexible and responsive, allowing it to be tailored to help anyone.

19. These agencies, who trust the CoC to provide funding, are being asked to completely abandon their missions and visions that have produced the best outcomes according to rigorous data analysis and evidence-based best practices. They are being asked to react immediately and adopt a new set of standards that will force them to deliberately revictimize the most vulnerable among us, who cannot do anything to stop it.

20. Because we adhere to best practices, we have prioritized permanent housing over transitional housing because we know these strategies will reduce homelessness in Delaware. We know that transitional housing is more expensive, results in longer periods of homelessness, and leads to higher rates of return to homelessness. Reducing the amount of time individuals and families, including those who are chronically homeless with disabilities, experience homelessness is a key element of why we have chosen this path and why we have been successful.

21. Enforcing the NOFO would force Delaware to abandon its successful model of permanent housing and a shift to transitional housing would undo decades of work and progress.

22. This NOFO seems to be based on the belief that homeless equals criminal. Or, perhaps, that every person experiencing homelessness is in need of mental health or substance use treatment. This is simply untrue. In fact, homelessness data shows more individuals and families experiencing homelessness for the first time, more falling into homelessness because of the cost of living and cost of housing, more elderly people, more families, more people who just can't make the math of living work. There is still a cohort of people who would meet the definition of chronically homeless but these are the people who need the permanent housing being eliminated by this NOFO. Instead of judging and criminalizing those who are unhoused, we have a duty to offer resources and assistance. Those who are unhoused should not go unheard; we should be listening to their needs and helping in any way we can. LGBTQIA+ individuals experience homelessness at a higher rate than the general population, further preventing them from receiving safe, reliable housing and resources they need. This NOFO supports criminalization and isolation of those who are deemed "different" than those who penned it.

23. In addition, the loss of federal funding that would be caused by implementation of the NOFO would be catastrophic to Delaware's efforts to fight homelessness.

24. Last year, Delaware 's CoC projects were awarded $11.8M for permanent housing.

25. The Challenged NOFO provides that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects" (the "Permanent Housing Cap")

26. A cap of "no more than 30%" (which could imply the cap could be lower than 30%) on funding for permanent housing means Delaware would lose nearly $8M in funding that

9

currently supports Delawareans in stable, permanent housing. In total, implementation of the NOFO would result in an upwards of 70% reduction in the amount of CoC funding receives from these grants.

27. In a state as small as Delaware, a funding cut of upwards of 70% would mean more than uncertainty. Rather, implementing the NOFO would result in a significant departure from past practices and best practices, and it will cause serious harm. Through this NOFO, HUD would require its states, local and non-profit partners to abandon Housing First and to return to a service delivery model that was popular decades ago and proven to be ineffective. Within months, this action would cut off funding to partners that may struggle to survive any housing projects that may have to close. That would mean many of our neighbors will no longer be welcomed in their homes. DHSA is certain that at least 300 units of permanent housing serving our most vulnerable population will be eliminated if the NOFO proceeds as directed. That means at least 500 Delawareans, including children, survivors of domestic violence and those with disabilities, will be rendered homeless.

28. If the terms and conditions of the NOFO are enforced, our CoC funding committee will be forced to make decisions that will put people back on the streets. Delaware is depending on the $11.8M in funding to match services from FY24. Not only will this NOFO cut 70% of Delaware's funding for FY25; it forces an unnecessary and punitive "Survivor" type of elimination process. Agencies and non-profits will be forced to do whatever they have to do to beat another agency out for limited resources. The CoC will be forced to pick and choose programs that can pivot fast enough to meet the new deadline at the expense of leaving their successful models behind.

  a. Even if HUD plans to utilize its authority under the Full-Year Continuing Appropriations and Extensions Act, 2025 (Public Law 119-4, approved March 15, 2025) to enable them to repurpose $100 million made available for Permanent Supportive Housing to fund CoC projects under this NOFO, and even if requiring Delaware to abandon Housing First and implement the Gender Ideology terms were legal, requiring adherence to the terms of conditions of the NOFO by January 16, 2026, would still subject Delaware to the likelihood of upwards of 70% of its critical and anticipated funding because compliance in that timeframe that is wholly unreasonable.

  b. Delaware's existing PHA resources will not be able to absorb families that lose their permanent housing because of this NOFO or people who are housed in transitional housing programs with time-limits.

  c. Eliminating rental housing subsidies, to the extent they are part of a larger affordable housing development (LIHTC or other), may result in those housing projects being unable to meet the obligations or payments to their investors and lenders, and threaten the affordable housing provided by the entire project. This will jeopardize current and future investments, strain affordable housing pipelines, increase the risk of homelessness, threaten local economies, and destabilize communities.

