UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>                    Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>                  Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM<br><br>DECLARATION OF JENNIFER MINE |

## DECLARATION OF JENNIFER MINÉ

I, Jennifer Miné, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Program Manager at the District of Columbia ("District" or "D.C.") Department of Human Services (DHS), Family Services Administration (FSA), Office of Grant Administration and Management. I have held this role since February 2025. As Program Manager, I am responsible for the administration and management of all of DHS FSA locally and federally funded grants, including the HUD Continuum of Care grant.

2. I have worked at DHS since June 2021, first as a Grants Management Specialist and then as Supervisory Grants Management Specialist. I graduated from Montclair State University with a bachelor's degree in psychology, and then earned my Master's degree in Public Administration from Rutgers University.

3. I am familiar with the information in the statements set forth below through personal knowledge, consultation with DHS staff, or from my review of relevant documents and information.

4. I submit this declaration in connection with the U.S. Department of Housing and Urban Development's ("HUD") November 13, 2025 "FY 2025 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO" (the "NOFO"). It is my understanding that the NOFO will govern all fiscal year 2025 applications for Continuum of Care funding and that, by issuing the NOFO, HUD rescinded a previous Notice of Funding Opportunity for fiscal year 2025.

5. This NOFO reverses many years of federal housing policy and gives recipients almost no time to adjust. If implemented, the NOFO threatens to undermine the housing stability

2

of over a thousand District residents and families, and it represents an existential threat to the continued operation and stability of the Continuum of Care program in the District.

### Continuum of Care Program

6. The Continuum of Care ("CoC") program, created by the 2009 Homeless Emergency Assistance and Rapid Transition to Housing Act, Pub. L. No. 111-22, § 1301(2) (2009), was created to provide funding to State, tribal, and local governments and nonprofit organizations to work towards the goal of ending homelessness.

7. CoC program funding goes towards permanent housing, permanent supportive housing for individuals with disabilities (including mental health and substance use issues), rapid rehousing, supportive services, and homelessness prevention. These funds may be used to acquire, construct, or lease property or for rental assistance, program operating costs, and supportive services. My understanding is that the CoC program has always prioritized funding renewals in order to provide stability for the people and families it supports.

8. Based on my experience, I know that if the NOFO remains in effect, funding for the District's CoC is likely to dramatically decrease. As a result, homelessness will markedly increase, resulting in the District and its residents suffering immediate, irreparable harm.

### District Participation in the CoC Program

9. I am familiar with the CoC program in the District of Columbia.

10. In fiscal year 2024, the District of Columbia CoC received $33.2 million in funding. Of that, $6.8 million went directly to DHS. DHS is the largest single recipient of CoC funding in the District and receives its funding directly from HUD.

11. Most of the other CoC funds awarded to the District are disbursed from HUD to The Community Partnership for the Prevention of Homelessness ("TCP"), a local nonprofit

organization whose mission is "to serve as a focal point for efforts to reduce and ultimately prevent homelessness in the District." TCP is the "collaborative applicant" for the District's CoC and coordinates the collective CoC funding application.

12. The District of Columbia's Interagency Council on Homelessness ("ICH") serves as the board for the District's CoC program, coordinating the strategic vision and identifying goals. TCP and ICH work together to administer and manage the CoC. As the government agency responsible for managing homelessness support and prevention in the District, DHS also works with TCP and ICH to support the District's CoC.

13. DHS has long received CoC funding. DHS uses CoC program funds to operate the Shelter Plus Care program, which is a permanent supportive housing program providing rental assistance and supportive services for individuals who are categorized as chronically homeless. HUD's Shelter Plus Care program was initially established in 1992, with the District receiving Shelter Plus Care program funding starting in 1994. By 2012, HUD folded the Shelter Plus Care program into the CoC program. DHS's Shelter Plus Care program currently supports approximately 220 individuals and families with rental assistance and supportive services. These 220 individuals and families constitute a significant proportion of the approximately 1138 individuals and families currently receiving support from CoC-funded programs in the District.

14. DHS and the people who benefit from the Shelter Plus Care program rely on reasonably predictable and consistent HUD NOFOs and funding determinations to support stability in housing and services. An unpredictable and inconsistent HUD NOFO creates potentially devastating instability for both the program and its participants, and it will likely have ripple effects on locally funded programs and their beneficiaries.

**The NOFO's Impact on District CoC Programming**

15. I understand that the NOFO represents a significant departure from HUD's past practices and will cause serious harm.

16. The NOFO is for fiscal year 2025 and states that it "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

17. Additionally, the NOFO presents both substantive and administrative concerns that will jeopardize DHS's ability to continue providing rental assistance to the 220 households who are currently enrolled in Shelter Plus Care.

