**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br><br> DECLARATION OF CHRISTINE HALEY |

## DECLARATION OF CHRISTINE HALEY

I, Christine Haley, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the State of Illinois's Chief Homelessness Officer. I oversee the Illinois Office to Prevent and End Homelessness (OPEH), an interagency Office that leads the State's work to prevent and end homelessness. OPEH is administratively housed within the Department of Human Services for the State of Illinois (IDHS). I was appointed Illinois' first Chief Homelessness Officer on November 3, 2021.

2. As the Illinois Chief Homelessness Officer, I serve as the chair of the Illinois Interagency Task Force on Homelessness (IITFH). 20 ILCS 1305/10-75(f)(l). OPEH provides staffing support to the IITFH, which was created ..to facilitate and implement initiatives related to decreasing homelessness and unnecessary institutionalization in [Illinois], improve health and human services outcomes for people who experience homelessness, and strengthen the safety nets that contribute to housing stability." 20 ILCS 1305/10-75(b).

3. As Chief Homelessness Officer and Chair of IITFH, I am the State of Illinois' lead policymaking official and spokesperson on homelessness prevention through programmatic, policy, legislative, and budgetary efforts, and through communication with the Illinois General Assembly federal and local leaders on these critical issues. I also oversee implementation of the State's interagency plan to prevent and address homelessness, Home Illinois, which is centered on the principles of building affordable and permanent supportive housing (PSH), bolstering safety nets, securing financial stability, and closing the mortality gap between people experiencing homelessness and the general population.

4.  I have worked in housing and homelessness in a variety of leadership roles for over two decades, including serving as Director of Housing for Cook County Health (CCH), one of the nation's largest public safety-net health systems, and as an administrator in the housing sector with the Corporation for Supportive Housing, Housing Opportunities for Women, and Heartland Alliance. I hold a Bachelor of Arts from the University of Notre Dame and a Master of Science in Social Administration from Case Western Reserve University.

5.  I am familiar with the information in the statements set forth below through personal knowledge, consultation with IDHS and Illinois Housing Development Authority (IHDA) staff, and from my review of relevant documents and information.

### Preventing and Ending Homelessness in Illinois:
### A state and federal partnership

6.  Through the work of Home Illinois, the State is endeavoring to address the critical gap in essential housing and services. Illinois increased funding to address and prevent homelessness from state FY 2023 to FY 2025 by 154% to support the work of Home Illinois. The HUD Continuum of Care (CoC) Program, which endorses a community-wide response to homelessness, has provided significant financial support to homeless and supportive housing services throughout Illinois. Critically, HUD CoC grants are interwoven with State funds to operate a range of programs serving people experiencing homelessness including **PSH,** rapid rehousing, transitional housing, and a broad range of services.

7.  Nineteen regional Continuums of Care in 111inois (Illinois CoCs) cover the entire State,[1] and collectively received $182,457,651 in HUD CoC funding through HUD's 2024

---

[1] The Illinois CoCs are Chicago Continuum of Care, the Cook County Continuum of Care, the DuPage County Continuum of Care, the Lake County Coalition for the Homeless, the Continuum of Care for Kane County, Heartland Continuum of Care, St. Clair County Continuum of Care, the Continuum of Care for Champaign County, the McHenry County Continuum of Care, the Decatur/Macon County Continuum of Care, the Madison County

Continuum of Care Program NOFO. These funds went directly to community-based organizations and local governments (cities, counties, public housing authorities), with approximately 88% of that funding supporting permanent housing programs, including PSH, rapid rehousing, and joint transitional housing rapid-rehousing programs.

8. The State of Illinois is not a direct recipient of HUD CoC funding; however, it works closely with each of the 19 Illinois CoCs, and HUD CoC funding is integral to the State's operation of its own grants and programs. For example, the IDHS Supportive Housing Program (SHP) and Emergency and Transitional Housing Program (ETH) are commonly blended by grantees with HUD CoC grant funding to operate programs that in State FY 2025 served nearly 50,000 unhoused and formerly homeless individuals and families in Illinois.

