# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF WINIFRED KAYE SMITH |
| Defendants. | |

## DECLARATION OF WINIFRED (WENDY) KAYE SMITH

I, Winifred (Wendy) Kaye Smith, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Deputy Executive Director of Housing Programs at Kentucky Housing Corporation (KHC) for the Commonwealth of Kentucky.

2.      I have 29 years' experience in affordable housing and community development. I joined KHC in 2013, first serving as a contractor performing strategic planning, policy development, program and process improvement, and special projects management. I became KHC's Deputy Executive Director of Housing Programs in 2018. Prior to joining KHC, I worked as a freelance consultant providing technical assistance and training for U.S. Department of Housing and Urban Development (HUD) Community Planning and Development programs, led a community development corporation in Dayton, Ohio, and worked as a community organizer in Cincinnati, Ohio. I earned a bachelor's degree in interdisciplinary studies focused on urban studies and social work from Miami University in Ohio and a master's in community planning from the University of Cincinnati.

3.      KHC's overall role in Kentucky: KHC serves as Kentucky's state housing finance agency. KRS 198A.040. KHC was created by legislation in 1972 as a de jure municipal corporation and political subdivision of the Commonwealth of Kentucky "to perform essential governmental and public functions and purposes in improving and otherwise promoting the health and general welfare of the people by the production of residential housing in Kentucky." KRS 198A.030(2). Under KRS 198A.040(31), KHC is authorized "to perform the following activities for lenders, holders, housing finance agencies, or other third-party entities, who are located within or without the boundaries of the Commonwealth: (a) Service mortgage loans; (b) Administer federal or state

program contracts; and (c) Perform other housing activities to facilitate the delivery or preservation of affordable housing."

4.      KHC is governed by a board of directors whose appointed members are all appointed by the Governor. KRS 198A.030(3). The Governor also designates one of his appointments to be the chairman of the board of directors. KRS 198A.030(7).

5.      KHC's programs first focused on mortgages for first-time and lower income homebuyers and has expanded to include rental development, rental assistance, homeownership repair and development, homelessness programs, home weatherization, programs to help homeowners in the aftermath of the 2008 housing crisis and Great Recession, and programs to help homeowners, renters, and homeless Kentuckians during the Covid-19 pandemic.

6.      I am familiar with the information in the statements set forth below either through personal knowledge, consultation with KHC staff, or from my review of relevant documents and information. Specifically, I am the executive leader over KHC's Homelessness Programs which include but are not limited to the U.S. Department of Housing and Urban Development ("HUD") Continuum of Care ("CoC") Program. I work regularly with KHC's department managing director, assistant director, managers, and technical staff who administer and implement CoC grants.

7.      In my role as Deputy Executive Director of Housing Programs, I lead a broad range of federal and state housing programs including affordable multifamily rental development, rent assistance for roughly 26,000 households each month, homeownership opportunities, and housing solutions for homeless Kentuckians. Federal programs under my purview include the following: The HUD Continuum of Care Program, HUD Emergency Solutions Grant Program ("ESG"), HUD HOME Investment Partnership ("HOME") Program, HUD HOME American Rescue Plan Program ("HOME-ARP"), HUD Housing for Persons with AIDS, Housing Trust Fund, Low-

Income Housing Tax Credits, Tax-Exempt Bond Multifamily Financing, the U.S. Department of Energy ("DOE") Weatherization Assistance Program, the U. S. Department of Health and Human Services ("HHS") Low Income Home Energy Assistance Program ("LIHEAP"), HUD Section 8 Housing Choice Voucher Program, HUD Section 8 Project-Based Rental Assistance Program, HUD 811 Rental Assistance Program, and the HUD Preservation and Reinvestment Initiative for Community Enhancement program. State programs under my leadership include the Kentucky Affordable Housing Trust Fund and the Kentucky Rural Housing Trust Fund. In addition, I oversee compliance, asset management, and loan servicing for KHC's affordable multifamily housing portfolio. During the Covid-19 pandemic, I led KHC's deployment of more than $300M in new, one-time relief funds from Treasury and HUD.

8.    The impacted CoC is the Kentucky Balance of State Continuum of Care (KY BoS CoC) - CoC#: KY-500. KHC's roles in the CoC include collaborative applicant, planning agency, HMIS lead, and direct grantee of 33 project grants eligible to apply for renewal under the FY 2025 CoC Notice of Funding Opportunity ("NOFO"). In addition to these direct roles with the CoC, KHC marshals its other programs to align with the work of the CoC, including the Emergency Solutions Grant Program, Section 8 Housing Choice Voucher Program, HOME-ARP Program, Low-Income Housing Tax Credits, and a modest amount of discretionary grant and match funds.

9.    The KY BoS CoC's geographic area includes 118 of Kentucky's 120 counties. Kentucky's two most populated counties (Fayette and Jefferson) each have their own CoC and are not included in the KY BoS CoC. Based on 2024 annual estimates of population published by the U.S. Census Bureau, the 118-county BoS has a population of approximately 3.4 million. Fayette and Jefferson Counties, by comparison, have a combined population estimate of approximately 1.1 million. One hundred (100) of the 118 counties comprising the KY BoS CoC meet the

definition of a "rural area" for purposes of the FY 2025 CoC Competition as defined in the FY 2025 CoC NOFO. The geographic area covered by the KY BoS CoC includes mid-sized counties near universities and colleges, supportive services, and hospitals, while many are in geographically isolated areas where access to employment, health care, and services is limited. The KY BoS CoC includes five of Kentucky's six congressional districts.

10.    The membership of the KY BoS CoC is comprised of community stakeholders working to or interested in working to prevent and end homelessness across the CoC's geographic area. Membership includes individuals and organizations such as non-profit emergency shelter and housing assistance providers, victim service providers, veteran service organizations, school systems, health care providers, such as public health departments and community mental health centers, faith-based organizations, and people with lived experience of homelessness. Membership includes both CoC-funded and non-funded organizations. Examples of membership organizations includes, but is not limited to, several Community Action agencies, Salvation Army agencies, Volunteers of America organizations, victim service providers funded by the Violence Against Women Act (VAWA) and the Victims of Crime Act (VOCA), and substance use treatment and recovery programs. Member organizations serve people experiencing or at risk of homelessness, including individuals, families with children, and unaccompanied youth; people with disabilities including physical, mental, and behavioral; people who are experiencing homelessness for the first time as well as people considered chronically homeless; people who are fleeing or attempting to flee domestic violence; and veterans. Members elect regional representatives annually to serve on the CoC's Advisory Board. The CoC Advisory Board also includes elected at-large members representing a broad cross section of community interests. The KY BoS CoC currently has 71 projects eligible for renewal through the FY 2025 CoC competition. These projects include: 33

Permanent Supportive Housing (PSH) projects; 14 Rapid Rehousing (RRH) projects; 3 Joint Transitional Housing (TH)-RRH projects; 3 TH projects including one for victims of domestic violence and two for youth between the ages of 18-24; 16 Supportive Services Only (SSO) projects including those dedicated to street outreach or coordinated entry; and 2 grants for HMIS. Fifty-nine (59) of these seventy-one (71) projects were funded under the FY 2024 and FY 2025 NOFO through a highly competitive process and have grant terms of one year. The remaining twelve (12) projects were funded through the 2022 CoC Supplemental to Address Unsheltered and Rural Homelessness ("Special NOFO" or "SNOFO"). These NOFO projects were also awarded by HUD through a highly competitive national competition and have an initial grant term of 3 years. These 12 projects are eligible for renewal for a 12-month grant term through the FY 2025 funding round. In addition, the CoC has 8 SNOFO-funded projects (2 PSH, 1 RRH, 4 SSO, and 1 HMIS) that will be eligible for renewal in FY 2026.

