# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>                    Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>                  Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM<br><br>DECLARATION OF GREG PAYNE |

1

## **DECLARATION OF GREG PAYNE**

I, Greg Payne, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Senior Advisor on Housing Policy in the Maine Governor's Office of Policy Innovation and the Future ("GOPIF"). I am also the Chair of the Maine Continuum of Care Board of Directors.

2. Prior to joining GOPIF, I was the director of the Maine Affordable Housing Coalition, a diverse association of private and public sector organizations committed to ensuring that all Mainers are adequately and affordably housed. Before that, I served as a development officer for over fourteen years with Avesta Housing, a nonprofit organization focused on developing and operating affordable homes. I have also served as Board Chair for the National Low Income Housing Coalition and have worked for the Atlanta Task Force for the Homeless and the Massachusetts Coalition of the Homeless.

3. I have a B.A. in Economics from the College of the Holy Cross, and a J.D. from Northeastern University School of Law. After graduation from law school, I practiced real estate law, specializing in affordable housing.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with staff at GOPIF and other state and quasi-state agencies, or from my review of relevant documents and information.

5. The Maine Continuum of Care ("Maine CoC") is a group of service providers and other interested parties who work together in a collaborative planning process to develop programs that address ending homelessness.

6. Continuums of Care represent specific geographic areas. The Maine CoC's geographic area is the entire State of Maine.

2

7. State agencies, local governments, and nonprofit organizations submit applications to Maine CoC in order to receive funds from the United States Department of Housing and Urban Development ("HUD") to support programs designed to address homelessness.

8. Maine CoC reviews and scores those applications, and then submits a consolidated application to HUD, through its Collaborative Applicant (the Maine State Housing Authority).

9. Each year, the Notice of Funding Opportunity ("NOFO") Committee of the Maine CoC reviews and analyzes the NOFO and responds to the questions in the CoC-level application. Individual project-level applications are reviewed, scored, and ranked by a Selection Committee made up of individuals who do not have a conflict of interest regarding any of the applications. The Selection Committee uses scoring tools developed and approved by the Maine CoC and makes a recommendation to the Maine CoC Board of Directors. The Board may accept or modify the recommendation based on protocols established by the Maine CoC.

10. For FY 2024, the Maine CoC submitted 31 project-level applications from 16 different agencies. Of those, 20 projects (from 11 agencies) were approved for funding by HUD.

11. Fourteen of the 20 funded projects were for, or included a component for, permanent housing. These funded projects included those providing permanent supportive housing and rapid rehousing.

12. The majority of permanent housing provided through the Maine CoC is permanent supportive housing. Residents must qualify both as homeless at time of entry, and as having a documented disability. Many were chronically homeless before securing this housing. Permanent supportive housing provides stability, safety, and an array of services to help residents remain successfully housed. Without the combination of housing and services, many would become homeless again, likely returning to emergency shelter or the streets.

13. As a result of Maine CoC's application, HUD awarded $22,658,059 to eleven entities to fund twenty projects. Of this amount, $20,543,675 was awarded to fund fourteen

3

projects providing permanent housing. This enabled the projects to provide homes for approximately 1,797 persons who were formerly unhoused.

14. While the CoC funding process has always been recognized as a competition, at both the local and federal levels, previous NOFOs were structured to allow CoCs to prioritize funding for projects that address the highest needs of their communities. For the Maine CoC and our partner agencies, that priority has always been ensuring the long-term safety and stability of our most vulnerable citizens though permanent housing. Until now, that was also a priority built into the NOFO itself, to the point where, according to the National Alliance to End Homelessness, 87% of all CoC funding nationwide goes to initiatives that provide permanent housing. The predictability and consistency of the CoC program is critical because of the large number of people whose housing status relies on this funding source and the large number of service providers who support the housing stability of those individuals. Significant changes in policy or approach have the potential to jeopardize the health and stability of thousands of Maine people, and increase costs to local and state government, unless care is taken to ensure that such changes are undertaken on a reasonable timeframe.

15. I have reviewed the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025 and have concluded that it will cause serious harm. Most significantly, it will dramatically reduce the ability to provide permanent housing to people in Maine.

16. The November 13, 2025 NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

17. The NOFO issued on July 31, 2024 was for FY 2024 and FY 2025, as a result of Congress authorizing HUD to issue two-year NOFOs.

18. In 2024, the CoC NOFO was designed to shift from an annual process to a two-year funding cycle, covering both FY 2024 and FY 2025. The NOFO application process requires a tremendous amount of time that providers would otherwise spend working with clients or programs, or even on other aspects of CoC-related efforts. The Maine CoC, in anticipation of not having a full NOFO process in 2025, took the opportunity to make significant changes at a local level, including the hiring of an Executive Director, dissolving and reestablishing our Board of Directors with only 5 returning members, finding a new HMIS lead agency to oversee our data collection and reporting, restructuring each of our committees, and rewriting our governance and by-laws to incorporate all of these changes. Now, in the midst of these changes, we are faced with not just another NOFO, but a radically different and potentially harmful NOFO. Injecting this unexpected, complicated and time-consuming task, with a much more rapid turnaround than is typically provided to stakeholders in the federal CoC NOFO process, has harmed Maine's ability to prepare the strongest possible application and has compromised our governance transition.

