# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No.1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF SARAH SQUIRRELL |

## DECLARATION OF SARAH SQUIRRELL

I, Sarah Squirrell, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Director of the Office of Behavioral Health (Office) within the Department of Health and Human Services for the State of Maine.

2. As part of my duties as Director, I am responsible for, and oversee, the administration of the Office, its programs, and its services.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Office staff, or from my review of relevant documents and information.

4. The Office's Permanent Supportive Housing (PSH) program is federally funded by the U.S Office of Housing and Urban Development (HUD) through the Continuum of Care (CoC) Program.

5. The Office is a recipient of Permanent Supportive Housing (PSH) Continuum of Care (CoC) funds and a long-standing member of the Maine Continuum of Care (MCoC), including through participation at both the CoC Board and committee level.

6. The Office's PSH program operates statewide and is designed to meet the needs of the State of Maine's most vulnerable people with disabilities and mental health and substance use conditions. The program provides rental assistance and supportive services to assist households with at least one member (adult or child) with a disability in achieving housing stability. The program is designed to promote HUD's community-wide commitment to ending homelessness; quickly rehouse homeless individuals and families while minimizing trauma and dislocation; promote access to and utilization of mainstream resources and treatment services and supports;

and optimize self-sufficiency among individuals and families experiencing homelessness. The Office and a subrecipient of the grant administer the program statewide by utilizing a network of local non-profit community-based agencies.

7. The Office's PSH program serves chronically and literally homeless individuals with a serious mental illness, substance use disorder, or HIV/AIDS or a related disease. The program prioritizes vulnerable subpopulations to be served, including veterans; persons fleeing domestic violence; families; and eligible homeless youths.

8. In the FY23 Continuum of Care Competition, the PSH program successfully consolidated nine separate PSH CoC grants and was awarded $12,256,655.00 to administer the program. From February 2024 –July 2025, the program served 1511 individuals, of whom 72% experienced a primary diagnosis of severe mental illness, and 57% reported living with co-occurring disabilities. The data suggests that the stability offered by the program has led to positive outcomes for the vulnerable populations it serves, for example, of those served, 51% of adults either gained, maintained, or increased personal income, 1279 individuals were actively enrolled in health insurance, 77% of all adults received supplemental income assistance through state and federal programs, and 785 individuals participated in supportive services.

9. Most recently, in the FY24-FY25 Continuum of Care Program Competition, the Office was awarded $13,862,639.00 to administer the program. The program currently serves 1270 individuals, including 271 children, located across all sixteen counties in the State of Maine, with 384 individuals coming from the longest temporary living situations and/or chronic homelessness. In addition to the 1270 individuals currently served by the program, there are an additional 117 PSH resources that had previously been made available through the Maine Coordinated Entry

System and are currently available for individuals to be prioritized to through Maine's coordinated entry process.

10. The Office begins planning for the CoC NOFO Competition long before the NOFO announcement is made, including in projecting future program budgets, analyzing program goals and accomplishments, completing CoC registration, and reviewing the project's Grant Inventory Worksheet (GIW). To apply for PSH funding, the Office completes a detailed project level application, inclusive of the following: applicant profile, standard forms, assurances, certifications, project description, subrecipient information, housing service and HMIS information, a detailed budget, and various attachments and certifications necessary for submission. In addition to the project level application, the Office also contributes to the drafting of the application submitted by the collaborative applicant on behalf of the MCoC. MCoC membership and grantees collaborate extensively, frequently on a weekly basis, to craft responses to the collaborative application narrative prompts.

11. The Office and its subrecipient have operated the PSH program in different capacities via numerous grants from HUD since the 1990s. The program was formerly funded under the Shelter + Care (S+C) program until the enactment of the HEARTH Act, which prompted the reauthorization and consolidation of S+C into the Continuum of Care program.

