# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>              Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>              Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM<br><br>DECLARATION OF DANIELLE MEISTER |

## **DECLARATION OF DANIELLE MEISTER**

I, Danielle Meister, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Assistant Secretary for the Division of Homeless Solutions at the Department of Housing and Community Development (DHCD) for the State of Maryland. I make this declaration based on personal knowledge and information obtained in my official capacity.

2. I started this position in January 2024 and have held several leadership roles in homeless services at DHCD since January 2020. Since starting at DHCD, I have directly overseen the management of over $550 million in federally-funded grant programs through the U.S. Treasury, U.S. Department of Health and Human Services, and U.S. Department of Housing and Urban Development. Prior to my employment at DHCD, I worked in senior leadership positions at anti-poverty and homeless services in local government and nonprofit organizations for 15 years. I have a Master's in Public Affairs from Indiana University Bloomington.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with DHCD staff, or from my review of relevant documents and information.

4. DHCD is the CoC Collaborative Applicant and HMIS Lead Agency for the Maryland Balance of State Continuum of Care (MD-514). Additionally, we provide state funding and technical assistance for homeless services to all 10 Continuums of Care in Maryland, manage the state's Homeless Services Data Warehouse, lead the Maryland Interagency Council on Homelessness, and oversee the state's strategy to prevent and end homelessness.

5. As the Assistant Secretary for the Division of Homeless Solutions, I provide executive leadership and decision making on homeless response strategy, ensure successful and

compliant management of all federal and state grant funding to address homelessness, and oversee implementation of the Maryland Balance of State CoC programs in alignment with federal statute and HUD program regulations. As the CoC Collaborative Applicant and HMIS Lead, our division is responsible for applying for federal funding through the annual HUD CoC Program funding competition, monitoring HUD CoC- and ESG- funded programs for compliance, implementing written standards and procedures for program services and Coordinated Entry, operating the Homeless Management Information System which collects homeless data and tracks programmatic outcomes, and facilitating the Continuum of Care Board which is responsible for the overall governance of the CoC.

6. The Maryland Balance of State CoC (MD-514) organizes and governs the homeless services system for 9 rural and suburban counties in Maryland, over a third of the State. The CoC geographic coverage area includes Allegany, Calvert, Cecil, Charles, Frederick, Harford, Garrett, St. Mary's, and Washington counties.

    a. The members of the CoC include nonprofit and local government entities providing direct homeless services such as street outreach, shelter, and permanent housing, healthcare and benefits systems leaders, community stakeholders, people with lived experience of homelessness, faith leaders, and partner organizations addressing poverty and homelessness in the local community.

    b. In 2024, HUD awarded a total of $8,663,478 in grant funding under the CoC competition to the Maryland Balance of State CoC. Of this award, $6,802,605 was allocated to permanent supportive housing, $684,083 to rapid re-housing, $424,656 to joint transitional-rapid re-housing, $341,920 to supportive

    services, and $410,214 for planning and HMIS grants used to meet HUD grant administrative and compliance requirements. The permanent supportive housing (PSH) projects funded under the CoC program, by federal statute, require participants to have a permanent disability and experience homelessness in an unsheltered setting, emergency shelter, or transitional housing prior to receiving assistance. Additionally, HUD regulations and funding requirements require the CoC to prioritize all new PSH openings for people who are chronically homeless and have been homeless for at least 12 months in a three-year period and further prioritize people with the longest length of homelessness. For rapid re-housing (RRH) and joint transitional-rapid re-housing (Joint TH-RRH) projects, participants are not required to have a disability for eligibility, but HUD does require the CoC to prioritize those who are chronically homeless for openings, and a participant must have a permanent disability to meet the HUD chronic homeless definition. All of the housing projects funded by the CoC program, by nature of HUD-issued eligibility and prioritization requirements, serve the most vulnerable, high acuity, medically fragile, and elderly people experiencing homelessness within our CoC and State.

c.    This prioritization strategy and a strong focus on permanent housing outcomes has led to a 54 percent reduction in unsheltered homelessness and 41 percent reduction in overall homelessness for the Maryland Balance of State CoC over the last 10 years (2015-2024). Statewide, across all 10 Maryland Continuums

4

of Care, these practices have also led to a 42 percent reduction in unsheltered homelessness and 28 percent reduction in overall homelessness..

