# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF KAREN R. BYRON |

## **DECLARATION OF KAREN R. BYRON**

I, Karen R. Byron, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Balance of State (BoS) Continuum of Care (CoC) Supervisor at the Executive Office of Housing and Livable Communities (EOHLC) for the Commonwealth of Massachusetts. I have held this position since 2021. As more fully described below, my primary duties and responsibilities in this role include overseeing and managing a portfolio of community informed programs providing permanent and temporary housing and related support services for extremely vulnerable Massachusetts families and individuals living with disabilities and suffering from persistent and recurrent homelessness. I have been working in United States Department of Housing and Urban Development (HUD) funded low-income housing and homeless programs since 1995 and CoC programs since 2008.

2. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with EOHLC staff, or from my review of relevant documents and information.

**Overview of Massachusetts CoC Programs**

3. There are 11 CoC programs that operate in the Commonwealth pursuant to the federal McKinney-Vento Homeless Assistance Act, as amended. 42 U.S.C. § 11301, et seq.

4. As required by this statute and its implementing regulations at 24 C.F.R. Part 578, the CoC program is designed to:

   a. Promote communitywide commitment to the goal of ending homelessness;

   b. Provide funding for efforts by non-profit providers, States, and local governments to quickly rehouse homeless individuals (including youth) and

2

        families, while minimizing the trauma and dislocation caused to homeless individuals, families, and communities by homelessness;

    c. Promote access to and effective utilization of mainstream programs by homeless individuals and families; and

    d. Optimize self-sufficiency among individuals and families experiencing homelessness.

5. In total, the 11 CoC programs in Massachusetts receive over $136 million in funding each year from HUD to support housing and supportive service programs for nearly 4,000 chronically homeless, homeless, and disabled families and individuals in the Commonwealth. The population served includes veterans, elders, people living with HIV and AIDS, runaway youth, domestic violence survivors, children, and families. The myriad problems created by poverty and marginalization are compounded when combined with disabilities, including severe mental illnesses. It is no overstatement to say that the CoC programs serve the most vulnerable members of our communities.

**EOHLC's Role Overseeing the BoS CoC**

6. EOHLC is the state agency which oversees the Massachusetts BoS CoC (one of the 11 CoC program grantees in the Commonwealth). In this capacity, EOHLC applies for and receives grant funding directly from HUD to administer and fund eligible CoC program activities as carried out by its subrecipients, which consist of supportive service and housing providers. EOHLC is responsible for preparing and submitting the consolidated CoC Program Competition application to HUD for the CoC program it administers, including subrecipient project applications.

7. I manage a team of six people at EOHLC who work on the BoS CoC. We ensure the BoS CoC projects operate in accordance with the regulations at 24 C.F.R. Part 578, including

ensuring a community-wide process involving the coordination of various providers to develop strategies for ending homelessness and identifying resources available to meet that goal. My team's work includes: providing project oversight and working with subrecipients to address challenges and ensuring effective and efficient use of CoC funding; managing invoices for funding and developing contracts with subrecipients; undertaking a full annual monitoring as well as a quarterly review process to ensure projects are on target for spending and contract compliance; performing governance tasks including committee development (e.g., the Project Evaluation Committee, which assists in rating applications from potential subrecipients); coordinating with our Advisory Board (which makes a final decision regarding the content of the CoC's application to HUD); preparing for the funding competition; ensuring participation in the annual Point in Time (PIT) count (an annual survey conducted by COCs to gather concrete data on homeless populations); partnering with Emergency Solutions Grants (ESG) recipients; and participating in the consolidated planning process within the BoS CoC jurisdiction. Once the notice of funding (NOFO) is released, we immediately review it, develop a calendar, and plan for ensuring participation by our community members. Planning initiatives include developing new project applications, posting all information to our own webpage and partner webpages, meeting with the Project Evaluation Committee to rank projects, meeting with the Advisory Board to approve project ranking, and developing the BoS CoC application.

