# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No. 1:25-cv-00626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | DECLARATION OF PAULA KAISER VAN DAM |
| Defendants. | |

**DECLARATION OF PAULA KAISER VAN DAM (MICHIGAN)**

I, Paula Kaiser Van Dam, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am the Director of the Bureau of Community Services at Michigan Department of Health and Human Services (MDHHS) for the State of Michigan.  In this role, I oversee the Housing and Homeless Services unit which administers three COCP grants from HUD.  Housing and Homeless Services unit is responsible for participating in the three CoCs through which it receives its HUD funding as well as sub-granting those HUD funds to local non-profits who deliver direct services to eligible clients.  MDHHS is responsible for ensuring the appropriate and eligible expenditure of these funds per HUD and other federal regulations.

2.     I am familiar with the information in the statements set forth below either through personal knowledge, consultation with MDHHS staff, or from my review of relevant documents and information.

I.   **MDHHS's CoCP Grants and Role**

3.      MDHHS currently administers three grants through the Department of Housing and Development (HUD) Continuum of Care Program (CoCP).  These grants run through three CoCs:  Balance of State (MI-500), Detroit, Highland Park and Hamtramck (MI-501), and Pontiac, Royal Oak/Oakland County CoC (MI-504).  The MDHHS administered grants within each CoC are:

- MI-500 (Balance of State) -- Rapid Rehousing (RRH) MI0831L5F002400

| Rapid Rehousing (10/1/2025 - 9/30/2026) | | |
|---|---|---|
| | HUD Funding | MDHHS Match* |
| Rental Assistance | $ 2,381,496.00 | $ 595,374.00 |
| Support Services | $ 1,530,958.00 | $ 382,739.50 |
| Rural (repairs) | $ 32,000.00 | $ 8,000.00 |
| Admin | $ 353,850.00 | $ 88,462.50 |
| Total | $ 4,298,304.00 | $ 1,074,576.00 |
| | Total with Match | $ 5,372,880.00 |

*MDHHS provides the required 25% cash match for this grant. This total match includes $150,000 in funds from the Michigan State Housing Development Authority.

- MI-504 (Oakland) -- Permanent Supportive Housing (PSH) MI0135L5F042417

| PSH Oakland (05/01/2025 - 04/30/2026) | |
|---|---|
| Budget Line | Amount |
| Rental Assistance | $ 930,804.00 |
| Support Services | $ 76,650.00 |
| Admin | $ 19,739.00 |
| Subrecipient Match | $ 256,799.00 |
| Total | $ 1,283,992.00 |

- MI-510 (Detroit) -- Permanent Supportive Housing (PSH) MI0059L5F012417

| PSH Detroit (05/01/2025 - 04/30/2026) | |
|---|---|
| Budget Line | Amount |
| Rental Assistance | $ 3,296,292.00 |
| Support Services | $ 209,790.00 |
| Admin | $ 186,300.00 |
| Subrecipient Match | $ 923,096.00 |
| Total | $ 4,615,478.00 |

These three grants provide more than $478,000 of rental assistance per month as well as ongoing support services to individuals and families living in 503 housing units.

3

4. MDHHS subgrants these funds to local nonprofits, which deliver services directly to the target population of homeless individuals and families. MDHHS oversees the subrecipients to ensure proper fund use, service to eligible individuals and families, high-quality service delivery and compliance with HUD performance standards.

5. MDHHS has been a grantee in MI-500, MI-501 and MI-504 for over 15 years, providing the necessary supports, oversights and investments in those CoCs. In addition to being a state partner and funder of other homeless programs, MDHHS has the unique relationship in these three CoCs to ensure that its subrecipients are providing quality service delivery to assist people experiencing homelessness connect to permanent housing.

6. CoC administrative staff and leadership are responsible for preparing, administering, scoring and ranking applications for CoC funding. When funding rounds are held annually, this process required three to four months of focused effort to complete.

7. As the grantee, MDHHS is responsible for submitting the application to the CoC during their open process. Since MDHHS has subrecipients, it requires MDHHS to collect, analyze and report on data and narrative from all subrecipients so that MDHHS can submit one comprehensive application. MDHHS staff spend weeks gathering information from subrecipients and preparing each CoC application.

