UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF SARAH RENNIE |

1

## DECLARATION OF MICHIGAN COALITION AGAINST HOMELESSNESS

I, Sarah Rennie, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Senior Director of Advocacy and Engagement and in-house counsel for the Michigan Coalition Against Homelessness, State of Michigan.

2. I am a 1998 graduate of the University of Toledo, College of Law, and I have been admitted to the State Bar of Michigan, the Eastern District of Michigan, and the Sixth Circuit Court of Appeals. I have twenty-five years of experience litigating cases for people in poverty, including fifteen years as a legal aid attorney representing the chronically homeless. I have obtained several published legal opinions, including *Moldowan* v. City of Warren 578 F.3d 351 (6th Cir. 2009)—a case of first impression won on interlocutory appeal. I was elected twice as Secretary of the Monroe County Continuum of Care and authored the City of Adrian Rental Ordinance. Additionally, I have four years of experience as Executive Director of Blue Water Safe Horizons, a homeless service delivery program that included a shelter and served as the Housing Access Assessment and Resource Agency. While there, I also chaired the St. Clair County Continuum of Care/Local Planning Body. I have served as an elected member of the Detroit Continuum of Care and as a member of the Michigan Homeless Policy Council, where I was appointed Chair of the Training Committee. I was appointed twice to the Governor's Task Force on Sexual Assault. I have participated in the State Bar of Michigan Access to Justice Committee for persons in poverty, chaired the State of Michigan's Standing Committee on Domestic Violence, and am currently appointed to the State of Michigan Committee on Juvenile Justice. Over the past decade, I have focused on issues related to domestic violence, poverty, and homelessness, and was a lead author of a white paper on inequities within the VI-SPDAT. I currently serve as the Senior Director of

Advocacy and Engagement for the Michigan Coalition Against Homelessness (MCAH) and as MCAH's in-house counsel. MCAH is a statewide coalition of over 92 member agencies affected by the 2025 HUD CoC NOFO.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with MCAH staff, or from my review of relevant documents and information.

4. MCAH is a statewide coalition that includes over 92 homeless service providers, along with representatives from 14 of Michigan's 20 Continuums of Care (CoC), the Michigan Coalition to End Domestic and Sexual Violence (which encompasses more than 73 domestic violence agencies), and the Michigan Veterans Foundation. MCAH members explicitly authorize it to advocate on their behalf. Its goal is to foster collaboration among Michigan's homeless service providers to pool resources for training and advocacy. MCAH's mission is to end homelessness in Michigan through statewide advocacy, public awareness, and support services that empower communities and service agencies. It aims to influence policy and improve access to resources by connecting government, nonprofits, and concerned citizens to drive systemic change and ensure no one is left behind. All MCAH members are entities affected by the 2025 HUD CoC NOFO Competition, either as direct recipients of the Continuum of Care, subrecipients under that grant, or as historical individual beneficiaries of a CoC award.

5. MCAH supports its members in preparing applications for the 2024 HUD CoC NOFO Competition. MCAH membership is Statewide. Last year, HUD awarded Michigan CoCs $107,737,734 through the 2024 CoC NOFO Competition, providing critical, much-needed funding for the statewide homelessness service delivery system. The 2024 HUD CoC grants adopted a housing-first model that positively impacted thousands of lives. For a brief snapshot of the

outcome, among persons in permanent supportive housing (PSH) and rapid rehousing (RRH) funded by this allocation, the 1-year housing retention or discharge rate was over 90%. (29,729 persons participated in PSH/RRH in Michigan in CY2024.) In comparison, the 2025 HUD CoC NOFO emphasizes, among other models, transitional housing, which has a 65% housing discharge rate. Significantly, the timing and major scope shift of the 2025 HUD CoC NOFO will lead to the following effects:

a. The issuance of the 2025 HUD CoC NOFO was much later in the year than in previous years. Over the past decade, CoCs have been notified of HUD's intent to award grants and the amounts by November or December. Some CoCs have subrecipient grant awards ending in February 2026. The 2025 NOFO grantees will not be announced until May, with at least another 60 days typically passing before HUD executes contracts and begins payments. As a result, nearly all of the CoC's subrecipient projects will face a funding gap. Many subrecipients hold lease agreements with their clients, so not only will thousands of Michiganders be deprived of rental assistance, but the delay in grant awards will also push many grantees into breach of contract with landlords.

b. Similarly, the 2025 HUD CoC NOFO limits renewal grants for permanent housing to 30%, rejects the housing-first model, requires new projects to offer 40 hours of supportive services per participant without extra operational funding, and restricts new PSH projects eligibility to physical or developmental disabilities. Across Michigan, the average CoC request for renewal grants exceeds 90%; all follow a housing-first approach, and all rural CoCs report they cannot afford the additional operational costs of supportive services. Michigan depends on PSH projects to provide the least restrictive options for persons with mental health disabilities. Typically, CoCs spend a full quarter year planning their HUD

4

      CoC NOFO application and dedicate at least 120 hours to structure and planning. The 2025 HUD CoC NOFO application demands MCAH members to shorten their competition and review time by several months, develop new supportive services, shift to a treatment-first approach, and figure out how to transition individuals with severe mental health disabilities from critical programs within six weeks. CoCs and MCAH members have relied on consistent NOFOs aligned with best practices for over ten years. This change risks causing irreparable harm to CoCs, MCAH members, homeless services, and all low-income individuals with mental health disabilities who depend on PSH and Community Mental Health to live integrated lives.

6. I understand that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from past practices and will cause serious harm.

7. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." Michigan CoCs and Subrecipients have already relied on the FY 2025 awards published on July 31, 2025, to plan, prepare, provide services, enter contracts, and budget to serve the homeless in their communities. It is estimated that this retraction will force at least over 8,000 persons (including over 2,500 families with children) into homelessness. It will cause CoCs and subcontractors to breach contracts, including lease agreements with private landlords, affecting the local economy. This shift is also expected to result in statewide layoffs, impact HMIS data integrity due to staff attrition, and ultimately dismantle the existing homeless service delivery infrastructure, which represents over two decades of work, evaluation, and implementation.

8. The implementation of HUD's gender ideology provisions creates a specific hardship for service providers in Michigan. That provision states in relevant part: "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons: (a) evidence that the project has previously or currently … conduct[s] activities that rely on or otherwise use a definition of sex other than as binary in humans." Michigan's Elliott-Larsen Civil Rights Act (ELCRA) was amended in 2023 to include explicit protections against discrimination based on sexual orientation and gender identity in housing, employment, and public accommodations. HUD provides no indication that this limitation only applies when using HUD CoC funding, and, in fact, new HMIS data requirements seem to mandate that agencies recognize only a sex binary. However, HUD cannot, through NOFO language alone, relieve housing service providers of their obligation to comply with ELCRA. Similarly, the 2025 HUD CoC NOFO introduces a new data requirement asking service providers to have participants identify their religion. Such a request may also violate ELCRA, which traditionally has explicitly prohibited asking persons seeking housing about their religious beliefs. The conflict between the 2025 HUD CoC NOFO and Michigan law places MCAH's members at a significant competitive disadvantage and forces members to weigh the risk of non-compliance with the NOFO against the potential legal harm of being sued under ELCRA.

9. Until 2025, CoC grantees were required to follow a promulgated equal access rule, which mandated that all housing programs be open to individuals and families regardless of family composition, sexual orientation, gender identity, or marital status. HUD also required that CoC and MCAH subrecipient members be trained in and implement policies that promote Housing First, Diversity, Equity, and Inclusion, along with Racial Justice and Disability Rights (including serving persons with mental health disabilities and providing trauma-informed care for substance

users). In the 2025 HUD CoC NOFO, "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons … (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." The implementation of this provision will unfairly prejudice every CoC in Michigan, as they were compliant with HUD's prior and directly contrary directives until the change in the administration.

10. The 2025 HUD CoC NOFO provides a bonus for using the SAVE system. This will unfairly prejudice Michigan non-profit service providers, as there are no additional dollars for the SAVE system. In addition, as a practical matter, persons experiencing homelessness do not have documentation and often do not know their Social Security numbers. In addition, the SAVE system can take up to four days to respond, which will force service providers in climates such as Michigan to choose between complying with SAVE and allowing a person to wait on the Street in below-zero weather conditions or shelter individuals in defiance of this provision because of life-threatening climate conditions

11. The 2025 HUD CoC NOFO's requirement that the entire geography of the CoC have a camping ban will make many CoCs unable to be competitive in this NOFO. Michigan does not have a statewide camping ban. Counties in Michigan can only legislate areas not covered by municipalities. This means that for many CoCs to score points under this section, they would be required to ask every city, village, and township to ban camping individually. Because the timing is so short, even if MCAH members wanted a camping ban, there is no time to implement it, which prevents MCAH members from obtaining full points in this section.

12. Involuntary commitment under Michigan law requires that a person be adjudicated a danger to themselves or others. Michigan lacks the mental health and judicial system resources to implement involuntary commitment as a service delivery model.

13. Michigan is compliant with SORNA, but CoCs have never been part of that compliance framework. CoCs lack the infrastructure, funding, and resources to map the location of homeless sex offenders.

14. Even if all the above conditions were not themselves problematic, compliance with dramatically different service delivery provision would require a complete overhaul of MCAH CoC membership and its applicants. Moreover, even for the CoCs that are the most agile and capable of such an overhaul, because the majority of scoring requires new services to be in place or scoring is based on past performance, the **best score** that any Michigan CoC could achieve is 75/130- historically too low a score to be funded  For the first time, HUD has reserved the right to issue a supplemental CoC NOFO should there be insufficient applications with high enough scores. Based on this, MCAH believes that few, if any, Michigan CoCs will receive any of the historic $107,737,744 in CoC funding for Michigan, dramatically affecting CoCs and subrecipients' ability to serve members, rendering many Michiganders homeless, forcing extensive layoffs, and devastating Michigan's economy.

15. Through over thirty-five years of operation and expertise, MCAH has never encountered a threat as devastating and extreme to persons in poverty. Not only will this application fracture the homeless service delivery infrastructure, which has taken decades to build, but lives will be lost. MCAH manages the Michigan Statewide Homeless Management Information System (SMHMIS) and can attest that Housing First works, with an over 90% housing discharge or retention rate. Homeless rates in Michigan continue to rise, not because of a failure in the current homeless

service delivery system, but because Michigan faces an affordable housing crisis—recent estimates show the state is short by over 298,000 affordable housing units. Additionally, real wages remain stagnant, and inflation is rising. The radical shift in services and the lack of time for agencies to adapt will turn Michigan's housing crisis into a housing catastrophe. Furthermore, CoCs relied on the two-year funding award in FY 2024. If HUD insists on this ill-advised change in service delivery, it must provide sufficient time for CoCs to adapt and implement these changes in the 2026 HUD CoC NOFO Competition.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed this 22nd day of November 2025.

*Sarah Rennie*
Sarah Prout Rennie
Senior Director of Advocacy
Michigan Coalition Against Homelessness