# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF JENNIFER LEIMAILE HO |

## DECLARATION OF JENNIFER LEIMAILE HO

I, Jennifer Leimaile Ho, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Commissioner at the Minnesota Housing Finance Agency ("Minnesota Housing") for the State of Minnesota. The State created Minnesota Housing as a state agency in 1971, acknowledging that "[a]n adequate supply of housing of a variety of housing types serving persons and families of all income levels and properly planned and related to public transportation, public facilities, public utilities and sources of employment and service is essential to the . . . prosperity of the state and its communities." Minn. Stat. § 462A.02, subd. 2.

2. Minnesota Housing is a government agency within the state of Minnesota's executive branch. The agency has statutory authority to finance all aspects of housing for low- and moderate-income Minnesotans.

3. Minnesota Housing also provides resources to stabilize families who are experiencing or at risk of homelessness and provides capacity building funds for local agencies that support and assist families.

4. Before joining Minnesota Housing, I served as the Senior Advisor for Housing and Services at the U.S. Department of Housing and Urban Development, where I managed the Department's work to connect housing with health and social services. I have also served as the deputy director of the U.S. Interagency Council on Homelessness, where I shepherded the development of Opening Doors, the nation's first comprehensive federal plan to prevent and end homelessness.

5. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Minnesota Housing staff, or from my review of relevant documents and information.

6. I was appointed as the Commissioner of Minnesota Housing in December 2018.

7. Minnesota Housing funds permanent supportive housing projects and administers multiple grant programs that intersect with Continuum of Care ("CoC") funded activities. Diminished funds for CoCs in Minnesota would negatively impact the viability of those projects and the efficient administration of these programs, endangering housing stability and the opportunity to enter housing for people experiencing barriers to housing across the state.

8. Minnesota Housing funds permanent supportive housing projects that provide affordable housing and supportive services for persons with disabilities as well as people experiencing other significant barriers to housing. Funding takes multiple forms, such as deferred or forgivable loans, and comes from a variety of sources, such as federal Low-Income Housing Tax Credits and state Housing Infrastructure Bond proceeds. These permanent supportive housing projects typically also secure funding from multiple sources, including CoC-administered grant funds. At least 52 permanent supportive housing properties in Minnesota have secured Minnesota Housing and CoC funds and rely on both sources to provide affordable housing and supportive services. Loss of CoC-administered funding could lead to evictions, lost affordable housing units, and destabilization of the operations and financial viability of properties housing and serving extremely vulnerable populations in Minnesota.

9. Minnesota Housing has invested several other federal resources, including the HOME Investment Partnerships Program ("HOME") and the National Housing Trust Fund ("NHTF"), in permanent supportive housing projects funded with CoC dollars. Loss of CoC

operational dollars mean HOME- and NHTF-supported units are at risk of loss, and funding restrictions from those programs means Minnesota is unlikely to be able to reallocate those dollars to new projects. Moreover, if a property is unable to meet its compliance obligations associated with its funding sources, the property may fall into default. Loss of one federal housing program has cascading effects that make other federal funding sources less efficient, and in some cases, unusable.

10. Minnesota Housing also has multiple state grant programs that fund organizations serving people experiencing, or at risk of, homelessness that would be significantly affected by the diminished capacity of CoCs in Minnesota. Minnesota Housing's Family Homeless Prevention and Assistance Program, Homework Starts with Home, and Housing Trust Fund use state funds to work with qualifying organizations to provide rental assistance, utility assistance, housing navigation services, rapid rehousing, and other forms of housing-related assistance to people experiencing, or at risk of, homelessness in Minnesota. Each program requires that participating organizations use the CoC-administered coordinated entry system to connect with people in need of assistance.

11. Decreased capacity of the CoCs in Minnesota to administer the coordinated entry system would lead to delays in, or loss of, assistance for people who need help now. If CoCs in Minnesota lose, or are forced to shift funding, this could negatively impact their ability to administer the coordinated entry system. This could lead to increased evictions, loss of housing opportunities, and generally greater housing instability for vulnerable populations across Minnesota.

12. Minnesota Housing staff consult and plan with CoC coordinators regarding regional needs, capacity, and funding-specific requirements as part of Minnesota Housing's

feasibility and post-funding selection process for the projects it funds. Minnesota Housing staff also provide technical assistance to CoCs coordinators on state policies and requirements for various reasons, including completion of HUD applications, which Minnesota Housing has done since CoCs were created under the HEARTH Act in 2012.

13. Consistency in funding from all sources in permanent supportive housing is key to financial, building, and resident stability.

14. I understand that the HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025, represents a significant departure from past practices and will cause serious harm.

