# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF MARC JOLIN |

# **DECLARATION OF MARC JOLIN**

I, MARC JOLIN, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Deputy Director of the Housing Stabilization Division (HSD) at Oregon Housing and Community Services (OHCS), the State agency that finances the development of affordable housing and administers programs to prevent and end homelessness.

2. I have over 30 years of experience working on efforts to prevent and end homelessness. I worked as a legal services attorney representing people experiencing homelessness. While in that role, I served on the Multnomah County, Oregon Continuum of Care (CoC) board and participated in the Notice of Funding Opportunity (NOFO) process. I subsequently spent eight years as the executive director of a homeless services agency in Multnomah County, Oregon that is a recipient of CoC permanent supportive housing funding. While in that position, I also served as co-chair of Multnomah County's CoC Board. From 2016 to 2022, I served as the director of the Multnomah County office that serves as the Lead Agency for the Multnomah County CoC. In that role, I was extensively involved in supporting the annual NOFO application process. As HSD's Deputy Director, I lead program teams that oversee the implementation of the State of Oregon's investments in outreach, shelter, rehousing, and homelessness prevention.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with OHCS staff, or from my review of relevant documents and information.

## CoCs in Oregon

4.      There are eight CoCs in the State of Oregon: OR-500 (Eugene, Springfield/Lane County); OR-501 (Portland, Gresham/Multnomah County); OR-502 (Medford, Ashland/Jackson County); OR-503 (Central Oregon – Deschutes, Crook, and Jefferson Counties); OR-504 (Salem/Marion, Polk Counties); OR-505 (Balance of State); OR-506 (Hillsboro, Beaverton/Washington County); and OR-507 (Clackamas County). The CoCs span the full geography of the state, addressing the housing and services needs of thousands of our most vulnerable residents. CoCs can include nonprofits, city and county governments, and other partners.

5.      Collectively, Oregon's eight CoCs received over $65 million in HUD CoC funding for federal Fiscal Year 2024. Approximately 90 percent of that funding supported permanent housing programs, including permanent supportive housing (PSH), rapid rehousing (RRH), and joint transitional housing-rapid rehousing (TH-RRH) programs.

6.      The State of Oregon is not a direct recipient of CoC funding, but OHCS uses State funds to administer a Homeless Management Information System (HMIS) on behalf of four Oregon CoCs. An HMIS is an information technology system used to collect data regarding individuals and families experiencing homelessness and the outcomes of homelessness services. HUD requires each CoC to enter data into an HMIS that meets certain standards. OHCS has been playing the role of HMIS implementer described above since 2022.  For the four CoCs whose HMIS OHCS administers, OHCS provides HMIS data in support of their applications as requested.

## 2025 CoC NOFO

7. The HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025 ("2025 NOFO") represents a major departure from HUD's past practices and will cause serious harm to the State of Oregon. I expect the 2025 NOFO to harm the State in at least four ways:

   a. The 2025 NOFO will likely return many Oregonians to homelessness, which will cause greater demand for, and place greater burdens on, State-funded homelessness response services, temporary and permanent housing services, State-funded health services, educational support services, and criminal justice and corrections services;

   b. The 2025 NOFO will likely diminish the value of investments the State has made in permanent supportive housing—investments that were made in reliance on the continued availability of CoC funding;

   c. The new conditions included in the 2025 NOFO will likely make it impossible for a given project to receive both CoC funds and State funds, thus threatening the financial viability of certain projects, or else coercing the State to change its laws, rules, or policies so as not to conflict with HUD's new requirements; and

   d. The changes in the 2025 NOFO will require OHCS to invest State funds in updating the HMIS that OHCS administers on behalf of four CoCs and in training the CoCs on those updates.

