UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM <br><br> DECLARATION OF LILY SOJOURNER |

**DECLARATION OF LILY SOJOURNER**

I, Lily Sojourner, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Director of the Office of Economic Opportunity for the State of Vermont. I have served in this role since 2023.

2. As Director of the Office of Economic Opportunity, my main responsibilities include leadership and oversight of the programs administered by the Office, including some of Vermont's core programs to address homelessness and housing instability within the state.

3. I have worked for the Vermont Agency of Human Services since 2010 and specifically with the Office of Economic Opportunity since 2020. I hold a Master's Degree in Social Work and am a licensed social worker in the State of Vermont.

4. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Office of Economic Opportunity staff, or from my review of relevant documents and information.

5. I am familiar with the Department of Housing and Urban Development's ("HUD") Continuum of Care ("CoC") Program. The purpose of the CoC Program is to promote a community-wide commitment to the goal of ending homelessness; to provide funding for efforts by to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness; to promote access to and effective utilization of mainstream programs by homeless individuals and families, and to increase self-sufficiency among those experiencing homelessness.

6. Vermont has two HUD-recognized Continua of Care that apply for federal homeless funding for their corresponding geographic areas. The Chittenden County Homeless Alliance ("CCHA") covers Chittenden County and the City of Burlington. The Vermont Balance of State CoC encompasses the remaining counties in Vermont.

7. The Office of Economic Opportunity currently receives and has in the past received grant funding under the CoC Program.

8. The CoC grant to the Office of Economic Opportunity covers the following counties across Vermont's Balance of State Continuum of Care: Franklin, Grand Isle, Rutland, Bennington, Orange, Washington, Lamoille, Caledonia, Essex Orleans counties as well as parts of Windham and Windsor counties. Subrecipients use the funds from the Office to conduct Coordinated Entry assessments with households experiencing homelessness, and in some cases, provide those households with housing navigation services. The assessment allows households to be added to the local Coordinated Entry master list, which is used to prioritize and match households to various housing programs (services, units, rental assistance, etc.). Housing navigation services focus on helping households locate and secure housing through the reduction of barriers, connections to benefits and other services, and access to financial resources to support move-in. They serve households meeting all four categories of HUD's homeless definition, with a subset working specifically with survivors of domestic/sexual violence. The Office's most recent award totaled $886,880. The award supports increased staff capacity, enabling faster connection to the Coordinated Entry system, which opens the door to certain housing programs. The specialized connection to Coordinated Entry for domestic/sexual violence survivors supports safety and confidentiality while ensuring trauma-informed services. The additional housing

navigation service capacity in some communities addresses the need for staff to be available to work with households to meet their housing needs.

9. The Office of Economic Opportunity ordinarily plays several roles in preparing the application.

   a. For the Office's own project, we coordinate with the Balance of State Coordinated Entry Committee to make decisions about applying to expand the current projects or renew at current levels. We submit a preliminary application to the Balance of State's local competition and, if selected by the ranking committee, we prepare a project application and submit it to HUD. Preparing these applications includes working with all our subrecipients to establish scope of work and budgets.

   b. The Office supports the collaborative application that the Housing and Homeless Alliance of Vermont submits to HUD on behalf of the Balance of State Continuum of Care. We support the response by providing information as both the state's Emergency Solutions Grant (ESG) recipient and as the Agency of Human Services representative on the Balance of State board. This involves gathering information and reviewing the application.

   c. Other project applicants from both CoCs sometimes reach out to the Office for consultation as they develop their projects to ensure that projects are aligned with the State's overall goals.

10. The Office of Economic Opportunity has applied for and received CoC Program grants since 2016.

11. The Office of Economic Opportunity works with multiple subrecipients for its Supportive Services Only project. The subrecipients play two specific roles in their communities:

a. Coordinated Entry Lead Agency: HUD requires all CoCs to maintain a Coordinated Entry system, which requires there to be a Lead Agency. These subrecipients shepherd and oversee the Coordinated Entry process in their local regions, and the system could not operate as currently designed if this capacity were lost.

b. Domestic/Sexual Violence Coordinated Entry Partner: It is vital that the Coordinated Entry system both include survivors of domestic/sexual violence and ensure their unique needs are being met. These subrecipients have committed to ensuring that survivors can safely and confidentially access the Coordinated Entry system. Without this capacity, survivors may not be able to access Coordinated Entry because they would not feel safe using any other local provider to do so. Even if they do access the system through another provider, their experience may be impacted as they would be completing the assessment with staff who are not specifically training to work with survivors.

12. The Office of Economic Opportunity and the multiple subrecipients of funding from our Supportive Services Only project rely on reasonably predictable and consistent grant funding to maintain staff year-to-year. A disruption in CoC funding would undermine that consistency both directly and indirectly. A disruption in CoC funding would drive agencies to lay off staff, reducing capacity to meet the needs of people in their community experiencing homelessness and potentially increasing requests to the Office for state funding. In addition, many subrecipients supplement CoC grant funds with state funding to support the same positions, so a loss of the CoC funds could lead those organizations to make up the gap with state-funding. That, in turn, would threaten to overextend that state's funding capacity.

13. I understand that the HUD Continuum of Care Notice of Funding Opportunity ("NOFO") released on November 13, 2025, represents a significant departure from past practices and will cause serious harm to Vermont.

14. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

   a. All project applicants, including the Office and the Collaborative Applicant Housing and Homeless Alliance of Vermont, were operating under the understanding that currently funded projects would be renewed for another year based on the last Notice of Funding Opportunity. This understanding was in place when the local competition was conducted. By not honoring the intention to renew in FY25, all CoCs and project applicants must engage in a significant process to submit a new collections of applications, made even more burdensome by other programmatic changes announced in the most recent NOFO. The requirement to go through a new application process puts the projects—and Vermont—at risk for losing funds that they reasonably believed were guaranteed, and substantially increases the administrative burden on applicants.

15. The NOFO stated that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." The CoC application process has a tiered approach. Projects in Tier 1 are protected from national competition and will receive funding. Projects in Tier 2 are subject to a scoring mechanism that places each CoC in the country in competition with each other. Rather than 80-90% of the Balance of State's amount to renew current projects and be protected from

6

national competition, only 30% is now protected. CoCs have developed processes, strategies, and policies about which Tiers projects are placed in based on the long-standing practice of Tier 1 being set between 80-90% of ARD. This change will significantly impact the CoC's process and will mean there is a higher risk of Vermont losing funds.

16. The NOFO imposes a 30 percent cap on the percentage of a grantee's Annual Renewal Demand that may be used to fund permanent housing projects. Seventy-nine percent of Vermont's 2024 award across the two CoCs can be characterized as programs that would be subject to the cap. That percentage is consistent with prior HUD policies that did not limit what percentage of funding could support permanent housing projects. Changing that policy destabilizes long standing programs in communities, impacts the stability of provider agencies, creates pressure on the emergency shelter and crisis response systems, and jeopardizes the housing of those households currently participating in these programs. In Vermont, these projects support individuals who have experienced chronic homelessness and are living with disabilities. A loss of funding could result in these individuals losing their housing.

17. For example, one of Vermont's two CoCs, the Chittenden County Homeless Alliance, anticipates that the 30 percent cap on permanent supportive housing and rapid rehousing could remove over half a million dollars from that organization's already-thin budget. That loss of funding could, in turn, force up to 20 formerly chronically homeless individuals each living with significant disabilities back onto the streets, reversing those individual's progress and further straining the emergency shelter and crisis response systems.

18. The NOFO suggests that HUD may deny eligibility to projects that "previously or currently . . . conduct activities that rely on or otherwise use a definition of sex other than as binary in humans." But for years, HUD has required that CoC applicants comply with nondiscrimination

7

requirements that were not consistent with the NOFO's directive. For instance, HUD's Equal Access Rule applies to CoC-funding programs and includes the requirements that programs provide individuals access "in accordance with the individual's gender identity." 24 C.F.R.§ 5.106. Vermont must also comply with other statutory and regulatory requirements that could conflict with this criterion.

19.   The NOFO suggests that HUD may deny eligibility to projects that engage in certain harm reduction techniques, including operating safe injection sites or distributing sterile needles. The Office's project does not engage in these activities. But it is possible that this type of activity could be conducted elsewhere within the jurisdiction or by related entities, which the NOFO suggests could impact all project applications submitted by the CoCs.

20.   The NOFO also announced a new set of "public safety" rating criteria that give applicants extra rating points for being located in jurisdictions with certain specified public policies. For instance, the NOFO offers applicants bonus points for being in jurisdictions that prohibit public illicit drug use, prohibit public camping, have a practice of involuntarily committing individuals experiencing homelessness, comply with SORNA registration and notification requirements by mapping the location of homeless sex offenders.

21.   These "public safety" rating criteria privilege or punish applicants based on factors beyond their control.

22.   Even if these conditions were not themselves legally problematic, compliance with dramatically different funding conditions will require the CoCs to thoroughly review and potentially overhaul its processes and those of its applicants. The CoCs and their applicants will need to expend substantial time and money to complete that effort, which likely cannot be completed by the application deadline of January 14, 2026.

23. If the novel funding conditions go into effect, applicants in Vermont will not receive the funding they were counting on and long-term projects will be derailed.

24. A disruption in funding to CoC grantees could diminish Vermont's ability to provide services to unhoused people in Vermont. Vermont relies on CoC funding to address the needs of Vermonters experiencing homelessness. A higher risk of losing funds creates uncertainty and increases pressure on state general funds. A loss of funding would destabilize programs and provider agencies, and individuals benefiting from these programs may be at risk of homelessness. The individuals who benefit from the CoC Program already are among the most vulnerable people in Vermont and often face other challenges in addition to being without a home.

25. Terminating programs that rely on CoC grants therefore will increase burdens on other state health, safety and support services. Vermont could lose funding that helps Vermonters experiencing homelessness access resources and could cause some Vermonters who have successfully exited homelessness to re-enter homelessness if these programs end.

26. Terminating programs that rely on CoC grants will interfere with Vermont's homelessness goals. For instance, Vermont has been working to shift unhoused residents from the costly emergency housing program to more effective and cost-effective solutions. Removing funding from Permanent Supportive Housing programs has the potential to put people back into homelessness and add to the need seen in the emergency housing program and across the state's shelters.

27. That outcome would run counter to the purposes of the CoC Program as I understand them through the statute and regulations. The CoC Program helps states and localities coordinate and collaborate to address homelessness. The new funding criteria undermine that

purpose by putting critical funding at risk for Vermont and jeopardizing the stability of critical programming.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 24 day of November 2025.

*Lily Sojourner*
LILY SOJOURNER
Director
Office of Economic Opportunity
Vermont Department for Children and Families