UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., <br><br> Defendants. | C.A. No.1:25-cv-000626-MSM-AEM <br><br><br> DECLARATION OF MEGHAN MARSHALL |

## DECLARATION OF MEGHAN MARSHALL

I, Meghan Marshall, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Executive Officer at the California Interagency Council on Homelessness (Cal ICH).

2. Led by its Executive Officer, Cal ICH is the State of California's central coordinating body charged with aligning homelessness policy, data and programs across state government. Established by statute Cal ICH was created in 2017 to oversee the implementation of Housing First policies, guidelines, and regulations to reduce the prevalence and duration of homelessness in California. Cal ICH brings together 19-state agencies and departments to develop statewide strategy, oversee statutory homelessness mandates, and support Continuums of Care (CoCs) and local jurisdictions as they implement programs to address homelessness in their community. Through these authorities and resources, Cal ICH provides statewide policy guidance, data oversight, interagency coordination, and performance accountability to support California's efforts to prevent and end homelessness.

3. I am familiar with the information in the statements set forth below either through personal knowledge, consultation with Cal ICH staff, or from my review of relevant documents and HDIS data. If called as a witness, I could and would testify competently to the matters set forth below.

4. I was appointed Executive Officer of Cal ICH on March 24, 2023. Prior to being appointed Executive Officer of Cal ICH, I held a series of executive and senior management positions across county health, human services, and homelessness systems that form the foundation of my subject-matter expertise in housing and homelessness policy and program

development. My experience includes serving as the Director of Public Health for the Counties of Placer and Yuba, where I oversaw complex, multi-funded operations and advanced major health system reforms; Deputy Director of Sacramento County Health Services, where I led the county's COVID-19 homelessness response; and Division Manager for Sacramento County's Department of Human Assistance, where for five years I oversaw the planning, development, and evaluation of countywide homeless programs serving individuals with serious mental illness and high service needs. Earlier in my career, I managed large-scale federally funded programs for low-income children and families, gaining deep expertise in federal program compliance, funding structures, and cross-system service delivery. Across these roles, I have consistently been responsible for designing, implementing, and evaluating housing and homelessness interventions; managing complex funding streams; leading multi-disciplinary teams; and coordinating across health, behavioral health, and human services systems. This career trajectory has provided me with a comprehensive understanding of the structural, operational, and policy drivers of homelessness and uniquely positions me as an expert in the development, oversight, and performance management of homelessness programs at scale.

5. In addition to my professional experience, my academic training and lived experience further ground my expertise in housing and homelessness policy. I hold a Bachelor of Arts in Social Work and a Master of Social Work, both from California State University, Sacramento, and a Master of Public Health from George Washington University. These disciplines—social work and public health—are foundational to understanding the structural, behavioral, and population-level factors that drive homelessness, as well as the policy and systems interventions required to reduce it. Together, they have equipped me with the analytical, clinical, and systems-design skills necessary to lead complex housing and homelessness initiatives at scale.

My lived experience of homelessness as a child also provides essential insight into the realities faced by vulnerable families and strengthens my commitment to improving California's homelessness response. When combined with my eighteen years of executive and management leadership across county health, public health, human services, and homelessness systems, these experiences uniquely qualify me as a subject-matter expert in homelessness policy, program development, and system performance.

6. As Executive Officer of Cal ICH, I serve as the State of California's subject-matter expert in homelessness policy, statewide homelessness data, homelessness system performance, and evidence-based program design and evaluation. I also coordinate statewide homelessness policy, oversee statutory data reporting and performance measurement, lead the State's homelessness data infrastructure, and coordinate interagency efforts to reduce and prevent homelessness. My responsibilities include statewide leadership of California's Homeless Data Integration System (HDIS)—an unprecedented data warehouse that compiles federal Homeless Management Information System (HMIS) data from all 44-California CoCs—which requires overseeing Cal ICH's analytic operations, public dashboards, and evaluation requirements under state law. I also advise the Governor's Office, the Legislature, and state agency Secretaries on data trends, program performance, and policy implications related to preventing and ending homelessness. My responsibilities also include coordinating homelessness programs and accountability systems across state departments, all 44-CoCs, Tribal governments, and local jurisdictions across California.

7. Cal ICH is the State of California's coordinating body for homelessness, responsible for statewide policy alignment, system performance, data integration, and oversight of state homelessness investments. Cal ICH is responsible for statewide reporting mandates,

performance oversight, and HDIS data integration that depend on consistent CoC operations and funding continuity. The funding administered by the U.S. Department of Housing and Urban Development (HUD) through the CoC Program, are essential to the functioning of California's homelessness response.

