UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>      Plaintiffs,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>      Defendants. | C.A. No.1:25-cv-000626-MSM-AEM<br><br>DECLARATION OF MARY MCGEOWN |

## DECLARATION OF MARY MCGEOWN

1. I, Mary McGeown, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

2. I am the Undersecretary for Human Services at the Executive Office of Health and Human Services (EOHHS or EHS) for the Commonwealth of Massachusetts. I have held this position since April 2023. My primary duties and responsibilities in this role include policy development, administrative oversight and management, and coordination across agencies to support low-income individuals and families with complex needs that cut across health, housing, child welfare, disability, mental health and immigrant and migrant services. The Office of Homeless Youth Services reports directly to me.

3. I am familiar with the information set forth below either through personal knowledge or consultation with EOHHS staff, or from my review of relevant documents and information.

### EOHHS Involvement in Massachusetts Continuum of Care (CoC) and Youth Homeless Demonstration Program (YHDP)

4. EOHHS is comprised of 11 agencies and the MassHealth program. EOHHS works with many of Massachusetts' most vulnerable residents—including individuals with intellectual and developmental disabilities; older adults; blind, Deaf, and hard of hearing residents; those struggling with substance use disorders, mental illness, or co-occurring illness; and survivors of sexual assault, domestic violence, and human trafficking—to decrease health disparities, build a strong social safety net, fight hunger and food insecurity, address social determinants of health, support our workforce, and increase the accessibility and affordability of care across the Commonwealth.

5. As relevant to this lawsuit, EOHHS administers the state Medicaid and Children's Health Insurance (CHIP) programs, known in Massachusetts as "MassHealth." The MassHealth program and the MassHealth managed care entities contract with providers who provide access to medical and behavioral health care and long-term services and supports to qualifying children, families, seniors, and people living with disabilities in Massachusetts. EOHHS also oversees the Department of Transitional Assistance (DTA), which administers the SNAP program (formerly known as food stamps) and provides cash assistance to families, children and the disabled under the TANF and EAEDC programs; MassAbility, which connects individuals with disabilities with employment opportunities, housing, and supportive services; the Executive Office of Aging and Independence (AGE), which connects older adults with housing and supportive services; the Department of Mental Health (DMH), which provides access to services and supports to meet the mental health needs of individuals of all ages enabling them to live, work and participate in their communities; and the Department of Public Health (DPH), which seeks to promote health and wellness by improving equitable access to public health and health care services, including for people with substance use disorders.

6. In Massachusetts, there are currently eleven Continua of Care (CoC), including the Commonwealth of Massachusetts, that receive grants from the U.S. Department of Housing and Urban Development (HUD). The work of EOHHS depends on and is intertwined with the work of all eleven Massachusetts CoCs in a variety of ways, as outlined in the following paragraphs.

7. Several of the agencies that make up EOHHS, including DMH, DPH, MassHealth, and AGE, provide services and wraparound supports to residents served by CoCs—particularly those in permanent supportive housing (PSH). In some instances, the services and wraparound supports provided by EOHHS agencies are funded through the CoC program. In

Barnstable County, the Cape Cod and Islands, CoC provides rental assistance directly to DMH, which then contracts a vendor to deliver intensive coordinated services to 22 individuals. In total, approximately 200 individuals served by DMH would face immediate risk of homelessness if CoC funding is significantly reduced or eliminated.

8.  In many other instances, EOHHS agencies provide services and supports with state funding, while a nonprofit project operator receives CoC funding to cover operational costs such as rent, staffing, and management expenses. Several projects structured in this way exist in each of the eleven Massachusetts CoC areas. In such projects, neither the Commonwealth nor the CoC subrecipient could offer the permanent supportive housing program without the work of the other.

9.  Most if not all Massachusetts residents currently living in permanent supportive housing operated by CoC subrecipients using CoC funds likely rely on MassHealth, and in many instances on one or more EOHHS agencies, for standalone health, mental health, and substance use disorder treatment services. MassHealth also funds services for certain residents of CoC-funded permanent supportive housing in Massachusetts through the Specialized Community Support Program for Homeless Individuals (CSP-HI). CSP-HI provides pre-tenancy supports, support in transitioning into housing, and tenancy sustaining supports to over 3,700 MassHealth members who have behavioral health disorder diagnoses that interfere with their ability to access essential medical services or other basic needs and who are experiencing homelessness, among other things. Without CoC funding for PSH, MassHealth members receiving CSP-HI may be at risk of becoming homeless again or experiencing longer durations of homelessness, which in turn, reduces the effectiveness of CSP-HI and potentially increases costs to MassHealth for longer duration of services.

