UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>      Plaintiffs,<br><br> v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>      Defendants. | C.A. No.1:25-cv-000626-MSM-AEM<br><br>DECLARATION OF RUBY DHILLON-WILLIAMS |

## DECLARATION OF RUBY DHILLON-WILLIAMS

I, Ruby Dhillon-Williams, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am the Director of the Arizona Department of Housing (ADOH).

2. As Director of ADOH, I oversee the ADOH staff that administers funding for a variety of state and federal programs, including the Housing and Community Development Division, managed by an Assistant Deputy Director. Within that Division is the Special Needs Housing program. The Special Needs Division was developed to enable the agency to address the housing needs of populations that require a more comprehensive approach to housing stability beyond basic, affordable housing opportunities. These populations have been identified as those living with HIV/AIDS, individuals experiencing serious mental illness, those with chronic substance abuse issues, persons and families who are homeless, and victims of domestic violence. Part of this work involves ADOH's status as the United Funding Agency, Collaborative Applicant, and Homeless Management Information System (HMIS) lead agency for the Continuum of Care for the 13 non-metro counties in the State.

3. I am familiar with the information in the statements set forth below through consultation with ADOH staff or from my review of relevant documents and information.

4. ADOH acts as both a United Funding Agency (UFA) and Collaborative Applicant for the Arizona Balance of State Continuum of Care (AZ BoS CoC).

5. The purpose of the AZ BoS CoC is to plan and implement strategies and services to end homelessness. What makes ADOH unique from Maricopa's and Pima's collaborative applicants is that ADOH is also the recipient of the project funds awarded for the AZ BoS CoC. ADOH then contracts with sub-recipients for project implementation throughout the State.

ADOH's responsibilities as UFA include: overall management and coordination of CoC activities; fiduciary responsibility for funds awarded to the AZ BoS CoC; executing contracts with sub-recipients for projects that provide housing and services to support ending homelessness in the AZ BoS CoC geographic area; monitoring sub-recipient performance; overall coordination for annual point in time count; submission of all required HUD reports; and ensuring that the CoC is operating in compliance with the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009 (HEARTH Act of 2009).

6. I oversee the Assistant Deputy Director, who manages all staff who carry out the work of the AZ BoS CoC activities, including review and direction of the response to the U.S. Department of Housing and Urban Development's (HUD) Notice of Funding Opportunity (NOFO).

7. A Continuum of Care is a community planning process to organize and deliver housing and services to meet the specific needs of people experiencing homelessness as they move to stable housing and maximum self-sufficiency. The Continuum of Care process was established by HUD to enable localities to apply to the federal government for McKinney-Vento Homeless Assistance Act competitive grant programs. This process brings together local governments, community businesses, faith-based organizations, nonprofits, and current and/or formerly homeless persons to develop local solutions to end homelessness.

8. A BoS CoC typically covers a large geographic area, sometimes rural and non-contiguous jurisdictions. The AZ BoS CoC covers 13 of Arizona's 15 counties: Apache, Cochise, Coconino, Gila, Graham, Greenlee, La Paz, Mohave, Navajo, Pinal, Santa Cruz, Yavapai, and Yuma Counties. The two Arizona counties excluded from the AZ BoS COC are Maricopa County

(Phoenix metro area) and Pima County (Tucson metro area), where local community entities serve as CoC leads.

9. Members of the AZ BoS CoC are representatives from all sectors that are directly or indirectly involved with addressing homelessness, including nonprofit homelessness providers, faith-based organizations, local and state government agencies, businesses, public housing agencies, social service providers, tribal nations, advocates, and people with lived experience of homelessness.

10. In 2021, HUD awarded ADOH status as the UFA on behalf of the AZ BoS CoC. As a UFA, ADOH is responsible for fiscal and programmatic oversight of its subrecipients funded through the annual HUD NOFO process. Oversight includes processing of requests for reimbursement, program compliance and performance, and fiscal and programmatic monitoring. Programmatic and fiscal performance is also incorporated into annual NOFO funding priorities and decisions. ADOH also receives CoC Planning and UFA funds. These funds are awarded to the Collaborative Applicant and UFA for the purposes of strengthening the AZ BoS CoC system, providing required CoC programs and services (e.g.; HMIS, Coordinated Entry), and performing fiscal and programmatic oversight of the CoC and its subrecipients.

