# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF WASHINGTON, *et al.*,<br><br>Plaintiffs,<br>      v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>Defendants.<br><br>AND<br><br>NATIONAL ALLIANCE TO END HOMELESNESS, *et al.*,<br><br>Plaintiffs,<br>      v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>Defendants. | Case Nos. 25-cv-626<br>            25-cv-636<br><br>District Judge Mary S. McElroy<br>Magistrate Judge Amy E. Moses |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 4

ARGUMENT ...................................................................................................................... 7

I.     PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS ............................. 8

     A.     Plaintiffs are not likely to succeed on the merits of their claims with respect to the 2025 NOFO because those claims are now moot and, even if not moot, cannot result in irreparable harm. ...................................................... 8

     B.     Plaintiffs are not likely to succeed on their failure-to-act claims under Section 706(1) of the APA. ................................................................... 15

          i.     Processing of 2025 CoC applications ..................................................... 16

          ii.     Renewals of 2025 CoC awards ............................................................... 17

               a.     The 2024 NOFO does not create a legally binding obligation to renew existing contracts ....................................... 18

               b.     The Renewal Provision does not create a legally binding obligation to renew. .................................................................. 20

          iii.     Notice of funding availability ................................................................. 28

     C.     Plaintiffs are not likely to succeed on their Section 706(2) claims. ................... 30

          i.     Plaintiffs fail to identify a final agency action. ..................................... 31

          ii.     Plaintiffs lack standing to assert a Section 706(2) claim with respect to the recission of the 2024 NOFO. ........................................... 35

          iii.     Any rescission of the 2024 NOFO was committed to agency discretion by law ..................................................................................... 36

          iv.     Plaintiffs are not likely to succeed on the substance of their Section 706(2) claims ......................................................................... 38

               a.     Recission of the 2024 NOFO was not contrary to law. ............... 38

               b.     Neither the rescission of the 2024 NOFO nor the withdrawal of the 2025 NOFO was arbitrary and capricious ........................ 42

     D.     THE IRREPARABLE-HARM PRONG DOES NOT FAVOR RELIEF. ........... 46

II.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST GRANTING RELIEF. ...............................................................................47

III.   PLAINTIFFS' REQUESTED RELIEF IS IMPROPER EVEN IF THIS COURT FINDS A VIOLATION OF THE APA.........................................................................47

       A.    Mandatory relief is not a proper remedy with respect to Plaintiffs' Section 706(2) claims..................................................................................................48

       B.    Plaintiffs' requested relief exceeds the remedy this Court may grant with respect to Plaintiffs' Section 706(1) claims. ....................................................49

IV.    PLAINTIFFS SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY PRELIMINARY INJUNCTIVE RELIEF AND ANY PRELIMINARY RELIEF SHOULD BE STAYED TO ALLOW CONSIDERATION OF WHETHER TO APPEAL. .....................................................52

CONCLUSION.......................................................................................................................53

# TABLE OF AUTHORITIES

## CASES

*ACLU of Mass. v. U.S. Conf. of Cath. Bishops*,
  705 F.3d 44 (1st Cir. 2013) ................................................................. 11, 13

*Alcresta Therapeutics, Inc. v. Azar*,
  318 F. Supp. 3d 321 (D.D.C. 2018) ................................................................. 46

*Already, LLC v. Nike, Inc.*,
  568 U.S. 85 (2013) ................................................................. 8

*Am. Acad. of Pediatrics v. U.S. FDA*,
  330 F. Supp. 3d 657 (D. Mass. 2018) ................................................................. 24, 26

*Am. Ass'n of Retired Pers. v. EEOC*,
  823 F.2d 600 (D.C. Cir. 1987) ................................................................. 28

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.*,
  934 F.3d 649 (D.C. Cir. 2019) ................................................................. 10

*Am. Diabetes Ass'n v. U.S. Dep't of Army*,
  938 F.3d 1147 (9th Cir. 2019) ................................................................. 12

*Am. Hosp. Ass'n v. Bowen*,
  834 F.2d 1037 (D.C. Cir. 1987) ................................................................. 34

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ................................................................. 15

*Am. Pub. Health Ass'n v. Nat'l Insts. of Health*,
  145 F.4th 39 (1st Cir. 2025) ................................................................. 42

*Ass'n of Am. Univs. v. Dep't of Def.*,
  792 F. Supp. 3d 143 (D. Mass. 2025) ................................................................. 7

*Atieh v. Riordan*,
  797 F.3d 135 (1st Cir. 2015) ................................................................. 42

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................. 16, 31, 33

*Bos. Bit Labs, Inc. v. Baker*,
  11 F.4th 3 (1st Cir. 2021) ................................................................. 9, 10, 11

*Brock v. Pierce County*,
  476 U.S. 253 (1986) ................................................................. 39, 40

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014)...................................................................................22

*California v. Texas*,
   593 U.S. 659 (2021)...................................................................................13

*Calvary Chapel of Bangor v. Mills*,
   52 F.4th 40 (1st Cir. 2022) .......................................................................12

*Charlesbank Equity Fund II v. Blinds to Go, Inc.*,
   370 F.3d 151 (1st Cir. 2004).............................................................9, 14, 46

*Citizens Alert Regarding Env't v. EPA*,
   102 F. App'x 167 (D.C. Cir. 2004) ...........................................................34

*Citizens Awareness Network, Inc. v. United States*,
   391 F.3d 338 (1st Cir. 2004)...............................................................43, 45

*Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*,
   387 F. Supp. 3d 33 (D.D.C. 2019) ............................................................17

*Cobell v. Kempthorne*,
   455 F.3d 301 (D.C. Cir. 2006)............................................................33, 35

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
   603 U.S. 799 (2024)............................................................................48, 49

*Ctr. for Biological Diversity v. Zinke*,
   260 F. Supp. 3d 11 (D.D.C. 2017) .....................................................15, 17, 51

*Ctr. for Sci. in the Pub. Int. v. U.S. FDA*,
   74 F. Supp. 3d 295 (D.D.C. 2014) ......................................................15, 25

*D.H.L. Assocs., Inc. v. O'Gorman*,
   199 F.3d 50 (1st Cir. 1999) .......................................................................10

*Da Costa v. Immigr. Inv. Program Off.*,
   80 F.4th 330 (D.C. Cir. 2023), *denying reh'g en banc*,
   2023 WL 6466438 (D.C. Cir. Oct. 3, 2023)..........................................23, 26

*Dep't of Educ. v. California*,
   604 U.S. 650 (2025)...................................................................................52

*Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,
   591 U.S. 1 (2020) .....................................................................................45

*Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*,
  18 F.4th 38 (1st Cir. 2021) ................................................................. 47

*Doe v. Trs. of Bos. Coll.*,
  942 F.3d 527 (1st Cir. 2019) ............................................................... 8

*DSE, Inc. v. United States*,
  169 F.3d 21 (D.C. Cir. 1999) .............................................................. 52

*El Paso Nat. Gas Co. v. United States*,
  750 F.3d 863 (D.C. Cir. 2014) ............................................................ 17

*EPA v. Brown*,
  431 U.S. 99 (1977) ........................................................................... 31

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................... 42, 43, 44

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021) ..................................................................... 42, 44

*Fla. Med. Ass'n v. Dep't of Health, Educ., & Welfare*,
  947 F. Supp. 2d 1325 (M.D. Fla. 2013) ................................................ 32

*Flast v. Cohen*,
  392 U.S. 83 (1968) ........................................................................... 13

*Forest Guardians v. Babbitt*,
  174 F.3d 1178 (10th Cir. 1999) .......................................................... 24

*Golden v. Zwickler*,
  394 U.S. 103 (1969) ........................................................................... 8

*Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*,
  201 F. App'x 7 (1st Cir. 2006) ........................................................... 13

*Gulf of Me. Fisherman's All. v. Daley*,
  292 F.3d 84 (1st Cir. 2002) ............................................................... 10

*Harris v. Univ. of Mass. Lowell*,
  43 F.4th 187 (1st Cir. 2022) ............................................................. 12

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ......................................................................... 37

*Illinois v. Fed. Emergency Mgmt. Agency*,
  ---F. Supp. 3d---, 2025 WL 2716277 (D.R.I. Sep. 24, 2025) .................... 11

*In re Am. Fed'n of Gov't Emps.*,
    837 F.2d 503 (D.C. Cir. 1988) ....................................................................... 28

*In re Barr Lab'ys.*,
    930 F.2d 72 (D.C. Cir. 1991) ................................................................. 25, 29

*Kingdomware Techs., Inc. v. United States*,
    579 U.S. 162 (2016) ...................................................................................... 18

*Kokajko v. Fed. Energy Regul. Comm'n*,
    837 F.2d 524 (1st Cir. 1988) ........................................................................ 24

*LaRoque v. Holder*,
    679 F.3d 905 (D.C. Cir. 2012) ..................................................................... 12

*Lawson v. FMR LLC*,
    571 U.S. 429 (2014) ...................................................................................... 23

*Liberty Fund, Inc. v. Chao*,
    394 F. Supp. 2d 105 (D.D.C. 2005) ............................................................. 30

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ......................................................................... 36, 37, 38

*Lockhart v. United States*,
    577 U.S. 347 (2016) ...................................................................................... 21

*Loper Bright Enters. v. Raimondo*,
    603 U.S. 369 (2024) ...................................................................................... 38

*Lowe v. Gagné-Holmes*,
    126 F.4th 747 (1st Cir. 2025), *cert. denied*, 145 S. Ct. 2795 (2025) ............ 9, 10, 11

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ................................................................................. 31, 33

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555, 560 (1992) .............................................................................. 35

*Marciano v. Adams*,
    2023 WL 3477119 (2d Cir. May 16, 2023) ................................................... 9

*Maryland v. King*,
    567 U.S. 1301 (2012) .................................................................................... 47

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) ................................................................... 25

*Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Com. of Mass.*,
  649 F.2d 71 (1st Cir. 1981) ........................................................................... 48

*Massachusetts v. Nat'l Insts. of Health*,
  770 F. Supp. 3d 277 (D. Mass. 2025), *appeal filed sub nom.*
  *Ass'n of Am. Med. Colls. v. Nat'l Insts. of Health*, No. 25-1344 (1st Cir. Apr. 9, 2025)... 14, 47

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
  367 F.3d 68 (1st Cir. 2004) ........................................................................... 47

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010).......................................................................................... 49

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*,
  463 U.S. 29 (1983)...................................................................................... 42, 43

*Murthy v. Missouri*,
  603 U.S. 43 (2024)...................................................................................... 35, 36

*Nat'l Fair Hous. All. v. U.S. Dep't of Hous. & Urb. Dev.*,
  2025 WL 2105567 (D.D.C. July 28, 2025)........................................................ 28

*Nat'l Treasury Emps. Union v. Trump*,
  2025 WL 1441563 n.4 (D.C. Cir. May 16, 2025) .............................................. 52

*Nat'l Treasury Emps. Union v. Vought*,
  149 F.4th 762 (D.C. Cir. 2025)................................................................. 17, 31

*New England Reg'l Council of Carpenters v. Kinton*,
  284 F.3d 9 (1st Cir. 2002) ............................................................................... 9

*New Jersey v. Trump*,
  131 F.4th 27 (1st Cir. 2025) ............................................................................. 8

*New Mexico v. Musk*,
  769 F. Supp. 3d 1 (D.D.C. 2025) ................................................................... 46

*Nken v. Holder*,
  556 U.S. 418 (2009)........................................................................................ 47

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004)................................................................................. *passim*

*Oakville Dev. Corp. v. Fed. Deposit Ins. Corp.*,
  986 F.2d 611 (1st Cir. 1993)............................................................................. 8

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n*,
  506 F.2d 33 (D.C. Cir. 1974)................................................................... 19

*Palisades Gen. Hosp. Inc. v. Leavitt*,
  426 F.3d 400 (D.C. Cir. 2005)............................................................ 36, 48

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  918 F.3d 151 (D.C. Cir. 2019)................................................................ 43

*Planned Parenthood of Wis., Inc. v. Azar*,
  316 F. Supp. 3d 291 (D.D.C. 2018), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019)..... 19, 34

*Powerex Corp. v. Reliant Energy Servs., Inc.*,
  551 U.S. 224 (2007)............................................................................. 22

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*,
  397 F.3d 56 (1st Cir. 2005) .................................................................. 14

*River St. Donuts, LLC v. Napolitano*,
  558 F.3d 111 (1st Cir. 2009)................................................................. 42

*Save Greers Ferry Lake, Inc. v. Dep't of Def.*,
  255 F.3d 498 (8th Cir. 2001).................................................................. 12

*Sierra Club v. EPA*,
  353 F.3d 976 (D.C. Cir. 2004)................................................................ 42

*Spencer v. Kemna*,
  523 U.S. 1 (1998) .......................................................................... 13, 18

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)............................................................................ 35

*Telecomms. Rsch. & Action Ctr. v. FCC*,
  750 F.2d 70 (D.C. Cir. 1984)......................................................... *passim*

*Town of Portsmouth v. Lewis,,*
  813 F.3d 54 (1st Cir. 2016) .................................................................. 11

*Towns of Wellesley, Concord & Norwood v. Fed. Energy Regul. Comm'n*,
  829 F.2d 275 (1st Cir. 1987).............................................................. 24, 26

*U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*,
  121 F.4th 339 (1st Cir. 2024).................................................................. 7

*U.S. Postal Serv. v. Gregory*,
  534 U.S. 1 (2001) ............................................................................. 19

*United States v. Montalvo-Murillo*,
    495 U.S. 711 (1990)...............................................................................40, 41

*Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
    714 F.3d 186 (4th Cir. 2013).......................................................................16

*Watson v. Chessman*,
    362 F. Supp. 2d 1190 (S.D. Cal. 2005) ........................................................32

