# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| STATE OF WASHINGTON, et al., | |
| Plaintiffs, | |
| v. | C.A. No.1:25-cv-000626-MSM-AEM |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al., | SUPPLEMENTAL DECLARATION OF PASCALE LEONE |
| Defendants. | |

## <u>SUPPLEMENTAL DECLARATION OF PASCALE LEONE</u>

I, Pascale Leone, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am the Executive Director of the Supportive Housing Network of New York (the "Network"), a non-profit membership organization representing more than 200 non-profit organizations that operate and develop supportive housing in New York.  I have served in this role for the past three years, since 2022.

2.      I am familiar with the statements set forth herein based on either my personal knowledge, consultation with Network staff and service providers, or from my review of relevant documents and information.

3.      I submit this supplemental declaration in further support of Plaintiffs' motion for a preliminary injunction.

### Expiring Contracts

4.      Under the FY25 Continuum of Care (CoC) Notice of Funding Opportunity (NOFO), released on November 13, HUD had stated that awards would be made no sooner than May 2026. Due to the typical contracting process, funds would not start flowing in that instance until June or July 2026. Contracts begin to expire in January 2026 and continue expiring every month on a rolling basis. Across New York State, at least 2,878 households are living in CoC-funded housing that has a contract expiring on May 31, 2026, or before. The chart below shows the number of units in the state that are part of expiring contracts each month.



5.      Without the housing assistance provided by the CoC, these households are at high risk of becoming homeless again, especially given the lack of available and affordable housing in New York.

6.      The rescindment of the NOFO on December 8 exacerbates the funding gap that already existed in its original timetable. HUD has stated that they plan to issue another NOFO for these funds at some point before the funds expire. With each passing month, there are hundreds more units statewide that will expire without knowing their renewal status. This level of uncertainty will cause programs to close, even before they officially lose funding. Nonprofits generally are unable to float funding for a project that may not be renewed.

7.      Irreparable harm is caused when housing assistance is lost and supportive housing programs close. Many CoC program participants are tenants with leases. After losing funding for rental assistance, they will be unable to pay their rent. Some will leave voluntarily. Others will stay and ultimately face eviction for nonpayment of rent. Landlords will re-rent apartments to new tenants. Meanwhile, nonprofits lay off staff and shut down the infrastructure required to run the programs.

8.      Even if funding is later restored, re-opening a program is not guaranteed and would take about six months. Scattered site programs would need to find new units to rent on the private market. If congregate sites have been repurposed or re-rented to new tenants, re-opening a supportive housing program there would not be viable.

9.      Original tenants may be difficult to locate. They may also be ineligible or deprioritized for the re-opened supportive housing program. Existing HUD regulations require the

3

prioritization of permanent supportive housing to chronically homeless people who meet very specific criteria. They also require the use of a Coordinated Entry system that prioritizes referrals based on additional specific criteria related to vulnerability that have been developed by each CoC.

**Compressed and Uncertain Timetable**

10.    The NOFO process requires each CoC to hold their own internal competition to rate and rank projects before submitting their full application to HUD. Project applications for this local competition must be submitted 30 days prior to the final deadline to HUD, per HUD's NOFO. As such, most CoCs' deadlines for project applications were on or before December 14. HUD has provided no guidance about whether or when CoCs should continue their internal competitions.

11.    The original timetable for the FY25 NOFO was already compressed. Providers and CoCs had rushed to do 12 weeks of work in an 8-week period, with Thanksgiving, Christmas and New Year holidays reducing business days.

12.    This work was also more intensive and difficult than typical years. Due to the dramatic policy changes, CoCs and providers were making impossible choices that would likely result in permanent housing programs closing and people becoming homeless.

**Lack of Certainty Around Reissuing NOFO**

13.    HUD stated they would reissue the FY25 CoC NOFO with their new priorities.

14.    CoCs and providers are completely unsure about when and how many times the new NOFO will be issued. They are concerned that a new timetable will be unworkable, but also unsure whether continuing to work on applications under the November 13 NOFO structure will be relevant or useful under a new NOFO.

15.    The CoC Builds NOFO was issued three times. The third time, there was a seven-day application period.

16.    The current state of affairs for CoCs and CoC-funded providers is chaos and confusion. The rescindment of the NOFO on December 8 provides no relief from that chaos and confusion, while the announcement that a new NOFO will be released at an unspecified time before the funding expires only adds more delays and uncertainty.

**Outstanding Materials and Questions**

17.    HUD never provided basic materials and information that applicants would need to respond to the NOFO.

18.    When the NOFO was rescinded on December 8, HUD had still not released the application in the official portal, known as *eSNAPS*. Typically, the application is released 6-8 weeks before the HUD deadline, to allow CoCs to fully prepare. Without the application, there are many details that cannot be prepared in advance.

19.    When the NOFO was rescinded on December 8, HUD had still not clarified outstanding questions about the new priorities and ranking structure. For example: Will Transition projects that were Permanent Supportive Housing and want to become Transitional Housing count toward the 30% cap on permanent housing?

20.    To the best of our knowledge, HUD has not answered any substantive questions submitted through their *Ask a Question (AAQ)* online portal. The AAQ portal is the mechanism that HUD traditionally uses to clarify any confusion that providers and CoCs have related to the NOFO and the application process.

**Communication with Tenants and Landlords**

21.    With no guidance and a ticking clock, CoCs and providers are making difficult decisions about when and how to notify tenants and landlords about imminent funding gaps and the potential loss of housing assistance and closure of programs.

22.    We estimate that more than 8,000 of the 13,861 CoC-funded households are located in scattered site programs, where nonprofit providers rent housing from landlords on the private market.

23.    Nonprofits have worked for decades to develop trust and positive working relationships with private landlords. Abrupt funding losses, and even communication about funding uncertainty, can damage those relationships and reduce the amount of housing available to these programs in the future.

24.    CoC-funded units are present in at least 110 buildings in New York that were publicly financed with state and local sources in order to serve as supportive and affordable housing. In this context, the CoC contracts provide rental assistance or operating funding, which anchor these mixed-finance developments that combine at least $1.46 billion in state and local capital subsidy, Low-Income Housing Tax Credits (LIHTC), and private investment. Specifically,

at least $511 million in equity is raised from LIHTC across these 110 buildings. Funding uncertainty shakes the equity market for LIHTC, as investors' confidence in the stability of government housing programs weakens. This threatens future development of affordable and supportive housing, which is completely reliant on this public-private partnership. Material loss of funding may also throw these buildings out of compliance and cause real financial injury to current investors.

25.     CoC program participants have all experienced homelessness or been at-risk of homelessness before. Communicating that their housing is at-risk could cause additional trauma. While providers want to limit that trauma, especially when the risk is uncertain, advance notice and planning may help the household prepare.

**Imminent Homelessness**

26.     The most tangible and immediate impact of the timing flaws, chaos and uncertainty in the current CoC NOFO process in New York is a likely imminent return to homelessness for thousands of households.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge.

Executed this 12th day of December 2025.

_/s/ Pascale Leone_

Pascale Leone
Executive Director
Supportive Housing Network of NY