IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
* * * * * * * * * * * * * * * *25-CV-636-MSM
                                 *
NATIONAL ALLIANCE TO END         *
HOMELESSNESS, et al              *
             Plaintiffs,         *
                                 *
        VS.                      *
                                 *
UNITED STATE DEPARTMENT OF       *
HOUSING AND URBAN               *DECEMBER 19, 2025
DEVELOPMENT, et al              *
             Defendants.         *
                                 *
* * * * * * * * * * * * *        *
                                 *
STATE OF WASHINGTON, et al,      *
             Plaintiffs,         *
                                 *
        VS.                     *25-CV-626-MSM
                                 *
UNITED STATES DEPARTMENT OF      *
HOUSING AND URBAN               *
DEVELOPMENT, et al              *
             Defendants.        *VIA VIDEO CONFERENCE
***************************** *PROVIDENCE, RI
```

BEFORE THE HONORABLE MARY S. McELROY

DISTRICT JUDGE

(MOTIONS FOR PRELIMINARY INJUNCTIONS)

**APPEARANCES:**

FOR THE PLAINTIFFS:

State of Washington          Zane Muller
                             Washington State Attorney
                             General's Office
                             1125 Washington Street SE
                             PO Box 40100
                             Olympia, WA  98504-0100

National Alliance to         Kristin Bateman, Esq.
End Homelessness             Democracy Forward Foundation
                             PO Box 34553
                             Washington, DC 20043

FOR THE DEFENDANTS:

U.S. Department of Housing   JOHN BAILEY,, DOJ-Civ
and Urban Development        U.S. Department of Justice,
                             Civil Division
                             950 Pennsylvania Avenue NW
                             Washington, DC 20530


Court Reporter:              Denise P. Veitch, RPR
                             One Exchange Terrace
                             Providence, RI  02903

VIA VIDEO CONFERENCE

19 DECEMBER 2025 --

THE COURT:  Good morning.  We are going to go on the record in two civil actions combined, it's civil action 25-525, I'm sorry, 26, and 25-636, the United States -- National Alliance to End Homelessness versus the Department of Housing and Urban Development, and then the other case which we have titled the State of Washington versus the Department of Housing and Urban Development.  And I want to make sure I said those numbers correctly because I didn't put my glasses on yet.  It is 25-626 and 25-636.

So, good morning.  We are on the record, so I just remind everybody that the stenographer is taking a transcript and so it's important that you remember that when you're speaking.  I find that people tend to speak more quickly when they're on Zoom probably in part because they are reading some of what they're saying; so I would appreciate it and I think you will appreciate it if you slow down.  I don't want to have to interrupt you to tell you to slow down; if I do it is not because I'm mad but just because the stenographer will need the time.

Okay.  So who is appearing for the Plaintiffs at this hearing?  Will you identify yourselves for the

record, please.

MS. BATEMAN: Kristin Bateman for the National Alliance to End Homelessness Plaintiffs.

THE COURT: Okay.

MR. MULLER: And Zane Muller on behalf of the Plaintiff States.

THE COURT: Okay. All right. Good morning.

And how about for the Defendants, the Department of Housing and Urban Development.

MR. BAILEY: Good morning, your Honor. John Bailey for the United States.

THE COURT: Okay. Great. Welcome. And I am going to ask everybody who is not speaking to mute themselves. I don't know, Ms. Bateman or Mr. Muller, if you are prepared to begin, so whenever you're ready we'll hear you on the preliminary injunction motions filed in both cases.

MS. BATEMAN: Thank you, your Honor, and good morning. Again, Kristin Bateman for the National Alliances Plaintiffs, and Mr. Muller and I will divide the argument, with the Court's permission. I can start with a brief overview and then address the Plaintiffs' likelihood of success on the merits of their challenges to the rescission of the fiscal year 24-25 NOFO and why that is sufficient for the relief that we're seeking.

And then Mr. Muller will address the likelihood of success of the merits of the challenges to the fiscal year 25 NOFO.  And then each set of Plaintiffs will address their respective harms.

THE COURT:  That's great.  And I should have asked, Mr. Bailey, we have received an e-mail I believe from you or from somebody in your agency indicating that a new NOFO might go out before this hearing.  We checked this morning; I'm assuming nothing has been issued.  Is that correct?

MR. BAILEY:  Yes, your Honor.  I spoke with agency counsel this morning, and they told me that their expectation is that the new NOFO will be published by close of business today, at which point we will immediately file a notice with the court with the new NOFO.  We've been working diligently to do so.  We tried to give the Court as much notice as possible; and that's my understanding, that it will be filed or published by close of business today.

THE COURT:  Okay.  Thank you.

And Ms. Bateman, just so that we can, so I can sort of put this in some sort of an organizational format for myself, the issues here are not just the new NOFO which Mr. Muller will speak to, but also the rescission of the previously issued 24-25 NOFO.  Is

that correct?

MS. BATEMAN:  That's right, your Honor.

THE COURT:  Okay.  I'll hear you.

MS. BATEMAN:  Thank you.

The Continuum of Care Program is the program Congress created to be the primary federal response to homelessness, and permanent housing is a cornerstone of that program.  And of course when you're talking about permanent housing, you're talking about homes that people live in, so, of course, stability and continuity is crucial for that.  For that reason, Congress in the statute prioritized renewals of successful projects on a timely basis.

On November 13th HUD threw all of that into chaos.  It rescinded the two-year fiscal year 24-25 NOFO that it had issued before to govern the awards for both fiscal year 24 and fiscal year 25 funds.  It did this just weeks before renewal awards for fiscal year 25 would have been going out, and it did it just weeks before people's existing grants would begin expiring in January.  This very-late rescission guaranteed that there will be funding gaps because, as HUD itself said, the best it could do would be to make awards in May and that's already very aggressive.

This is causing serious, serious harm to

Plaintiffs and their ability to carry out their missions.  They are providing housing to people.  Gaps in funding means they can't provide that housing anymore, and that means that individuals, families with children, veterans, victims of domestic violence are going to lose their housing in the middle of winter.  We need relief as soon as possible to mitigate this harm.  It's already too late to fully prevent the irreparable harm that this very late stage rescission has caused, but we do seek relief that will minimize it.

In particular, we're asking for three things: We're asking that the Court stay the rescission of the fiscal year 24-25 NOFO.  We are asking that the Court enjoin the Defendants from taking a new agency action that would rescind it or replace it all over again; and third, we are asking that the Court order the Defendants to begin taking the steps necessary to process renewals under the fiscal year 24-25 NOFO, short of obligating the funds, but the purpose of doing that is so that if and when the Court grants us the final judgment we're seeking -- which will be an order requiring the Defendants to award the renewals under the old NOFO -- that there won't then be a further lag while HUD undertakes the administrative processes that

it needs to undertake to actually get those grants awards out.  So what we're asking now is just for them to begin that process so there isn't a lag at the end of the day if and when we win final judgment.

So with that, I can turn to our likelihood of success on the merits of the challenge to the rescission of that old fiscal year 24-25 NOFO.  The very late-stage rescission of that NOFO is unlawful and must be set aside under the APA for two independent reasons.  First, it is contrary to law and in excess of the agency's statutory authority; and second, it is arbitrary and capricious.  And I can through the merits of both of those claims before briefly addressing the Defendants' nonmerits challenges to that.

So first there's the statutory problem.  Under 42 USC 11382, Congress set a deadline.  Congress said HUD has to issue a NOFO for awards under the CoC Program within three months of an appropriation.  The fiscal year appropriation happened on March 15th, 2025, which means that three-month deadline was June 15th. June 15th came and went; they had not done a new NOFO. There was already obviously this new existing NOFO in place, the fiscal year 24 -25 NOFO, so once the deadline came and passed, they no longer had authority to issue a new NOFO.

HUD has two responses to this. First they say that an agency doesn't usually lose authority to do something once its deadline passes. And that is certainly true in many circumstances, but not in the circumstances here. The key difference is that HUD had already taken the required action. So normally if Congress says Hey, agency, you have to take some action and you have to do it by this date, and the agency blows the deadline, it doesn't mean they lose authority to take the action. Congress really wanted them to take the action and so it wouldn't make sense to say Oh, you're off the hook, agency, because you were too slow and missed the deadline.

That is not the circumstance we have here because the agency had taken the action. It had issued the NOFO, the fiscal year 24-25 NOFO that covered the fiscal year 25 funds. So once that date, deadline came, that was the deadline. They couldn't then go back on what they had done and keep doing it over and over again after that. If that were the case, the deadline would have no meaning.