29. The NOFO provides that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

  a. Tier 1, simply stated, is the portion of funding that is most likely to be awarded, as HUD strongly prioritizes those projects. They are also unlikely to lose

11

        funding – almost like a safe zone. Tier 2 should be considered the competitive funding portion. These projects are considered lower-priority and are therefore at risk for funding, making their projects less protected. We understand the 30 percent is an "up to" and not certain. Not knowing the percentage so we can prepare our non-profits and state agencies is detrimental. Delaware's current model is designed for 70 percent in Tier 1. Flipping Tier 1 and Tier 2 ultimately turns our model on its head, meaning what we have come to rely on will no longer exist and will force participants to compete, effectively pulling the rug out from under us.

    b.    Under the banner of uncertainty, there are certain grantees for whom lease renewals are set to be executed during this NOFO period or shortly thereafter, and uncertainty of renewal may cause them to evict residents in advance of any final funding decision being made.

    c.    Those individuals and families that worked hard and are in permanent housing will return to being homeless.

30.    "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Pg. 15.

    a.    I understand that the result of implementing this term of the NOFO would mean most of Delaware's permanent housing projects would be unfunded or underfunded, meaning those currently housed in permanent housing will

    become unhoused or be placed in transitional housing, which goes against the HEARTH Act and its guiding principles.

  b. No permanent housing will be funded out of Tier 2 funding applications. Only transitional housing, supportive services only, and supportive services street outreach are eligible. Again, under HEARTH, we have steered away from the transitional housing model because it has proven ineffective.

  31. This NOFO prohibits engaging in harm reduction-strategies that have proven helpful and saved lives, following the Housing First model. For example, rather than providing stable housing for individuals struggling with addition, this proposed NOFO treats housing as a "reward" rather than a basic resource. A more effective and humane approach is to keep people safe even if they are using – education, not eviction. Evidence-based best practices emphasize meeting people where they are, but this NOFO instead dictates where people must be to receive basic assistance, based on an antiquated and judgmental philosophy. Eliminating such harm-reduction approaches creates an ineffective and unrealistic structure based on the unfounded assumption that people will get better while ignoring existing resources to provide assistance.

  32. Even if these conditions were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of our processes and those of our applicants. This will require more time, money, and effort to comply, and is not feasible to do by January 14, 2026.

  33. Agencies and non-profits are scrambling. Participants are scared. The model we have depended on for more than a decade is being threatened by this Administration.

  34. If the NOFO is enforced, applicants will not receive funding they were counting on, and long-term projects will be derailed. This is especially concerning given the unrealistic

timeframe.  This may happen in advance of the NOFO cycle as programs make decisions about signing new lease agreements or other contracts when federal funding is unlikely to support their obligations.

35. Consequences for program participants will be severe.  Program participants are among the most vulnerable people in our State and often face other challenges in addition to being without a home. By definition, most individuals affected have disabilities, making the situation more dire.

36. Terminating programs that rely on CoC grants will therefore increase burdens on other state health, safety and support services. Already overburdened and underfunded shelter systems will be greatly impacted and will be forced to turn away those asking for care and assistance, creating a powder keg of complexities.

37. Terminating programs that rely on CoC grants will interfere with our state's homelessness goals. Per Executive Order 8, the Collaborative is directed to consolidate state resources in one place by:

    a. Effectively coordinating and maximizing resources of existing programs and activities to prevent homelessness and to assist individuals and families who are homeless to obtain housing;

    b. Overseeing the implementation of government programs and activities in support of a plan to reduce homelessness by 50% and end youth homelessness in Delaware within five (5) years; and

    c. Recommending changes in existing programs and services, expansion of existing programs and services, and additional programs and services as

may be necessary to address the diverse causes and conditions of homelessness.

38. In 2024, Matt Meyer wrote in a memo, "Housing is a human right; to guarantee that right, we must provide affordable, quality and safe shelter to every Delawarean. Lack of adequate supportive housing is one of the biggest barriers to eliminating homelessness and getting individuals with disabilities the care they need." DSHA stands firm in our commitment to end homelessness in Delaware. We are a small state, and we know – personally– people that will be negatively impacted by this unprecedented overreach.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of November 2025.

/s/ *Matthew Heckles*
Matthew Heckles
Director
Delaware State Housing Authority