18. First, the NOFO caps the amount of CoC Permanent Housing ("PH") funding to just 30% of our Annual Renewal Demand ("ARD"). PH includes three types of housing: Permanent Supportive Housing ("PSH"), Rapid Rehousing ("RRH"), and Joint Transitional and Rapid Rehousing ("TH-RRH") projects.

19. The 30% cap on PH funding is a dramatic departure from past practice. In fiscal year 2024, 90% of DHS's CoC funding went to PH. For the past decade, HUD has issued guidance specifically instructing CoC funding recipients to prioritize PH funding. In previous funding years, and as recently as HUD's fiscal year 2024 CoC NOFO, HUD's CoC funding priorities included PSH projects serving chronically homeless individuals and families, as well as RRH projects that provide temporary rental assistance and services to help households quickly exit homelessness. In 2017, HUD introduced the new Joint Transition-Rapid Rehousing Program Model to the CoC Program. The Joint TH-RRH model provides a safe place for participants to stay and receive supportive services while moving them to permanent housing quickly. In response to HUD's CoC

5

funding priorities, many CoCs, including the District's, have spent the last decade building a predominantly PH-focused CoC portfolio.

20. This sudden pivot away from Permanent Housing will have significant negative consequences for service recipients, applicants, and DHS. In the District, about 1,138 households are currently receiving PH through a HUD CoC-funded program. A de-prioritization of PH (limiting the CoC to only 30% PH) would put $21.1 million in funding of these programs at risk. This will put about 790 households in jeopardy of losing their rental subsidy and supportive services, cause a strain on the District's locally funded PSH program, and, if households return to homelessness, increase demand on our shelter system.

21. Second, the NOFO limits "Tier 1" funding to only 30% of our ARD. CoC funding applicants are required to divide the projects for which they seek funding into two tiers; Tier 1 projects are the priority and most likely to be funded. In previous years, Tier 1 projects could make up as much as 90% of the ARD. Because Tier 1 has been slashed to only 30% of the ARD, DHS and other CoC applicants will be effectively required to join a national competition to fund programs that have previously been renewed many times. This will result in a possible loss of $24 million in CoC funding for the District, which will impact housing and rental assistance for 1,138 households. Notably, the combined effect of the 30% cap on PH and the 30% cap on Tier 1 funding requests will result in far less PH funding year over year, far into the future.

22. Third, the NOFO now restricts CoC funding recipients' use of race-conscious and gender-inclusive policies and practices, and it also suggests that past race-conscious or gender-inclusive policies or practices may threaten a recipient's continued eligibility to receive CoC funds. This, too, is the opposite of the guidance DHS received from HUD as recently as the last CoC NOFO, for fiscal year 2024. HUD's fiscal year 2024 NOFO outlined mandatory requirements

associated with a broad range of statutes and regulations, including the Fair Housing Act, the ADA, and Section 504, as well as Executive Orders focused on racial equity and equity for LGBTQ+ populations. But the new fiscal year 2025 NOFO makes it clear that HUD will penalize projects and CoCs for participation in the very activities HUD previously required. In addition, an applicant's treatment of gender identity was previously part of the funding scoring criteria, but the new NOFO elevates it to a threshold criterion. This puts CoC funding in the District of Columbia, where gender identity is a protected trait under local law, in serious jeopardy. *See* D.C. Code § 2-1402.21(a).

23. This sudden departure from past practice will put the District at risk of losing all $33.2 million of our CoC funding. For DHS, losing this funding would require the closure of a program that has provided housing for vulnerable residents since 1994. It would also financially strain CoC applicants who are local nonprofit organizations. And it would potentially retraumatize participants by forcing their return to homelessness.

24. Fourth, the NOFO introduces new scoring criteria that reverses HUD and DHS's "Housing First" policy and Equal Access principles by prohibiting public camping or loitering and requiring participation in supportive services. This is yet another major change. D.C.'s CoC, including DHS, has spent the last decade ensuring programs prioritized Housing First, reducing barriers to services by not mandating participation, and practicing harm reduction to help participants achieve long-term success. But the new NOFO's Merit Review prioritizes forced services and anti-DEI policies. This is the exact opposite of the programming that DHS and other District CoC members have developed over the past years, in reliance on guidance from HUD. In addition, the NOFO's expanded Risk Review increases the likelihood of project rejection, allowing HUD to consider media reports, Inspector General and Government Accountability Office

7

findings, public complaints, or an organization's "history of subsidizing activities that conflict with the NOFO" as grounds for denying funding. These changes jeopardize funding for life-saving programs in the District and will undermine participants' success and ability to obtain and maintain permanent housing.