9. IDHS programs also rely on Illinois CoCs to operate local grant selection processes for IDHS grants, including the Homeless Prevention grant, the Rapid Rehousing grant, the Shelter Diversion grant, and the Scattered Site PSH grant, which are distributing a total of $80,793,739 in state funding in FY 2026.

10. IHDA similarly relies on CoC funding to support its mission to create and preserve affordable housing in Illinois. A comparison of CoC funded projects to IHDA's portfolio confirmed 15 buildings with 814 total units that received capital investment from IHDA and ongoing annual support from CoC funding.

11. In addition, Illinois agencies rely on the Coordinated Entry System (CES) run by Illinois CoCs to make targeted referrals to state programs including IDHS's Rapid Rehousing

---

Partnership to End Homelessness, the Northen Illinois Homeless Coalition, the Will County Continuum of Care, the Home for All Continuum of Care, the Central Illinois Continuum of Care, the West Central Illinois Continuum of Care Consortium, the Northwestern Illinois CoC, the South Central Illinois Continuum of Care and the Southern Illinois Continuum of Care.

Program, the Scattered Site Supportive Housing Program, Supportive Housing Services Program, and the Shelter Diversion Program, and IHDA's PSH Program.

12.  All of these critical programs and collaboration are now at risk because of the effects of the HUD Continuum of Care Notice of Funding Opportunity (HUD CoC NOFO) released on November 13, 2025, which will undem1ine the progress Illinois has made as a state, and lead to a return to homelessness for some of our most vulnerable residents.

### 2025 HUD Coe NOFO

13.  The HUD CoC NOFO represents a significant departure from past practices and will cause serious harm to the State of Illinois, including by jeopardizing implementation of Home Illinois. I expect the HUD CoC NOFO to harm Illinois in at least three ways:

   a. First, the HUD Coe NOFO 's sudden and substantial shift away from funding PSH without a phased implementation, advance notice, or alignment with existing regulatory frameworks, will likely result in a significant loss of permanent housing funding and an increase in homelessness.

   b. Second, the HUD Coe NOFO will likely diminish the value of investments the State has made in PSH -investments that were made in reliance on the continued availability of CoC funding.

   c. Third, the conditions included in the HUD Coe NOFO will likely make it impossible for projects in Illinois to receive both Coe funds and State funds, thus threatening the financial viability of certain projects, or else coercing the State to change its laws, rules, or policies so as not to conflict with HUD 's new requirements.

14. As explained in more detail below, I expect that the changes contained in the HUD 2025 CoC NOFO will result in the loss of at least $106 million in permanent housing resources currently funded in Illinois through HUD's 2024 Continuum of Care Program NOFO. HUD's dramatic and rapid departure from the policies and priorities that have guided the CoC program for many years will cause significant harm to the State's efforts to reduce homelessness. Many of the CoC lead agencies and program providers are also recipients of State homelessness and housing funds. For years, where appropriate, Illinois has worked to align our program and service delivery models, our funding strategies, and our outcome tracking and reporting with those of the HUD CoC program. We did this where those models and strategies were rooted in evidence-based best practices and because doing so facilitated communities having one integrated homelessness response system that maximizes leveraging of scarce resources and minimizes inefficiencies and duplication. By not providing adequate notice and opportunity to address and integrate HUD's changes in program and service delivery priorities, HUD is destabilizing all of the work to end homelessness in Illinois, reversing gains in the State towards ending homelessness, and needlessly putting the housing and health of countless formerly homeless Illinoisians in jeopardy.

15. OPEH coordinates with Illinois CoCs across the state, including since the release of the HUD CoC NOFO. CoCs report that they will face enormous challenges meeting the short timelines imposed by the HUD CoC NOFO, especially if they must solicit and evaluate large numbers of new projects that do not involve permanent housing. The Illinois CoCs have serious concerns about being able to combine State and federal funds in CoC programs because of the conflicting legal, regulatory, and policy requirements. They have also expressed concern about the provisions indicating that HUD may penalize them for having complied with past CoC requirements regarding racial equity and gender inclusivity, Finally, my Office has heard of

6

confusion among CoCs about what many of the terms in the HUD CoC NOFO mean, including the new requirements to offer 40 hours of services in new transitional housing projects and other details that have not been explained by HUD.