11.    The current award amount for the seventy-one (71) projects eligible to renew through the FY 2025 funding round is $21,511,505. This amount is considered the CoC's Annual Renewal Demand (ARD) for FY 2025. PSH, which is housing and supportive services for high-need persons experiencing homeless with disabilities accounts for $7,973,676 (37%) of the FY 2025 ARD. RRH, which is tenant-based rental assistance limited, just like TH, to no more than 24 months coupled with supportive services, accounts for $7,439,260 (35%) of the FY 2025 ARD. Joint TH-RRH projects, which combine the TH and RRH components into the same project comprise $2,456,703 (11%) of the FY 2025 ARD followed by $558,667 for TH (3%), $2,658,497 (12%) for SSO projects, and $424,702 (2%) for HMIS projects.

12.    The following are examples of CoC-funded projects:

- *Welcome House PSH*—a PSH project providing tenant-based rental assistance and supportive services to approximately eleven (11) households at a time in the Northern Kentucky area. One member of each household must have a disability to be eligible. Individuals and families experiencing chronic homelessness are prioritized. Rental assistance and services are not time limited;

- *ZeroV DV Bonus RRH*—a RRH project providing rental assistance and supportive services to victims of domestic violence and their families. While defined as "permanent housing" by the HEARTH Act and the CoC Interim Rule, assistance is limited to 24 months. However, the intent is to help the household maintain their housing by tapering down CoC-funded assistance while the household works to increase their share of the rent payment so that by the end of the 24-month term, they are able to maintain the housing permanently. The project can serve approximately 96 households at any given time in any of the 118-counties comprising the KY BoS CoC; and

- *KCEOC-COC YHDP TH-Ryan's Place Project*—a TH project serving unaccompanied youth experiencing homelessness between the ages of 18-24 in Knox County, KY—a county with the 4th highest poverty rate in the state and the highest rate of homelessness in the entire state. The site-based project can serve 8 youth at any given time in shared housing.

13.     The KY BoS CoC has built a system that is able to move people experiencing homelessness quickly into permanent housing and to provide the services necessary in a client-centered and housing-focused manner to reduce the number of households returning to homelessness. While the need continues to outpace available resources, the CoC has expanded its ability to provide tenant-based rental assistance and related services in more counties across the

CoC. CoC's are required to collect client-level data in its HMIS. This data is reported to HUD as part of the System Performance Measures collected and evaluated for all CoCs. Measure *7b.1: Permanent Housing Destinations or Retention* measures the retention of or positive exit from PSH into other non-CoC funded permanent housing. During the 12-month reporting period between 10/1/2023 and 9/30/2024, 98.4% (964 people) retained their PSH or exited to other permanent housing destinations. *Measure 2: Returns to Homelessness* measures clients who exit CoC programs to a permanent housing destination to determine how many return to homelessness at any point up to two-years after leaving the program. Of those who exited permanent housing programs (e.g., PSH or RRH) to other permanent housing during the same 12-month reporting period, only 9% returned to homelessness after two years. This is compared to a return rate of 16% for those who exited from emergency shelters.

14.     CoC renewal project applicants must complete detailed applications for CoC funding using HUD's online application platform called e-snaps. Projects seeking renewal funding must update information on project descriptions, agency capacity, detailed budgets, match sources and documentation, and complete and attach numerous standard federal forms relating to program compliance and regulations. New project applicants must also complete detailed applications in e-snaps describing the entire project design, budget, implementation plan, and all required forms and attachments. Prior to submitting applications to HUD, applicants must also complete various steps as part of the HUD-mandated local CoC competition. The KY BoS CoC requests numerous pieces of information outside of e-snaps, including quantitative data generated from HMIS to evaluate client level outcomes as well as various narrative responses explaining how the project has or will meet various expectations of HUD and the CoC. Applicants must respond within the timeframe designated by the KY BoS CoC, which is determined based on HUD's final submission deadline

for CoCs as set forth in the NOFO. HUD requires that CoCs set local competition deadlines no less than 30 days prior to the HUD final submission deadline.

15.    For reference, the FY 2024 NOFO was released by HUD on July 31, 2024. During the next three months, KHC facilitated meetings of the CoC Scoring and Ranking Committee; facilitated a special CoC board meeting to review and approve application guidelines for local competitions; provided technical assistance to local applicants; received, reviewed, and scored multi-faceted project applications; combined all applications into a consolidated application; and submitted the consolidated application to HUD on October 30, 2024. In contrast, the FY 2025 CoC NOFO was published by HUD on November 13, 2025 and has set the final submission deadline to HUD as January 14, 2026. This significantly reduces the timeline for development of a competitive application and will require project applicants to submit all parts of their applications to the CoC no later than December 15, 2025.

16.    Although some previous NOFOs have required as few as 60 days to respond in the past, the FY 2025 NOFO differs significantly in some critical ways. Firstly, the issuance of the NOFO was not expected, given the indications in the FY 2024 NOFO that the FY 2025 process would be focused on renewals. The timing of the NOFO also presents major challenges, with the preparation and response period occurring during a major holiday season, when organizations that apply for funding, including faith-based organizations, are typically extremely busy. As of November 21, 2025, the "Project Application Detailed Instructions," as well as the actual project application documents, are not available in the HUD CoC Program Application and Grants Management system ("*e-snaps*"), which provide critical information necessary to complete the applications. The information provided through *e-snaps* is used by applicants to complete the application to the CoC, which under the FY 2025 NOFO is due on December 15, 2025.

17.     Additionally, the terms of the FY 2025 NOFO represent the most significant philosophical and programmatic changes since the CoC program took effect in its current form in 2012. These changes present the challenge of not only preparing and submitting an application on a compressed timeline, but also re-designing existing projects in a matter of weeks when organizations were expecting to have their projects renewed.

18.     With regard to KHC's role in the KY BoS CoC, the roles and responsibilities of all CoCs are codified by the HEARTH Act and enumerated in the CoC Interim Rule (24 CFR Part 578). CoCs must designate an agency to serve as its "collaborative applicant" responsible for submitting the Consolidated Application to HUD for CoC Program funding on behalf of the entire CoC. The Consolidated Application includes various elements required by HUD including individual project applications and a comprehensive application detailing the CoC's system-level outcomes and ongoing plans to advance the goals of the HEARTH Act. The collaborative applicant is the only agency allowed to apply for CoC Planning funds, which are used to carry out the responsibilities of the CoC as outlined in the CoC Interim Rule. KHC is the collaborative applicant for the KY BoS CoC as designated by the membership of the CoC.