19. My understanding is that the November 13, 2025 NOFO is intended to essentially negate the FY 2025 award, and we must now reapply for FY 2025 funds.

20. Negating the previously announced FY 2025 award and requiring that the Maine CoC reapply for FY 2025 funds within nine weeks with a significantly different approach than in the past is likely to negatively impact the Maine CoC's efforts to address homelessness in Maine. The organizations that had expected to receive funding for the coming year now have their staffing plans and budgets thrown into doubt, and there is significant risk that the Maine CoC will be unable to submit an application by January 14, 2026 that adequately supports the housing needs of vulnerable Maine residents.

21. The November 13, 2025 NOFO sets a cap on permanent housing funds - only 30% of funding can be used for providing permanent housing. Currently, under the FY 2024 Maine CoC award, approximately 91% of funds are being used to provide or support permanent housing.

22. The 30% cap on permanent housing will have an extraordinarily large and negative impact on Maine people and communities because there is unlikely to be backup support enabling them to retain their housing. The people served by such programs have a very high risk of becoming homeless again if they lose the support provided through the current CoC grants. Not only would such a loss of housing security likely create trauma and suffering for those affected, but it would also likely shift many of the costs associated with their return to homelessness to the state and local communities, especially through new shelter beds and General Assistance, much of which is funded by the State.

23. The CoC application process is two-tiered. Projects included in Tier 1 are not subject to national competition, though they are subject to a degree of intra-state competition because HUD typically only allows approximately 90% of annual renewal project demand to be included in Tier 1. Thus, the CoC has to choose which of its renewal projects to allocate to Tier 1, as those projects have a greater chance of funding than the ones allocated to Tier 2. However, the November 13, 2025 NOFO deviates significantly from this past practice in that only 30% of annual renewal project demand can be put into Tier 1, subjecting the 70% balance of annual renewal project demand to the national competition and making it less likely to be funded. Given that the vast majority of existing Maine CoC funds are used to help keep people in their homes, this 30% provision puts the housing security of those people at additional risk.

24. Practitioners in Maine have learned over the past 25 years that conditioning permanent housing on receipt of substance use treatment services leads to poor outcomes. Permanent supportive housing providers in Maine's CoC grant believe that the vast majority of people would refuse those services and thus be prohibited from entering permanent supportive housing, or be forced to leave the permanent supportive housing they currently have. As a result, the individuals with the most complex needs would be left homeless. The prioritization in the November 13, 2025 NOFO for programs that require receipt of such services would thus

6

disadvantage states like Maine that base their programs on established best practices. Were we to abandon that approach in favor of gaining the points awarded in the new NOFO, it would harm the state by returning stably housed people to the street and barring currently homeless individuals from gaining the housing security they need to achieve stability.

25. The above-referenced concern about abandoning long-established best practices applies as well to incentives requiring people to accept support services more generally. The experience of Maine practitioners is that individuals are more likely to take advantage of services after they have been housed. Were we to create such requirements, our projects would fare worse, and more people would become or remain homeless.

26. The priority included in the November 13, 2025 NOFO regarding anti-camping laws puts the Maine CoC at a disadvantage because no such statewide anti-camping law exists in Maine, nor does the Maine CoC have the ability to create such a law.

27. Regardless of the validity of the various priorities and threshold requirements included in the November 13, 2025 NOFO, the volume and complexity of the changes require a significant amount of process changes for both project applicants and the Maine CoC, making it problematic for the Maine CoC to submit a competitive application by January 14, 2026.

28. The Maine CoC is receiving significant feedback from participant organizations that the November 13, 2025 NOFO contains new provisions that create obstacles to their ability to comply, based on conflicts with state requirements that those organizations are already subject to. More broadly, there is enormous concern that the nature of the new NOFO will, by definition, eliminate funding for successful programs.

29. The termination of existing funding for permanent housing that is necessitated by the new NOFO is likely to result in increased public health and public safety costs as a result of the increased homelessness that it will cause. It is well documented in Maine and in other jurisdictions that when people experience homelessness, they have more contacts with law

enforcement, get sicker, and are more likely to utilize expensive ambulance services and hospital emergency rooms. The increase in homelessness also makes it more likely that affected individuals will be forced to live outside in encampments, one of the very outcomes that the new NOFO appears to be seeking to avoid.

30. The Continuum of Care Program is one of the most important resources that Maine has to address homelessness. It is currently used successfully in Maine to provide permanent housing and services to over 1,800 vulnerable people. That stability is paramount to the well-being of the individuals served as well as the communities in which they live. Unfortunately, the new NOFO includes provisions that threaten that stability at great human and community cost.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of November 2025.

_____
Greg Payne
Senior Advisor on Housing Policy
Governor's Office of Policy Innovation and the Future