12. The Office relies on predictable and consistent NOFOs to run the statewide PSH program in Maine. The stability of the program allows the Office to establish and strengthen partnerships with the subrecipient of the grant, the CoC, and coordinated entry to create a cohesive system of support for Maine people experiencing homelessness. The security of consistent NOFOs has given the Office confidence to successively award (via competitive procurement) PSH funding to a subrecipient who, in turn, has relied on the grant's stability to invest in substantial program

infrastructure to ensure stable housing for recipients. Their investments include a comprehensive statewide subsidy and rent management system essential to the effective functioning of such a dynamic program, as well as program management and training for regional sub-contractor agencies. Most importantly, however, is the security that consistent NOFOs offer to program participants: the ongoing rental and services support keeps them on the path to self-sufficiency and recovery in alignment with HUD's programmatic goals.

13. I understand that the HUD Continuum of Care Notice of Funding Opportunity (NOFO) released on November 13, 2025 represents a significant departure from past practices in **timing, funding caps and allocations, scope of competition, scoring criteria and weight, limitations on new projects, and risk review**, and will cause serious, irreparable, and long term harm to the people this grant is intended to serve and the State of Maine's homeless response system.

14. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." This recission comes four months into the first year of the previously awarded two-year PSH grant to the Office, substantially truncating the program year and introducing uncertainty into a housing system that has, by definition, been established to promote permanency and support. Planned investments in program enhancements, particularly in Maine as it relates to health and treatment navigation services, are now slowed, to the detriment of the population this grant serves.

15. The stability of the PSH grant has meant that the Office and Maine's homeless response system have been able to withstand any historical HUD delays in awarding, processing, and releasing funds between grant years. The prior FY24 NOFO extended the competition period

to two years and this helped provide additional stability in the system, alleviate financial strain, and reduce administrative burdens, particularly among the network of non-profit local providers who deliver the PSH program in Maine. This new NOFO states that awards will be announced in May 2026, which is only three months prior to the end of the Office's first program year. This is an infeasibly short window of time in which to pivot a statewide program with multiple contracted agencies and to potentially relocate participants to safe, secure, and available housing. If HUD is delayed again in announcing the new award, the timeline would be further compressed, pressure on local agencies compounded, and distress among an already vulnerable population further elevated resulting in more individuals unhoused and on the streets.

16. Whereas in the two-year FY24 NOFO there was no cap on project component types, this new NOFO now states that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing (PH) projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Prior to this NOFO, the Office's statewide PSH program was awarded $13,862,639 – 85% of all PSH funding in the state – to help 839 formerly homeless households on the path to self-sufficiency and recovery. The FY25 NOFO's introduction of a cap means that the current $20.5m in permanent housing projects currently funded through the Maine CoC must be squeezed into a $6.8m cap going forward. This will profoundly destabilize Maine's homeless response system: even if all the MCoC's Permanent Housing funds under the 30% cap were allocated to the Office's PSH program, it would result in a 50% cut to existing funding, while funding cuts distributed evenly across all projects would result in a 70% cut. Under these scenarios, potentially half to 70% of the 1270 men, women, and children housed through the program could return to the streets.

17. The PSH program and the Housing First principles that underlie it have worked well for years to support incredibly vulnerable people, the vast majority of whom are disabled. Research over decades of work in the field has conclusively demonstrated that supportive services are a crucial component of lasting success and preventing a return to homelessness. Until now, the federal administration has acknowledged the overwhelming research into these approaches and has shaped its program policies and priorities accordingly. The FY25 NOFO represents a sharp reversal of decades-long policy, putting vulnerable Mainers at risk and shifting their care and much of the costs associated with their return to homelessness to the state and local communities, through new shelters and General Assistance. The Office does not have the resources to absorb the effects of this shift in federal policy.

18. This new NOFO also changes the proportion of CoC projects subject to competitive scoring. In the FY24 NOFO, 90% of projects could be ranked in the non-competitive Tier 1; in the FY25 NOFO, Tier 1 can comprise only 30% of projects. Currently, $20,543,675 or approximately 91% of CoC funds awarded to the MCoC are dedicated to permanent housing projects. This is the most significant structural change in a decade and affects the Office's PSH program directly. Our PSH project has historically been in Tier 1 and has consistently scored very well against established performance criteria. Now, however, the drastic reduction of projects protected in Tier 1 means that the Office's PSH program will face significantly greater competition with other projects in Tier 1. In other words, the Office's program is subject to an estimated 50-70% cut based on the 30% cap to PSH (as described above) *as well as* to a 30% cap on Tier 1; this compound compression means that the Office's PSH Tier 1 funding will likely be slashed *in excess of* 70% even before scoring takes place. Any reduction in funding translates directly into a reduction in services to formerly unhoused Mainers and an increase in individuals returning to homelessness.