7. Each year, the HUD CoC funding competition requires DHCD and other CoC Collaborative Applicants across Maryland to conduct an intensive and fast-paced open local funding competition to solicit new and renewal projects that align with HUD's stated policy, funding, and scoring priorities outlined in the NOFO. DHCD and other Collaborative Applicants must also prepare a lengthy and detailed CoC application, which consists of scored questions on our CoC homeless data, performance outcomes, system-level strategy for addressing homelessness, and governance practices. Finally, DHCD and other Collaborative Applicants must score and rank all projects selected for inclusion in the CoC's application for funds and align them into a Tier 1 and Tier 2 according to HUD's thresholds. The application for funds also requires Collaborative Applicants to sign legal certifications that the information submitted in the application is accurate and that the projects chosen to receive awards will fully comply with statute and HUD policy. The CoC funding application process is time-consuming, extensive, and must be carefully executed in order to meet the tight deadlines that HUD establishes for project applicants, notification requirements for accepted/rejected projects, and the overall NOFO submission.

8. DHCD has been the Collaborative Applicant for the Maryland Balance of State CoC since January 2020, when the CoC was created through the merger of 5 separate Continuums of Care. The CoC subsequently expanded through two additional mergers. The 2025 CoC Competition will be the sixth competition that DHCD has led.

9. The majority of projects funded by the CoC NOFO receive 12-month grants which renew on an annual basis. These grants fund monthly rental assistance payments on behalf of

program participants to private landlords, pay leasing costs to owners of single-site housing, and provide supportive services and administrative funds for staff payroll, operations, and financial management and oversight. The majority of costs associated with operating a CoC-funded projects are mandatory routine monthly or biweekly costs. Receiving an award or payment from HUD even one week late means that program staff may not be paid for work completed, rents may not be paid to landlords and program participants will face eviction, or that a nonprofit may have to pay interest on a line of credit if they have to borrow funds to meet these obligations.  Under a normal year, HUD typically releases the NOFO in the summer and requires applications to be submitted in the fall.  It takes HUD several months to score applications, make award determinations, and publicly announce those determinations.  Prior year award announcements have been released in January or February.  It takes an additional several months for local HUD field offices to issue actual grant agreements and enable projects to draw down funds for services provided.  Projects funded under the CoC competition that have grant expiration dates in the first half of the calendar year routinely receive award notices and grant agreements after their awards have already expired and they are operating projects un-funded.

10. I understand that the HUD Continuum of Care Notice of Funding Opportunity was released on November 13, 2025, over four months later than normal. The due date for CoC application submissions is January 14, 2026. This late NOFO release and submission will already cause significant harm. The NOFO also noted the expected date of award would be May 1, 2026. Considering that it takes several months for grant agreements to be issued, it will now be extremely difficult, if not impossible, that any CoC renewal projects with grant expiration dates before July 1, 2026 will have a legally executed grant agreement in place before their current funds run out. For example, 31 projects totaling $20,803,765 in CoC awards across Maryland have grants that

6

will expire between January 1, 2026 and June 30, 2026. These projects provide permanent housing to 1,250 households and 2,224 people.

11. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." This change is in direct conflict with the statutory permission Congress gave HUD to conduct a biannual competition instead of an annual competition in 2025. CoCs did not know and were not prepared to submit an annual funding application in 2025, as the next competition would have been in 2026.

12. "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

    a. This change will put 70 percent of the CoC's project portfolio at risk of being cut, by requiring the CoC to put these projects in "Tier 2". HUD scores Tier 2 projects independently using their own criteria stated in the NOFO, and makes them compete for funding with Tier 2 projects in other communities. Historically, Tier 1 thresholds have been set at 90 to 95 percent, which allowed the CoC to put the majority of its highest-performing projects serving the most vulnerable clients, typically permanent supportive housing, in Tier 1. This gave CoCs assurances that those clients enrolled in those projects would likely not be impacted by any losses of funding or HUD cuts. Having a project in Tier 1 gave the funding recipient affirmation that even in the case of a late award, the funding was likely to be awarded and the project should continue to serve clients even if it had not received a renewal notice yet because it would

7

    eventually receive HUD reimbursement for services – critical for ensuring the stability of housing.

  b. Changing the Tier 1 threshold to 30 percent puts significantly more projects "at-risk" of funding cuts and creates unpredictability for organizations providing the direct services. Communities that do not score as well as others on the overall application, and those that do not submit high-barrier transitional housing projects in Tier 2, are likely to lose funds permanently. This change is likely also to make renewal projects unwilling to continue providing services unreimbursed without an award notice or grant agreements, which could cause a disruption in housing and services.