8.      The BoS CoC covers 115 communities in the northeastern region of Massachusetts. Its membership includes representatives from nonprofit homeless providers, municipal governments, law enforcement entities, advocate organizations, faith-based organizations, and other groups as well as persons with lived experience of homelessness. The BoS CoC provides funding for CoC program components including Supportive Services (SS or SSO for Supportive

Services Only), Transitional Housing (TH), Rapid Rehousing (RH), Joint Component Transitional Housing-Rapid Rehousing (TH-RRH), Permanent Supportive Housing (PSH), Youth Homelessness Demonstration Program (YHDP), and the administration of Homeless Management Information System (HMIS) and Coordinated Entry (CE). For fiscal year (FY) 2024, the BoS CoC was awarded $33,131,265, of which $20,880,538 (roughly 63 percent of the total funding) has been obligated for PSH; $2,812,025 for RRH; and $3,576,093 for joint TH-RRH (inclusive of YHDP).

9. Combined with the HUD grant assistance provided through the McKinney Vento Homeless Assistance Act and required matching funds, including but not limited to state funds, the BoS CoC received the following amounts:

   a. FY 2022:    $42,760,190.00

   b. FY 2023:    $36,630,514.75

   c. FY 2024:    $37,989,851.25

10. The BoS CoC's subrecipients use CoC funding to carry out important programs serving the most vulnerable people in the Commonwealth, including those who are chronically homeless, households with children, elders, veterans, those with multiple disabilities, and youth and young adults between the ages 18 and 24. ACTION, Inc. is one such subrecipient. Since 2012, ACTION has operated Welcome Home 1 Expansion (WH1) in Gloucester as the first program implementing Housing First principles in their area of the state. WH1 provides 57 units of PSH. Households entering WH1 are chronically homeless. Many have spent years on the street prior to being housed, have numerous behavioral and physical health challenges, and many are unable to attain employment due to their disabilities, including substance abuse disorders. All receive case management along with a plethora of supportive services at the agency and throughout the

community. In the last year there were no exits to homelessness; and nearly all participants maintained housing or exited to their own permanent housing.

11. Typically when HUD releases a new NOFO for the CoC program, EOHLC schedules a meeting with the full CoC membership (which includes both funded and non-funded entities, those that would like to apply for funding, persons with lived experience of homelessness and other stakeholders) to provide a schedule and invite new project applicants and project ideas. We also typically raise and discuss changes in the NOFO, Tiering criteria (i.e., which projects will be in Tier 1 as opposed to Tier 2, as Tier 1 projects are fully funded before any Tier 2 projects are funded), and any other relevant information related to the NOFO. The BoS CoC Project Evaluation Committee also meets to review our ranking tool and any new priorities identified in the NOFO.

12. The BoS CoC staff support subrecipients in their application processes, including technical support in the utilization of the federal E-SNAPS system.

13. We provide training for all applicants (new and renewal) and make ourselves available for their questions and assist them if they are struggling with E-SNAPS.

14. We review the project applications for completeness, accuracy, and eligibility, amending them when necessary until they are finalized.

15. We create review teams who score project applications and submit scores for review by the Project Evaluation Committee, which reviews scores and develops at least two options for the Advisory Board to vote on to determine the Priority Listing.

16. The Advisory Board then meets and evaluates the Project Evaluation Committee suggestions to determine the Tier 1 and Tier 2 rankings for the CoC, which are then put into the Priority Listing. Their vote is binding.

17. While project applications are being developed and reviewed, the EOHLC CoC staff work to address subrecipient and potential subrecipient questions, reaching out to leveraging and partnering organizations (including Public Housing Authorities across the CoC) to most effectively and accurately respond. Staff also work to gather and develop required attachments, review CoC and partner webpage postings, and include all CoC members and new organizations who wish to be part of the CoC or apply for funding.

18. BoS CoC grants have historically been used to provide funding for housing and services via new projects and renewals for successful projects. This mix ensured ongoing service provision that minimizes displacement and re-traumatization while supporting stability and long-term success of formerly homeless families and individuals.