8. Housing stability, especially for Permanent Supportive Housing (PSH) residents, is of utmost importance to ensure individuals and families do not fall back into homelessness. In order to maintain that stability, forecasting HUD grant funding from year to year is necessary. Prior to the 2024 CoC awards, MDHHS was particularly excited when HUD announced it was moving to a two-year award cycle as it would allow MDHHS the opportunity to develop stronger

expenditure and utilization models, thus utilizing these federal funds in a more efficient and effective way.

**II.    The FY 2025 Continuum of Care NOFO**

9.    I understand that the FY 2025 HUD Continuum of Care Notice of Funding Opportunity (NOFO) was released on November 13, 2025. This NOFO represents a significant departure from past practices and will cause serious harm to MDHHS and individuals and families experiencing homelessness in Michigan as further described below.

A.    <u>Drastic reduction to permanent housing projects</u>

10.    To start, applicants are only permitted and encouraged to apply for Transitional Housing projects and projects that deliver supportive services as new projects (and as reallocated from existing renewal project funding). Transitional Housing was debunked decades ago as an expensive and unsuccessful strategy for addressing homelessness.[1] The current NOFO takes critical funding away from permanent housing programs such as the Rapid Rehousing and Permanent Supportive Housing grants MDHHS administers and forces funding (and subsequently, people) into a failed model of long-term homelessness.

11.    In order to invest in more transitional housing and supportive services only projects, the NOFO limits the amount of permanent housing (PH and RRH) to 30 percent of eligible award amount. Nationally, 87% of CoC funding is currently devoted to permanent housing projects. Dropping this amount to 30% will directly result in the termination of existing permanent housing projects and the eviction of vulnerable adults from permanent housing.

---

[1] See Samantha Batko & Pear Moraras, *Evidence Shows Permanent Supportive Housing Helps People Exit Homelessness. A Proposed Funding Change Would Cut Those Programs*, Urban Institute (Nov. 18, 2025), available at https://www.urban.org/urban-wire/evidence-showspermanent-supportive-housing-helps-people-exit-homelessness-proposed.

12. Based on the funding limits in the new NOFO that only 30% of funding can be allocated toward permanent housing projects, the three grants currently managed by MDHHS will either be reduced dramatically or eliminated. This will impact more than 500 households who currently receive housing assistance through MDHHS' HUD grants.

13. The Rapid Rehousing (RRH) grant currently managed by MDHHS in the Balance of State CoC is currently too large to apply as a renewal grant in the new NOFO as its current size would far exceed the 30% maximum. The current MDHHS RRH grant has 19 subgrantees and, according to the new NOFO, it is unlikely that a straight conversion of this RRH project to Transitional Housing would be eligible for funding. MDHHS has been covering the 25% match requirement on this grant which is more than $1 million in state General Fund—funding that will be lost or need to be repurposed if MDHHS no longer oversees a RRH grant in the Balance of State CoC.

14. In addition, the two Permanent Supportive Housing (PSH) grants managed by MDHHS in Detroit and Oakland County have been in existence for more than 15 years, allowing low income, formerly homeless, disabled residents maintain stable housing for as long as they need it. The new NOFO essentially guarantees that the majority of residents in these PSH grants will be evicted and return to homelessness.

15. Shifting funding away from permanent housing, especially when housing is at its most unaffordable[2] for low-income individuals and families will increase the number of people experiencing homelessness in Michigan; most notably, those who have been receiving rental assistance through existing HUD PSH grants

---

[2] Aimee Picchi & Mary Cunningham, *America's deepening affordability crisis summed up in 5 charts*, CBS News (Nov. 19, 2025), available at https://www.cbsnews.com/news/affordability—2025—in:flation—food—prices—housing—child—care—health—costs/.

B. <u>Abandonment of Housing First</u>

16. The NOFO also reflects an abrupt reversal of HUD's longstanding Housing First policy. Specifically, the NOFO includes a project rating criteria across project types that scores Transitional Housing and Permanent Housing projects higher if service participation is required (with onsite services preferred).

17. Sobriety and/or participation in substance use treatment is never a requirement for access to current permanent housing resources. This is in direct conflict to the "Housing First" philosophy that has been in place for over a decade.

18. The focus on service participation will likely result in MDHHS losing grant funding. For instance, MDHHS' Rapid Rehousing grant funds subrecipients in the 61-county Balance of State Continuum of Care. Currently, none of the subrecipients require service participation, nor do the subrecipients have the resources to offer, let alone require, service participation.