15. This NOFO for FY 2025 "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

    a. We take this to mean that any awards or assurances of funds under the 2024 NOFO are no longer effective. This will have a severe negative impact for recipients relying on these funds based on the results of the 2024 NOFO. Permanent supportive housing projects may lose access to expected funds if CoCs score lower under the new criteria and, even if funds are still available, there will be a funding gap for any projects with expiring grant contracts.

    b. Developers can invest years securing funding commitments for new permanent supportive housing projects, typically based on the requirement that additional funding will also be secured from other sources to make a project viable. If expected funding from one source is jeopardized, as it would be if CoC funding for these projects was no longer available, this would affect the viability of all

5

        permanent supportive housing projects in Minnesota that partially relied on this funding.

   c.    Even if a project is funded under this NOFO, there will still be a funding gap for projects with expiring grant contracts as awards under this NOFO will not even be announced until May 2026. This is likely to be the case for at least 34 projects across the state of Minnesota. Loss of, or gaps in, funding will severely limit the ability of affected permanent supportive housing projects to staff the property, provide services, or even continue to provide housing to people experiencing or at risk of homelessness. Even if these projects are able to maintain the same level of service they would have otherwise provided, they will have to find another source of funds in the interim, which is unlikely due to the scarcity of options.

   d.    For Minnesota Housing, this could mean an increase in requests for emergency funds or potentially defaulting on funding obligations. For people experiencing or at risk of homelessness, this could mean increased evictions, loss of opportunity for housing, and a general increase in housing instability.

16.    "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." Pg. 15.

   a.    This would make the majority of CoC's ARD subject to Tier 2, which is scored and awarded differently than Tier 1. Tier 1 funds are more equally distributed among the CoCs and awarded based on CoC project rankings. Award of Tier 2 funds is based on relative application scores under the current NOFO.

      b.      This differs significantly from the breakdown in the 2024 NOFO, in which Tier 1 was 90 percent of ARD and Tier 2 was 10 percent. This puts significantly more emphasis on scoring in order for applicants to be awarded funds.

      c.      Minnesota CoCs are unlikely to score competitively based on criteria under this NOFO. This NOFO indicates applicants will receive points for projects requiring participants to take part in services, reductions in the number of encampments or the number of people living in encampments, utilization of standards for involuntary commitment, and assisting law enforcement with mapping and checking the location of homeless sex offenders. These factors differ from Minnesota Housing and the Minnesota CoCs historical approach in using data-driven and person-centered strategies to assist people experiencing or at risk of homelessness.

      d.      Additionally, the scoring criteria in this NOFO indicate points will be given for factors outside the control of the CoCs, such as state or local laws prohibiting public drug use or public camping, the enforcement of those laws by that state or locality, and implementation by the state of the Sex Offender Registry Notification Act. Minnesota CoCs would score lower and receive substantially less funding under the new breakdown, based only on whether certain laws have been adopted, for which they do not control.

17.    "Investment in Transitional Housing and Supportive Service Only Projects. In order to promote balance and increase competition, no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." Pg. 15.

7

a. It is our understanding that a cap of 30 percent of a CoC's ARD for Permanent Housing projects will severely limit the ability of CoCs to fund new, and support existing, long-term affordable housing for people experiencing, or at risk of, homelessness.

b. Capping Permanent Housing funding at 30 percent of the CoC's ARD significantly differs from past practices. The 2024 NOFO did not limit the percentage of a CoC's ARD that could be used for Permanent Housing, both permanent supportive housing and rapid rehousing.

c. Limiting the amount of funding a CoC can use on Permanent Housing will harm the viability of proposed projects, the ability of CoCs to support existing permanent housing, and the ability of CoCs and their partners to keep pace with the increasing need for long-term housing for vulnerable populations in Minnesota.

d. For Minnesota Housing's investments in existing permanent housing, this could mean increased requests for emergency funding, requests to reduce the number of housing units, reduce or discontinue services, or loss of permanent supportive housing units to standard low-income units. If permanent supportive housing properties struggle to maintain viability and can no longer maintain operations, there will ultimately be loan defaults and federal Low-Income Housing Tax Credit recaptured. In addition, Minnesota Housing is likely to see an increased demand in funding from limited state resources for new permanent supportive housing projects. For people experiencing or at risk of homelessness, this could mean increased evictions, loss of new housing opportunities, and an overall

      increase in housing instability if permanent supportive housing properties are unable to operate and construction of new properties is less likely to keep pace with increasing demand.

18. Geographic Discrimination/"Public Safety" terms

    a. Bonus points for… (Pg. 86-87):

        i. Prohibiting public illicit drug use, which shifts scoring focus away from programs providing housing to policing substance use and gives points for the existence and enforcement of state and local laws CoCs have no control over.

        ii. Prohibiting public camping or loitering, which gives points for the existence and enforcement of state and local laws for which CoCs have no control over.

        iii. Involuntary commitment, which is not related to providing affordable housing by CoC-supported programs and would be inappropriate for a program to participate in a separate civil matter unrelated to providing housing.

        iv. Implementing SORNA registration and notification and mapping location of homeless sex offenders, which is outside the purview of CoCs-supported programs. Whether a state implements SORNA is outside a CoC's control and tracking the location of sex offenders for law enforcement does not affect a program's ability to provide housing.

      v.      Cooperating with law enforcement to connect violators with services, which does not score based on outcomes or success in connecting people with services, but rather an unrelated relationship with law enforcement.