8. As explained in more detail below, I expect that the changes contained in the 2025 NOFO will result in the loss of at least $39 million in permanent housing resources in Oregon during FY 2025. HUD's dramatic and rapid departure from the policies and priorities that have

guided the CoC program for many years will cause significant harm to the State's efforts to reduce homelessness. Many of the CoC lead agencies and program providers are also recipients of State homelessness and housing funds. For years, where appropriate, Oregon has been working to align our program and service delivery models, our funding strategies, and our outcome tracking and reporting with those of the CoC program. We did this where those models and strategies were rooted in evidence-based best practices and because doing so facilitated communities having one integrated homelessness response system that maximizes leveraging of scarce resources and minimizes inefficiencies and duplication. By not providing adequate notice and opportunity to address and integrate HUD's changes in program and service delivery priorities, HUD is destabilizing all of the ending homelessness work in the State and needlessly putting the housing and health of countless formerly homeless Oregonians in jeopardy.

9. In 2019, the State of Oregon adopted an ambitious five-year Statewide Housing Plan that included specific goals related to homelessness and PSH. In the final report, we were able to celebrate meeting our goals to increase the percentage of formerly homeless people who retained their housing and to expand the number of PSH units in the State. We were able to achieve these goals and have been able to maintain this progress in part because of our efforts to align with and leverage CoC funding. Terminating 70 percent of CoC-supported permanent housing programs—as the 2025 NOFO requires—will undermine the progress we have made as a State, and lead to a return to homelessness for some of our most vulnerable residents.

10. CoCs from across Oregon report that they and the projects they fund will face enormous challenges meeting the short timelines imposed by the 2025 NOFO, especially given that they will be required to solicit and evaluate large numbers of new projects that do not involve permanent housing. They have indicated serious concerns with being able to braid State funds into federally funded CoC programs because of the conflicting legal, regulatory, and policy

5

requirements. They have also expressed concern about the provisions indicating that HUD may penalize them for having complied with past CoC requirements regarding racial equity, gender inclusivity, housing first, and harm reduction.

11. The State of Oregon depends on reasonably predictable and consistent CoC NOFOs because CoC funding is a significant and critical component of our statewide homelessness response. The types of programming that CoC funding can be used for affects how we prioritize our limited homeless services and housing funding. Reasonably predictable and consistent policy direction in the NOFO allows the State to align, or at least minimize conflict, with federal policy. Rapid shifts in program and policy priorities in the 2025 NOFO leave the State and our community-based providers struggling to adapt, uncertain about legal, financial, and programmatic risk, and unable to effectively deliver services. The ones who suffer the most dire consequences are the people experiencing and at risk of homelessness in our communities who depend on these services.

12. When HUD adheres to notice and comment procedures before making changes like the ones discussed below, it affords State agencies and CoCs a greater opportunity to not only seek to influence those policies, but also to anticipate the changes they might bring and align local and State policies to the extent practicable. But when new HUD policies are implemented suddenly, misalignment becomes inevitable. Oregon will therefore suffer increased harm because the changes discussed in the 2025 NOFO were adopted without notice and comment procedures.

13. The 2025 NOFO states that it "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024." (2025 NOFO at 15.) Because the 2024 NOFO was set up as a two-year award, the funding for 2025 was largely assured and could be relied upon by the State and the CoCs to align with established priorities. As explained below, the changes in the 2025 NOFO's program priorities

6

and in its Tier 1 and Tier 2 allocations mean that many current programs will no longer receive funding and total funding awarded to Oregon CoCs may drop due to the new evaluation criteria in the NOFO.

**Increased Demand for State-Funded Services**

14. The 2025 NOFO will eliminate funding for numerous permanent housing projects, which will increase homelessness and lead to a greater demand for State-funded homelessness response, shelter, housing, and other services. The 2025 NOFO states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." (2025 NOFO at 15.) "Annual Renewal Demand" (ARD) is "the total amount of funds requested by eligible renewal projects in each FY funding opportunity." (2025 NOFO at 125.) When a CoC prepares an application for a CoC NOFO, it must either approve and rank, or reject, each project submitted to it. Higher scoring applications are in Tier 1, while lower scoring applications are in Tier 2. Tier 1 applications are essentially guaranteed to be approved by HUD as long as they satisfy eligibility and quality standards. Historically, CoCs have been able to put 90 percent or more of their ARD in Tier 1, which effectively ensured that funding for those projects would be renewed. The remaining percentage in Tier 2 was subject to a competitive process among all CoCs based on available funding, the strength of the CoC's overall application, and the performance of the individual projects. Limiting the amount of ARD that can be put in Tier 1 to 30 percent means that 70 percent of each CoC's ARD is now at risk, subject to a competitive national process among all CoCs. In Oregon, that change puts $45 million for critical homelessness and housing services at risk that had previously been secure.