      8.      For decades, California has relied on the federal framework governing the CoC Program, which establishes the structure, funding expectations, and data requirements that anchor the nation's homelessness response. The CoC Program is not discretionary or informal—it was formally codified into federal law in 2009 through the Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act, which cemented CoCs as the primary local governance bodies for homelessness, set national performance obligations, and mandated use of HMIS for all CoC-funded programs. Because HMIS is a federally required data system, California built its statewide Homeless Data Integration System (HDIS) to align with and integrate HMIS data from all 44-CoCs, ensuring that state homelessness reporting and system performance measures rest on consistent, federally defined data standards. And because CoCs themselves are federal entities, established and governed under HEARTH, California has embedded CoCs into the architecture of its own homelessness programs—making CoCs eligible applicants for state funding sources and relying on CoCs as core partners in state-local coordination. This longstanding federal structure has shaped the State's program design, data systems, and funding expectations for more than a decade.44-CoCs operate in California.

      a.      In 2024, HUD awarded $683,837,939 to California CoCs in HUD CoC funding. About 90% of awarded funds were for Permanent Supportive Housing (PSH),

   Permanent Housing Rapid-Rehousing (RRH); or Joint Transitional – Rehousing projects.[1]

b. In 2024, California HDIS data shows 43,217 individuals resided in HUD CoC-funded Permanent Housing; and of those in HUD CoC-funded Permanent Housing, 28,450 individuals from 22,748 households resided in HUD CoC funded PSH, specifically. Additionally, in 2024, CoCs reported via HMIS to HDIS that 376,024 people in California accessed CoC services while experiencing homelessness; of those who accessed services while experiencing homelessness, 69,663 of those participants exited homelessness and moved into permanent housing.

c. The State collaborates with CoCs primarily in the context of state-funded housing and homelessness programs that CoCs administer or support, and through the data and reporting requirements tied to those state investments. All state programs require that providers enter project and participant data into the CoC's HMIS. To support this work, Cal ICH provides CoCs with training, technical assistance, analytic support, and ongoing guidance to ensure that state-funded projects are accurately entered into HMIS, that reporting meets both state and federal standards, and that local systems are equipped to manage the performance and compliance expectations associated with state grants. This collaboration enables CoCs to meet state requirements tied to the funding they receive, while also ensuring that California can meet its own statutory obligations for data quality, statewide reporting, and system performance.

---

[1] https://files.hudexchange.info/reports/published/CoC_AwardComp_State_CA_2024.pdf pg. 1

9. From my nearly 20 years of experience in local government and as Cal ICH's Executive Officer, I have learned that no single funding source is sufficient to cover the full costs of capital development, operations, *and* supportive services for affordable permanent housing projects. As a result, it is standard and often essential for projects to combine multiple funding streams—state, federal (including HUD CoC), and local—to ensure buildings can be acquired or constructed, operated, and staffed with adequate services. The provision of state funds to projects that also receive CoC funding is essential to advancing California's homelessness goals, as articulated in the Statewide Action Plan to End and Prevent Homelessness (2025–2027). The Action Plan establishes five statewide goals:

   a. Help more people leave unsheltered homelessness,

   b. Help more people move into housing,

   c. Ensure people do not experience homelessness again,

   d. Prevent more people from entering homelessness, and

   e. Create more housing for people experiencing or at risk of homelessness.

10. Permanent housing—particularly PSH and RRH—is foundational to achieving each of these five goals. California's strategy relies on a combination of state and local capital and operations funding and HUD CoC rental assistance and supportive services to make permanent housing viable and sustainable. No single funding stream can accomplish all of these goals on its own.

11. Combining state funds with HUD CoC resources directly advances the Statewide Action Plan by:

    a. Increasing permanent housing placements (Goals 1 and 2) through projects where state dollars cover capital or operations while CoC funds provide rental assistance or services;

    b. Ensuring housing stability and reducing returns to homelessness (Goal 3) by leveraging CoC-funded case management, tenancy supports, and long-term rental subsidies; and

    c. Creating new permanent housing units (Goal 5) by enabling state programs such as Homekey[2] to move forward with sustainable operating models.

12. When CoC funding is stable, state investments achieve their intended purpose; when CoC funding is disrupted, capped, or reduced, the State's ability to meet the goals of the Statewide Action Plan is undermined.

13. The State of California relies on predictable, stable, and consistent CoC funding and funding cycles to plan, finance, and administer its own state programs to address homelessness. CoC renewal funding has historically been a stable and predictable federal homeless assistance funding stream, with program requirements, including project renewals, remaining relatively consistent from year to year. This stability has allowed California to plan multi-year capital investments, state-funded operating subsidies, and long-term program structures with the reasonable expectation that CoC rental assistance and supportive services would remain available for the life of a project.

---

[2] Homekey is a housing funding program administered by the California Department of Housing and Community Development. Homekey provides funding to local governments, public housing authorities, and non-profits to fund the construction, acquisition and rehabilitation of housing for permanent supportive housing projects to help individuals and families transition from homelessness.

14. Abrupt or fundamental changes to the NOFO framework—such as the FY 2025 NOFO released on November 13, 2025—disrupt every level of the State's coordinated planning and create immediate operational and fiscal risks for state-funded projects. Unpredictable changes in eligibility, scoring, funding caps, and allowable uses undermine the State's ability to fully execute its own programs and erode the continuity of services for Californians who depend on CoC-supported housing.