10. DPH, through its Bureau of Substance Addiction Services (BSAS), spends $12.9 million annually to fund Housing Stability Support services for people who are eligible for supportive housing and are in or interested in recovery from substance use disorder. These services are provided only to housed individuals in support of the mutually reinforcing goals of maintenance in recovery and stabilization in housing. Throughout the state, participants in BSAS programs are able to afford to live in permanent housing because of the support of CoC funding. The BSAS program serves 710 households, including 555 households living in permanent supportive housing.

11. Separately, EOHHS Homeless Youth Services invests $10.41 million annually across ten regions, seven of which also receive $10.78 million annually from their participation in the Youth Homelessness Demonstration Program (YHDP). YHDP funding is integrated into the CoC Program for seven CoCs—Boston, Pittsfield/Franklin/Hampshire Counties, Springfield/Hampden Counties, Worcester, Cape and the Islands, Balance of State, and Lynn—that use YHDP resources for housing and services that are specifically targeted to 18-24 year olds (although these funds may also support youth under 18). The funding is "braided" with EOHHS-funded supportive services and staffing, which strengthens local responses to youth homelessness by pairing federal housing resources with ongoing state-funded supports.

**Impact of the FY 2025 NOFO on the Work of EOHHS Agencies**

12. The HUD Continuum of Care Notice of Funding Opportunity released on November 13, 2025 ("2025 NOFO"), represents a major departure from HUD's past practices and will cause serious harm to the Commonwealth of Massachusetts, including to the health care and human services provided or funded by EOHHS. Based on my experience and knowledge as Undersecretary for Human Services at EOHHS, and as set forth in greater detail in the following sections, I expect the 2025 NOFO to have the following negative impacts on the work of EOHHS and its agencies:

    a. The permanent supportive housing cap, the 30% limit on Tier 1 funding, and the grant conditions challenged in the Complaint may return many Massachusetts residents to homelessness. Any increase in individual or family homelessness is likely to cause greater demand for, and place greater strain on, services paid for and administered by EOHHS;

    b. The risk of losing substantial funding and the sudden reduction in funding for permanent supportive housing will likely diminish the value of investments the Commonwealth has made in reliance on the stability of CoC funding, including investments (like those programs above) EOHHS agencies have made to develop and support Massachusetts' substantial CoC-funded permanent supportive housing network; and

    c. Adapting to the sudden changes in the 2025 NOFO will require substantial programmatic reorganization in several EOHHS agencies, adding administrative and operational costs to the Commonwealth.

13. The reduction in CoC funding for permanent supportive housing is expected to dramatically reduce the availability of such housing in Massachusetts and push an estimated 2,801 individuals currently in supportive housing into homelessness. These individuals, by definition, have a disabling condition and have extremely low incomes. They are therefore very likely MassHealth members. The costs of the MassHealth program are shared by the Commonwealth and the federal government, with the Commonwealth paying approximately half of the costs. The MassHealth program currently accounts for approximately 40 % of the state budget.

14. Data consistently show homeless individuals have higher health care utilization and costs, which increase costs to the Commonwealth compared to health care expenditures for permanently housed individuals. Decades of research show that the housing first and PSH models have significant positive impacts on health and well-being, including reduction in hospitalizations and emergency department utilization among people with disabling conditions. For this reason, housing first models are a recommended intervention by the Community Preventive Services Task Force of the CDC.[1] Data from Massachusetts further confirms that people experiencing homelessness have higher health care utilization costs, and PSH reduces health care expenditures.[2] Increasing homelessness in Massachusetts will likely exacerbate

---

[1] Community Preventive Services Task Force, *Social Determinants of Health: Permanent Supportive Housing with Housing First (Housing First Programs)*, June 2019, *available at* https://www.thecommunityguide.org/findings/social-determinants-health-housing-first-programs.html

[2] Monica Bharel et al., *Health care utilization patterns of homeless individuals in Boston: preparing for Medicaid expansion under the Affordable Care Act*, Am. J. Public Health, Dec. 2013, available at https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2013.301421;
Kevin Brennan et al., *The Preventive Effect of Housing First on Health Care Utilization and Costs among Chronically Homeless Individuals*, Dec. 2020, *available at* https://www.bluecrossmafoundation.org/sites/g/files/csphws2506/files/2020-12/Housing%20First_summary_Final.pdf

mental, behavioral, and physical health issues and threaten substance use recovery among Massachusetts. (According to data collected through the HUD Point in Time count, nearly 40%.)