11. The work of the AZ BoS CoC is governed collaboratively with a Governance Advisory Board. The Governance Advisory Board (GAB) is responsible for providing planning, coordination, guidance, and direction for the use of CoC resources. The GAB has fifteen (15) members. The following are permanent sector representatives nominated by the identified agency or entity:

- The Special Needs Administrator from ADOH. This individual is a Co-Chair for the GAB. At the Special Needs Administrator's discretion, the ADOH Continuum of Care

> Coordinator, who manages community partnerships, assists with reporting functions, and offers a variety of other supports integral to the BoS CoC planning and operations, may act on behalf of the Special Needs Administrator as a Co-Chair. This representative is a permanent position and not subject to term limits.
>
> • One (1) representative from the Arizona Department of Education's McKinney/Vento Homeless Liaison. This representative is a permanent position and not subject to term limits.
>
> • One (1) representative from the Arizona Department of Economic Security, who has direct responsibility for the Emergency Solutions Grants Program (ESG) and Domestic Violence Services. This representative is a permanent position and not subject to term limits.
>
> • One (1) representative from the Arizona Health Care Cost Containment System (AHCCCS), Arizona's Medicaid administrator overseeing integrated physical and behavioral health care. This representative is a permanent position and not subject to term limits.
>
> • One (1) representative from the Arizona Housing Coalition. This representative is a permanent position and not subject to term limits.
>
> • One (1) representative from the Arizona Coalition to End Sexual and Domestic Violence.  This representative is a permanent position and not subject to term limits.

The remaining nine members represent other key stakeholders including but not limited to:

> • At least one (1) individual who has lived experience (homeless or formerly homeless). The individual(s) that are representative of this sector may represent other demographic groups or stakeholders.

- At least one (1) member or representative from one of the AZ BoS CoC's recognized Native American/American Indian tribal communities.
- A maximum of five (5) members can be CoC subrecipients in order to avoid potential conflicts of interest. No subrecipient agency can have more than one (1) person on the Governance Advisory Board by Charter.

12. ADOH, as the Collaborative Applicant, is responsible for preparing the consolidated application. The consolidated application requests information ranging from CoC membership representation to adherence to federal priorities to coordination with healthcare partners and provision of services. Each nonprofit seeking funding through the CoC is required to attach a project application to the consolidated application. The project applications are reviewed and ranked in accordance with CoC policy. The ranking and reviewing are referred to as the "local competition." The project applications describe the population to be served, how services will be provided, and a programmatic budget. Most project applications include permanent housing, which includes both permanent supportive housing and tenant based rental assistance.

13. As the Collaborative Applicant for the AZ BoS CoC, ADOH performs a variety of necessary functions, such as oversight of HMIS administration, conducting program monitoring, engagement and education of stakeholders, and submission of HUD funding applications.

14. ADOH is also the state agency responsible for administering federal Emergency Solutions Grant (ESG) funds and state homeless program funds. In this role, ADOH works to align state and federal program requirements and ensure coordinated community planning across funding streams. ADOH's specific responsibilities include the following: staffing the GAB for the AZ BoS CoC; producing planning materials; collecting and reporting on performance data; monitoring program performance; coordinating resources, integrating activities, and facilitating

collaboration; preparing the Consolidated Application for CoC funds; recruiting stakeholders; and coordinating HMIS activities.

15. ADOH is also responsible for the timely and accurate submission to HUD of the annual Consolidated CoC Program Application. ADOH provides CoC staff support for all tasks associated with completion of the annual CoC Consolidated Application. ADOH facilitates HMIS activities for HUD compliance in coordination with the HMIS administrator to ensure all HMIS activities are carried out in accordance with the HEARTH Act. All agencies within the AZ BoS CoC must comply with HMIS requirements for CoC funding, state homeless service funding, and any additional requirements outlined in HMIS policies and procedures.