*Weinstein v. Bradford*,
    423 U.S. 147 (1975)....................................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................8, 13

**STATUTES**

5 U.S.C. § 551 .............................................................................................16

5 U.S.C. § 701 ......................................................................................30, 36

5 U.S.C. § 704 ...............................................................................15, 30, 31

5 U.S.C. § 705 ........................................................................................7, 48

5 U.S.C. § 706 ......................................................................................*passim*

31 U.S.C. § 1341 .........................................................................................18

31 U.S.C. § 1501 .........................................................................................18

42 U.S.C. § 11381 *et seq.* ..............................................................................4

42 U.S.C. § 11381 .........................................................................................4

42 U.S.C. § 11382 ................................................................................*passim*

42 U.S.C. § 11386a ............................................................................5, 22, 23

42 U.S.C. § 11386c .........................................................................20, 21, 22

Helping Families Save Their Homes Act of 2009,
    Pub. L. No. 111-22, 123 Stat. 1632 (codified at 42 U.S.C. §§ 11381–11389) .....................3, 4

Consolidated and Further Continuing Appropriations Act, 2015,
    Pub. L. No. 113-235, 128 Stat. 2130 (2014).........................................29

Consolidated Appropriations Act, 2016,
    Pub. L. No. 114-113, 129 Stat. 2242 (2015).........................................29

Consolidated Appropriations Act, 2019,
    Pub. L. No. 116-6, 133 Stat. 13 ................................................................. 29

Further Consolidated Appropriations Act, 2020,
    Pub. L. No. 116-94, 133 Stat. 2534 (2019) ....................................... 5, 25

Consolidated Appropriations Act, 2021,
    Pub. L. No. 116-260, 134 Stat. 1182 (2020) ........................................ 29

Consolidated Appropriations Act, 2022,
    Pub. L. No. 117-103, 136 Stat. 49 .......................................................... 29

Consolidated Appropriations Act, 2023,
    Pub. L. No. 117-328, 136 Stat. 4459 (2022) ........................................ 29

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-42, 138 Stat. 25 ..................................................... *passim*

Full-Year Continuing Appropriations and Extensions Act, 2025,
    Pub. L. No. 119-4, 139 Stat. 9 ....................................................... 4, 5, 25

**RULES**

Fed. R. Civ. P. 65 ........................................................................................ 52

**REGULATIONS**

Federal Actions to Address Environmental Justice in Minority Populations
    and Low-Income Populations,
    Exec. Order No. 12,898, 59 Fed. Reg. 7629 (Feb. 11, 1994) ................... 43

Further Advancing Racial Equity and Support or Underserved Communities
    Through the Federal Government,
    Exec. Order No. 14,091, 88 Fed. Reg. 10825 (Feb. 16, 2023) ................. 44

Initial Rescissions of Harmful Executive Orders and Actions,
    Exec. Order No. 14,148, 90 Fed. Reg. 8237 (Jan. 20, 2025) ................... 37

Ending Illegal Discrimination and Restoring Merit-Based Opportunity,
    Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025) ................... 43

Ending Crime and Disorder on America's Streets,
    Exec. Order No. 14,321, 90 Fed. Reg. 35817 (July 24, 2025) ............... 5, 6

Improving Oversight of Federal Grantmaking,
    Exec. Order No. 14,332, 90 Fed. Reg. 38,929, § 6 (Aug. 7, 2025) ............ 6

**OTHER AUTHORITIES**

GAO-06-382SP, *Principles of Federal Appropriations Law*, 3rd ed., vol II (Feb. 2006), https://www.gao.gov/assets/gao-06-382sp.pdf........................................................ 19

Grants.gov, *Funding Opportunity Number FR-6800-N-25*, https://www.grants.gov/search-results-detail/355762........................................... 33

Grants.gov, *Opportunity Listing - FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants*, https://simpler.grants.gov/opportunity/12dd8119-e867-458d-afdb-c8d808a7c513 ............... 32

## INTRODUCTION

The at-issue lawsuits primarily challenge a Notice of Funding Opportunity ("NOFO") that no longer exists. In November 2025, the Department of Housing and Urban Development ("HUD") issued the 2025 NOFO, which reflected HUD's shift in priorities with respect to the Continuum of Care ("CoC") program. The issuance of this NOFO had been foreshadowed by HUD for months. Indeed, as early as July 3 of this year, HUD announced its intention to issue a new NOFO for 2025 CoC awards and explained that prospective recipients should prepare to file new applications. This announcement was in line with the disclaimers embedded in the 2024 NOFO, which—although a 2-year NOFO—merely reserved HUD "the right" to award 2025 CoC awards based on 2024 CoC applications and, in any event, explicitly reserved HUD's discretion to modify the terms of the 2024 NOFO as it pertained to 2025 CoC awards.

Plaintiffs filed these two lawsuits after the issuance of the 2025 NOFO, primarily challenging the substance of the 2025 NOFO. After the suits were filed (and based in part upon concerns that Plaintiffs raised in their filings), on December 8, 2025, HUD withdrew the 2025 NOFO in order to revise it appropriately and replace it with a new NOFO.

Despite the December 8 withdrawal, Plaintiffs request that the Court act—on an emergency basis—to enforce a promise HUD never made: renew their 2024 CoC awards for Fiscal Year 2025. For the reasons explained below, the Court should deny the requested injunctive relief.

Plaintiffs are unlikely to prevail on the merits. First, because the 2025 NOFO has been rescinded, Plaintiffs' challenge to the substance of its terms is moot. After all, the 2025 NOFO has no present effect. But even if this Court determines that the challenge to the 2025 NOFO remains live because of the possibility that HUD may impose some of the same or similar terms in the

future, Plaintiffs are not irreparably harmed by terms that may or may not be imposed when a future NOFO is ultimately issued.

Moreover, Plaintiffs are not likely to succeed on any Section 706(1) failure-to-act claims under the Administrative Procedure Act ("APA")—i.e. any claim that HUD has "unreasonably delayed" or illegally "withheld" (1) the processing of 2025 renewals, (2) issuance of 2025 renewals, or (3) the timely issuance of a 2025 NOFO such that any drastic relief in the form of mandamus would be warranted. First, the processing of renewals does not constitute a "discrete" final agency action to which the APA's failure-to-act prong can even apply; rather, it is the type of programmatic operation that is not reviewable under the APA. As for contract renewals, Plaintiffs have no legal right to them. And even if they did, the process has not been "unreasonably delayed" because HUD has until September 2027 to obligate the majority of the funds. Finally, even to the extent that HUD failed to issue a timely NOFO before the expiration of the statutory deadline—the heart of Plaintiffs' claims—this delay does not warrant mandamus. After all, HUD's CoC NOFOs are routinely delayed; indeed, the 2024 NOFO was also delayed. But regardless, even if Plaintiffs prevail on their delayed-issuance claim, the maximum remedy under the APA is an order requiring HUD to issue a new NOFO (which HUD is already working toward).

Nor are Plaintiffs able to prevail on their claim that the rescission of the 2024 NOFO violates Section 706(2) of the APA. First, the rescission is not a final agency action. The 2024 NOFO was not removed in one discrete act; rather, HUD had been clear for months that it would not continue implementing it. Nor, in any event, does the recission of the 2024 NOFO entail "legal consequences" for 2025 CoC awards. Second, Plaintiffs lack standing to bring a Section 706(2) claim with respect to the rescission of the 2024 NOFO. That is because the maximum remedy this Court can grant for a Section 706(2) violation is a stay of the offending agency action. But a stay

of the 2024 NOFO rescission does not remedy Plaintiffs' purported imminent harm: an alleged gap in funding. Because the 2024 NOFO did not create any binding obligations on HUD with respect to 2025 CoC awards, a stay of its rescission would not remedy any gaps in funding through contract renewals. Third, the rescission is not reviewable because it was a mere policy determination to abandon the prior Administration's policy priorities. Such choices are committed to agency discretion by law under Section 701(a)(2) of the APA. Finally, even if the recission was reviewable, it was neither contrary to law nor arbitrary and capricious. It was not contrary to law because a mere procedural deadline cannot "lock" HUD into the 2024 NOFO; HUD is permitted to take delayed action by issuing a new NOFO following the expiration of the statutory deadline. Indeed, HUD does it routinely. Nor was the rescission arbitrary and capricious: HUD is entitled to change course to reflect changes in policy priorities, and Plaintiffs' alleged reliance interest does not render HUD's decision arbitrary given the warnings by HUD that a new NOFO is forthcoming.

Critically, even if the Court determines that Plaintiffs are entitled to relief, their requested injunction is nevertheless improper and beyond this Court's authority under the APA. Plaintiffs seek an order barring HUD from issuing a new 2025 NOFO and a mandatory injunction requiring that HUD begin processing 2025 CoC renewals under the 2024 NOFO. This type of mandatory injunctive relief, which commands specific performance, is not available for claims under Section 706(2) of the APA. Rather, this Court may only vacate the challenged agency action by staying the 2024 NOFO rescission; it cannot bar HUD from replacing the 2024 NOFO with a new NOFO. While a claim under Section 706(1) permits this Court to issue a mandatory injunction, such authority has well-defined limits: This Court can only mandate that HUD comply with its legal obligations, but it cannot dictate *how* HUD complies with those obligations. So, at most, this Court can order HUD to issue a new NOFO (or issue renewals pursuant to its statutory obligations). It

cannot—as Plaintiffs request—order HUD to re-issue the *2024 NOFO* or grant renewals pursuant to *its* terms.

## BACKGROUND

In 2009, Congress consolidated several homeless assistance grants into one CoC program. Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009, Pub. L. No. 111-22, div. B, § 1002(b)(1), 123 Stat. 1632, 1664 (codified at 42 U.S.C. §§ 11381–11389) (amending the McKinney-Vento Homeless Assistance Act). The CoC program is designed to quickly rehouse homeless individuals "while minimizing the trauma and dislocation caused . . . by homelessness" and "optimiz[ing] self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381(2), (4). The goal of creating a single program was, in part, to codify in federal law the CoC planning process as a required and integral function necessary to generate local strategies for ending homelessness. Pub. L. No. 111-22, § 1002(b)(2), 123 Stat. at 1664.

The fiscal year 2025 CoC program involves $3,918,000,000: $3,544,000,000 appropriated in fiscal year 2025; $100,000,000 in fiscal year 2025 reallocations; and $294,000,000 in prior-year recaptured appropriations, as explained below.

In March 2025, Congress appropriated $3,544,000,000 for the CoC program as authorized under 42 U.S.C. § 11381 *et seq*, to remain available until September 30, 2027. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, tit. I, §§ 1101(a)(12), 1112, 139 Stat. 9, 12, 14 (authorizing the same amounts and under the same authority and conditions provided in the Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 362, including by advancing appropriations with "a comparable period of availability" as in the 2024 Appropriations Act). The 2024 appropriation did not require HUD to renew existing contracts at the same funding levels, but rather afforded HUD the discretion to

adjust renewal amounts. Pub. L. No. 118-42, 138 Stat. at 362–63 ("*Provided further*, That the Secretary may make reasonable adjustments to renewal amounts to enable renewal projects to operate at substantially the same levels, including cost-of-living adjustments for supportive services from the prior grant[.]").

The fiscal year 2025 appropriation also provided $100,000,000, subject to specific provisos, for one-time awards under the CoC program for the new construction, acquisition, or rehabilitation of new permanent supportive housing. Pub. L. No. 119-4, § 1101(a)(12), 139 Stat. at 12 (authorizing the same amounts and under the same authority and conditions as Pub. L. No. 118-42, 138 Stat. at 364). However, the fiscal year 2025 appropriation also authorized HUD to repurpose the $100,000,000 as additional funding for one-time awards under the CoC program, subject to the same conditions as the $3,544,000,000 amount, and not limited to permanent supportive housing. Pub. L. No. 119-4, § 11305, 139 Stat. at 40.

The Further Consolidated Appropriations Act, 2020, authorized HUD to make certain recaptured funds available for grants under the CoC program. Pub. L. No. 116-94, § 231(a)(1), 133 Stat. 2534, 3008 (2019). The recaptured amounts in the fiscal year 2025 CoC program totaled $294,000,000 and remain available until expended. *Id*. at § 231(a).

HUD awards CoC grants on a competitive basis and evaluates applicants based on selection criteria established in a NOFO. 42 U.S.C. § 11382(a)-(b). The McKinney-Vento Act confers on HUD wide discretion to determine selection criteria. *See id*. § 11386a(b)(1)(G) (providing that funds shall be awarded based on criteria established by the HUD Secretary, including, among other things, "such other factors as the Secretary determines to be appropriate to carry out this part in an effective and efficient manner"). This wide discretion is a reflection of Congress' acknowledgment

that HUD—the expert agency on public housing—is best situated to determine how to implement the CoC program.

On July 24, 2025, President Trump issued Executive Order No. 14,321, *Ending Crime and Disorder on America's Streets*, which declared homelessness a national crisis and established national policies and criteria for HUD to effectuate its homeless-assistance programs. 90 Fed. Reg. 35817, § 3 (July 24, 2025). On August 7, 2025, the President issued Executive Order No. 14,332, *Improving Oversight of Federal Grantmaking*, establishing additional grant criteria to ensure that federal grants are awarded in a manner that effectively accomplishes the goals of their respective programs. *See* 90 Fed. Reg. 38,929, § 6 (Aug. 7, 2025).

Under the previous Administration, HUD issued a NOFO on July 31, 2024. *See National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 6-1 ("2024 NOFO"). In it, HUD merely "reserve[d] the right to award available FY 2025 funds . . . based on this NOFO competition." *Id.* at 4. It also provided that "Projects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds . . . and are not required to apply for renewal for FY 2025 funds." *Id.* Importantly, HUD expressly "reserve[ed] the right to modify th[e] [2024] NOFO or issue a supplemental FY 2025 CoC and YHDP NOFO if necessary (e.g., to accommodate a new CoC or YHDP priority or new funding source)." *See id.* at 4-5.