THE COURT: What they could have done had they wanted to in March when the appropriations bill was being put forth by Congress? What could Congress have done to give the agency either more time or more

authority?

MS. BATEMAN:  Congress could have done any number of things.  Congress could have said -- could have changed the deadline.  Congress could have said, you know, you don't get to use the old NOFO; you have to do a new NOFO.  There's any number of things Congress could have done, of course didn't do those things, and so what we have is a statute that Congress did enact, which are these statutes saying there is a three-month deadline.  There's a statute that Congress enacted saying Hey, HUD, you can do a two-year NOFO.  HUD did that two-year NOFO.  And so that is the sort of scenario we're looking at.

THE COURT:  And so when Congress acts but fails to change sort of this part of the analysis, how does the Court look at it.  I mean officially didn't change it, or if it was some sort of oversight by Congress?

MS. BATEMAN:  You certainly would not look at it as if it were an oversight by Congress.  You look at, we look at the laws that Congress enacted, and the laws that Congress enacted here are both the deadline of the three-month deadline, and there's also the law that Congress enacted that authorized the two-year NOFO.  So given that and given that there was authorization to do a two-year NOFO, which HUD then did do, to give the

deadline that Congress enacted effect, the agency had to meet it.

THE COURT:  Okay.  And your argument is whatever the fiscal act that allowed the 24-25 NOFO, about a two-year NOFO, HUD acted under that two-year NOFO and had the HUD decided that we don't want to have that same policy going forward, it was incumbent on them to either go to Congress and get more time or more direction or to change in the guiding principles, for lack of a better word; or for them to issue a NOFO within the deadline that set forth different criteria but that were, that were consistent with the law but also allowed that to change the policy.

Is that your argument essentially?  That the time to do something about it passed in June, and certainly in March they had an opportunity that they didn't take?

MS. BATEMAN:  Yes, your Honor, that's right.

And one argument the Defendants make in response that I will, that I can address now is they sort of make an argument that Oh, actually there wasn't a fiscal year 24-25 NOFO in place, once the deadline came in June.  And they say that's the case because in January they closed the FY24-25 NOFO on Grants.gov. But that is not a rescission.  They did not say that

was a rescission.  No one understood that as a rescission.  It is entirely typical for HUD to close a grant opportunity on Grants.gov -- excuse me -- after awards had been made, as they had been; and HUD, again, when it issued the 25 NOFO said this NOFO is rescinding the old NOFO.  So it's clear that the rescission had not happened until November.

And there's a second reason why the rescission is unlawful, and that is because it is arbitrary and capricious.  It came so late that HUD needed to consider the implications of that, the impact of that on the communities, on the providers.  It needed to consider that making such a late-in-the-game change would mean that people would experience funding gaps, that that would mean they could not continue supporting housing for people who were formerly homeless; did not consider that that would mean people would be displaced back into homelessness in the middle of winter.  It did not consider the impacts that would have on their health and safety progress they had made in substance use treatment, things like that.  It didn't consider the reliance interests of the CoCs, of the service providers, and of the people who are in that housing. And sort of less life and death, but didn't consider the administrative burdens that this would place on the

CoCs, who would then have to run a new competition, when the whole point or a large part of the point of having a two-year NOFO was so that people wouldn't have to run this competition two years in a row.  It's a huge burden on the CoCs.

The Defendants essentially say that this is a policy-driven choice and there was a change in administration so of course they should be able to do this.  But the fact that there's a change in administration and a change in policy preference is not free rein to make whatever changes you want.

THE COURT:  So can we just clarify this because I think I've said this approximately a hundred times: It's not about the policy.  It's about the methodology.

Is that -- I mean I understand you may have disagreements with the policy.  That's not the Court's purview.  This Administration is entitled to its policies.  It's not entitled to its own processes.  Is that essentially the argument?

MS. BATEMAN:  That's right, your Honor.  I think I would add sort of an additional point on that which is that in these particular facts and circumstances and given the amount of time that has passed, it is no longer reasonable for them to take an action that would be rescinding this old NOFO.

(Overlapping speech)

THE COURT:  Right, but because the deadline passed, not because somehow the policy is flawed.  Is that -- because they didn't do what they needed to do within a time frame that had been set forth by Congress; correct?

MS. BATEMAN:  That is correct.  I think there is an additional reason.  Say there were no statutory deadline, say Congress had remained silent on that, which of course is not the case, but just say hypothetically.  I think it would still be substantively unreasonable, substantively arbitrary and capricious at this point in time to rescind the old NOFO because of the serious harms that would work on the communities that the Congress passed the statute to protect.

It's not to say that they don't have a right to their own policies to the extent that they can effectuate those policies within the confines of the statute.  But even if they could do that, which is, you know, a question we may be litigating at some point; but even if they could do that, there's a separate point that at this point for fiscal year 25 funding it is just too late.  It is too late to make that shift.

THE COURT:  And it wasn't too late in March to

go to Congress and say we would like to change the policy and here's how we would like to change it, and we'd do X, Y, and Z with the funding appropriation or with the statute that's already in place.  But that isn't November or December; it was in March.

MS. BATEMAN:  Right, your Honor.

THE COURT:  Thank you.  Continue.

MS. BATEMAN:  Okay.  And just briefly on the sort of nonmerits arguments that the Defendants raise, they raise three of them, saying that the Court doesn't even have power to consider the merits challenges to the rescission.

First they say that the rescission is a final agency action, and for two reasons they say.  They say it's actually not a discrete action because we did these things that sort of foreshadowed or people should have known it was coming.  That's ridiculous.  And, you know, the agency doesn't get out of review of its actions by sort of drawing it out.

They also say that the rescission does not produce legal consequences; but, of course, it does. Under the fiscal year 24-25 NOFO grants would be awarded under certain criteria and conditions, and those are no longer the criteria and conditions under which grants will be awarded.  That produces legal

consequences and is final agency action.

They also say that we don't have standing to challenge the NOFO because the relief that the Court could grant in their view doesn't redress the harms that we're facing in not having the funding. But that is not a standing question. That is a merits question, you know, *Steel Co.* and other cases that we cite in our brief make clear that is a not jurisdictional standing question; it's a merits question.

And then the third point they make is that this is committed to agency discretion by law. That is a rare and narrow exception to when judicial review is available. That exception exists only when there are no meaningful standards against which to judge the agency's exercise of discretion, you know, when there is no law to apply.

And there is certainly law to apply here. There's, of course, the statutory deadline, but then there's also the CoC statute and everything the CoC statute says about the criteria HUD should be considering when awarding funds, everything the CoC statute says about how renewals are important and how stability is important. So those provide meaningful standards against which the Court can judge HUD's exercise of discretion.

On the requested relief, we've asked for three things, as I mentioned:  A stay of the rescission, an injunction barring the Defendants from taking a new agency action to rescind the NOFO all over again; and third, an order requiring them to begin processing the renewal so that there isn't further delay if and when we win final judgment.

THE COURT:  Tell me the third one.  Where does the Court have the authority to order them process those renewals?

MS. BATEMAN:  So you would have both inherent equitable authority, you know, injunctive, to grant that injunctive relief.  And the APA also recognizes the Court's equitable authority to do that in 5 USC 703 and also in 5 USC 705 which authorizes the Court to issue necessary or appropriate process to preserve status or rights.  Of course, the status or rights that we are seeking to preserve here are people's eligibility for funding, for renewal funding under the old fiscal year 24-25 NOFO.  If that fiscal year 24-25 NOFO were in place, HUD would be processing renewals under that; so that's the sort of status quo ante that we are trying to preserve here is status quo ante in which HUD would be taking those steps.  And so that sort of answers the Defendants' objections about the

Court not having authority to issue the these types of injunctive relief.

I will briefly also mention that they characterize that request for an order requiring them to start processing, they characterize that as a mandatory injunction that the Court can't issue.  So there are a couple problems with that: (1) The First Circuit has said that that doesn't actually count as a mandatory injunction because it's just preserving the status quo, for the reasons I was just saying.  But also even if it were properly characterized as a mandatory injunction, that doesn't make a difference. As the First Circuit said in *Braintree Labs* the standard is the same, you know, of course the court shouldn't be granting injunction unless the circumstances require it; but the same four-factor test that we look at as for any type of injunction, and here --

THE COURT:  I'm sorry; go ahead.

MS. BATEMAN:  I was just going to say that the exigencies of the circumstances certainly demand it. We're facing funding gaps, funding gaps starting in January.  People need awards to be able to continue providing housing to people, and the delays are just causing harm.