25. Fifth, the delayed introduction of the NOFO plus the NOFO's shortened application timeframe from the standard 90 days to just 60 days places additional considerable strain on DHS and the District's CoC. Typically, HUD releases CoC NOFOs in the summer, with applications due 90 days later, and funding decisions made by the top of the following year. This year, the NOFO was not released until November, applicants were given only 60 days to apply, and funding awards are not anticipated until May 2026. This is problematic for DHS and the District of Columbia for several reasons.

26. Shortening the application period from 90 days to 60 days makes it much more difficult for the Collaborative Applicant administering CoC funding to coordinate and prepare a consolidated application. TCP, in their role as the Collaborative Applicant, and the ICH, in their role as the CoC Board, would normally engage in a lengthy process that includes meets with the community to discuss funding and program priorities and strategize an approach to the consolidated application; assemble the ranking committee; run HMIS report, review HMIS data, and provide applicants with the opportunity to "clean up" their data; review, score and rank renewing applications, bonus opportunity applications and reallocation applications; and then develop the consolidated application. The abbreviated 60-day timeframe, in conjunction with HUD's radical changes to the CoC funding priorities and criteria, makes it extremely difficult for the District CoC to put forth a quality application for funding. This will directly affect DHS's ability to obtain CoC funding.

27. In addition, many agencies in the District, including DHS, will run out of CoC funding well before HUD's anticipated award announcement date in May 2026. DHS's fiscal year 2024 CoC grant ends on January 31, 2026, and I know from my work coordinating with TCP that many other CoC-funded organizations are in a similar or worse position. As a result, DHS and other agencies in the District's CoC will have to go for months without funding—and will do so without knowing whether that funding will ever come, because of the many changes HUD has made in this NOFO. This will have significant negative consequences for DHS and other applicants in the District because we will need to decide immediately if and how to continue funding programs through the uncertainty of HUD funding. This will also impact our ability to bring new participants into these programs, creating a possible bottleneck of flow from our shelter and transitional housing programs into our PH programs.

28. Sixth, the NOFO excludes "substance use disorder" from several project application rating factors. These rating factors award points for projects supporting participants with physical disabilities or impairments or developmental disabilities. Excluding substance use disorder from the rest of HUD-recognized disabilities runs counter to decades of federal law, HUD regulations, and District law. *See, e.g.*, Homeless Services Reform Act of 2005, as amended (D.C. Code § 4-751.01 *et seq.*). If CoC programs cannot count projects that support participants whose disability is a substance use disorder towards their rating factors, that would put the District's CoC programs that support participants with substance use disorders at even greater risk of being defunded. Participants with substance use disorders who are currently being served by these would suddenly be at risk of losing both their housing and any related supportive services.

29. Viewed on their own, each of the above concerns presents novel and significant challenges to DHS's ability to satisfactorily apply for and receive CoC funding for fiscal year

9

2025. When viewed together, however, these concerns coalesce into an undeniable threat to DHS's ability to continue participating in CoC programming, which would undermine decades of work to prevent and end homelessness across the District.

30. Even if these changes were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of DHS's processes. DHS would need to change its participant eligibility determinations and assess whether it can continue providing services to current participants. DHS would also need to identify other suitable housing and other funding sources to continue rental payments and supportive services for current participants. This would require DHS to divert and expend significant time and resources.

31. Furthermore, terminating programs that rely on CoC grants will unavoidably increase burdens on other District health, safety and support services. CoC program participants are among the most vulnerable people in the District and often face other challenges in addition to imminent homelessness. Many of the District's HUD CoC-funded PH programs were established many years ago, including DHS's Shelter Plus Care. A majority of the Shelter Plus Care participants are now elderly and/or have a disabling condition. These participants rely on government benefits such as social security, Medicaid and their housing subsidy. Many of these participants are unable to increase their fixed income or afford suitable housing without this subsidy. The loss of these programs and grant funding will only increase strain on other District resources and risks forcing vulnerable residents back into homelessness.

32. Terminating programs that rely on CoC grants will undermine the District's homelessness goals. The District's ultimate goal is to make homelessness rare, brief, and nonrecurring by aligning city agencies, providers, and funders around a common mission and measurable outcomes. The District currently works toward this goal through prevention and

diversion; rapid exit to stable housing; permanent supportive housing and long term supports; coordinated entry, assessment and equity; data, performance and system modeling; and system capacity and implementation priorities. DHS and District residents have long relied on HUD CoC funding to support these efforts, and losing that funding would make our goals much more difficult to achieve.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __22nd__ day of November 2025.

_____
Jennifer Miné
Program Manager
DHS/FSA, Office of Grant Administration and Management