16. The State of Illinois depends on reasonably predictable and consistent HUD CoC NOFOs because CoC funding is a significant and critical component of our statewide homelessness response. The programming that CoC funding can be used for affects how we prioritize our limited homeless services and housing funding. Reasonably predictable and consistent policy direction in the NOFO allows the State to align, or at least minimize conflict, with federal policy. Rapid shifts in program and policy priorities in the HUD CoC NOFO leave the State and our community-based providers struggling to adapt, uncertain about legal, financial, and programmatic risk, and unable to effectively deliver services. Those who will suffer the most dire consequences are the Illinoisians experiencing homelessness who depend on these services.

17. When HUD adheres to notice and comment procedures before making changes like the ones discussed below, it affords State agencies and CoCs a greater opportunity to not only seek to influence those policies, but also to anticipate the changes they might bring and align local and State policies to the extent practicable. But when new HUD policies are implemented suddenly and unilaterally, misalignment is inevitable. Illinois will therefore suffer increased harm because the changes in the HUD CoC NOFO were adopted without notice and comment procedures.

18. HUD's plan to "repurpose $100 million made available for Permanent Supportive Housing to fund CoC projects under this NOFO" (HUD CoC NOFO at 14), will be devasting to the State, people in permanent housing programs across Illinois, and service providers. The loss of permanent housing funding, which funds PSH, Rapid Rehousing Programs, and Joint Transitional Housing-Rapid Rehousing Programs, will devastate the already extremely strained

7

housing system. Currently, 11,431 people are in CoC grant-funded permanent housing beds in Illinois. The loss of permanent housing funding that will result from the HUD CoC NOFO is expected to cause 7,547 people across Illinois to lose their housing and return to homelessness. In the City of Chicago alone, CoC-funded permanent housing programs serve approximately 7,205 individuals; a 70 percent reduction in funding for permanent housing would mean approximately 4,815 individuals in Chicago would lose housing supports and face a return to homelessness.

19. The HUD CoC NOFO states that it "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." (HUD CoC NOFO at 15.) Because the 2024 NOFO was set up as a two-year award, the funding for 2025 was largely assured and could be relied upon by the State and the CoCs to align with established priorities. As explained below, the changes in the HUD CoC NOFO's program priorities and in its Tier 1 and Tier 2 allocations mean that many current programs will lose funding due to the new evaluation criteria in the NOFO.

20. The HUD CoC NOFO will eliminate funding for numerous permanent housing projects, which will increase homelessness and lead to a greater demand for State-funded homelessness response, shelter, housing, and other services. The 2025 NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." (2025 NOFO at 15.) "Annual Renewal Demand" (ARD) is "the total amount of funds requested by eligible renewal projects in each FY funding opportunity." (2025 NOFO at 125.) When a Coe prepares an application for a CoC NOFO, it must either approve and rank, or reject each project submitted to it. Higher ranking applications are in Tier 1, while lower ranking applications are in Tier 2. Tier 1 applications are essentially guaranteed to be approved by HUD if they satisfy eligibility and quality standards.

8

Historically, CoCs have been able to put 90 percent or more of their ARD in Tier 1, which effectively ensured that funding for those projects would be renewed. The remaining percentage in Tier 2 was subject to a competitive process among all CoCs based on available funding, the strength of the CoC's overall application, and the performance of the individual projects. Limiting the amount of ARD that can be put in Tier 1 to 30 percent means that 70 percent of each CoC's ARD is now at risk as now subject to a competitive national process among all CoCs. In Illinois, that change puts $110 million in federal funding for critical homelessness and housing services at risk. This is funding that was previously secure.