19.     In this role, KHC coordinates and oversees the local application process for CoC funding and submits the Consolidated Application on behalf of the CoC to HUD in accordance with HUD's NOFO requirements. As the collaborative applicant, KHC also provides one-on-one and group technical assistance to CoC member agencies preparing project applications in designing their projects, determining project types, budgets, and staffing needs, as well as understanding HUD regulations and other requirements of federally funded agencies. The process is labor intensive, detail heavy, and time consuming. In addition to working with current grantees, KHC conducts outreach to potential applicants and typically holds webinars and "office hours" for

applicants applying for the first time. Since the KY BoS CoC covers such a large geographic area, under typical circumstances KHC consults with partners across the CoC to propose new projects where gaps in services exist or to make modifications to existing projects to be more effective in meeting the CoC's expectations.

20.     KHC is also the recipient of CoC Planning Grant funding on behalf of the full CoC. Through a memorandum of understanding (MOU) between the KY BoS CoC Advisory Board and KHC, KHC is the designated lead planning agency for the CoC responsible for ensuring all parts of the CoC's statutory and regulatory obligations as well as its related strategic vision are implemented. In addition to its responsibilities as collaborative applicant, the planning responsibilities of the CoC as overseen by KHC include, but are not limited to, the following: facilitating the operation of the CoC Advisory Board, which is the governing body required to guide the direction of the CoC; conducting meetings of the full CoC membership to promote community collaboration in addressing homelessness; establishing and operating a Coordinated Entry System as required by HUD to facilitate the assessment and referral of people experiencing homelessness to CoC, ESG, and other federally funded resources; coordinating an annual Point-In-Time (PIT) Count of people experiencing homelessness and reporting results to HUD; conducting gap analyses; monitoring and evaluating CoC and ESG project recipient performance and taking corrective action as needed; tracking system-level performance to determine how the homeless response system is functioning collectively and making strategic modifications as needed; and collaborating with partners across other systems such as schools, health care, victim service providers, veteran service organizations, faith-based organizations, and local and state governments to maximize resources and advance common goals that reduce homelessness.

21.     In addition to receiving the CoC Planning Grant, KHC also serves as the recipient (i.e., direct grantee) of thirty-three (33) CoC grants for projects that are eligible to apply for renewal through the FY 2025 CoC Competition. KHC directly administers 4 grants eligible for renewal in FY 2025 including two for the Homeless Management Information System (HMIS), one for the CoC's CoC-wide Coordinated Entry System, and one for a Permanent Supportive Housing (PSH) project. The remaining twenty-nine (29) CoC grants are sub-awarded by KHC to non-profit partner organizations across the KY BoS CoC to implement PSH, Rapid Rehousing (RRH), Transitional Housing (TH), and Supportive Services Only (SSO) projects. While these non-profits are responsible for carrying out the day-to-day operations of these projects in their local communities, KHC serves as the overall administrator of the grants providing financial oversight, interfacing with HUD on draw requests and monitoring, and providing technical assistance to grantees.

22.     KHC also serves as the lead agency ("HMIS Lead") for the implementation of the KY BoS CoC's Homelessness Management Information System (HMIS). Per the CoC Interim Rule, each CoC must operate a single HMIS for its geographic area and designate an agency to serve as lead of its implementation. The HMIS is the electronic platform CoC-funded agencies as well as other federally-funded projects such as the ESG Program, the U.S. Department of Veterans Affairs (VA) Supportive Services for Veterans Families (SSVF) program, and the HHS Runaway and Homeless Youth (RHY) program use to enter client-level data on characteristics (e.g., demographics, income, length of time homelessness) and outcomes (e.g., exit destinations and change in income) that can be evaluated on an individual, project, and system level. Responsibilities of KHC as the HMIS Lead include but are not limited to the following: establishing, reviewing, and updating as needed policies and procedures for data entry,

timelessness, and quality; providing training and technical support to system users; overseeing the reporting process for the CoC, providing data to HUD and community stakeholders as required or requested; and analyzing data to determine the effectiveness of individual projects and the system as a whole.

23.     In its role as collaborative applicant for the KY BoS CoC, KHC is responsible for overseeing all parts of the CoC application process, including: coordinating the local competition which involves developing application guidelines; preparing detailed instructions and required documents to be completed by applicants; setting policy priorities; providing ongoing technical assistance to new and renewal project applicants; creating scoring criteria and tools to use to score and rank projects as required by HUD; reviewing all project applications for completeness and compliance with all requirements; and submitting all parts of the CoC Consolidated Application to HUD on behalf of the CoC. The Consolidated Application includes all individual project applications (70+), the CoC Application which responds to questions on behalf of the full CoC and is used by HUD to score CoCs in the national competition (this is completed by KHC), and the Project Ranking of Projects based on local scoring criteria. To facilitate all aspects of the application process, KHC must work closely with the CoC's Scoring and Ranking Committee, which is comprised of representatives from agencies not funded by CoC as well the CoC Advisory Board. The Committee and the Advisory Board must approve the competition policies and scoring criteria as well as the ranking of projects based on the approved criteria. This requires numerous meetings including public meetings of the CoC Advisory Board as well as advance planning and coordination with various community stakeholders.

24.     KHC has served as the CoC's collaborative applicant since the CoC Interim Rule went into effect in 2012. Prior to 2012, the CoC operated under different federal guidelines where

the term "collaborative applicant" did not exist. CoCs were still required to designate an agency to compile and submit all parts of the CoC application. KHC served in that capacity from the mid-1990s until its current role beginning in 2012.

25.      CoC regulations define Permanent Housing as "community-based housing, the purpose of which is to provide housing *without a designated length of stay.*" 24 CFR 578.37(a)(1). HUD has structured CoC competitions since FY 2012 to help ensure CoCs can support an ongoing commitment to recipients of permanent housing supports. While local KY BoS CoC funding competitions may lead to reductions in funding or complete reallocations for under-performing or under-spending projects, the national CoC award cycle as administered before FY 2025 generally allowed projects meeting performance standards to plan for renewal. This was a result of HUD's prior commitment to place at least an average of 93.6% of a CoC's Annual Renewal Demand in Tier 1 across all CoC competitions since FY 2012. Projects that a Continuum of Care's local funding competition ranked in Tier 1 were guaranteed to be conditionally committed awards. Although there have been delays in release of funds to CoC projects due to government shutdowns in the past, renewal awardees knew that they could continue services because costs incurred during a program year prior to grant execution are eligible costs for reimbursement. Maintaining such a large Tier 1 percentage is especially valuable to Permanent Housing grantees because they feel comfortable housing clients with lease terms that may extend into another program year and feel safe making a commitment to *permanent* housing for their clients. It also helps grantees build long term relationships with landlords who can rely on CoC rental or leasing payments.