19. The Office's PSH program scored highly for many years against consistent and transparent scoring criteria because, in partnership with partner agencies, we invested in infrastructure and programming designed to meet the federal priorities of the time. The FY25 NOFO upends those long-held priorities and establishes new priorities for which the Office must pivot an extensive statewide program in a short time frame on reduced funding. Additionally and notably, the FY 2025 NOFO introduces new scoring criteria based on past performance – performance that was guided and shaped by prior, now-discarded federal priorities. For example, the new FY25 NOFO awards bonus points to projects that mandate participants to engage in services, whereas the prior NOFO encouraged voluntary participation in services. In other words, the FY25 NOFO contains a deep, and possibly deliberate, mismatch that will tip many CoC Tier 2 projects, including as much as 70% or more of the Office's PSH program, towards a low overall score. This puts any Tier 2 portion of the Office's program, and the Mainers that portion supports, at particular risk.

20. The Office's PSH program is additionally at-risk based on the new NOFO's Merit Review process, which replaces prior CoC scoring and shifts weighting. Separate from individual project review and scoring, the Merit Review evaluates the entire CoC as a collective. In this new NOFO, HUD elevates "public safety" as a major scoring factor: CoCs must show laws prohibiting camping and illicit drug use, enforcement protocols, cooperation with law enforcement, use of involuntary commitment standards, and SORNA implementation across the entire geographic area of the CoC. Maine's CoC is statewide and many of these statewide laws and frameworks do not exist nor, based on the legislative process, could they be implemented if desired within the compressed timing of the competition. This means that Maine's CoC as a whole will likely score lower than other CoC jurisdictions and hence receive less or no funding at all, putting the entirety

of the Office's PSH project at risk. It has been suggested that the Merit Review is deliberately constructed to facilitate a shift in federal homelessness funding from "blue states" to "red states."

21.     The Office is exploring how it might create programs under the new NOFO to keep PSH program participants from being turned out of their safe, stable homes to the streets. Unfortunately, the new NOFO's project quality and eligibility thresholds create significant barriers to a trauma-informed transfer of participants from permanent to transitional housing. Participants cannot enter new transitional programs except if they are deemed homeless; this means that the Office would have to force vulnerable Mainers into homelessness as part of the transition. Similarly, the Office would have to move participants who currently access supportive services voluntarily into 40 hours of mandatory customized services per week and, to earn bonus points in scoring, subject them to "voluntary" immigration verification. These are not trauma-informed best practices for addressing the behavioral health needs of the homeless population. Indeed, these approaches contradict the stated FY25 policy priority wherein "CoCs should encourage the use of trauma informed care [and] ensure safety of program participants."

22.     Finally, HUD's review of applications has always included an assessment of risk and past performance. In the FY25 NOFO, this risk review incorporates the same criteria (financial controls, effective management systems, results of audits) but adds two new criteria: (a) "[o]ther public sources such as newspapers, Inspector General or Government Accountability Office reports or findings, or other complaints that have been proven to have merit" and (b) a "[h]istory of subsidizing of facilitating activities that conflict with the purpose of this

9

NOFO." These conditions are highly subjective and could disqualify any project, including the Office's PSH program, based on a process that is not transparent, standardized, or protected from partiality.

23. Current vulnerable PSH participants are scared and confused. One gentleman wrote to my office: "I feel alone abandoned by the government. I don't even have a car that I can live in. And I know being alone wolf on the street there's no way I Will survive or stay sober. I really need any and all assistance available." PSH participants are our north star as we navigate the challenges this NOFO presents and at the heart of our concerns expressed in this declaration.

24. In summary, the new FY25 NOFO puts the Office's long-standing HUD-funded PSH program in existential peril and, with it, the success, recovery, and self-sufficiency of Maine's most vulnerable people.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of November 2025.

*Sarah Squirrell*
Sarah Squirrell
Director
Office of Behavioral Health, Department of Health and Human Services