13. "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Pg. 15.

  a. The Maryland Balance of State CoC has $7,911,344 in renewal permanent housing projects in its portfolio. The 30 percent cap on permanent housing would require the CoC to cut $5,418,016 in funding to local projects, ending permanent housing assistance for 466 households, 821 people, and 355 children. The majority of projects impacted would be permanent supportive housing, which would have a direct and disparate impact on people with disabilities and the elderly. The majority of program participants only receive disability or social security income, and are unable to afford fair market rental housing without a subsidy.

b. Statewide, the 30 percent cap will result in a $45,927,091 cut to permanent housing projects, ending housing assistance for 2,399 households, 4,305 people, and over 1,900 children.

c. Previously, the CoC competition did not have a cap on permanent housing assistance – in fact, it explicitly has required and prioritized funding permanent housing since 2013 over transitional housing and other interventions. This allowed CoCs to allocate funds according to local needs – by strategically funding projects for PSH, RRH, and Joint TH-RRH to match the local households experiencing homelessness and their level of acuity and need.

d. The CoC and State do not have alternative permanent housing resources, such as vouchers or affordable housing, to be able to transition the impacted program participants to another subsidized program. Additionally, there are insufficient shelter beds to provide impacted households if they cannot afford to maintain housing independently when their HUD-funded subsidy ends. During the last HUD Point-in-Time Count, the shelter bed vacancy rate was less than 3 percent. These households are highly likely to become unsheltered, return to abusive or dangerous family/friends, or forced into an institutional setting.

e. The reduction of permanent housing will have lasting and severed economic impacts to local governments, the state, and broader community. The immediate and increased unsheltered homelessness will result in an increase of $230 million in costs statewide in the form of costs to emergency services such as Fire, EMS, and law enforcement, emergency department use, Medicaid,

healthcare systems, and correctional systems. These costs are borne by the state and local governments and municipalities.

14. Mandatory Supportive Services for New Transitional Housing Projects. HUD's newly introduced threshold requirements demand that a new transitional housing project require participants to take part in supportive services such as substance use treatment. Additionally, they require programs to provide 40 hours per week of customized services for each participant. HUD notes that only participants who are working, elderly, or have a physical or development disability can be exempted from these requirements. This is discriminatory towards people on the basis of their type of disability. People with mental health, substance use, or chronic disease are not afforded the same exemptions. Both the statute and governing HUD regulations employ a more expansive concept of "disability" that encompasses a broad range of qualifying conditions. *See* 42 U.S.C. § 11360(10)(A); *id.* § 15002(8); 24 C.F.R. § 578.3.

15. Even if these conditions were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of our processes and those of our applicants. This will require more time, money, and effort to comply, and is not feasible to do by January 14.

16. Projects have reported that they do not have sufficient time to design and submit new transitional housing project applications, considering these have not been eligible under the HUD competition for many years. Most transitional housing programs are single-site complexes – unless a project applicant already has secured a building that meets HUD Housing Quality Standards, they would not be able to apply and meet threshold. Additionally, all CoC project applications require a 25 percent cash or in-kind match as a threshold requirement. As project applicants are required to submit applications to their CoC by December 14 (30 days ahead of the

HUD deadline), 3 weeks is insufficient time to fundraise or enter into a legal Memorandum of Understanding that has a fiscal commitment.

17. The requirement to provide 40 hours of customized services per week per participant in new transitional housing projects is substantially different than current program models. This will require programs to hire additional full-time staff, increasing the cost to deliver housing assistance dramatically.

18. Terminating programs that rely on CoC grants will interfere with our state's homelessness goals and DHCD's ability to accomplish its mission and objectives. Governor Moore's State Plan sets a goal to end chronic homelessness in the state by 2035. In State Fiscal Year 2025, 2,900 people experienced chronic homelessness. Cutting permanent housing assistance by $45 million and returning an additional 4,300 people to homelessness immediately will more than double the number of people experiencing homelessness in just one year. This singular action by HUD would reverse more than a decade of progress in addressing homelessness in our state and have rippling economic impacts to the state, local governments, landlords and property owners, eviction courts, and jobs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __24th__ day of November 2025.

_____
Danielle Meister
Assistant Secretary, Division of Homeless Solutions
Maryland Department of Housing and Community Development