19. Our subrecipients plan their budgets, including staffing and program capacity, well in advance of the NOFOs. Knowing when the NOFO is likely to be published, and knowing what will be required to demonstrate a successful project that is seeking renewal, allows subrecipients to provide ongoing support to those being served.

20. Federal regulations require subrecipients to make one-year commitments; but without the expectation that successful projects can anticipate renewal, those agencies are at risk if they enter into one-year leases at any point during the contract period beyond month one. Subrecipients are likely to stop admitting new households in order to preserve funding for existing obligations due to this uncertainty. Fewer households experiencing homelessness will be able to access housing as a direct result.

21. EOHLC and subrecipient service providers have been operating with the understanding that CoC NOFOs would be reasonably predictable and consistent with those from prior years—as indicated by the past decade or so of NOFOs, and HUD's indication of a two-year

funding cycle in the last NOFO. Subrecipients must make programmatic decisions between NOFOs, including whether to renew leases or admit new program participants. They make those decisions in reliance on successive NOFOs aligning with applicable law, HUD's own guidance, and prior NOFOs.

22. The vast majority of federal CoC funding made available to Massachusetts in a given federal FY has historically been used to provide permanent housing for the most vulnerable homeless individuals and families.

23. To be effective, EOHLC's internal assessment tool for BoS CoC project applications must be aligned with HUD's priorities. Any disruption or change in HUD's process or goals requires substantial planning to re-tailor the tool. This is usually done well in advance, which was not possible this year without advance notice of the dramatic shifts in the FY 2025 NOFO.

24. EOHLC is also responsible for the development and submission of the Commonwealth's 5-year Consolidated Plan. A Consolidated Plan is a HUD-approved plan developed in accordance with HUD regulations at 24 C.F.R. Part 91. As part of the BoS CoC funding application, EOHLC must certify that its proposed CoC programs are consistent with the Consolidated Plan and the community planning and development program goals.

25. The fundamental goal of the community planning and development programs, including the CoC program, is to develop viable urban communities by providing decent housing and a suitable living environment and expanding economic opportunities principally for low-and moderate-income persons. As set forth in the HUD regulations, "[t]he primary means towards this end is to extend and strengthen partnerships among all levels of government and the private sector, including for-profit and non-profit organizations, in the production and operation of affordable

housing." 24 C.F.R. § 91.1 (a)(1). Under the regulations, 'providing decent housing' expressly includes 'assisting homeless persons to obtain appropriate housing' and 'increasing the supply of supportive housing.' 24 CFR § 91.1(a)(1)(i).

26. Pursuant to HUD regulations, this Consolidated Plan requires the jurisdiction to state in one document its plan to pursue these goals for all the community planning and development programs, as well as for housing programs.

27. EOHLC recently submitted Commonwealth's five-year Consolidated Plan in June 2025.

28. A core component of our Consolidated Plan is dedicated to homelessness planning, including addressing the interrelationship between stakeholders, projects, and funding that contribute to a cohesive strategy confronting this multi-faceted problem. Large-scale and sudden changes to the CoC program disrupt the entire landscape and undermine EOHLC's ability to certify that its CoC programs are consistent with and further the goals set forth in its Consolidated Plan as required by the CoC regulations at 24 C.F.R. § 578.27.

**The FY 2025 CoC NOFO**

29. HUD issued last year's NOFO for FY 2024-2025 as a transition from one-year to two-year application cycles for the CoC program. The BoS CoC spent months preparing its FY 2024-2025 consolidated application, anticipated not needing to submit one this year, and had planned accordingly with respect to staff capacity and communications within the CoC membership, subrecipients, and potential subrecipients.

30. The HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, purports to "rescind[] and supersede[] any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or

Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." It represents a significant departure from past practices and will cause serious harm to and throughout Massachusetts.