19. Further, NOFO's functional requirement for fully integrated mental health and substance use treatment in housing programs is unrealistic as Michigan's mental health and substance use provider networks are already over capacity and unable to accommodate the immediate influx of thousands of homeless individuals currently in the homeless response system.

20. In addition, the points awarded to projects with service participation provide an exception for individuals over age 62 or who have a physical disability/impairment or a developmental disability. This exception notably excludes individuals with mental health disabilities. In calendar year 2024, more than 17% (5,305) of all people accessing homeless services in Michigan self-reported they had a mental health disability. Excluding individuals with mental health disabilities effectively requires CoCs to (a) provide mental health treatment and recipients to participate in 40 hours of treatment per week—both of which are unrealistic for several

7

reasons; or (b) exclude individuals with mental health disabilities because the CoCs cannot provide the required services. As a result, this term is likely to push hundreds of mentally disabled Michigan residents back into homelessness.

C. <u>Exclusion of applicants who respect individuals' chosen identity.</u>

21. The NOFO also include a term permitting HUD to reject applications for projects from an applicant that "has previously or currently . . . conducts activities that rely on or otherwise use a definition of sex other than as binary in humans." This term was not included in previous CoCP NOFOs and, in fact, previous NOFOs required applicants to not discriminate against transgender and gender-fluid individuals.

22. This language in the NOFO foretells the likelihood that most existing HUD funded programs, including MDHHS's programs, will not meet the eligibility criteria or will be disqualified.

D. <u>Geographic discrimination conditions</u>

23. The NOFO also includes terms that appear designed to discriminate against jurisdictions that do not sufficiently penalize homelessness. Applicants receive points if they cite "state or local law(s) that cover the CoC's entire geographic area" that prohibit "public illicit drug use" and "public camping or loitering" and cite state and local protocols that enforce these prohibitions; demonstrate utilization of standards like "involuntary commitment," which are a matter of state and local law; indicate that the state implements and is compliant with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); and assist law enforcement in checking the location of homeless sex offenders, and cooperate with law enforcement in connecting violators of public camping or drug laws with services.

24. None of these conditions are within the control of the CoCs; and thus CoCs are effectively punished based on their geographic location alone.

25. For MDHHS's Rapid Rehousing grant for the Balance of the State CoC, MDHHS would need to verify this information about local laws for 61 counties—a practically impossible task.

26. In addition, street outreach philosophy for the last 15+ years does not support a criminalization of unsheltered homelessness through the coordination and cooperation with law enforcement to force unsheltered individuals and families into institutional settings.

E. <u>Exclusion of applicants who provide Safe Consumption Sites and other harm reduction programs</u>

27. The NOFO also includes a provision allowing HUD exclude applicants based on current or past operate on drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of "harm reduction."

28. While MDHHS supported programs do not operate safe consumption sites, MDHHS actively encouraged its subgrantees to have access to Narcan and participate in trainings on how to administer it. Overdoses happen in all temporary and permanent housing settings and training providers in life saving measures is a critical component to ensuring they are able to support their clients' health and wellbeing. To the extent HUD considers access to Narcan to be "harm reduction," despite Narcan being a proven life-saving drug, HUD may exclude MDHHS from participation in CoCP, cutting all grant funding.

9

### III. Conclusion

29. In sum, as a result of the drastic changes to CoCP as reflected in the NOFO, MDHHS anticipates it will lose 80-90% of its current grant funding—if not all funding due to the gender identity conditions.

30. Historically, HUD has given CoCs at least one year of notice of shifting priorities that allow time to adopt and implement. HUD's failure to give any notice of the drastic changes in priorities for CoCF makes it nearly impossible to implement the programmatic changes needed before January 14, 2026—the deadline to apply to the NOFO. Accordingly, MDHHS risks being unable to apply for funding at all. MDHHS will be forced to devote untold staffing hours and costs to effectuate the changes needed to comply with the terms of the NOFO.

31. Finally, it is important to note that projects, like the ones administered by MDHHS, will be penalized by the terms of the new NOFO for participation in certain activities which they were required to comply with in past HUD NOFOs.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 21st day of November 2025.

*Paula Kaiser Van Dam*

---
Paula Kaiser Van Dam
Director, Bureau of Community Services
Michigan Department of Health and Human Services