19. "HUD reserves the right to verify past performance and evaluate the eligibility of a project application submitted during the CoC Program Competition for the following reasons (a) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans; (b) evidence that the project operates drug injection sites or 'safe consumption sites,' knowingly distributes drug paraphernalia on or off of property under their control, permits the use or distribution of illicit drugs on property under their control, or conducts any of these activities under the pretext of 'harm reduction.'" Pg. 55.

    a.    These "past performance" provisions appear to give HUD discretion to disqualify any and all renewals for projects currently receiving CoC funds. Such projects are subject to existing laws, HUD guidance, and grant documents that require or encourage activities that this NOFO would deem disqualifying.

20. "The CoC must demonstrate that projects require program participants to take part in supportive services (e.g. case management, employment training, substance use disorder treatment) in line with 24 CFR 578.75(h) by attaching supportive service agreements (contract, occupancy agreement, lease, or equivalent)." Pg. 80.

    a.    This new requirement is a departure from 24 CFR 578.75(h), which currently gives housing providers the option of requiring participation in certain supportive services mandatory for their residents. The flexibility under existing

regulations is essential for allowing CoC-funded housing providers to comply with local and state licensing laws and for giving these housing providers the ability to combine limited CoC funds with other federal and state funding sources. By requiring providers to mandate services, the NOFO makes CoC funding incompatible with other federal funding frequently used in combination with CoC grants. For example, HUD's Section 811 program prohibits service mandates for residents, requiring that supportive services must be voluntary and not a condition of residency. HUD Section 8 rent assistance programs also prohibit mandated services. In addition, requiring all CoC providers to mandate services interferes with state licensing powers and landlord-tenant law. The current CoC regulations recognize the need for compatibility with state requirements, providing that "Services provided with assistance under this part must be provided in compliance with all applicable State and local requirements, including licensing requirements." 24 CFR part 578.75(a)(2).

21. Even if these conditions were not themselves problematic, compliance with dramatically different conditions will require a complete overhaul of our processes and those of applicants. This will require more time, money, and effort to comply, and is not feasible to do by January 14.

22. At this time, CoCs are required to submit their project prioritizations by December 15, only one month after the NOFO was released. This gives them three weeks to send out requests for proposals for projects, review and score applications, and then develop a Tier 1/Tier 2 prioritization strategy before moving on to developing their own applications. The tightness of this timeline means that projects that might ordinarily apply for funding are unable to do so, leading to

both less competition and transparency in the overall CoC application process. As a result, some Minnesota CoCs will be unable to develop or submit their prioritizations on time – leading to not only total loss of funding for certain CoCs, but unequal access to CoC resources throughout the State.

23. Minnesota Housing has heard from several applicants who rely on CoC grants that they are worried, fearful, and concerned about their inability to comply with the NOFO. Concerns expressed include that providers will have to stop working with households that do not meet the eligibility criteria of elderly/physically disabled in permanent supportive housing units, inability to quicky flip from supportive housing to transitional housing due to other funding and federal Low-Income Housing Tax Credit restrictions, and the inability to comply with service requirements due to conflict with other federal funding sources. We have heard from applicants that inability to comply may also lead to closing doors and buildings. If the NOFO prevails, applicants will not receive funding they were counting on and projects that have been in operation for a long time will be derailed. The result would be existing housing being lost.

24. Permanent housing projects that were selected or on track to be selected for capital funding resources, including federal Low-Income Housing Tax Credits, will likely end. As a result, the predevelopment funds invested by the developer would likely be lost, significantly reducing the developer's ability to pursue new projects. Additionally, funds returned to Minnesota Housing may expire before they can be reallocated to other projects.

25. Consequences for program participants will be severe. Program participants are among the most vulnerable people in our State and often face other challenges in addition to being without a home, in particular in Minnesota's cold winter months where the risk of mortality is high for people who are unhoused. Another concern expressed to us is that people who are currently

housed in permanent supportive housing would no longer be considered homeless, and therefore not eligible for transitional housing, which would ironically lead to homelessness.

26. Terminating programs that rely on CoC grants will interfere with our State's homelessness goals. The Minnesota Interagency Council on Homelessness is responsible for implementation of the statewide strategic plan on homelessness. This plan is implemented in partnership with cities, counties, Tribes, and CoCs throughout Minnesota. The goals of the plan are to prevent homelessness, create a crisis response geared toward housing outcomes, create access to housing that people can afford, and connect people to services for long-term stability. One of the plan's key strategies in reducing homelessness is permanent supportive housing. Permanent supportive housing is an important part of the housing continuum and plays a critical role in housing vulnerable populations and ending homelessness. The 30 percent cap on permanent housing in this NOFO would reduce the availability of permanent housing, which will increase homelessness in Minnesota.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24 day of November 2025.

*[signature: Jennifer Ho]*

Jennifer Leimaile Ho
Commissioner
Minnesota Housing Finance Agency