15. The 2025 NOFO provides that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects." (2025 NOFO at 15.) The 30 percent cap on

7

the amount of ARD that can be allocated to permanent housing projects will have devastating consequences for vulnerable Oregonians. Consistent with HUD's longstanding priority of expanding permanent housing opportunities for people experiencing homelessness, approximately 90 percent of Oregon's total CoC award currently funds permanent housing programs. Therefore, the 30 percent cap will require defunding approximately $39 million of permanent housing programs. The loss of these programs will put thousands of people at risk of returning to the streets and without the support they need to exit homelessness. For instance, in Multnomah County alone, CoC-funded programs serve approximately 2,380 individuals; a 70 percent reduction in funding for permanent housing would mean approximately 1,666 individuals in Multnomah County would lose housing supports and face a return to homelessness. This will harm the State of Oregon because people who lose permanent housing as a result of HUD's decision to defund these programs will become reliant on State- and locally funded homeless and housing services, including State-funded outreach, emergency shelter, rehousing, and permanent supportive housing (PSH) programs.

16. In most of the State, there are no locally funded PSH resources, so households losing access to CoC-funded PSH will look to the State's PSH program. If they are unable to find PSH, they will likely return to homelessness and will need support from outreach workers and emergency shelters. OHCS is among the most significant funders of these services across the State, and in some CoCs, OHCS is the principal funder of these critical emergency services. People experiencing homelessness who are not able to access CoC-funded rapid rehousing programs will remain in need of State-funded shelter services and will have to rely on State-funded rapid rehousing programs to escape homelessness. In many communities across the State, aside from CoC-funded programs, the State is the principal funder of rehousing services.

17. Homelessness has devastating consequences for individuals' physical and mental health. There is a well-documented connection between homelessness and increased health care needs, including both acute and chronic physical and behavioral health care challenges. By defunding $39 million in permanent housing programs and exposing thousands of highly vulnerable individuals to the streets, HUD's 30 percent cap on permanent housing programs will likely increase the demand on State-funded health care services, including the Oregon Health Plan (Medicaid), which is funded by a combination of federal and State funds. That will further harm the State of Oregon.

18. Creating and prolonging homelessness among families with school-aged children has additional consequences for State-funded public education. Children who experience homelessness are more likely to struggle in school and to require additional supportive services, many of which are paid for in part with State funds, which will further increase the harm to Oregon.

19. The increase in homelessness that results from defunding permanent housing programs will likely also impose additional costs on our State courts, law enforcement, and corrections systems, which are funded in part with State funds. We know that one of the consequences of moving people experiencing chronic homelessness into permanent housing is a reduction in involvement in the criminal justice system. By removing people from PSH and returning them to the streets and shelter, HUD's policy changes will increase the likelihood of their involvement in the criminal justice and court systems.

### Diminishing Value of State Investments

20. The 2025 NOFO will harm the State by diminishing the value of investments it has made in PSH. OHCS has invested heavily in the expansion of PSH over the last five years, adding more than 1,000 units. A number of the projects the State invested in were chosen for funding based on their having CoC PSH funding available to cover critical program operating expenses.

21. For example, in 2020, OHCS provided approximately $3.75M in state loans (via general obligation bond proceeds authorized by Article XI-Q of the Oregon Constitution, which requires the State to maintain an operating or ownership interest in any capital investments) to The Keystone, a 15-unit PSH project in Eugene, Oregon. OHCS's decision to award funding to The Keystone was in part because the project would leverage federal CoC funding for PSH rental assistance and services. The project currently receives funding from the OR-500 CoC for Eugene, Springfield/Lane County CoC.