15. This FY 2025 NOFO "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

   a. This rescission represents a significant and abrupt departure from past federal practice. In prior years, CoC renewal funding has been predictable, allowing state agencies, local governments, developers, landlords, lenders and service providers to rely on reasonable expectations that renewal awards would follow the standard federal formula and established scoring rubric.

   b. By rescinding all prior references to FY 2025 awards—including expectations set forth in HUD's July 31, 2024, materials—HUD has created immediate instability in the operating budgets of thousands of permanent housing units statewide.

16. This HUD CoC NOFO disrupts the two-year funding cycle authorized by Congress and creates undue uncertainty for projects that were expected to receive a second year of funding. Given the late publication of the CoC NOFO, awards are not expected to be made until May 2026, at the earliest and if at all. This creates a projected 4- to 6-month funding void for CoCs in California, beginning in January 2026. When federal operating funding becomes uncertain or

collapses, California will likely need to determine whether it can repurpose state dollars originally intended to address current homelessness to instead prevent people who were stably housed from re-entering homelessness because of programs losing funding due to this drastic shift. Either California will have to expend its own dollars, or California and its residents will experience concrete harms from increased homelessness. In effect:

a. Housing programs with state and/or local capital investments will start operating at a deficit, be forced to tap into their reserves, and require state intervention;

b. The State and local governments will need to redirect whatever limited resources can be shifted away from new housing creation and other programs to patch gaps that CoC dollars have historically filled, simply to prevent thousands of Californians from losing housing and becoming homeless again;

c. If the state is forced to redirect existing state dollars to hold the line against increased homelessness, it will dramatically undermine the State's ability to meet its strategic commitments. According to the most recent Point-in-Time count as detailed in the 2024 Annual Homelessness Assessment Report submitted to Congress, California's homelessness policies and strategies work: while homelessness increased nationally by over 18%, California limited its overall increase to just 3%.

d. In short, the NOFO rescission transforms a predictable federal funding stream into an unstable and unpredictable resource. As a direct result, state programs that were designed to expand housing and accelerate exits from homelessness will instead be forced into emergency triage to keep existing residents housed.

17. This NOFO further destabilizes California's response to homelessness and investment in housing through its provision that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects."

   a. This single provision places California's homelessness system at immediate risk. California's CoCs—by far the largest in the nation—position permanent housing interventions as the backbone of their local strategies. Historically, approximately 90 percent of CoC funding to California CoCs has been dedicated to PSH, RRH, or Joint TH–RRH programs. Capping Permanent Housing funding to 30 percent of ARD forces California CoCs to defund the very programs responsible for stabilizing tens of thousands of people who have already exited homelessness.

   b. This provision also directly threatens the viability of California's state-funded housing portfolio. The State has invested billions of dollars to acquire, develop, and preserve permanent housing. By limiting CoCs to 30 percent Permanent Housing funding, HUD effectively removes the operating and services foundation upon which a significant portion of California's state-funded housing rests.

   c. As a result, California's homelessness response system—already strained by the nation's largest population of people experiencing homelessness—faces a cascading crisis: CoCs will be forced to eliminate or drastically reduce PSH and RRH programs; state-funded permanent housing sites will face immediate operating shortfalls; and thousands of individuals currently stably housed will face an increased risk of eviction or program displacement. The State, in turn, will be forced to redirect limited state dollars away from reducing unsheltered

11

homelessness and into emergency stabilization efforts simply to prevent widespread returns to homelessness. In short, the 30 percent cap directly undermines California's Housing First law, destabilizes its long-term investments in permanent housing, and reverses more than a decade of coordinated federal–state homelessness strategy.

18. Another troubling feature of the NOFO is that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."

   a. As in past NOFOs, "HUD will [] select all projects in Tier 1 that pass project quality and project eligibility thresholds." In other words, Tier 1 projects are essentially guaranteed funding so long as they meet basic eligibility requirements.

   a. Historically, Tier 1 has been set at approximately 90% of ARD, protecting renewal projects—especially PSH—from funding loss. This structure allowed CoCs and their state partners to plan, build, finance, and sustain permanent housing with reasonable certainty. Setting Tier 1 at only 30% of ARD means that renewal projects statewide—including the majority of PSH and RRH programs—are collectively at enormous risk of partial or full defunding. These programs have historically relied on federal renewal stability and are financed, staffed, and occupied based on multi-year renewal expectations.

   b. With only 30% of renewal funding protected, California may see widespread loss of rental assistance, supportive services, and operating funds across permanent housing units. This places tens of thousands of formerly homeless and currently stable Californians at immediate risk of housing instability and potential return to homelessness.

19. As a result of these provisions and more, the NOFO will in effect, reduce or eliminate operating support for PSH. Losing CoC operating support for PSH will likely force the State to determine whether it can repurpose and redirect state homelessness dollars not to reduce unsheltered homelessness, but to prevent homelessness among people who are currently housed. California will likely be pushed into using homelessness prevention spending to plug federal gaps, keep people housed, and avert large-scale destabilization.

20. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 15th day of November 2025.

Meghan Marshall
Executive Officer
California Interagency Council on Homelessness