15. Not only will health impacts increase costs to the MassHealth program, but programs that the Commonwealth funds to support people living in permanent supportive housing will face greater challenges and costs. For example, BSAS is the "Payor of Last Resort" for substance use disorder treatment services in the Commonwealth. This means that BSAS pays the cost of treatment with contracted vendors for clients who are uninsured or underinsured. The NOFO scoring criteria award points to programs that require substance use disorder treatment before they can be housed; the costs of such treatment provided by BSAS-contracted vendors will in most cases fall on the Commonwealth through BSAS for the uninsured. The increased periods of homelessness that individuals will suffer while waiting to access treatment may also exacerbate problems such that treatment becomes more difficult and more expensive.

16. DMH also contracts with CoC PSH recipients to fund staffing, helping meet grant match requirements and provide direct care to homeless individuals with serious mental illness, often with co-occurring substance use disorders. These services are provided by a range of qualified staff, including licensed clinical social workers who conduct assessments, counseling, and behavioral treatment planning, as well as skilled direct care staff who provide daily support, service coordination, and assistance with maintaining housing stability. Together, these staffing resources support the delivery of direct care and clinical supports that help individuals remain safely housed and connected to care. Loss of CoC funding would disrupt these critical services, placing individuals at higher risk of eviction, housing instability, and a return to homelessness. This could result in individuals leaving PSH for unsheltered homelessness, increasing mental health needs and service demand, and further straining EOHHS resources.

17. The 2025 NOFO will harm the Commonwealth by diminishing the value of investments it has made in projects which were chosen for funding based on their having CoC PSH funding available to cover critical program operating expenses.

18. For example, BSAS at the Department of Public Health currently funds Housing Stability Support services for more than 700 people who are housed, eligible for supportive housing, and in or interested in recovery from substance use disorder. The 2025 NOFO's significant reduction in funding for permanent supportive housing would likely lead to up to 555 of these households losing their stable housing. Because of the loss of housing, these individuals would no longer be eligible for Housing Stability Supports, and would therefore lose those benefits. This will result in underutilization of the Housing Stability and Supports program, undermining the investments the Commonwealth has made in both developing the program and helping its participants to recover from substance use disorder and develop independence.

19. The new point system in the 2025 NOFO also creates various barriers to accessing low-threshold housing programs—like work requirements and mandatory treatment services—that undermine individuals on their road to recovery. BSAS spends $4.9 million annually to support 263 households in these low threshold settings. With the 2025 NOFO, those households will be at risk of losing their housing due to ineligibility for the program or potential closure of the program. BSAS's multi-million dollar investment in services for them will be suddenly undermined, as well.

20. Of the remaining 292 households with permanent housing vouchers receiving BSAS services, more than 60% (120+) will likely lose their housing as a result of the 2025 NOFO. The permanent voucher may be cut, clients may not meet new eligibility requirements and will therefore be removed from the program, or the vendor may discontinue the HUD contract due to the administrative and fiscal burden of implementing new requirements. BSAS's

investment in supportive services for this population—which totals about $4.8M annually—will also be undermined.

21. Transitional housing placements may be lost if residents cannot meet the new eligibility requirements required in the NOFO, such as work requirements and requirements to engage in treatment prior to housing placement. BSAS funds $3.2 million annually in supportive services for households in these transitional housing settings: $2.3 million for individual adults, $193,000 for families, and $766,000 for young adults. The loss of housing and the enhanced services BSAS provides would destabilize individuals' recovery from substance use disorder, which could result in additional health care costs to the DPH and MassHealth.

22. If the changes called for in the 2025 NOFO are implemented, limiting who will be eligible for Housing Stability Support services, the Commonwealth may be compelled to develop an alternative system of services at a significant financial cost to the Commonwealth. This would include either the Commonwealth finding alternative housing opportunities to keep current clients housed and eligible for Housing Stability Support services, or remodeling the Housing Stability Support services to serve individuals without housing, either of which would require significant administrative and financial investments.

23. Reduced CoC funding and/or NOFO conditions that conflict with state requirements will impact programs with braided CoC-EOHHS funds, in some cases making it impossible for programs to continue because they need, but cannot obtain, both sources of funding. For example, some vendors use BSAS-contracted dollars as a funding match for HUD leasing contracts or funding. BSAS contracts require a harm-reduction model of care, some portions of which may be prohibited under the 2025 NOFO grant conditions. The harm reduction model of care includes recovery-oriented policies that do not automatically result in eviction

upon a client's return to use. The NOFO may prohibit such policies, putting the continued viability of such programs in question.

24.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 2nd day of December 2025.

                          */s/ Mary McGeown*
                          Mary McGeown
                          Undersecretary for Human Services
                          Massachusetts Executive Office of Health and Human Services