16. ADOH is responsible for submitting all required CoC reporting on behalf of the AZ BoS CoC. This includes managing and collecting data for the annual HUD Point in Time Count each January to count all persons experiencing unsheltered and sheltered persons within the CoC. The PIT also includes data collection and reporting on the Housing Inventory Count (HIC), an annual count of all available shelter and housing units in the CoC for persons experiencing homelessness. Other required reports include annual Longitudinal Systems Analysis (LSA) used to prepare the federal Annual Homeless Assessment Report (AHAR) and System Performance Measure (SPM) reporting. As a UFA, ADOH also is responsible for submitting Annual Performance Reporting (APR) and financial reporting in HUD's Sage system. Sage is a web-based reporting system used by recipients of funding through HUD's Office of Special Needs Assistance Programs (SNAPS). All HUD mandatory reporting is included and evaluated as part of the annual CoC NOFO process.

17. All funding that is competitively awarded to the AZ BoS CoC is administered through direct contracts between HUD and the nonprofit. ADOH currently receives $516,509 for

planning and administrative (UFA) activities through a non-competitive grant and $6,632,503 from the competitive CoC NOFO. According to the National Alliance to End Homelessness, 85% of CoC funding nationwide is used for permanent housing (PH) or Permanent Supportive Housing (PSH)). In the AZ BoS CoC, that figure is 90% (not including the planning/UFA grants). This figure includes supportive services directly included and tied to PSH grants. Overall, AZ BoS CoC funding currently provides 353 PH units (282 PSH/71 Rapid Rehousing (RRH) – noting 40 Domestic Violence (DV) RRH beds are included in this figure). If the AZ BoS CoC loses 60% of PH above the current 30% threshold, these 13 rural counties across Arizona stand to lose around 210 PH units, including all RRH. These caps under the current NOFO are estimated to impact around 430 rural Arizonans.

18. The AZ BoS CoC resources fund rental assistance for apartments in the community in which the program participant is the leaseholder. Rent is paid directly from the nonprofit to the landlord. A consistent NOFO ensures continuity for households in receipt of this rental assistance. Shifting priorities away from permanent housing would likely be destabilizing for tenants and creates volatility around rental assistance that will erode the confidence that local landlords have in the ability of the nonprofit to pay the rent consistently at a time when housing is scarce and finding units for households experiencing homelessness is already incredibly difficult. Tenants who also have a lease with the landlord and gaps in rental assistance will violate the lease, resulting in loss of stable housing and an increase in homelessness.

19. Because services are connected to housing, a loss of permanent housing programs would likely equate to a loss of necessary services, like mental health and substance use, vital services for long-term stability. Additionally, without stable housing and supportive services, participants are more likely to experience worsening health conditions, like substance use disorders

and food insecurity. Loss of housing can also lead to unemployment, as participants may lack a stable place to live or work from. Most notably, participants would likely be at a higher risk of experiencing violence and other harms that are common for those experiencing homelessness.

20. Through consultation with ADOH staff, I understand that the HUD CoC NOFO released on November 13, 2025, represents a significant departure from past practices and threatens unintended serious harm.

21. This NOFO is for FY 2025 and "rescinds and supersedes any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."

22. There is significant strategic planning, system analysis, and policy work that takes place in preparation for the HUD NOFO. CoCs were previously informed that a NOFO would not be issued until 2026 and as such, through consultation with ADOH staff, it is my understanding that certain aspects of the planning work necessary to adequately prepare for the NOFO, as well as to prepare communities, tenants, and other stakeholders for the dramatic priority shifts, were not yet undertaken or prioritized.

23. Nonprofits were not expecting that they would need to compete for funding until 2026. The sudden change to competing in 2025 will prevent programs from hiring staff and placing households in permanent housing, serving as a chilling effect for operational programs in the coming months.

24. The cap on permanent supportive housing would likely also negatively impact other Arizona homeless programs, which include but are not limited to the Maricopa County CoC and Tucson Pima CoC and its affiliate programs. This change in the NOFO priorities impacts housed

individuals, private landlords, nonprofit service providers, local businesses and local emergency services if people are evicted because they no longer have rental assistance.