On July 3, 2025, HUD announced in an email to the CoC listserv that applicants should expect a "new application process for 2025 funding" and that HUD "intends to publish a NOFO for 2025 [CoC] awards." *National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 6-3 ("HUD July 3, 2025 Email"). The notice further advised prospective applicants "to prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants," while also stating that

"[HUD] recognize[s] this is a new application process for 2025 funding and [is] committed to providing CoCs the resources needed to serve their communities." *Id.*

HUD issued a 2025 NOFO on November 13, 2025 with applications due on January 14, 2026. S*ee National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 6-2 ("2025 NOFO"). Plaintiffs filed their lawsuits on November 25, 2025, *see State of Washington v. HUD*, 25-cv-626, ECF No. 1, and on December 1, 2025, *see National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 1. Following these lawsuits, on December 8, 2025, HUD rescinded the 2025 NOFO. *See State of Washington v. HUD*, 25-cv-626, ECF No. 41-2 at 2 (HUD notice that it has "withdrawn" the 2025 NOFO); *see also State of Washington v. HUD*, 25-cv-626, ECF No. 41 at 1 (explaining that HUD has "withdrawn the 2025 NOFO in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO"). On December 12, 2025, in an email to the CoC listserv, HUD stated, in part: "On Monday, December 8th, [HUD] withdrew the [2025 NOFO]. HUD intends to make appropriate revisions to the NOFO and publish a new NOFO and is working diligently toward that end." December 12, 2025 HUD Notice (attached as Exhibit A).[1]

## ARGUMENT

The APA provides that a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of . . . review proceedings" where "required and to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. "The same standard governs" the issuance of a § 705 stay and a

---

[1] During this Court's December 8, 2025 hearing, Defendants were instructed to "address the nature and the effect of the [December 8] rescission and how and when that decision was made" in the instant filing. *See* December 8, 2025, Hearing Transcript at 15 (attached as Exhibit B). The instant brief addresses the "nature and effect" of the rescission. *See* Argument I.A. The attached Declaration from Bryan W. Horn, Acting Principal Deputy Assistant Secretary for Community Planning and Development at HUD, provides a non-privileged description of "how and when that decision was made." *See* Bryan W. Horn Decl. (attached as Exhibit C).

preliminary injunction. *Ass'n of Am. Univs. v. Dep't of Def.*, 792 F. Supp. 3d 143, 164 (D. Mass. 2025). Both are "extraordinary and drastic remed[ies] that [are] never awarded as of right." *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (citation omitted). And such relief is warranted only if a movant establishes that "(1) it is 'likely to succeed on the merits'; (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief'; (3) 'the balance of equities tips in [its] favor' and (4) 'an injunction is in the public interest,'" *New Jersey v. Trump*, 131 F.4th 27, 33 (1st Cir. 2025) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)), with the first factor being "the most important," *Doe v. Trs. of Bos. Coll.*, 942 F.3d 527, 533 (1st Cir. 2019). Plaintiffs fail to carry their burden.

## I. PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

### A. Plaintiffs are not likely to succeed on the merits of their claims with respect to the 2025 NOFO because those claims are now moot and, even if not moot, cannot result in irreparable harm.

Since bringing their lawsuit, Plaintiffs' challenges to the 2025 NOFO have been rendered moot by HUD's December 8 decision to rescind the NOFO and reissue a revised NOFO. *See State of Washington v. HUD*, 25-cv-626, ECF No. 41-2 (HUD notice that it has "withdrawn" the 2025 NOFO); *id.* ECF No. 41 at 1–2 (notice of withdrawal in response to issues raised by Plaintiffs in this litigation). And, even if the challenges are not moot, any alleged harm from the 2025 NOFO conditions is entirely speculative and cannot at this juncture support preliminary injunctive relief.

Mootness is a jurisdictional bar to Plaintiffs' challenges to the 2025 NOFO. Because federal courts "do not render advisory opinions," a "substantial controversy, between parties having adverse legal interests" must exist at all stages of the litigation. *Golden v. Zwickler*, 394 U.S. 103, 108 (1969) (citation omitted). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer 'live' or the

parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted). It is "well established that, in circumstances where a court cannot provide effectual relief, no justiciable case remains" and the case is moot. *Oakville Dev. Corp. v. Fed. Deposit Ins. Corp.*, 986 F.2d 611, 613 (1st Cir. 1993). "[I]f a case loses its live-controversy character at any point in the proceedings, the mootness doctrine generally stops [the court] from pumping new life into the dispute." *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 8 (1st Cir. 2021).

Because the 2025 NOFO no longer exists, this Court may no longer "vacat[e]" the 2025 NOFO, "stay" the challenged conditions, or enjoin Defendants from implementing the 2025 NOFO. *See State of Washington v. HUD*, 25-cv-626, ECF No. 49 ("State Plaintiffs' Suppl. PI") at 2; *see also National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 5 at 3. And any separate request to enjoin the *withdrawal* of the 2025 NOFO cannot save Plaintiffs' mooted claims because their request for relief is premised on just such a result. Plaintiffs have received what they sought: nullification and withdrawal of the challenged 2025 NOFO. Any continued litigation regarding the substance of a NOFO that no longer exists would necessarily be speculative pending the issuance of a new NOFO.

To the extent the Court finds that Plaintiffs' claims about 2025 NOFO conditions are not moot, Plaintiffs cannot satisfy their burden to show any irreparable harm will result from those conditions, meaning that preliminary injunctive relief is not warranted. "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004). Alleged harm that might result from hypothetical funding conditions is exactly that: conjecture.

*Injunctive relief.* An injunction of the 2025 NOFO is unwarranted because this Courts "cannot enjoin what no longer exists." *Lowe v. Gagné-Holmes*, 126 F.4th 747, 755 (1st Cir. 2025) (quoting *Marciano v. Adams*, 2023 WL 3477119, at *1 (2d Cir. May 16, 2023)), *cert. denied*, 145 S. Ct. 2795 (2025); *New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 18 (1st Cir. 2002) ("[I]t would be pointless either to enjoin the enforcement of a regulation that is no longer in effect or to declare its constitutional status."). With the "offending" policy "wiped away, there is nothing harming" Plaintiffs and thus "nothing left" for a court to do "that would make a difference to [Plaintiffs'] legal interests." *Bos. Bit Labs*, 11 F.4th at 9.

Consistent with these principles, the First Circuit has confirmed that when a policy is amended or repealed after plaintiffs bring a lawsuit challenging the legality of that policy, "sheer 'power'" to "reinstitute" a challenged policy "is not a sufficient basis on which a court can conclude that a challenge remains live." *Id.* at 11 (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 934 F.3d 649, 661 (D.C. Cir. 2019)); *see Lowe*, 126 F.4th at 755 (holding disputes over vaccination mandates to be moot where they "no longer exist[]"); *Gulf of Me. Fisherman's All. v. Daley*, 292 F.3d 84, 88 (1st Cir. 2002) (noting that the "promulgation of new regulations and amendment of old regulations are among such intervening events as can moot a challenge to the regulation in its original form"); *D.H.L. Assocs., Inc. v. O'Gorman*, 199 F.3d 50, 54–55 (1st Cir. 1999) (finding a plaintiff's challenges to ordinances moot where (1) they had never been enforced against the plaintiff and (2) the ordinances no longer existed, and, indeed, had been "recast" for the "purpose of making it more likely to overcome constitutional challenge").

Because the 2025 NOFO "no longer exists and is 'no longer in controversy,'" Plaintiffs' "request for relief [with respect to the 2025 NOFO] 'is at this point neither immediate nor real.'" *Lowe*, 126 F.4th at 755 (quoting *Bos. Bit Labs*, 11 F.4th at 9). Indeed, Defendants have specifically

"withdrawn the 2025 NOFO in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." *State of Washington v. HUD*, 25-cv-626, ECF No. 41 at 1.

Moreover, neither the voluntary-cessation nor the capable-of-repetition-yet-evading-review exception to mootness applies.

*First*, the voluntary-cessation exception "exists to stop a scheming defendant from trying to 'immuniz[e] itself from suit indefinitely' by unilaterally changing 'its behavior long enough to secure a dismissal' and then backsliding when the judge is out of the picture." *Bos. Bit Labs*, 11 F.4th at 10 (quoting *Town of Portsmouth v. Lewis*, 813 F.3d 54, 59 (1st Cir. 2016)). It applies when a defendant ceases the challenged practice "in order to moot" the plaintiff's case and "there exists a reasonable expectation that the challenged conduct will be repeated." *Lowe*, 126 F.4th at 756 (citation omitted). But the exception typically requires evidence that the party asserting mootness would simply revert to their pre-litigation positions. *Illinois v. Fed. Emergency Mgmt. Agency*, --- F. Supp. 3d---, 2025 WL 2716277, at *6 (D.R.I. Sep. 24, 2025) (describing the voluntary-cessation doctrine as designed to prevent defendants from "manipulating a court's jurisdiction").[2] Here, HUD's rescission—which was done at least in part to "assess the issues raised by Plaintiffs in their suits," *State of Washington v. HUD*, 25-cv-626, ECF No. 41 at 1—was designed to consider and,

---

[2] The First Circuit has declined to "join the line of cases holding that when it is a government defendant which has altered the complained of regulatory scheme, the voluntary cessation doctrine has less application unless there is a clear declaration of intent to re-engage." *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 56 n.10 (1st Cir. 2013). But it "g[a]ve some weight" in its analysis "to the fact that the defendants are high-ranking federal officials, including a cabinet member, who have, as a matter of policy, abandoned the prior practice" and adopted a lawful replacement. *Id.* at 56. And that fact weighed in favor of finding that there was no "reasonable expectation of recurrence" where the defendant agency had altered terms for awarding funds and established three-year timelines for those terms. *Id.* The First Circuit aligns, then, with other courts in its recognition that the application of the voluntary-cessation doctrine "can be triggered only when there is a reasonable expectation that the challenged conduct will be repeated following dismissal of the case." *Id.*

as appropriate, respond to the concerns Plaintiffs had raised in their briefing. Moreover, because the typical remedy in an APA case is remand, *see* 5 U.S.C. § 706, Defendants' actions merely accelerated any appropriate remedy. And courts have held that the correction of potential legal errors in response to litigation should "weigh[] in favor of a finding of mootness," not against it. *Am. Diabetes Ass'n v. U.S. Dep't of Army*, 938 F.3d 1147, 1153 (9th Cir. 2019); *see also LaRoque v. Holder*, 679 F.3d 905, 908 (D.C. Cir. 2012) (holding that where the Attorney General withdraws a Voting Rights Act objection in response to "changes in law or facts" a lawsuit based on that objection is moot); *Save Greers Ferry Lake, Inc. v. Dep't of Def.*, 255 F.3d 498, 501 (8th Cir. 2001) (holding that where a district court's preliminary injunction "clearly had the salutary effect of prompting" the Marine Corps to "reevaluate" and withdraw its policy, the injunction was moot with respect to the withdrawn policy).[3]

*Second*, the capable-of-repetition-yet-evading-review exception applies "only if '(1) the challenged action [is] in its duration too short to be fully litigated [before] its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again." *Calvary Chapel of Bangor v. Mills*, 52 F.4th 40, 47 (1st Cir. 2022) (emphasis omitted) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). The exception "operates only in extraordinary situations." *Id.* Here, Plaintiffs' claims focus on the receipt of CoC funding—which typically follows months after any new NOFO has been issued—and therefore is "not among or closely analogous to the 'inherently transitory' claims that the Supreme Court has previously found to fit this exception." *Harris v. Univ. of Mass. Lowell*, 43

---

[3] To be clear, Defendants do not maintain that the forthcoming NOFO will not include any of the same (or similar) conditions that appeared in the withdrawn 2025 NOFO. But because the contours of the forthcoming NOFO are not yet clear, review is improper at this stage. And in any event, Plaintiffs will be able to challenge the new NOFO should they continue to have concerns.

F.4th 187, 194 (1st Cir. 2022) (describing such claims as "involving elections, pregnancies," and challenges to "temporary restraining orders").

**Declaratory relief.** Plaintiffs' request for declaratory relief cannot save their claims from mootness. Courts "are not in the business of pronouncing that past actions which have no demonstrable continuing effect were right or wrong." *Spencer v. Kemna*, 523 U.S. 1, 18 (1998). Such a pronouncement would take the form of a quintessentially advisory opinion without any possibility of judicial relief. And "it is quite clear that the oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." *Flast v. Cohen*, 392 U.S. 83, 96 (1968) (citation omitted). Plaintiffs' request for declaratory relief is necessarily moot because they cannot sustain a lawsuit based merely on a desire to validate their now-mooted allegations about the 2025 NOFO. *See California v. Texas*, 593 U.S. 659, 673 (2021) (holding that declaratory relief "cannot alone supply jurisdiction otherwise absent"); *ACLU of Mass.*, 705 F.3d at 53 (reversing a declaratory judgment "deeming past conduct illegal" as "merely advisory"); *Governor Wentworth Reg'l Sch. Dist. v. Hendrickson*, 201 F. App'x 7, 9 (1st Cir. 2006) (declining to reach a claim where the "collateral consequences" of the moot, disputed act "are too speculative to support a claim"). Without power to act on live claims, courts must dismiss those claims. *See Spencer*, 523 U.S. at 18.

**Irreparable harm.** Finally, even if the Court finds that Plaintiffs' challenges to the 2025 NOFO are not moot, Plaintiffs cannot show irreparable harm sufficient to justify preliminary relief because the harm Plaintiffs allege will result stems from conditions that no longer exist. "A plaintiff seeking a preliminary injunction must establish" that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20. To the extent that Plaintiffs might challenge some future iteration of the NOFO, the contours of Plaintiffs' claims might

become sufficiently clear once a new NOFO is issued. But, because the 2025 NOFO has no effect, there are no standards for this Court to determine how and when Plaintiffs may suffer *any* injury from the conditions in the NOFO (let alone sufficient irreparable harm to warrant a preliminary injunction).