THE COURT:  And if the Court were to, say, have the authority to enjoin the rescission of the NOFO and enjoin -- and preclude the agency from issuing a new NOFO, the effect of not being able to order the processing of the current, for the current NOFO, the 24-25 NOFO would be that the agency would then be not able to spend the money that Congress had appropriated and directed them to spend for housing.  Is that essentially --

MS. BATEMAN:  I apologize; could you say that one more time.

THE COURT:  So looking at the three things that you're asking for, you're asking for me to enjoin the rescission of the 24-25 NOFO; and then, if you're successful on that, for the Court to then preclude the agency from issuing a subsequent NOFO.  And then if the Court has the authority to do those two things, the argument the Court has the -- no authority to do the third thing then puts the agency in a position where they would be not spending funds that Congress had directed them to spend.  Is that essentially sort of the equitable argument, for lack of a better word?

MS. BATEMAN:  That is not quite the equitable argument we're making.  The argument we're making is that the irreparable harm that we're facing is not

being able to get these funds and not being able to get these funds in time to keep people in the housing that they're relying on.  And so it's really a timing problem, and the reason we're asking for the order requiring them to start the process of making those renewals is to ensure that if and when we get final judgment, say final judgment is in February, that people then can get their awards in February, as opposed to two months later as they engage and HUD has to go through all the steps it needs to actually make the awards.

And with that, unless the Court has further questions for me, I will turn it over to Mr. Muller to address the challenges to the 25 NOFO.

THE COURT:  Did we sufficiently address mootness?  The government is arguing it's moot because they withdrew the NOFO.

MS. BATEMAN:  I will address that briefly before turning over to Mr. Muller.  The mootness argument I think does not apply to our claims challenging the fiscal year -- challenging the rescission of the fiscal year 24-25 NOFO.

THE COURT:  I see.

MS. BATEMAN:  I don't think there is any dispute that that has still been rescinded.  The rescission is

still in place.  HUD is standing by that rescission, so that is still very straightforwardly a live controversy; and I think Mr. Muller will also address why the challenges to not withdrawn 24-25 NOFO are not moot.

THE COURT:  Okay.  Thank you.

MR. MULLER:  Thank you, your Honor.  Zane Muller with the Washington State Attorney General's Office on behalf of the Plaintiff States. I want to touch briefly on a timing argument that's in our brief and then turn to mootness.

Defendants argue that the June 15th deadline is a mere technicality, but that reading is not compatible with any coherent reading of the McKinney-Vento Act, and that's because the timing provision of the statute has to be read together with the renewal provision of the statute, and that's basic of canon of harmonious construction.  Under 42 USC 11382(b), HUD is required that it shall release a NOFO for grants not later than three months after the enactment of the Act making the relevant appropriation.

Reading that in conjunction with the renewal provision of the statute, which is 11386(c), Congress directed that HUD make -- that the funds shall be available for renewal contracts in successive one-year

terms.  So that language is mandatory, shall be available in successive one-year terms.

The idea that HUD can sort of indefinitely delay renewals to whenever it gets around to publishing a NOFO that it likes, to read the word "successive" out of the statute, that the statute doesn't permit those funding gaps; and in the 20 years that this program has been operative, you know, HUD points to one or two, you know, delays when the NOFO may have (indecipherable). They don't point to any situations where their extent is funding gaps; and that's the problem here, your Honor.  That's the harm that's really affecting the Plaintiff States.

I want to turn to mootness.  And your Honor is correct that, you know, elections have consequences.  A new Administration is entitled to enact policy priorities, but they have to do so within that guardrails that are set by Congress, and that's the problem in addition to the timing piece that we're challenging with the 2025 NOFO, why we're asking the Court to enjoin that NOFO, not just its rescission, the 24-25 NOFO, but also the substantive conditions that are within them.

HUD's comment here is sort of a classic case of voluntary cessation.  You know, rather than defend the

substance of the 2025 NOFO, Defendants withdrew it one hour before the hearing on its contents.  Defendants have more or less admitted that they intend to rehash the conditions in that NOFO in their forthcoming NOFO. If you look to Footnote 3 in Defendants' opposition brief, Defendants do not maintain that the forthcoming NOFO will not include any of the same or similar conditions that appeared in the withdrawn 2025 NOFO. In the meantime, CoCs across the country have to pause their intake of homeless people because they don't know if they have funding next year, they don't know what those conditions are going to be; and it's the uncertainty leading to these funding gaps that is the critical harm that the Plaintiff States are facing in this case.

This is precisely the situation that the voluntary cessation doctrine exists.  There's already been enough waste of judicial and administrative and state resources with this sort of, you know, withdrawn NOFO, forthcoming NOFO, all well outside the statutory time frame.

In a recent case in this court, your Honor, Judge Smith faced similar conduct from FEMA.  This is the *Illinois v. FEMA* case.  He found that FEMA had not met its formidable burden of showing that the conduct

was not reasonably expected to recur.  The conduct there, very similar to what we're seeing here, FEMA announced grant funding conditions tied to immigration enforcement -- so unrelated to the statute -- tried to walk them back after Plaintiff States challenged those conditions, and Judge Smith found that those conditions were not mooted by the withdrawal.

*New York v. Trump*, a similar case, Chief Judge McConnell of this court, similar gamesmanship by the Office of Management and Budget where you're having the White House coming out and saying, well, we withdrew the memorandum but not policy, following a challenge by the plaintiff states.  And it's this haphazard approach, your Honor, that's really the reason that we think mootness is not something that the government should be entitled to, and it's why we're asking your Honor to enjoin not just the rescission of the 24 NOFO, but also the substance of the 25 NOFO.

Unless your Honor has any questions about the sort of arguments that we made about the substance of the NOFO, we would note that the Court is entitled to treat those arguments as conceded.  There's no response to them in the Defendants' opposition brief.  Unless your Honor has questions, I'm happy to move on to irreparable harm.

THE COURT: No, I think they weren't addressed in the reply brief, so I'm assuming the government is conceding those arguments.

MR. MULLER: Thank you. So turning to irreparable harm, your Honor, I think it's just important, again, to sort of reframe the stakes in the case. We're talking about families with children, veterans, people with disabilities, survivors of domestic violence; and for whoever at HUD is sort of making these decisions to, you know, indefinitely delay the ability of providers and states to serve these people, the fact that, you know, we're looking at evictions in wintertime in CoCs across the country is, frankly, breathtaking.

So there's the immediate harm, the administrative harms that we've talked about, your Honor, and that's the sort of confusion and chaos imposed by an overnight change from decades of practice. Very similar to the *New York v. DOJ* case in front of your Honor, the uncertainty isn't just a matter of, you know, additional paperwork. It's causing real harm. It's derailing the operation of the CoCs, providers. You know, many of these providers, they rely on various sources of funding, and the fact that they're not able to have even the assurance of

funding the way they have previously under the sort of normal practice of HUD, the sort of renewal structure that Congress dictated, means they're not able to get other sources of funding.  Many CoCs, as we pointed out in the Byron Declaration from the state of Massachusetts CoC Office, there are people sleeping outside today who would not otherwise be sleeping outside, because CoCs are having to pause intake because they don't know whether they're going to have the shelter beds that they thought they were going to, that they relied on in the CoC Program.

As my colleague pointed out, grants are starting to expire as early as January, and we're going to see mass evictions on a rolling basis, and each month of delay is going to be more harms.  You know, in California 43,000 people are housed as a result of CoC funding.  In New York City, as many as 10,000 people. We have declarations that we put in to supplement, your Honor, this is the Leone (phonetic) Declaration from New York that shows that each month of delay without certainty and without funding, there are hundreds of units of expiring housing, and hundreds of individuals, hundreds of families are being thrown out into the cold in wintertime because HUD cannot get its act together.

With respect to state-specific harms to the

state agencies, we've touched on those briefly, your Honor, with the sort of the administrative gap and the harm. But I want to point out also the burden to state emergency health care education systems that would result if HUD is, you know, this policy is not to proceed. In Maryland, this is Meister Declaration, those costs are estimated at $230 million sort of burdens additional to other state services. You know, there's a lot of evidence that housing first and sort of getting folks in housing, keeping them housed reduces state expenditures on urgent emergency care and is sort of consensus in the field.

You know, HUD's conduct is jeopardizing state loans to providers who have gotten CoC funds and state funds and now may not be able to, you know, continue their operations, and it risks capital investment the states have made in housing projects. This is talked about as something Illinois is facing in particular.

So with that, I know there are other harms. Unless your Honor has any further questions on these points, I'd like to turn it back to colleague, Ms. Bateman.

THE COURT:  Okay.

MR. MULLER:  Thank you.