21. The HUD CoC NOFO provides that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund permanent housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." (2025 NOFO at 15.) The 30 percent cap on the amount of ARD that can be allocated to permanent housing projects will have devastating consequences for vulnerable Illinoisians. Consistent with HUD's longstanding priority of expanding permanent housing opportunities for people experiencing homelessness, nearly 90 percent of Illinois's total CoC award currently funds permanent housing programs. Therefore, the 30 percent cap will require defunding approximately $106 million of permanent housing programs. The loss of these programs will put thousands of people at risk of immediately returning to the streets and without the support they need to exit homelessness.

22. Significantly, the 30% cap on permanent housing funding represents a structural shift in HUD's prioritization. It reverses two decades of federal strategy prioritizing PSH and Rapid Rehousing programs as the most sustainable path to long-term self-sufficiency. PSH is an evidence-based practice, serving people experiencing chronic homelessness. For decades, PSH funded by the HUD CoC Program has provided essential support to Illinosians experiencing

9

chronic homelessness. As a vital but limited resource, PSH targets the most vulnerable people within the larger homeless population in the State, including people living in cars, tents, abandoned buildings and shelters.

23. If the HUD CoC NOFO moves forward, years of system-building progress in Illinois will be set back, weakening the unified crisis response system HUD's CoC model was designed to support. While innovation and accountability are essential, these unanticipated shifts will destabilize the housing system and disrupt services to vulnerable populations, increasing rather than decreasing homelessness.

## The HUD CoC NOFO Will Decrease Housing and Increase Homelessness and Demand for State Services in Illinois

24. IDHS's Supportive Housing Program (SHP) funds housing programs for formerly homeless individuals and families across the State. SHP relies on a combination of state funding, HUD CoC funding, and other funding sources to serve a high-risk population of formerly homeless individuals and families as well as those at risk of becoming homeless in Illinois. A high percentage of SHP participants are individuals with chronic health and mental health conditions, physical and developmental disabilities, or a history of substance use. The program ensures residents have necessary support services to prevent their return to homelessness and provides resources to enhance their ability to function independently in the community.

25. IDHS funds supportive services and related costs for SHP, including case management, alcohol and substance use counseling, job training, and childcare. For State FY 2026, Illinois allocated over $25 million in state funding to deliver supportive services to SHP participants in transitional and permanent housing. SHP does not, however, fund rental subsidies. Instead, SHP funds are matched with another source that provides rental subsidies, often a HUD CoC grant. In State FY 2026, IDHS has committed over $17,000,000 for more than 5,000 SHP

participants who live in supportive housing that is blended with CoC rental subsidies. Both funding streams are crucial to keep these extremely vulnerable participants housed.

26. Without HUD CoC funding for rental subsidies, the programs supported by the SHP grant that are blended with CoC funding would not be viable. Over five thousand residents would face eviction from these programs, and IDHS could be forced to wind down its Supportive Housing Services programs that are blended with CoC funding. Illinois would not only face further costs, including any liability that may result if the State is forced to tem1inate its contracts with supportive services providers as well as an increase in demand for wholly state-funded services, it would also be frustrated from realizing Home Illinois' pledge to increase supportive housing.

27. This anticipated loss of housing for over 5,000 people, including adults and children, in Illinois comes at a time when the state already faces unprecedented demand and an inadequate supply of affordable and supportive housing. For example, in 2024, 17 of the 19 Illinois CoCs saw increases in the number of people experiencing homelessness. Of these, six Illinois CoCs saw increases of over 40% in just one year. And in most communities across Illinois, there are no locally funded PSH resources, so households losing access to CoC-funded housing will look to the State's programs. If they are unable to find PSH, they will likely return to homelessness and will need support from outreach workers and emergency shelters. IDHS is among the most significant funders of these services across the State, and in some CoCs, IDHS is the principal funder of these critical emergency services.

28. A potential increase of over 5,000 residents experiencing homelessness following eviction from SHP/CoC grant supported programs would also put significant financial strain on Illinois's other state public services, including emergency medical systems, state- and federally-funded behavioral-health providers, and child-welfare programs serving unhoused families. As a

result, the HUD CoC NOFO would overwhelm multiple State systems, untenably driving up costs and demand in systems of last resort. For example, it is well known that homelessness has devasting consequences for individuals' physical and mental health.[2] Higher healthcare costs of unhoused individuals results in increased billing to Medicaid, which is jointly funded by Illinois and federal dollars.