26.      HUD has been using this model since FY 2012 to support the expansion of permanent supportive housing projects, yet the FY 2025 CoC NOFO turns this model upside down. The NOFO allows only 30% of a CoC's ARD to be included in Tier 1 and places a 30% cap on

Permanent Housing. This essentially removes the ability of current, high performing Permanent Housing awardees effectively plan for ongoing program operations. Even if they have an application that scores well, there is still a strong chance it could be placed in Tier 2 and subject to the national competition, where it could be defunded by a HUD "merit review" for compliance with Presidential policy priorities even if it scored high in the national competition.

27.    It is my understanding that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from past practices and will cause serious harm.

28.    This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

a.    The FY 2025 Continuum of Care (CoC) NOFO released on November 13, 2025 — which rescinds and fully replaces the congressionally aligned FY 2024/FY 2025 CoC Competition and YHDP Renewal/Replacement NOFO published on July 31, 2024 — fundamentally alters both the timeline and eligibility structure for CoC funding. Under the July 31, 2024, NOFO, CoCs were promised that if they were awarded funds through the FY 2024-FY 2025 CoC Competition for FY 2024 funds, they would be eligible to receive FY 2025 funds through a renewal process for another 12-year grant term without having to go through a new competitive process, allowing for stable planning, strategic investment, and continuity across local homeless response systems; the reissued NOFO abruptly withdraws that framework, forcing CoCs into immediate uncertainty. As a result, communities now face destabilizing risks to system-level and project-level planning, imminent service disruptions, rental and service funding gaps, and the need to rapidly

reconfigure programs to comply with federal directives that run counter to more than a decade of evidence-based CoC system design. The sudden policy reversal threatens stranded projects, severe cash-flow challenges, and a weakened capacity to address and end homelessness.

b.      The shift to a one-year FY 2025 CoC NOFO — issued abruptly and in direct conflict with the two-year structure promised in the July 31, 2024, NOFO — introduces immediate and far-reaching instability to KHC and the KY BoS CoC in the implementation of the CoC Program, which impacts the entire homelessness response system. The FY 2025 CoC NOFO effectively reneges on the promise of housing and supportive services permanency that direct service providers, the KY BoS CoC, and HUD made to persons with disabilities experiencing homelessness. KHC and the KY BoS CoC will be required to spend significant time and resources responding to a NOFO and re-applying for competitive funding that we understood had already been awarded to the KY BoS CoC.

c.      For project applicants and direct service providers, the compressed timeline and reconfigured funding priorities create acute operational challenges: organizations must rapidly rewrite new project applications, redesign budgets, and pivot program models with little notice nor guidance from HUD, all while bracing for rental assistance cuts, staffing disruptions and losses, broken landlord partnerships, and contract losses. Meanwhile, CoC lead agencies like KHC face an unprecedented administrative burden as they are forced to unwind two-year planning cycles, realign local priorities, reinterpret new federal rules, and manage community-wide financial and programmatic fallout — all within a dramatically shortened timeframe. In addition, the proposed new award announcement date of May 2026 means that providers who have existing funded programs that were anticipating a

renewal in early 2026 will have one or more months during which their program will not be funded, even if they receive an award under the new one-year FY 2025 CoC NOFO. Many of these providers will not be able to bridge that gap in funding for any significant length of time. Collectively, these impacts will destabilize local systems, erode trust between federal partners and communities, and ultimately place the highly vulnerable households with disabilities currently served by 959 permanent housing units in the KY BoS CoC at significantly heightened risk of returning to homelessness — triggering a surge in unsheltered homelessness, particularly in rural and distressed communities that lack local infrastructure beyond the CoC Program, including already weak or nonexistent emergency shelter system capacity.

29.    The FY 2025 NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

     a.  HUD has required CoCs to rank projects into two tiers for over 10 years at least. Projects ranked in Tier 1 at the CoC level are selected for funding by HUD so long as the projects meet the minimum required thresholds established by HUD, thereby ensuring continuity of services and outcomes. Projects in Tier 2 must compete against all other projects in Tier 2 from all other CoCs using scoring criteria established by HUD. Tier 1 projects are significantly more likely to be funded by HUD than Tier 2 projects. This has allowed local communities to prioritize high performing projects and those that serve the most vulnerable populations, such as the chronically homeless and those projects serving people with multiple disabling conditions. Projects must still compete at the local level to determine Tier placement. Allowing a larger portion of the CoC's ARD to be placed in Tier 1 has allowed for more effective and efficient planning

for communities to be able to continue to provide housing and supportive services for people in need of permanent housing assistance, especially those in PSH projects. The FY 2025 CoC NOFO reduces the Tier 1 portion from 90% to 30%. Because the scoring used by HUD to evaluate Tier 2 projects favors larger metropolitan areas, the vast majority of the KY BoS CoC's funding is at risk of being reallocated by HUD to other communities that meet their new expectations.

b.  Historically, the majority of funds have been allowed to be placed in Tier 1 using local scoring and ranking criteria developed by local communities. In FY 2024, Tier 1 was set at 90% of a CoC's ARD. The least amount allowed in Tier by HUD in the past 10 years was 85% in the 2015 CoC competition.

c.  The KY BoS CoC's FY 2025 Annual Renewal Demand is $21,511,505. At 30%, Tier 1 will equal $6,453,451. The remaining $15,058,054 must be placed in Tier 2, regardless of project type or how effective the project has been for the community. Because the Tier 2 scoring criteria favors larger metropolitan areas, and the KY BoS CoC has a larger percentage of rural areas than other CoC's, the KY BoS CoC is at a higher risk of losing 70% of its current funding – more than $15 million – in a matter of months.

d.  The KY BoS CoC currently has approximately $17.8 million in permanent housing projects. Even if the CoC placed only PH projects in Tier 1, excluding from Tier 1 any project types, the CoC would still have to place $11.4 million worth of PH projects in Tier 2, putting these projects at significant risk of being cut entirely by HUD. This means nearly 700 households are at-risk of becoming homeless quickly, including families with children and elderly with disabilities. Approximately 1,200 people would

lose their current housing over the next 12 months. Without the PH assistance available in the CoC, people who become homeless for the first time in the coming months and years, as well as those who are facing chronic homelessness, will not have a pathway to housing stability that the KY BoS CoC currently provides. This will lead to both more people experiencing unsheltered homelessness and increased overcrowding and lengths of stay in emergency shelters in Kentucky.