31. The substantive changes in the FY 2025 NOFO require more effort to address than prior NOFOs. The BoS CoC process for navigating annual NOFOs, described above, is structured under the reasonable expectation that NOFOs released by HUD align with HUD's own five-year strategic plan and will be relatively consistent year-to-year. For example, HUD's current strategic plan for FY 2022-2026 emphasizes that HUD will "implement a Housing First approach to reducing homelessness."

32. The FY 2025 NOFO includes a substantial shift from PSH projects towards TH and SSO projects. As a result, the BoS CoC must now change its processes to prepare the consolidated application to account for that shift. As new TH and SSO projects (except for coordinated entry and homeless management information system SSO) have not been a possibility in CoC NOFOs for several years, they are not addressed as part of the BoS CoC's ranking tool.

33. Further preventing timely amendments to the ranking tool, HUD provided no advance notice of this change beyond an email sent on July 3, 2025, which stated in relevant part, "the NOFO will seek to provide opportunities for new types of projects including . . . transitional housing programs." The BoS CoC was not provided any relevant detail enabling us to begin to amend our ranking tool to account for this change until the NOFO was released, 62 days before the due date for consolidated applications. Applications for potential subrecipients must be sent to the BoS CoC in advance of this due date to allow time for the BoS CoC to rank the subrecipients according to our rating tool, at least 30 days before consolidated applications are due per the NOFO. This dynamic creates significant pressure for the BoS CoC to dramatically change our

10

ranking tool in the immediate future to enable potential subrecipients a fair opportunity to understand our ranking criteria and tailor their plans and applications appropriately.

34. Normally the process of developing a tool can take time as the Committee (comprised of community members and subrecipients) will carefully identify metrics and scoring weight and test the tool. Time spent on this detracts from time we can spend on the CoC application and ensure we are addressing all of the other requirements in the FY 2025 NOFO.

35. The lack of notice for these changes, and their significant departure from past NOFOs, has prevented the BoS CoC from engaging in more thorough outreach for new projects that may be responsive to the new NOFO.

36. Additionally, the FY 2025 NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."

37. Tier 1 projects receive funding before any Tier 2 projects. Tier 1 represents the projects the CoC has ranked as being most important for funding and typically represent the highest performing projects in terms of funding expenditures and housing the number of households committed to in the application, as well as CoC strategic priorities.

38. In previous NOFOs, Tier 1 was typically set between 90 and 98 percent of ARD and projects that passed thresholds consistent with the regulations and statute could anticipate funding so long as they meet eligibility thresholds.

39. The FY 2025 NOFO also includes new terms regarding project eligibility, discussed further below, which purport to give HUD significant discretion to deem projects ineligible for a variety of reasons. As such, even projects that are allocated to Tier 1 face significant uncertainty and may not receive funding.

40. To maximize the amount of funding available to serve those in need, the BoS CoC may need to put required infrastructure (CE and HMIS) in Tier 2, creating substantial risk that those components will not receive funding. This could impact our ability to perform the annual Point in Time Count and provide relevant reports to Congress.

41. Separately, the FY 2025 NOFO includes a section titled "Investment in Transitional Housing and Supportive Service Only Projects." It provides that, "[i]n order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects."

42. New TH projects have not been contemplated under recent NOFOs, as acknowledged in a July 3, 2025, email from HUD alerting CoCs to anticipate a NOFO for FY 2025: "the NOFO will seek to provide opportunities for new types of projects including . . . transitional housing programs."

43. It is unclear how this change will impact existing participants in PSH. For example, if funding for a PSH project is reallocated to create a TH project, it is not clear whether the tenants of the PSH project will retain housing for two years in the new project. This is because TH must serve program participants that meet the definition of "homeless" under the CoC regulations. HUD has indicated in a response to a question posed by the BoS CoC on April 23, 2025, that once a household is placed in a PSH project, they will no longer treat the household as homeless. HUD provided no further guidance on this in the NOFO.