22. In 2020, OHCS awarded 9% Low-Income Housing Tax Credits and approximately $780,000 in state grants to The Nel, a 45-unit PSH project in Eugene, Oregon. OHCS's decision to award funding to The Nel was in part because the project would leverage federal CoC funding for PSH rental assistance and services. The project currently receives funding from OR-500 CoC for Eugene, Springfield/Lane County CoC.

23. If the CoC funding for these projects were reduced or eliminated, the State would either have to bear the cost of covering those operating expenses to sustain the projects, or would lose the full value of its investment in expanding PSH capacity and would have to take measures to minimize its financial losses by converting the projects to something other than PSH.

24. Another example of how the State of Oregon has worked to align its approach and fully leverage the resources of the CoCs is our reliance on the HUD-mandated coordinated entry systems to identify individuals for our State funded PSH programs. That alignment and reliance was possible because HUD's policies regarding Housing First and serving people with active substance use disorders in PSH aligned with the State's program requirements. If the changes called for in the 2025 NOFO are implemented, moving away from Housing First principles and limiting who is prioritized for CoC funded PSH, the State will be compelled to develop an

alternative system of referrals into its PSH programs across the State. This will represent a significant financial cost and harm to the State.

### Impossibility or Difficulty of Braiding CoC and State Funds Due to Conflicting Requirements

25. The State of Oregon sets requirements in statute, rule, and policy for the delivery of homeless and housing services by community-based organizations. Some of those State requirements may be directly in conflict with the requirements those same providers will be required to adhere to under the 2025 NOFO.

26. For instance, the 2025 NOFO includes conditions that could eliminate funding for any CoC-funded project that addresses, or has ever addressed, the needs of transgender and gender-diverse individuals. The 2025 NOFO states that CoC funds cannot be used to "conduct activities that rely on or otherwise use a definition of sex as other than binary in humans." (2025 NOFO at 108.) Oregon law prohibits housing programs and public accommodations in general from discriminating on the basis of gender identity, whether or not that gender identity is different from that traditionally associated with the individual's assigned sex at birth. This would make it difficult, and perhaps, in some cases, impossible, for a CoC-funded project to comply both with HUD's requirements and the requirements of Oregon law. That could result in the project having to forego CoC funds, which could result in the project becoming financially infeasible.

27. Another issue with the gender provisions is that HUD intends to look at projects' past practices regarding treatment of sex and gender identity. "HUD reserves the right to reduce or reject a project application submitted during the CoC Program Competition for the following reasons … (h) evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences or other forms of illegal discrimination or conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." (2025

NOFO at 65.) As recently as the 2024 NOFO, HUD required CoC providers to recognize and serve people based on inclusive gender identities.

28. The 2025 NOFO states that CoCs must comply with certain immigration and citizenship conditions. Several State-funded homeless programs, including the Oregon Rehousing Initiative and the Long Term Rental Assistance Program, specify that citizenship status may not be used to determine eligibility. A provider likely could not use CoC and State funds to run a single PSH program or operate any of the other types of programs that are prioritized in the 2025 NOFO. Without being able to combine CoC and State funds, certain programs may not be financially feasible. If these programs cease to exist, vulnerable Oregonians will likely lose their housing and return to homelessness, thus increasing the strain on State-funded programs and services, as discussed above.

29. The 2025 NOFO requires applicants to certify that they do not operate "drug injection sites or 'safe consumption sites,' knowingly distribute drug paraphernalia on or off of property under their control, permit the use or distribution of illicit drugs on property under their control, or conduct any of these activities under the pretext of 'harm reduction.'" (2025 NOFO at 55.) The 2025 NOFO also reserves the right to reject a project application if HUD determines that the project engages in any of the aforementioned activities. (2025 NOFO at 65.) In Oregon House Bill 3644 (2025), which establishes the framework for the Statewide Shelter System, the Oregon Legislature specified that the system must adhere to best practices, including harm reduction, and that 70 percent of the shelter capacity must be "low barrier," meaning, in part, that sobriety and participation in services cannot be mandatory. Depending on how HUD interprets the language of the above provision, CoCs participating in the Statewide Shelter System that seek to use CoC services, transitional housing, or permanent housing grants to support individuals in their State-funded shelter programs may face direct conflicts between the State's

requirements and HUD's requirements regarding service participation and prohibition on harm reduction practices related to people with active addiction disorders.