25. On page 15 of the NOFO, HUD states that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."

a. During the NOFO process, CoCs must rank projects into two tiers. HUD selects projects for funding based on how they are ranked and whether they are in Tier 1 or 2. Depending on a CoC's overall score, a CoC could lose some or all of its projects ranked in Tier 2. This year, only 30% of existing projects are safe from potential cuts, making the competition significantly harder and jeopardizing housing stability for hundreds of households.

b. In FY2024, Tier 1 was set at 90%. In FY2023, Tier 1 was set at 93%. In FY2022, Tier 1 was set at 95%, and in FY2021, Tier 1 was set at 100%.

c. Tier 1 ranked projects and the service recipients for whom the rent is paid will not have to participate in the competitive funding round. This is especially important for those residing in units paid for by permanent supported housing programs, which are intended to pay for case management and rental assistance for chronically homeless households with a documented disability for as long as needed.

d. Because the requirements for a project ranked in Tier 2 differ so drastically from previous years and the requirements to qualify for funding are not in line with previous federal priorities, it is unlikely that many of our current grantees will be competitive enough to receive an award.

26. Also on page 15 of the NOFO, HUD states that "[i]n order to promote balance and increase competition, no more than 30 percent of a CoC 's Annual Renewal Demand (ARD) under

this NOFO will fund Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects."

    a.    As stated above, the AZ BoS CoC devotes approximately 90% of its competitive CoC funding to permanent housing. Previous NOFOs prioritized voluntary service participation and required housing first practices. However, this NOFO imposes supportive services requirements, which conflict with previous priorities that emphasized housing stability over support service participation. The 30% cap on permanent housing funding would limit the AZ BoS CoC to some 100 units of housing across the 13-county region, a loss of an estimated 240 units.

    b. The service requirements in this NOFO state that projects should provide 40 hours of service per program participant per week. Not only will this require significant staffing, but it is not sustainable. Such a requirement is more in line with in-patient treatment versus housing. In addition, many of the providers within the AZ BoS CoC do not have the capability to quickly pivot to a transitional housing model in a matter of months. Typically, the physical structure and day-to-day operations of transitional housing are vastly different from permanent housing.

    27.    The NOFO also states that the CoC must demonstrate it has a decision-making governance board that includes at least 1 person with a former experience of homelessness, at least 3 elected public officials, at least 1 representative of the business community and 2 representatives of law enforcement. A change to the governance structure will require not only significant outreach, but it also could force the removal of current governance board members and require a change to the AZ BoS CoC's governance charter. Again, this is a significant change that will likely require longer than two months to modify the governance charter, solicit new board members, vote

in board members, train new representatives on the function of a CoC, and with instances of local officials, may require other local approvals to join the AZ BoS CoC.

28. If this NOFO remains operative, applicants will not receive funding they were counting on, and long-term projects will be derailed. This NOFO fails to address gaps in services for those projects that have contracts expiring before award announcements and also destabilizes the existing permanent housing projects with the restrictive cap. Nonprofit providers are vulnerable in continued operations.

29. Consequences for program participants will be severe. Program participants are among the most vulnerable people across Arizona and often face other challenges in addition to being without a home.

30. Terminating programs that rely on CoC grants will therefore increase burdens on other state health, safety and support services, and their associated costs.

31. If ADOH cannot bridge the expected CoC funding gap with State Housing Trust Funds or another State resource, by October 2026, grantees will start experiencing financial hardship due to stalled reimbursements.

32. This NOFO has created confusion and concern among CoCs, nonprofits, local governments, and the State of Arizona. The NOFO stands to severely disrupt services to tenants throughout Arizona. Since the release of the NOFO, ADOH has received numerous inquiries from CoCs and agencies that operate permanent supportive housing that were constructed with state funding but rely on CoC funds to support the rents and staffing, asking if they can convert to transitional housing. Pivoting to transitional housing would negatively impact tenants by imposing service agreements of up to 40 hours, generate fear and anxiety for tenants having to move in 24 months, and undermine housing stability across the CoC's geographic region.

33. This NOFO would likely have unintended negative impacts on the communities covered under the AZ BoS CoC. The AZ BoS CoC has spent years developing stakeholder interest, programmatic partnerships, local government and community buy-in, landlord relationships, and developing real permanent housing solutions for homeless individuals in accordance with long-standing federal priorities. Prioritizing transitional housing over permanent housing would likely have the unintended consequence of eroding housing stability for current households in the program, likely resulting in households once again experiencing homelessness, creating disruption and uncertainty for those households, and jeopardizing the limited affordable housing relations that have been cultivated across the region.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 5th day of December 2025.

Ruby Dhillon-Williams
Director
Arizona Department of Housing