An irreparable injury exists only when the alleged harm "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). At this stage of litigation, Plaintiffs must point to more than conjecture about how the challenged conditions might result in immediate and devastating harm. *See Charlesbank*, 370 F.3d at 162; *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 319 (D. Mass. 2025), *appeal filed sub nom. Ass'n of Am. Med. Colls. v. Nat'l Insts. of Health*, No. 25-1344 (1st Cir. Apr. 9, 2025). But currently there are *no* conditions in place. And Plaintiffs cannot speculate about which conditions might be reimposed with immediate irreparable harm absent preliminary relief. Any relief that Plaintiffs receive now will necessarily fail to reflect the contours of any future policy that Defendants might implement, meaning that *only* a "later-issued permanent injunction" can possibly provide adequate, non-speculative relief for Plaintiffs' claims. *Rio Grande*, 397 F.3d at 76. Plaintiffs' challenges to the now-withdrawn 2025 NOFO thus cannot support an irreparable-harm finding needed to justify a preliminary injunction.

To be clear, Defendants do not argue that the entirety of this litigation is moot. Nor do Defendants take the position that a challenge to a condition that *is* reimposed later would be moot. But because there are currently no conditions in place, and because the current record provides no clarity on what conditions any revised NOFO will contain, this Court should not enter injunctive relief at this time. Indeed, when a new NOFO issues, Plaintiffs will have ample opportunity to

challenge any new or reimposed conditions in that instrument. At that point, any alleged injury will no longer be speculative. But at this stage, Plaintiffs can *only* speculate. Injunctive relief is unwarranted.

> **B.    Plaintiffs are not likely to succeed on their failure-to-act claims under Section 706(1) of the APA.**

Under Section 706(1), which supplies the applicable APA standard of review, a court "shall . . . compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "[O]nly certain types of agency failures" to act are remediable under § 706(1) of the APA. *Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 20 (D.D.C. 2017) (Jackson, J.) (emphasis omitted) (analyzing an unreasonable-delay claim). "'In the context of a claim of unreasonable delay,' the Court must consider whether the agency's failure to respond is 'so egregious' as to warrant relief." *Ctr. for Sci. in the Pub. Int. v. U.S. FDA*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014) (quoting *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 79 (D.C. Cir. 1984) ("*TRAC*")). To prevail on an "unlawfully withheld claim," plaintiff must establish that the "agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64-65 (2004) ("*SUWA*"). A court cannot oversee "programmatic improvements" beyond such a specific and concrete action. *Id.* at 64 (citation omitted). Rather, Section 706(1) only applies to those activities that, if conducted, would themselves constitute final agency action under the APA. *See* 5 U.S.C. § 704.

The remedy for a Section 706(1) violation is akin to mandamus, which is a "drastic [remedy], to be invoked only in extraordinary circumstances." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (citation omitted). In granting any such remedy, the court "can compel the agency to act, but has no power to specify what the action must be." *SUWA*, 542 U.S. at 65.

15

As explained below, Plaintiffs are not likely to succeed on any claim that HUD has "unreasonably delayed" or "unlawfully withheld" the processing of 2025 CoC applications or the renewals of 2025 CoC contracts. At most, they can only establish that HUD failed to meet the statutory notice deadline to publish a timely 2025 NOFO pursuant to 42 U.S.C. § 11382(b). But the maximum relief this Court can provide with respect to any such Section 706(1) violation is to order HUD to issue a NOFO; it cannot order HUD to re-issue (let alone implement) the 2024 NOFO.

### i.  *Processing of 2025 CoC applications.*

Any claim that HUD has unreasonably delayed the "processing" of 2025 CoC renewals fails at the outset.[4] HUD's "processing" of CoC renewals is not a discrete "agency action," which is carefully prescribed to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13). A final agency action is the "*consummation* of the agency's decisionmaking process" *Bennett*, 520 U.S. at 178 (citation omitted). The "processing" of renewals, on the other hand, is—by its own terms—the "process" of an agency's decision making, not its consummation. *See Vill. of Bald Head Island v. U.S. Army Corps. of Eng'rs*, 714 F.3d 186, 193 (4th Cir. 2013) (explaining that agency action under the APA "does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract. Rather, the APA's definition of agency action focuses on an agency's *determination* of rights and obligations, . . . whether by rule, order, license, sanction, relief, or similar action." (internal citation omitted)).

---

[4] Although neither set of Plaintiffs explicitly argues that HUD has unreasonably delayed the processing of renewals, the NAEH Plaintiffs request that the Court order HUD to "process eligible grant renewals of FY 2025 funding under the FY24-25 NOFO." *National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 5 at 3.

Even if "processing" applications itself counted as final agency action (and it does not), Plaintiffs do not even identify a discrete statutory mandate that HUD "process" CoC applications by a particular date or in a particular manner.[5] Without more, Plaintiffs' generic request that the Court order HUD to begin "processing" CoC applications is not "a specific action that a court can competently compel and supervise." *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 20 (citing *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 891 (D.C. Cir. 2014)); *see also SUWA*, 542 U.S. at 66 ("General deficiencies in compliance . . . lack the specificity requisite for agency action."); *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019) (describing *SUWA*).

At bottom, an order that HUD begin "processing" 2025 CoC applications is akin to a "'general' order merely 'compelling compliance with broad statutory mandates'" that would improperly permit the "supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management." *Nat'l Treasury Emps. Union v. Vought*, 149 F.4th 762, 785 (D.C. Cir. 2025) (quoting *SUWA*, 542 U.S. at 66-67). Any such order is quintessentially the sort of judicial superintendence of "an agency's general mode of operations" that Section 706(1) does not allow. *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 27; *see also SUWA*, 542 U.S. at 66 (the agency-action requirement "protect[s] agencies from undue judicial interference with their lawful discretion").

### ii.    Renewals of 2025 CoC awards.

Any claim that HUD has unlawfully withheld or unreasonably delayed the "renewals" of Plaintiffs' 2025 CoC awards is also futile. "[T]he only agency action that can be compelled under

---

[5] As discussed later, Congress imposed only a deadline to *obligate* some portion of 2025 CoC funds (i.e. execute CoC contracts) by September 2027. *See infra* Argument.I.B.ii.b.

the APA is action legally *required*." *SUWA*, 542 U.S. at 63. And neither the 2024 NOFO nor the McKinney-Vento Act impose any legal requirement on HUD to renew Plaintiffs' 2024 contracts using 2025 CoC funds.

> a. The 2024 NOFO does not create a legally binding obligation to renew existing contracts.

Plaintiffs cannot rely on the 2024 NOFO to argue that 2025 renewals are "legally required." By its own terms, the 2024 NOFO only "reserve[d] the right" to award 2025 funds pursuant to the applications submitted in 2024; it did not make any binding guarantees to recipients with respect to 2025 CoC funds. *See* 2024 NOFO at 33 ("HUD *reserves the right* to award fiscal year 2025 funds based on this NOFO competition." (emphasis added)). So, the 2024 NOFO did not guarantee renewals (let alone "promise[]" renewals on a specific timeline). *See* State Plaintiffs' Suppl. PI at 2. Indeed, HUD expressly "reserve[ed] the right to modify th[e] [2024] NOFO or issue a supplemental FY 2025 CoC and YHDP NOFO if necessary (e.g., to accommodate a new CoC or YHDP priority or new funding source)." *See* 2024 NOFO at 4-5. To be sure, the 2024 NOFO explained that applicants need not submit a renewal application for 2025 funds, but even that statement was provisional: "Projects that are awarded FY 2024 funds *may be eligible* for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds." *Id.* at 4 (emphases added); *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171-72 (2016) (explaining that "the word 'may' . . . implies discretion").

Besides, a NOFO, as evident by its title, is a mere *Notice* Of Funding *Opportunity*. Any such notice is far from the type of "binding agreement between an agency and another person" that is needed to create "an obligation of the United States Government." *See* 31 U.S.C. § 1501(a)(1).

Indeed, making any such binding agreement would have violated the Anti-Deficiency Act, which bars "contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B). When the 2024 NOFO was issued, no appropriations were made for 2025 CoC funds. And although the Consolidated Appropriations Act of 2024 authorized HUD to "issue a 2-year notification of funding opportunity," it did not grant HUD the authority to *obligate* funds in advance of an appropriation. *See* Pub. L. No. 118-42, § 242, 138 Stat. at 386 ("For fiscal years 2024 and 2025, the Secretary may issue a 2-year notification of funding opportunity, including any alternative procedures or requirements as may be necessary to allocate *future* appropriations in the second year . . . ." (emphasis added)).

To trigger the "authorized by law" exception to the Anti-Deficiency Act, "a contract authorized by law requires not only authority to enter into a contract, but authority to do so without regard to the availability of appropriations. While the former may be inherent, the latter must be conferred by statute." GAO-06-382SP, *Principles of Federal Appropriations Law*, 3rd ed., vol II, at 6-88 (Feb. 2006), https://www.gao.gov/assets/gao-06-382sp.pdf. Because no such explicit authorization appeared in the Consolidated Appropriations Act of 2024, any obligation of 2025 CoC funds in the 2024 NOFO would have violated the Anti-Deficiency Act. This Court should refrain from any interpretation of the 2024 NOFO that assumes it was issued in violation of the Anti-Deficiency Act. *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) (referring to the "presumption of regularity" that "attaches to the actions of Government agencies").

At bottom, the 2024 NOFO merely "announce[d] . . . [HUD]'s tentative intentions for the future," and thus did not create a "binding norm" requiring that HUD issue 2025 renewals pursuant to its terms. *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974); *see also Planned Parenthood of Wis., Inc. v. Azar*, 316 F. Supp. 3d 291, 300 (D.D.C. 2018)

(concluding that a notice of funding opportunity that set out intermediate criteria by which applications would be evaluated announced only how "an agency decision will be made," and the "intermediate criteria by which applications will be evaluated" was not reviewable final agency action (emphasis omitted)), *vacated as moot*, 942 F.3d 512 (D.C. Cir. 2019).

    b.  <u>The Renewal Provision does not create a legally binding obligation to renew.</u>

Any attempt to rely on 42 U.S.C. § 11386c (the "Renewal Provision") to argue that Congress mandated 2025 CoC contract renewals is also futile. *See State of Washington v. HUD*, 25-cv-626, ECF No. 11 ("State Plaintiffs' PI") at 5 (arguing that the Renewal Provision "directs HUD to renew existing contracts"). Subsection (b) of this provision provides that "[t]he sums made available under subsection (a) shall be available for the renewal of contracts in the case of tenant-based assistance, successive 1-year terms, and in the case of project-based assistance, successive terms of up to 15 years at the discretion of the applicant or project sponsor." *Id.* § 11386c(b). According to the State Plaintiffs, this provision demands that renewal funds "shall be available . . . at the discretion of the applicant or project sponsor.'" *See* State Plaintiffs' PI at 29 (quoting 42 U.S.C. § 11386c(b)). As explained below, the State Plaintiffs misread the text of Subsection (b) while also completely ignoring Subsection (c), which makes explicit that the Secretary—not the recipient—has ultimate discretion to renew contracts. *See* 42 U.S.C. § 11386c(c) ("Nothing in this section shall be construed as prohibiting the Secretary from renewing contracts under this part in accordance with criteria set forth in a provision of this part other than this section.").

To begin with, the State Plaintiffs' reading is premised on a splintered version of Section 11386c(b), which, in its uninterrupted form, provides: "The sums made available under subsection (a) shall be available for the renewal of contracts in the case of tenant-based assistance,

successive 1-year terms, and in the case of project-based assistance, *successive terms of up to 15 years* at the discretion of the applicant or project sponsor." *Id.* § 11386c(b) (emphasis added).

Read in full, it becomes clear that the only "discretion" provided to recipients of "project-based assistance" contracts is the *length* of the renewal (i.e. "up to 15 years"), not *whether* their contract is renewed in the first place. This reading is consistent with the last-antecedent rule, which makes clear that the phrase "discretion of the applicant or project sponsor" modifies the phrase that immediately precedes it—i.e. "successive terms of up to 15 years." *Id.*; *see also Lockhart v. United States*, 577 U.S. 347, 351 (2016) ("[A] limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." (citation omitted)). Notably, the phrase "at the discretion of the applicant or project sponsor" does not appear in the first half of the provision, which pertains to "tenant-based assistance" contracts. That omission makes sense because the length of those renewals is prefixed—i.e. 1-year terms. 42 U.S.C. § 11386c(b). But because the length of project-based assistance contracts is not pre-fixed—i.e. "*up to* 15 years"—Congress included the relevant qualifier to make clear that the length of the latter type of renewals is at the discretion of the recipient. *Id.* (emphasis added). The State Plaintiffs' attempt to read this qualifier as "direct[ing] HUD to renew existing projects," *see* State Plaintiffs' PI at 5, stretches the qualifier far beyond its reach.

Moreover, to the extent that Plaintiffs argue that Congress mandated renewals at their discretion by providing that funds "*shall* be available for renewal," *see, e.g.*, State Plaintiffs' PI at 24 (emphasis added) (quoting 42 U.S.C. § 11386c(b)), that argument also falters. This language merely requires that funds be made "available" for renewal. The availability of funds for renewals does not *entitle* project sponsors to the funds by operation of law—it only assures that some funds are available for renewals at the option of the Secretary.

21

Besides, Subsection (b) itself makes abundantly clear that the Secretary has ultimate say over "whether to renew a contract":

> The Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that (1) there is a demonstrated need for the project; and (2) the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary.