MS. BATEMAN:  Yes, your Honor.  The harms to the

National Alliance Plaintiffs are very similar and they're, again, facing funding gaps that means they're not going to be able to keep people in housing. The Department of Justice -- excuse me. The Department of Housing and Urban Development does not do much to dispute those harms. What it does is Oh, you're focusing so much on the harms to the people who are going to be displaced into homelessness, that's not a harm to you. But actually, that's not true.

As this court, the District of Rhode Island has recognized and other courts have recognized, harms to an organization's mission is harm, irreparable harm to the organization, and when people who they are serving -- to help them get out of homelessness -- have to be forced back into homelessness, that is a harm to their mission. And as my colleague was discussing, the chaos and confusion is also harm to them.

THE COURT: Is there anything else you wish to add?

MS. BATEMAN: Nothing further from me, your Honor, unless you have further questions, or Mr. Muller has anything.

THE COURT: No, I don't.

Mr. Muller, did you want to add anything?

MR. MULLER: Nothing further for Plaintiff

States, your Honor.  Thank you.

THE COURT:  Thank you.

Mr. Bailey.

MR. BAILEY:  Good morning, your Honor.

THE COURT:  Good morning.

MR. BAILEY:  The heart of the claims currently before the Court concern the 2024 NOFO rescission and the appropriate remedy for that rescission if the Court finds the rescission violated the APA.  I'm happy to go through any particular questions the Court has now, by my plan was to start with the merits of the contrary to law and arbitrary and capricious claims with respect to the 2024 rescission.

THE COURT:  Well, I'd take to talk about -- and maybe you can do it within the contrary to law and arbitrary and capricious.  The timing of this seems that the agency is basically changing HUD's longstanding HUD policy or is that what they're seeking to do, changing longstanding HUD policy of housing first, which I think has been a policy of HUD's for about 20 years.

That is a policy decision that the agency may seek to change.  The question is how are they seeking to change it, and did they go to Congress in March and say we would like you to change this statute or we'd

like you to change the appropriations statute.  Or is this something that sort of somebody thought of in, you know, the summer or whatever and then went ahead in this sort of chaotic manner and tried to do it after the fact.  It feels like the time to do this is maybe in the next appropriations bill, in the next congressional session, which I think is still the same congressional session, the two-year session.

But the concern I have is that we keep getting this agency action that is happening after an opportunity to go to Congress and have the agency action, the law changed consistent with what the agency would like to do, but the agency's failure to seek the proper mechanism.  So I don't know if you can address that or if you're going to address that in the contrary to law part; but it's concerning to the Court that we sort of keep having these cases where the agency issues these, you know, orders or memos or changes in policy, but they haven't done the work to get that policy through; and so it sort of begs the question are they really intending to change the policy, or is the chaos the point.

MR. BAILEY:  Yes, your Honor, I'm happy to address that as I go into the contrary to law section. The first thing that I'd like to say is the way that

HUD is able to change the way the program works is through changing the NOFOs.  It can change the requirements.  It can --

THE COURT:  Within the confines of what Congress has -- this is where I think that we're talking past each other, Mr. Bailey.  And I don't want to interrupt you, I'm going to let you make your argument, but I think that you need to address the fact that Congress has set forth parameters within the statutes, within the funding appropriations bill that was just passed during this Administration in March; and those things the Administration either didn't seek to change or decided that that was too difficult and they wanted to do it in this other way that appears to be contrary to the statutes.  So, respectfully, that's not the only mechanism.  HUD can't decide tomorrow that they don't want to house homeless people, that they've decided they're going to house, you know, homeless animals instead; I know that's flip, and I don't mean to be flip.

So there are parameters set forth by Congress. That's sort of how our system works and you have to follow them, just like I do.

MR. BAILEY:  I apologize if I misunderstood, your Honor.  I absolutely agree that there are

parameters set by Congress that bind (indecipherable).

I'm talking from the process perspective my understanding is that, you know, the Continuum of Care Program is not the exact same year after year.  It's not the exact same program.  I mean there are going to be at least changes on the margins, response to evolving circumstances.  And so at least to an extent.  The Continuum of Care Program can be changed by the Secretary through the NOFO, understanding that there were substantive guardrails in the statute, too.

But process-wise I don't think it's the case that HUD has to go to Congress whenever it wants to make any kind of change.  And so when we look at timing, there's a -- all agree there's a statutory in the organic act, a three-year deadline for -- I'm sorry.

THE COURT:  Three months; right?

MR. BAILEY:  Thank you, your Honor.

THE COURT:  No, no; that's okay.

MR. BAILEY:  Three months after appropriations are enacted.

So I heard my friend on the other side said that we pointed out one or two times that the NOFO was late, and I think this is very important context and not just context but would show that Plaintiffs' argument just

can't be right.

The NOFO that Plaintiffs ask this Court to restore, it was issued past the three-month deadline. It was issued four months and three weeks after.  The fiscal year 2023 NOFO, that was a full six months after.  2022, four months and two weeks.  2021, seven months and three weeks.

THE COURT:  And what happened in the meantime?

MR. BAILEY:  Well --

THE COURT:  Because now we're six months past the deadline, a little more than six months past the deadline.  Even when you issued, it was five months past deadline.  So those examples that you're giving us going back to 20 -- I forget what you just said, 2017?  -- the NOFOs, what happened to the existing NOFOs at the time that those NOFOs were delayed?

MR. BAILEY:  Yes, your Honor.  So my understanding is that at least in the past decade the NOFOs have all been yearly and only authorized to operate for one year.  So in the ordinary course there is an annual NOFO that sets the Continuum of Care essentially program requirements for the following fiscal year.  So each year the Secretary issues a NOFO and that is at least to some degree a macedon (phonetic) to change how a program operates whether you

have, you know, priorities, new applicants, projects.

So my point of this context is that I don't think it's the case that when the agency misses its deadline they just totally lose the ability to change the program because every year the NOFO I would assume at least on the margin changes something. It's a $3.7 billion program this year. I would expect that there's something to change.

So that said, this is why -- before I get to why I don't think Plaintiffs' rule would work in practice, I'd just like to start with the basic tenets, and I think at least the National Alliance Plaintiffs agree the presumption administrative law is that if the statute doesn't specify a consequence for non-compliance with the deadline, the federal courts are not going to impose a coercive sanction unless, unless that's in the statute. And the idea being that when Congress puts the guideline in the statute, unless it says the agency is going to be divested of its power, it would rather it be late than never; and there's no consequence specified here.

So I'll also back up and say this is a question of statutory interpretation because a three-month deadline is inorganic that which 18 USC 11382(c), I believe. So it's a question of statutory construction,

does that deadline essentially -- is it essentially jurisdictional such that it's going to divest the agency of authority.

And going back to my point about how these NOFOs are primarily, they only operate for one year. They don't contemplate projecting into a second year. So let's take -- let's go back to 2015 where the NOFO was nine months after appropriations. If that had been challenged and then it was found that, you know, it was unlawfully delayed, it missed a deadline, the agency just has no power to enact one, it would essentially, it would essentially mean that the agency couldn't operate the Continuum of Care programming.

THE COURT: Let me ask you a question. So that was nine months after the deadline, so it was a full year after the appropriations though. Is that what you're saying?

MR. BAILEY: No, your Honor. Nine months after the enactment of appropriations.

THE COURT: So six months after the deadline.

MR. BAILEY: Yes, your Honor.

THE COURT: In 2015 was it so late with the appropriations by Congress that we were facing, that the agencies were facing and the states were facing a funding gap or was funding continued? That's the part

that nobody -- that you can't seem to answer, is what happened at that point.  Did people just not get funding?  Did they continue the same funding?  Was the appropriations bill passed like in October when or September when we expect it to be passed?  And were we talking about being, you know, 18 months before or 15 months before funding was going to lapse?

MR. BAILEY:  Your Honor, I think the key here, and this is why I backed up to talk about being a matter of statutory construction, is that this isn't a fact and circumstances balancing test where a court says, well, in this situation should the agency lose the ability to do the thing that Congress asked it to do.  But the question is does the statute make that deadline and fact jurisdictional.

THE COURT:  Okay.  We can get to my questions when we get to the APA, arbitrary and capricious and then, of course, irreparable harm.

But if you don't know the answer you can just say I don't know.

MR. BAILEY:  Your Honor, I don't have additional context, so that's why (indecipherable).

THE COURT:  For any of the other years you cited?