### Diminishing Value of State Investments

29. Consistent with its mission to finance affordable housing in Illinois, IHDA finances affordable housing developments on favorable terms designed to insure the stability of these buildings as long-term affordable housing. Some IHDA loans allow the borrower to delay repayment for several years while prioritizing the repayment of other loans, including costs, to give the project an opportunity to succeed. IHDA relies on a combined stream of state and federal funding to develop and maintain publicly-supported affordable housing across the State. For 2024-2025, IHDA set a policy priority to accelerate the development of permanent supportive housing units.

30. The HUD CoC NOFO's required limit of 30% of each CoC's funding in permanent housing projects will impair IHDA's ability to meet its goal of increasing annual development of PSH over the coming years. It will also impair the financial health of affordable housing projects in IHDA's existing portfolio, including the 15 IHDA funded buildings that receive annual CoC funding noted above. Federal CoC funding currently provides 15 IHDA buildings $4,528,056 in

---

[2] A 2024 Illinois Department of Public Health study of Illinois Homelessness Mortality and Morbidity from 2017-2022 found that homeless individuals had an average of seven emergency department visits and 2.5 hospital admissions per year. For the years 20I7T2022, the total cost billed for persons experiencing homelessness utilizing Illinois hospitals was $16,429,817,000. However, in the same time period, during times this same group of individuals was likely housed, they had an average of only 1.7 emergency department visits and .4 hospital admissions per year. Healthcare costs during periods of homelessness are significantly higher. *See* https://dph.illinois.gov/content/dam/soi/en/web/idph/publications/idph/topics-and-services/life-stages-populations/homelessness/hmmr-report-201722.pdf

funding annually for a combination of rental assistance, operating costs and/or supportive services to support the ongoing expenses of operating each building. IHDA initially invested $79,950,002 from a variety of sources to finance these buildings to serve the target population. Currently, IHDA is owed $25,189,077 in loans from these projects.

31. One of the 15 IHDA supported buildings in the West Englewood neighborhood in Chicago affords 19 units of accessible PSH for formerly homeless individuals, including individuals who were previously committed to state-run mental health institutions. IHDA provided a $4.8 million loan to support this 25-unit building, of which the majority remains outstanding. IHDA's decision to award funding for this building was in part because the project would leverage federal CoC funding. The building's current CoC grant through the Chicago Continuum of Care totals $441,000 to cover rental assistance, administrative costs, and on-site supportive services for tenants provided by a nonprofit organization with a mission to serve special needs populations.

32. Another building in the Near West Side community of Chicago is a 90-unit studio apartment complex designed to house homeless individuals with a range of disabilities. The complex provides long-term housing with no limit on the length of residency. IHDA provided a $3.3 million loan for initial capital investment, which the complex is still repaying. IHDA's decision to award funding to this project was in part because the project would leverage federal CoC funding for resident services and building operating costs. The project currently receives a $210,000 CoC grant through the Chicago Continuum of Care.

33. In 2021, IHDA awarded over $6.5 million in funding to a not-for-profit organization to support the construction of a 16-unit supportive housing development in Skokie, Illinois. The Skokie development provides long-term housing and mental health and employment support to individuals living with mental health disabilities. The not-for-profit's current CoC grant through

the Cook County Continuum of Care for $122,000 supports housing, clinical, and employment services for 10 residents with mental illness. IHDA's decision to make a capital investment in the building was in part because the project would leverage funding from the not-for-profit organization's CoC grant, which provides building residents an opportunity for independent living with in-building mental-health support, access to a crisis hotline, and support from clinicians and employment specialists.

34. Another Chicago building in the Humboldt Park neighborhood, a studio and family residential complex that provides targeted housing to homeless individuals with chronic mental health conditions and chemical dependency, receives CoC rental subsidy grant support for 69 units. The complex currently receives a $1 million CoC grant through the Chicago Continuum of Care to cover rental assistance and another $400,000 grant through the Chicago Continuum of Care to cover supportive services and operating costs. IHDA has invested $750,000 in the complex.