30.    The FY 25 NOFO states that "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." (FY 2025 NOFO, p. 15.)

a.   The restriction limiting CoCs to funding no more than 30 percent of their Annual Renewal Demand (ARD) for Permanent Housing (PH) projects – including PH-Permanent Supportive Housing (PSH), PH-Rapid Re-Housing (RRH), and Joint Transitional Housing (TH) and PH-RRH projects – will have profound and immediate negative consequences for the KY BoS CoC and the individuals and families it serves. Funding dedicated for renewal of existing permanent housing programs will face abrupt shortfalls, forcing them to either reduce or eliminate essential housing subsidies and supportive services. This directly destabilizes programs that currently house individuals with disabilities, chronic homelessness histories, and other high-needs populations including homeless youth and survivors of domestic violence, undermining years of system-level planning and investment in housing stability. For clients, the consequences are dire: the loss of permanent housing subsidies will result in

involuntary exits to unsheltered homelessness, heightened exposure to health risks, and, for the most vulnerable populations, increased risk of mortality. The policy de-prioritizes evidence-based permanent housing programs, erodes the hard-won stability of CoC systems, and threatens the safety and lives of the individuals these programs were designed to protect. This cap will cause the KY BoS CoC to lose $11,416,187, totaling 64% of permanent housing renewals. Although the exact number of households and units impacted by this loss of renewal resources cannot be precisely predicted at this time, a 64% reduction from the number in currently supported by CoC PH grants could result in as many as 668 families who are at serious risk of homelessness losing their rent assistance in the Kentucky Balance of State.

b. Historically, the CoC Program has prioritized the development and renewal of permanent housing projects, including Permanent Supportive Housing (PH-PSH) and Rapid Re-Housing (PH-RRH), as the cornerstone of an evidence-based strategy to end homelessness. In past CoC competitions, there were no arbitrary caps limiting the proportion of Annual Renewal Demand (ARD) that could be allocated to permanent housing, allowing CoCs to maintain and expand successful permanent housing programs based solely on targeted local needs and performance outcomes. The FY 2025 NOFO's restriction, which limits permanent housing projects to no more than 30% of a CoC's ARD, represents a stark departure from this precedent and undermines the core purpose of the program. By capping funding for permanent housing, the NOFO effectively shifts resources away from proven solutions and redirects them to transitional housing or supportive service-only projects that do not provide long-term housing stability and undermine the prospect of achieving self-sufficiency. This

approach contradicts the evidence-based design of the CoC Program, which was intentionally created to prioritize permanent housing solutions as the most effective means of reducing homelessness, improving health and public safety outcomes, and reducing reliance on emergency systems. HUD's policy shift will destabilize CoC systems, erode hard-won housing gains achieved via highly competitive locally driven process, and place thousands of Kentucky's most vulnerable disabled individuals and families at heightened risk of returning to homelessness. If the 30% limit is implemented, in Kentucky's BoS CoC, approximately 1,220 vulnerable individuals, including children and a minimum of 641 persons with disabilities, have a high likelihood of returning to unsheltered homelessness due to the incredibly weak and under-resourced emergency shelter capacity across the state. The FY 2025 NOFO and policy differ from past CoC competitions by effectively forcing CoCs to implement a "one-size-fits-all" approach, imposing restrictive, time-limited supports that fail to account for local variations in housing markets, service gaps, and the complex, long-term needs of clients. This approach undermines the KY BoS CoC's ability to tailor interventions to promote stability and self-sufficiency, leaving vulnerable individuals and families (including homeless youth and survivors of domestic violence) – particularly those with disabilities or histories of chronic homelessness – at heightened risk of program failure, housing loss, and a return to homelessness.

c.  The FY 2025 NOFO's cap on permanent housing funding marks a shift toward time-limited, less stable interventions and will have the most devastating impact on people currently living in CoC-funded permanent housing. Individuals with disabilities, chronic health conditions, or long histories of homelessness rely on long-

term rental subsidies and intensive supportive services to maintain stability. If the 30% cap on permanent housing subsidy is implemented, many of these residents will lose their housing because their programs cannot be renewed at current funding levels, forcing them into involuntary exits. Additionally, current PH-assisted clients will not be eligible to access Transitional Housing projects the NOFO aims to create given HUD definition of homelessness. This will result in a dramatic increase in returns to homelessness, including unsheltered homelessness, where exposure to violence, weather, untreated medical conditions, and lack of care significantly raise the risk of injury, hospitalization, and death. For these households, the removal of permanent housing is not merely a service reduction – it is a life-threatening disruption that reverses years of progress to stability and self-sufficiency. Project applicants and housing/service providers will face immediate operational and financial crises. Projects that were designed, funded, and staffed around evidence-based permanent housing models will be forced either to downsize, convert to entirely different interventions, such as costly or infeasible transitional housing, or close altogether. Providers will be required to rapidly rework budgets, reassign staff, and make difficult decisions about which households to evict due to reduced capacity. Many communities have built their homeless response systems around permanent supportive housing and rapid rehousing as the backbone of stability; this sudden shift guts that foundation. The result will be cascading program instability — contract losses, staff layoffs, increased administrative burden, and the unraveling of coordinated crisis response networks that depend on these permanent housing beds to prevent severe harm. Local economies and housing markets will also see negative impacts. KHC, as CoC lead, will be responsible for managing

systemwide upheaval with very little time, resources, or policy flexibility. KHC will need to unwind multiyear planning cycles, rewrite consolidated applications under extreme time pressure, and referee difficult local decisions about which permanent housing programs will lose funding and ultimately close. KHC will also bear the responsibility for communicating these devastating changes to partners, local governments, and residents, all while attempting to maintain system coordination amid contracting capacity and rising homelessness. The administrative strain will be immense: increased grievance filings, loss of community trust, heightened conflict among providers, and the collapse of long-standing planning frameworks that were built on long-standing federal guidance prioritizing permanent housing. The shift effectively destabilizes the entire CoC governance structure and erodes the credibility of federal-local partnerships that communities have relied upon for more than a decade.

d.   A loss of $11,416,187 (64%) of permanent housing renewals will have a profound impact on the people, places, and programs supported by the KY BoS CoC. First and foremost, it will cause residents in roughly 1,575 units to lose their permanent housing subsidy and supportive services and will lead to returns to homelessness for a great number of currently assisted households. This rapid increase in homelessness will overwhelm an already under resourced emergency shelter system in the KY BoS CoC. As the Emergency Solutions Grants (ESG) recipient for the KY BoS receiving $2,566,609 in FFY 2025 funding, KHC was only able to assist 27 emergency shelters, 10 of which only serve survivors of intimate partner violence. It is likely that many of these shelters will lack the capacity to respond to a significant increase in local homelessness.

e.   Regardless of funding source, 81 counties in the 118-county BoS lack year-round emergency shelter, placing responsibility for homeless response on emergency responders, most often local police. In communities without any or sufficient emergency shelter, the loss of permanent housing will lead to an increase in unsheltered homelessness, which is largely illegal in Kentucky. Under the SAFER Kentucky Act, local governments are legally obligated to arrest and criminally charge persons experiencing unsheltered homelessness who sleep in public places. A loss of permanent housing solutions for homeless Kentuckians will further divert criminal justice resources away from other public safety priorities, increasing local law enforcement, jail, court, and public defender costs.

f.   The loss of CoC permanent housing will place increased demand on other subsidized housing programs that do not have the capacity to meet the need. KHC allocated approximately $1 million of ESG funding to 19 subrecipient agencies to provide Rapid Re-Housing, far less than the $8.95 million in CoC PH funding that could be lost. Much of KHC's ESG funding is already committed to continuing existing client assistance. KHC also serves as a Public Housing Authority (PHA), providing Housing Choice Vouchers (HCVs) in 87 counties, but does not have the voucher capacity to meet the housing needs of households losing housing due to FY 2025 NOFO restrictions.