44. Further, existing PSH projects may lose 70 percent of their CoC funding in the FY 2025 competition. These projects likely have current contracts using FY 2024 funding. Such subrecipients may be unable to fulfill their commitments under their FY 2024 awards due to

uncertainty as to whether and to what extent they may receive future CoC awards that can be used for PSH. These subrecipients may be unable to agree to full year leases under their current awards, may need to stop accepting referrals to preserve funding under their FY 2024 award, or be forced to take other similar actions.

45. The FY 2025 NOFO includes, "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." In addition, pursuant to the FY 2025 NOFO, "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons, [including] evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans."

46. These terms are a sharp deviation from how HUD has operated the CoC program in the past as memorialized in prior NOFOs, the 2016 Equal Access rule, and other HUD publications and trainings. For example, the FY 2024-2025 NOFO included scoring criteria that provided an advantage for CoCs that "[serve] all family members together and in accordance with each family member's self-reported sexual orientation and gender identity" and "annually [conduct] training to providers about how to effectively implement the Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity Rule, and the Equal Access in Accordance with an Individual's Gender Identity in Community Planning and Development Programs Rule."

47. The BoS CoC, its subrecipients, and potential future subrecipients have taken actions in-line with historic HUD requirements and guidance regarding gender identity and sexual orientation which HUD may now use to deem project applications ineligible for funding or otherwise negatively impact their scores during the competition.

48. Pursuant to the FY 2025 NOFO, "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition" based on "evidence that the project operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'"

49. Some subrecipients receiving CoC funds through the BoS CoC use funding through the Massachusetts Department of Public Health's (DPH) Bureau of Substance Addiction Services (BSAS) as match. BSAS contracts require harm reduction models of care. Not only would the new NOFO terms prevent the use of these additional funds at subrecipient projects, requiring other sources of match at a minimum, they also may render these subrecipients ineligible for funding.

50. Some subrecipients receiving CoC funds for PSH and TH through the BoS CoC also receive funding through DPH-contracted Syringe Service Programs. Not only would the relevant new NOFO terms prevent the use of these additional funds at subrecipient projects, they also may render these subrecipients ineligible for funding.

51. Some subrecipients receiving CoC funds through the BoS CoC engage in harm reduction models of care independently from requirements associated with funding they receive, including the distribution of Narcan to reduce the risk of opioid related deaths. The new NOFO terms may render these subrecipients ineligible for funding.

52. The FY 2025 NOFO includes new related terms that provide a scoring advantage for applicants who can cite to certain types of state or local laws or protocols that "cover the CoC's entire geographic area" regarding prohibitions on "illicit drug use" and "public camping or loitering" and other associated terms.

53. I am unaware of any applicable laws or protocols that "cover the CoC's entire geographic area" that are likely to qualify for points under these terms. The BoS CoC covers a wide swath of the state, with different municipal governments, governmental structures, and laws. The BoS CoC, its subrecipients, and potential subrecipients have no control over such laws and protocols, or state laws and protocols, on illicit drug use and public camping or loitering. A portion or all of the project applications in the BoS CoC's consolidated application will be penalized in scoring under this NOFO accordingly.

54. Given that 70 percent of the funding made available by this NOFO is necessarily allocated to Tier 2 projects, the scoring criteria in the NOFO will have a significantly greater impact on determining which projects are awarded funded as compared to prior years.

55. As discussed above regarding the impact the NOFOs emphasis on TH over PSH on the BoS CoC in developing its consolidated application, these changes likewise create drastically different conditions and will require a complete overhaul of our processes and those of our subrecipients and potential subrecipients moving forward. Responding to the new and unexpected demands of the FY 2025 NOFO will take an extraordinary amount of time and work, and it is unrealistic for HUD to expect CoCs (including EOHLC) to accomplish this by the date consolidated applications are due to HUD on January 14, 2026. As of the date of this declaration, project applications and the CoC application are still not available in relevant online portals.