30. The State of Oregon's PSH program requires that PSH be operated according to Housing First principles. The PSH program's manual states that participants cannot be required to accept services as a condition of receiving PSH. In addition, the PSH must be low-barrier, including not screening out households because of active drug or alcohol use. These program requirements are in direct conflict with the new HUD CoC policies and create an immediate conflict for PSH programs that are braiding federal CoC and State resources.

31. One example of a current CoC-funded program that will confront some of these challenges is a Rapid Rehousing Program serving Oregon's Marion and Polk Counties. This program receives CoC funding, but relies on State funds to deliver critical case management and supportive services to the households transitioning from homelessness into housing. The State funds used in the most recent fiscal year included low-barrier requirements, including that sobriety and treatment are voluntary and there can be no required documentation of citizenship or gender and services must be available regardless of gender identity.

32. The 2025 NOFO threatens to penalize CoCs if HUD finds "evidence that the project has previously or currently conducts activities that subsidize or facilitate racial preferences" could be highly problematic for CoCs and CoC-funded programs if HUD construes all attempts to reduce or eliminate racial disparities in rates of homelessness as "subsidizing or facilitating racial preferences." The most recent comprehensive report on the demographics of homelessness in Oregon found that African Americans are experiencing homelessness at a rate 3.27 times higher than their share of the population. Similarly, American Indian and Alaska Native Oregonians experience homelessness at a rate 2.43 times as high as their share of the

13

population.[1] HUD has actively encouraged CoCs to engage racial equity work, and advancing racial equity is a core value of the State's efforts to address homelessness.

## HMIS Updates

33.     When HUD implements changes to the CoC HMIS data standards and reporting requirements, OHCS is responsible for working with our HMIS vendor to implement those changes and then to train the CoCs on how to properly use the new data fields and processes. Each instance of this represents a significant investment of OHCS staff time. Given the significant shifts in policy priorities included in the NOFO, we expect there to be multiple changes to HMIS required to align with these new policies. For example, until recently, HUD's HMIS data categories included "gender" and that category offered multiple identities beyond the binary. HUD recently eliminated "gender" as a demographic variable to be tracked and replaced it with "sex" and that offers only two options, male and female.

## Conclusion

34.     The abrupt and wholesale changes in program and policy priorities included in HUD's 2025 NOFO will cause multiple harms to the State of Oregon and to the thousands of vulnerable homeless and formerly homeless residents who rely on CoC programs each year. The most dramatic impacts will be from the defunding of critical housing programs, a decision that will consign thousands of additional people to homelessness and leave the State to bear the costs of sheltering and rehousing them, as well as the health care, criminal justice, and educational costs that result from the physical and psychological traumas that people experience when they are

---

[1] Greene, J., Spurbeck, F. H., and Zapata, M. (2023). 2023 Oregon Statewide Homelessness Estimates. Portland State University Homelessness Research & Action Collaborative, *available at* https://www.pdx.edu/homelessness/sites/homelessness.web.wdt.pdx.edu/files/2024-04/Oregon%20Statewide%20Homelessness%20Report%202023.pdf.

unhoused. The harms from HUD's actions are significantly exacerbated by the fact that they were made without adhering to the normal notice and comment rulemaking processes that would have allowed the State to work with CoCs to plan appropriately for how to minimize the adverse consequences of the changes on the program and people affected by the changes. Finally, HUD's new policy directions destabilize and undermines the State's effort to address homelessness, and create a variety of direct conflicts with State law and policy that will be difficult, if not impossible, for the community-based organizations that are part of the homeless response system to reconcile, potentially coercing the State to consider changing its policies.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

    Executed this 23rd day of November 2025.

                                            /s/ *Marc Jolin*

                                            MARC JOLIN
                                            Deputy Director
                                            Housing Stabilization Division
                                            Oregon Housing and Community Services