42 U.S.C. § 11386c(b). And contrary to the NAEH Plaintiffs' characterization, *see National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 5-1 at 44 ("NAEH Plaintiffs' PI"), the Secretary's renewal determination is not limited to these two factors. Subsection (c) of the Renewal Provision provides: "Nothing in this section shall be construed as prohibiting the Secretary from renewing contracts under this part in accordance with criteria set forth in a provision of this part other than this section." *Id.* § 11386c(c). The referenced "criteria" are identified in Section 11386a: "The Secretary shall award funds to recipients through a national competition between geographic areas based on criteria established by the Secretary." *Id.* § 11386a(a); *see also Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007) (explaining that the consistent-usage canon assumes that Congress uses the same word in different parts of the statute to mean the same thing). Importantly, these "criteria" include "such other factors *as the Secretary determines to be appropriate* to carry out this part in an effective and efficient manner." 42 U.S.C. § 11386a(b)(1)(G) (emphasis added).

In short—far from mandating renewals at the recipients' discretion—Congress gave the Secretary the discretion to authorize renewals "in accordance with criteria," *id.* § 11386c(c), which are, in turn, "established by the Secretary" himself, *id.* § 11386a(a). Plaintiffs' myopic reading of Subsection (b) (which merely reserves some funds for renewals) does not defeat the remainder of Subsection (b) or Subsection (c)'s specific commitment of renewal discretion to the Secretary.

This is especially true given the fact that Subsection (c) is a rule of construction that explicitly thumbs the scale in favor of the Secretary's discretion to renew contracts (and against any interpretation of Subsection (b) to the contrary). *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 696 (2014) (following Congress' "mandated . . . constru[ction] in favor of a broad protection of religious exercise" (citation omitted)).

Notably, Plaintiffs' unduly restrictive interpretation of Subsection (b) is also inconsistent with the nature of CoC awards as *competitive* grants. Section 11382(a) provides that "[t]he Secretary shall award grants[] . . . on a competitive basis." 42 U.S.C. § 11382(a). Similarly, Section 11386a(a) provides that "[t]he Secretary shall award funds to recipients through a national competition." *Id.* § 11386a(a). If, as Plaintiffs maintain, over 85% of the CoC funds must be allotted to renewals at the recipients' discretion, then all-but 15% of CoC funds are not subject to any competition at all. This tension between Plaintiffs' reading and Congress' mandate that CoC awards be granted on a competitive basis further undermines any claim that the Renewal Provision mandates renewals. *See Lawson v. FMR LLC*, 571 U.S. 429, 435 (2014) (interpreting the relevant provision in a manner that is consistent with the assumptions embedded in other provisions of the same statute). To be sure, HUD has historically spent a majority of its CoC funds on renewals. But HUD's historical exercise of discretion does not become "legally required" over time.

Because "renewals" are not "legally required," Plaintiffs cannot sustain a Section 706(1) claim in an effort to compel renewals. *See Da Costa v. Immigr. Inv. Program Off.*, 80 F.4th 330, 340 (D.C. Cir. 2023) (explaining that "[t]o state a claim for unreasonable delay," a plaintiff "must first allege that the agency failed to take a discrete agency action that it is required to take" (citation omitted)), *denying reh'g en banc*, 2023 WL 6466438 (D.C. Cir. Oct. 3, 2023).

23

But regardless, even if this Court determines that HUD is required to renew some CoC contracts pursuant to the Renewal Provision—which it is not—Plaintiffs cannot establish that HUD has "unreasonably delayed" such renewals. Courts in the First Circuit analyze an unreasonably delayed claim under the *TRAC* factors:

> (1) the time agencies take to make decisions must be governed by a "rule of reason,"
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason,
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake[,]
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority,
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay, and
> (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed"

*TRAC*, 750 F.2d at 80 (citations omitted); *see also Towns of Wellesley, Concord & Norwood v. Fed. Energy Regul. Comm'n*, 829 F.2d 275, 277 (1st Cir. 1987) (applying five of the six *TRAC* factors articulated by the D.C. Circuit); *Kokajko v. Fed. Energy Regul. Comm'n*, 837 F.2d 524, 526 (1st Cir. 1988) (recognizing and applying the sixth *TRAC* factor: how a statutory scheme governing speed of review might inform whether any delay is unreasonable).[6]

The first factor (the time agencies take to make decisions) and second factor (a statutory timetable) are typically considered together and ask whether the agency's timeline conforms to a

---

[6] Because Congress did not impose a "renewal" deadline for 2025 CoC funds, Plaintiffs have no basis to argue that HUD has "unlawfully withheld" the renewals of CoC funds. *See Am. Acad. of Pediatrics v. U.S. FDA*, 330 F. Supp. 3d 657, 663 (D. Mass. 2018) ("[I]f an agency has no concrete deadline establishing a date by which it must act, and instead is governed only by general timing provisions – such as the APA's general admonition that agencies could conclude matters presented to them 'within a reasonable time' . . . – a court must compel only action that is delayed unreasonably." (quoting *Forest Guardians v. Babbitt*, 174 F.3d 1178, 1190 (10th Cir. 1999))).

"rule of reason," a flexible assessment that takes into account the context of the agency's action. *TRAC*, 750 F.2d at 80. The court must consider the circumstances of the agency action at issue— not just compare the alleged delay with an idealized timeframe. *See id.*

Here, instead of imposing a deadline to "renew" 2025 CoC awards, Congress only imposed a partial "obligation" deadline on HUD: The majority of the 2025 CoC funds must be obligated by September 2027, *see* Pub. L. No. 119-4, § 1103, 139 Stat. at 12, while the remaining funds have no obligation date at all, *see* Pub. L. No. 116-94, § 231(a), 133 Stat. at 3008. In other words, HUD's statutory obligation to issue any 2025 CoC renewals is only limited by its obligation to obligate the majority of the funds (i.e. execute contracts) by September 2027. The forthcoming months will provide HUD with sufficient time to process applications, make awards (including renewals), and execute contracts well before the obligation deadlines. *See State of Washington v. HUD*, 25-cv-626, ECF No. 13-16 ¶ 9 (explaining that it typically takes less than a year from the issuance of a new NOFO to execution of contracts).

The remaining *TRAC* factors also weigh against finding any unreasonable delay. The fourth factor considers how compelling agency action would affect "agency activities of a higher or competing priority." *TRAC*, 750 F.2d at 80; *see also Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100-02 (D.C. Cir. 2003) (district court erred by disregarding the importance of "competing priorities" for limited resources in finding a five-year delay in agency action constituted unreasonable delay). And "[t]he agency is in a unique—and authoritative— position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way." *In re Barr Lab'ys.*, 930 F.2d 72, 76 (D.C. Cir. 1991). Here, HUD itself has explained that it "intends to make appropriate revisions to the NOFO and publish a new NOFO and is working diligently toward that end." Exhibit A.

*TRAC* factors three and five, both of which consider the nature of the interests implicated by any agency delay, overlap in this case. "The third looks to whether human health and welfare are at stake," and "the fifth assesses the nature and extent of the interests prejudiced by delay." *Ctr. for Sci. in the Pub. Int.*, 74 F. Supp. 3d at 304 (citation omitted). To the extent that Plaintiffs allege "financial harms" to their projects or "uncertainty" as a result of any delay, those alleged harms "are insufficient to tip *TRAC* factors three and five in [their] favor." *Da Costa*, 80 F.4th at 345.

To be sure, Plaintiffs also invoke the health and general welfare of the populations they serve. *See, e.g.*, State Plaintiffs' PI at 37. But, as Plaintiffs also admit, even in prior years, HUD generally did not even announce (let alone process) CoC awards until "January or February." *State of Washington v. HUD*, 25-cv-626, ECF No. 13-16 ¶ 9; *see also id.* at 13-3 ¶ 13 (explaining that HUD notified NYC CoC projects of last year's awards on January 17, 2025, and that the "process was similar to prior years"). Indeed, in a typical year, "[i]t [took] an additional several months for local HUD field offices to issue actual grant agreements and enable projects to draw down funds for services provided." *See id.* at 13-16 ¶ 9; *see also id.* at 13-4 ¶ 14 ("On March 20, 2025 and May 30, 2025, HUD provided NYC HPD with renewal agreements for the 40 renewed projects."). As such, "[p]rojects funded under the CoC competition that have grant expiration dates in the first half of the calendar year routinely receive[d] award notices and grant agreements after their awards ha[d] already expired and they [were] operating projects unfunded." *See id.* at 13-16 ¶ 9.

In light of the standard timeline in prior years, any alleged forthcoming delay in awarding 2025 CoC renewals would only likely delay the process by several *months*. *See id.* (reflecting the fact that it typically takes less than a year from the issuance of a new NOFO to execution of contracts); *see also* Exhibit A (explaining that HUD is "working diligently" to issue a new NOFO).

Such months-long delay—even if it involves health and welfare—does not warrant the extraordinary remedy of mandamus. *See Am. Acad. of Pediatrics*, 330 F. Supp. 3d at 664 (collecting cases and observing that "[g]enerally, '[t]he cases in which courts have afforded relief have involved delays of years'" (quoting *Wellesley, Concord, & Norwood*, 829 F.2d at 277)).

Finally, factor six examines whether the agency has acted in good faith. *See TRAC*, 750 F.2d at 80. This factor also weighs against granting relief. As explained in further detail below, HUD has publicly communicated its intention to issue a new NOFO for months. *See infra* Argument.I.C.i. In doing so, HUD put the public on notice—as far back as July 3, 2025—that 2025 CoC awards will require new "application[s]" that will need to address new Administration priorities. *See National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 6-3 ("HUD July 3, 2025 Email") at 1. Moreover, as HUD has explained in this litigation, it withdrew the 2025 NOFO "in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." *State of Washington v. HUD*, 25-cv-626, ECF No. 41 at 1. And it has recently announced that it is "working diligently" to issue a new NOFO. Exhibit A. In short, HUD has been clear about its intention to revise and replace the 2024 NOFO; has followed through on that intention; and when Plaintiffs identified issues with the 2025 NOFO, rather than simply ignoring those issues, HUD chose to assess and issue a new NOFO. Far from acting in bad faith, HUD has been transparent about its intention to issue 2025 CoC funds pursuant to a new NOFO.

But regardless, even if this Court determines that (1) the Renewal Provision mandates renewals and (2) HUD "unreasonably delayed" its renewal obligations, the maximum relief it could provide is to order HUD to begin renewals consistent with the Renewal Provision. The Court cannot—as Plaintiffs request—order that HUD issue renewals *pursuant to the 2024 NOFO* (let alone order HUD to renew *Plaintiffs'* contracts). That is because the Court may only compel HUD

to take whatever legally required action was unreasonably delayed, i.e. issuance of renewals. But a mandate that HUD issue renewals pursuant to the 2024 NOFO exceeds the Court's authority by purporting to dictate the specifics of *how* HUD must carry out any statutory mandate under the Renewal Provision to renew 2025 CoC contract. *SUWA*, 542 U.S. at 65.

Notably, this past July, another district court found that HUD's delay in awarding certain other grants was unreasonable, but it rejected plaintiffs' request to, among other things, order "HUD to move forward with the FY2024 NOFOs instead of posting new ones," and instead "order[ed] only that HUD comply with its statutory obligations under the Fair Housing Act." *Nat'l Fair Hous. All. v. U.S. Dep't of Hous. & Urb. Dev*., 2025 WL 2105567, at *13 (D.D.C. July 28, 2025). Similarly, here, to the extent that the Court finds any "unreasonable delay" in HUD's compliance with the Renewal Provision, it should only order that HUD issue renewals pursuant to the Renewal Provision. *See Am. Ass'n of Retired Pers. v. EEOC,* 823 F.2d 600, 605 (D.C. Cir. 1987) ("Section 706(1) does not provide a court with a license to substitute its discretion for that of an agency merely because the agency is charged with having unreasonably withheld action.").

Moreover, this Court should refrain from mandating any specific timetable for HUD's compliance with the Renewal Provision. Where, as here, "Congress deemed it unwise to impose a rigid timetable on [an agency]; [courts] are not free to ignore that judgment and rewrite the statute to include a specific timetable." *See In re Am. Fed'n of Gov't Emps.*, 837 F.2d 503, 506 (D.C. Cir. 1988). Prescribing a timeline with respect to 2025 CoC renewals is particularly unwarranted given the fact that the most relevant obligation deadline is September 2027—more than twenty months from now. *See Nat'l Fair Hous. All.*, 2025 WL 2105567, at *13 (refusing to prescribe a timetable even though the date of obligation was in September 2025—merely two months away).

   *iii.   Notice of funding availability.*

At most, Plaintiffs can show that HUD did not issue a 2025 NOFO within three months of the March 15, 2025 appropriation as directed by Congress. *See* 42 U.S.C. § 11382(b) ("The Secretary shall release a notification of funding availability for grants awarded under this part for a fiscal year not later than 3 months after the date of [appropriations]."). But a finding that an agency has missed a particular deadline "does not, alone, justify judicial intervention." *In re Barr Lab'ys, Inc.*, 930 F.2d at 75. Even if the Court finds that "[HUD]'s sluggishness has violated a statutory mandate," "[e]quitable relief . . . does not necessarily follow a finding of a violation: respect for the autonomy and comparative institutional advantage of the executive branch has traditionally made courts slow to assume command over an agency's choice of priorities." *Id.* at 74.