MR. BAILEY:  Except that they were past the

three-month deadline and there was no suggestion that the agency just couldn't administer the program that year. Again, it wouldn't have been another one from the year before to just spring back into life. The Plaintiffs' argument, it could only be plausible because there's this 2024 NOFO that contemplated going in 2025 and so they --

THE COURT: It's a two-year NOFO. Was there anything in the statute that prevented HUD from issuing the two-year NOFO?

MR. BAILEY: No, your Honor. That's not the point. I'm just saying that the Plaintiffs' argument can only work because there is a two-year NOFO. If there was a five-year NOFO it would be that the agency just like couldn't (indecipherable) the Continuum of Care Program.

THE COURT: Right. But that's not where we are. We're with the two-year NOFO.

MR. BAILEY: I understand that, your Honor. And I used that hypothetical because I think it informs the statutory construction. But I think I understand the Court's position, so I'm happy to move on.

I guess -- unless you have more granular questions I would like to at least address the statutory renewal point that the State Plaintiffs

raised.

THE COURT:  You need to slow down; I'm sorry, I just got a message that you're speaking too quickly for the stenographer.  I apologize.  Just slow down a little bit; and as I said it's not a criticism, it's just we tend to do that when we're on Zoom, everybody does it, so --.

MR. BAILEY:  Thank you, your Honor.  Please just let me know if I'm going too quick.

THE COURT:  I will try.

MR. BAILEY:  So I would just like to briefly address the statutory renewal argument, and this is based on, again, the organic act; they claim that renewals are essentially mandated when conditions are met.  And I don't think that the Court actually needs to decide that.  Whether or not the statute requires renewal of certain awards, I don't think that means the deadline's fatal to HUD that they would issue a NOFO. And this, again, goes back to my prior argument.  If we looked at this deadline as jurisdictional, the consequences would just be (indecipherable).

And the last point on this, I think the closest case the national -- the closest case that I recall seeing in the reply briefs as to why such a drastic sanction would be appropriate is the First Circuit's

decision in *Castañeda v. Souza* in 2015, and that concerned a provision of the I.A. that barred the A.G. from releasing criminal aliens on bond after they had been placed in immigration custody, and the court found that essentially this was one of the exceptional circumstances and that as a matter of statutory construction that they found the deadline to essentially be jurisdictional.

And I'd just like to point out the important differences here.  That timing deadline, it appeared -- and I'm quoting:  Appeared within an express exception to a grant of authority.

The court went on, again I'm quoting:  Itself makes clear what consequence would follow if such time limit is not met.

And the final thing that I think is key here is the court noted that the A.G. still retained the broad discretion to decide whether to assume and maintain *Castañeda.*

And for all the reasons I just said, that would be the exact opposite result here if this deadline was treated as a fatal possibility to issue a NOFO.

So at this point, your Honor, I'd like to move on to the arbitrary and capricious claim.

THE COURT:  Please.

MR. BAILEY:  So your Honor, our basic position here is that the decision to rescind the NOFO was reasonable because the government acts reasonably when it rescinds something that relies on several since-rescinded legal directives.  And what I'm talking about here is that the 2024-2025 NOFO, it was based off of -- I shouldn't say based off of.  It's requirements were informed by several Executive Orders, you know, for instance, one relating to environmental justice, other --

THE COURT:  Which ones, and issued by whom and when?

MR. BAILEY:  Your Honor, my understanding is that these were issued in the Biden Administration, but I would not -- I would have to check exactly.  But these were at the time that the 2024 NOFO was promulgated, these Executive Orders were on the books. They were legal directives to agencies.  They informed how the NOFO requirements came out.  We discussed in our briefing that requirement that agency focus on environmental justice.  There was a very similar provision in the NOFO.

And so now this Administration, President Trump has rescinded at least three Executive Orders that informed that 2024 NOFO.

THE COURT: Which one? Which ones?

MR. BAILEY: Your Honor, I know Executive Order 12,898 -- I'd have to look back at my briefing to give you the exact Executive Orders. But we identify, we identify three there that have been rescinded and that those directives directly inform the requirements of the NOFO; we cite the 2024 NOFO.

And I understand that this is, this might be a difficult position, but the government is basic that when you have these rescinded legal directives, the government is acting reasonably when it comes out with a new policy.

THE COURT: You're calling them legal directives, and let's just say what they're. They're policy directives.

MR. BAILEY: Yes, your Honor.

THE COURT: Okay. So they're not legal; a lawyer didn't issue them. The Presidents issue them -- some of the Presidents have been lawyers, but not all of them, and they're not necessarily legal directives.

So what I think the concern here is, is that you can't just -- agencies have different rules that they have to follow, and this is something that we seem to be coming up against quite a bit. And as you noted, Judge Smith had a case -- or maybe the Plaintiffs

noted that there were cases I've had, there were cases that Judge McConnell had, Chief Judge McConnell had; and they're all sort of coming up against the fact that just because you say you have this policy doesn't mean that policy is automatically enacted. There are things that have to happen. And we have an Administrative Procedures Act. Now, you may not like it, I may not like it having had to deal with it; but the fact of the matter is Congress set forth a mechanism for putting policy into action, which is what Congress is supposed to do; right? So it's not about Executive Orders and legal directives. That's -- if there were legal directives the Court could review the Executive Order. They're not legal directives. What they are is policy directives; correct?

MR. BAILEY: Well, your Honor, I don't think those things are mutually exclusive. I think that Executive Orders can function as legal directives to agencies in certain circumstances depending on the phrasing.

I think what's important here is -- I don't believe there's any dispute that the rescission of the Executive Orders is not an APA problem; there's -- we're not talking about that; right? So whatever process problem might there be with that, we're not

looking at that, so --

THE COURT:  Correct.  But they can issue whatever Executive Orders they want.  I mean Presidents have issued I think, I had read something the other day that FDR has the record or at least the modern record. So you can issue Executive Orders.

What we're talking about is the legal framework within which those policies can be effectuated, and I think that conflating those two and calling Executive Orders legal directives, it is misleading to the public who doesn't understand necessarily the law surrounding how these things are effectuated.

Do you know what I'm saying?

MR. BAILEY:  Your Honor, I appreciate your position.  The government has a different view that Executive Orders certainly are legal directives.  I mean there are certainly, as you're well familiar, many challenges to these Executive Orders.  If they were not functioning in legal directives to agencies, I'm not even sure any of those challenges could get off the ground.

THE COURT:  They're policy directives to agencies, and what's challenged is the agency action before the Court; isn't that right?  I mean Executive Orders themselves are not -- nobody is challenging the

President's right to issue Executive Orders.  The question is how the policy set forth in those orders are effectuated by the agencies.  Am I wrong about that?  If I'm wrong, tell me.

MR. BAILEY:  Your Honor, I've personally litigated cases where the relief is asking to enjoin Executive Orders, so I can't say that --

THE COURT:  Okay.

MR. BAILEY:  But I (indecipherable) that.  The processing analysis is at the agency level as assigned by the APA.

THE COURT:  Go ahead.  I didn't mean to take you off track, so take a minute to get back where you were.  I apologize.

MR. BAILEY:  I appreciate the Court's questions.  I just, I want to wrap up on this part of the arbitrary and capricious point before I move on to reliance, at the risk of repeating myself.  And I think that it is a unique situation when you have rescinded Executive Orders that no one doubts that action was fine.  And so when the legal framework and the policy framework, again, not mutually exclusive; but when both of those things change I think it is reasonable for the government to issue a new policy, and I submit that it would be arbitrary and capricious if the government

didn't because it stuck with the program that was based off of laws or Executive Orders, policy directives that weren't --

THE COURT:  Different, different laws versus policy directives.  Those are two different things.  That's where you're like, I think that's where we're conflating things and that's where the public misperception is.  The policy directives are separate from the law that Congress has enacted.

MR. BAILEY:  I understand, your Honor.  At this point I think I'd like to talk about reliance, unnecessary you had more questions.

THE COURT:  No.  That would be good.  Great.

MR. BAILEY:  So Plaintiffs assert reliance interests on the 2024 NOFO do not render its rescission arbitrary and capricious.  I think importantly it didn't make any promises to Plaintiffs regarding the issuance of awards at any point in time.  It certainly didn't make any promises to them about issuance of the 2025 awards on a particular timeline.  And the 2024 NOFO, it carved out, it says HUD reserves the right to, you know, re-award to 2025.  It wasn't some sort of entitlement.  And importantly, it put all CoC participants on notice that HUD may issue a supplementary NOFO to accommodate a new Continuum of

Care Program or any the priority. And so I don't think they can have very persuasive or provide full reliance interest when you're put on notice that this is subject to change. These are sophisticated actors, a lot of money is involved here, and in that situation I don't think that the reliance interests are enough to tip the scales.