35. If the CoC funding for these projects was reduced or eliminated, the State would lose the full value of its investment in expanding PSH capacity and would have to take measures to minimize its financial losses by converting the projects to something other than PSH. In the case of the Humboldt Park complex described above, if each of the residents in the 69-unit building were to lose their CoC rental subsidy, IHDA's community partner would have to evict the residents who could no longer pay rent and would be left with three options. It could: (1) flip the units previously intended for the lowest-income Illinoisans who are at the highest risk of homelessness into units for higher-income, less vulnerable individuals who could afford to pay unsubsidized rent; (2) sell the building, altogether displacing residents in need of affordable housing; or (3) search for a different funding source that could provide rental subsidies to fill 69 units with individuals who are at the highest risk for homelessness. Currently, such funding does not exist.

Any path forward without Coe grant funding would lead to the displacement of IHDA's targeted community.

**Impossibility of Braiding CoC and State Funds Due to Conflicting Requirements**

36.     The State of Illinois sets requirements in statute, rule, and policy for the delivery of homeless and housing services by community-based organizations. Some of those State requirements may be directly in conflict with the requirements those same providers will be required to adhere to under the HUD CoC NOFO.

37.     For instance, the HUD CoC NOFO includes conditions that could eliminate funding for any CoC-funded project that addresses, or has ever addressed, the needs of transgender and gender-diverse individuals. The HUD Coe NOFO states that CoC funds cannot be used to "conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." (2025 NOFO at I 08.) Illinois law prohibits housing programs and public accommodations in general from discriminating on the basis of sex and sexual orientation, including gender identity. 775 ILCS 5/1-103; 5/3; 5/5-101(2). This could make it impossible for a CoC-funded project to comply with HUD's requirements and the requirements of Illinois law and may force some projects to forego CoC funds, which could result in the project becoming financially unfeasible.

38.     Another issue with the gender provisions is that HUD intends to look at projects' past practices regarding treatment of sex and gender identity. "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons ... (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." (HUD

CoC NOFO at 65.) As recently as the 2024 NOFO, HUD required CoC providers to recognize and serve people based on inclusive gender identities.

39.  The HUD CoC NOFO also threatens to penalize CoCs if HUD finds "evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences." This could be problematic for CoCs and CoC-funded programs if HUD construes all attempts to reduce or eliminate racial disparities in rates of homelessness as "subsidizing or facilitating racial preferences." (HUD CoC NOFO at 65.) The most recent comprehensive report on the demographics of homelessness in Illinois found that Black residents of Illinois are almost 8 times more likely to experience homelessness than White residents in the state.[3] HUD has actively encouraged CoCs to engage in racial equity work, and advancing racial equity is a core value of the State's efforts to address homelessness.

## Conclusion

40.  The abrupt and wholesale changes in program and policy priorities included in HUD's CoC NOFO will cause multiple harms to the State of Illinois and to the thousands of vulnerable homeless and formerly homeless residents who rely on CoC programs each year. The harms from HUD's actions are significantly exacerbated by the fact that they were made without adhering to the normal notice and comment rulemaking processes or on a timeframe that would have allowed the State to work with CoCs to plan appropriately for how to minimize the adverse consequences of the changes on the program and people affected by them. Finally, HUD's new policy directions destabilize and undermine the State's effort to address homelessness and create a variety of direct conflicts with State law and policy that will be difficult, if not impossible, for

---

[3] *See* Arenas, I., et al. (2024). Black Homelessness in Illinois: Structural Drivers of Inequity. University of Illinois at Chicago Institute for Research on Race and Public Policy (2024), *available at* https://dph.illinois.gov/content/dam/soi/en/web/idph/publications/idhp/topics-and-services/life-stages-populations/homelessness/hmmr-report-201722.pdf

the community-based organizations that are part of the homeless response system to reconcile, potentially coercing the State to consider changing its policies.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of November 2025

_____
Christine Haley
Chief Homelessness Officer
Illinois Office to Prevent and End Homelessness