g.   Due to HCV funding shortfalls, in June 2024 KHC stopped taking applications to be added to the HCV waitlist. Currently 6,734 households are on KHC's HCV waitlist. Other PHAs statewide face similar constraints. The loss of CoC permanent housing will increase demand for PHA subsidies, placing higher need persons with disability

with a history of homelessness in competition with other low-income Kentuckians in need of housing support, ultimately lengthening the time all households must wait to receive a voucher.

h.  The 30% permanent housing cap will also cause assisted households to lose the supportive services provided with their CoC-funded permanent housing subsidy. The provision of optional supportive services along with permanent housing subsidy is why the KY BoS CoC has seen assisted households either retain or successfully exit from Permanent Supportive Housing at such high rates, with an average success rate of 95.4% over the last 5 years per KY BoS CoC System Performance Measures. The loss of these services will cause formerly assisted persons to depend on costly emergency services for medical and mental health care, increasing charity costs for hospitals and Medicaid costs for the Commonwealth. Formerly assisted households will also likely lose access to mainstream social services accessed via referrals from their housing case manager. These services cuts will also lead CoC grantees and subgrantees to lay off skilled social services workers, including case managers and peer support specialists, thus inhibiting the homeless services system's ability to help clients obtain and sustain housing.

i.  Further, these CoC cuts to permanent housing will also impact landlords throughout the Commonwealth, taking millions of dollars from the pockets of small businesses. It will also harm relationships they have established with homeless services agencies providing CoC vouchers, potentially causing landlords to refuse to again accept a housing voucher due to the promise of permanency being broken by the CoC program.

31.    The FY 2025 NOFO includes the following language: "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." (FY 2025 NOFO, p. 55.) In addition, it states that "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons … (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." (*Id.*, p. 65.) "Awards made under this NOFO will not be used to … conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." Pg. 108. "You must comply with these applicable provisions … Implementing Presidential Executive Actions" like EO "14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government"). (*Id.*, p. 108.)

a.    These provisions appear to conflict with the following federal laws and regulations: *Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs Final Rule* FR 5863-F-02, Effective 10/21/2016; *Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Final Rule* FR 5359–F–02, Effective 3/5/2012; and *Bostock v. Clayton Ctyounty*, 590 U.S. 200 (2020). These regulations are still in effect and have not been revoked via the rulemaking process under the Administrative Procedure Act. Legally, any agency receiving funding from HUD's Office of Community Planning and Development (CPD) must continue to comply with the Equal Access Rule. Additionally, these NOFO provisions conflict with the

following State and local laws: fairness ordinances that have been adopted by local Kentucky jurisdictions, as well as Kentucky Executive Order 2020-554 that prohibits discrimination in the workplace or in the provision of public services because of race, color, religion, sex, national origin, sexual orientation, gender identity or expression, ancestry, age, pregnancy, marital or familial status, disability or veteran status.

b.      This provision will also make CoC grantees and subgrantees ineligible for renewal funding because they have complied with prior HUD directives to ensure and promote LGBTQ+ equal access, including those issued via the FY 2024 CoC NOFO governing funding currently in use, as illustrated in the clauses copied below. Language mandating engagement with and protection of LGBTQ+ persons also exists in the FY 2023, FY 2022, FY 2021, FY 2018, FY 2017, and FY 2016 CoC NOFOs, such as the following:

> *"(7) Improving Assistance to LGBTQ+ Individuals. Discrimination on the basis of gender identity or sexual orientation manifests differently for different individuals and often overlaps with other forms of prohibited discrimination. CoCs should address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes. Additionally, when considering which projects to select in their local competition to be included in their application to HUD, CoCs should ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation. CoCs should also partner with organizations with expertise in serving LGBTQ+ populations." (FY 2024 CoC NOFO p. 9)*

*"Applicants must identify the steps they will take to ensure that traditionally underserved populations (such as Black, Latino, and Indigenous and Native American persons; Asian American persons, Pacific Islanders and other persons of color; members of religious minorities; lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons; persons who live in rural areas, persons with disabilities, and others adversely affected by persistent poverty or inequality) will be able to meaningfully participate in the planning process"* (FY 2024 CoC NOFO, p. 67).

*"f. Addressing the Needs of LGBTQ+ Individuals. Demonstrates efforts to address the needs of Lesbian, Gay, Bisexual, Transgender, and Queer (LGBTQ+) individuals and their families experiencing homelessness. Collaborative Applicants must demonstrate their CoC: includes LGBTQ+ serving organizations or advocacy groups in the CoC membership; annually conducts training to providers about how to effectively implement the Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Rule, and the Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs Rule; implemented and trained providers on a CoC-wide, anti-discrimination policy ensuring that LGBTQ+ individuals and families receive supportive services, shelter, and housing free from discrimination; regularly collaborates with LGBTQ+ and other organizations to update their*

> *CoC-wide, anti-discrimination policy, as necessary to ensure all housing and services provided in the CoC are trauma-informed and able to meet the needs of LGBTQ+ individuals and families; assisted providers in developing project level anti-discrimination policies that are consistent with the CoC-wide anti-discrimination policy; and has a process for evaluating compliance with their CoC's anti-discrimination policies and addresses any non-compliance with those policies.* (FY 2024 CoC NOFO, pp. 85-86).

c.      Finally, compliance with the Equal Access rule is essential to ensure that persons who identify as LBGTQ+ have safe access to services. Research has demonstrated that LBGTQ+ persons disproportionately experience homelessness and encounter barriers in receiving services, especially those who are transgender: 22% of LGBT adults say they have ever experienced homelessness – twice as many as non-LGBT (11%); 30% of respondents to the 2022 US Transgender Survey had experienced homelessness in their lifetimes; 8.3% of transgender adults recently experienced homelessness as compared to 2.5% of cisgender/genderqueer sexual minorities, and 1.4% of cisgender straight adults. (UCLA Williams Institute *Homelessness among LGBT Adults in the US);* LGBTQ youth have a 120% higher risk of experiencing some form of homelessness compared to non-LGBTQ youth (Chapin Hall); LGBTQ youth who reported experiencing homelessness or housing instability had higher rates of victimization, being in foster care, and food insecurity, compared to their stably housed LGBTQ peers. (Trevor Project); and the 2016 Equal Access Rule states "HUD has learned through its review that all individuals, including transgender persons and other gender nonconforming persons, can be safely

accommodated in shelters and other buildings and facilities in accordance with their
gender identity."

d.      Transgender persons are a small, but not insignificant, portion of the population
served by the KY BoS CoC. In 2022, 107 persons who were served by the KY BoS CoC
self-identified as transgender, with 69 in 2023, and 81 in 2024, per HMIS reports. The FY
2025 CoC NOFO eliminates their ability to receive homeless services in a safe and self-
affirming manner in compliance with federal law and punishes those agencies seeking to
provide client-centered services to transgender persons.