**Additional Harms to Massachusetts**

56. Already as a result of the FY 2025 NOFO, some BoS CoC subrecipients are not accepting new referrals as they are concerned they will not be able to comply with leasing requirements. Subrecipients are further concerned about the viability of the organization as a whole if they enter into contracts they cannot fulfill because funding is not awarded even if they are placed in Tier 1.

57. If the NOFO for FY 2025 is implemented as it stands, the BoS CoC and its subrecipients may not receive funding necessary for the continued operation of our programs. Long-term projects that have successfully housed the most vulnerable people in the Commonwealth, who otherwise are at the highest risk of experiencing chronic homelessness, may need to stop.

58. The consequences of any program closures for current participants will most likely be severe. Beyond the re-traumatization and destabilization the NOFO's knock-on effects will have on impacted individuals and families, people may end up on the streets, as nighttime temperatures in the BoS CoC's geographic area fall below freezing on most nights. Others—like survivors of domestic violence—may face the impossible choice of returning to an abuser or enduring unsheltered homelessness.

59. The Commonwealth has adopted an Olmstead Plan, a comprehensive, effective working plan for expanding access to community-based services for qualified persons with disabilities in long-term care facilities or at risk of entering such facilities. Access to affordable accessible housing for people with disabilities is a core pillar of this plan, and addressing homelessness through CoC funded PSH is an integral part of the Commonwealth's efforts to ensure individuals with disabilities are able to receive services in the most integrated setting. A reduction

in funding for COC/PSH would undermine these efforts and weaken the Commonwealth's ability to meet its Olmstead goals.

60. Terminating programs that rely on BoS CoC grants will also interfere with the Commonwealth's broader homelessness goals. EOHLC, on behalf of Massachusetts, submitted a new five-year Consolidated Plan to HUD in June 2025 for Federal FYs 2025-2029 alongside a corresponding annual action plan for Federal FY 2025.[1] These plans are required by HUD as related to several of its funding streams, including Community Development Block Grants (CDBG), HOME Investment Partnerships (HOME), ESGs, and others. These plans are the product of extensive planning and substantial citizen participation. Among the objectives described in the Commonwealth's current HUD-approved, Consolidated Plan[2] is the goal to "[r]educe chronic and family homelessness through a housing-based approach, with a long-term goal of ending homelessness." The plan was drafted in reliance on stable CoC funding from HUD for PSH and repeatedly cites the continued need for investment in and expansion of permanent supportive housing, including as provided through the CoC program. The plan details the interrelationship of CoC PSH funding with other state and federal programs that rely on one another to implement this strategy. For example, other state agencies, such as the Executive Office of Health and Human Services and its constituent departments, provide crucial supportive services to several CoC projects throughout the Commonwealth that are likely to be disrupted as a result of the FY 2025 NOFO. The FY 2025 NOFO's substantial departure from how the program has been run in prior years will necessitate significant re-evaluation of these strategies and programs.

---

[1] *Five Year Consolidated Plan 2025-2029* (June 2025), *available at* https://www.mass.gov/doc/final-fy2025-2029-five-year-consolidated-plan/download.
[2] *Statewide Housing Needs Assessment* (Feb. 2025), *available at* https://www.mass.gov/doc/statewide-housing-needs-assessment/download.

61.    In addition to the harms to EOHLC as the entity responsible for administering the BoS CoC, the changes in the FY 2025 NOFO and potential loss of funding to other CoCs in the Commonwealth will have a dramatic impact on the tightly woven fabric of homelessness prevention strategy statewide with substantial ramifications for other state services.

62.    If the other Massachusetts CoCs are unable to satisfy the new and unexpected demands of this NOFO, they may need to close their programs. Losing those programs may result in a statewide increase in homelessness, especially among families and individuals living with disabilities and suffering from persistent and recurrent homelessness (e.g., the most vulnerable populations served by CoC-funded programs). This could place additional strain on other state-funded systems of care.

63.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this __22nd__ day of November 2025.

*Karen R. Byron*

Karen R. Byron
Balance of State Continuum of Care Supervisor
Massachusetts Executive Office of Housing and Livable Communities