Here, any judicial enforcement of the notice deadline is unwarranted for two reasons. *First*, the three-month deadline is best understood as a mere directional guide from Congress. Indeed, HUD routinely issues a NOFO past the three-months deadline (and issuance delays have stretched as long as nine months after enactment of appropriations).[7] Given the fact that HUD has

---

[7] 2024 NOFO (issued on July 31, 2024—four months and three weeks after the enactment of appropriations on March 9, 2024, Pub. L. No. 118-42, 138 Stat. at 386); Fiscal Year 2023 CoC NOFO, FR-6700-N-25 (issued on July 5, 2023—six months after the enactment of appropriations on December 5, 2022, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 5158 (2022)); Fiscal Year 2022 CoC NOFO, FR-6600-N-25 (issued on August 1, 2022—four months and two weeks after the enactment of appropriations on March 15, 2022, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 743); Fiscal Year 2021 CoC NOFO, FR-6500-N-25 (issued on August 18, 2021—seven months and three weeks after the enactment of appropriations on December 27, 2020, Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1882 (2020)); Fiscal Year 2019 CoC NOFO, FR-6300-N-25 (issued on July 3, 2019—four months and two weeks after the enactment of appropriations on February 15, 2019, Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 446); Fiscal Year 2016 NOFO, FR-6000-N-25 (issued on August 15, 2016—eight months after enactment of appropriations on December 18, 2015, Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2879 (2015)); Fiscal Year 2015 NOFO, FR-5900-N-25 (issued on September 17, 2015—nine months after enactment of appropriations on December 16, 2014, Consolidated

historically missed the notice deadline by several months, Plaintiffs cannot establish that HUD's failure to meet the deadline this year "is so egregious as to warrant [relief]." *TRAC*, 750 F.2d at 72. *Second*, relief is unwarranted because HUD is currently "working diligently" to issue a new NOFO. *See* Exhibit A. HUD's intention to "provide[] relief in the foreseeable future . . . weighs against the issuance of [relief]." *Liberty Fund, Inc. v. Chao*, 394 F. Supp. 2d 105, 116 (D.D.C. 2005).

But even if this Court determines that mandamus relief is warranted with respect to Section 11382(b)'s notice obligation, the maximum relief it could provide is to order HUD to issue a NOFO. As the Supreme Court has explained, when "an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *See SUWA*, 542 U.S. at 65. Because the only agency action that may be compelled is the action that was allegedly unlawfully withheld, at most, this Court may only order HUD to issue *a* NOFO; it cannot order HUD to re-issue the *2024 NOFO* because doing so would be an improper attempt to specify the "manner" in which HUD must carry out its statutory duty under Section 11382(b). *Id.*

### C.    Plaintiffs are not likely to succeed on their Section 706(2) claims.

Plaintiffs cannot succeed on any challenge to HUD's rescission of the 2024 NOFO under Section 706(2) of the APA, which provides that a reviewing court "shall . . . hold unlawful and set aside agency action" that is "found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

---

and Further Continuing Appropriations Act, 2015, Pub. L. No. 113-235, 128 Stat. 2130, 2740 (2014)).

First, Plaintiffs cannot show that the rescission was a final agency action as required by Section 704 of the APA. *See id.* § 704. Second, Plaintiffs cannot show that they have standing to challenge the rescission. Third, HUD's decision to abandon the Biden-era 2024 NOFO was a policy-driven decision that was committed to HUD's discretion by law and therefore unreviewable under the APA. *See id.* § 701(a)(2). Fourth, even if the rescission was a final agency action that was not committed to HUD's discretion by law, the rescission would still survive Section 706(2) scrutiny because it was neither contrary to law nor arbitrary and capricious. *See id.* § 706(2)(A).

### i.    *Plaintiffs fail to identify a final agency action.*

The APA allows review of "final agency action for which there is no other adequate remedy in a court." *See id.* § 704. Plaintiffs "must direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990). Agency action is final if it satisfies both *Bennett* prongs: It (1) marks "the 'consummation' of the agency's decisionmaking process," *and* (2) determines "rights or obligations" or carries "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted). Importantly, the agency action must also be "circumscribed" and "discrete." *SUWA*, 542 U.S. at 62.

At this juncture, there is no "discrete" final agency action for this Court's review. Because the 2025 NOFO has been withdrawn, it cannot serve as the relevant final agency action. *See* NAEH Plaintiffs' PI at 36 n.4 (asserting that the final agency action is "[t]he [2025] NOFO's rescission of the [2024] NOFO and replacement with new and drastically different criteria and conditions"); *See* State Plaintiffs' PI at 25 (identifying the "Challenged Conditions" in the 2025 NOFO as the relevant "final agency action").

To be sure, HUD maintains that it intends to award 2025 CoC funds pursuant to a new NOFO. But any attempt to challenge HUD's *forthcoming* NOFO is a nonstarter for a simple

reason: The NOFO has not yet been issued. In other words, HUD has yet to "act," let alone act in a way that marks the "consummation of the agency's decisionmaking process." At most, HUD has expressed "a nonbinding statement of something [it] intends to do in the future." *Vought*, 149 F.4th at 779. Plaintiffs cannot challenge such future agency plans with "no immediate effect . . . but instead must await further agency actions implementing it." *Id.*; *see also EPA v. Brown*, 431 U.S. 99, 104 (1977) ("For [courts] to review [agency actions] not yet promulgated, the final form of which has only been hinted at, would be wholly novel."); *Fla. Med. Ass'n v. Dep't of Health, Educ., & Welfare*, 947 F. Supp. 2d 1325, 1354 (M.D. Fla. 2013) ("[W]hile the APA authorizes a court to enjoin a specific final agency decision it finds arbitrary, capricious or contrary to law, the APA does not afford a vehicle for enjoining possible future agency actions."); *Watson v. Chessman*, 362 F. Supp. 2d 1190, 1196 (S.D. Cal. 2005) (holding that "the APA has no relation to this case" when the plaintiff sought prospective injunctive and declaratory relief and "the alleged 'agency action' . . . ha[d] not yet happened").

To the extent that Plaintiffs maintain that the operative "final agency action" is HUD's "rescission" of the 2024 NOFO, that argument is also futile. To begin with, no single "discrete" action by HUD rendered the 2024 NOFO inoperative; rather, HUD abandoned the 2024 NOFO through a *series* of events that began over ten months ago. HUD first closed the 2024 NOFO from the grants.gov website on January 23, 2025. Grants.gov, *Opportunity Listing - FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants*, https://simpler.grants.gov/opportunity/12dd8119-e867-458d-afdb-c8d808a7c513 (last accessed Dec. 15, 2025. This closing prevented applicants from accessing the official version of the NOFO on grants.gov. Then, on July 3, 2025, through an email sent to the CoC listserv, HUD made clear that it "intends to publish a NOFO for 2025 [CoC]

awards," and that CoCs are "invite[d] . . . to prepare for an application focused on treatment and recovery, reducing unsheltered homelessness, reducing returns to homelessness, and increasing the earned income of participants." HUD July 3, 2025 Email at 1. The announcement further stated that "[HUD] recognize[s] this is a new application process for 2025 funding and [is] committed to providing CoCs the resources needed to serve their communities." *Id.* Indeed, on August 29, 2025—the due date for a subset of 2025 applications under the 2024 NOFO—the application remained closed on grants.gov. Grants.gov, *Funding Opportunity Number FR-6800-N-25*, https://www.grants.gov/search-results-detail/355762 (last accessed Dec. 15, 2025).

So, by the time HUD issued its now-withdrawn 2025 NOFO in November, the 2024 NOFO was a functional nullity. And when HUD withdrew the 2025 NOFO on December 8, it—yet again—merely expressed its intention to award 2025 CoC funds pursuant to a new NOFO. *See State of Washington v. HUD*, 25-cv-626, ECF No. 41-2 ("The Department still intends to . . . make changes to the previously issued CoC NOFO to account for new priorities."). HUD reiterated this intention with another email to the CoC listserv on December 12, 2025, stating, in part: "On Monday, December 8th, [HUD] withdrew the [2025 NOFO]. HUD intends to make appropriate revisions to the NOFO and publish a new NOFO and is working diligently toward that end." Exhibit A.

In sum, there was no "circumscribed" or "discrete" action that rendered the 2024 NOFO inoperative. To be sure, Plaintiffs take issue with the above series of events, but the APA does not provide an avenue for "generalized complaints about agency behavior," *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) (citation omitted), nor does it permit Plaintiffs to "seek wholesale improvement" of agency process "by court decree," *Lujan*, 497 U.S. at 891 (emphasis omitted).

But even if HUD's decision to abandon the 2024 NOFO was a "discrete" agency action that marked the "consummation" of HUD's decision-making process, it would still fail *Bennett*'s second prong because it does not carry any legal consequences. *See Bennett*, 520 U.S. at 178. After all—at least with respect to 2025 CoC funds—legal consequences did not flow from the 2024 NOFO (let alone its rescission).

As explained earlier, the 2024 NOFO did not create any legally binding guarantee of renewals using 2025 CoC funds. *See supra* Argument.I.B.ii. By its own terms, the 2024 NOFO only "reserve[d] the right" to award 2025 funds pursuant to the 2024 applications. *See* 2024 NOFO at 4. Nor did it provide a binding guarantee to recipients that they need not re-apply for 2025 funds. It merely provided that "Projects that are awarded FY 2024 funds *may be eligible* for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds," *id.* (emphases added), while "reserve[ing] the right" to modify requirements for 2025 awards, *id.* at 4-5. And on July 3, 2025, HUD announced that new "application[s]" will, indeed, be required for 2025 awards. *See* HUD July 3, 2025 Email at 1.

A NOFO with such provisional terms (at least with respect to 2025 awards) is a far cry from a final agency action that determines "right or obligations" or carries "legal consequences." *See Citizens Alert Regarding Env't v. EPA*, 102 F. App'x 167, 168 (D.C. Cir. 2004) (holding that until the agency "completes its review and reaches a decision [on the grant award], there has been no final agency action . . . and the matter is not ripe for judicial review"); *Am. Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1053 (D.C. Cir. 1987) (reasoning that an HHS request for proposals that "binds neither the agency nor the [parties] to whom it is sent" is not a final agency action); *Planned Parenthood of Wis.*, 316 F. Supp. 3d at 303 (explaining that the at-issue announcement regarding grant-application criteria was not a final agency action because it "was simply a solicitation of

offers, kicking off an application process that will result in legally binding contracts only after offers are accepted and grants are awarded"). Given the fact that the 2024 NOFO itself did not carry any legal consequences with respect to 2025 funds, its withdrawal could not do so either.

Lastly, Plaintiffs cannot latch onto the December 8 withdrawal of the 2025 NOFO as the relevant final agency action. While the State Plaintiffs allege that the withdrawal "compounds [their] harms," State Plaintiffs' Suppl. PI at 2, they do not seek any relief with respect to the withdrawal. The omission is unsurprising given the fact that the only appropriate relief with respect to the December 8 withdrawal is to stay it, which would *reinstate* the terms of the 2025 NOFO (leading to precisely the opposite result sought by Plaintiffs). *See State of Washington v. HUD*, 25-cv-626, ECF No. 48 at 56-57 ("State Plaintiffs' Am. Compl."). But regardless, because Plaintiffs do not seek to remedy the withdrawal, they cannot leverage it to launch scattershot criticisms of HUD's rollout of its forthcoming NOFO. Doing so is precisely the type of "generalized complaints about agency behavior" that is impermissible under the APA. *Cobell*, 455 F.3d at 307 (citation omitted).

### ii. *Plaintiffs lack standing to assert a Section 706(2) claim with respect to the recission of the 2024 NOFO.*

To establish standing, a plaintiff must show an "injury in fact," a causal connection between the injury and the defendant's conduct, and a likelihood that "the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61. As the party invoking federal jurisdiction, Plaintiffs "bear[] the burden of establishing these elements," and therefore "must clearly . . . allege facts demonstrating each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citations omitted). Importantly, "plaintiffs must demonstrate standing for each claim that they press." *Murthy v. Missouri*, 603 U.S. 43, 61 (2024). Plaintiffs fail to meet their burden with respect to their Section 706(2) claims.

Plaintiffs' asserted injury stems from the alleged "gaps in funding" (and its alleged downstream consequences) absent 2025 CoC renewals. *See* State Plaintiffs' Suppl. PI at 2; *See* NAEH Plaintiffs' PI at 63. In other words, Plaintiffs' alleged injuries are redressable by contract renewals. But, as explained in further detail below, this Court cannot mandate contract renewals to remedy a Section 706(2) violation. *See infra* Argument.III.A. That is because this Court lacks the authority "to order specific relief[,]" such as the award of a contract, to remedy a Section 706(2) violation. *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). "Unlike a district court managing a garden variety civil suit, a district court reviewing a final agency action does not perform its normal role but instead sits as an appellate tribunal." *Id.* (citations omitted).

At most, the Court could only stay the rescission of the 2024 NOFO. *See* 5 U.S.C. § 706(2) (explaining that a remedy for a violation of Section 706(2) is to "hold unlawful and set aside" such actions). But a stay of the 2024 NOFO recission would not lead to contract renewals for any recipients (let alone Plaintiffs). As explained above, the 2024 NOFO did not make any binding guarantees with respect to the 2025 CoC renewals. *See supra* Argument.I.B.ii.a. Indeed, it explicitly "reserve[ed] the right to modify th[e] [2024] NOFO" with respect to the 2025 CoC awards. *See* 2024 NOFO at 4-5.

Because a stay of the 2024 NOFO would not remedy Plaintiffs' alleged injuries, Plaintiffs are not likely to establish standing to assert a Section 706(2) claim with respect to the 2024 NOFO recission. *Murthy*, 603 U.S. at 73 (holding that plaintiffs lacked standing because the requested relief against the Government would not remedy their purported harms).

### iii. *Any rescission of the 2024 NOFO was committed to agency discretion by law.*

Even if the rescission of 2024 NOFO was a final agency action, it is unreviewable under the APA because it was an agency action "committed to agency discretion by law." 5 U.S.C.

§ 701(a)(2). HUD's decision to abandon the Biden-era 2024 NOFO fits neatly among those "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" *Lincoln v. Vigil*, 508 U.S. 182, 191–92 (1993) (quoting 5 U.S.C. § 701).