Again, in July Plaintiffs were put on notice that HUD was very clear in its e-mail that the status quo was unacceptable, it was going to be changing priorities and that they should expect a new application process and new NOFO. So again, as of July it just confirmed what was already flagged back in July of 2024, that there's going to be a new process and, again, any reliance on what was there before is just not reasonable. So for those reasons, I'd like to move into remedy, which I think also involves on reliance interest.

So even if the Court were to determine that the rescission violated the APA, either as contrary to law or arbitrary and capricious, the government's position is that the proper remedy is at most to stay or vacate the rescission. An injunction barring HUD from rescinding or replacing the 2024 NOFO is just not the proper remedy under this part of the APA. And I

understand if we think about the three requests the National Alliance Plaintiffs made, they requested the Court enjoin HUD from issuing a new NOFO, as the second request, and the third request that the Court require HUD to begin processing applications consistent with the 2024.  Those are functionally the same.  If the Court was -- an injunction barring HUD from issuing a new NOFO would be the same as, functionally the same as requiring it to operate under --

(Overlapping speech)

THE COURT:  Can we agree the government has waived its objections and agreed or conceded by not -- that the substance of the now-rescinded 2025 NOFO that the Plaintiffs have said are unlawful, the government didn't engage with that in briefing or in argument, and so is that conceded?  I would assume it is.  That's what the law says, that I can assume that the government has conceded that; correct?

MR. BAILEY:  Your Honor, we did raise threshold mootness arguments, which would take care of that claims.  No, we certainly did not concede that.

THE COURT:  I think you did though because you didn't argue in the alternative Hey, if you don't find this to be moot, judge, here's why these parameters or things that are set forth are not contrary to law.  So

I think you did waive it.

MR. BAILEY:  Your Honor, I think the question of whether we conceded something or whether we waived something is different and maybe we're just talking colloquially, --

THE COURT:  Maybe.

MR. BAILEY:  -- talking over each other, so I apologize.  I just want to be careful with the representation I didn't hear that.  We did not concede --

(Overlapping speech)

THE COURT:  I gotcha.

MR. BAILEY:  -- but your Honor is absolutely correct, we did not in our briefing take on the merits that challenged the 2025 conditions.  We instead extended this argument.

THE COURT:  Right.  You didn't concede it, and I shouldn't -- and that's my fault for using the improper term.  It's waived, not conceded.  So, but the Court is entitled to consider those arguments waived; correct?

MR. BAILEY:  Your Honor, we did not address it on the merits, and so I'm not going to push back on that anymore.

THE COURT:  Okay.  Thank you.

MR. BAILEY:  So as I said, the government's

position is that the proper remedy under the APA Section 7062 is either stay or vacatur. It is not to predetermine the agency's conduct on remand.

And so what we're asking for here if the Court were to determine that the rescission is unlawful, the agency be given a chance to do what the agency does on remand and come up with a plan that addresses the concerns that were raised by Plaintiffs.

Another way that I found helpful of looking at this is stopping HUD from even issuing a revised NOFO, that's the same as this Court holding that any revised NOFO, no matter what it requires or how it's justified would be unlawful. And I just, I don't think that's the proper frame of analysis under the APA. I think the agency is entitled to a chance on remand to fix its own errors if there are any. Again, here, it's possible that 2025 NOFO will have a contingency plan with respect to funding, alleged funding gaps, or alternatively a, you know, a sufficiently fulsome record to show that they considered those.

And so again, your Honor, if this Court were to conclude that the 2024 rescission was unlawful, we're just asking this Court follow ordinary remand rules and give the agency another chance, which it has been working diligently to address Plaintiffs' concerns.

THE COURT:  Okay.  And if the Court were to take up what you are offering, and you're saying that a new NOFO could be issued as soon as, you know, today, can you maintain the status quo while you're doing that?

And my other question is since you have waived the argument about the substance, I'm assuming that notwithstanding your footnote, the new NOFO won't have the challenged conditions.

MR. BAILEY:  Your Honor, I can't, I can't speak to what the new conditions are of the NOFO.  I don't know that yet.  What I will say is I was told by agency counsel that the expectation is that it is today, by close of business today.  I'm not making promises for the federal government.

THE COURT:  No, absolutely.  Believe me, I get it.

MR. BAILEY:  But --

THE COURT:  But it cannot -- if the Court says, if the Court were to take your invitation and said you know what, the rescission is enjoined, but I'm not going to do these other things; I'm going to let agency do its job.  I have two questions:  (1) status quo, and (2) does the agency understand that they've waived the argument about the lawfulness of the conditions that are in the now-rescinded 2025 NOFO?

MR. BAILEY: Well, your Honor, I don't -- I think if this Court were to include that the arguments were waived for purposes of this PI, I don't think that that mean the government then estops in a different PI from addressing that, and that would be a different proceeding over the new NOFO. So I would respectfully push back strongly on the idea that the government is somehow estopped from addressing those arguments on the merits.

THE COURT: Okay.

MR. BAILEY: And certainly if we thought that that were the case we would have briefed the arguments, and we would certainly appreciate the opportunity to do so if the Court is inclined to find that way.

THE COURT: Understood. That makes sense.

But what the status quo?

MR. BAILEY: Your Honor, I apologize. What do you mean by the status quo?

THE COURT: So we're in a funding lapse, and I know that other people have been beyond the three months; you're arguing that it's not jurisdictional and so the HUD can issue these things late. But you haven't pointed to any case where they issued them late and there was a potential funding gap and told us what the agency did. So can the agency, can the Court order

the agency or will the agency maintain the status quo, continue the programs as they're funded now until a future NOFO is issued, the proper amount of time is allowed for applications and consideration and then, you know, funding is reissued pursuant to that NOFO.

Is the agency going to continue -- because the problem that we have here is the late in the day kind of thing; right?  Had we done this in March or April, May, even June or July, we would have time for the agency to issue an appropriate NOFO; to have states and agencies go through the process, get the funding pursuant to whatever policy that lawfully is part of that NOFO; and then, you know, for the agencies that were going to continue to receive funding, they would continue to receive that funding.

But what you, what you appear to be doing now is saying Hey, when there's no funding there's no funding, you know, people will now be homeless, because of this sort of lack of diligence in moving these things forward.  Does that make sense?

MR. BAILEY:  I think I understand, your Honor. I can't make any representations sitting here today about what the agency is or is not willing to do.  But I understand the status quo.  Even if the Court were to, again, set aside the rescission, the 2024 NOFO, as

I started with, it didn't require the agency to renew awards. It didn't require the agency to award a particular grant and any particular person, especially any particular timeline.

THE COURT: But it did allow the agencies and states and whoever are applicants to not apply for continued funding and have that funding just continue; and I guess that's what I'm asking about.

MR. BAILEY: I'm sorry, could say it one more time.

THE COURT: Maybe. I'm not sure if -- that was unclear even to me. I apologize.

The 24-25 NOFO had a provision, as I understood it and, you know, I'm a generalist, not a specialist as you folks are in these areas of the law -- but had a provision that be permitted the agency, HUD, to continue funding a second year without the need for new applications. Is that accurate?

MR. BAILEY: Yeah, absolutely, at least as to some participants and programs it allowed the agency to renew without a new application, absolutely.

THE COURT: But not just to renew, to continue; right? Like no new application, no new changes, no whatever. They could just say, you know, you're getting X number of dollars this year and you're going

to get the same amount next year, or we're increasing it by whatever, you know, cost of living has gone up in the last year, or reducing it, or whatever it is.

But is the agency willing to continue that until a new NOFO is lawfully in place?

MR. BAILEY: Obviously, your Honor, I can't make any representations about what my clients are willing to and I think it's -- we might be talking past each other or perhaps sort of getting back into the merits of what the NOFO requires, but -- and my clients' view is not that the 2024 NOFO while it was in place required it to actually continue these programs to a second year; it gave --

THE COURT: It gave them the option, but with the 2024 NOFO in place and no 2020 -- with the 24-25 NOFO in place and no new NOFO, my question is what does the agency plan to do with that provision in the two-year NOFO? Because if it's reinstated, then it's at the agency discretion to continue it; but it can't be arbitrary and capricious, has to follow the rules, it has to do all these things; correct?

MR. BAILEY: Absolutely has to follow the APA, your Honor. I think perhaps where we're missing each other is -- I expect the new 2025 NOFO to be issued today and then that would govern the next fiscal year's

appropriation.  So I don't -- I can't make a representation.  I don't think my clients would be willing to say that they're going to operate under the 2024 NOFO because, again, the intention here as of this afternoon we have a new 2025 NOFO.  And Plaintiffs, if it does not address Plaintiffs' concerns they're free to challenge that, and we will work in good faith with our briefing schedule and address it.