32.     Even if these terms and provisions within the FY 2025 NOFO were not themselves
severely catastrophic, compliance with dramatically different conditions will require a complete
overhaul of KHC, KY BoS CoC, and applicant processes. Compliance with these new
requirements will require more time, resources, funds, and effort to comply, and is not feasible to
do by the January 14, 2026 application deadline the FY 2025 NOFO issued in mid-November
2025.

33.     KHC is hearing urgent and widespread concern from KY BoS CoC-funded agencies
throughout the Commonwealth regarding funding gaps that are all but inevitable because of the
late and rushed issuance of the FY 2025 NOFO. Some FY 2024 project grant terms are scheduled
to end as early as March 2026, yet the FY 2025 NOFO indicates that HUD will not make funding
determinations *until* May 2026. Even if award announcements are made in May 2026, funds cannot
be released until grant agreements are executed, which will take additional time. This creates a
critical multi-month period during which programs will lack clarity on their funding status even if
those projects are awarded under the new FY 2025 NOFO, leaving agencies unable to plan or
implement bridge measures to pay landlords, maintain staff, or continue essential supports for

tenants. Any interruption in funding during this period could force some CoC-funded agencies to permanently close, immediately terminating housing and services for highly vulnerable disabled program participants. For participants, this is not merely a temporary disruption — it represents sudden loss of safe, stable housing, supportive services, and continuity of care, placing already vulnerable individuals and families at immediate risk of returning to homelessness, crisis, and life-threatening conditions.

34.     Additionally, CoC-funded agencies have raised urgent concerns regarding the health, well-being, and housing stability of the participants they serve. The combination of delayed funding, drastic cuts to permanent housing resources, and abrupt policy shifts threatens to destabilize the very programs that safeguard these individuals' basic needs. For the people served – many of whom have disabilities, chronic health conditions, or histories of prolonged homelessness – interruptions in housing and supportive services are not minor setbacks; instead, they are preventable declines in physical and mental health, disruptions in critical care, and, in the most severe cases, premature death. Furthermore, several KY BoS CoC permanent housing projects provide housing assistance to victims of domestic violence, including children. The primary cause of homelessness for these households was due to domestic violence and the housing assistance, and the trauma-informed customized services provided to these households is vital to their immediate safety and long-term stability. Abrupt loss of such support services could be detrimental. These funding and policy changes place participants at extreme risk, eroding the hard-won stability that the KY BoS and CoC programs have provided for years and undermining the life-saving work of dedicated providers across Kentucky.

35.     If the FY 2025 NOFO remains in place, the KY BoS CoC faces a catastrophic blow to its homeless response system and the potential collapse of nonprofit CoC grantees in rural areas.

The unprecedented 30% cap on permanent housing renewals, combined with draconian restrictions on the use of remaining funds and abrupt policy shifts, will force the termination and drastic reduction of critical Permanent Supportive Housing and Rapid Re-Housing programs – the very programs that keep the most vulnerable disabled Kentuckians housed. Agencies will be confronted with difficult decisions: thousands of people with disabilities, chronic illnesses, and histories of long-term homelessness will be displaced from safe, stable housing and abruptly returned to unsheltered homelessness.

36.      The human toll will be immediate and severe. Exposure to extreme winter weather, predatory violence, untreated medical and behavioral health conditions, and lack of supportive services will place lives in jeopardy. Projections suggest that at least 1,220 Kentuckians in the Balance of State, including children and at least 641 people with disabilities, could be forcibly displaced, facing conditions that dramatically increase the risk of injury, illness, and preventable death. Mandatory compliance requirements in alternative program models – including coerced substance use or mental health treatment – will strip participants of autonomy, trigger re-traumatization, and accelerate housing loss.

37.      Beyond the human cost, the systemic consequences are equally dire. CoC-funded agencies will face months of funding uncertainty, administrative overload, and, in many cases, permanent closure. The KY BoS CoC will lose the infrastructure it has painstakingly built over decades, dismantling coordinated housing and supportive services across 118 counties – a geography already challenged by rural isolation, scarce resources, and minimal alternative services. State systems, including emergency healthcare, psychiatric services, law enforcement, and social services, will be overwhelmed as the displaced population floods crisis response systems that are ill-equipped to absorb them.

38.     Additionally, communities and local economies across Kentucky will face severe consequences due to the FY 2025 NOFO. Hundreds of landlords who currently rely on CoC-funded rent payments will stop receiving them, placing many housing units at risk of foreclosure and further exacerbating the Commonwealth's already critical housing supply shortage. Preserving these units is essential not only for individual stability but also for sustaining local economic growth and community development. Moreover, the NOFO's policies will push thousands of people back into unsheltered homelessness, creating widespread safety risks, straining public services, and undermining the vitality of communities across the state. This destabilization may also discourage business investment and economic engagement, as companies are less likely to locate in areas facing heightened homelessness and community instability.

39.     If the FY 2025 NOFO is implemented as written, the KY BoS CoC risks the collapse of its evidence-based, permanent housing framework, a dramatic increase in unsheltered homelessness, avoidable suffering and death, a devastating reversal of years of progress in ending homelessness in the Commonwealth, and risks deterioration of an already strained housing market as well a stall or deter local economic development. The human, societal, and financial costs will be profound, immediate, and would be preventable without the FY 2025 NOFO.

40.     The NOFO's cap on permanent housing funding and its forced shift toward time-limited, less stable interventions will inflict the most severe and immediate harm on individuals currently living in CoC-funded permanent housing. These residents are not simply "program participants" – they are people with significant disabilities, chronic and often life-limiting health conditions, traumatic histories, victims of domestic violence, and long patterns of homelessness who have finally achieved stability through long-term rental subsidies and wrap-around supportive services. Permanent Supportive Housing and long-term rental assistance are not interchangeable

with shorter-term models; they are medically necessary, evidence-based interventions that allow
people with complex needs to remain safely housed in the community.

41.    Under this policy, many residents will lose their homes because renewal programs
will no longer be fundable at the levels required to sustain them. Providers will be forced to
discharge tenants who are stable only because they have a permanent housing subsidy and ongoing
support. These are individuals who cannot simply "transition" into short-term programs or time-
limited assistance. The result will be widespread involuntary exits from housing, pushing people
back onto the streets, into cars, abandoned buildings, encampments, and other places not meant
for human habitation – conditions that are dangerous, risk public safety, traumatizing, and
incompatible with basic survival for many disabled households.

42.    Compounding this harm, the alternative models prioritized by the NOFO often
require participants to comply with rigid, coerced treatment plans – including mandatory substance
use treatment, mental health programming, and intrusive case management directives I – to remain
eligible for housing. For people with disabilities, trauma histories, or complex behavioral health
conditions, these requirements strip away personal autonomy and dignity, forcing individuals to
engage in services that may not be clinically appropriate, wanted, or effective. Many will be
removed from programs for "noncompliance," not because they pose a risk or have failed in
housing, but because the program's model demands obedience to predetermined service paths
rather than supporting self-directed recovery. These punitive and medically unsound mandates will
lead directly to further housing loss, re-traumatization, and disengagement from care, pushing
individuals into crisis, hospitalization, incarceration, or back onto the streets.