The 2024 NOFO plainly reflected the prior Administration's policy priorities. For instance, it required "[c]ompliance with equity requirements, including racial equity and underserved communities and LGBTQ+ requirements that apply in accordance with Executive Orders 13985, 13988, and 14091." 2024 NOFO at 117; *see also id.* at 9 ("In this NOFO, HUD is emphasizing system and program changes to address racial equity within CoCs and projects."). Notably, all three referenced Executive Orders have since been rescinded. *See* Exec. Order No. 14,148, *Initial Rescissions of Harmful Executive Orders and Actions*, 90 Fed. Reg. 8237 (Jan. 20, 2025). Indeed, the 2024 NOFO identified several "[s]trategic and [o]ther goals" that have been rejected by this Administration, including investing in "renewable energy across HUD programs" and "[s]trengthen[ing] [e]nvironmental [j]ustice." 2024 NOFO at 6-7.

Because the 2024 NOFO reflected the prior Administration's policy judgments, HUD's decision to depart from it was similarly a reflection of the new Administration's judgment regarding which projects "best fits the agency's overall policies" under new leadership and "whether agency resources are best spent on" current projects or whether they would be better spent differently. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). And there are no standards "against which to judge the agency's exercise of discretion" in choosing to abandon the prior Administration's housing priorities. *Id.* at 830. Accordingly, HUD's rescission of the 2024 NOFO was a policy-driven decision regarding how to "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Vigil*, 508 U.S. at 192; *see also id.* at 193 (explaining that an agency's "allocation of funds" to various programs and priorities "requires 'a complicated

balancing of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another" and "whether a particular program 'best fits the agency's overall policies'" (quoting *Heckler*, 470 U.S. at 831)).

Absent any legally binding directive to the contrary, an agency may exercise its unreviewable "capacity to adapt to changing circumstances." *Vigil*, 508 U.S. at 192. Here, as explained below, there is neither a statutory bar on HUD's ability to rescind the 2024 NOFO, *see infra* Argument.I.C.iii.a, nor a binding obligation to implement the 2024 NOFO for 2025 CoC awards, *see infra* Argument.III.B. To the extent that any statutory limitation exists with respect to HUD's ability to *implement* certain specific funding priorities, none create an *ipso facto* statutory bar on HUD's ability to *abandon* a prior administration's NOFO. As such, HUD's decision to transition away from the 2024 NOFO was a policy decision that was committed entirely to HUD's discretion and therefore unreviewable under Section 701(a)(2) of the APA. *See Vigil*, 508 U.S. at 193 (explaining that as long as the agency abides by its legal obligations, the APA "gives the courts no leave to intrude" via arbitrary-and-capricious review).[8]

### iv. *Plaintiffs are not likely to succeed on the substance of their Section 706(2) claims.*

Even if this Court determines that the rescission of the 2024 NOFO is a final agency action and that it was not committed to agency discretion by law, it should still reject Plaintiffs' Section 706(2) claims that the rescission was contrary to law or arbitrary and capricious.

### a.    Rescission of the 2024 NOFO was not contrary to law.

---

[8] To accept this argument, this Court need not conclude that the terms of a future NOFO would also be unreviewable under the APA. HUD's imposition of new NOFO terms is fundamentally different than the at-issue choice to merely reject the prior Administration's NOFO and accompanying policy priorities. The latter is a routine exercise of policy discretion that is fundamentally unreviewable.

When reviewing a contrary-to-law claim under Section 706(2), "courts must exercise independent judgment in determining the meaning of statutory provisions" and "set aside" any action that is "inconsistent with the law as they interpret it." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392, 394 (2024).

Plaintiffs argue that the rescission of the 2024 NOFO was contrary to 42 U.S.C. § 11382(b), which provides that "[t]he Secretary shall release a notification of funding availability for grants awarded under this part for a fiscal year not later than 3 months after the date of [appropriations]." 42 U.S.C. § 11382(b). Plaintiffs argue that because the relevant appropriations occurred on March 15, 2025, HUD was bound to issue a new NOFO by June 15, 2025. *See* NAEH Plaintiffs' PI at 37–38; State Plaintiffs' Suppl. PI at 1. According to Plaintiffs, because HUD failed to meet its June 15 deadline, it lost the ability to issue a new NOFO, and was therefore bound by the 2024 NOFO. *See* NAEH Plaintiffs' PI at 37–38; State Plaintiffs' Suppl. PI at 1. This argument fails for several reasons.

To begin with, Plaintiffs overstate the extent to which the 2024 NOFO was "in effect" on June 15. *See* State Plaintiffs' Am. Compl. ¶ 150. As explained above, the 2024 NOFO was a functional nullity as early as January 2025 when it was pulled down from grants.gov. *See supra* Argument.I.C.i. So, any assertion that the 2024 NOFO "remained in effect" on June 15, *see* State Plaintiffs' Am. Compl. ¶ 150, cannot withstand scrutiny.

But in any event, the Supreme Court has already rejected similar attempts by litigants to leverage procedural deadlines to prevent the Executive from taking delayed action. In *Brock v. Pierce County*, the Court examined a statute providing that the Secretary of Labor "shall" issue a determination within 120 days of receiving information concerning misuse of federal funds. 476 U.S. 253, 260 (1986). Plaintiff—much like Plaintiffs here—latched onto the word "shall" in the

operative provision to argue that the 120-day deadline was mandatory and the failure to comply with it barred the Secretary from taking any action after the deadline. The Court rejected this argument, explaining that it "would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action." *Id.* Although the Court acknowledged that the deadline was mandatory, it observed that it was ancillary to the statute's *substantive* mandate to the Secretary: The statute "does not merely command the Secretary to file a complaint within a specified time, but requires him to resolve the entire dispute within that time." *Id.* at 261. The latter requirement "is a more substantial task than filing a complaint, and the Secretary's ability to complete it within 120 days is subject to factors beyond his control." *Id.* Moreover, the Court refused to infer that Congress intended to bar the Secretary from taking action after the 120-day deadline in light of the fact that the statute's substantive mandate pertained to "public rights." *Id.* at 260.

The Supreme Court reiterated this line of reasoning in *United States v. Montalvo-Murillo*, 495 U.S. 711 (1990). There, the Court once again examined the Government's failure to satisfy a mandatory statutory deadline—this time, its obligation to provide a hearing within a certain time prior to seeking pretrial detention. Once again, the Court reasoned that "[a]lthough the duty [to meet the statutory deadline] is mandatory, the sanction for breach is not loss of all later powers to act." *Id.* at 718. This is true "even on the assumption that . . . the Government should bear some of the responsibility for [missing the deadline]." *Id.* at 721.

Similarly, here, the notice deadline in Section 11382(b) did not bar HUD from issuing a new NOFO after June 15. As was the case in *Brock*, the Secretary's obligation to issue a notice is plainly ancillary to his "more substantial task" of implementing the CoC program. *Brock*, 476 U.S.

40

at 261. This is especially true given the fact that the Secretary's substantive obligation with respect to the CoC program pertains to "public rights." *Id.*

Moreover, as was the case in *Montalvo-Murillo*, Plaintiffs' expansive reading of a mere procedural requirement "proves too much." 495 U.S. at 718. After all, HUD's CoC NOFOs are routinely delayed. *See supra* Argument.I.B.iii. Indeed, the 2024 NOFO itself was delayed: It was issued on July 31, 2024—four months and three weeks after the enactment of appropriations on March 9, 2024. *See* Pub. L. No. 118-42, 138 Stat. at 386. And yet, Plaintiffs do not argue that the previous Secretary lacked the authority to issue their preferred NOFO simply because he missed the deadline back in 2024. *See Montalvo-Murillo*, 495 U.S. at 719 (observing that "absolute compliance" with procedural rules would lead to unreasonable results to which plaintiffs themselves would object).

Ultimately, as the Court explained in *Montalvo-Murillo*, "[t]here is no presumption or general rule that for every duty imposed upon . . . the Government . . . there must exist some corollary punitive sanction for departures or omissions, even if negligent." *Id.* at 717. "[M]any statutory requisitions intended for the guide of officers in the conduct of business devolved upon them . . . do not limit their power or render its exercise in disregard of the requisitions ineffectual." *Id.* at 718 (citation omitted). The notice deadline in Section 11382(b) is such a requirement; it functions as a "guide" for HUD and imposes no sanctions for its violation. Plaintiffs' attempt to leverage this procedural requirement to bootstrap billions of dollars in CoC funds pursuant to their preferred NOFO is precisely the type of opportunistic interpretation of procedural requirements that the Supreme Court rejected in *Brock* and *Montalvo-Murillo.*

Lastly, even under Plaintiffs' unduly technical reading of Section 11382(b), HUD was not "locked into" the terms of the 2024 NOFO on June 15. That is because the 2024 NOFO *itself* did

not obligate HUD to its terms for purposes of 2025 CoC awards. As explained above, the 2024 NOFO explicitly "reserve[d] [HUD]'s right" to impose subsequent terms with respect to 2025 CoC awards. 2024 NOFO at 4-5. So, to the extent that the Court concludes that Section 11382(b)'s deadline bound HUD to the 2024 NOFO on June 15, HUD's subsequent decision to depart from it for purposes of 2025 CoC awards was anticipated by (and therefore consistent with) the 2024 NOFO.

> b. Neither the recission of the 2024 NOFO nor the withdrawal of the 2025 NOFO was arbitrary and capricious.

"The APA's arbitrary-and-capricious standard requires" only that an "agency action be reasonable," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'" (quoting *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009))). And "a court is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. Indeed, when agency policy changes, or when an agency rescinds a prior policy, that change need not "be justified by reasons more substantial than those required to adopt a policy in the first instance." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009).

Here, HUD's decision to rescind the 2024 NOFO was not arbitrary and capricious. As explained above, the 2024 NOFO incorporated the policy choices of the previous Administration. *See supra* Argument.I.C.ii. It is hardly unreasonable for a new Administration to abandon the policy priorities of the prior Administration. As the First Circuit has explained, "[t]o assess

reasonableness, we look to whether the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Am. Pub. Health Ass'n v. Nat'l Insts. of Health*, 145 F.4th 39, 53 (1st Cir. 2025) (quoting *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

HUD "need not demonstrate to a court's satisfaction that the reasons for [departing from the prior Administration's policies] are *better* than the reasons for [retaining them]." *Fox Television*, 556 U.S. at 515. After all, "[n]ew administrations are entitled to reevaluate and modify agency practices, even longstanding ones." *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 918 F.3d 151, 158 (D.C. Cir. 2019); *see also State Farm*, 463 U.S. at 42 ("[W]e fully recognize that regulatory agencies do not establish rules of conduct to last forever . . . and that an agency must be given ample latitude to adapt their rules and policies to the demands of changing circumstances." (citations omitted)); *Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 351 (1st Cir. 2004) ("An agency's rules, once adopted, are not frozen in place. The opposite is true: an agency may alter its rules in light of its accumulated experience in administering them.").

The 2024 NOFO implemented legal directives from since-rescinded Executive Orders that reflected policy priorities of the prior Administration. For instance, Executive Order 12,898 required each federal agency to "make achieving environmental justice part of its mission" by identifying "disproportionately high and adverse human health or environmental effects" of agency programs on "minority" and "low-income populations." *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations*, Exec. Order No. 12,898, § 1-101, 59 Fed. Reg. 7629 (Feb. 11, 1994). The 2024 NOFO implemented that directive,

noting that HUD "may consider environmental justice in evaluating applications." 2024 NOFO at 110. President Trump rescinded that requirement on January 21, 2025. *See* Exec. Order No. 14,173, § 3(i), 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025). Another example: President Biden issued Executive Order 14,091 on February 16, 2023, which required agencies to "support ongoing implementation of a comprehensive equity strategy" to "yield equitable outcomes for all Americans, including underserved communities." *Further Advancing Racial Equity and Support or Underserved Communities Through the Federal Government,* Exec. Order No. 14,091, § 3, 88 Fed. Reg. 10825, 10828 (Feb. 16, 2023). The 2024 NOFO also implemented that directive, noting that HUD would "emphasiz[e] rating factors regarding CoC evaluation of racial disparities as well as system and program changes to address racial equity within CoCs." 2024 NOFO at 37. President Trump rescinded that requirement on January 20, 2025. *See* Exec. Order No. 14,148, § 2(bbb), 90 Fed. Reg. at 8239. A new Administration's decision to rescind a NOFO premised on the prior Administration's policy directives (including rescinded executive orders) is among the type of actions that fall within the "zone of reasonableness" under the APA. *See Prometheus Radio*, 592 U.S. at 423; *see also Fox Television*, 556 U.S. at 514.

Nor do Plaintiffs' alleged reliance interests on the 2024 NOFO render its recission arbitrary and capricious. As already explained, contrary to Plaintiffs' assertion, the 2024 NOFO did not make any "promise[s]" to Plaintiffs regarding the timeline for 2025 awards. *See* State Plaintiffs' Suppl. PI at 2. Indeed, as far back as July 3, 2025, HUD made public announcements that recipients should prepare to file new "application[s]" for 2025 CoC awards. July 3, 2025 HUD email at 1. In the 2024 NOFO itself, HUD merely "reserve[d] the right to award available FY 2025 funds . . . based on th[e] [2024] NOFO competition," 2024 NOFO at 4, while putting recipients on notice that new NOFO conditions may be imposed for 2025 funds "to accommodate a new CoC or YHDP

priority or new funding source," *id.* at 4-5. There was simply no guarantee of future selection (or of a timeline for renewals) that would have created adequate reliance interests.