THE COURT:  But -- okay.  But if -- okay.  I think you've answered it; never mind.

I think that the issue for the Court is that you keep doing this forever and never push out any money from the agency and then that sort of contravenes Congress's intent when they issued the appropriations statute back in March, the budget bill, and when the law was originally enacted.  But I understand what you're saying; and I didn't mean to make you the spokesperson for the entire HUD just relative to this case.

It's very difficult at this point because we don't know what this new NOFO is going to say, so we have to act I think as if it's not coming today.  So I want -- if you're done I would like to, I have a question for the Plaintiffs.

MR. BAILEY:  Your Honor, could I please just

readdress the --

(Overlapping speech)

MR. BAILEY:  -- mootness issue.

THE COURT:  Sure.

MR. BAILEY:  So we would just like to clarify here, I'm not going to push back and say we do not concede anything and we do not waive anything, there was no intentional giving up a right, so that is our position.  I understand the Court's view on our arguments.

But as to the mootness argument itself, I think that all agree that the rescinded 2025 NOFO conditions are moot unless an exception applies, and the voluntary cessation exception does not apply here because what that's trying to get it is when an agency is trying to evade a court's jurisdiction; and respectfully, your Honor, respectfully, I understand -- I bring it up intentionally because we would not (indecipherable) standards on one day and put the Court on notice of what's going on if we were trying to evade this Court's jurisdiction.

THE COURT:  But if they have one that's going to be ready by the close of business today, they have one that could have been ready by the close of business yesterday, so it does -- and the constant sort of

churning and the chaos, as I said at the beginning, seems to be the point.  And I'm not putting that on you, Mr. Bailey; you've done a very good job of answering the questions that I've had and briefing and all of that.  But I think that saying, well, we didn't waive anything and we might issue the exact same NOFO again, it is evading the Court's jurisdiction, notwithstanding what your position might be, or is an attempt to evade it, I should say.  So I understand what you're saying.  I realize that -- it's not directed at you; it is sort of the chaos that's created by these quick rescissions and issuing of things without them being properly vetted through lawyers, maybe, who know what the APA says and requires, know what the statute says and requires.  So that's the concern I have.  And I realize that's not for you to answer, but it does appear to be an intentional evasion of the Court's jurisdiction by the agency.

MR. BAILEY:  Well, I can tell you, your Honor, it's my understanding and impression that working diligently to revise the NOFO and get it right; so I don't, respectfully, think it's quite fair to say they could have just had it ready in time if you want to get it right and hope to avoid further litigation over the revised NOFO that I understand will have material

changes designed to address Plaintiffs' concerns.

So the last thing that I'll say on this, I promise this will be very quick.

THE COURT:  Sure.

MR. BAILEY:  Even the Alliance, National Alliance (indecipherable) don't actually need that, we don't actually need preliminary relief on the rescinded conditions, and I think that's in a footnote in the brief.  And so I think they even acknowledge they're not being irreparably harmed by conditions that have been rescinded that might not come back.  And so there is no irreparable harm here for just because these conditions -- even if this Court concludes the conditions could be reimposed.

The funding gap that the State Plaintiffs pointed to, that's not -- that has nothing to do with the challenged conditions.  That's what the 2024 renewal rescission (indecipherable).

So this will really be the last thing that I say.  I think as a matter of judicial economy it would make sense to wait for the, to my understanding revised NOFO to then address those provisions.

THE COURT:  Wouldn't it just for judicial economy -- and by the way, I think that ship has sailed.  But wouldn't it have made sense to issue it

yesterday?  That's what I'm asking you, because we're going through this whole thing; I've been working on it and I have a law clerk who's working on it exclusively for, you know, weeks on these things.  And the question becomes like, you know, why today by the close of business?  And I'm not -- that's not to you, Mr. Bailey.  That's to the agency lawyers who are drafting these things.  They know what is and is not lawful, they know what is and is not arbitrary and capricious, and the timing seems to be strategic.  That's all I'll say on that.

But I am going to ask -- I'm think the Plaintiffs need to address something -- but I don't want to cut you off.  You don't need to rush through your argument if there's more that you want to say, Mr. Bailey.

MR. BAILEY:  I had one point that we didn't have the information available at the time of our briefing, so I think this helps contextualize why it would be improper to order that the agency start using the 2024 NOFO even if the Court sets aside the rescission.

So the 2024 NOFO, as we discussed, it contemplated applications -- I'm sorry -- it contemplated those participants in 2024 also being funded in 2025 using those same applications.  But it

also stated that there would be, there could be new applications in certain circumstances, and that new application deadline was I believe August 30th, 2025. And because the agency wound down the 25-4 NOFO (verbatim) starting in June of -- January of this year when they removed it from the website, then in July where they sent out e-mails saying there's going to be a new one. And then -- I confirmed this with agency counsel -- they shut down the portal that could be used to submit new applications, and it did not accept new applications; the idea being is that this is a competitive process. You can't have two NOFOs in the system at once; right? So all CoC participants were going, were going to be judged under the forthcoming 2025 NOFO.

So if this Court were to restore the 2024 NOFO and say that the agency has to start immediately acting under it, that would certainly help these Plaintiffs, but it would foreclose any new applicants from participating in the process.

THE COURT: But is that because of the court's action or because of the agency's lack of diligence in acting quickly and within the timeframe set forth by Congress?

MR. BAILEY: Your Honor --

THE COURT:  That's rhetorical; I shouldn't make you answer that.  I can tell you it's because of the Agency, not because of the Court.

So I understand your argument.  It's a good argument.  I think the problem is that, you know, we're talking about equity, and the agency can't say, well, it's not fair, but they shut down the process, they didn't accept applications, they didn't do anything to make the process happen; they just sort of broke it and said we'll fix it later and haven't yet done that.  That's how it looks from here.  And I realize it's a very unsophisticated way of putting it, but that I think is the core of the issue with those arguments.

So I understand what you're saying.  I take that and note what you're saying, that isn't fair to other states, other agencies who didn't have an opportunity, but that unfairness is created by the Agency, not by the Court or the Plaintiffs in this case, these cases.

If you're through I do want to ask the Plaintiffs' attorney to address a couple of issues.

MR. BAILEY:  Yes, your Honor.  Thanks for the time.

THE COURT:  Thank you.

Ms. Bateman or Mr. Muller, the government makes the argument that you're arguing that that three months

is jurisdictional and that in the past other administrations, other budgets, other whatever, other HUD agencies have gone past that deadline, well past that deadline, six months in 2015 according to Mr. Bailey.

So why should it be strictly applied here? It doesn't appear to be jurisdictional.

MS. BATEMAN: So I disagree, your Honor. This goes back to the distinction I was talking about earlier, which is when there is a deadline, when Congress tells an agency you have to do something and you have to do it by this date. If the agency blows the deadline, they don't get off the hook from doing the thing that Congress required it to do. The idea is basically it's better late than never.

But that same logic does not apply where the agency has done the required thing already. So here, the agency fulfilled its requirement to issue a NOFO. It did that in 2024 when it issued the two-year 24-25 NOFO. It satisfied its obligation to issue a NOFO for 2025 at that point. So at that point the deadline is sort of mandatory, and if the deadline passes the agency does not have authority to just keep doing it again and again, or else the deadline would have no effect.

MR. MULLER:  If I may, your Honor, just one thing I would add is the way this program has worked since its inception is that, you know, approximately 90 percent of funds that have been dispersed by HUD have been disbursed on a renewal basis.  So there was no mystery about sort of whether a project could count on its funding for following year.

And here, you know, in the 2025 NOFO, HUD arbitrarily said we're going to cut two-thirds of those renewal funds.  And so the idea that this is sort of, you know, just the same, normal practice, we always sort of miss this deadline is really I think misplaced, your Honor.

THE COURT:  So what you're saying is that because there's a two-year NOFO that was issued, and the agency didn't act within the time frame and tried to act well after the time frame in such a manner as to sort of undermine what has been done in previous years, that -- it puts sort of more meat into the deadline? Is that essentially what you're saying?  Maybe I'm not understanding.  I know I'm not articulating it, so maybe I can ask you to say that again.

MR. MULLER:  Again, your Honor, it's about reading the statute coherently and reading the statute against the past practice that HUD has always followed;

and it also gets to the irreparable harm piece because the fact that, you know, funds are not going to be disbursed in a timely manner, that, you know, projects that have consistently relied on this funding are not going to have it is why, why the timing piece is a problem this year when it has not been in years past.