43.    The return to unsheltered homelessness carries catastrophic consequences:
exposure to extreme weather events;; life-threatening infections; unmanaged chronic illnesses;

predatory violence; sexual assault; and the escalation of behavioral health crises. Research consistently shows that mortality rates among people experiencing unsheltered homelessness are several times higher than for housed populations; for individuals with disabilities who lose permanent housing, the risk of premature death increases dramatically within months. This policy shift will not only erase years of progress in stabilizing the most vulnerable people in our communities; it will also directly result in avoidable medical crises, suffering, and preventable loss of life.

44.    For these households, eliminating or capping permanent housing is not a mere procedural change or budget adjustment. It is the removal of the only intervention that has kept them alive. This abrupt reversal is not just destabilizing — it is deeply inhumane, disregarding the lived realities, clinical needs, and personal autonomy of the very people the CoC Program was fundamentally created to protect.

45.    Terminating programs that rely on CoC grants will not only destabilize the Kentucky Balance of State homeless response system but will also dramatically increase burdens on state health, safety, and human service infrastructures. When permanent housing programs close or downsize due to the FY2025 NOFO's restrictive funding cap, the individuals and families they serve – many with significant disabilities, unmanaged medical conditions, and complex behavioral health needs – do not simply disappear; they are displaced into systems that are already strained to their limits. State Medicaid programs, emergency departments, psychiatric facilities, jails, crisis-response teams, adult protective services, and child welfare agencies will experience immediate surges in demand as people lose the housing stability that prevents crises in the first place.

46.    Emergency rooms and inpatient hospital units will likely see rising admissions from untreated conditions that were previously stabilized through supportive housing. Law enforcement

and jails will likely face increased encounters with people experiencing psychiatric distress or survival-related offenses, diverting public safety resources away from community priorities. State-funded detox, mental health, and crisis-stabilization programs – already over capacity – will likely be forced to absorb individuals whose needs could have been effectively managed through housing rather than costly and under-resourced institutional interventions.

47.     Moreover, shelters in many Kentucky Balance of State communities either do not exist or could not meet basic accessibility, safety, or medical accommodation standards, pushing displaced individuals into unsheltered environments where risks of injury, victimization, and death sharply increase. As homelessness rises, so too does the demand on public sanitation, transportation systems, courts, and local governments attempting to respond without adequate housing resources. In short, dismantling CoC-funded permanent housing programs shifts the burden from a targeted, evidence-based federal housing system onto the broadest and most expensive state systems – creating higher costs, worse outcomes, and avoidable human suffering. Moreover, the KY BoS CoC depends entirely on CoC funding to sustain its homeless response system and critical, life-saving interventions, including Permanent Housing programs. The Commonwealth does not allocate dedicated state funds in its annual budget to address homelessness, making CoC resources an essential source of support for these essential services and housing subsidies.

48.     The FY 2025 Continuum of Care (CoC) NOFO represents a dramatic and unprecedented shift in federal homeless policy that will profoundly destabilize the KY BoS CoC and undermine the Commonwealth's proven efforts to address homelessness with evidence-based, humane, and permanent solutions. By capping permanent housing (PH) funding at just 30% of the KY BoS CoC's Annual Renewal Demand and severely restricting the allowable use of remaining

funds, the NOFO will terminate or downsize essential Permanent Supportive Housing (PH-PSH) and Rapid Re-Housing (PH-RRH) programs, which are the backbone of Kentucky's approach to addressing and solving homelessness. These programs have been specifically designed to house individuals with disabilities, chronic health conditions, and long histories of homelessness – populations for whom long-term rental subsidies and supportive services are not optional, but life-saving interventions.

49.     The abrupt defunding of these programs will have catastrophic impacts on program participants. Hundreds of thousands of highly vulnerable residents across the country risk involuntary exits from stable housing, forcing them into unsheltered homelessness, encampments, or institutional settings. Specifically, KHC projects upwards of 1,220 people currently living in permanent housing in the Balance of State will be impacted. Exposure to extreme weather, predatory violence, untreated medical and behavioral health conditions, and lack of supports will sharply increase risks of injury, hospitalization, and preventable death. Compounding this harm, the NOFO's push toward restrictive, time-limited programs will mandate compliance with treatment and service plans that may be clinically inappropriate, coercive, or entirely unwanted, stripping participants of autonomy and dignity while triggering further housing instability and re-traumatization. Additionally, access to these services is extremely limited, and in many cases nonexistent, across the vast majority of the predominantly rural and severely under-resourced communities across the 118-county KY BoS CoC.

50.     For KY BoS CoC-funded projects and providers, the policies required under the FY2025 NOFO would likely force immediate operational crises. CoC agencies will be required to downsize or close programs, reallocate limited staff and resources, and make ethically impossible decisions about who will remain housed. This will erode program stability, disrupt long-term

partnerships with landlords and service networks, and undercut years of system-level planning designed to coordinate housing, outreach, and supportive services across rural communities in Kentucky.

51.     The CoC lead agency, KHC and the KY BoS CoC, will likely face unprecedented administrative and system-level burdens, including reprogramming local funding allocations, managing community-wide programmatic fallout, and mitigating the consequences of program terminations, all while attempting to uphold the integrity of a system designed to make homelessness rare, brief, and non-recurring. The FY 2025 NOFO's arbitrary funding restrictions effectively dismantle the CoC's evidence-based, housing framework and undermine Kentucky's statewide homelessness goals.

52.     The combined effects of terminating permanent housing programs, redirecting funds to less stable interventions, and enforcing harshly restrictive uses of remaining funding will not only reverse decades of progress in ending homelessness in Kentucky but will actively jeopardize the lives of the most vulnerable residents, dismantle the KY BoS CoC's local governance infrastructure, and undermine the Commonwealth's commitment to addressing homelessness with humanity, dignity, and permanent solutions.

53.     In conclusion, HUD's FY 2025 NOFO will damage the KHC, the KY BoS CoC, individual CoC agencies, and Kentuckians of have, are or will experience homelessness in the 118-county CoC. The NOFO upends decades of federal policy focused on ensuring homeless Kentuckians have access to permanent housing and supportive services. The FY 2025 NOFO takes away local decision-making authority, no longer allowing localities to determine the split of funds between permanent housing and temporary housing. By limiting the amount of funds local communities can use for permanent housing to just 30%, the NOFO threatens loss of housing for

an estimated 2,610 formerly homeless Kentuckians across the Commonwealth, including 1,220 in the Balance of State, thereby increasing homelessness. People currently experiencing homelessness or those who become homeless in the future will not have access to the permanent housing programs that have intentionally been a part of the CoC's homeless response system for many years. This will strain housing nonprofits, private landlords, and properties developed alongside CoC assistance and services.

54.    With Kentucky's current housing supply shortage, rising housing costs, and increasing homelessness, the Commonwealth cannot afford to reverse affordable housing gains and push Kentuckians back into homelessness.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of November 2025.

Winifred (Wendy) K. Smith
Deputy Executive Director, Housing Programs
Kentucky Housing Corporation