Courts have observed that similar disclaimers, limitations, and reservations are directly relevant when determining whether the reliance interest was justified in the first instance, and if so, how much weight the court should assign to them. *See e.g.*, *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 31 (2020) ("These disclaimers are surely pertinent in considering the strength of any reliance interests."). Plaintiffs' hopes to continue to receive awards (let alone, receive them on a particular timeline) do not negate the disclaimers and warnings embedded in the 2024 NOFO itself and HUD's public statements. As such, Plaintiffs' claimed reliance interests cannot make HUD's decision to shift the focus of its funding efforts arbitrary and capricious as a matter of law.

Even if this Court determines that the rescission of the 2024 NOFO violated Section 706(2) of the APA, it can, at most, stay the rescission. But it cannot—as Plaintiffs request—bar HUD from rescinding and replacing the 2024 NOFO with a new NOFO. That is because, as explained in further detail below, Section 706(2) only permits the court to vacate or stay the offending agency action; it does not permit the court to dictate agency's future conduct on remand. *See infra* Argument.III.A.

Lastly, Plaintiffs cannot sustain an arbitrary-and-capricious claim with respect to the December 8 withdrawal of the 2025 NOFO. After all, Plaintiffs themselves identified a number of issues with the 2025 NOFO in their briefing. While Defendants do not necessarily agree with all their concerns, it is reasonable for HUD to take action on its own to correct any errors and craft a new NOFO that is consistent with the law and reflective of the Administration's policy priorities. *See Citizens Awareness Network*, 391 F.3d at 352 ("It is enough that the agency reasonably

determines that existing processes are unsatisfactory and takes steps that are fairly targeted at improving the situation."). Indeed, vacating the 2025 NOFO was the primary relief Plaintiffs sought when they initially filed their suits. State Plaintiffs' Am. Compl. at 56–57; *National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 1 at 70.

### D.    THE IRREPARABLE-HARM PRONG DOES NOT FAVOR RELIEF.

"[I]rreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief," and "[t]he burden of demonstrating" irreparable harm "rests squarely upon the movant." *Charlesbank*, 370 F.3d at 162. Plaintiffs have failed to meet their burden.

Plaintiffs cannot rely on the alleged harms faced by the homeless populations they serve to satisfy this prong. *See, e.g.*, NAEH Plaintiffs' PI at 64 ("HUD's unnecessary delay in proceeding with the award of essential funds will push individuals and families at high risk of homelessness out of the homes they depend on."). That is because "injuries to third parties are not a basis to find irreparable harm." *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018). In *New Mexico v. Musk*, for instance, the court rejected a similar attempt by plaintiff states to seek injunctive relief against the termination of federal employees by relying on the alleged imminent harms to the employees residing in their states. 769 F. Supp. 3d 1 (D.D.C. 2025). The court explained that although "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large[,]" those do not amount "to imminent harm to *Plaintiff States* in particular." *Id*. at 6-7.

Plaintiffs' attempt to identify irreparable harm to themselves as a result of any forthcoming "gaps in funding" fares no better. *See* NAEH Plaintiffs' PI at 63; *see also* State Plaintiffs' Suppl. PI at 2 (same). As explained above, even in prior years, recipients did not receive CoC funds until their contracts were executed, which generally occurred in the spring. *See supra* Argument.I.B.ii.b.

So, at this juncture, Plaintiffs' request for emergency relief is functionally a demand that HUD move *more expeditiously* than it has in prior years to award their contracts. Preliminary injunctive relief is not an appropriate vehicle for expediting Plaintiffs' preferred outcome. *See Massachusetts*, 770 F. Supp. 3d at 319 (granting preliminary relief where "the risk of harm" was "*immediate*, devastating, and irreparable" (emphasis added)).

Lastly, Plaintiffs cannot sustain a request for preliminary relief in order to remedy any alleged "confusion," *see* State Plaintiffs' Suppl. PI at 2, caused by HUD's transition from the 2024 NOFO to the forthcoming NOFO. As the First Circuit has made clear, a preliminary injunction "should not issue merely to calm the imaginings of the movant." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).

## II. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST GRANTING RELIEF.

The balance of the equities and the public interest also tip in Defendants' favor. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (holding that "[t]hese factors merge when the Government is the opposing party"). Plaintiffs' requested injunction would effectively bar HUD from implementing its Congressional mandate to set housing policies and priorities. "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Dist. 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (invoking *King*).

## III. PLAINTIFFS' REQUESTED RELIEF IS IMPROPER EVEN IF THIS COURT FINDS A VIOLATION OF THE APA.

For the above reasons, Defendants maintain that Plaintiffs are not entitled to any preliminary injunctive relief. But even if this Court concludes otherwise, Plaintiffs are not entitled

to the relief they seek—i.e. an order barring HUD from issuing a new 2025 NOFO, *see* State Plaintiffs' Suppl. PI at 2, and a mandatory injunction requiring that HUD begin processing 2025 CoC contracts pursuant to the 2024 NOFO, *see National Alliance to End Homelessness v. HUD*, 25-cv-636, ECF No. 5 at 3.

Because the requested order would prescribe HUD's future conduct, it would amount to a mandatory injunction. *See Mass. Coal. of Citizens with Disabilities v. Civ. Def. Agency & Off. of Emergency Preparedness of Com. of Mass.*, 649 F.2d 71, 76 n.7 (1st Cir. 1981) ("Mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief."). Any such relief is improper with respect to Plaintiffs' Section 706(2) claims and exceeds the relief this Court may grant with respect to their Section 706(1) claims.

### A. Mandatory relief is not a proper remedy with respect to Plaintiffs' Section 706(2) claims.

A violation of Section 706(2) does not authorize the Court "to order specific relief" such as the award of a contract. *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005). The APA's remedies for violations of Section 706(2) is to "hold unlawful and set aside" such actions—i.e. vacate such actions. 5 U.S.C. § 706(2). "[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the correct legal standards." *Palisades Gen. Hosp*, 426 F.3d at 403 (citation omitted). At this preliminary stage, the limit of APA remedy is prescribed by Section 705, which provides that "the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to *preserve status or rights* pending conclusion of the review proceedings." 5 U.S.C. § 705 (emphasis added).

48

Importantly, once the Court stays the agency action that must be "set aside"—i.e. recission of the 2024 NOFO—it cannot dictate what the agency does on remand. *See Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 831 (2024) (Kavanaugh, J., concurring) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." (citation omitted)). In other words, even if the Court concludes that HUD's recission of the 2024 NOFO was flawed, it should refrain from ordering any injunction that purports to bar HUD from issuing *any* recission and replacement of the 2024 NOFO in the future. On this score, the Supreme Court's decision in *Monsanto Co. v. Geertson Seed Farms* is instructive. 561 U.S. 139 (2010). There, the district court concluded that the Animal and Plant Health Inspection Service (APHIS)'s decision to deregulate a variety of genetically engineered alfalfa violated the operative statute because APHIS did not first conduct an assessment of the deregulation's environmental consequences. *Id.* at 147. The district court then sought to remedy the violation by not only vacating the deregulation decision but also enjoining APHIS from deregulating (in whole or in part) the alfalfa variety in the future without completing an environmental review. *Id.* at 148. The Court reasoned the district court abused its discretion in granting remedies beyond the vacatur. *See id.* at 164-65. Similarly, here, any order that purports to enjoin HUD from rescinding the 2024 NOFO in the future with a revised 2025 NOFO would improperly prejudge the outcome on remand. *See id.* at 160 (noting that until an agency actually exercises its authority to "effect a partial deregulation, any judicial review of such a decision is premature").

**B.    Plaintiffs' requested relief exceeds the remedy this Court may grant with respect to Plaintiffs' Section 706(1) claims.**

While a Section 706(1) claim permits this Court to issue a mandatory injunction—i.e. compel agency action—Plaintiffs' requested relief goes beyond the *type* of action this Court may compel under the APA.

It is black-letter law that the court may only remedy a Section 706(1) violation through an order that compels the agency to *comply* with its legal obligation—not one that dictates *how* the agency must comply with its legal obligation. *See SUWA*, 542 U.S. at 65. As explained above, HUD's only relevant legal obligations are (1) to issue a notice of 2025 CoC funds under 42 U.S.C. § 11382(b) and (2) obligate 2025 CoC funds by September 2027 at the earliest. Even if the Court finds a Section 706(1) violation with respect to either obligation, the maximum relief it can provide is to compel HUD to issue a NOFO and comply with its obligation to award 2025 CoC awards by the obligation date. *See supra* Argument.I.B.

But Plaintiffs want much more. Specifically, the NAEH Plaintiffs request that the Court order Defendants "to process eligible grant renewals of FY 2025 funding under the FY24-25 NOFO"; "within four days of entry of an Order, to file a report that sets forth any steps necessary to process renewals under the FY24-25 NOFO"; and "within seven days of the Order, to inform recipients of the steps they must take in order for renewals to be processed, up to but not including the obligation of funding." *National Alliance to End Homelessness v. HUD*, ECF No. 5 at 3-4.[9] Similarly, the State Plaintiffs request that the Court enjoin "Defendants from implementing the 2025 NOFO or any subsequent NOFO covering FY 2025." *State of Washington v. HUD*, 25-cv-626, ECF No. 49 at 2.

---

[9] The NAEH Plaintiffs—who, notably, seek a more aggressive mandatory injunction than the one sought by the State Plaintiffs—did not even raise a Section 706(1) claim.

In other words, Plaintiffs request that this Court effectively impose the 2024 NOFO on HUD for purposes of 2025 CoC awards by (1) barring HUD from issuing any new NOFO and (2) ordering HUD to begin renewals pursuant to the 2024 NOFO. Both requests are improper under Section 706(1) because neither is "legally *required*." *SUWA*, 542 U.S. at 63. As explained above, there is no legal requirement that HUD use 2025 CoC funds for renewals (let alone *Plaintiffs'* renewals). *See supra* Argument.I.B.ii. Nor is there a requirement that HUD issue renewals pursuant to the 2024 NOFO. Indeed, even the 2024 NOFO itself does not impose any such requirement. *See supra* Argument.I.B.ii.a. And the procedural deadline in 42 U.S.C. § 11382(b) did not strip HUD of its substantive legal authority to issue a delayed NOFO at some future point. *See supra* Argument.I.B.ii.b.

In order for Plaintiffs to receive the remedies they seek, they must show that they are (1) substantively entitled to renewal of their contracts and (2) entitled to processing renewals on the timeframe they propose. As shown above, Plaintiffs are not *entitled* to renewals, *see supra* Argument.I.B.ii, but they *may* receive renewed contracts. Any Plaintiffs whose contracts are renewed would, at that point, have no remaining live stake in this litigation. As for the second required showing, Plaintiffs falter because they have identified no statutory provision establishing any timeframe within which HUD is required to renew awards (other than its overarching obligation deadline in September 2027). *See supra* Argument.I.B.ii.b. Because Plaintiffs can make neither showing, this Court should refrain from ordering Plaintiffs' requested relief.

Importantly, accepting the above limitation on permitted remedies at this juncture does not foreclose any review of (or relief with respect to) the forthcoming NOFO. But, before a new instrument is in place, ordering Plaintiffs' requested relief would improperly dictate how the agency goes about complying with its legal obligations. *See SUWA*, 542 U.S. at 65.

Ultimately, Plaintiffs want this Court to supervise HUD's "general mode of operations," *Ctr. for Biological Diversity*, 260 F. Supp. 3d at 27, by dictating the way in which it must carry out its statutory mandate to issue a notice and obligate 2025 CoC funds. This Court lacks such supervisory authority under the APA.

## IV.     PLAINTIFFS SHOULD BE ORDERED TO POST SECURITY IN CONNECTION WITH ANY PRELIMINARY INJUNCTIVE RELIEF AND ANY PRELIMINARY RELIEF SHOULD BE STAYED TO ALLOW CONSIDERATION OF WHETHER TO APPEAL.

Should the Court be inclined to order any injunctive relief, the Court should also order Plaintiffs to post security. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c); *see also Nat'l Treasury Emps. Union v. Trump*, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) ("[W]e clarify that injunction bonds are generally required." (citing Fed. R. Civ. P. 65(c)); *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond"). As Plaintiffs are, apparently, seeking disbursement of funds pursuant to a previous NOFO, this Court should order the posting of a bond equal to the size of any payment that the Court orders on a preliminary basis here. Without such a protective measure, there may be no way to recover the funds lost to United States taxpayers if the judiciary ultimately determines that Defendants were "wrongfully enjoined." *See* Fed. R. Civ. P. 65(c); *cf. Dep't of Educ. v. California*, 604 U.S. 650, 651-52 (2025) (explaining that "respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee promised to return withdrawn funds should its grant termination be reinstated, and the District Court declined to impose bond" (citation omitted)).

Finally, Defendants respectfully request that if this Court does enter injunctive relief, it stay the relief for a period of seven days to allow the Solicitor General to determine whether to appeal and if so whether to seek a stay pending appeal.

## CONCLUSION

For the reasons identified above, Defendants respectfully request that this Court deny Plaintiffs' Motions for a Preliminary Injunction.

DATE: December 15, 2025                    Respectfully submitted,

                                          BRETT A. SHUMATE
                                          Assistant Attorney General
                                          Civil Division

                                          YAAKOV M. ROTH
                                          Principal Deputy Assistant Attorney General
                                          Civil Division

                                          John Bailey
                                          Counsel to the Assistant Attorney General
                                          Civil Division

                                          JOSEPH E. BORSON
                                          Assistant Branch Director

                                          PETER R. GOLDSTONE
                                          Trial Attorney

                                          WILLIAM S. JANKOWSKI
                                          Trial Attorney

                                          */s/ Pardis Gheibi*
                                          PARDIS GHEIBI (D.C. Bar No. 90004767)
                                          Trial Attorney, U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L Street, N.W.
                                          Washington, D.C. 20005
                                          Tel.: (202) 305-3246

Email: pardis.gheibi@usdoj.gov *Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on December 15, 2025, the above document was filed with the CM/ECF

filing system.

/s/ *Pardis Gheibi*