THE COURT:  And so I guess that's sort of what I was asking Mr. Bailey, and maybe I should have asked the States.

But in the past when that deadline has passed, funding continued.  There were no gaps in funding, is that correct, for the programs that were approved under the previous NOFO?

MS. BATEMAN:  In the past there were no gaps like this.  Awards went out typically in January, which is when the awards would begin expiring.  There are a few years in which awards went out as late as March, never later that that, first of all.  But second of all, that was against the context that Mr. Muller was talking about where the agency had said Hey, we're going to -- CoC, you can designate 90 percent of your projects as Tier 1, and they're essentially guaranteed so long as there isn't some big problem.  And so there was certainty and people could plan against that background of uncertainty and borrow from whatever

funds and that kind of thing.

This is truly unprecedented.

THE COURT: Okay.

Mr. Bailey, is there anything else you wanted to add?

MR. BAILEY: Nothing further, your Honor. Thank you.

THE COURT: Okay. Anybody else? Anything?

(Pause)

THE COURT: We're going to take a five-minute recess.

MR. MULLER: Sorry, your Honor, just briefly. I want to speak to the relief piece that the States are seeking because, as Mr. Bailey pointed out, there is -- Plaintiff States are seeking to enjoin the conditions of the challenged 2025 NOFO, and there are important reasons for that, your Honor.

You know, as Mr. Bailey has represented, there are new conditions coming out perhaps later today. Many of them may be the same, may be different from, you know, conditions that we're challenging. So for reasons we described in the mootness section of our brief, we think an order would be beneficial.

We also think, your Honor, that, you know, for the benefit, you know, in the event that there's an

order and the government decides to appeal it, we think that having the benefit of a ruling on the merits of those issues is important because, again, the uncertainty of sort of, you know, what the final outcome is going to be here, and the uncertainty around that is a big piece of the harm and so we think it's better to sort of flesh all these issues out as quickly as possible and to provide that clarity.

The final piece too, your Honor, you spoke about, you know, the sort of status quo issue.  You know, the problem is that the government can't fix the timing piece, right, regardless of what the new NOFO says.  And, you know, there is widespread newspaper reporting, your Honor, that when HUD prepared the original NOFOs, that people who were preparing it were actually forbidden from speaking with any HUD lawyers; and so the idea that they sort of need just another chance, a little more time, and that that delay should fall on the feet of, you know, homeless individuals and families is just a little bit hard to countenance.  So that's all.

Thank you.

THE COURT:  We're going to take a five-minute recess and we'll be back.  I'm not sure whether I'm going to issue a ruling now or whether I am going to

issue -- I mean I am definitely going to issue a written ruling.  The question is whether I'm going to give you a verbal ruling first.  And the problem here is the anticipated NOFO because if that NOFO wasn't, you know, was something we knew about what was coming -- and Mr. Bailey, this has nothing to do with you.  Please know that I don't think that you're somehow, you know, withholding this.  But I think it's intentionally being withheld until after this hearing because, you know, I criticized the agency for withdrawing the last one right before the last hearing maybe, but also I think in order to sort of, you know, evade court jurisdiction.

So we're going to take a five-minute recess, and I will be back.

(Recess)

THE CLERK:  All set, Judge.

THE COURT:  Okay.  Thank you.

Okay.  This is not one of, you know, it's not an easy case and it is made a little more speculative by not knowing what the agency intends to do today. Mr. Bailey, to be clear, that's not on you at all.

So the matter is before the Court on the motions for temporary restraining orders and preliminary injunctions in State of Washington versus HUD, and the

National Alliance to End Homelessness versus HUD, and the motions were converted into preliminary injunction motions; they were TROs.

So a request for a preliminary injunction is a request for extraordinary relief.  Everybody, every court to address it says it.  To secure a preliminary injunction, a plaintiff has to show a substantial likelihood of success on the merits, a significant risk of irreparable harm if the injunction is withheld, a favorable balance of the hardship, and that the injunction is in the public interest.  Here, as in these cases with the government, where the government is the opposing party, the last two issues merge.

So preliminarily I reject the Defendants' contention that these cases are moot based on its rescission of the fiscal year 2025 NOFO.  This is sort of a classic voluntary cessation scenario, and the Defendants have a heavy burden of showing that the challenged conduct cannot reasonably be expected to reoccur.  And they have not only not met that burden, but, to the contrary, they expressly reserve the right to re-issue the same or similar conditions, and so I find that concession defeats mootness and effective relief remains available at least for the issues that are live.

So the Plaintiffs in both actions have demonstrated a likelihood of success on the merits, and at this stage the record plausibly shows that HUD's rescission of the two-year NOFO and issuance of the 2025 NOFO conflicts with the statutory mandates of the McKinney Vento Act, including Congress's prioritization of permanent housing and renewal stability and the formula-based allocations scheme, as well as the statutory deadline for issuance of a NOFO.

The Plaintiffs have shown serious questions under the APA both substantively and procedurally, including unexplained departures from longstanding policy, failure to consider reliance interests, and adoption of sweeping new grant conditions without required notice and comment.

The Plaintiffs have further established irreparable harm.  The withdrawal of the operative NOFO and the delayed and conditional replacement guarantee funding gaps, and these are concrete, imminent harms that cannot be remedied by money damages; so the rescission sort of exacerbates rather than alleviates those harms.  And I think it's noted that we don't know what the agency intends to do, although we know they intend to do it today.

The balance of the equities and the public

interest strongly favor temporary relief, and the Plaintiffs seek to preserve the status quo Congress authorized and on which states, local governments, and service providers have relied.

So they haven't, the Defendants haven't identified a comparable framework from maintaining -- a hardship for the government for maintaining that framework for the short period while the Court adjudicates the merits, or, the agency lawfully issues a NOFO that complies with the statutes, the law, and this Court's orders.  Ensuring lawful agency action, continuity of housing, and stability for vulnerable populations is clearly in the public interest.

So the motions for preliminary injunction in 25-626 and 25-636 are granted.  The Defendants are enjoined from implementing or enforcing the fiscal year 2025 NOFO and its conditions.  And I realize that it's been withdrawn, but it's important to note that the government has not engaged with or challenged or supported the legality of those conditions and the prior fiscal -- the important thing is the Court is enjoining the rescission of the 2024-25 NOFO, and that will remain in effect pending agency action consistent with the law and this Court's rulings.

And so I'm going to follow this with a written

order but -- and I'm asking the Plaintiffs to provided the Court and opposing counsel with proposed language specifically stating the terms of the preliminary injunction.

So the 2024 rescission is enjoined.  It is -- the agency is ordered to maintain status quo unless and until a lawful order, a lawful NOFO consistent with law and this Court's order is substituted.

Okay.  So we'll get something in writing out to you early next week.  As soon as there's a new NOFO, I would like the parties to consult with each other to determine whether or not that ends this case; and if it is agreed that it does, then let the Court know.  And if it doesn't, provide a copy of the new NOFO to the Court as soon as it issues, okay?

MR. MULLER:  Yes, your Honor.

THE COURT:  Okay.  Is there anything further for this hearing?

MR. BAILEY:  Not from the government, no.

THE COURT:  Okay.  And we will issue a written order, but it may become not necessary depending on what the new NOFO that we're expecting today does, so we'll have to address that.  But if everybody just gets me the language they want, then we can at least look at it over the weekend and determine whether or not that's

necessary, okay?

MR. BAILEY:  Yes, your Honor.

THE COURT:  Okay.

(Overlapping speech)

THE COURT:  I'm sorry?

MR. BAILEY:  I apologize.  Did you want the government to propose language as well?

THE COURT:  You're welcome to propose language if you'd like to, yes, but you could also engage with the Plaintiffs' proposal language and figure it out.  I realize that you don't speak for the agency, you're their lawyer, so, you're their litigation counsel, so that might not be possible, but, sure, propose the language you think is appropriate, okay?

All right.  Everybody have a good day, a good weekend, Merry Christmas, Happy Hanukkah, Happy New Year.  And but get me that stuff as soon as possible, and if we need to issue a written order if it doesn't moot out the case, we'll do that hopefully early next week, okay?

MS. BATEMAN:  Thank you, your Honor.

THE COURT:  Okay.  Thank you.

(Adjourned)

C E R T I F I C A T I O N

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Denise P. Veitch_
Denise P. Veitch, RPR
Federal Official Court Reporter

December 27, 2025
Date