## 7.2    Beds by CoC Category, 2024

### Continuums of Care (CoC) were divided into four geographic categories

(1) Major city CoCs (n=48) are CoCs that contain one of the 50 largest cities in the United States. In two cases, Phoenix and Mesa, AZ, and Arlington and Fort Worth, TX, two of the largest US cities are located in the same CoC.

(2) Other largely urban CoCs (n=61) are CoCs in which the population lives predominately in an urbanized area within the CoC's principal city or cities, but the CoCs does not include one of the nation's 50 largest cities.

(3) Largely suburban CoCs (n=165) are CoCs in which the population lives predominantly in suburban areas, defined as urbanized areas outside of a principal city or urban clusters within 10 miles of urbanized areas.

(4) Largely rural CoCs (n=111) are CoCs in which the population lives predominantly in urban clusters that are more than 10 miles from an urbanized area or in Census-defined rural areas.

*Note: These definitions have been adapted from definitions used by the US Department of Education's National Center for Education Statistics to characterize the locations of schools. For detailed information on how they were applied to CoCs, see the About the Report section of this report.*

**Exhibit 7-7: Inventory of Year-Round Beds by Program Type and CoC Category, 2024\***



*Excludes safe haven inventory, which accounts for between 0.1% and 0.3% of beds across the four CoC categories.

In rural CoCs, the split of inventory for people currently experiencing homelessness and people transitioning out of homelessness is roughly even (49% vs 51%). Other largely urban CoCs have significantly more bed inventory for people transitioning out of homelessness than for people currently experiencing homelessness (63% vs 37%).

DOJ-HUD-AR00668

## Context for Changes in the National Inventory, 2021-2024

In response to the COVID-19 pandemic, the U.S. Government passed the Coronavirus Aid, Relief, and Economic Security Act (CARES Act) in March 2020. As part of the CARES Act, Congress appropriated $4 billion to the Emergency Solutions Grants - Coronavirus (ESG-CV) program to help communities support additional homeless assistance and prevention activities. ESG recipients could use ESG-CV funds for additional sponsor-based rental assistance, hotel or motel costs for people experiencing homelessness, and temporary emergency shelters. HUD required that at least 50 percent of funds be drawn by June 2022 and all ESG-CV funds be fully spent by the end of 2023 (with the exception of reallocated funds, which could be spent through June 2024). As such, the impact of ESG-CV funds on bed inventory was greatest in 2021 and 2022. The share of the total inventory for people currently experiencing homelessness that was funded using ESG-CV funds increased from 14 percent in 2021 to 19 percent in 2022 but declined to 8 percent in 2023 and just 3 percent in 2024 as ESG recipients spent down remaining ESG-CV funds in anticipation of the spending deadline. ESG-CV funds were also used to support an increase in the rapid re-housing inventory. In 2021, 10 percent of all rapid re-housing was funded using ESG-CV funds, and by 2022 this had peaked at 34 percent. However, by 2023, the share of rapid rehousing funded by ESG-CV went back down to 10 percent, and by 2024 it was just 1 percent.

In March 2021, Congress passed the American Rescue Plan Act (ARPA) which included $1.1 billion in funding to support Emergency Housing Vouchers (EHV). EHVs are used to provide housing support to people experiencing homelessness or at risk of homelessness. The HIC captures data on OPH and PSH that was supported using EHV funds. CoCs mainly recorded EHV in the HIC as additional OPH inventory. At the time of the 2022 HIC, 34 percent of all OPH and one percent of PSH inventory was supported by EHV funding. In 2023 and 2024, this reached 44 percent for OPH and declined to under one percent for PSH, in accordance with HUD guidance on how to record EHV in the HIC.

**Exhibit 7-8: Inventory of Beds Funded by Coronavirus Relief-Related Funding, 2021-2023**

| | 2021 | | 2022 | | | 2023 | | | 2024 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Bed Inventory (#) | ESG-CV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) | Bed Inventory (#) | ESG-CV Funded (%) | EHV Funded (%) |
| **Emergency Shelter, Safe Haven, and Transitional Housing Inventory** | 396,466 | 14% | 418,642 | 19% | | 449,567 | 8% | | 509,710 | 3% | |
| **RRH Inventory** | 137,206 | 10% | 149,866 | 34% | | 144,765 | 10% | | 146,652 | 1% | |
| **OPH Inventory** | 53,856 | | 90,098 | | 34% | 122,227 | | 44% | 136,962 | | 44% |
| **PSH Inventory** | 376,709 | | 387,305 | | 1% | 395,986 | | 0.5% | 397,241 | | 0.8% |

Note: ESG-CV funding is only available for ES and RRH inventory and was in use by the time of the 2021 HIC. EHV funding can be used to support OPH and PSH housing and was in use by the time of the 2022 HIC. Inventory included is limited to year-round, current inventory.

DOJ-HUD-AR00669

## Appendix A: State-Level Data

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alabama | 4,601 | 39.3% | -15.6% | 2,698 | 58.6% | 1,903 | 41.4% | 9 | 3,430 | 1,171 | 182 | 291 | 533 |
| Alaska | 2,686 | 2.8% | 63.6% | 479 | 17.8% | 2,207 | 82.2% | 37 | 2,019 | 667 | 197 | 106 | 781 |
| Arizona | 14,737 | 3.5% | 0.6% | 7,291 | 49.5% | 7,446 | 50.5% | 20 | 11,640 | 3,097 | 821 | 994 | 774 |
| Arkansas | 2,783 | 6.7% | -27.5% | 1,334 | 47.9% | 1,449 | 52.1% | 9 | 2,035 | 748 | 125 | 226 | 3,497 |
| California | 187,084 | 3.1% | 34.6% | 123,974 | 66.3% | 63,110 | 33.7% | 48 | 161,445 | 25,639 | 9,052 | 9,310 | 66,548 |
| Colorado | 18,715 | 29.6% | 31.6% | 4,791 | 25.6% | 13,924 | 74.4% | 32 | 10,196 | 8,519 | 591 | 978 | 4,059 |
| Connecticut | 3,410 | 13.1% | -23.9% | 574 | 16.8% | 2,836 | 83.2% | 9 | 2,302 | 1,108 | 174 | 174 | 81 |
| Delaware | 1,358 | 9.1% | 28.0% | 238 | 17.5% | 1,120 | 82.5% | 13 | 803 | 555 | 29 | 89 | 1,386 |
| District of Columbia | 5,616 | 14.1% | 5.6% | 900 | 16.0% | 4,716 | 84.0% | 83 | 3,960 | 1,656 | 420 | 213 | 224 |
| Florida | 31,362 | 2.0% | -34.8% | 16,868 | 53.8% | 14,494 | 46.2% | 14 | 23,799 | 7,563 | 1,367 | 2,333 | 6,100 |
| Georgia | 12,290 | 0.0% | -37.4% | 6,673 | 54.3% | 5,617 | 45.7% | 11 | 9,562 | 2,728 | 578 | 646 | 1,633 |
| Hawaii | 11,637 | 87.0% | 91.7% | 4,042 | 34.7% | 7,595 | 65.3% | 81 | 7,145 | 4,492 | 351 | 283 | 1,567 |
| Idaho | 2,750 | 19.7% | 57.2% | 1,374 | 50.0% | 1,376 | 50.0% | 14 | 1,631 | 1,119 | 88 | 209 | 531 |
| Illinois | 25,832 | 116.2% | 66.8% | 2,664 | 10.3% | 23,168 | 89.7% | 21 | 12,310 | 13,522 | 1,947 | 559 | 381 |

DOJ-HUD-AR00670

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indiana | 6,285 | 4.5% | -14.6% | 1,477 | 23.5% | 4,808 | 76.5% | 9 | 4,584 | 1,701 | 273 | 422 | 1,884 |
| Iowa | 2,631 | -0.8% | -3.8% | 464 | 17.6% | 2,167 | 82.4% | 8 | 1,903 | 728 | 137 | 135 | 598 |
| Kansas | 2,793 | 6.0% | 32.3% | 904 | 32.4% | 1,889 | 67.6% | 9 | 2,109 | 684 | 156 | 211 | 764 |
| Kentucky | 5,231 | 9.8% | -35.1% | 1,716 | 32.8% | 3,515 | 67.2% | 12 | 4,105 | 1,126 | 290 | 391 | 987 |
| Louisiana | 3,469 | 9.5% | -36.9% | 1,558 | 44.9% | 1,911 | 55.1% | 8 | 2,861 | 608 | 205 | 223 | 446 |
| Maine | 2,702 | -36.5% | 2.4% | 273 | 10.1% | 2,429 | 89.9% | 19 | 1,548 | 1,154 | 181 | 115 | 1,984 |
| Maryland | 6,069 | 3.5% | -37.0% | 1,036 | 17.1% | 5,033 | 82.9% | 10 | 4,126 | 1,943 | 254 | 312 | 789 |
| Massachusetts | 29,360 | 53.4% | 94.1% | 1,635 | 5.6% | 27,725 | 94.4% | 42 | 6,966 | 22,394 | 564 | 550 | 459 |
| Michigan | 9,739 | 8.2% | -65.6% | 1,623 | 16.7% | 8,116 | 83.3% | 10 | 5,882 | 3,857 | 565 | 456 | 976 |
| Minnesota | 9,201 | 9.6% | 25.6% | 2,084 | 22.6% | 7,117 | 77.4% | 16 | 5,013 | 4,188 | 782 | 299 | 1,707 |
| Mississippi | 1,041 | 6.0% | -24.4% | 486 | 46.7% | 555 | 53.3% | 4 | 874 | 167 | 44 | 40 | 1,534 |
| Missouri | 7,312 | 9.0% | 17.0% | 2,384 | 32.6% | 4,928 | 67.4% | 12 | 5,162 | 2,150 | 501 | 513 | 84 |
| Montana | 2,008 | -7.8% | 74.6% | 576 | 28.7% | 1,432 | 71.3% | 18 | 1,466 | 542 | 122 | 168 | 423 |
| Nebraska | 2,720 | 10.5% | -23.0% | 301 | 11.1% | 2,419 | 88.9% | 14 | 2,020 | 700 | 154 | 129 | 1,824 |
| Nevada | 10,106 | 16.6% | 16.9% | 4,914 | 48.6% | 5,192 | 51.4% | 32 | 8,404 | 1,702 | 545 | 644 | 102 |

DOJ-HUD-AR00671

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| New Hampshire | 2,245 | -8.0% | -0.1% | 579 | 25.8% | 1,666 | 74.2% | 16 | 1,516 | 729 | 118 | 128 | 645 |
| New Jersey | 12,762 | 24.3% | -26.3% | 1,767 | 13.8% | 10,995 | 86.2% | 14 | 8,194 | 4,568 | 515 | 521 | 575 |
| New Mexico | 4,631 | 20.5% | 53.6% | 2,242 | 48.4% | 2,389 | 51.6% | 22 | 3,744 | 887 | 207 | 298 | 1,846 |
| New York | 158,019 | 53.1% | 152.4% | 5,638 | 3.6% | 152,381 | 96.4% | 81 | 62,562 | 95,457 | 7,671 | 1,180 | 1,700 |
| North Carolina | 11,626 | 19.2% | -1.5% | 4,523 | 38.9% | 7,103 | 61.1% | 11 | 8,396 | 3,230 | 524 | 688 | 3,093 |
| North Dakota | 865 | 10.3% | 36.0% | 190 | 22.0% | 675 | 78.0% | 11 | 646 | 219 | 83 | 44 | 5,077 |
| Ohio | 11,759 | 3.3% | 4.4% | 2,379 | 20.2% | 9,380 | 79.8% | 10 | 8,402 | 3,357 | 815 | 589 | 1,429 |
| Oklahoma | 5,467 | 17.6% | 29.5% | 2,216 | 40.5% | 3,251 | 59.5% | 13 | 4,407 | 1,060 | 450 | 304 | 1,344 |
| Oregon | 22,875 | 13.6% | 30.0% | 14,191 | 62.0% | 8,684 | 38.0% | 54 | 18,923 | 3,952 | 1,315 | 1,407 | 7,707 |
| Pennsylvania | 14,088 | 12.2% | -13.1% | 2,635 | 18.7% | 11,453 | 81.3% | 11 | 9,524 | 4,564 | 690 | 719 | 2,140 |
| Rhode Island | 2,442 | 34.9% | 78.0% | 534 | 21.9% | 1,908 | 78.1% | 22 | 1,565 | 877 | 73 | 130 | 756 |
| South Carolina | 4,593 | 13.3% | -18.9% | 1,846 | 40.2% | 2,747 | 59.8% | 9 | 3,703 | 890 | 269 | 388 | 894 |
| South Dakota | 1,338 | 4.4% | 131.1% | 227 | 17.0% | 1,111 | 83.0% | 15 | 1,044 | 294 | 147 | 42 | 151 |
| Tennessee | 8,280 | -10.1% | -26.1% | 4,348 | 52.5% | 3,932 | 47.5% | 12 | 6,640 | 1,640 | 399 | 570 | 1,577 |
| Texas | 27,987 | 2.2% | -29.7% | 12,339 | 44.1% | 15,648 | 55.9% | 9 | 21,648 | 6,339 | 1,355 | 1,837 | 5,028 |

DOJ-HUD-AR00672

| State | All People Experiencing Homelessness, 2024 | Percent Change 2023 to 2024 | Percent Change 2007 to 2024 | All People Experiencing Unsheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Unsheltered, 2024 | All People Experiencing Sheltered Homelessness, 2024 | Percent of People Experiencing Homelessness that are Sheltered, 2024 | Number of People in State Experiencing Homelessness per 10,000 People | Individuals Experiencing Homelessness, 2024 | People in Families with Children Experiencing Homelessness, 2024 | Unaccompanied Youth Experiencing Homelessness, 2024 | Veterans Experiencing Homelessness, 2024 | Individuals Experiencing Chronic Homelessness, 2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Utah | 3,869 | 4.9% | 28.5% | 1,008 | 26.1% | 2,861 | 73.9% | 11 | 2,923 | 946 | 240 | 121 | 869 |
| Vermont | 3,458 | 4.9% | 234.1% | 167 | 4.8% | 3,291 | 95.2% | 53 | 2,153 | 1,305 | 131 | 108 | 918 |
| Virginia | 7,141 | 5.6% | -26.7% | 1,581 | 22.1% | 5,560 | 77.9% | 8 | 4,665 | 2,476 | 309 | 389 | 640 |
| Washington | 31,554 | 12.5% | 35.0% | 16,222 | 51.4% | 15,332 | 48.6% | 40 | 24,320 | 7,234 | 1,723 | 1,780 | 11,986 |
| West Virginia | 1,779 | 25.6% | -26.2% | 788 | 44.3% | 991 | 55.7% | 10 | 1,592 | 187 | 108 | 132 | 603 |
| Wisconsin | 5,049 | 3.9% | -10.6% | 510 | 10.1% | 4,539 | 89.9% | 9 | 3,136 | 1,913 | 216 | 351 | 357 |
| Wyoming | 501 | -5.8% | -6.7% | 89 | 17.8% | 412 | 82.2% | 9 | 399 | 102 | 80 | 37 | 94 |

DOJ-HUD-AR00673

# Appendix B: Additional Data on People Experiencing Homelessness in 2024

## *Changes to the 2024 PIT Demographic Reporting Options.*

In 2024, HUD changed the way data on race, ethnicity, and gender were collected by both expanding the categories and allowing for multiple sections, creating more inclusive identification and reporting. These updates in reporting options aligned with updates made to the FY2024 HMIS Data Standards.

### *Updates to Race and Ethnicity Reporting:*

HUD combined the race and ethnicity options into a single element that allowed people to select one or more race and ethnic identities from the list below.

1) American Indian, Alaska Native, or Indigenous
2) Asian or Asian American
3) Black, African American, or African
4) Hispanic/Latina/e/o
5) Middle Eastern or North African
6) Native Hawaiian or Pacific Islander
7) White

When reporting race and ethnicity for the PIT Count, CoCs were required to report race and ethnicity using the following categories. Under these categories, people were only included in a single race/ethnicity if the person identified with only one race/ethnicity identity (e.g., Black, African American, or African). Selecting the multi-racial reporting option indicates that the person identified with more than one race.

1) American Indian, Alaska Native, or Indigenous
2) American Indian, Alaska Native, or Indigenous & Hispanic/Latina/e/o
3) Asian or Asian American
4) Asian or Asian American & Hispanic/Latina/e/o
5) Black, African American, or African
6) Black, African American, or African & Hispanic/Latina/e/o
7) Hispanic/Latina/e/o
8) Middle Eastern or North African
9) Middle Eastern or North African & Hispanic/Latina/e/o
10) Native Hawaiian or Pacific Islander
11) Native Hawaiian or Pacific Islander & Hispanic/Latina/e/o
12) White
13) White & Hispanic/Latina/e/o
14) Multi-Racial & Hispanic/Latina/e/o
15) Multi-Racial (not Hispanic/Latina/e/o)

### *Updates to Gender Reporting*

Following the updates made to the FY2024 HMIS Data Standards, the gender response options were also updated to allow for the following response options:

1) Woman (Girl if child)
2) Man (Boy if child)

DOJ-HUD-AR00674

3) Culturally Specific Identity (e.g., Two-Spirit)
4) Transgender
5) Non-Binary
6) Questioning
7) Different Identity

When reporting gender for the PIT Count, people could select as many response options as applied to their gender identity. When reporting for the PIT count, CoCs were required to report genders based on the following categories. Under these categories, people were only included in a single gender if the person identified with only one gender identity (e.g., Transgender). More than one gender means that the person identified with more than one gender.

1) Woman (Girl if child)
2) Man (Boy if child)
3) Culturally Specific Identity (e.g., Two-Spirit)
4) Transgender
5) Non-Binary
6) Questioning
7) Different Identity
8) More Than One Gender

DOJ-HUD-AR00675

## B-1: Additional Data on All People Experiencing Homelessness

**Exhibit B1-1: Demographic Characteristics of People Experiencing Homelessness, 2024**

| | All People Experiencing Homelessness | | Sheltered People Experiencing Homelessness | | Unsheltered People Experiencing Homelessness | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 771,480 | 100% | 497,256 | 100% | 274,224 | 100% |
| **Age** | | | | | | |
| **Under 18** | 148,238 | 19.2% | 137,159 | 27.6% | 11,079 | 4.0% |
| **18 to 24** | 57,640 | 7.5% | 43,232 | 8.7% | 14,408 | 5.3% |
| **25-34** | 146,859 | 19.0% | 95,216 | 19.1% | 51,643 | 18.8% |
| **35-44** | 153,849 | 19.9% | 84,122 | 16.9% | 69,727 | 25.4% |
| **45-54** | 118,740 | 15.4% | 58,215 | 11.7% | 60,525 | 22.1% |
| **55-64** | 104,007 | 13.5% | 54,989 | 11.1% | 49,018 | 17.9% |
| **65 and over** | 42,147 | 5.5% | 24,323 | 4.9% | 17,824 | 6.5% |
| **Gender** | | | | | | |
| **Woman (girl)** | 302,660 | 39.2% | 218,628 | 44.0% | 84,032 | 30.6% |
| **Man (boy)** | 459,568 | 59.6% | 274,680 | 55.2% | 184,888 | 67.4% |
| **Transgender** | 2,561 | 0.3% | 1,501 | 0.3% | 1,060 | 0.4% |
| **Gender Questioning** | 383 | 0.0% | 74 | 0.0% | 309 | 0.1% |
| **Culturally Specific Identity** | 324 | 0.0% | 71 | 0.0% | 253 | 0.1% |
| **Different Identity** | 720 | 0.1% | 174 | 0.0% | 546 | 0.2% |
| **Non Binary** | 1,977 | 0.3% | 1,001 | 0.2% | 976 | 0.4% |
| **More Than One Gender** | 3,287 | 0.4% | 1,127 | 0.2% | 2,160 | 0.8% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 4,272 | 0.6% | 2,758 | 0.6% | 1,514 | 0.6% |
| **American Indian Alaska Native or Indigenous Only** | 16,894 | 2.2% | 8,074 | 1.6% | 8,820 | 3.2% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 793 | 0.1% | 409 | 0.1% | 384 | 0.1% |
| **Asian or Asian American Only** | 10,401 | 1.3% | 6,315 | 1.3% | 4,086 | 1.5% |
| **Black African American or African and Hispanic/Latina/e/o** | 15,967 | 2.1% | 13,680 | 2.8% | 2,287 | 0.8% |
| **Black African American or African Only** | 227,769 | 29.5% | 168,206 | 33.8% | 59,563 | 21.7% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 499 | 0.1% | 402 | 0.1% | 97 | 0.0% |
| **Middle Eastern or North African Only** | 1,513 | 0.2% | 881 | 0.2% | 632 | 0.2% |

| | All People Experiencing Homelessness | | Sheltered People Experiencing Homelessness | | Unsheltered People Experiencing Homelessness | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 1,071 | 0.1% | 703 | 0.1% | 368 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 10,312 | 1.3% | 5,865 | 1.2% | 4,447 | 1.6% |
| **White and Hispanic/Latina/e/o** | 51,376 | 6.7% | 40,487 | 8.1% | 10,889 | 4.0% |
| **White Only** | 244,280 | 31.7% | 125,971 | 25.3% | 118,309 | 43.1% |
| **Multi-Racial and Hispanic/Latina/e/o** | 6,841 | 0.9% | 3,991 | 0.8% | 2,850 | 1.0% |
| **Multi-Racial All Other** | 24,346 | 3.2% | 13,088 | 2.6% | 11,258 | 4.1% |
| **Hispanic/Latina/e/o Only** | 155,146 | 20.1% | 106,426 | 21.4% | 48,720 | 17.8% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all people experiencing homelessness and people experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00677

**Exhibit B1-2: Changes in the Demographic Characteristics of People Experiencing Homelessness, 2023-2024**

| | Change in All People | | Change in Sheltered People | | Change in Unsheltered People | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 118,376 | 18.1% | 100,762 | 25.4% | 17,614 | 6.9% |
| **Age** | | | | | | |
| **Under 18** | 36,618 | 32.8% | 36,087 | 35.7% | 531 | 5.0% |
| **18 to 24** | 10,204 | 21.5% | 10,570 | 32.4% | -366 | -2.5% |
| **25-34** | 27,977 | 23.5% | 25,081 | 35.8% | 2,896 | 5.9% |
| **35-44** | 23,462 | 18.0% | 17,587 | 26.4% | 5,875 | 9.2% |
| **45-54** | 12,050 | 11.3% | 6,590 | 12.8% | 5,460 | 9.9% |
| **55-64** | 5,614 | 5.7% | 2,936 | 5.6% | 2,678 | 5.8% |
| **65 and over** | 2,451 | 6.2% | 1,911 | 8.5% | 540 | 3.1% |
| **Gender** | | | | | | |
| **Woman (girl)** | 52,651 | 21.1% | 45,773 | 26.5% | 6,878 | 8.9% |
| **Man (boy)** | 64,408 | 16.3% | 54,410 | 24.7% | 9,998 | 5.7% |
| **Transgender** | -1,526 | -37.3% | -394 | -20.8% | -1,132 | -51.6% |
| **Gender Questioning** | -376 | -49.5% | -189 | -71.9% | -187 | -37.7% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -1,112 | -36.0% | -210 | -17.3% | -902 | -48.0% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 56,629 | 31.6% | 56,418 | 50.2% | 211 | 0.3% |
| **Not Hispanic/Latina/e/o** | 61,747 | 13.0% | 44,344 | 15.6% | 17,403 | 9.2% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -1,950 | -8.4% | 358 | 3.4% | -2,308 | -18.3% |
| **Asian or Asian American** | -380 | -3.3% | 2,276 | 51.2% | -2,656 | -37.3% |
| **Black African American or African** | 112 | 0.0% | 5,561 | 3.2% | -5,449 | -8.1% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | 671 | 6.3% | 2,054 | 45.5% | -1,383 | -22.3% |
| **White** | -29,198 | -9.0% | -12,324 | -6.9% | -16,874 | -11.6% |
| **Multi-Racial** | -8,037 | -20.5% | -4,872 | -22.2% | -3,165 | -18.3% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as

DOJ-HUD-AR00678

Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B1-3: Largest Changes in People Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| Largest Increases | | | | | |
| New York | 54,819 | 53.1% | New York | 95,418 | 152.4% |
| Illinois | 13,885 | 116.2% | California | 48,098 | 34.6% |
| Massachusetts | 10,219 | 53.4% | Massachusetts | 14,233 | 94.1% |
| California | 5,685 | 3.1% | Illinois | 10,345 | 66.8% |
| Hawaii | 5,414 | 87.0% | Washington | 8,175 | 35.0% |
| Largest Decreases | | | | | |
| Maine | -1,556 | -36.5% | Florida | -16,707 | -34.8% |
| Tennessee | -935 | -10.1% | Texas | -11,801 | -29.7% |
| New Hampshire | -196 | -8.0% | Georgia | -7,349 | -37.4% |
| Montana | -170 | -7.8% | New Jersey | -4,552 | -26.3% |
| Wyoming | -31 | -5.8% | Maryland | -3,559 | -37.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B1-4: Percent of All People Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00679

## B-2: Additional Data on Individuals Experiencing Homelessness

**Exhibit B2-1: Changes in Numbers of Individuals Experiencing Homelessness Over Time, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All Individuals** | 99,307 | 24.1% | 116,867 | 29.6% | 103,116 | 25.2% | 44,987 | 9.6% |
| **Sheltered Individuals** | 43,267 | 20.3% | 44,122 | 20.8% | 56,862 | 28.5% | 28,545 | 12.5% |
| **Unsheltered Individuals** | 56,040 | 28.1% | 72,745 | 39.8% | 46,254 | 22.1% | 16,442 | 6.9% |

**Exhibit B2-2: Demographic Characteristics of Individuals Experiencing Homelessness, 2024**

|  | All Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 512,007 | 100% | 256,340 | 100% | 255,667 | 100% |
| **Age** | | | | | | |
| **Under 18** | 2,823 | 0.6% | 1,709 | 0.7% | 1,114 | 0.4% |
| **18 to 24** | 39,267 | 7.7% | 25,957 | 10.1% | 13,310 | 5.2% |
| **25-34** | 98,052 | 19.2% | 49,192 | 19.2% | 48,860 | 19.1% |
| **35-44** | 120,646 | 23.6% | 53,565 | 20.9% | 67,081 | 26.2% |
| **45-54** | 108,668 | 21.2% | 49,491 | 19.3% | 59,177 | 23.1% |
| **55-64** | 101,259 | 19.8% | 52,763 | 20.6% | 48,496 | 19.0% |
| **65 and over** | 41,292 | 8.1% | 23,663 | 9.2% | 17,629 | 6.9% |
| **Gender** | | | | | | |
| **Woman (girl)** | 153,477 | 30.0% | 79,589 | 31.0% | 73,888 | 28.9% |
| **Man (boy)** | 350,056 | 68.4% | 173,376 | 67.6% | 176,680 | 69.1% |
| **Transgender** | 2,449 | 0.5% | 1,411 | 0.6% | 1,038 | 0.4% |
| **Gender Questioning** | 356 | 0.1% | 60 | 0.0% | 296 | 0.1% |
| **Culturally Specific Identity** | 280 | 0.1% | 34 | 0.0% | 246 | 0.1% |
| **Different Identity** | 640 | 0.1% | 107 | 0.0% | 533 | 0.2% |
| **Non Binary** | 1,766 | 0.3% | 824 | 0.3% | 942 | 0.4% |
| **More Than One Gender** | 2,983 | 0.6% | 939 | 0.4% | 2,044 | 0.8% |
| **Race/Ethnicity** | | | | | | |

DOJ-HUD-AR00680

| | All Individuals | | Sheltered Individuals | | Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 3,007 | 0.6% | 1,575 | 0.6% | 1,432 | 0.6% |
| **American Indian Alaska Native or Indigenous Only** | 13,708 | 2.7% | 5,388 | 2.1% | 8,320 | 3.3% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 610 | 0.1% | 233 | 0.1% | 377 | 0.1% |
| **Asian or Asian American Only** | 7,652 | 1.5% | 3,765 | 1.5% | 3,887 | 1.5% |
| **Black African American or African and Hispanic/Latina/e/o** | 6,160 | 1.2% | 4,147 | 1.6% | 2,013 | 0.8% |
| **Black African American or African Only** | 140,174 | 27.4% | 85,562 | 33.4% | 54,612 | 21.4% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 418 | 0.1% | 321 | 0.1% | 97 | 0.0% |
| **Middle Eastern or North African Only** | 1,151 | 0.2% | 566 | 0.2% | 585 | 0.2% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 738 | 0.1% | 389 | 0.2% | 349 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 5,393 | 1.1% | 2,154 | 0.8% | 3,239 | 1.3% |
| **White and Hispanic/Latina/e/o** | 28,912 | 5.6% | 18,885 | 7.4% | 10,027 | 3.9% |
| **White Only** | 204,446 | 39.9% | 92,268 | 36.0% | 112,178 | 43.9% |
| **Multi-Racial and Hispanic/Latina/e/o** | 4,102 | 0.8% | 1,637 | 0.6% | 2,465 | 1.0% |
| **Multi-Racial All Other** | 16,796 | 3.3% | 6,414 | 2.5% | 10,382 | 4.1% |
| **Hispanic/Latina/e/o Only** | 78,740 | 15.4% | 33,036 | 12.9% | 45,704 | 17.9% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00681

**Exhibit B2-3: Changes in the Demographic Characteristics of Individuals Experiencing Homelessness, 2023-2024**

| | Change in All Individuals | | Change in Sheltered Individuals | | Change in Unsheltered Individuals | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 44,987 | 9.6% | 28,545 | 12.5% | 16,442 | 6.9% |
| **Age** | | | | | | |
| **Under 18** | -607 | -17.7% | -145 | -7.8% | -462 | -29.3% |
| **18 to 24** | 5,120 | 15.0% | 5,365 | 26.1% | -245 | -1.8% |
| **25-34** | 11,255 | 13.0% | 8,398 | 20.6% | 2,857 | 6.2% |
| **35-44** | 12,731 | 11.8% | 6,960 | 14.9% | 5,771 | 9.4% |
| **45-54** | 9,185 | 9.2% | 3,923 | 8.6% | 5,262 | 9.8% |
| **55-64** | 5,044 | 5.2% | 2,338 | 4.6% | 2,706 | 5.9% |
| **65 and over** | 2,259 | 5.8% | 1,706 | 7.8% | 553 | 3.2% |
| **Gender** | | | | | | |
| **Woman (girl)** | 13,146 | 9.4% | 7,083 | 9.8% | 6,063 | 8.9% |
| **Man (boy)** | 30,780 | 9.6% | 21,103 | 13.9% | 9,677 | 5.8% |
| **Transgender** | -1,435 | -36.9% | -336 | -19.2% | -1,099 | -51.4% |
| **Gender Questioning** | -315 | -46.9% | -146 | -70.9% | -169 | -36.3% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -1,092 | -38.2% | -239 | -22.5% | -853 | -47.5% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 11,911 | 10.8% | 11,717 | 24.2% | 194 | 0.3% |
| **Not Hispanic/Latina/e/o** | 33,076 | 9.3% | 16,828 | 9.4% | 16,248 | 9.2% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -1,636 | -8.9% | 309 | 4.6% | -1,945 | -16.6% |
| **Asian or Asian American** | -1,802 | -17.9% | 869 | 27.8% | -2,671 | -38.5% |
| **Black African American or African** | -4,255 | -2.8% | 1,800 | 2.0% | -6,055 | -9.7% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | -914 | -13.0% | 666 | 35.5% | -1,580 | -30.6% |
| **White** | -22,516 | -8.8% | -7,709 | -6.5% | -14,807 | -10.8% |
| **Multi-Racial** | -4,199 | -16.7% | -1,313 | -14.0% | -2,886 | -18.3% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in

DOJ-HUD-AR00682

this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B2-4: Largest Changes in Individuals Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| **State** | **#** | **%** | **State** | **#** | **%** |
| **Largest Increases** | | | | | |
| New York | 13,057 | 26.4% | California | 50,493 | 45.5% |
| California | 5,529 | 3.5% | New York | 34,506 | 123.0% |
| Illinois | 4,408 | 55.8% | Washington | 11,031 | 83.0% |
| Washington | 3,420 | 16.4% | Oregon | 9,052 | 91.7% |
| Oregon | 2,681 | 16.5% | Hawaii | 3,810 | 114.2% |
| **Largest Decreases** | | | | | |
| Tennessee | -975 | -12.8% | Florida | -9,241 | -28.0% |
| Colorado | -602 | -5.6% | Texas | -4,658 | -17.7% |
| Maine | -410 | -20.9% | Georgia | -2,959 | -23.6% |
| Montana | -218 | -12.9% | Tennessee | -1,822 | -21.5% |
| New Hampshire | -132 | -8.0% | Massachusetts | -1,326 | -16.0% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B2-5: Percent of Individuals Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00683

### B-3: Additional Data on People in Families with Children Experiencing Homelessness

**Exhibit B3-1: Changes in Numbers of People in Families with Children Experiencing Homelessness Over Time, 2007-2024**

|  | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All People in Families** | 24,915 | 10.6% | 17,536 | 7.2% | 87,898 | 51.2% | 73,389 | 39.4% |
| **Sheltered People in Families** | 62,588 | 35.1% | 49,591 | 25.9% | 86,008 | 55.5% | 72,217 | 42.8% |
| **Unsheltered People in Families** | -37,673 | -67.0% | -32,055 | -63.3% | 1,890 | 11.3% | 1,172 | 6.7% |

**Exhibit B3-2: Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2024**

|  | All People in Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 259,473 | 100% | 240,916 | 100% | 18,557 | 100% |
| **Age** | | | | | | |
| Under 18 | 145,415 | 56.0% | 135,450 | 56.2% | 9,965 | 53.7% |
| 18 to 24 | 18,373 | 7.1% | 17,275 | 7.2% | 1,098 | 5.9% |
| 25-34 | 48,807 | 18.8% | 46,024 | 19.1% | 2,783 | 15.0% |
| 35-44 | 33,203 | 12.8% | 30,557 | 12.7% | 2,646 | 14.3% |
| 45-54 | 10,072 | 3.9% | 8,724 | 3.6% | 1,348 | 7.3% |
| 55-64 | 2,748 | 1.1% | 2,226 | 0.9% | 522 | 2.8% |
| 65 and over | 855 | 0.3% | 660 | 0.3% | 195 | 1.1% |
| **Gender** | | | | | | |
| Woman (girl) | 149,183 | 57.5% | 139,039 | 57.7% | 10,144 | 54.7% |
| Man (boy) | 109,512 | 42.2% | 101,304 | 42.0% | 8,208 | 44.2% |
| Transgender | 112 | 0.0% | 90 | 0.0% | 22 | 0.1% |
| Gender Questioning | 27 | 0.0% | 14 | 0.0% | 13 | 0.1% |
| Culturally Specific Identity | 44 | 0.0% | 37 | 0.0% | 7 | 0.0% |
| Different Identity | 80 | 0.0% | 67 | 0.0% | 13 | 0.1% |
| Non Binary | 211 | 0.1% | 177 | 0.1% | 34 | 0.2% |
| More Than One Gender | 304 | 0.1% | 188 | 0.1% | 116 | 0.6% |
| **Race/Ethnicity** | | | | | | |

DOJ-HUD-AR00684

| | All People in Families | | Sheltered People in Families | | Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 1,265 | 0.5% | 1,183 | 0.5% | 82 | 0.4% |
| **American Indian Alaska Native or Indigenous Only** | 3,186 | 1.2% | 2,686 | 1.1% | 500 | 2.7% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 183 | 0.1% | 176 | 0.1% | 7 | 0.0% |
| **Asian or Asian American Only** | 2,749 | 1.1% | 2,550 | 1.1% | 199 | 1.1% |
| **Black African American or African and Hispanic/Latina/e/o** | 9,807 | 3.8% | 9,533 | 4.0% | 274 | 1.5% |
| **Black African American or African Only** | 87,595 | 33.8% | 82,644 | 34.3% | 4,951 | 26.7% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 81 | 0.0% | 81 | 0.0% | 0 | 0.0% |
| **Middle Eastern or North African Only** | 362 | 0.1% | 315 | 0.1% | 47 | 0.3% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 333 | 0.1% | 314 | 0.1% | 19 | 0.1% |
| **Native Hawaiian or Pacific Islander Only** | 4,919 | 1.9% | 3,711 | 1.5% | 1,208 | 6.5% |
| **White and Hispanic/Latina/e/o** | 22,464 | 8.7% | 21,602 | 9.0% | 862 | 4.6% |
| **White Only** | 39,834 | 15.4% | 33,703 | 14.0% | 6,131 | 33.0% |
| **Multi-Racial and Hispanic/Latina/e/o** | 2,739 | 1.1% | 2,354 | 1.0% | 385 | 2.1% |
| **Multi-Racial All Other** | 7,550 | 2.9% | 6,674 | 2.8% | 876 | 4.7% |
| **Hispanic/Latina/e/o Only** | 76,406 | 29.4% | 73,390 | 30.5% | 3,016 | 16.3% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00685

**Exhibit B3-3: Changes in the Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2023-2024**

| | Change in All People in Families | | Change in Sheltered People in Families | | Change in Unsheltered People in Families | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 73,389 | 39.4% | 72,217 | 42.8% | 1,172 | 6.7% |
| **Age** | | | | | | |
| **Under 18** | 37,225 | 34.4% | 36,232 | 36.5% | 993 | 11.1% |
| **18 to 24** | 5,084 | 38.3% | 5,205 | 43.1% | -121 | -9.9% |
| **25-34** | 16,722 | 52.1% | 16,683 | 56.9% | 39 | 1.4% |
| **35-44** | 10,731 | 47.8% | 10,627 | 53.3% | 104 | 4.1% |
| **45-54** | 2,865 | 39.8% | 2,667 | 44.0% | 198 | 17.2% |
| **55-64** | 570 | 26.2% | 598 | 36.7% | -28 | -5.1% |
| **65 and over** | 192 | 29.0% | 205 | 45.1% | -13 | -6.3% |
| **Gender** | | | | | | |
| **Woman (girl)** | 39,505 | 36.0% | 38,690 | 38.6% | 815 | 8.7% |
| **Man (boy)** | 33,628 | 44.3% | 33,307 | 49.0% | 321 | 4.1% |
| **Transgender** | -91 | -44.8% | -58 | -39.2% | -33 | -60.0% |
| **Gender Questioning** | -61 | -69.3% | -43 | -75.4% | -18 | -58.1% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -20 | -8.7% | 29 | 19.6% | -49 | -59.0% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 44,718 | 65.2% | 44,701 | 69.9% | 17 | 0.4% |
| **Not Hispanic/Latina/e/o** | 28,671 | 24.4% | 27,516 | 26.3% | 1,155 | 9.1% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -314 | -6.6% | 49 | 1.3% | -363 | -38.4% |
| **Asian or Asian American** | 1,422 | 94.2% | 1,407 | 106.7% | 15 | 7.9% |
| **Black African American or African** | 4,367 | 4.7% | 3,761 | 4.3% | 606 | 13.1% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | 1,585 | 43.2% | 1,388 | 52.6% | 197 | 19.1% |
| **White** | -6,682 | -9.7% | -4,615 | -7.7% | -2,067 | -22.8% |
| **Multi-Racial** | -3,838 | -27.2% | -3,559 | -28.3% | -279 | -18.1% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as

DOJ-HUD-AR00686

Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B3-4: Largest Changes in People in Families with Children Experiencing Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| Largest Increases | | | | | |
| New York | 41,762 | 77.8% | New York | 60,912 | 176.3% |
| Massachusetts | 9,512 | 73.8% | Massachusetts | 15,559 | 227.6% |
| Illinois | 9,477 | 234.3% | Illinois | 6,688 | 97.9% |
| Colorado | 4,878 | 134.0% | Hawaii | 1,757 | 64.2% |
| Hawaii | 2,927 | 187.0% | Vermont | 869 | 199.3% |
| Largest Decreases | | | | | |
| Maine | -1,146 | -49.8% | Florida | -7,466 | -49.7% |
| Georgia | -784 | -22.3% | Texas | -7,143 | -53.0% |
| Florida | -268 | -3.4% | Georgia | -4,390 | -61.7% |
| New Mexico | -144 | -14.0% | New Jersey | -3,774 | -45.2% |
| Indiana | -133 | -7.3% | Oregon | -3,767 | -48.8% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

**Exhibit B3-5: Percent of People in Families with Children Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00687

## B-4: Additional Data on Unaccompanied Youth Experiencing Homelessness

**Exhibit B4-1: Changes in Numbers of Unaccompanied Youth Experiencing Homelessness Over Time, 2017-2024**

|  | Total Change 2017-2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **All Unaccompanied Youth** | -133 | -0.3% | 3,960 | 11.6% | 3,467 | 10.0% |
| **Sheltered Unaccompanied Youth** | 6,904 | 37.2% | 8,175 | 47.3% | 4,923 | 24.0% |
| **Unsheltered Unaccompanied Youth** | -7,037 | -35.6% | -4,215 | -24.9% | -1,456 | -10.3% |

**Exhibit B4-2: Demographic Characteristics of Unaccompanied Youth Experiencing Homelessness, 2024**

|  | All Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 38,170 | 100% | 25,446 | 100% | 12,724 | 100% |
| **Age** | | | | | | |
| **Under 18** | 2,698 | 7.1% | 1,627 | 6.4% | 1,071 | 8.4% |
| **18 to 24** | 35,472 | 92.9% | 23,819 | 93.6% | 11,653 | 91.6% |
| **Gender** | | | | | | |
| **Woman (girl)** | 13,607 | 35.6% | 9,266 | 36.4% | 4,341 | 34.1% |
| **Man (boy)** | 22,852 | 59.9% | 15,089 | 59.3% | 7,763 | 61.0% |
| **Transgender** | 551 | 1.4% | 382 | 1.5% | 169 | 1.3% |
| **Gender Questioning** | 82 | 0.2% | 35 | 0.1% | 47 | 0.4% |
| **Culturally Specific Identity** | 50 | 0.1% | 10 | 0.0% | 40 | 0.3% |
| **Different Identity** | 80 | 0.2% | 41 | 0.2% | 39 | 0.3% |
| **Non Binary** | 530 | 1.4% | 362 | 1.4% | 168 | 1.3% |
| **More Than One Gender** | 418 | 1.1% | 261 | 1.0% | 157 | 1.2% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 304 | 0.8% | 169 | 0.7% | 135 | 1.1% |
| **American Indian Alaska Native or Indigenous Only** | 968 | 2.5% | 479 | 1.9% | 489 | 3.8% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 48 | 0.1% | 22 | 0.1% | 26 | 0.2% |

DOJ-HUD-AR00688

| | All Unaccompanied Youth | | Sheltered Unaccompanied Youth | | Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Asian or Asian American Only** | 605 | 1.6% | 270 | 1.1% | 335 | 2.6% |
| **Black African American or African and Hispanic/Latina/e/o** | 651 | 1.7% | 493 | 1.9% | 158 | 1.2% |
| **Black African American or African Only** | 11,762 | 30.8% | 8,730 | 34.3% | 3,032 | 23.8% |
| **Middle Eastern or North African and Hispanic/Latina/e/o** | 11 | 0.0% | 2 | 0.0% | 9 | 0.1% |
| **Middle Eastern or North African Only** | 243 | 0.6% | 196 | 0.8% | 47 | 0.4% |
| **Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o** | 71 | 0.2% | 35 | 0.1% | 36 | 0.3% |
| **Native Hawaiian or Pacific Islander Only** | 312 | 0.8% | 167 | 0.7% | 145 | 1.1% |
| **White and Hispanic/Latina/e/o** | 2,674 | 7.0% | 2,002 | 7.9% | 672 | 5.3% |
| **White Only** | 10,330 | 27.1% | 5,744 | 22.6% | 4,586 | 36.0% |
| **Multi-Racial and Hispanic/Latina/e/o** | 438 | 1.1% | 242 | 1.0% | 196 | 1.5% |
| **Multi-Racial All Other** | 1,482 | 3.9% | 845 | 3.3% | 637 | 5.0% |
| **Hispanic/Latina/e/o Only** | 8,271 | 21.7% | 6,050 | 23.8% | 2,221 | 17.5% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

DOJ-HUD-AR00689

**Exhibit B4-3: Changes in the Demographic Characteristics of Unaccompanied Youth Experiencing Homelessness, 2023-2024**

| | Change in All Unaccompanied Youth | | Change in Sheltered Unaccompanied Youth | | Change in Unsheltered Unaccompanied Youth | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Total** | 3,467 | 10.0% | 4,923 | 24.0% | -1,456 | -10.3% |
| **Age** | | | | | | |
| **Under 18** | -542 | -16.7% | -105 | -6.1% | -437 | -29.0% |
| **18-24** | 4,009 | 12.7% | 5,028 | 26.8% | -1,019 | -8.0% |
| **Gender** | | | | | | |
| **Woman (girl)** | 431 | 3.3% | 1,051 | 12.8% | -620 | -12.5% |
| **Man (boy)** | 2,977 | 15.0% | 3,789 | 33.5% | -812 | -9.5% |
| **Transgender** | -168 | -23.4% | -84 | -18.0% | -84 | -33.2% |
| **Gender Questioning** | -75 | -47.8% | -34 | -49.3% | -41 | -46.6% |
| **Culturally Specific Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Different Identity** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Non Binary** | -246 | -31.7% | -111 | -23.5% | -135 | -44.6% |
| **More Than One Gender** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Ethnicity** | | | | | | |
| **Hispanic/Latina/e/o** | 1,972 | 18.8% | 3,001 | 49.9% | -1,029 | -23.0% |
| **Not Hispanic/Latina/e/o** | 1,456 | 6.0% | 1,883 | 13.0% | -427 | -4.4% |
| **Race (any ethnicity)** | | | | | | |
| **American Indian Alaska Native or Indigenous** | -449 | -26.1% | -111 | -14.6% | -338 | -35.1% |
| **Asian or Asian American** | 5 | 0.8% | 22 | 8.1% | -17 | -4.5% |
| **Black African American or African** | -28 | -0.2% | 242 | 2.7% | -270 | -7.8% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | -96 | -20.0% | 20 | 11.0% | -116 | -39.1% |
| **White** | -4,008 | -23.6% | -1,384 | -15.2% | -2,624 | -33.3% |
| **Multi-Racial** | -482 | -20.1% | -114 | -9.5% | -368 | -30.6% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

DOJ-HUD-AR00690

**Exhibit B4-4: Largest Changes in Unaccompanied Youth Experiencing Homelessness by State, 2017-2024**

| Change 2023-2024 | | | Change 2017-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| Largest Increases | | | | | |
| New York | 3,203 | 71.7% | New York | 4,842 | 171.2% |
| Illinois | 949 | 95.1% | Illinois | 1,217 | 166.7% |
| Hawaii | 175 | 99.4% | Arizona | 243 | 42.0% |
| Florida | 154 | 12.7% | District of Columbia | 192 | 84.2% |
| Nevada | 116 | 27.0% | Ohio | 120 | 17.3% |
| Largest Decreases | | | | | |
| California | -1,121 | -11.0% | California | -3,910 | -30.2% |
| Washington | -303 | -15.0% | Nevada | -1,621 | -74.8% |
| Tennessee | -160 | -28.6% | Florida | -652 | -32.3% |
| Oregon | -109 | -7.7% | Washington | -412 | -19.3% |
| Montana | -61 | -33.3% | Colorado | -172 | -22.5% |

**Exhibit B4-5: Percent of Unaccompanied Youth Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00691

## B-5: Additional Data on Veterans Experiencing Homelessness

**Exhibit B5-1: Changes in Numbers of Veterans Experiencing Homelessness Over Time, 2009-2024**

|  | Total Change 2009–2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % | # | % |
| **All Veterans** | -40,485 | -55.2% | -41,205 | -55.6% | -4,370 | -11.7% | -2,692 | -7.6% |
| **Sheltered Veterans** | -24,378 | -56.2% | -24,406 | -56.2% | -3,017 | -13.7% | -1,036 | -5.2% |
| **Unsheltered Veterans** | -16,107 | -53.8% | -16,799 | -54.8% | -1,353 | -8.9% | -1,656 | -10.7% |

**Exhibit B5-2: Demographic Characteristics of People in Families with Children Experiencing Homelessness, 2024**

|  | All Veterans | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
|  | # | % | # | % | # | % |
| **Total** | 32,882 | 100% | 19,031 | 100% | 13,851 | 100% |
| **Gender** | | | | | | |
| **Woman (girl)** | 3,329 | 10.1% | 1,661 | 8.7% | 1,668 | 12.0% |
| **Man (boy)** | 29,189 | 88.8% | 17,252 | 90.7% | 11,937 | 86.2% |
| **Transgender** | 110 | 0.1% | 51 | 0.0% | 59 | 0.1% |
| **Gender Questioning** | 12 | 0.0% | 2 | 0.0% | 10 | 0.1% |
| **Culturally Specific Identity** | 26 | 0.3% | 6 | 0.1% | 20 | 0.6% |
| **Different Identity** | 13 | 0.3% | 1 | 0.3% | 12 | 0.4% |
| **Non Binary** | 105 | 0.0% | 27 | 0.0% | 78 | 0.1% |
| **More Than One Gender** | 98 | 0.3% | 31 | 0.2% | 67 | 0.5% |
| **Race/Ethnicity** | | | | | | |
| **American Indian Alaska Native or Indigenous and Hispanic/Latina/e/o** | 139 | 0.4% | 59 | 0.3% | 80 | 0.6% |
| **American Indian Alaska Native or Indigenous Only** | 898 | 2.7% | 376 | 2.0% | 522 | 3.8% |
| **Asian or Asian American and Hispanic/Latina/e/o** | 14 | 0.0% | 5 | 0.0% | 9 | 0.1% |
| **Asian or Asian American Only** | 376 | 1.1% | 152 | 0.8% | 224 | 1.6% |
| **Black African American or African and Hispanic/Latina/e/o** | 298 | 0.9% | 187 | 1.0% | 111 | 0.8% |
| **Black African American or African Only** | 9,890 | 30.1% | 6,746 | 35.4% | 3,144 | 22.7% |

DOJ-HUD-AR00692

| | All Veterans | | Sheltered Veterans | | Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Middle Eastern or North African and Hispanic/Latina/e/o | 4 | 0.0% | 0 | 0.0% | 4 | 0.0% |
| Middle Eastern or North African Only | 53 | 0.2% | 9 | 0.0% | 44 | 0.3% |
| Native Hawaiian or Pacific Islander and Hispanic/Latina/e/o | 32 | 0.1% | 21 | 0.1% | 11 | 0.1% |
| Native Hawaiian or Pacific Islander Only | 308 | 0.9% | 120 | 0.6% | 188 | 1.4% |
| White and Hispanic/Latina/e/o | 1,094 | 3.3% | 775 | 4.1% | 319 | 2.3% |
| White Only | 16,034 | 48.8% | 9,465 | 49.7% | 6,569 | 47.4% |
| Multi-Racial and Hispanic/Latina/e/o | 248 | 0.8% | 94 | 0.5% | 154 | 1.1% |
| Multi-Racial All Other | 1,291 | 3.9% | 485 | 2.5% | 806 | 5.8% |
| Hispanic/Latina/e/o Only | 2,203 | 6.7% | 537 | 2.8% | 1,666 | 12.0% |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. The data for all individuals experiencing homelessness and individuals experiencing unsheltered homelessness includes extrapolated (estimated) race/ethnicity data for 22 CoCs that did not conduct an unsheltered count in 2024 and thus did not have these new race/ethnicity categories.

**Exhibit B5-3: Changes in the Demographic Characteristics of Veterans Experiencing Homelessness, 2023-2024**

| | Change in All Veterans | | Change in Sheltered Veterans | | Change in Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| Total | -2,692 | -7.6% | -1,036 | -5.2% | -1,656 | -10.7% |
| Gender | | | | | | |
| Woman (girl) | -651 | -16.4% | -154 | -8.5% | -497 | -23.0% |
| Man (boy) | -2,042 | -6.5% | -896 | -4.9% | -1,146 | -8.8% |
| Transgender | -63 | -36.4% | -23 | -31.1% | -40 | -40.4% |
| Gender Questioning | -17 | -58.6% | -7 | -77.8% | -10 | -50.0% |
| Culturally Specific Identity | N/A | N/A | N/A | N/A | N/A | N/A |
| Different Identity | N/A | N/A | N/A | N/A | N/A | N/A |
| Non Binary | -56 | -34.8% | 6 | 28.6% | -62 | -44.3% |
| More Than One Gender | N/A | N/A | N/A | N/A | N/A | N/A |
| Ethnicity | | | | | | |
| Hispanic/Latina/e/o | -657 | -14.0% | -154 | -8.4% | -503 | -17.6% |
| Not Hispanic/Latina/e/o | -2,035 | -6.6% | -882 | -4.8% | -1,153 | -9.1% |
| Race (any ethnicity) | | | | | | |
| American Indian Alaska Native or Indigenous | -232 | -18.3% | -26 | -5.6% | -206 | -25.5% |

DOJ-HUD-AR00693

| | Change in All Veterans | | Change in Sheltered Veterans | | Change in Unsheltered Veterans | |
|---|---|---|---|---|---|---|
| | # | % | # | % | # | % |
| **Asian or Asian American** | -218 | -35.9% | -26 | -14.2% | -192 | -45.2% |
| **Black African American or African** | -948 | -8.5% | -270 | -3.7% | -678 | -17.2% |
| **Middle Eastern or North African** | N/A | N/A | N/A | N/A | N/A | N/A |
| **Native Hawaiian or Pacific Islander** | -87 | -20.4% | -28 | -16.6% | -59 | -22.9% |
| **White** | -3,159 | -15.6% | -1,103 | -9.7% | -2,056 | -23.0% |
| **Multi-Racial** | -308 | -16.7% | -129 | -18.2% | -179 | -15.7% |
| **Hispanic/Latina/e/o Only** | N/A | N/A | N/A | N/A | N/A | N/A |

Note: In 2024, communities were asked to update the response options available for people to select their gender and race/ethnicity. Since these categories were not collected in prior years, changes over time cannot be reported for all categories. Furthermore, some changes in gender and race may appear as artificial decreases because of these new reporting categories. For example, the declines in the number of people who identified as transgender, gender questioning, or non-binary in 2024 could be due to people reporting under one of the new gender categories that could not be included in the change over time calculations in this chart. Similarly, in 2023, people were required to identify as at least one race and one ethnicity. In 2024, people could report as Hispanic/Latina/e/o Only, thus reducing the count of people who identified as another race in addition to Hispanic/Latina/e/o. This may help explain some of the reductions observed in the number of people who reported their race as White.

**Exhibit B5-4: Largest Changes in Veterans Experiencing Homelessness by State, 2009-2024**

| Change 2023-2024 | | | Change 2009-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| **Largest Increases** | | | | | |
| Washington | 96 | 5.7% | Oregon | 130 | 10.2% |
| New York | 82 | 7.5% | Vermont | 47 | 76.5% |
| New Jersey | 67 | 14.8% | Rhode Island | 10 | 8.3% |
| Arizona | 62 | 6.7% | N/A | -- | -- |
| New Mexico | 42 | 16.4% | N/A | -- | -- |
| **Largest Decreases** | | | | | |
| California | -1,279 | -12.1% | California | -8,663 | -48.2% |
| Nevada | -450 | -41.1% | Florida | -4,802 | -67.3% |
| Florida | -225 | -8.8% | New York | -4,699 | -79.9% |
| Texas | -199 | -9.8% | Texas | -3,654 | -66.5% |
| Tennessee | -189 | -24.9% | Georgia | -2,114 | -76.6% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2009 and 2024.

DOJ-HUD-AR00694

**Exhibit B5-5: Percent of Veterans Experiencing Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00695

## B-6: Additional Data on Individuals with Chronic Patterns of Homelessness

**Exhibit B6-1: Changes in Numbers of Individuals with Chronic Patterns of Homelessness Over Time, 2007-2024**

| | Total Change 2007-2024 | | Total Change 2010–2024 | | Total Change 2020–2024 | | Total Change 2023-2024 | |
|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % |
| **All Individuals with Chronic Patterns of Homelessness** | 32,772 | 27.4% | 46,523 | 43.9% | 42,057 | 38.1% | 9,480 | 6.6% |
| **Sheltered Individuals with Chronic Patterns of Homelessness** | 11,252 | 26.9% | 9,691 | 22.4% | 15,909 | 42.9% | 2,883 | 5.8% |
| **Unsheltered Individuals with Chronic Patterns of Homelessness** | 21,520 | 27.6% | 36,832 | 58.7% | 26,148 | 35.6% | 6,597 | 7.1% |

**Exhibit B6-2: Largest Changes in Individuals with Chronic Patterns of Homelessness by State, 2007-2024**

| Change 2023-2024 | | | Change 2007-2024 | | |
|---|---|---|---|---|---|
| State | # | % | State | # | % |
| **Largest Increases** | | | | | |
| Washington | 4,295 | 55.8% | California | 26,207 | 65.0% |
| Oregon | 1,423 | 22.6% | Washington | 9,383 | 360.5% |
| Nevada | 715 | 30.1% | Oregon | 4,878 | 172.4% |
| Florida | 700 | 13.0% | Nevada | 2,222 | 255.1% |
| Illinois | 577 | 44.1% | New Mexico | 989 | 139.1% |
| **Largest Decreases** | | | | | |
| California | -962 | -1.4% | Texas | -2,903 | -36.6% |
| New York | -597 | -10.5% | New York | -1,399 | -21.6% |
| Tennessee | -280 | -15.1% | Florida | -1,363 | -18.3% |
| Alaska | -171 | -24.3% | Tennessee | -1,190 | -43.0% |
| Montana | -117 | -21.7% | Virginia | -1,045 | -53.2% |

Notes: Due to changes in their PIT count methodology, Colorado, North Dakota, South Dakota, Michigan, and Wyoming were excluded from the list of largest decreases between 2007 and 2024.

DOJ-HUD-AR00696

**Exhibit B6-3: Percent of Individuals with Chronic Patterns of Homelessness that are Sheltered or Unsheltered by CoC Category, 2024**



DOJ-HUD-AR00697

**GOVERNANCE**
Homelessness, Housing

June 26th, 2025
**Report** by Stephen Eide

# The Future of Housing for the Homeless

### Executive Summary

Permanent supportive housing (PSH) has become a central part of the government's response to homelessness. PSH, which provides rental assistance coupled with social services, is prioritized for "chronic" cases: those with a disability and a long-term experience of homelessness.

There are around 400,000 PSH units nationwide, up 25% over the last decade. That increase reflects policymakers' embrace of the Housing First philosophy, which emphasizes permanent housing as the solution to homelessness. Proponents of these policies claimed that they would dramatically reduce, or perhaps even end, homelessness. But homelessness reached a record high last year, exceeding the record high of the previous year.[1] Chronic homelessness, too, is at a record high.[2]

The Trump administration has indicated that, given these failures, it will reassess the place of PSH in federal homelessness policy.

That reassessment is appropriate, especially because the PSH model will face even more challenges in the coming years. Problems inherent in PSH that were ignored during its rapid growth will become more acute and hinder further expansion:

1. PSH budgets will have to divert more resources to maintain old units, thus reducing resources for adding new units.

2. PSH's emphasis on community integration creates community opposition, which slows the rate at which new units can be brought online. Community opposition will increase in coming years.

3. PSH is hard to scale, and its effect on homelessness, which is limited to begin with, fades over time. That will weaken public support for the model.

4. Some PSH tenants need a higher level of care than the model can deliver.

Reassessment is not the same as replacement. PSH will continue to play an important role in government's response to homelessness. To strengthen current PSH programs, this report concludes with the following recommendations:

1. Decouple PSH and Housing First by giving PSH providers more flexibility.

2. Invest in temporary housing.

3. Create treatment courts for housing.

4. Shift more responsibility for the most difficult PSH tenants to other behavioral health systems.



DOJ-HUD-AR00698

## Introduction

In some places, such as California, homelessness has consistently ranked among top public concerns since the 2010s.[3] In response, policymakers have prioritized investment in permanent supportive housing (PSH), or service-enhanced housing for the homeless.

At the end of the Biden administration, federal outlays on homelessness had reached historical highs.[4] There has also been an impressive increase in state and local commitments to housing for the homeless.[5] In total, Los Angeles's HHH program (2016), New York City's NYC 15/15 initiative (2015), and New York State's Empire State Supportive Housing Initiative (2015) will build more than 40,000 units of PSH. The nation's PSH stock has increased 25% since 2014 (**Figure 1**).

But the case for even more spending on PSH has weakened recently because, despite historical investment in the model, rates of homelessness have risen to record-high levels. Some of that surge has been driven by the recent increase in migrants, many of whom were placed in shelters.[6] But the number of unsheltered and chronically homeless people—who are a priority for PSH placement due to disability and long-term homelessness—is also at a historical high. Independent of the migrant surge, New York and California have long been grappling with homelessness crises, despite their investments in PSH (**Figures 2–3** and **Table 1**).

### Figure 1

## PSH Units, 2007–24



DOJ-HUD-AR00699

**Figure 2**

## Chronically Homeless, 2007–24



DOJ-HUD-AR00700

12/22/25, Case 1:25-cv-00626-MSM-AEM    Document 76-1    Filed 12/31/25  Page 34 of 129 PageID
The Future of Housing for the Homeless
#: 2320

## Figure 3

## Street Homeless, 2007–24



Source for Figs. 1, 2, and 3: U.S. Dept. of Housing and Urban Development (HUD), "The 2024 Annual Homelessness Assessment Report (AHAR) to Congress," December 2024; HUD Exchange, "CoC Homeless Populations and Subpopulations Reports," December 2025, exhibits 7-3, 1-1, 6-1

## Table 1

## PSH Expansion vs. Change in Homelessness, 2007–24

|  | # Change, 2015–24 | % Change, 2015–24 |
| --- | --- | --- |
| **Nationwide** |  |  |
| PSH Units | 78,568 | 24.7% |
| Street Homeless | 100,956 | 58.3% |
| Chronically Homeless | 69,415 | 83.5% |
| **California** |  |  |
| PSH Units | 27,998 | 55.2% |
| Street Homeless | 50,275 | 68.2% |
| Chronically Homeless | 37,370 | 128.1% |
| **New York** |  |  |
| PSH Units | 12,491 | 31.3% |

DOJ-HUD-AR00701

| Street Homeless | 1,616 | 40.2% |
| Chronically Homeless | 750 | 17.3% |

Source: Author analysis of HUD data

PSH expansions have been guided by a theory known as Housing First, which holds that permanent housing benefits must be granted without requiring participation in services, sobriety, or any other behavioral change. In Housing First–style PSH, social services are provided on a purely voluntary basis. Some PSH programs began before the development of Housing First.[7] However, at present, Housing First and PSH are functionally indistinguishable.

**Problems That Will Hinder Further PSH Expansion**

Over the last two decades, Housing First has gained influence among major government funders of homelessness programs, such as the U.S. Department of Housing and Urban Development's Continuum of Care program and the California state government. Policymakers—and, to an extent, the broader public—believed advocates who claimed that Housing First could end homelessness. But because the jurisdictions that most thoroughly implemented Housing First have seen large increases in homelessness, skepticism about the policy is growing. With national homelessness trends now so unfavorable, a reassessment of Housing First is unavoidable. In its FY26 budget request, the Trump administration called for restructuring homelessness assistance grants as mainly temporary housing.[8] While the final results of the budget process are uncertain, the proposal is evidence of the administration's intent to redirect homelessness policy away from Housing First. [9]

A thorough reassessment of homelessness policy should also examine the PSH model—including its inherent problems, which were ignored as the model expanded and are likely to worsen in coming years. Faced with such an assessment, even the policymakers most ideologically committed to PSH and Housing First would have to accept the fact that expansion will be even harder than in the past.

**Expansion vs. maintenance**

PSH exists in two forms: tenant-based, in which the subsidy is given to the individual who uses it to rent a unit on the private market; and site-based, in which the subsidy is connected to a unit. Most PSH stock is tenant-based, especially outside New York and California (**Table 2**).[10]

## Table 2

**Tenant-Based vs. Site-Based PSH, 2024**

| **Total PSH Nationwide** | **412,623** | |
| Tenant-Based PSH, Nationwide | 248,241 | 60.2% |
| Site-Based PSH, Nationwide | 164,382 | 39.8% |

DOJ-HUD-AR00702

| | | |
|---|---|---|
| **Total PSH, California and New York** | **135,209** | |
| Tenant-Based PSH, New York and California | 53,078 | 39.3% |
| Site-Based PSH, New York and California | 82,131 | 60.7% |
| **Total PSH, Outside California and New York** | **277,414** | |
| Tenant-Based PSH, Outside California and New York | 195,163 | 70.4% |
| Site-Based PSH, Outside California and New York | 82,251 | 29.6% |

Source: Author analysis of HUD, "2024 Housing Inventory Count (Raw File)"

Some homeless advocates favor tenant-based PSH because it provides the homeless with ordinary housing: a normal rental unit like one that any other household might use, integrated into buildings and neighborhoods inhabited by the non-homeless.[11] Orthodox Housing First doctrine holds that "consumer choice" is paramount and that, given the choice, homeless Americans would prefer to "live in a place of their own rather than in congregate specialized housing with treatment services onsite."[12] The dominance of tenant-based PSH is also in line with broader norms in affordable housing, which have, over the years, shifted toward voucher-style approaches.[13]

However, tenant-based PSH has certain practical disadvantages. Expanding tenant-based PSH, at scale, requires getting more landlords to enter the business of housing the formerly homeless. NYC 15/15 was initially projected to create 7,500 units of site-based PSH and 7,500 tenant-based units. But with too few landlords willing to participate, the city recently announced that most of the tenant-based units would be converted to site-based.[14] The problem is especially acute in hot housing markets, which pose the greatest risk of homelessness for low-income individuals but which also offer landlords the widest choice of tenants. As a result, tenant-based PSH is particularly hard to scale in places where it is seen as most needed.

Relying on landlords also subjects PSH tenants to greater risk of eviction. Formerly homeless people are more likely to engage in behaviors that can lead to eviction, including nonpayment of rent,[15] hoarding,[16] setting fires, flooding, noise, harassing other tenants, assaulting other tenants, and "unit takeovers," ceding control of a unit to a drug dealer or someone else interested in using it for criminal purposes.[17] Some studies of tenant-based PSH programs show extraordinarily high rates of housing instability.[18] While eviction may sometimes benefit other tenants, it is easier to control in the case of site-based PSH.

But site-based PSH also faces practical difficulties. Like mainstream affordable housing programs, site-based PSH developments rely on multiple funding sources, such as the Low-Income Housing Tax Credit (a block grant–style federal program available to states),[19] own-source state and local housing programs, and population-specific resources such as for veterans and tenants with AIDS. However, the extremely low incomes of PSH tenants and the need for service funding make financing these projects especially expensive and complex.[20]

In 2023, the Los Angeles–based Skid Row Housing Trust, a major site-based PSH provider, fell into receivership. [21] Beginning in the late 1980s, the organization built a strong reputation by acquiring derelict for-profit hotels in Skid Row and renovating them into nonprofit PSH. Over the years, Skid Row Housing Trust grew its portfolio by tapping into various new funding streams—but it also failed to maintain its older properties. By 2022, a quarter of its 2,000 units were vacant, often due to severe damage, triggering a vicious cycle of declining

DOJ-HUD-AR00703

rent revenues and further deterioration.[22] Because each property relied on different funding streams, money dedicated to viable properties could not be used to repair damaged units. The severity of the situation was not evident before receivership because the trust's financial statements reported the condition of the organization as a whole, not individual properties. Its portfolio of 29 buildings was sold off to new owners whose goal is to maintain all units as PSH, but finances remain precarious.[23]

The downfall of Skid Row Housing Trust reflects a classic pathology of American government: prioritizing expansion over maintenance. Faced with a homelessness emergency, the city of Los Angeles rushed to bring new housing units online. The city's voters approved historical levels of investment in PSH, including via the $1.2 billion HHH program in 2016, in which the trust participated.[24] Policymakers devoted less attention and resources to maintain existing programs.

The Skid Row Housing Trust began around 1990, when many other PSH programs were launching.[25] Examples of other once-admired supportive housing providers now facing financial problems are the San Francisco-based Tenants and Owners Development Corporation and the Chicago-based Heartland Alliance. In NYC, some older PSH projects currently have more than 100 building violations,[26] while more than 2,000 PSH units are currently offline because they are too damaged to rent.[27]

All landlords rely on rents to fund upkeep, which is especially challenging for PSH. Low-income households not only pay less in rent than working-class and middle-income Americans, but their payments are also more erratic.[28] Rent delinquency is a major concern for many PSH providers.[29] Meanwhile, as PSH building stock continues to age, so do the tenants,[30] which will require expensive accessibility-related maintenance.

### Community integration vs. community opposition

To promote community integration, PSH is meant to resemble normal community living, not institutional living. Residents can come and go as they please, without being subject to any more requirements than a typical tenant. Best-practice manuals, such as a 2010 report published by the federal Substance Abuse and Mental Health Services Administration, advise against "clustering" PSH tenants.[31] The pursuit of integration, however, often provokes community opposition, which critics term "NIMBYism" (Not in My Backyard-ism).

PSH prioritizes those who have experienced long-term homelessness, without imposing any expectation of behavioral change. Thus, asking a neighborhood to accept PSH is a different proposition from, for example, asking it to accept a family shelter, affordable housing project, or market-rate apartment building. Individuals whose behavior in tent encampments provoked community outrage do not necessarily become ideal neighbors after they are placed in housing.[32]

Working-class and low-income neighborhoods[33]—which often welcome forms of development that wealthy areas reject, such as affordable housing—are less receptive to programs like PSH, single-adult shelters, methadone clinics, and safe consumption sites. Residents of these areas feel that they are already "saturated."[34]

Over the past two decades, cities such as Los Angeles, San Francisco, and New York have expanded not only PSH but also a broader array of programs serving those with addiction, seriously mental illness, and criminal

DOJ-HUD-AR00704

records. As a result, more neighborhoods can now credibly claim to be saturated than when PSH expansion started.

Even when funding is available, community opposition slows down the pace at which government can bring units online. If opposition remains high, inflows into homelessness are likely to outpace the number of people housed in PSH.

### Scale and fadeout

PSH is hard to scale. The peer-reviewed literature on PSH/Housing First largely examines rates of residential stability among formerly homeless people placed in PSH. In these studies, residential stability rates typically hover around 80% over the course of the study—usually less than five years.[35] However, these findings reflect outcomes of individual programs, not the effects of Housing First implemented at a community-wide scale. One 2017 study found that reducing homelessness by a single person may require building as many as 10 PSH units. [36]

A major PSH expansion will absorb a certain portion of a community's homeless population. But after all those units are leased, what happens to new people who fall into homelessness? Over a period longer than a few years, many homeless people who do not get PSH will exit homelessness, and some homeless people who do receive PSH will wind up homeless again.[37] Thus, the effect of PSH, over and against other interventions, fades over time.

Scale- and fadeout-related problems mean that even dramatic investments in PSH might not yield noticeable and sustainable improvement in street conditions. That has certainly been the experience in California, where public support for PSH has weakened.[38] Advocates can still argue that expanding PSH is the right thing to do —but they can't argue that members of the public will notice a change in their quality of life.

### Health vs. housing

PSH differs from mainstream affordable housing most distinctly in its promise of supportive services. But those services can be expensive: per unit estimates of annual PSH costs range from less than $20,000 to over $50,000. [39] Some providers argue that they have been underfunded.[40]

These requests for more money may reflect unreasonably low funding rates for old programs and how, in recent years, government required PSH providers to accept tenants with increased behavioral and health problems, who are more expensive to handle.[41] It's also possible that funding rates were consciously set too low, in order to build political support for PSH and the idea that it was the most cost-effective solution to homelessness.[42]

PSH is prioritized for the chronically homeless, whose needs are among the most acute within the homeless population generally—which itself has some of the highest needs among all low-income groups. Meeting these needs might require an array of nurses, case managers, professionals who specialize in supported employment (via social enterprise or corporate responsibility programs), staff for art and music programs, fitness and nutrition specialists, mental-health professionals (psychiatrists, clinical social workers), and substance-abuse

DOJ-HUD-AR00705

professionals (detox, medication-assisted treatment, peer support). Whether, or to what degree, investment in these services is appropriate depends on whether PSH is appropriately defined as a health or housing program.

The argument for increased spending on supportive services is, to some extent, similar to that for greater investment in maintenance of existing units. But spending on basic maintenance does not raise questions about the ultimate goal of PSH. If residential stability is the only standard of success in homelessness policy, only a modest level of supportive services is appropriate.

Residential stability can also be achieved by simply not evicting tenants for behavior that would normally merit that course of action. In the case of some tenant-based PSH programs, supportive services functionally serve the landlord,[43] who expects to have someone to call when friction arises. Supportive-services personnel intercede with, and on behalf of, landlords and find new housing situations when existing ones become untenable. Supporting landlords is an important goal.[44] But it is different from improving the health of formerly homeless tenants. If PSH "service" funds serve only to manage friction with landlords, it is not obvious why these funds should qualify for Medicaid reimbursement.[45]

Some proponents of PSH obscure questions about the program's purpose by equating investment in housing with investment in health care. But the Housing First literature reveals high rates of social isolation and mortality,[46] as well as poor health outcomes,[47] among participants. These outcomes suggest a deeper problem: PSH programs are effectively warehousing those with complex needs in environments that cannot provide adequate care.[48] Several journalistic accounts have detailed how PSH can become gruesome for tenants who need more care than the programs provide.[49] While some argue that establishing and maintaining housing is in itself therapeutic—or at least helps to socialize—that is less true when tenancy requires fewer expectations.

Perhaps more spending on supportive services would improve health outcomes for some PSH tenants. But for tenants with the most acute, unmet needs, the focus should be instead on finding a program that provides a higher level of care than PSH—for their own benefit, as well as that of other tenants and the host neighborhood.

### Recommendations

The recent rapid expansion of PSH was premised on a flawed assumption: that homelessness was immune from normal dilemmas encountered in other fields of social policy. The problems facing PSH—expansion vs. maintenance, scale and fadeout, NIMBYism, community opposition, and the failure to distinguish between health and social needs[50]—are familiar. Infrastructure and public housing struggle with maintenance; alternatives to incarceration and charter schools confront scaling problems; pre-K programs face fadeout; and addiction services regularly provoke NIMBY backlash. The belief that homelessness was somehow exceptional in its avoidance of normal policymaking pitfalls fed an even more flawed assumption: that homelessness could be ended.

Funding for federal homelessness programs is unlikely to rise dramatically in the near-term. At the state and local levels, homelessness-related ballot initiatives have recently been passing by slimmer margins than they did

DOJ-HUD-AR00706

during the 2010s.[51] Increased fiscal restraint, combined with the challenges facing PSH, means that even policymakers who are philosophically committed to Housing First will have to consider alternatives in the coming years.

The growth of Housing First was driven, in part, by exaggerated claims about its effectiveness[52] but also by a legitimate desire for permanent housing solutions to homelessness on the part of many American communities. This need can be exaggerated, but it is real. What communities want is not an end to PSH but the freedom to operate it as best they see fit.

Reassessing PSH should, above all, be focused on consolidating and improving current programs. Here are some recommendations about how to relieve pressure on PSH providers:

**Decouple PSH and Housing First by giving PSH providers more flexibility**

Provider flexibility could be expanded by loosening requirements in the "Notice of Funding Opportunity" for HUD's Continuum of Care program or by block-granting the Continuum of Care program.[53]

With more flexibility, PSH providers would be able to:

- Require that tenants take their medication (as happened in some PSH programs before the advent of Housing First),[54] pass drug tests, or show up for social- and health-services appointments

- Use probationary housing—i.e., require that tenants stay in their unit for a few months before they acquire standard tenant protections

- Impose stricter rules on some tenants

- Pursue more integration with behavioral health programs that use incentives and coercion, such as assisted outpatient treatment or contingency management

- Use homelessness funds on sober-living or recovery housing programs

A program that imposed behavior rules, provided housing on a probationary basis, and asked more of some clients than others could still be meaningfully considered service-enhanced or supportive housing. The goal would be to create housing for the homeless that expected recovery and personal transformation, as opposed to just allowing for that possibility.

Greater rule enforcement will help reduce community opposition. A program that imposes behavioral requirements on tenants will provoke less backlash than one that asks nothing. It may also help to lower capital needs, as tenants with unaddressed behavioral health disorders will do more damage to units than stabler tenants.[55]

PSH programs should also have more flexibility over tenant selection. In the current "Coordinated Entry" approach, governments allocate PSH units based on who has been homeless longer and struggles the most with mental illness and addiction. This approach has three problems. First, it rewards drug addiction;[56] it is overly bureaucratic, leading to long waits to fill vacancies, which, in turn, lead to disruptions in rent revenues; and it has burdened providers with tenants who are too difficult to manage.[57] Coordinated entry was adopted

DOJ-HUD-AR00707

partly to prevent providers from cherry-picking or "creaming" their tenants. But any well-designed social-services system gives the provider some degree of selectivity over its clients.[58]

More flexibility is imperative in an era of flat funding. One of the most misleading arguments for Housing First to gain traction was that housing without rules is cheaper than the alternative. Some advocates say that rules will reduce the uptake of services because conforming to rules will be a deal-breaker for many members of the street population. But regulated housing programs tend to be safer—which always ranks as a top priority in surveys of the unsheltered—and, when there's more demand for PSH than supply, which is normally the case, providers have leverage. Rules-oriented PSH will not lack for takers.

Changes to federal homelessness policy will affect different communities differently. Wealthy, big-spending jurisdictions, such as New York and California, will be the least affected. The typical U.S. community devotes very little own-source revenues to homelessness-specific programs. But all would appreciate more flexibility. The end of Housing First need not, and should not, mean the end of PSH.

**Invest in temporary housing**

Since 2007, PSH and other permanent housing programs have grown 260%, whereas shelter and other temporary housing programs have increased only 20%.[59]

An unrealistic belief that government can solve homelessness through permanent housing has left many homeless individuals without access to any kind of housing. PSH as currently structured is highly perfectionist. It attempts to end homelessness by providing housing in units that cost as much as $800,000 and require a years-long wait on the street to secure.[60] Those living on the streets should not be encouraged to hold out for perfection.

Shelter is less of an all-or-nothing proposition than PSH. It is much easier to bring shelter beds online quickly than PSH units. If it is true that "housing is health care," that is just as true for temporary as for permanent housing. Shelter takes someone off the streets, provides food and a place to sleep and store belongings, and offers connection to other services. Shelter is much safer than the streets.[61] Studies of homeless mortality have found disproportionately high mortality rates among the unsheltered population.[62] The rate of sexual assault and trauma for homeless women, especially the 84,000 unsheltered among them,[63] is very high. Building more shelters is by far the most efficient way to protect them.[64] The most truly pragmatic, "greatest good for greatest number" approach to homelessness would be shelter-oriented, not PSH-oriented. When someone does access PSH, he'll be able to benefit more from it—and place less pressure on the program—if he has spent the previous months in a shelter instead of on the streets deteriorating.

Homelessness policymaking requires managing flows. Every day, some Americans fall into homelessness and others move out. But people don't fall into chronic homelessness so much as transition into it from episodic homelessness. Not investing in temporary housing, because all the funding is tied up in PSH, risks undermining these individuals' motivation, thus leading more non-chronic cases to become chronic ones.

**Create treatment courts for housing**

DOJ-HUD-AR00708

Courts are commonly used to effect behavioral change. Examples include problem-solving criminal courts and family court.[65] Setting up a similar program within housing court would allow providers to use the eviction threat as leverage—something they already do—but through a more formal process. A housing court–based treatment program would begin eviction proceedings, and then divert tenants into a drug or mental-health program to avoid eviction. The goal would be to replicate the success that sober living and contingency housing programs have had in promoting behavioral health, but within the PSH context. Behavioral health resources would be required to divert tenants into these programs, which will be more robust in some communities than in others.

**Shift more responsibility for the most difficult PSH tenants to other behavioral health systems**

The health needs of some formerly homeless PSH tenants cannot be met by current programs. Those needs should be dealt with by transferring responsibility for them to mental-health or addiction-services authorities, rather than adding more social- and health-services enhancements to current PSH programs.

The best argument for Housing First is that it is hard to repair broken lives, and, for those who are homeless, not much seems to work other than housing.[66] However, outside the homelessness context, there are evidence-based programs for rebuilding broken lives. Examples include supported employment and other vocational services,[67] full-service partnerships,[68] clubhouses,[69] first-episode psychosis interventions,[70] special court programs (problem-solving courts like mental-health courts[71] and HOPE-style desistance mandates[72] ), reentry programs,[73] sober-living housing programs,[74] 12-step addiction programs,[75] contingency management,[76] and assisted outpatient treatment.[77] At homelessness conferences and in strategic planning documents, these programs tend to be eclipsed by interest in the technical details about how to fund and build more PSH. These programs are operated by other agencies—criminal justice, addiction, mental health—outside homeless services and thus are evaluated based on a different standard from residential stability. While PSH's goal of residential stability might be appropriate for some cases, other tenants would benefit from being placed in a program with different goals. In those cases, the resources should follow the tenant. In the debate about "criminalization of mental illness," there is broad agreement that the criminal-justice system is the wrong place for many mentally ill people. This idea of a "category error"[78] also applies to homeless services.

**Conclusion**

We are entering an era of consolidation for PSH. To a greater extent than in the last two decades, governments will now have to focus on the quality of current programs as much as the raw quantity of units. Expansion can no longer be the only priority.

To promote a reassessment of PSH and Housing First, the federal government must adopt a more deferential role in homelessness policymaking. In contrast to other policy areas, such as higher education, federally directed homelessness reform will not require using funding as leverage to force change at the state and local levels. Homelessness represents a case in which recipients of federal funding deserve more programmatic flexibility than they have recently experienced.

DOJ-HUD-AR00709

**Acknowledgments**

The author would like to thank the Moynihan Center at The City College of New York, and, for their comments on the draft, Dan Kent, Paul Webster, and Judge Glock.

**Endnotes**

Please see Endnotes in PDF

Photo: Robert Gauthier/Los Angeles Times via Getty Images

 **Download PDF**

## / Donate

Are you interested in supporting the Manhattan Institute's public-interest research and journalism? As a 501(c)(3) nonprofit, donations in support of MI and its scholars' work are fully tax-deductible as provided by law (EIN #13-2912529).

DOJ-HUD-AR00710



# DISCOVERY INSTITUTE

## How Congress Can Reform Government's Misguided Homelessness Policies

Real Solutions for Mental Illness, Drug Addiction, and Crime Cannot be Found in Housing Subsidies Alone



THE *Center* ON
WEALTH & POVERTY

DOJ-HUD-AR00711





**3**    **Executive Summary**

**7**    **Homelessness: A Growing Crisis in American Communities**

**13**    **"Housing First" Is Not Working**

**21**    **The Time Has Come for Real Reform**

**24**    **Glossary**

**27**    **Endnotes**

**fixhomelessness**.org

DOJ-HUD-AR00712

# Executive Summary



America is suffering a complicated homelessness tragedy in myriad cities and rural areas. Huge sums of government money have been thrown at the problem, most notably in housing programs, but also indirectly in the criminal justice system (police, courts, and jails) and hospital emergency rooms. The homelessness epidemic also drains private charitable resources and suppresses economic growth and development in many communities. Lax enforcement of borders is allowing deadly drugs into the country, worsening the conditions found in homeless encampments.

Any efforts to address this web of interlocking crises are doomed to failure if they begin with an inadequate diagnosis of the causes. Though lack of housing is a major factor in what we call homelessness, it is erroneous to view homelessness as *primarily*—let alone solely—a housing problem that can be solved through a "Housing First" approach that

> With Housing First, the Obama Administration said it could end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020. Additionally, advocates argued that the Housing First approach would end all types of homelessness by 2023.

ignores untreated mental illness, and with "harm reduction" projects that enable addicts to continue devastating drug habits.

Data from the Department of Housing and Urban Development (HUD) confirm dramatic nationwide increases in homelessness, as illustrated in the charts in the full report (see below). The total number of individuals experiencing homelessness within all five HUD homelessness categories is approaching 1.2 million, and unsheltered homelessness increased 20.5% over the five pre-COVID years – a dramatic shift from the drop of 31.4% between 2007-2014, before Housing First was officially adopted by the federal government.

Children are hit especially hard. The total number of children experiencing homelessness increased from 679,724 in the 2006-2007 school year to 1,508,265 in the 2017-2018 school year, a pre-COVID increase of 122%. The number of children

DOJ-HUD-AR00713

in unsheltered situations (on the street and in vehicles) more than doubled between the 2016-2017 and 2017-2018 school years.

The federal government has attempted to mask the magnitude of the crisis in at least two ways. First, citing the COVID pandemic, HUD stopped collecting relevant data on unsheltered homelessness in 2020. More disingenuously, HUD resorted to an accounting gimmick to reclassify over 100,000 individuals from transitional programs (considered to be experiencing homelessness) to Rapid Rehousing programs (deemed no longer experiencing homelessness). This, even though the individuals were mostly in the same rooms, in the same buildings, being housed by the same agencies, for the same period of time.

The federal policy of Housing First is at the heart of America's deteriorating homelessness problem. Supported by powerful and self-serving interests, this approach is embraced by many state and local jurisdictions, as well as the White House and Congress. Housing (to repeat) should be part of any homelessness program. But, by insisting that subsidized housing be provided to people experiencing homelessness without time limits or any requirements that individuals participate in wraparound services (such as mental illness clinical services and treatment, substance use disorder treatment, job training, and job retention programs), this approach has become a "housing only" solution in practice. **In essence, we have created an enormous federal homelessness assistance program which is functionally equivalent to HUD Section 8 Housing — but with no rules.**

The results have been disastrous. The dramatic shift in the trajectory of homelessness numbers mentioned above correlate with the federal adoption of Housing First. Namely, unsheltered street homelessness rose by more than 20% even as subsidized housing vouchers went up more than 40%.

California provides an alarming example of the failures of Housing First. In 2016, California enacted a law that required that every state dollar spent on homelessness be spent on Housing First programs. **From 2015 (the year before the new state policy) to 2019, unsheltered street-level homelessness in California rose 47.1%** in just four years. California now boasts almost half of America's unsheltered street-level homeless population and nearly one in four of America's overall homeless population, even though it contains only 12% of the U.S. population. Only this year did the state pass a "Care Court" program that may—in a year or two—make it easier to get help for people with serious mental illness. Also, a recent settlement announcement by the LA Alliance for Human Rights commits LA County to more mental health and addiction treatment outreach and beds, not just housing.

Results within other jurisdictions also illustrate the folly of Housing First. In Seattle/King County the number of unsheltered people experiencing homelessness rose to more than 5,500, and gun crimes tied to homelessness encampments jumped 122% during the first half of 2022. In Portland, Oregon, people experiencing homelessness comprised 50% of all arrests between 2017 and 2020, even though their share of the population was less than 2%. In New York City, the number of deaths of people experiencing homelessness more than doubled in a three-year period from 2018 to 2021, up to 640 deaths, with the most frequent cause of death being drug overdose.

### "Housing First" Is Not Working

**Advocates had claimed that shifting to a Housing First approach, with its massive increases in subsidized housing vouchers, would end homelessness in ten years (i.e. by 2023).** The failure of their prediction is rooted in flawed assumptions about the nature of the crisis, especially the prevalence of untreated mental illness and drug use disorders within the homelessness community. In their 2019 ground-

DOJ-HUD-AR00714

breaking study, the California Policy Lab, a non-partisan research institute based at the University of California, found that 78% of the unsheltered homelessness population reported having mental health conditions and 50% reported that their mental health conditions contributed to their loss of housing. Additionally, 75% of the unsheltered population reported substance abuse conditions, and 51% reported that the use of drugs or alcohol contributed to their loss of housing.

Because of the funding restrictions dictating how homelessness assistance dollars are to be spent, the intensive treatment and clinical services most needed by so many people living on the street have become an afterthought. Consequently, the federal Housing First approach has led to the following adverse effects to individuals and families (which are explained more fully in the full report):

1. Elimination of service participation requirements has removed incentives for individuals to participate in effective programs and therapies.
2. Elimination of federal funding for intensive wraparound services has undercut services needed for treatment and recovery (e.g. for mental illness and substance use disorders).
3. The chance to develop customized treatment approaches has been diminished by a one-size-fits-all housing approach.
4. Concurrent defunding of emergency services has led to increased negative outcomes, including death.
5. Program focus has been lost by changing the policy goal from self-sufficiency to increased inputs in the form of housing vouchers.
6. The expansion of this federal Housing First policy to state and local governments has dramatically increased homelessness.

Of course, the deemphasis on treatment of the seriously (and often dangerously) mentally ill did not begin with Housing First. Deinstitutionalization of psychiatric patients is a policy now six decades

in effect, dramatically illustrated by the fact that the U.S. has only 5% as many psychiatric beds as it had fifty years ago. One of the most glaring examples of unintended consequence in American health history, the federal policy has led to untold suffering and death by consigning hundreds of thousands of seriously mentally ill people to the streets, homelessness encampments, jails and prisons, instead of to effective treatment.

## The Time Has Come for Real Reform

Immediate policy changes are necessary to reverse the growing homelessness crisis. **Homelessness should be addressed primarily as a mental and behavioral health issue, rather than simply a housing issue.** Increasingly, American citizens demand reform – polling indicates homelessness is now the number one or number two local issue among voters in twenty of the highest populated cities in America, and homelessness continues to be the top statewide issue in many states.

Congress is encouraged to take the following actions to address the crisis, with a goal of helping to move as many people as possible out of homelessness and toward recovery and self-sufficiency. More detailed descriptions and justifications are provided in the full report.

1. Pass legislation directing HUD to eliminate Housing First as the primary approach to address homelessness, including in Notices of Funding Availability (NOFAs), policies, rule-making, guidance, technical assistance, and in federal communications.
2. Pass the Housing PLUS Act to prohibit HUD from restricting or limiting Continuum of Care (CoC) funds (see CoC definition in glossary below) going to providers that require the provision of supportive services (such as addiction treatment or job counseling) or program participation requirements, or to faith-based organizations. The Act also requires that no less than 30% of CoC funding shall be used by recipients that provide or offer access to wraparound services.



DOJ-HUD-AR00715

3. Prioritize economic "self-sufficiency" as the primary measurement of effectiveness of all federal homelessness assistance programs rather than the number of housing vouchers distributed.

4. Prioritize trauma-informed wraparound services in all federal homelessness assistance programs by requiring that a minimum of 40% of CoC funding be used for direct trauma-informed wraparound services (such as mental illness clinical services and treatment, substance use disorder therapy and treatment, job training, and job retention) and limiting housing vouchers to 60% of funding.

5. Require participation in treatment and training activities when enrolled in federally funded homelessness assistance programs, similar to PELL Grants, unemployment assistance, and Temporary Assistance for Needy Families (TANF).

6. Restore funding for emergency programs, which are an important steppingstone on the path to self-sufficiency.

7. Replace the Continuum of Care (CoC) system with a state block grant system to ensure more efficient delivery of services, eliminate conflicts of interest, increase accountability, and improve outcomes. Alternatively, Congress should reform the governance structures of CoCs to eliminate conflicts of interest and expand membership to include state and local elected officials as well as general public stakeholders for greater accountability.

8. Eliminate the Institutions for Mental Diseases Exclusion ("IMD Exclusion") in Medicaid to increase federal reimbursements for inpatient mental illness and substance use disorder treatment. The exclusion currently prevents many mentally ill people from receiving the treatment they need to avoid landing up on the streets or in emergency rooms or jails.

9. Review the budget of the National Institute of Mental Health to ensure its priorities reflect the actual problems of neglect seen in the day-to-day care of the mentally ill, especially those who are homeless.

10. Incentivize local governments to reduce or eliminate building fees and burdensome regulations to enable affordable housing construction.

DOJ-HUD-AR00716



# Homelessness:
## A Growing Crisis in American Communities

Homelessness has skyrocketed in the United States over the last decade and has reached crisis levels in many American cities. This is a tragedy for those caught up in the heartbreaking cycle of homelessness that plagues communities. Attendant issues include overwhelmed emergency rooms, drug overdoses, damage to public spaces, urban decay, overcrowded jails, decreased public safety, and intimidating chaos on many streets. Small businesses are especially hurt, since patrons are reluctant to journey into areas with high levels of homelessness. Fixing the homelessness problem will cost money. But not fixing it is already costing plenty — and letting the problem fester will cost even more.

### HUD Documenting Dramatic Rise in Adult Homelessness

The graphs below, based on data from the U.S. Department of Housing and Urban Development (HUD) *Annual Homeless Assessment Reports* (AHARs) and the U.S. Department of Education (ED) *Annual Federal Data Summary School Years – Education for Homeless Children and Youth*, illustrate the magnitude of the homelessness crisis in the U.S. over the last decade.

The federal government has two different formal definitions of homelessness, as well as methodologies and metrics to measure the number of people experiencing homelessness.

DOJ-HUD-AR00717

HUD primarily tracks adults, while ED tracks child and youth homelessness per the McKinney-Vento Homeless Assistance Act of 1987. While each agency's data is explored separately below, both federal cabinet departments report that homelessness is increasing across all populations, regardless of the differences in how homelessness is defined.

HUD aggregates data from 400 regional Continuums of Care (CoC) that conduct annual "Point-in-Time Counts" (PITCs). Additional data is stored in each CoC's Homelessness Management Information System (HMIS), which reports a variety of demographic and statistical information to HUD for its annual reports. HUD's general definition of a person experiencing homelessness is one who "lacks a fixed, regular, and adequate nighttime residence."[1]

Per HUD's *Annual Homeless Assessment Reports* (AHARs) and PITCs, individuals experiencing homelessness are grouped into five sub-categories based on what type of housing they are living in:

1. **Unsheltered** (also known as street-level homelessness),
2. **Emergency Shelters** (e.g. Citygate rescue missions and Salvation Army centers),
3. **Transitional Housing** (subsidized apartments with wraparound services for up to two years),
4. **Rapid Rehousing** (the most radical form of subsidized "Housing First" units that have no participation requirements), and
5. **Permanent Supportive Housing** (subsidized lease-based housing units, typically supported by vouchers).

Figure 1 illustrates the dramatic nationwide increases in homelessness. The stacked colored bars illustrate those living unsheltered, in emergency shelters, in transitional housing, in rapid rehousing, and in permanent supportive housing (unsheltered number for 2021 is estimated — HUD did not provide data). When totaled together, these latter five cohorts reflect the aggregated year-round homelessness count in the United States. The vertical dotted line is the inflection point when HUD formally shifted federal homelessness policies and funding to a "Housing First" philosophy per the 2013 HUD Notice of Funding Availability (NOFA).



**Figure 1: National HUD Data (Adults)**

DOJ-HUD-AR00718



## Key Takeaways:

- The total number of individuals experiencing homelessness within all five HUD categories is approaching 1.2 million individuals, not the half a million number that is frequently incorrectly cited by media sources.

- HUD artificially counts those participating in permanent supportive housing and rapid re-housing programs as "not experiencing homelessness" while those in transitional housing programs are counted as "experiencing homelessness." This gimmick artificially lowers the number of people considered to be experiencing homelessness. Sound policy decisions require objective and accurate data.

- Even though federal funding of the homelessness assistance system has significantly expanded after the policy shift to the Housing First approach, unsheltered homelessness rose dramatically between 2014 to 2020. The total number of unsheltered individuals experiencing homelessness increased 20.5% over the five pre-COVID years after HUDs adoption of Housing First.[2]

- In 2022, the Biden Administration did not report the national unsheltered count for 2021. This omission was likely made to hide the dramatic increases in unsheltered homelessness since the onset of the Housing First approach.

- Prior to the implementation of Housing First, the total number of unsheltered individuals had dropped 31.4% between 2007-2014, when intensive wraparound services for participants were required for most homelessness assistance program participants. The downward trend ended with HUD's adoption of the Housing First approach.

- The programmatic changes required by the 2013 HUD NOFA (Notice of Funding Availability) penalized service agencies and programs that included service participation requirements and incentivized those that included no such service participation requirements. Furthermore, funding guidelines and system performance measures prioritized speed-of-placement rather than quality of placement, resulting in replacing high-quality recovery and rehabilitative programs with subsidized housing absent of participation requirements in treatment programs. **In essence, we have created a federal homelessness assistance program which is functionally equivalent to Section 8 housing with no rules, no treatment programs, and no participation requirements.**

DOJ-HUD-AR00719

**HUD Documents an Even Higher Homelessness Rise of Adults in California**

Figure 2 below focuses solely on the State of California.  As with Figure 1, the stacked colored bars illustrate those living unsheltered, in emergency shelters, in transitional housing, in rapid rehousing, and in permanent supportive housing (unsheltered number for 2021 is estimated — HUD did not provide data).

California state data is revealing because California requires 100% of state funding to go to Housing First programs. Consequently, 100% of federal and state homeless assistance funds go solely to Housing First programs.

Additionally, the State of California encourages local governments and CoCs to restrict their funding to the Housing First approach.  Consequently, almost all local judications within the state—including the City of Los Angeles and Los Angeles County—require government funding of all types (national, state, and local) to fund Housing First programs. The State of California, therefore, provides a statistically controlled study of the outcomes of this one-size-fits-all policy.  The results of going "all in" on Housing First have been devastating and have increased human suffering.



Figure 2: HUD Data for California (Adults)

**Key Takeaways:**

- California communities have experienced worse outcomes than other parts of the country.

- California rates of unsheltered homelessness jumped after the 2013 federal implementation of Housing First. Rates jumped again after California mandated that all state funding for homelessness assistance be restricted to Housing First programs.

- Homelessness in California has been increasing at a faster rate than the rest of the U.S.  **From 2015 to 2019 (starting the year before passage of the law mandating that all state funding be used for Housing First programs), unsheltered homelessness rose 47.1%.**  This increase occurred prior to the COVID pandemic in 2020.[3]

- From 2015 to 2019, following the passage of the law mandating that all state funding go to Housing First programs, overall homelessness in California rose 33.8% (again all before the COVID pandemic).

DOJ-HUD-AR00720

**Department of Education Reports Dramatic Increase in Number of Children Experiencing Homelessness**

The U.S. Department of Education *Annual Federal Data Summary School Years – Education for Homeless Children and Youth* aggregates data provided by local and state school administrators for each Pre-K-12 school student who experiences homelessness.[4] ED's definition of homelessness within Section 725 of the McKinney-Vento Act defines children and youth experiencing homelessness as children who lack a fixed, regular, and adequate nighttime residence at least once over a school year.[5]

The annual report groups children experiencing homelessness into five cohorts based on where they are living:

1. **Unsheltered,**
2. **Motels and Hotels,**
3. **Shelters and Transitional Housing,**
4. **Staying with Others, and**
5. **Location Not Reported.**

Figure 3 illustrates the dramatic increases in nationwide child and youth homelessness. The stacked colored bars illustrate <span style="color:red">unsheltered</span>, <span style="color:orange">motels and hotels</span>, <span style="color:green">shelters and transitional housing</span>, <span style="color:blue">staying with others</span>, and those whose <span style="color:purple">location is not reported</span>.

Children often start by staying with others and then move into motels, shelters, or the street, once they overstay their welcome with friends and family. In accordance with ED's codifying guidelines, the first type of homelessness a child experiences categorizes the child's status throughout the year, which does not necessarily reflect the current type of homelessness that child is experiencing. Since most children start experiencing homelessness in the "living with others" category, it is always overrepresented in the data, while those unsheltered and staying in shelters are underrepresented.



Figure 3: National Department of Education Data (Families with Children)

**Key Takeaways:**

- The number of children experiencing homelessness continues to rise.

- The total number of children experiencing homelessness increased from 679,724 in the 2006-2007 school year to 1,508,265 in the 2017-2018 school year, a pre-COVID increase of 122%.

- The total number of children living in shelters, transitional housing, motels, and in unsheltered situations increased from 283,137 in the 2012-2013 school year to 390,760 in the 2017-2018 school year – a 38.1% pre-COVID increase.

- The number of children in unsheltered situations (on the street and in vehicles) more than doubled between the 2016-2017 and 2017-2018 school years – a 104% increase.

- A sizeable percentage of adults experiencing homelessness first experienced homelessness as a child. For example, HUD's point-in-time count survey reports that 20% of adults experiencing homelessness in Los Angeles first experienced homelessness as children. In Seattle and Santa Cruz, the number is 18%, while San Francisco's rate is 15%.

DOJ-HUD-AR00721



## Homelessness is Increasing Despite Dramatic Increases in Federal Funding

The substantial increases in the number of people experiencing homelessness indicated by the HUD and ED data presented above have occurred even as federal funding for programs intended to address homelessness has dramatically increased. In 2022, Congress appropriated more than $7.9 billion for targeted homelessness assistance programs – President Biden has asked for an additional $8.7 billion in the FY 2023 federal budget.[6] This represents more than a three-fold increase from the $2.8 billion spent in 2008.

These amounts do not include the more than $4 billion in directly dedicated homelessness assistance and the more than $64.9 billion in indirect homelessness assistance allocated in the CARES Act and American Rescue Plan COVID-19 relief packages.[7,8] See Figure 4 for an illustration of the year-over-year spending since 2009.



### Figure 4: Federal Homelessness Spending

DOJ-HUD-AR00722

# "Housing First" Is Not Working



**Federal Government Formally Embraces Housing First in 2013**

The 2013 Housing and Urban Development Notice of Funding Availability (HUD NOFA) formally shifted federal policies and funding to a "Housing First" philosophy, which offers government-subsidized homelessness housing vouchers to individuals with no participation and treatment requirements (such as attending life-skills classes or seeing a drug addiction counselor).[9] **Disconnecting housing subsidies from any participation requirement for rehabilitation and treatment is the most radically negative single change to federal homelessness assistance policy in decades.**

In addition to formally prioritizing the Housing First approach over all other homelessness assistance strategies, the 2013 HUD NOFA also, for the first time, formally funded rapid rehousing subsidies while simultaneously phasing out funding for transitional housing. These changes fundamentally altered the way homelessness assistance is allocated by the federal government.

HUD's implementation of Housing First led to changes in federal regulations, grant application scoring factors, and program guidance to local communities. Taken together, local governments and Continuums-of-Care (CoCs) were heavily pressured to adopt Housing First policies to continue to receive federal funding. Local agencies that did not conform to these guidelines were de-funded. These changes impacted the programs and organizations that make up most of the direct front-line homelessness service providers, including faith-based and transitional housing providers. Housing First has essentially become Section 8 federally subsidized housing vouchers without any rules.

**Disastrous Results**

The results of the shift to Housing First have been disastrous. Shortly after the policy shift away from requiring service participation when receiving homelessness assistance, HUD measured unsheltered homelessness rose from 175,399 in 2014 to 211,293 in 2019, a 20.5% increase in five

DOJ-HUD-AR00723

years (all pre-COVID).[10] During the same period, the number of individuals receiving subsidized Rapid Rehousing and Permanent Supportive Housing vouchers rose from 338,065 to 482,254, a 42.7% increase. **In short, even though the number of housing vouchers increased more than 40%, unsheltered street homelessness increased more than 20%. If the Housing First approach were working to reduce overall homelessness, unsheltered street level homelessness should have dropped dramatically. Instead, the opposite occurred.**

The increase in homelessness has occurred even as permanent supportive "Housing First" units have doubled, Rapid Rehousing units have increased sixfold, and federal spending on homelessness has more than tripled.

The negative impacts of skyrocketing homelessness on communities are manifold, including increased demand on local government resources, including, most notably, the criminal justice system (e.g. police, courts, and jails) and emergency rooms. The growing crisis of homelessness drains non-profit resources, increases drug overdoses, exacerbates urban decay, and suppresses economic growth and development.

**Communities Are in Crisis**

Beyond the bleak national numbers, the data demonstrate especially dramatic rises in the hundreds of cities (and states) that have aggressively embraced the flawed Housing First philosophy — such as Los Angeles, San Francisco, Sacramento, Portland, Seattle, and New York City.

California provides an especially alarming example of the failure of Housing First. As discussed above, the California legislature passed a bill in 2016 that required every state dollar spent on homelessness must be spent on Housing First programs. **Consequently, unsheltered street-level homelessness in California rose 47.1%**

**in just four years and overall homelessness increased 30.7% (pre-COVID).**

California now boasts almost half of America's unsheltered street-level homeless population and nearly one in four of America's overall homeless population (all five HUD AHAR categories), even though it contains only 12% of the United States population.[11] **If Housing First worked as promised by advocates, California should have the lowest rates of homelessness in the U.S., not the highest.**

Some progress was made this year in California where a law recommended by the governor was passed creating Care Courts that at least offer the prospect that—in a year or two—people with severe mental illness who are experiencing homelessness can be required to get treatment. Fought by the ACLU from a misguided fear of civil liberties abuse, the fact that the law was passed overwhelmingly in the legislature is a sign of increasing public desire for reform. Likewise, a successful lawsuit by the LA Alliance for Human Rights commits LA County to increase mental health and substance abuse outreach and treatment as part of its vast housing expenditures. But California still has a long way to go and is moving slowly.

The experiences of other jurisdictions also illustrate the folly of Housing First. In Seattle/King County the number of unsheltered people experiencing homelessness rose to more than 5,500, and the Seattle Police Department reports that gun crimes tied to homelessness encampments jumped 122% during the first half of 2022.[12] In Portland, Oregon, people experiencing homelessness comprised 50% of all arrests between 2017 and 2020, even though the population of people experiencing homelessness was less than 2%.[13] In New York City, the number of deaths of people experiencing homelessness more than doubled in a three-year period from 2018 to 2021, up to 640 deaths, with the most frequent cause of death being drug overdose.[14]

DOJ-HUD-AR00724

Exacerbating the negative effects of federal and state Housing First polices are poorly conceived local policies that significantly raise housing construction costs to make housing unaffordable for many, especially low-income Americans. Chief among them are onerous regulations and exorbitant local construction permitting fees that inflate housing construction costs. Not limited to California, excessive fees and regulations have made housing unaffordable in many parts of the country, especially in communities where the cost of living is the highest.

**Attempts to Mask the Problem**

The federal government has attempted to mask the magnitude of the crisis in at least two ways. First, due to the COVID pandemic, HUD stopped collecting relevant data on homelessness in 2020. More disingenuously, HUD resorted to an accounting gimmick that reclassified assistance programs to produce an artificial, short-term public relations success. After the 2013 HUD NOFA, changes to annual HUD NOFA deprioritized transitional housing in favor of Rapid Rehousing. Consequently, 101,746 individuals were "reclassified" from transitional programs (which are considered to be still experiencing homelessness) to Rapid Rehousing programs (which are deemed no longer experiencing homelessness).

This definitional sleight-of-hand was based on the fact that, though both programs have the same HUD regulatory 24-month limit, HUD considers people living in rapid rehousing programs as no longer experiencing homelessness. This is because they are housed through a "lease" and, therefore, are covered under the Fair Housing Act.[15] On the other hand, people living in transitional housing are still considered by HUD to be experiencing homelessness because those programs often provide housing through a "participation contract" rather than a lease. In short, under current federal policy, Rapid Rehousing participants are considered tenants while transitional housing participants are considered people experiencing

homelessness. It is bureaucratic nonsense meant to bolster the claims of Housing First advocates.

It is important to note that the 101,746 reclassified individuals were mostly in the same rooms, in the same buildings, being housed by the same agencies — yet deemed no longer to be experiencing homelessness. These types of short-term accounting gimmicks fail to seriously address the problem of increasing homelessness.

Despite the attempts to hide the true magnitude of the homelessness crisis, the data clearly proves the Housing First advocates wrong.

**Why has Housing First Failed to End Homelessness as Promised?**

More than a decade ago, **progressive Senators and House Members and other advocates of Housing First argued that the approach would end all types of homelessness by 2023.[16] With Housing First, the Obama Administration said it could end veteran homelessness by 2015, chronic homelessness by 2016 and family homelessness by 2020.[17]**

Unfortunately however, as documented above, even though federal spending has nearly tripled, homelessness has not ended, but has increased dramatically, even before COVID.

How could advocates have been so wrong about Housing First ending homelessness by 2023? In short, the Housing First approach is fatally flawed. By focusing on rapidly placing individuals into housing regardless of whether the placement is clinically appropriate, the approach works against the achievement of long-term outcomes, such as graduating out of homelessness or attaining lasting housing self-sufficiency. **By ignoring the root causes of homelessness – such as untreated mental illness combined with substance use disorders – Housing First is at best an expensive short-term band-aid that only addresses the symptom of an individual's living on the street.**

DOJ-HUD-AR00725

These flawed theoretical assumptions allowed subsidized housing vouchers to be used as substitutes for mental illness treatment and substance use disorder therapy. In addition, Washington-based policy advocates who had little or no front-line experience providing direct services did not realize how prevalent untreated mental illness and co-presenting substance use disorders were within the community of homelessness. For example, in 2014, the President and CEO of the National Alliance to End Homelessness claimed that only 20% percent of the people experiencing homelessness have a mental illness or a substance abuse problem.

Yet the California Policy Lab, a non-partisan research institute based at the University of California, found in their 2019 ground-breaking study of 64,000 people experiencing homelessness that **78% of the unsheltered homelessness population reported having mental health conditions, and 50% reported that their mental health conditions contributed to their loss of housing.** Additionally, **75% of the unsheltered population reported having substance abuse conditions, and 51% reported that the use of drugs or alcohol contributed to their loss of housing.**[18]

Unfortunately, because of the expense of creating permanent supportive housing, and the funding restrictions dictating how homelessness assistance dollars are to be spent, the intensive treatment and clinical services so many people living on the street need have become an afterthought.

Housing vouchers are subsidies and do not have the ability to treat mental illness, nor do they address substance use disorders. The failure of Housing First is graphically illustrated by the many individuals isolated in apartments in terrible living conditions with no treatment for mental illnesses nor therapy for substance use disorders, whose stories often end in tragedy. For example, a study

of Boston's chronically homeless unsheltered population shows low housing retention and nearly half of the studied cohort (45%) died while housed. The study concludes "Housing stability for this vulnerable population likely requires more robust and flexible and long-term medical and social supports."[19] Similar poor outcomes have occurred in Los Angeles with Project Room Key.

Subsidized housing and converted motels are highly inadequate substitutes for treatment. Housing First warehouses people, without care, into isolated living arrangements in which drug use and untreated mental illness tend to proliferate. The Los Angeles Times reports that the deaths that occurred in Project Room Key units increased the number of deaths due to the unabated presence of methamphetamine and fentanyl.[20] Meth and fentanyl were directly responsible for the increase in overdose deaths and also contributed to other causes of death such as heart failure, suicide due to drug-induced psychosis, and brain hemorrhage.[21]

**Housing First is based on a faulty premise that homelessness is simply a housing issue which can be solved with subsidized housing. In fact, the root cause of most homelessness in the United States is untreated mental illness, often combined with co-presenting substance use disorders (SUDs).** Policies that fail to address these root causes, when combined with policies that make housing unaffordable, only exacerbate the crisis.

### Housing First is Impeding Effective Help

Not only has Housing First led to increases in homelessness, the approach has also harmed families and individuals by impeding service providers from deploying treatments that effectively address the root causes of their predicament.

Specifically, we note the following adverse effects of the federal Housing First approach:

 **The elimination of service participation requirements has removed incentives for individuals to participate in effective programs and therapies.**

The elimination of service participation requirements — such as robust case management and treatment for substance use disorders — has adversely impacted many service providers (including many faith-based organizations) by stripping them of their best intervention tools. These organizations had used these requirements successfully for years as an incentive to improve the mental and physical health of program participants and to promote self-sufficiency.

**Service participation requirements have been successfully employed in most other federal social service programs and were integral to the welfare policy reforms enacted under President Clinton in 1996.** For example, Pell Grants require recipients to make satisfactory academic progress, attend classes, and maintain a passing grade point average. Unemployment benefits require program participation, including demonstrated participation in prescriptive job searches. Temporary Assistance for Needy Families (TANF), which provides benefits to families in poverty, requires beneficiaries to work or advance their education.

Many Housing First proponents argue that participation requirements are barriers to shelter and housing. They claim that people experiencing homelessness refuse to accept offers of shelter and housing because they do not want to or cannot participate. The growth of homeless encampments shows that refusal of shelter and services exists even with "low barrier" policies. **The real barrier to recovery is the lack of participation in robust treatment services, especially for mental health and substance use disorder issues.**

Participation requirements are the key element to improved health and increased self-sufficiency that leads to reduced numbers of people experiencing homelessness.

 **The elimination of federal funding for intensive wraparound services has pulled the plug on the critical services needed for treatment and recovery (e.g. for treatment of mental illness and substance use disorders).**

For most, homelessness is a medical and clinical issue rooted in untreated mental illness, often combined with substance use disorders. Consequently, the best intervention is robust trauma-informed care along with wraparound services such as mental health treatment, substance use disorder interventions, medical provisions, life-skill classes, and job training and retention.

However, because of the shift in federal policy and funding, many local and county governments have reduced or eliminated treatment services needed to address mental illness and addiction head on. Instead, they often take the short-sighted, least-resistance route of short-term spending on (federally subsidized) housing vouchers rather than providing the long-term treatment and recovery services needed to address the underlying causes of homelessness.

Making matters worse, the few locations where voluntary services are offered are often poorly funded and understaffed. And absent participation requirements, programs like addiction services, workforce training, and life-skills classes are frequently avoided by individuals who might benefit.

**Housing First's prohibition against participation requirements and its myopic emphasis on funding housing subsidies has practically stopped funding treatment programs of any clinical benefit within homelessness programs.** After stopping participation requirements and stopping funding of treatment, it is no wonder why homelessness is skyrocketing.

DOJ-HUD-AR00727



**The movement away from customized treatment approaches to a one-size-fits-all housing approach has limited treatment approaches.**

Moving an unsheltered individual to housing provides a number of health and emotional benefits. However, housing alone does not lead to sustained mental health nor recovery from addictions. **A housing voucher does not kick a drug habit, address chemical instability, nor teach one how to write a job resume.** Yet Housing First advocates argue housing vouchers will end all types of homelessness. This is akin to providing the same medical treatment to a person with an infection, a broken leg, or experiencing a stroke.

To be clear, Housing First vouchers are a one-size-fits-all approach, with no room for variations in treatment or alternative interventions. Housing *First* has become housing *Only*.

The Institute for Children, Poverty & Homelessness (ICPH), points out that the one-size-fits-all approach does not work for all populations nor in all locations. Specifically, ICPH did a study of New York City's Housing First program, which has been practiced on a large scale for an extended period of time.[22] Though Housing First advocates had promised the recidivism rate would drop, the ICPH found that after "Rapidly Rehousing" 33,000 families from 2005 to 2011, the recidivism back to shelter rate actually increased. ICPH posits that Rapid Rehousing is analogous to a steroid shot — the pain temporarily goes away but comes back quickly, since the underlying issues have not been addressed. ICPH goes on to say that there is a lack of evidence showing long-term success of Rapid Rehousing and Housing First.

Tragically, a one-size-fits-all approach can actually harm individuals experiencing homelessness who need and benefit from customized, trauma-informed wraparound services. When the only

intervention is "housing," little or no treatment is provided and few clinical outcomes are achieved. We will fail if Housing First is the only tool in the toolbox.



**The defunding of emergency services has led to increased negative outcomes, including death.**

**De-funding of emergency services, like emergency sheltering and mental health services, has reduced critical front-line life-saving services for individuals living on the street.** Before the 2013 HUD NOFA was implemented, funding for the homelessness Continuum of Cares were evenly balanced – funding about one-third each for emergency services, transitional housing, and long-term housing.

After the changes implemented by the 2013 HUD NOVA, the federal government terminated funding of homelessness emergency services and began to phase out funding of transitional housing in favor of funding Housing First vouchers. This destabilized the balance between the three equally important and critical phases of Continuum of Cares described above.

As a result, emergency services have been replaced with housing outreach workers with little expertise and few resources to help those in need. Their objective is limited to recruiting people experiencing homelessness into Housing First programs, along with a bottle of water and words of comfort. Replacing emergency services with housing outreach workers tragically accepts the viewpoint that homelessness is a housing problem rather than a broader humanitarian crisis that can only be addressed through a wholistic program focusing on the treatment of underlying causes.

The de-funding of critical emergency services has particularly restrained the ability of faith-based and non-profit agencies to help individuals in need.

DOJ-HUD-AR00728



**In changing the ultimate goal from self-sufficiency to maximizing the number of vouchers distributed, Housing First has led to a loss of program focus.**



**The expansion of Housing First to state and local governments has dramatically increased homelessness.**

The federal government currently measures success in addressing homelessness by how many, and how quickly, taxpayer-subsidized housing vouchers are distributed — regardless of whether the vouchers actually help pull people out of homelessness. **The government should instead gauge success by measuring self-sufficiency: the number of people who exit from homelessness over a sustained period.**

Federal programs instruct Continuums of Cares to avoid objective, performance-oriented metrics. In fact, instead of measuring "outcomes," HUD's performance system measures "outputs" based on process-related performance of CoCs in providing housing. Even HUD's metrics of income increases are belied by equating earned income from a job with government subsidies from various government programs. This represents yet another example of measuring the wrong thing.

**The fatal flaw of Housing First should be obvious — the federal government is not measuring how many individuals attain self-sufficiency every year (i.e. no longer needing government-subsidized housing vouchers). Instead, they measure failure — the number of people dependent on government handouts.**

Unfortunately, many Housing First advocates have aggressively resisted efforts to have meaningful and truthful measurements because this would spotlight how Housing First has failed to truly reduce the number of people experiencing homelessness.

Housing First grants have induced state and local governments to adopt the Housing First model, despite its failures. Contrary to the promises of Housing First advocates, the approach has not ended homelessness where it has been implemented. On the contrary, in many locales such as Los Angeles and San Francisco, as well as California as a whole, **adoption of the Housing First experiment has substantially increased the number of people experiencing homelessness.**

According to a recent survey, most citizens blame local mayors and city councilmembers for increases in homelessness.[23] But it is appropriate to lay much of the blame at the feet of the federal government. Since HUD exclusively promotes and funds Housing First throughout the U.S., many municipalities are limited in their responses to homelessness. Knowing that Housing First has not worked at a national level, why would we want to push this flawed policy onto local governments?



**The issue of untreated mental illness is an inescapable and neglected part of the homelessness puzzle.**

Starting in the Depression years of the 1930s and accelerating over the decades, the long-term neglect of mental hospital care by state governments became an embarrassment and even, in some cases, scandalous. Instead of improving care, policy makers de-institutionalized state mental health hospitals. The 1965 Medicaid bill, which provided support for funding of

DOJ-HUD-AR00729

state facilities that serve lower income people, specifically left out individuals in the age categories between 21 and 65, who often present with significant and serious mental illnesses and conditions. It was thought that this "Institutions of Mental Disease ("IMD") Exclusion would hold down costs, take advantage of new medications, protect civil liberties and somehow enable people with mental illness or substance abuse issues to get good local community-based care.

In practice, however, it succeeded mainly in justifying states' increasing failures to provide their own adequate funding for professional psychiatric care in state hospitals, while the patients released to home care and local clinics most often received ineffective or insufficient treatment. Among other things, small community clinics seldom can afford on-site professional psychiatric personnel that meet the needs of the seriously mentally ill. This meant that people treated at home or at smaller mental health clinics often wound up on the streets or in jail due to a lack of settings that could appropriately respond to crises, stabilize, and in many cases, provide residences for those experiencing serious mental illness.

There are now only five percent as many psychiatric beds in state hospitals as we had a half century ago. Indeed, **there are more people in psychiatric care in prisons than in hospital care making jails, prisons, and homeless encampments modern-day asylums.**

As Dr. Thomas Insel, recent Director of the National Institute of Mental Health, notes in his book *Healing*, "We so overcorrected the problematic state of institutions in the 1960's that we effectively created an enormous deficit in funded psychiatric beds." Federal funding for mental illness, meanwhile, tends to go to programs that assist persons with tractable neuroses, rather than resistant psychoses. Even middle-class and wealthy Americans in many communities find hospital care and long-term adult residences for mental illness hard to acquire, which is a largely unreported calamity for thousands of families in America and is reflected, among other things, in rising suicide rates. But the impact on homelessness is especially acute.

DOJ-HUD-AR00730

# The Time Has Come for Real Reform



A s described in this report, Housing First has been an abject failure in addressing the growing crisis of homelessness. The approach is built on a false premise—that homelessness is primarily a housing issue rather than a mental illness issue with co-presenting substance use disorders.

A reverse course is needed. **Rather than seeking to increase the number of taxpayer-subsidized housing vouchers, our goal should be to help move as many people as possible into recovery and stability, and then toward self-sufficiency with supported long-term sobriety.**

To that end, the two most important tools to end homelessness are: 1) the promotion and funding of trauma-informed mental and behavioral health treatment, integrated and directly tied to the provision of affordable housing; and 2) the development of truly affordable housing construction through the elimination of local building fees and excessive regulatory requirements.

Citizens in communities around the country are increasingly exasperated by the results of misguided government policies. Polling indicates homelessness is now the number one or number two local issue among voters in twenty of the highest populated cities in America, and homelessness continues to be the top statewide issue in almost all polls in California.[24]

Congress is encouraged to take the following specific actions as soon as possible to begin to address the national homelessness crisis:

DOJ-HUD-AR00731

1. **Pass legislation directing HUD to eliminate Housing First as the primary approach to address homelessness.** Housing First prioritization should be eliminated in NOFAs, policies, rule-making, guidance, technical assistance, and in federal communications. Additionally, appropriations should specifically eliminate government funding for any program or regulation that only provides housing vouchers (i.e. has no service participation requirements).

2. **Pass the Housing PLUS Act.** Sponsored by Rep. Andy Barr (KY-6), H.R. 6018, the Housing PLUS Act, would prohibit the HUD Secretary from restricting or limiting Continuum of Care (CoC) funds going to providers that require the provision of supportive services (such as addiction treatment or job counseling) or program participation requirements, or to faith-based organizations. By requiring that no less than 30% of CoC funding be used by recipients that provide or offer access to wraparound services, the bill will provide much needed flexibility to allow local communities to customize their efforts to individual needs. However, the 30% provision within H.R. 6018 should be amended to no less than 40%.

3. **Prioritize economic "self-sufficiency" as the primary measurement of effectiveness of all federal homelessness assistance programs.** In order to receive federal funding, all tribal, state, regional, and local governments, as well as CoCs should also prioritize "self-sufficiency" as the number one measurement of homelessness assistance program effectiveness.

4. **Prioritize trauma-informed wraparound services.** The CoC program should require a minimum of 40% of all federal homelessness assistance funding to be used for direct trauma-informed wraparound services, such as mental illness clinical services and treatment, substance use disorder treatment, job training, and job retention (i.e. funding for housing vouchers should be limited to 60% of funding across all homelessness assistance programs).

5. **Require program participation in all federally funded homelessness assistance programs.** To receive federal housing support, participants should be required to participate in self-sufficiency, health, life skills, behavioral health services and treatment plans, similar to what is done for Pell Grants, TANF, and unemployment insurance benefits.

6. **Restore funding for emergency programs.** As phase one in the Continuum of Care, 25% to 33% of all federal homelessness assistance funding should be allocated to emergency services. The other 67% to 75% of the funding would go to the second and third phases of the CoC, for transitional housing and longer-term housing, respectively. Additionally, rules and regulations that impede faith-based organizations, and other non-profits, from helping people experiencing homelessness should be eliminated.

7. **Replace the Continuum of Care (CoC) funding system with a state block grant system. If moving to a state block grant system is not feasible, then reform the existing CoC governance model.** State block grants, built on the premise that states have a better understanding of local conditions than the federal government, provide a more efficient means of funding CoCs. If a state block program is not feasible, then Congress should reform the governance structures of Continuums of Cares by restricting any type of CoC membership of agencies that receive CoC funds (e.g. stop self-dealing conflicts of interest). Additionally, CoC board membership should be expanded to include state and local elected officials, as well as general public stakeholders, to increase accountability.

8. **Eliminate the Institutions for Mental Diseases Exclusion ("IMD Exclusion") in Medicaid** to increase federal reimbursements for inpatient mental illness treatment. Due to the IMD Exclusion, many mentally ill people do not receive treatment, or are prematurely terminated from treatment. Consequently, they land up on the streets or in jail or prisons. Follow-up clinical services should also be reimbursed in order to allow discharged hospital patients to receive ongoing treatment to continue to improve and get well.

9. **Review the budget of the National Institute of Mental Health** to ensure its priorities reflect the actual problems of neglect seen in the day-to-day care of the mentally ill, especially those who are homeless.

10. **Incentivize local governments to eliminate local building fees for affordable housing construction.** Local governments should be incentivized to streamline building codes and eliminate unnecessary regulations that unnecessarily inflate the cost of housing.

DOJ-HUD-AR00732

# Produced by Discovery Institute's Center on Wealth and Poverty

## Dr. Robert G. Marbut Jr.

Lead Writer, Project Coordinator, and Discovery Institute Senior Fellow. Dr. Marbut worked in three different U.S. Presidential Administrations, including being selected as a White House Fellow to President George H.W. Bush and serving as the Executive Director of the U.S. Interagency Council on Homelessness from 2019 to 2021. He was a San Antonio City Councilperson/Mayor-Pro-Tem, and was the Founding President & CEO of *Haven for Hope Transformational Campus*.

## Ambassador Bruce Chapman

Contributor and Discovery Institute Chairman of the Board. Ambassador Chapman was appointed by President Ronald Reagan to the position of Director of the United States Census Bureau and served as the United States Ambassador to the United Nations International Organizations in Vienna. He was also the Director of the White House Office of Planning and Evaluation, which worked on many poverty issues.

## Steven J. Buri

Contributor and Discovery Institute President. Mr. Buri has served in various capacities in government at the local, state and federal levels. He served as Deputy Mayor then as Mayor of the City of Newcastle, Washington. He was selected by the American Council of Young Political Leaders to participate as part of a bi-partisan political delegation to Nepal to share policy lessons from the United States and to promote the adoption of a new Nepalese constitution.

## Paul Webster

Contributor, Editor and Discovery Institute Researcher. Mr. Webster is the Founder and Director of Hope Street Coalition. He has an extensive background in legislation, public policy, administration, and program delivery. He served as a senior policy advisor in the U.S. Department of Housing and Urban Development and was the Vice President of a homelessness services provider.

## Erik L. Nutley

Editor and Discovery Institute Program Director. Mr. Nutley retired from the U.S. Air Force in 2008, after a career as a squadron commander, instructor pilot, engineer, and Assistant Professor of aeronautical engineering at the U.S. Air Force Academy. As a Department of Defense civilian in the Pentagon, he conducted program oversight of multi-billion-dollar Air Force and Navy aircraft procurement programs.

## For more information

Visit www.FixHomelessness.org or email info@discovery.org.

Contact Dr. Robert G. Marbut Jr. at 210-260-9696.

DOJ-HUD-AR00733

# Glossary

**Affordable Housing –** Taxpayer-subsidized housing for people at or below a region's median income. According to HUD, affordable housing is intended for people paying no more than thirty percent of their gross income for housing costs, including utilities.

**American Rescue Plan –** An Act of Congress, passed in 2021, which provided $1.9 trillion in economic stimulus. The American Rescue Plan provided $4 billion in direct support to state and local programs for people experiencing or at risk of homelessness, as well as $51.6 million in indirect homelessness assistance.

**Annual Homelessness Assessment Report (AHAR) –** An annual report requiring HUD to provide to Congress nationwide counts of homelessness compiled from regional Point-in-Time Counts, Housing Inventory, and HMIS data reporting from CoCs. The number of people experiencing homelessness is reported in five major categories based on type of housing: Unsheltered, Emergency Shelters, Transitional Housing, Rapid Rehousing, and Permanent Supportive Housing.

**Barriers to Housing –** Barriers are challenges that act to prevent individuals and families from getting and maintaining housing. Examples of barriers are lack of income, unemployment, criminal convictions, lack of identification, mental illness, and substance use disorders.
Behavioral Health – Refers to how behaviors impact an individual's well-being, distinct from mental illnesses. Substance use disorders, alcoholism, and gambling fall under the general umbrella of behavioral health.

**CARES Act –** Congressional legislation (The Coronavirus Aid, Relief, and Economic Security Act of 2020, and the Coronavirus Responses and Consolidated Appropriations Act of 2021), which provided economic assistance to individuals, families, businesses, and tribal, state, and local governments impacted by the Covid-19 pandemic. Both Acts provided expedited funding and regulatory changes to governments to address the impacts of the COVID-19 virus, including homelessness.

**Case Management –** A service provided by homelessness assistance providers that coordinates overall treatment for people experiencing homelessness.

**Continuum of Care (CoC) –** A CoC is a self-appointed regional or local planning body, organized to fulfill the responsibilities prescribed in the CoC Program Interim Rule for a defined geographic area, that coordinates housing and services funding for families and individuals experiencing homelessness. CoCs determine local funding allocations, with many of the member agencies receiving federal funds themselves.

**Chronic Homelessness –** The state of experiencing homelessness – living in a place not meant for human habitation – for at least twelve months or four separate occasions in the last three years and eligible for Social Security disability payments due to a disability.

**Disability –** The physical, intellectual, and developmental inability to do any substantial gainful activity, which can be expected to result in death, or which has lasted for a continuous period of twelve months or more. Chronic homelessness and a diagnosis of substance use disorder are considered disabilities and qualify people experiencing homelessness for Social Security Disability Income.

**Encampments –** Locations where two or more people experiencing homelessness live in an

DOJ-HUD-AR00734

unsheltered area. Encampments are typically made up of tents and improvised structures and can be in either urban or rural settings.

**Emergency Shelter –** A facility that provides temporary shelter for people experiencing homelessness.

**Housing Unit –** A house, apartment, group of rooms, or single room occupied or intended for occupancy as separate living quarters.

**Housing First –** An approach that centers on solving homelessness by providing taxpayer funded housing vouchers free of charge to people experiencing homelessness. Per HUD and the Housing First philosophy, participation in treatment services are not allowed to be mandatory.

**Housing Management Information System (HMIS) –** HMIS is a local information technology system used to collect client-level data and data on the provision of housing and services to individuals and families experiencing homelessness and persons at risk of homelessness. Each Continuum of Care (CoC) is responsible for selecting an HMIS software solution that complies with HUD's data collection, management, and reporting standards.

**HUD –** U.S. Department of Housing and Urban Development is the lead funding agency on most federal programs to address homelessness.

**Intensive Case Management –** A program for people with severe and persistent mental health issues that severely impact their ability to meet basic needs, maintain medication compliance, managing symptoms, attending and scheduling appointments, life skill classes, employment training, and connecting to specialized services.

**McKinney-Vento Act –** The federal law that provides regulations and funding of many homelessness assistance programs. The Act originally created fifteen programs providing a spectrum of services to people experiencing homelessness, including Supportive Housing Program, Shelter Plus Care

Program, and Emergency Shelter Grant Program. It also established the United States Interagency Council on Homelessness. Later, the HEARTH Act of 2009 consolidated many of these programs, established the federal definition of chronic homelessness, and authorized the Continuum of Care Program as the means to distribute federal grants to communities for homelessness assistance.

**Mental Health / Mental Illness –** Mental illness refers to "conditions that affect a person's thinking, feeling, mood, or behavior." These can include but are not limited to depression, anxiety, bipolar disorder, or schizophrenia. Mental health reflects "our emotional, psychological, and social well-being."

**Notice of Funding Availability / Notice of Funding Opportunity (NOFA/NOFO) –** The public notice by the federal government of grants and other funding available to address specific needs or issues. NOFAs / NOFOs define what eligible activities qualify for funding, how to apply for funds, and what specific information should be included in proposals to describe projects and justify funding awards.

**Outcomes vs. Outputs –** Outcomes are the desired end-game goals to be accomplished (e.g. how many people exit homelessness). Outputs are sub-step actions that contribute towards accomplishing outcomes (e.g. how many hygiene kits are given out).

**Outreach Services –** Services that attempt to engage and persuade people experiencing homelessness to go into a trauma-informed treatment program or to accept housing.

**Overhead Construction Costs –** Overhead construction costs include cost of permitting fees, utility hook-ups, and germane and non-germane building codes, as well as the impact of regulations such as parking ratios, environmental reviews, and financing. California has some of the highest building fees and regulatory costs due to laws like the California Environmental Quality Act


DOJ-HUD-AR00735

(CEQA). In California, it is common to have more than $100,000 overhead construction costs per housing unit.

**Participation Requirements –** See Service Participation Requirements below.

**Permanent Supportive Housing –** Leased-based taxpayer subsidized housing for people experiencing homelessness. Per HUD, participation treatment requirements and services are not allowed to be mandatory.

**Point-in-Time Count (PITC) –** The Point-in-Time Count is a count of people experiencing homelessness (both unsheltered and sheltered) on a single night in January. A PITC is required by HUD for communities that receive federal homelessness assistance funds and is one of the responsibilities of the local Continuum of Care.

**Preconditions –** Preconditions, distinct from service participation requirements, are pre-qualifying conditions for individuals to participate in a program based on screening requirements. Preconditions and screening requirements could include sobriety, absence of a serious mental illness, or ability to work.

**Rapid Re-Housing (RRH) –** An intervention that provides short-term (up to three months) and medium-term (4-24 months) tenant-based rental assistance and supportive services to households experiencing homelessness. The practice of quickly moving people experiencing homelessness into taxpayer subsidized lease-based housing for a maximum of 24 months. Per HUD and the Housing First philosophy, participation treatment requirements and services are not allowed to be mandatory.

**Services –** A wide array of assistance activities provided by service agencies for people experiencing homelessness. Services include, but are not limited to, trauma-informed care, case management, job skills training, life skill classes, laundry, hygiene care, substance use disorder treatment, treatment for mental illness, dental care, and health care.

**Service Participation Requirements –** As with Pell Grant and Temporary Assistance for Needy Families (TANF), these are required activities persons must participate in to continue in a program and receive taxpayer funded assistance. Activities can include attending meetings with case managers or job training and life skill classes, and participation in substance use disorder treatment. Per HUD and the Housing First philosophy, participation treatment requirements and services are not allowed to be mandatory.

**Serious Mental Illness (SMI) –** A mental, behavioral, or emotional disorder resulting in serious functional impairment, which substantially interferes with or limits one or more major life activities of daily living.

**Substance Use Disorder (SUD) –** Clinically significant impairment, including health problems, disability, and failure to accomplish responsibilities at work, school, or home caused by the recurrent use of alcohol and/or drugs.

**Transitional Housing (TH) –** Transitional Housing provides temporary housing with supportive services to individuals and families experiencing homelessness, with the goal of interim stability and longer-term goal of successfully moving into permanent housing. Transitional Housing programs cover the costs for both housing and accompanying supportive services for program participants for up to 24 months.

**Trauma Informed Care –** A customized approach of care that addresses an individual's underlying history of trauma.

Wrap Around Services / Robust Services – A wraparound approach customizes treatment services based on the individual needs of people experiencing homelessness.

DOJ-HUD-AR00736

# Endnotes

1. US Department of Housing and Urban Development, HUD Exchange, "Category 1 Literally Homeless," accessed August 31, 2022, https://www.hudexchange.info/homelessness-assistance/coc-esg-virtual-binders/coc-esg-homeless-eligibility/four-categories/category-1/.

2. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

3. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

4. US Department of Education, National Center on Homeless Education, "Data and Statistics on Homelessness," accessed August 31, 2022, https://nche.ed.gov/data-and-stats/.

5. National Archives, Federal Register, "McKinney-Vento Education for Homeless Children and Youths Program," accessed August 31, 2022, https://www.federalregister.gov/documents/2016/03/17/2016-06073/mckinney-vento-education-for-homeless-children-and-youths-program

6. United States Interagency Council on Homelessness, "FY 2023 Proposed Federal Budget for Homelessness," accessed August 31, 2020, https://www.usich.gov/tools-for-action/fy-2023-proposed-federal-budget-for-homelessness.

7. National Low Income Housing Coalition, "Coronavirus Response Packages, Updated May 12, 2020," accessed August 2022, https://nlihc.org/sites/default/files/Coronavirus-Budget-Chart.pdf.

8. United States Interagency Council on Homelessness, "Making the Most of the American Rescue Plan: A Guide to the Funding That Impacts People Experiencing Homelessness," accessed August 31, 2022, https://www.usich.gov/resources/uploads/asset_library/USICH_American_Rescue_Plan_Guide.pdf.

9. US Department of Housing and Urban Development, Docket No. FR-5700-N-31B, Notice of Funding Availability (NOFA) for the Fiscal Years 2013 and 2014 Continuum of Care Program Competition.

10. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

DOJ-HUD-AR00737

11. US Department of Housing and Urban Development, "2020 AHAR: Part 1 - PIT Estimates of Homelessness in the U.S./2007-2020 Point-in-Time Estimates by State," accessed August 31, 2022, https://www.huduser.gov/portal/datasets/ahar/2020-ahar-part-1-pit-estimates-of-homelessness-in-the-us.html.

12. Tammy Mutasa, "Growing crime rate at Seattle's homeless camps prompts anxiety, demands for solutions," May 20, 2022, KOMO News, accessed August 31, 2022, https://komonews.com/news/operation-crime-justice/crime-at-seattles-homeless-camps-prompts-anxiety-demands-for-city-crackdown.

13. Piper McDaniel, "Homeless people are more likely to be victims of violence than housed people," July 13, 2022, Street Roots, accessed August 31, 2020, https://www.streetroots.org/news/2022/07/13/violence-conflated.

14. Kevin Duggan, "Lost and Forgotten: Record Number of Homeless Died in New York Last Year, Report Finds," AMNY Newsletter, March, 22, 2022, accessed August 31, 2022, https://www.amny.com/news/record-homeless-died-new-york-last-year-report/.

15. 24 CFR 578.3 Definitions: Permanent housing means community-based housing without a designated length of stay, and includes both permanent supportive housing and rapid rehousing. To be permanent housing, the program participant must be the tenant on a lease for a term of at least one year, which is renewable for terms that are a minimum of one month long and is terminable only for cause.

16. Tina Trenkner, "Are Cities' Pledges to End Homelessness Working?" March 26, 2012, Governing, accessed August 31, 2022, https://www.governing.com/archive/gov-homelessness-rising-decade-after-pledges-to-end-it.html.

17. US Department of Housing and Urban Development, HUD Exchange, "USICH Opening Doors - Federal Strategic Plan to Prevent and End Homelessness," June 2015, accessed 31 August 2022, https://www.hudexchange.info/resource/1237/usich-opening-doors-federal-strategic-plan-end-homelessness/#:~:text=The%20Plan%20is%20focused%20on,ending%20all%20types%20of%20homelessness.

18. Janey Rountree, Nathan Hess, and Austin Lyke, "Health Conditions Among Unsheltered Adults in the U.S." October 2019, California Policy Lab Policy Brief, accessed 31 August 2022, https://www.capolicylab.org/wp-content/uploads/2019/10/Health-Conditions-Among-Unsheltered-Adults-in-the-U.S.pdf.

19. Jill Roncarati, Henning Temeier, Rebecca Tachick, Tyler VanderWeele, and James J O'Connell, "Housing Boston's Chronically Homeless Unsheltered Population: 14 Years Later." Medical Care 59, Suppl 2 (2021): 170-174, accessed September 13, 2022, https://pubmed.ncbi.nlm.nih.gov/33710091/.

20. Ananya Roy and Chloe Rosenstock, "We Do Not Forget: Stolen Lives of LA's Unhoused During the COVID-19 Pandemic," UCLA Luskin Institute on Inequality and Democracy, December 1, 2021, accessed September 13, 2022, https://escholarship.org/uc/item/9104j943.

DOJ-HUD-AR00738

21. Emily Alpert Reyes, Benjamin Oreskes, and Doug Smith, "Why did so many homeless people die while staying at one hotel using Project Roomkey?" Los Angeles Times, June 28, 2021, accessed September 13, 2022, https://www.latimes.com/homeless-housing/story/2021-06-28/la-homeless-people-died-after-entering-covid-hotel-why.

DOJ-HUD-AR00739



# How Congress Can Reform Government's Misguided Homelessness Policies



**fixhomelessness**.org

DOJ-HUD-AR00740



# HUD's 2024 Continuum of Care Program Funding Awards*

## 2024 National Award
## Total Award:  $3,623,037,241

### Awards by Component:

| | # of New Projects | New Project Award Total | # of Renewal Projects | Renewal Proj. Award Total | # of Exp. Projects[1] | Exp. Project Award Total[1] | # of YHDP Projects | YHDP Award Total | Planning/UFA Award Total | Total # of Proj. | Total Award | % of Nat. Award |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Permanent Housing** | | | | | | | | | | | | |
| PH - Permanent Supportive Housing | 98 | $56,241,944 | 3051 | 2,078,211,709 | 70 | $83,008,752 | 36 | $11,446,945 | n/a | 3255 | $2,228,909,350 | 62% |
| PH - Rapid Re-housing | 111 | $52,481,029 | 969 | $532,930,563 | 46 | $74,012,868 | 98 | $54,733,387 | n/a | 1224 | $714,157,847 | 20% |
| **Joint TH - Rapid Re-housing** | 46 | $17,037,361 | 268 | $146,236,002 | 6 | $2,835,473 | 90 | $64,780,770 | n/a | 410 | $230,889,606 | 6% |
| **Transitional Housing** | 0 | $0 | 176 | $37,002,571 | 1 | $241,285 | 33 | $7,891,751 | n/a | 210 | $45,135,607 | 1% |
| **Supportive Services Only** | 17 | $3,482,257 | 402 | $109,415,888 | 16 | $10,978,921 | 212 | $49,878,970 | n/a | 647 | $173,756,036 | 5% |
| **HMIS** | 6 | $426,858 | 318 | $69,307,472 | 15 | $4,106,102 | 29 | $2,609,801 | n/a | 368 | $76,450,233 | 2% |
| **Safe Haven** | 0 | $0 | 28 | $9,540,518 | 0 | $0 | 0 | $0 | n/a | 28 | $9,540,518 | <1% |
| **CoC Planning Grant** | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | $139,573,132 | 376 | $139,573,132 | 4% |
| **Unified Funding Agency Costs Grant** | 0 | $0 | 0 | $0 | 0 | $0 | 0 | $0 | $4,624,912 | 15 | $4,624,912 | <1% |
| **GRAND TOTAL** | 278 | $129,669,449 | 5,212 | $2,982,644,723 | 154 | $175,183,401 | 498 | $191,341,624 | $144,198,044 | 6,533 | $3,623,037,241 | |
| **% of Total Award** | | 3.5% | | 82.3% | | 4.8% | | 5.2% | 3.9% | | | |

*Specific project-level award information for Continuums of Care can be found at https://www.hudexchange.info/grantees/allocations-awards/
[1]Expansion Projects include the combined total for renewal projects being expanded and their expansion amounts, and are excluded from the separate renewal project awarded totals.

DOJ-HUD-AR00741



**POLICY BRIEF**   OCTOBER 2019

CALIFORNIA
POLICY
LAB

# Health Conditions Among Unsheltered Adults in the U.S.

**JANEY ROUNTREE, NATHAN HESS,** and **AUSTIN LYKE**

---

### November 2025: Important research note: Please read before reading or citing this study

There has been considerable interest in this analysis, however, there have also been mis-interpretations of the findings. While we had already posted a research note explaining some important caveats in interpreting this analysis, given recent events, we are updating this research note. Please reach out to press@capolicylab.org if you have additional questions.

**This study does not describe the prevalence of health conditions among all people experiencing homelessness or explain the causes of homelessness.** This study analyzes data from a non-representative sample of people in 15 states who were given a triage survey while they were experiencing homelessness and being prioritized for supportive housing. In many communities, this survey is typically given to a subset of people whom case managers believe are medically vulnerable or disabled enough to qualify for fully supportive housing or housing subsidies. The people in this sample are therefore on average much more medically vulnerable than the broader population of people experiencing homelessness. In other words this sample has selection bias. **The purpose of this brief was to compare health conditions among people accessing shelter vs people not accessing shelter — among this already vulnerable group.**

In addition, these triage surveys asked respondents about their lifetime prevalence of mental health and health conditions. However, those findings should be interpreted with caution because they are focused on lifetime prevalence and they are self-reported. In contrast, in more recent research, CPL analyzed clinical diagnoses of mental illness among people receiving homelessness services in Los Angeles. In a 2021 study, we showed that 20% of participants in Street Outreach services had a diagnosis of serious mental illness in the previous twelve years. In a follow-up study, looking at the previous 5 years (prior to enrolling in services), we showed that 10% of people had been diagnosed with a psychotic spectrum disorder, and an additional 7% had been diagnosed for other serious mental illness without psychotic spectrum disorder.

CPL is adding this additional context to this research note because we are deeply concerned about these survey results being misused to make broad claims about the causes of homelessness. Hundreds of studies — including our own — show economic pressures are the primary drivers of homelessness, that housing people ends homelessness, and that targeted financial assistance helps people at risk of homelessness stay stably housed.

---

DOJ-HUD-AR00742

**POLICY BRIEF**      OCTOBER 2019



CALIFORNIA POLICY LAB

# Health Conditions Among Unsheltered Adults in the U.S.

**JANEY ROUNTREE, NATHAN HESS,** and **AUSTIN LYKE**

## SUMMARY

Little is known about the vulnerabilities and past experiences of unsheltered individuals or how they differ from individuals in shelters. This study adds to our understanding by analyzing new data from a survey (VI-SPDAT) given to homeless individuals across the United States. Health and behavioral health and trauma are significant contributing factors to loss of housing, particularly for unsheltered women. Unsheltered people continue to experience major and worsening health conditions while homeless. People with the longest experiences of homelessness, most significant health conditions, and greatest vulnerabilities are not accessing and being served by emergency shelters. Rather than receiving shelter and appropriate care, unsheltered people with major health challenges are instead regularly engaged by police and emergency services.

Although based upon analysis of more than 64,000 surveys, for a variety of reasons this data is likely not fully representative of the unsheltered or sheltered population. Nevertheless, this analysis provides the most comprehensive national picture of people experiencing unsheltered homelessness in the United States to date and compares their experiences with homeless individuals in shelters. While this study compares these two groups, it does not make causal claims. For example, while individuals who are sheltered report on average fewer health and mental health conditions, the data does not support a finding that shelter is the cause of improved health. In fact, it is just as likely that people who are unsheltered for long periods of time are those who cannot access shelter for a variety of reasons. The findings do reinforce the importance of stable housing as a social determinant of health and as essential for ending homelessness, for people in both groups.

HEALTH CONDITIONS AMONG UNSHELTERED ADULTS IN THE U.S.

DOJ-HUD-AR00743

## BACKGROUND

On a single night in January last year there were an estimated 553,000 individuals experiencing homelessness in the United States. Nearly 200,000 of these individuals were unsheltered, sleeping on sidewalks, in parks, in cars, or in other outdoor locations.[1] Little is known about the vulnerabilities and past experiences of unsheltered individuals or how they differ from individuals in shelters. This study adds to our understanding by analyzing new data from the Vulnerability Index Service Prioritization Decision Assistance Tool (VI-SPDAT) survey given to homeless individuals across the United States.

The VI-SPDAT is a short survey designed by OrgCode Consulting to help communities assign housing and prevention services according to the seriousness of an individual's needs. The survey has a total of 27 questions, including questions about physical health, mental health, age, gender, race, police contacts, emergency room visits, recent trauma, and other issues. It allows communities to meet federal requirements for intake assessments, is provided for free, and is widely used throughout the country. The VI-SPDAT recommends "no housing intervention" for scores three and under, "an assessment for Rapid Re-Housing" for scores between four and seven, and "an assessment for Permanent Supportive Housing / Housing First" for scores of eight and above.

## ACKNOWLEDGMENTS

We gratefully acknowledge our partners at the National Alliance to End Homelessness, the United States Interagency Council on Homelessness, and the Department of Housing and Urban Development for their thoughtful feedback on early drafts of this brief. We also thank OrgCode Consulting for providing the VI-SPDAT data analyzed here, and for their responsiveness to questions from our research team. All errors should be attributed to the authors.

## DATA AND METHODOLOGY

In order to learn more about the unsheltered homeless population OrgCode agreed to share a non-representative convenience sample of VI-SPDAT survey data from more than 64,000 unsheltered and sheltered individuals in 15 different states with the California Policy Lab.[2] These data are an important source of information about a virtually unknown population living in crisis on the streets. That said, like all data sets, these data have certain features that could introduce bias or measurement error in either direction; making the population appear more or less vulnerable accordingly. For example, neither CPL nor OrgCode has a way to measure how consistently unsheltered or sheltered individuals were assessed within each community providing data in this study. It is also possible that some providers may only choose to assess individuals whom they believe in advance will qualify for or be prioritized for homelessness services. For a more detailed explanation of the data used for this analysis, and potential biases, please see the Appendix. Additional details on the data used, including the results of linear models used to determine the significance of observed differences in outcomes by demographic characteristics of the sample can be found in the accompanying Technical Appendix available online.[endnote with link].[3]

## RESEARCH QUESTIONS

This study focuses on the following four questions:

1. What are the self-reported causes of homelessness for unsheltered and sheltered homeless adults, as measured by the VI-SPDAT assessment?

2. What are unsheltered homeless adults' health conditions and vulnerability and how do they compare to sheltered adults?

3. How long are unsheltered homeless adults unstably housed and how frequently are they accessing emergency shelters?

4. How frequently do unsheltered and sheltered homeless adults interact with law enforcement or utilize emergency services?

## SNAPSHOT OF THE SAMPLE POPULATION

There are clear demographic differences within the OrgCode sample compared to the general United States population and national estimates of the sheltered homeless population, especially among African Americans who are overrepresented in our sample.[4] Initial analysis of the data, however, found that the largest share of the differences in reported outcomes could be attributed to shelter status and gender. Differences by race or ethnicity were comparatively small for most outcomes. We found no differences by geography or community type in all but one of our outcomes. Consistent with other outcomes though, the observed difference was small relative to the effect of shelter status.[5] Ongoing analysis and consultation are

DOJ-HUD-AR00744

needed to consider whether there are important implications within this data for efforts to create racially equitable systems for preventing and ending homelessness.

The average unsheltered adult in the sample is male (81%) and has a median age of 47. A slight majority of the unsheltered population is living in the West (51%) and most live in an urban area (89%). Finally, a little over half of the sample is white (57%).

The average adult in shelter is also male (77%) and has a median age of 45. The largest proportion also lives in the West (33%) and in an urban area (81%), but is more likely to be African American (60%).[6]

The mean VI-SPDAT score for unsheltered people was 9.9 compared to 4.7 for sheltered people; unsheltered women's mean VI-SPDAT score was 12.



FIGURE 1. Distribution and mean VI-SPDAT score by shelter status

Note: Sheltered and unsheltered VI-SPDAT responses drawn from the same set of 15 areas across the Unites States. Size and population density of the areas varies. Sample is not constructed to be representative, and is not assumed to be.

## FINDINGS

The analysis finds stark differences between people who are unsheltered and people who are sheltered. Unsheltered people — especially unsheltered women — report profoundly greater health challenges, higher rates of experiences of violence and trauma, and longer lengths of homelessness than people who are staying in shelters. The higher rates of health conditions and vulnerability for people experiencing unsheltered homelessness begin even before people lose their housing and are also seen early in their experiences of homelessness. These findings raise questions about whether emergency shelters are serving people with high health needs when they initially become homeless. Finally, unsheltered adults are engaged by police and emergency services much more regularly than sheltered individuals.[7]



FIGURE 2. Physical health conditions, mental health conditions, substance abuse-related loss of housing for sheltered and unsheltered adults[8]

**Health and behavioral health care needs, and experiences of abuse and trauma, are major factors in loss of housing among unsheltered people, most especially for unsheltered women.[9]**

Unsheltered people were more than four times as likely to report that physical health conditions had contributed to loss of housing as sheltered people (46% vs. 11%), nearly three times as likely to report mental health conditions had contributed to loss of housing (50% to 17%), and more than eight times as likely to report that use of drugs or alcohol had contributed to loss of housing (51% vs. 6%).

DOJ-HUD-AR00745

Significant portions of both unsheltered (46%) and sheltered people (34%) reported that experiences of abuse and/or trauma had caused their current spell of homelessness. Unsheltered women however reported abuse and/or trauma as the cause of their homelessness at much higher rates (80%) than either unsheltered men (38%) or sheltered women (34%).



FIGURE 3. Unsheltered and sheltered adults who experienced trauma[10]

## Unsheltered people continue to experience major and worsening health conditions while homeless.

At the time of VI-SPDAT assessment, unsheltered people are more than four times as likely as sheltered people to report a physical health condition (84% vs. 19%), nearly one and a half times as likely to report a mental health condition (78% vs. 50%), more than five times as likely to report a substance abuse condition (75% vs. 13%), and 25 times as likely to report all three conditions concurrently (50% vs. 2%).



FIGURE 4. Physical health, mental health, substance abuse, and trimorbidity by shelter status[11]

DOJ-HUD-AR00746

Even unsheltered people who have been homeless for less than a year report much greater presence of health conditions than people who have been homeless for greater than three years but who are sheltered (75% vs 37%).

Shelter status also affects respondents' experiences of having basic needs met. While just 3% of sheltered individuals report difficulty meeting basic needs, 50% of unsheltered individuals report difficulty taking care of basic needs like bathing, changing clothes, using a restroom, and having access to food and clean water.



FIGURE 5. Physical health conditions by shelter status and length of time unstably housed[12]

## People with the longest experiences of homelessness, most significant health conditions, and greatest vulnerabilities are not accessing and being served by emergency shelters.

Unsheltered people reported lengths of time since last stably housed that were on average more than six times longer than sheltered people (2,632 days vs. 410 days) — and unsheltered women reported an average of 5,855 days since they were last stably housed.

Most people who were assessed while unsheltered are not using shelter with any significant frequency. Unsheltered women reported spending an average of 18 nights in shelters over the previous two years; unsheltered men reported an average of 44 nights in shelter. The median for both was even lower; for unsheltered women it was just four nights in the last two years, and eight nights for men.

DOJ-HUD-AR00747

**Compared to people who are sheltered, unsheltered people with major health challenges are much more regularly engaged with policing efforts and emergency responses.**

Unsheltered individuals report ten times as many police contacts on average (21 compared to 2) in the previous six months, and were approximately nine times as likely to report they had spent at least one night in jail in the last six months (81% vs. 9%). Police contacts are not necessarily related to enforcement and can be any type of interaction with police.

Unsheltered people were more likely to report at least one visit to an emergency room in the last six months than sheltered people (94% vs. 74%), reported twice as many visits (8 vs. 4), and were nearly three times as likely to report at least one trip in an ambulance over the same timeframe (74% vs. 29%).



FIGURE 6. Police contacts, jail spells, emergency room visits, and ambulance rides in previous six months by shelter status[13]

DOJ-HUD-AR00748

## KEY INSIGHTS & FUTURE RESEARCH

These findings provide substantial evidence that unsheltered homelessness is a housing issue, a public health and health care issue, and a personal safety issue. While the ultimate answer is to house all homeless individuals and prevent others from experiencing homelessness, addressing the problem at the moment will require mobilization of efforts and resources from multiple sectors and systems, not just from programs currently dedicated to preventing and ending homelessness. Below we discuss in detail key insights and questions for future research.

- For those people who were surveyed, health, behavioral health and trauma are significant contributing factors to loss of housing, particularly for unsheltered women. Future research should explore the role that lack of access to adequate health and behavioral health care, plays among the causes of unsheltered homelessness.

- Whether people are unsheltered or sheltered, they report worsening health conditions the longer they are homeless. This finding is consistent with the many studies that have found permanent housing to be a social determinant of health.[14] Future research should focus on documenting effective strategies for moving people from the street and shelters into permanent housing.

- People with the longest experiences of homelessness, most significant health concerns, and greatest vulnerabilities are not accessing or being served by emergency shelters. As policymakers design interventions for unsheltered homelessness and balance investments in emergency housing and permanent housing, they will need to consider whether emergency housing is adequate or appropriate for a highly vulnerable population, half of whom are trimorbid.

DOJ-HUD-AR00749

## APPENDIX:
## Additional Notes on the VI-SPDAT Data

OrgCode provided de-identified VI-SPDAT survey data, including answers to individual questions on the survey, for over 64,000 single adults age 25 or older. Service providers in 15 states representing all regions of the country collected the assessments over a three-year period from 2015 through 2017. Non-disclosure agreements between these communities and OrgCode prohibit identification of individual communities.

The sample is a "convenience sample" of data voluntarily provided to OrgCode by individual communities for the purposes of research and is not meant to be nationally representative. Our analysis found no statistical significance of geographical region (West, Midwest, Northeast, Southeast, Southwest) when controlling for sheltered status on any of the outcomes in this brief.

These data are an important source of information about a virtually unknown population living in crisis on the streets. That said, like all data sets, these data have certain features that are important to understand before interpreting the results of our analysis. In particular, there are several aspects of the data collection process that could bias the results "upward," making the population appear more vulnerable, or "downward," making the population appear less vulnerable. First, all responses to VI-SPDAT questions are self-reported, and individuals may not answer every question. Before the data was sent to CPL, OrgCode coded non-responses as "no," which prevents CPL from independently measuring how many questions were not answered. It also presents a potential downward bias of unknown magnitude on responses. In addition, OrgCode recommends that workers wait to administer the VI-SPDAT until the third contact with an unsheltered individual, and up to two weeks for sheltered individuals to allow trust to be built between the two people. Actual practice can vary from place to place and may bias the answers in either direction.

Moreover, neither CPL nor OrgCode has a way to measure how consistently unsheltered or sheltered individuals were assessed within each community. It is possible that some providers may only choose to assess sheltered or unsheltered individuals whom they believe in advance will qualify for or be prioritized for homelessness services, which could bias the results upward. Finally, men and African Americans are overrepresented in the OrgCode data compared to recent national data on sheltered and unsheltered single adults.[15]

DOJ-HUD-AR00750

*The California Policy Lab builds better lives through data-driven policy. We are a project of the University of California, with sites at the Berkeley and Los Angeles campuses.*

*This research publication reflects the views of the authors and not necessarily the views of our funders, our staff, our advisory board, or the Regents of the University of California.*

## Endnotes

1  2018 Annual Homeless Assessment Report to Congress: https://files.hudexchange.info/resources/documents/2018-AHAR-Part-1.pdf

2  Data presented in this brief have not been reweighted to correct for potential sources of bias in selection.

3  Readers interested in a more technical discussion of the data and methods can also access an online technical appendix at the following address: www.capolicylab.org/briefs/tbd

4  The United States population is 13% African American; African Americans account for 47% of the US sheltered homeless population and 27% of the US unsheltered population; African Americans in the VI-SPDAT sample account for 60% of the sheltered population and 37% of the sheltered population. 2018 Annual Homeless Assessment Report to Congress.

5  See Technical Appendix for results from linear regression models that use shelter status, gender, age, community type, and geography as predictors for each outcome included in our findings.

6  A detailed breakdown of the sample demographics can be found in the online technical appendix.

7  Police contacts are not necessarily related to enforcement and can be any type of interaction with police.

8  We found large statistically significant differences between the overall sheltered and unsheltered populations, and by gender within sheltered status. Differences by race/ethnicity were smaller or insignificant.

9  Full text of the questions asked in the VI-SPDAT is: Have you ever had to leave an apartment, shelter program, or other place you were staying because of your physical health? Have you ever had trouble maintaining your housing, or been kicked out of an apartment, shelter program or other place you were staying, because of a mental health issue or concern? Has your drinking or drug use led you to being kicked out of an apartment or program where you were staying in the past?

10 Full text of the question asked in the VI-SPDAT is: Has your current period of homelessness been caused by an experience of emotional, physical, psychological, sexual, or other type of abuse, or by any other trauma you have experienced?

11 Figure four shows the percentage of individuals who responded "yes" to at least one of five questions relating to physical health, one of four questions relating to mental health, and one of two questions relating to substance abuse. Individuals are tribmorbid if they answered "yes" to at least one question in each of the three groups of concerns. The full text for all 11 VI-SPDAT questions relating to physical health, mental health, and substance abuse conditions can be found in the online technical appendix.

12 Figure five shows the percentage of individuals who responded "yes" to at least one of five questions relating to physical health grouped by the length of time individuals reported since their last stable housing.

13 Full text of the VI-SPDAT questions after the prompt "In the past six months, how many times have you…" are as follows: "Talked to police because you witnessed a crime, were the victim of a crime, or the alleged perpetrator of a crime or because the police told you that you must move along? Stayed one or more nights in a holding cell, jail or prison, whether that was a short-term stay like the drunk tank, a longer stay for a more serious offence, or anything in between? Received health care at an emergency department/room? Taken an ambulance to the hospital?"

14 Shaw, Mary. (2004). "Housing and Public Health." *Annual Review of Public Health, Vol 25*, 397–418. doi:10.1146/annurev.publhealth.25.101802.123036. See also Hetherington, K., & Hamlet, N. (2018). "Health and Homelessness." In Bonner A. (Ed.), *Social Determinants of Health: An Interdisciplinary Approach to Social Inequality and Wellbeing* (pp. 195–210). Bristol: Bristol University Press. www.jstor.org/stable/j.ctt22p7kj8.20

15 2018 Annual Homeless Assessment Report to Congress

DOJ-HUD-AR00751

# Toward a New Understanding

The California Statewide Study
of People Experiencing Homelessness

June 2023

Benioff Homelessness
and Housing Initiative



University of California
San Francisco



DOJ-HUD-AR00752



**Toward a New Understanding** The California Statewide Study of People Experiencing Homelessness

DOJ-HUD-AR00753

**AUTHORS:**

Margot Kushel, MD and Tiana Moore, PhD

With *(listed in alphabetical order)*:

Jennafer Birkmeyer, MPH

Zena Dhatt, BS

Michael Duke, PhD

Kelly Ray Knight, PhD

Kara Young Ponder, PhD

**STATISTICS:**

Jennafer Birkmeyer, MPH; Sara Colom, PhD; Dave Graham-Squire, PhD; Kim Nguyen, ScD; Eve Perry, MPP; Margo Pottebaum, BA; Mai See Yang, PhD; and Statistics Team Project Manager: Regina Sakoda, BS

**QUALITATIVE RESEARCH:**

Dallas Augustine, PhD; Zena Dhatt, BS; Michael Duke, PhD; Anita Hargrave, MD; Tianna Jacques, BA; Kelly Ray Knight, PhD; Grace Taylor, BA; Kara Young Ponder, PhD

**EPIDEMIOLOGY:**

Meghan Morris, PhD; Paul Wesson, PhD

**BHHI CORE FIELD RESEARCH TEAM:**

Operations Manager: Layan Kaileh, MSW. *RDS Manager:* Angelica DeGaetano, LLM. *Qual Managers:* Zena Dhatt, BS and Michael Duke PhD. Diana Flores, MPH; Tremone Fucles, MPH; Norma Guzman, BA; Tianna Jacques, BA; Amy Lara, MPH; Corbin Platamone, MPH; Abraham Renteria-Ramirez, BA; Madison Rodriguez, BS; Regina Sakoda, BS; Ivan Smith, AS; Elana Straus, BA; Grace Taylor, BA

**Suggested citation:**

Kushel, M., Moore, T., et al. (2023). Toward a New Understanding: The California Statewide Study of People Experiencing Homelessness. UCSF Benioff Homelessness and Housing Initiative.

Photos cover and opposite page: Sam Comen/unhousedca.org

DOJ-HUD-AR00754

# Table of Contents

04 **Executive Summary**

11 **Introduction**

12 **Study Overview and Methods**

12 Study Population and Eligibility

14 Venue-Based and Respondent Driven Sampling Methods

14 Administered Questionnaires

16 In-Depth Interview Sub-Studies

17 Community Engaged Practices

17 **About the Report**

19 **Chapter 1: Who Experiences Homelessness in California?**

19 Overview

20 **Who Experiences Homelessness in California?**

20 Family Structure

21 Age

21 Adults with Minor Children

22 Current Marital or Partner Status

22 Race

23 Birthplace and Where Participants Lived Prior to Homelessness

23 Gender

23 Sexuality

24 Education

24 Veteran Status

24 Prior Experiences of Homelessness and Length of Current Episode

24 Chronic Homelessness

25 **The Disproportionate Burden of Homelessness**

25 **Experiences Over the Life Course**

25 Discrimination, Exposure to Violence, and Incarceration

26 Mental Health Over the Life Course

27 Substance Use Over the Life Course

29 **Summary**

29 **Key Takeaways**

31 **Chapter 2: Pathways to Homelessness**

32 **Housing Costs and Household Income**

32 **Homelessness Entrances from a Non-Leaseholding Arrangement**

33 **Homelessness Entrances from a Leaseholding Arrangement**

35 **Homelessness Entrances from Institutional Settings**

36 **Reasons for Leaving Last Housing**

37 Economic Reasons

39 Social Reasons

41 Health-Related Reasons

44 Other Reasons

44 **Primary Reason for Leaving Last Housing**

46 **Homelessness Prevention**

49 **Summary**

49 **Key Takeaways**

51 **Chapter 3: Experiences During Homelessness**

51 **Where Did People Stay?**

53 Shelter Access and Suitability

53 Vehicular Homelessness

53 Use of Domestic Violence Shelters by Survivors of IPV

53 **Physical Health and Use of Healthcare Services**

54 Physical Health Status

56 Pregnancy

56 Access to Healthcare

58 Acute Health Care Utilization

59 **Behavioral Health**

59 Mental Health

61 Substance Use

64 **Criminal Justice Involvement**

65 **Confiscations and Forced Displacements**

66 **Experiences of Violence**

66 **Income**

66 **Work and Employment**

68 **Benefits**

69 **Discrimination**

71 **Summary**

71 **Key Takeaways**

73 **Chapter 4: Barriers and Facilitators of Returns to Housing**

73 **Interest in Obtaining Permanent Housing**

73 **Challenges to Accessing Housing**

74 Housing Costs

74 Trade-offs to Make Housing Affordable

75 The Role of Rental Subsidies

76 Lack of Case Management and Housing Navigation Assistance

77 Wait Times and Hopelessness

77 Logistical and Technological Barriers to Receiving Housing

78 Family Status

79 Discrimination and Prior History as Barriers

79 Challenges Associated with Physical and Behavioral Health

80 **What Would Help Individuals End Their Homelessness?**

81 **Key Takeaways**

83 **Chapter 5: Policy Recommendations**

83 **Increase Affordable Housing Options Available to Extremely Low-Income Households**

84 **Increase Homelessness Prevention**

85 **Facilitate Swift Exits from Homelessness**

85 **Increase Access to Services to Match Clients' Physical and Behavioral Health Needs**

87 **Address the Criminal Justice to Homelessness Cycle**

87 **Increase Opportunities for Earned Income and Benefits Utilization**

88 **Support Those Impacted by Domestic Violence**

88 **Increase Outreach to Those Experiencing Unsheltered Homelessness**

88 **Center Racial Equity**

90 **ACKNOWLEDGMENTS**

92 **REFERENCES**

DOJ-HUD-AR00756

# Executive Summary

IN CALIFORNIA, more than 171,000 people experience homelessness daily. California is home to 12% of the nation's population, 30% of the nation's homeless population, and half the nation's unsheltered population. While homelessness is a major issue for California, there are many conflicting ideas about what to do about it. To design effective programs and policies to address homelessness, we need to understand who is experiencing it, how they became homeless, what their experiences are, and what is preventing them from exiting homelessness.

To answer these questions, the University of California, San Francisco (UCSF) Benioff Homelessness and Housing Initiative conducted the California Statewide Study of People Experiencing Homelessness (CASPEH), the largest representative study of homelessness since the mid-1990s and the first large-scale representative study to use mixed methods (surveys and in-depth interviews). Guided by advisory boards composed of people with lived experience of homelessness and those who work on homelessness programs and policies, we selected eight counties that represent the state's diversity and recruited a representative sample of adults 18 and older experiencing homelessness throughout California. The investigators conducted the research between October 2021 and November 2022. We administered questionnaires to nearly 3,200 participants, selected intentionally to provide a representative sample, and weighted data to provide statewide estimates. To augment survey responses, we recruited 365 participants to participate in in-depth interviews. With this context, CASPEH provides evidence to shape programs and policy responses to the homelessness crisis.

## WHO EXPERIENCES HOMELESSNESS IN CALIFORNIA

**First, we explore the life experiences of study participants.** Individuals with certain vulnerabilities, those with a history of trauma, and/or those from racially minoritized groups, are at higher risk of experiencing homelessness. People who experience homelessness have higher rates of mental health conditions and substance use than the general population. For many, these problems predated their first episode of homelessness.

⚑ **The homeless population is aging, and minoritized groups are overrepresented.** The median age of participants was 47 (range 18-89). Participants who report a Black (26%) or Native American or Indigenous identity (12%) were overrepresented compared to the overall California population. Thirty-five percent of participants identified as Latino/x.

⚑ **People experiencing homelessness in California are Californians.** Nine out of ten participants lost their last housing in California; 75% of participants lived in the same county as their last housing.

⚑ **Participants have been homeless for prolonged periods.** Thirty-nine percent of participants were in their first episode of homelessness. The median length of homelessness was 22 months. More than one third (36%) met federal criteria for chronic homelessness.

⚑ **Participants reported how stress and trauma over the life course preceded their experience with homelessness.** Participants reported experiences of discrimination, exposure to violence, incarceration, and other traumas prior to homelessness. These experiences interacted and compounded to increase vulnerability to homelessness.

⚑ **Physical and sexual victimization throughout the life course was common.** Nearly three quarters (72%) experienced physical violence in their lifetime; 24% experienced sexual violence. Sexual violence was more common among ciswomen (43%) and transgender or nonbinary individuals (74%).

⚑ **Participants reported high lifetime rates of mental health and substance use challenges.** The majority (82%) reported a period in their life where they experienced a serious mental health condition. More than one quarter (27%) had been hospitalized for a mental health condition; 56% of these hospitalizations occurred prior to the first instance of homelessness. Nearly two thirds (65%) reported having had a period in their life in which they regularly used illicit drugs. Almost two thirds (62%) reported having had a period in their life with heavy drinking (defined as drinking at least three times a week to get drunk, or heavy intermittent drinking). More than half (57%) who ever had regular use of illicit drugs or regular heavy alcohol use had ever received treatment.

## PATHWAYS TO HOMELESSNESS

**Second, we sought to understand the context of participants' lives prior to their most recent episode of homelessness.** High housing costs and low income left participants vulnerable to homelessness.

In the six months prior to homelessness, the median monthly household income was $960. A high proportion had been rent burdened. Approximately one in five participants (19%) entered homelessness from an institution (such as a prison or prolonged jail stay); 49% from a housing situation in which participants didn't have their name on a lease or mortgage (non-leaseholder), and 32% from a housing situation where they had their name on a lease or mortgage (leaseholder).

DOJ-HUD-AR00758

⚑ **Participants exiting housing to homelessness reported having minimal notice.** Leaseholders reported a median of 10 days notice that they were going to lose their housing, while non-leaseholders reported a median of one day.

⚑ **Non-leaseholders reported lower incomes and housing costs than leaseholders.** In the six months prior to homelessness, the median monthly household income for non-leaseholders was $950. Of non-leaseholders, 43% were not paying any rent; among those who reported paying anything, the median monthly rent was $450. Among non-leaseholders who paid rent, 57% were rent burdened (paying more than 30% of household income for rent). Many non-leaseholders previously had been in leaseholding arrangements, but were able to forestall homelessness by moving in with family or friends. Not only did participants lack legal rights, but they often were living in substandard and overcrowded conditions. These arrangements tended to be highly stressful, leading to conflicts.

⚑ **Leaseholders had higher incomes, but higher housing costs.** The median monthly household income for leaseholders in the six months prior to homelessness was $1400. The median housing costs were $700. While 10% of participants whose names were on the lease didn't pay for housing, among those who paid rent, 66% met criteria for rent burden. Sixteen percent of leaseholders had received a rental subsidy in their last housing. Those who became homeless immediately after leaving a leaseholding situation were similar in many ways to the non-leaseholders but lacked options to move to after losing their housing.

⚑ **The most common reason for leaving last housing was economic for leaseholders and social for non-leaseholders.** Twenty-one percent of leaseholders cited a loss of income as the main reason that they lost their last housing. Among non-leaseholders, 13% noted a conflict within the household and 11% noted not wanting to impose. For leaseholders, economic considerations interacted frequently with social and health crises. For example, participants' (or household members') health crises led them to lose their job.

⚑ **Participants who entered homelessness from institutional settings reported not having received transition services.** Nineteen percent of participants entered homelessness from an institutional setting, such as prolonged jail and prison stays. Few reported having received services prior to having exited.

⚑ **A low proportion of those who entered homelessness from housing situations had sought or received homelessness prevention services.** Many participants were unaware of these services. Overall, 36% of participants had sought help to prevent homelessness, but most sought help from friends or family, rather than non-profits or government agencies.

⚑ **Even if the cause of homelessness was multifactorial, participants believed financial support could have prevented it.** Seventy percent believed that a monthly rental subsidy of $300-$500 would have prevented their homelessness for a sustained period; 82% believed receiving a one-time payment of $5,000-$10,000 would have prevented their homelessness; 90% believed that receiving a Housing Choice Voucher or similar option would have done so.

© Sam Comen




DOJ-HUD-AR00759

## EXPERIENCES DURING HOMELESSNESS

Next, we examined participants' experiences of homelessness. **Homelessness is devastating to health and well-being.** Participants' experiences were difficult and marked by significant health challenges, high use of drugs and alcohol, frequent victimization, and interactions with the criminal justice system. For the most part, participants were disconnected from the job market and services.

⚑ **Most participants were unsheltered.** More than three quarters (78%) noted that they had spent the most time while homeless in the prior six months in unsheltered settings (21% in a vehicle, 57% without a vehicle). Over the prior six months, 90% reported at least one night in an unsheltered setting. Participants who stayed in shelters reported general satisfaction with them; many who didn't expressed concerns about curfews, the need to vacate during the day, health risks, and rules. Forty-one percent of participants noted a time during this homelessness episode where they wanted shelter but were unable to access it.

⚑ **Participants reported poor health and many health challenges.** Forty-five percent of all participants reported their health as poor or fair; 60% reported a chronic disease. More than one third of all participants (34%) reported a limitation in an activity of daily living, and 22% reported a mobility limitation.

⚑ **Among women of reproductive age, pregnancy was common.** One quarter (26%) of those assigned female at birth age 18-44 years had been pregnant during this episode of homelessness; 8% reported a current pregnancy.

⚑ **Despite these health challenges, participants had poor access to healthcare.** While 83% of participants reported having health insurance (primarily Medicaid); half (52%) reported a regular non-emergency department (ED) source of care. Half (49%) had seen a health care provider outside the ED in the prior six months. Almost one quarter (23%) reported an inability to get needed healthcare in the prior six months.

⚑ **Participants had high rates of acute and emergent health service utilization.** In the prior six months, 38% reported an ED visit that didn't result in a hospitalization; 21% reported a hospitalization for a physical health concern and 5% for a mental health issue.

⚑ **Many participants had symptoms of mental health conditions; few had access to treatment.** Participants noted how the stresses of homelessness exacerbated their mental health symptoms. Two thirds (66%) noted symptoms of mental health conditions currently, including serious depression (48%), anxiety (51%), trouble concentrating or remembering (37%), and hallucinations (12%). Only 18% had received non-emergent mental health treatment recently; 9% had received any mental health counseling and 14% any medications for mental health conditions.



DOJ-HUD-AR00760

⚑ **Substance use, particularly methamphetamine use, was common; few received treatment.** Many participants reported using drugs and alcohol to help them cope with the circumstances of homelessness. Almost one third (31%) reported regular use of methamphetamines, 3% cocaine, and 11% non-prescribed opioids. Sixteen percent reported heavy episodic drinking. Nearly one quarter (24%) noted that substance use currently caused them health, legal, or financial problems. Approximately equal proportions reported that their use of drugs had decreased, stayed the same, or increased during this homelessness episode. Six percent of participants reported receiving any current drug or alcohol treatment. Twenty percent of those who report current regular use of illicit drugs or heavy episodic alcohol use reported that they wanted treatment, but were unable to receive it.

⚑ **Criminal justice involvement and experiences of violence were common.** Nearly one third (30%) of participants reported a jail stay during this episode of homelessness. Participants reported that homelessness left them more vulnerable to violence. More than one third of all participants (38%) experienced either physical (36%) or sexual (10%) violence during this episode of homelessness. Ciswomen (16%) and transgender or non-binary individuals (35%) were more likely to experience sexual violence.

⚑ **Participants noted substantial disconnection from labor markets, but many were looking for work.** Some of the disconnection may have been related to the lack of job opportunities during the pandemic, although participants did report that their age, disability, lack of transportation, and lack of housing interfered with their ability to work. Only 18% reported income from jobs (8% reported any income from formal employment and 11% from informal employment). Seventy percent reported at least a two-year gap since working 20 hours or more weekly. Of all participants, 44% were looking for employment; among those younger than 62 and without a disability, 55% were.

## BARRIERS AND FACILITATORS OF RETURNS TO HOUSING

**Next, we examined what prevented participants from re-entering housing.** While participants faced many barriers to returning to housing, the primary one was cost. Participants overwhelmingly wanted permanent housing, but they had conflicting feelings about emergency shelter.

⚑ **Nearly all participants expressed an interest in obtaining housing, but faced barriers.** Nearly 9 in 10 (89%) participants noted housing costs as a barrier to re-entering permanent housing. Other barriers included lack of necessary documentation, discrimination, prior evictions, poor credit history, challenges associated with physical or behavioral health conditions, and family considerations (such as having enough space for their children).

© Sam Comen



DOJ-HUD-AR00761

⬛ **Participants were not receiving regular assistance, such as housing navigation, to help them exit homelessness.** Fewer than half (46%) had received any formal assistance to re-enter housing during their episode of homelessness. Only 26% received assistance monthly or more frequently in the prior six months. Two thirds of participants believed that their lacking assistance was a barrier in their re-entering housing.

⬛ **Participants believed that financial assistance would help them obtain housing and exit homelessness.** Eighty-six percent thought that a monthly subsidy of $300-$500 a month would help them re-enter housing. Ninety-five percent thought a lump-sum payment of $5,000-$10,000 would help them. Ninety-six percent thought that a Housing Choice Voucher (or similar rental subsidy) would help them re-enter housing.

## POLICY RECOMMENDATIONS

**Based on these findings, we offer policy recommendations.** The full report presents more detailed recommendations; we list our top six here:

**1** **Increase access to housing affordable to extremely low income households** (those making less than 30% of the Area Median Income) through (1) supporting production of housing (e.g., Low Income Housing Tax Credits, leveraging land use tools), (2) expanding availability of rental subsidies (e.g., Housing Choice Vouchers), and (3) supporting their use on the rental market (e.g., increase housing navigation services, create and enforce anti-discrimination laws).

**2** **Expand targeted homelessness prevention** (e.g., financial support, legal assistance) at service settings (e.g., social service agencies, healthcare settings, domestic violence services, community organizations) for both leaseholders and non-lease holders. Expand prevention and transition services at institutional exits (jails, prisons). Expand and strengthen eviction protections.

**3** **Provide robust supports to match the behavioral health needs of the population** by (1) increasing access to low barrier mental health, substance use, and harm reduction services during episodes of homelessness (including unsheltered settings) and (2) appropriately staffing permanent supportive housing with evidence-based models (e.g., pathways to housing, assertive community treatment, and intensive case management) that meet the needs of the population.

**4** **Increase household incomes through evidence-based employment supports** (e.g., training, transportation) and affirmative outreach to support increasing receipt of benefits.

**5** **Increase outreach and service delivery to people experiencing homelessness,** including a focus on unsheltered settings.

**6** **Embed a racial equity approach in all aspects of homeless system service delivery.** Ensure that prevention activities and coordinated entry prioritization schemes address racial inequities; and that service delivery is conducted in a way that support racial equity.



DOJ-HUD-AR00762



© Sam Comen

**Toward a New Understanding** The California Statewide Study of People Experiencing Homelessness

DOJ-HUD-AR00763

## INTRODUCTION

## California is home to the largest population of people experiencing homelessness in the United States.

More than 171,000 people experience homelessness daily in California, two times more than the next highest state. While 12% of the overall United States population lives in California, 30% of the nation's homeless population and half the nation's unsheltered population (those living outside, in vehicles, or in places not meant for human habitation) reside here. There are many conflicting ideas about how homelessness became a crisis in California and what to do about it. To determine effective policies, we need to understand who is experiencing homelessness, how they came to be homeless, what their experiences are while homeless, and what is preventing them from returning to housing.

The University of California, San Francisco (UCSF) Benioff Homelessness and Housing Initiative (BHHI) conducted the California Statewide Study of People Experiencing Homelessness (CASPEH). The CASPEH is the largest representative study of homelessness conducted in California and the largest representative study of homelessness in the United States since the mid-1990s. The study examined the characteristics and experiences of adults experiencing homelessness, the precipitants of homelessness, the barriers and facilitators to exiting homelessness, the impact of the COVID-19 pandemic on homelessness, and the opportunities to better prevent and end homelessness in California. By recruiting a representative sample of all California adults experiencing homelessness and by using a combination of questionnaires and in-depth interviews, we provide an accurate picture of the homelessness crisis and its impact on the adults who experience it. We intend for this work to help the public understand the myriad causes and consequences of homelessness and to shape policy conversations about potential solutions.

DOJ-HUD-AR00764

## STUDY OVERVIEW AND METHODS

The research team used best practices to recruit a representative sample of all adults experiencing homelessness in California, whether they be young or old, in family units with children or single, sheltered or unsheltered, and using services or not. Thus, the sample accurately represents all adults experiencing homelessness regardless of service use, living situation, family structure, or language spoken. The study used questionnaires to determine accurate data on the proportions of people who report certain experiences. In addition, the study used in-depth interviews to understand how and why participants experienced what they did.

To guide our work, we convened community advisory boards consisting of those with lived experiences of homelessness and those involved in policy and practice. These boards played a critical role at every stage of the process. Designed to be representative of all adults 18 years and older experiencing homelessness in California,[1] the study includes nearly 3,200 administered questionnaires and 365 in-depth interviews with adults experiencing homelessness in counties representing eight regions (Figure 1). In partnership with a wide array of community stakeholders, the UCSF BHHI team collected data between October 2021 and November 2022.

The study received approval from the UCSF Institutional Review Board. All study staff underwent extensive training in research methods and received certification in ethical conduct of research. The study was funded by the UCSF Benioff Homelessness and Housing Initiative, the California Healthcare Foundation (CHCF), and Blue Shield of California Foundation (BSCF). UCSF conducted the study at the request of the California Health and Human Services Agency Secretary Mark Ghaly. The study did not receive funding from the State of California. UCSF BHHI takes responsibility for the findings. Neither CHCF, BSCF, nor the State of California had a role in analyzing the data or interpreting the findings.

### Study Population and Eligibility

The California Statewide Study sought to understand the experiences of all adults experiencing homelessness in California. Eligible participants were at least 18 years old and homeless, as defined by the Homeless Emergency Assistance and Rapid Transitions to Housing (HEARTH) Act.[2] All participants provided informed consent prior to study participation.

> Representative of all adults 18 years and older experiencing homelessness in California, the study includes nearly 3,200 administered questionnaires and 365 in-depth interviews with adults experiencing homelessness in eight counties representing eight distinct regions.

DOJ-HUD-AR00765

**FIGURE 1** Map of the Eight Study Regions



- Northern California
- Inland California
- Northern Central Valley
- Outer Bay Area
- Inner Bay Area
- Southern Central Valley
- Central Coast and Southern California
- Los Angeles

DOJ-HUD-AR00766

INTRODUCTION

## Venue-Based and Respondent-Driven Sampling Methods

To provide a representative sample, we divided California into eight regions (Figure 1). Using a variety of data inputs to choose counties within a region that would allow us to draw conclusions about all adults experiencing homelessness in California, we chose one county in each region (Figure 1). With these methods, the counties together stand in for every county across California.

To ensure representativeness within each county, we used venue-based sampling supplemented by respondent-driven sampling (RDS) to recruit participants. In venue-based sampling, we developed a list of places where people experiencing homelessness may be found (encampments, shelters, free and low-cost food programs, showers, and community centers) and selected a random sample of these places. Within each venue, we selected a random sample of people to interview based on the number of people who were present at the time of our visit.[3]

Respondent-driven sampling seeks to recruit people from populations who are likely to be missed during venue-based sampling. Our Advisory Boards recommended we use RDS to find young adults, LGBTQ adults, farmworkers, and residents at domestic violence shelters. With the help of community members who have connections to these groups, we recruited study participants, administered the survey to them, and then asked them to help us recruit other people in their networks. This process continued with participants referring us to members of their communities who then referred us to others.

Using information on all who were eligible and all who participated, we weighted responses to generate statewide estimates.[4]



Photo: Barbara Ries

## Administered Questionnaires

Trained research staff administered questionnaires to 3,198 participants, covering topics including demographics, prior and current living situation, employment, income, precipitants of homelessness, barriers to re-entering housing, physical and mental health, work, criminal justice involvement, experiences of violence, experiences of discrimination, and service utilization (e.g., health, mental health, homelessness, benefits, etc.) (Table 1). We designed the questionnaire to understand who was homeless, how participants came to be homeless, what happened to them when homeless, and what was preventing them from exiting homelessness.

Study staff administered questionnaires in person using internet-enabled tablets. For select participants staying in domestic violence shelters, staff conducted surveys via telephone to protect privacy. We conducted interviews in English (95%) and Spanish (5%). For a few interviews (<1%), staff conducted interviews with trained interpreters (American Sign Language and Russian). Interviews lasted 45-60 minutes.

> We designed the questionnaire to understand who was homeless, how participants came to be homeless, what happened to them when homeless, and what was preventing them from exiting homelessness.

DOJ-HUD-AR00767

**TABLE 1** Overview of Questionnaire Domains and Location(s) in Report

| Questionnaire Domain | Content Summary | Chapter(s) |
|---|---|---|
| Demographics | Race, gender identity, sexual orientation, education, relationship status, place of birth, chronic homelessness, household status, size | 1 |
| Housing Trajectories | Qualities of last housing prior to homelessness, including where they lived, tenure, when they left, and institutional entries and exits | 2 |
| Precursors and Precipitants to Homelessness | Qualities of last housing: owned/rent, leaseholder status, housing costs, rental assistance, circumstances of exiting last housing (e.g., notice prior to leaving, reasons for leaving) | 2 |
| Homelessness Prevention | Help sought and/or received prior to homelessness, scenarios that might have prevented homelessness | 2 |
| History of Homelessness | Previous experiences of homelessness, age when first experienced homelessness | 1 |
| Returns to Housing | Barriers and resources that would help exit homelessness | 4 |
| Housing Services | Instrumental support during this episode of homelessness | 4 |
| Living Situation | Sheltered and unsheltered locations during this episode (limited to past six months) | 3 |
| Income, Employment, and Benefits | Income before and during homelessness, employment changes prior to homelessness, current employment and employment barriers, receipt of social safety net benefits | 3 |
| Healthcare Access and Utilization | Health insurance, regular place for healthcare, ambulatory care, emergency department use, hospitalization, unmet needs for healthcare | 3 |
| Physical Health | Health status, chronic disease, disability, functional status, COVID-19 | 3 |
| Pregnancy and Children | Pregnancy history, minor children, custody | 1, 2, 3 |
| Carceral System | Involvement with the criminal justice system (lifetime, prior to homelessness, during homelessness), re-entry support, interactions with police | 1, 2, 3 |
| Mental Health | Mental health symptoms (lifetime, prior to homelessness, current). Receipt of mental health treatment (ambulatory and hospitalization) prior to and during episode | 1, 2, 3 |
| Substance Use | Substance use (tobacco, alcohol, cocaine, methamphetamine, opioids) before and during homelessness, unmet treatment needs, changes in use with homelessness, treatment | 1, 2, 3 |
| Interpersonal Violence | Physical, emotional, or sexual violence (lifetime, prior to, and during homelessness) | 1, 2, 3 |
| Discrimination | Discrimination before and during homelessness | 1, 2, 3 |

DOJ-HUD-AR00768

INTRODUCTION

**TABLE 2** In-Depth Interview Sub-Studies, Objectives, and Number of Participants

| In-Depth Interview Topic | Objective | Number of Participants |
|---|---|---|
| Barriers to Returns to Housing | To understand the challenges that participants face in returning to permanent housing | 65 |
| Behavioral Health Among People Experiencing Homelessness | To understand the impact of behavioral health issues on participants' experience of homelessness and the deleterious effects of homelessness on behavioral health | 58 |
| Precipitants of Homelessness | To understand the precursors of homelessness and identify opportunities for homelessness prevention | 66 |
| Black Experiences of Homelessness | To understand Black Californians' experiences of homelessness, with an emphasis on the effects of anti-Black racism | 50 |
| Latino/x[8] Experiences of Homelessness | To understand Latino/x populations' experiences of homelessness | 35 |
| Incarceration and Homelessness | To understand the interconnectedness between experiences of incarceration and/or other criminal legal contact and homelessness | 41 |
| Intimate Partner Violence (IPV) and Homelessness | To understand the relationship between intimate partner violence and homelessness | 50 |



Photo: Barbara Ries

## IN-DEPTH INTERVIEW SUB-STUDIES

To understand the full context of participants' experiences, we conducted 365 in-depth interviews in seven sub-studies. In these in-depth interviews, we asked a series of open-ended questions, which allowed participants to share their experiences. The research team selected participants for in-depth interviews based on their questionnaire responses and the researcher's assessment that the participant would be able to discuss the interview topic at length. Staff audio-recorded all in-depth interviews and trained transcriptionists created written transcripts. We coded and analyzed all of the in-depth interviews. See Table 2 for more details on the interviews.

DOJ-HUD-AR00769

## COMMUNITY-ENGAGED PRACTICES

Our team committed to community-engaged practices throughout the study. We relied on the expertise of three advisory boards: the Lived Expertise Advisory Board (a group of individuals with lived experiences of homelessness); the Learning Collaborative Advisory Board (a group of leaders from each of the representative regions); and the Policy and Practice Advisory Board (a group of local, state, and national government partners, service providers, and members of advocacy groups). These boards provided feedback on questionnaires and qualitative interview guides, provided region-specific expertise during study implementation, interpreted findings, and partnered with us to disseminate findings.

To collect data, we partnered with community workers with lived experience of homelessness and knowledge of homelessness in their communities to help with study administration. Supporting out-reach and recruitment efforts, they served as integral members of the study staff team.

## ABOUT THE REPORT

This report summarizes our main findings, organized by the pathways that lead to homelessness to highlight that homelessness is an experience people have—not an indicator of their character. Chapter 1 provides an overview of who experiences homeless-ness in California. Chapter 2 discusses our findings on how people became homeless, with a focus on what was happening prior to their current episode of homelessness and opportunities for prevention. Chapter 3 describes the experience of homelessness, with attention to the health and safety of those experiencing homelessness. Chapter 4 focuses on individuals' interactions with the homelessness system and the barriers they faced to regaining housing. Finally, in Chapter 5, we present policy recommendations.

Throughout this report, we use vignettes, drawn from our in-depth interviews, to help readers understand the experience of study participants. A widely-used approach for illustrating themes in qualitative research, such vignettes draw on a composite of several partici-pants' common experiences. We created composite experiences to protect privacy and to elucidate the range of experiences shared by multiple participants.

> We partnered with community workers with lived experience of home-lessness and knowledge of homelessness in their communities to help with study administration. Supporting outreach and recruitment efforts, they served as integral members of the study staff team.

### A NOTE ON TERMINOLOGY

We use several terms to describe our participants and their housing status. These terms include: people experiencing homelessness (or PEH), homeless, unhoused, and unsheltered.

We define these terms as follows:

- **People Experiencing Homelessness:** A human-centered alternative to the term homeless, people experiencing homelessness centers the person and their experience with housing.

- **Homeless:** Refers to the circumstances of not having a permanent indoor place to sleep.

- **Unhoused:** Refers to not having a permanent indoor place to sleep.

- **Unsheltered:** Refers to living in an area not meant for human habitation such as a sidewalk, a park, or a car.

DOJ-HUD-AR00770



© Sam Comen

CHAPTER 1

# WHO Experiences Homelessness in California?

## Overview

In their book, *Helping America's Homeless: Emergency Shelter or Affordable Housing*,[6] Martha Burt and Laudan Aron note that homelessness arises because of an interaction between structural factors (such as the availability of affordable housing or income inequality), individual factors that increase a person's risk of becoming homeless (such as substance use, mental health challenges, or childhood adversity), and the presence or absence of a social safety net (unemployment income, publicly funded healthcare).

When structural conditions are favorable and there is a strong safety net, fewer people become homeless, and those that do tend to be only those with many individual risk factors. When structural conditions are unfavorable and there isn't a strong safety net, those with fewer individual vulnerabilities become homeless as well. In the United States, structural conditions are unfavorable. Income inequality is the widest it has been in decades.[7] There is an enormous wealth gap by race (the median white family had $184,000 in wealth in 2019 compared to just $38,000 and $23,000 for the median Hispanic and Black families, respectively).[8] Only 33 units of housing are affordable and available for every 100 extremely low-income households (those who make less than 30% of the area median income) in the United States; in California, there are only 24.[9] Our safety net is frayed, with only one in four households who qualify for rental housing subsidies nationwide receiving them, time-limited unemployment benefits, and other gaps. Thus, in the United States in 2023, many who become homeless do not have significant individual vulnerabilities, but those with individual vulnerabilities are at an even higher risk.



> *I've met some really good people [out here]… Everybody out there in the real world is one paycheck away from being homeless.*
>
> — CASPEH participant

When someone asks "Who experiences homelessness?" it is easy to conflate two different questions. As they explain in their book, *In the Midst of Plenty: Homelessness and What to Do About It*,[10] Marybeth Shinn and Jill Khadduri note that you will get different answers depending on which question you ask: "Why do some people become homeless?" or "Why do so many people become homeless?" The former question will lead to answers about individual characteristics, and the latter will lead to answers about structural conditions. Sometimes, people confuse these and answer one (why are so many people homeless) with an answer better suited for the other. In their book, *Homelessness is a Housing Problem*,[11] Gregg Colburn and Clayton Page Aldern help us understand this distinction by using the analogy of musical chairs, reminding us that the game starts with an equal number of chairs and players who walk around those chairs. At some point, someone pulls away a chair and stops the music, and the players scramble for the remaining chairs. Imagine a game where one player had sprained their ankle the night before, and played walking with crutches they don't know how to use. In this analogy, players are people in an area, chairs are housing, and the player with the sprained ankle is someone with an

DOJ-HUD-AR00772

individual vulnerability. If you had to guess who would be standing when the music stops, you would guess it would be the person on crutches. That helps answer the question: Why is this person standing? But, if you ask a different question: Why is there someone standing? They are standing because there are only 9 chairs. If there had been 10 chairs, everyone would be sitting. If no one had sprained their ankle and yet you only had 9 chairs, either two people would be sitting on one another, or *someone* would be standing. As we will explain, the reason California has so much homelessness is that we don't have enough "chairs"—in this case, housing affordable to the lowest income households. But, when we ask who is homeless, we find that those with certain individual vulnerabilities to homelessness—either because of a health condition or exposure to structural racism—are at increased risk of homelessness.

In this chapter, to answer the question "Who is experiencing homelessness in California?" we examine the demographic characteristics of CASPEH participants including age, family structure, partner status, race and ethnicity, place of origin, gender, and sexual orientation. To set the stage for later chapters, we explore where study participants were living, for how long they had been homeless, and their experiences of trauma, mental health conditions, and substance use throughout their lives.

Due to the ongoing impact of structural racism, homelessness disproportionately impacts racially marginalized communities, including Black and Indigenous people. We report on the very high rates of prior trauma in those who experience homelessness. We describe the high proportion of people who have experienced mental health and substance use challenges. We recognize that many characteristics that increase one's risk for homelessness are intertwined. For example, experiencing trauma, such as sexual or physical violence, increases one's risk for having substance use and mental health problems. Those who face structural vulnerabilities, having less access to resources throughout their lives, are at higher risk of developing health problems. In calling out these issues, we point out how they interact with one another. In noting them, we are not saying that these experiences are responsible for someone becoming homeless, nor are we answering the question: "why are there so many people experiencing homelessness?" Rather, we are recognizing that in a state with far too few "chairs," it is important to know who has been left standing.

# WHO EXPERIENCES HOMELESSNESS IN CALIFORNIA?

## Family Structure

One way that policymakers and researchers categorize people experiencing homelessness is through family structure. In alignment with the federal definitions of homeless adults, we classified people as belonging to one of three family structures: single homeless adults (adults 25 and older who are not living with minor children); adults in homeless families (adults living with minor children); and transition age young adults (TAY; young adults aged 18-24 not living with minor children). Ninety percent of our sample were single adults, 7% were adults in families, and 3% were TAY. Throughout the report, when appropriate, we will present data by family structure, as these groups have different needs and experiences.

Children and youth younger than 18 are an important contingent of people experiencing homelessness. However, our study did not attempt to capture the experience of children and youth younger than 18. This leads to several key differences with the Point in Time Count (PIT), which presents data on "people in homeless families," including both adults and minor children. Because our study included adults only, it has a lower proportion of people in families than the PIT. Further, when the PIT and others discuss TAY, they typically include those 12-24 experiencing homelessness without a caregiving adult. For our purposes, we included only those aged 18-24 and call them transition age young adults. Prior research suggests that aging out of institutions (such as the child welfare system ["foster care"] and juvenile detention), complex family situations, and holding a gender or sexual minority identity increase risk for homelessness among TAY.

DOJ-HUD-AR00773

### Older Adults

California's homeless population is aging, with the proportion of older adults (defined as adults older than 50) in the state's homeless population increasing. Among single homeless adults, 48% were 50 and older. Among single adults 50 and older, 41% became homeless for the first time at age 50 or older.

**FIGURE 2** Age Distribution of CASPEH Participants

- 18-24 years
- 25-39 years
- 40-49 years
- 50-64 years
- 65+ years



Cumulative percentage does not equal 100% due to rounding.

### Age

The CASPEH sought to understand the experiences of homeless adults (18 years and older). Participants ranged from 18 to 89 years of age. The median age of participants was 47 years, with an interquartile range[12] (IQR) of 37 to 56 years. The median age of single adults was 49 (IQR 38 - 57), 36 (IQR 29-42) for adults in families, and 22 (IQR 21-23) for TAY. Overall, 4% of participants were between 18 and 24 and 44% were 50 and older. Figure 2 presents the age distribution of participants.

### Adults with Minor Children

Seven percent of participants met the federal definition of being adults in homeless families. Adults living in homeless families had a median of 1 child living with them (range 1-6). The median age of children living in homeless families was 7 (IQR 2-12). Twenty-six percent of children living in homeless families were aged two or younger. In keeping with the federal definition, we included only adults with minor children (younger than 18) currently living with them as adults in homeless families.

Many adults experiencing homelessness have minor children, but those children aren't staying with them. We found that an additional 27% of participants had children (younger than 18) who were not currently living with them (30% of single adults and 8% of TAY). There are many reasons why parents who experience homelessness may not be living with their children. Among all participants, 18% reported having ever lost custody of a child to Child Protective Services (CPS); 11% reported they currently did not have custody of a minor child due to their child being removed by CPS. Homelessness can increase the chance that CPS removes a child from a parent's custody. In addition, parents may make the difficult decision to temporarily give up custody of their children due to struggles with housing—either because they cannot find a place where both they and their children can stay, or because they have a place where their child can stay, but not themselves. Faced with the difficult decision to remain with one's child or have the child not be homeless, some parents make the decision to separate from their child. We found that 11% of all participants (24% of all women) had voluntarily given up primary caretaking responsibilities due to housing instability or homelessness at some point in their lives. Currently, 8% of all participants (10% of those younger than 60) reported that they had given up custody of their minor children temporarily because they were homeless. This was more common in women than men (19% of women younger than 60 and 6% of men younger than 60).

DOJ-HUD-AR00774

Although some participants had lost custody of their children to CPS, others asked relatives to care for their children so that they would not be exposed to the challenges of being homeless. For example, after describing how she had lost her housing due to a substantial rent increase, a participant added: "So, I wound up homeless. My son had to go stay with his dad. And it wasn't fair to my son." Many of these parents maintained contact with their children and put aside money to purchase small gifts for when they visited them. These parents expressed a determination to improve their housing situation so that they could live with their children.

## Current Marital or Partner Status

More than half of participants (57%) were currently single and never married, while 23% were either married or partnered. Twenty-one percent of participants were divorced, separated, or widowed (18% divorced or separated and 3% widowed).

## Race

We asked participants to share their racial identities (Figure 3). Unlike the PIT, which asks one question about racial identity and a separate question about Hispanic origin, we constructed one race measure. Our race measure treats Latino/x participants as a racial group rather than an ethnicity and includes expanded racial categories. Along with allowing participants to choose all that apply, we include the category "multiracial." These differences mean that our race data cannot be compared to the PIT or general population estimates. For the purpose of description, in this section we provide a breakdown of racial groups in two ways: the percentage of our sample who identified a racial group as their sole racial identity and the percentage of our sample who identified a racial group as one of their racial identities. Separately, we constructed categories around those who chose: (1) white only, (2) Black only or Black and another racial group,[13] (3) Latino/x only, (4) more than one racial group or the multiracial category, (5) Native American/Indigenous or Indigenous to Mexico, Central or South America, (6) Asian American or Pacific Islander[14] (Figure 3).

Across our sample, 27% of participants identified as white and 26% as Black or African American (20% selected Black as their sole racial identity and 6%

selected Black as one of their racial identities). Thirty-five percent of participants identified as Latino/x (26% identified Latino/x as their sole racial identity and 9% as one of their racial identities). Twelve percent of our study participants identified Native American, Alaskan Native, or Indigenous to Mexico, Central or South America as one of their racial identities (3% selected Native American/Alaskan Native only; 0.15% selected Indigenous to Mexico, Central or South America only; 8% selected Native American and some other racial group; 1% selected Indigenous to Mexico, Central or South America and some other racial group). Asian or Pacific Islanders made up 3% of our sample (2% selected Asian or Pacific Islander as their sole identity and 1% as one of their identities.). Twenty-two percent of all participants identified as either more than one race or multiracial. The most common answers for those who marked more than one racial group were: Native American/Indigenous and White; Latino/x and White; and Latino/x and Native American/Indigenous.



**FIGURE 3** Racial Identities of CASPEH Participants

- White
- Black
- Latino/x
- Multiracial
- Native American/Indigenous
- AAPI
- Other

27%
<1%
2%
3%
15%
26%
26%

Twenty percent identified Black as their sole racial identity; 6% as one of their racial identities.

DOJ-HUD-AR00775

## UNDERSTANDING RACE AND ETHNICITY IN THE CASPEH

In order to measure the lived experience of race for CASPEH participants, our team decided to include a race and ethnicity measure that differs from the race and ethnicity domains on the Point-in-Time Demographic Survey. The Point-in-Time Demographic Survey follows the United States Census in asking two separate questions about race and Hispanic origin: a five-category measure of race ([1] White, [2] Black or African American, [3] American Indian or Alaska Native, [4] Asian, and [5] Native Hawaiian or Other Pacific Islander) and a two-category measure of Hispanic origin ([1] Hispanic or [2] Non-Hispanic.) There is a debate about whether this is the best way to categorize race and ethnicity in the United States. Scholars point out that the socially constructed five-category measure of race is an imperfect reflection of the way that people live race in their daily lives, flattening and concealing in-group variation and inequality. With regard to the Hispanic origin measure, scholars note that Latino/Latina/Latinx, Hispanic, or Latin American are ways that people racially identify and differentiate themselves from other racial groups.[15]

In our quest to represent people's lived experiences of race as accurately as possible, our team made the decision to use a single nine-measure race domain that treats those who identify as Latino/x or Hispanic as a racial group and includes expanded racial categories. These categories are: Black, African-American, African; White, Caucasian, or European-American; Native American or Alaskan Native; Pacific Islander, Samoan, or Hawaiian; Asian or Asian-American; Latino/Latina/Latinx, Hispanic, or Latin American'; Indigenous from Mexico/Central/South America; 'Mixed/Multiracial'; or 'Other.'

While these changes make it difficult to compare our race data one-to-one with the Point-In-Time Count, we believe it reflects the daily lived experience of race in California and elsewhere more accurately.

Black Californians were overrepresented among older homeless adults compared to those in younger age brackets. One in three (31%) adults aged 50 and older identified as Black compared to 23% of participants younger than 50 years.

### Birthplace and Where Participants Lived Prior to Homelessness

Despite conjecture that people move to California once homeless, our data did not support this. In fact, most participants did not move far from where they last were housed. Ninety percent of participants became homeless in California, having been last housed in the state. People who experience homelessness in California *are* Californians. Three-quarters (75%) of participants lived in the same county where they were last housed; 3% were homeless in a nearby county within the same census region. Eleven percent stayed within California, but lived in a different census region from where they lost their housing.

Most participants (87%) were born in the United States. One-quarter (28%) of Latino/x, 60% of AAPI, and 52% of "other" respondents were born outside of the United States. Two-thirds (66%) were born in California.

### Gender

Sixty-nine percent of all participants identified as cisgender men; 30% identified as cisgender women; and 1% identified as non-binary, transgender, or gender non-conforming (Figure 4).[16] The proportion of non-binary, transgender, or gender non-conforming participants was higher among TAY (6%). While adults in homeless families are thought to be primarily women, we found that 34% of participants experiencing homelessness with their minor children were cisgender men.

### Sexuality

Nine percent of participants identified as lesbian, gay, bisexual, pansexual, queer, or another non-heterosexual sexual identity. Transition age young adults were more likely to identify with these identities. While a similar proportion of single adults (9%) and adults in families (9%) did, one in five (19%) of TAY did.

DOJ-HUD-AR00776

CHAPTER 1: WHO EXPERIENCES HOMELESSNESS IN CALIFORNIA?



**FIGURE 4** Gender Identities of CASPEH Participants by Family Structure

● Cisgender men   ● Cisgender women   ● Transgender/non-binary/gender non-conforming

| | | |
|---|---|---|
| All | 69% / 30% | 1% |
| Single adults | 72% / 27% | 1% |
| Adults in families | 34% / 66% | 0% |
| TAY | 64% / 30% | 6% |

## Education

Two-thirds of all participants (63%) had at least a high school diploma or equivalent. Twenty-nine percent held a high school diploma or GED, 24% had some college-level education (but did not obtain a degree), and 10% held a college degree (Associates or Bachelors). Single adults reported education beyond high school (26% some college and 11% a college degree) more frequently than adults in homeless families or TAY.

## Veteran Status

There has been substantial progress preventing and ending homelessness among United States Veterans in the last decade. Still, 6% of participants report having served in the military (active duty). An additional 0.4% reported serving in the reserves or National Guard (and not active duty).

## Prior Experiences of Homelessness and Length of Current Episode

Participants reported recurrent and lengthy episodes of homelessness. Less than half of participants were in their first episode of homelessness. Thirty-nine percent of participants indicated their current episode of homelessness was their first episode. Adults in families (54%) were more likely to report that this is their first episode of homelessness than single adults (38%) and TAY (35%).

The median length of the current episode of homelessness was 22 months. Those in their first episode had been homeless longer than those with prior episodes. For those who experienced homelessness before, the median length of their current episode was 16 months, compared to 34 months for those in their first episode.

Participants first became homeless as an adult at the median age of 33 (IQR 21-45). Those who had a prior episode of homelessness reported first experiencing homelessness at the median age of 28 (IQR 18 - 39). For those in their first episode of homelessness, the median age when they first became homeless was 41 (IQR 33-52). Among single adults 50 and older, 41% had their first episode after age 50.

A small proportion (4%) reported having experienced childhood homelessness along with their caregivers (before the age of 18). This was more common among TAY (13%) than adults in homeless families (4%) and single homeless adults (4%).

## Chronic Homelessness

Chronic homelessness is defined as both (1) experiencing homelessness for at least 12 months or having four or more episodes of homelessness in the prior three years that together total more than 12 months and (2) having a disabling condition. More than one third (36%) of participants met criteria for chronic homelessness. Single adults were more likely to experience chronic homelessness (37%) compared to adults in families (26%) and TAY (23%). Were chronic homelessness defined only based on the time period (rather than requiring having a disabling condition), more would qualify: 75% of single adults, 62% of adults in families, and 74% of TAY.

DOJ-HUD-AR00777

## THE DISPROPORTIONATE BURDEN OF HOMELESSNESS

People who are members of populations marginalized by racism and colonization face economic and structural disadvantages. These structural disadvantages lower the threshold for people who face them to become homeless and prolong episodes by creating barriers to exiting homelessness. Racially marginalized populations are at higher risk for experiencing homelessness due to historical and ongoing structural racism and discrimination. We found that Black and Indigenous participants were overrepresented compared to their representation in the general population in California. Because there are different methodologies for measuring race, it is difficult to make direct comparisons between CASPEH participants and California's overall population. With that said, 26% of participants reported Black as one of their racial identities; among Californians of all ages, 7% did. Twelve percent of participants identified Native American/Alaskan Native as one of their racial identities; among Californians of all ages, 3% did.[17 18] The 2022 PIT count found that homelessness in the Latino/x community is increasing. We defined Latino/x differently than the Census or the PIT count, making comparisons difficult. In our study, 35% of study participants identified as Latino/x (26% as the sole identity and 9% as Latino/x and another identity).[19]

## EXPERIENCES OVER THE LIFE COURSE

Homelessness does not happen in a vacuum. It occurs in conjunction with structural conditions that produce and reproduce inequalities. These conditions include high housing costs, low wages that do not keep pace with inflation, the steady disappearance of jobs from low-income neighborhoods, the consequences of mass incarceration on families, and the ongoing effects of classism, racism, sexism, homophobia, and transphobia on people's life chances. Individual vulnerabilities—like substance use and mental health conditions—interact with these structural conditions. At the beginning of the chapter, we reviewed how homelessness is an interaction between structural conditions, individual conditions, and the presence or absence of a safety net. When structural conditions are worse and

there isn't a safety net, people with fewer individual vulnerabilities become susceptible to homelessness. However, the relationship between structural conditions, individual experiences, and homelessness is complex—as unequal structural conditions not only create the overall risk for homelessness, but they also increase the risk of having, and severity of, individual vulnerabilities. To understand CASPEH participants' experiences of homelessness, we have to understand their experiences of trauma, stress, mental health, substance use, and incarceration over the life course. In this section, we share some key common experiences that participants had over the life course, including exposure to trauma, incarceration, mental health challenges, and substance use. We reflect on how these experiences amplify and reinforce one another and leave participants at higher risk of experiencing homelessness.

### Discrimination, Exposure to Violence, and Incarceration

In in-depth interviews, participants shared stories of discrimination and exploitation that impacted their daily lives and abilities to thrive throughout their lives. Participants faced repeated barriers to meeting their basic needs and bureaucratic hurdles to receiving help. Living in communities with few employment options, they reported experiencing exploitation and discrimination on the job market and in other aspects of their lives. Because of their constrained choices, they faced numerous impediments to thriving.

Our survey data revealed that participants experienced high rates of interpersonal violence (Figure 5). Nearly three quarters (72%) of participants reported a lifetime experience of physical violence; 24% reported experiencing sexual violence. Physical violence was common among both cisgender men (70%), cisgender women (75%), and transgender/non-binary individuals (87%). Experiences of sexual violence were more common among cisgender women (43%) and trans/non-binary (74%) participants than cisgender men. Nearly half (49%) of all participants experienced physical or sexual violence before age 18; 45% reported experiencing physical violence and 15% sexual violence.

DOJ-HUD-AR00778

CHAPTER 1: WHO EXPERIENCES HOMELESSNESS IN CALIFORNIA?

More than three quarters (79%) of participants had been incarcerated in jail or prison during their lifetime. More than one third (37%) spent time in prison, and 77% were incarcerated in jail.

Research shows that cumulative trauma exposure is linked to poor self-rated mental health as well as substance use disorders. It is not surprising that CASPEH participants had high levels of depression, anxiety, suicidal ideation, and substance use.

### Mental Health Over the Life Course

Because one can only receive a mental health diagnosis if one had access to healthcare, we asked about experiences of mental health symptoms over the lifecourse; using standard language, we described the conditions we asked about in addition to naming them. Because we wanted to focus on conditions that led to impairments in function, we asked about "serious symptoms" that lasted over a "significant period of time." We asked whether participants had ever experienced a "significant period in your life where you experienced" serious depression (sadness, hopelessness, loss of interest, difficulty with daily functioning); serious anxiety (uptight, unreasonably worried, inability to feel relaxed); hallucinations


© Sam Comen

(saw things, heard voices that others didn't hear or see); or trouble understanding, concentrating, or remembering (Figure 6).[20] Eighty-two percent of participants experienced one of these in their lifetime; depression (69%) and anxiety (69%) were the most common, but 23% reported having experienced hallucinations. Separately, we asked whether they had ever received a diagnosis of post traumatic stress disorder; one quarter (25%) said that they had.

To assess whether participants ever had a severe enough mental health crisis to lead to a hospitalization, we asked whether they had ever experienced a hospitalization for a mental health problem; 27% had. More than half (56%) reported that their first hospitalization had occurred prior to their first episode of homelessness. Fifteen percent of adults in families reported a mental health-related hospitalization, while 28% of single adults and 32% of TAY did.

One in three participants (31%) attempted suicide at some point in their lifetime. Twenty-one percent of adults in families reported a suicide attempt, while 32% of single adults and 32% of TAY did. Many factors are associated with the risk of suicide attempts—including individual factors (e.g., prior trauma, mental health, and substance use challenges); criminal legal involvement; relationship factors (e.g., social isolation or loss of relationships); and community factors (discrimination and poor access to healthcare).[21] Many of these are heightened among people experiencing homelessness. The high rates of attempted suicide reflect the many overlapping traumas that people who are homeless have experienced.



**FIGURE 5** Lifetime Experiences of Physical and Sexual Violence by Gender

● All    ● Cisgender men    ● Cisgender women
● Transgender/non-binary/gender non-conforming

**Physical violence**

| | |
|---|---|
| 72% | |
| 70% | |
| 75% | |
| 87% | |

**Sexual violence**

| | |
|---|---|
| 24% | |
| 15% | |
| 43% | |
| 74% | |

DOJ-HUD-AR00779



**FIGURE 6** Self-Reported Mental Health Conditions at Any Point in Participants' Lifetime by Family Structure

- Any mental health condition   Anxiety   Depression
- Trouble remembering, concentrating, or understanding   Hallucinations

**All**
- 82%
- 69%
- 69%
- 49%
- 23%

**Adults in families**
- 81%
- 65%
- 63%
- 36%
- 8%

**Single adults**
- 82%
- 69%
- 70%
- 50%
- 24%

**TAY**
- 77%
- 68%
- 68%
- 51%
- 21%

## Substance Use Over the Life Course

People who have experienced trauma (including violence and childhood adversity) and those with mental health problems are at higher risk of having substance use disorders. We asked participants to report their lifetime use of three classes of drugs (non-prescribed amphetamines [like methamphetamine], cocaine, and non-prescribed opioids) and to describe patterns of use (Figure 7). We asked participants if they ever used any of these substances three times a week or more frequently. Nearly two-thirds (65%) of participants reported ever using either amphetamines, cocaine, or non-prescribed opioids regularly (at least three times a week). More than half (56%) reported having had a period where they used amphetamines regularly, one third (33%) reported lifetime regular cocaine use, and one in five (22%) reported regular non-prescribed opioid use in their life. Among those who reported ever using any of these substances regularly, 64% reported having started to do so prior to their first episode of homelessness. We asked participants if they had ever used injection drugs; 26% had.

Homelessness does not happen in a vacuum. It occurs in conjunction with structural conditions that produce and reproduce inequalities. Individual vulnerabilities— like substance use and mental health conditions— interact with these structural conditions.

DOJ-HUD-AR00780

CHAPTER 1: WHO EXPERIENCES HOMELESSNESS IN CALIFORNIA?

To understand participants' experiences with alcohol, we asked participants if there was ever a time where they drank alcohol three or more times per week to the point where they felt buzzed or drunk, or drank less frequently but more heavily for short periods (like getting drunk on the weekends). By this measure, 62% reported this. Of these participants, 79% reported doing so prior to their first episode of homelessness.

We asked participants if they had ever had a non-fatal overdose, asking about episodes of overdose that required immediate medical attention, naloxone, or a visit to the emergency department. One in five (20%) participants indicated that they experienced an overdose during their lifetime. To assess whether drug or alcohol use had caused problems with function, we asked whether drug or alcohol use led to financial, health, social, or legal problems at some point in their lifetime. Half (47%) of participants indicated that it had.

To understand whether participants had ever received treatment for a drug or alcohol problem, we asked about receiving any type of treatment, including 12-step groups (such as Alcoholics Anonymous [AA] or Narcotics Anonymous [NA] groups), residential treatment, counseling, medications, or any other treatment to help with drug or alcohol problems. Among those who ever had regular use of any drugs or regular heavy alcohol use, 57% reported having ever received treatment. Finally, we asked whether they had ever wanted treatment but had been unable to access it, to understand whether they had encountered any barriers to treatment. Among those who ever had regular drug use or regular heavy alcohol use, 29% reported having ever wanted treatment for drugs or alcohol and had been unable to receive it.



**FIGURE 7** Proportion of Participants Who Reported Regular Substance Use Ever in Their Lives by Family Structure

- Any substance 3+ times a week
- Amphetamines 3+ times a week
- Opioids 3+ times a week
- Cocaine 3+ times a week

**All**
- 65%
- 56%
- 22%
- 33%

**Adults in families**
- 38%
- 35%
- 6%
- 15%

**Single adults**
- 68%
- 58%
- 23%
- 35%

**TAY**
- 57%
- 48%
- 35%
- 25%

DOJ-HUD-AR00781

## SUMMARY

In this chapter, we learned about who experiences homelessness in California. We found that the vast majority of adults who experience homelessness in California are single homeless adults, meaning those 25 and older living without minor children. However, we learned that many more had minor children but were living separately from them. The single adult homeless population in California is aging, with nearly half age 50 and older, 41% of whom had their first ever episode of homelessness after age 50. Adults in homeless families and TAY shared many similarities with single homeless adults, but had some key differences, including a much higher proportion of TAY young adults identifying as members of gender and sexual minority communities. Due to the ongoing impacts of structural racism, Black and Indigenous individuals are overrepresented in the adult homeless population. Due to different ways to assess racial and ethnic identity, we cannot make easy comparisons to census data for Latino/x adults.

Despite myths surrounding the homeless population, adults experiencing homelessness in California are Californian, with deep roots in the community. Most are experiencing homelessness in the same county as where they were last housed. Participants reported significant sources of trauma in their lives, much of it predating their homelessness, including experiences with physical and sexual violence and incarceration. Like many with these experiences, they reported high levels of both mental health distress and substance use. A high proportion reported episodes in their life with serious mental health symptoms, hospitalizations, and suicide attempts; a significant proportion reported periods of regular substance use and almost half reported that their substance use had caused them social, legal, or health problems. These findings give us a sense of who is experiencing homelessness in California.

### KEY TAKEAWAYS

- Single homeless adults comprise the vast majority of adults experiencing homelessness in California.

- Single homeless adults are aging, with nearly half age 50 and older.

- People experiencing homelessness in California are Californians. Ninety percent of our sample last lost their housing in California. Seventy-five percent of participants lost their housing in the same county in which they experienced homelessness.

- Once homeless, adults remain homeless for extended times. The median length of homelessness was nearly two years.

- One-third of adults met criteria for chronic homelessness.

- Ongoing impacts of structural racism place communities of color at increased risk for homelessness. Black and Indigenous communities are disproportionately impacted.

- Participants' lives were marked by multiple forms of stress and trauma, including violence and incarceration. Nearly three in four experienced physical violence, one in four experienced sexual violence, and three in four were incarcerated at some point in their lifetime.

- Substance use and mental health conditions were common. Many of these predated homelessness. One in five reported a history of a non-fatal overdose. Almost one third reported a lifetime history of a suicide attempt, reflecting the deep vulnerability of this population.

DOJ-HUD-AR00782



© Sam Comen

DOJ-HUD-AR00783

CHAPTER 2

# PATHWAYS to Homelessness

Understanding the context of people's lives prior to becoming homeless is necessary for designing policies to prevent and end homelessness. Homelessness is an experience that people have, not a statement of who they are. In this chapter, we seek to understand how people came to be homeless.

In the survey, we asked participants to report on experiences during the six months prior to their becoming homeless. The months before people become homeless are marked by tremendous stress. Challenges with health, mental health, and substance use can contribute to the descent into homelessness, but can also be caused by the stress of housing instability. We present findings on these aspects of the participants' life in the six months prior to homelessness (including their health, mental health, and use of substances) recognizing the complex interactions between these experiences and the subsequent loss of housing. Through our in-depth interviews, we learned how these experiences acted—as a cause of housing loss or an effect of stress of losing housing, or both.

We asked where participants were living, whether they had tenancy rights or other legal protections, the costs of their housing, and their income immediately prior to this episode of homelessness. We asked about the last place they stayed for at least a month right before their current episode of homelessness. For this analysis, we considered the last place individuals lived as the last non-institutional setting where they stayed for one month or more, or the last institutional setting where they stayed for three months.[22] We determined whether the non-institutional settings were places where they held a lease or mortgage[23] ("leaseholders") or not, such as a doubled-up situation ("non-leaseholders").

> *The rent's so high in this town, it's unbelievable...*
> *If you had a minimum wage job you cannot pay your rent, and no one would let you in on a minimum wage job. You couldn't get a place. There's no way.*
>
> — CASPEH participant

We asked participants to report what they believed caused their most recent episode of homelessness, acknowledging that multiple precipitants are often intertwined. Thus, we allowed participants to name more than one cause. Then we asked participants to name which, among the causes they reported, contributed the most. We asked them to report on what assistance they sought and what they received. Finally, we asked participants to reflect on what could have prevented their homelessness.

We used in-depth interviews to untangle how multiple stressors interacted and the sequence in which they occurred. For example, job loss may lead participants to fall behind in rent, which may lead the household to be evicted. After eviction, household members may move in with family members without a lease. Overcrowded conditions can cause tempers to flare, leading to conflict. Understanding how these factors are connected can lead to a clearer and more actionable picture of how homelessness begins.

DOJ-HUD-AR00784

## HOUSING COSTS AND HOUSEHOLD INCOME

High housing costs combined with low incomes left participants vulnerable to homelessness. The median monthly household income of participants' in the six months prior to homelessness was $960 (IQR $220-$2100) (Table 3). Overall, the median monthly housing costs were $375 (IQR $0–$800). However, this statistic obscures an important point. Many participants were already living with family or friends ("doubled up") or living in informal arrangements without leases; others entered from a leaseholder arrangement and still others entered homelessness from institutional settings where they didn't have housing costs. Overall, 49% entered homelessness from a non-leaseholder, non-institutional housing situation, [24] 32% entered from a leaseholder arrangement, and 19% entered from an institutional setting.

Participants entering from non-leaseholder arrangements tended to have relatively low housing costs, but were staying in suboptimal—and impermanent—places, without legal protections. Many, if not most, had left formal leaseholding arrangements at some point before doubling up, but had forestalled homelessness through one or more non-leaseholding arrangements. Earlier, they had faced experiences similar to those who had left leaseholding arrangements. After losing that housing, they experienced a more gradual descent into homelessness, exhausting other options before entering homelessness. Those who came from leaseholding situations had higher housing costs and when they lost that housing had no other options but homelessness. Next, we describe the experiences of those who entered homelessness from non-leaseholders situations, leaseholder arrangements, and institutional settings.

## HOMELESSNESS ENTRANCES FROM A NON-LEASEHOLDING ARRANGEMENT

Among those who entered homelessness from a non-institutional setting, 60% were in non-leaseholder arrangements. Some contributed rent while others stayed for free. The median monthly housing costs for these non-leaseholders was $200, (IQR: $0 to $500). Almost half (43%) reported paying nothing for rent. Among non-leaseholders who reported paying anything for housing, the median monthly rent was $450.

The median monthly income for all non-leaseholders in the six months prior to homelessness was $950 (IQR: $221-$2000). For those who paid no rent, their median monthly household income was $500 (IQR: $0-$1200). For non-leaseholders who did pay rent, their median household income was $1200 (IQR: $500-$2400). Among non-leaseholders who paid rent, 57% were rent burdened (paying more than 30% of their income in rent) and 41% were severely rent burdened (paying more than 50% of their household income in rent).

**TABLE 3** Median Monthly Income, Housing Costs, Housing Tenure, and Advance Notice Before Homelessness for Leaseholders and Non-Leaseholders

| Participant Type | Monthly Income Prior to Homelessness (IQR) | Monthly Cost of Last Housing (IQR) | Housing Tenure | Warning Before Losing Housing |
|---|---|---|---|---|
| All Participants | $960 ($220-$2,100) | $375 ($0-$800) | 1 year | 5 days |
| Non-leaseholders | $950 ($221-$2,000) | $200 ($0-$500) | 1 year | 1 day |
| Leaseholders | $1,400 ($700-$2,600) | $700 ($350-$1,100) | 3 years | 10 days |

DOJ-HUD-AR00785

> ### CARLOS' STORY
>
> Carlos experienced a spinal injury when he fell off a ladder at work. Unable to continue working and ineligible to receive workers' compensation since he was paid in cash, Carlos could no longer afford the rent for his apartment. As the leaseholder, he decided to vacate the apartment to avoid having an eviction on his record. He then rented a room in a two-bedroom apartment, but left after several months due to conflicts with his roommates. Carlos hoped that moving in with his sister's family would provide a long-term solution to his housing situation, but her family was facing COVID-related job loss and a shortage of space. Wanting to avoid being a burden to his family and without other options, Carlos became homeless, living in his truck. After receiving multiple parking tickets, his truck was towed. He now lives in an encampment in a park near City Hall.

Participants described using limited financial or social network resources to secure suboptimal housing, by living temporarily with friends or relatives. These arrangements were often strained by the hosts' financial stress and/or overcrowding. The conditions became untenable, sometimes falling apart due to interpersonal conflict brought on by difficult circumstances. Others reported losing their housing in non-leaseholding situations when the primary tenants faced eviction.

For those whose last housing was a non-leaseholding arrangement, the median warning time that they would lose their housing was one day, reflecting the volatility of these circumstances. Participants who entered homelessness from a non-leaseholding arrangement reported having spent a median of one year at their last (non-leaseholding) housing. Of non-leaseholders, 42% reported that this was their first episode of homelessness.

## HOMELESSNESS ENTRANCES FROM A LEASEHOLDING ARRANGEMENT

Among all participants, 32% entered from a stable living situation in which they were on a lease, mortgage, or other written agreement, although most were on a lease (rather than a mortgage).[25] Among those who entered from a non-institutional setting, 40% entered directly from holding a lease (36%) or mortgage (4%). These individuals described rapid descents precipitated by discrete events, such as a threatened (or actual) eviction, domestic violence, a family health crisis that required immediate full time caretaking, an incarceration, or wildfire. By the time they became homeless,

many had navigated through a series of less stable and lower quality housing. These included moving from being a primary leaseholder to renting a room in a shared house, having multiple roommates, or renting low-quality housing.

Those who left leaseholder situations described little forewarning prior to being forced to leave, with no chance to make alternative arrangements, or no alternatives remaining. Participants who left leaseholder arrangements reported having a median of 10 days of warning before losing their housing.

For those who had a lease agreement, the median monthly housing costs were $700, with an interquartile range of $350 to $1100. Leaseholders' median monthly income was $1400 (IQR: $700-$2600). Some (10%) of those on leases contributed nothing for rent; for instance, some participants were listed on a family member's lease but didn't contribute to the rent. Among those who paid rent in leaseholder arrangements, 66% met the criteria for rent burden (spending at least 30% of income on rent) and 42% met criteria for severe rent burden (spending at least 50% of income on rent). Across the eight counties, leaseholders' median income ranged from $1100 to $1800 and median housing costs from $500 to $800. Comparing median rent to median income, we found that median cost burdens ranged from 33% to 55%. A small proportion (6%) of participants reported receiving a rental subsidy in their last housing; 16% of all leaseholders did.

DOJ-HUD-AR00786

CHAPTER 2: PATHWAYS TO HOMELESSNESS

### SPOTLIGHT ON EVICTION

An eviction occurs when someone is forcibly removed from their home, often (but not always) for falling behind on rent or mortgage payments. Those whose names appear on the lease receive a notice to vacate the property. Once a leaseholder is evicted, the eviction appears on their housing record making it more difficult to find a new place to live. It can also trigger a move into worse housing, housing with others, or directly into homelessness. For those living doubled up or in housing without a lease, we don't use the term eviction. However, a leaseholder may ask non-leaseholders to leave a property. While this doesn't leave a legal trail, it has similar effects in displacing the non-leaseholder—either to a different housing option (often less favorable) or into homelessness.

> *We lost our home in January. Our landlord had received the full amount or some substantial amount of the emergency rent assistance…about $6,000.00, and two months later he pretty much nailed us with a 90-day notice to quit. We were paid up on rent and everything, and he didn't give us any option of helping us stay in a hotel or anything while he fixed the little crack that was in our bathroom that he said that was the whole foundation being unstable. But he moved two people in like two weeks after we got our stuff out in March… we've been homeless ever since.*

Participants who entered homelessness from a leaseholding situation reported having spent a median of three years in their last housing. Almost half (47%) reported that this was their first ever episode of homelessness.

Participants discussed their experience with eviction or threatened eviction.[26] Many reported evictions due to falling behind in rent. Participants reported a variety of reasons for being behind in rent including job loss, personal health crises, accumulation of financial struggles, and the loss of contributing household members due to ill-health, death, or other reasons. Those who lost their housing due to evictions for non-payment of rent reported receiving "pay or quit" orders. Unable to pay the rent and fearing the impact of an eviction on their credit record, they left their housing suddenly without adequate time to make alternative arrangements. Some participants reported other non-financial reasons for eviction, including lease violations, or conflict with property owners and other household members. Others reported receiving eviction notices due to the need for property repairs. Participants regarded these eviction notices as a response to their complaints about poor housing conditions. In some cases, participants faced eviction due to the owner or a family member moving in or the owners selling the property. Several survivors of interpersonal violence described facing eviction as a result of conflict-related property damage, noise disturbances, or "causing a scene" including 911 calls to the home. Others reported losing housing due to climate emergencies, such as wildfires.

Leaseholders in California have rights that grant either 3-, 30-, 60-, or 90-day notice prior to eviction. The 10 day median notice leaseholders reported may reflect a high proportion of people who were behind on their rent and received a 3-day notice to pay or quit. The three day warning is allowable only for non-payment of rent. The short notice participants reported may reflect that many evictions were for non-payment of rent or that tenants had limited access to legal protections to enforce eviction orders. The absence of adequate notice presents a challenge to homelessness prevention efforts, which depend on recognizing that someone is at risk of losing their housing in time to intervene.

## HOMELESSNESS ENTRANCES FROM INSTITUTIONAL SETTINGS

Nineteen percent of all participants entered homelessness directly from an institutional setting; 8% entered from a prolonged jail stay and 6% from a prison stay.[27] Of those who entered from institutional settings, 67% had been homeless when they entered that setting.

A larger proportion of participants had institutional stays in the six months prior to homelessness than entered directly from those institutions, suggesting that some who became homeless had short housing stays between their institutional stay and homelessness. In the six months prior to homelessness, 20% of participants spent time in jail, 9% spent time on probation, 10% were released from prison, and 4% served parole.

People leaving institutional stays reported facing different but related challenges compared with those who entered from housing. In addition to struggling to identify and pay for housing, their social networks had been depleted, they faced barriers to employment, and in many cases, they did not receive assistance from service providers. Participants who were incarcerated in a different county than they were living prior to conviction reported not having the resources to travel back to their home county post-release. Those under community supervision faced barriers to living with friends or relatives living in different parts of the state from where they were serving community supervision. Some who left drug treatment facilities noted that they left after relapsing and had limited options. Like those coming from non-institutional settings, they faced the prospect of finding new housing in high-cost housing markets with low incomes.



**FIGURE 8** Proportion of Participants Exiting Jail or Prison Who Received Support Signing Up for Benefits, Health Care Services, or Finding Housing

● Jail  ● Prison

**Benefits**
19%
18%

**Healthcare**
17%
14%

**Housing**
17%
14%

Jail re-entry support is only reported for individuals who reported jail stays of 30 days or more.

In survey data, participants who had been incarcerated reported receiving minimal support upon exiting prisons or jails. In fact, most who exited the carceral system reported receiving no support at all (Figure 8).

In-depth interviews highlighted the dearth of integrated discharge support. When asked to describe what being released from jail was like, one participant shared: "[They said] 'Thank you,' cut your bracelet off, and off you go. There's nothing. They don't know if you're going to go out and going to be homeless, if you're going back to being homeless, they don't—they don't ask any of that."

> ❝ *It's a rough road and then people treat you as though you're nothing because you have been incarcerated. Nevertheless, I feel like I've served my time… and if I'm striving to get jobs and find avenues and find housing, then those opportunities should be more readily available for me…* ❞

DOJ-HUD-AR00788

## REASONS FOR LEAVING LAST HOUSING

We asked participants to report on the circumstances that led them to leave their last housing.[28] They could choose as many causes as they felt described their situation. We grouped these reasons into general categories (economic, social, health, and other) and stratified by leaseholder status, to see whether patterns differed between leaseholder and non-leaseholders. While the patterns are useful, within each category there are diverse reasons which call for different solutions. We present these data in broad categories (Figure 9), then separately by specific reason. Finally, we asked participants to name which reason was the most important. We detail specific economic, health, social, and other reasons in Table 4.

Separately, we asked participants to report on experiences that they may have had in the six months prior to becoming homeless—recognizing that these experiences may have contributed to their housing loss, or been a result of the stress or difficulty that they were under. Through in-depth interviews, we explored how these factors played out and interacted with one another.

**TABLE 4** Economic, Social, Health, and Other Reasons for Leaving Last Housing

| Economic | Social | Health | Other |
|---|---|---|---|
| Exchanged work for housing, and work ended | Breakup between residents | COVID-19 health and safety concerns | Left the area for a job, family, etc. |
| Lost or reduced income | An issue with the rules | Became sick or disabled | Went into an institution |
| Lost rental assistance | Conflict among residents | Participant or partner became pregnant | Poor housing conditions |
| Non-housing costs increased | Conflict with property owner | Participant's substance use | Program ended |
| Building sold or foreclosed; owner/primary leaseholder change | Conflict with your neighbors or concerns about neighborhood safety | Someone else became sick, disabled, or died | Fire or natural disaster |
| Housing costs were too high | Didn't want to impose/ wanted own space | Other health reason | |
| Housing costs increased | Discrimination (race or other identity) | | |
| Someone else stopped paying rent | Others needed more space | | |
| Stolen from or was victim of scam | Substance use by others in the household | | |
| Other economic reason | Violence or abuse in the household | | |
| | Other social reason | | |

DOJ-HUD-AR00789

## ECONOMIC REASONS

We included anyone who reported any economic reason to have an economic reason for housing loss; participants could indicate multiple reasons (Figure 10) along with social, health, or other reasons. Participants whose last housing was as a leaseholder cited at least one economic reason (58%) more commonly than non-leaseholders (40%).

The most frequently reported economic reason was loss of income. Participants living on the economic margin, with high housing costs, low incomes, and little savings, had little margin for error. Loss of income or decrease in work propelled many living on the economic margins into homelessness. Twenty-two percent reported that lost or reduced income was a reason for losing their last housing. Leaseholders reported this reason more frequently than non-leaseholders (35% of leaseholders, 15% of non-leaseholders). Many participants reported other economic reasons related to low income and high housing costs. Twelve percent noted that while neither the cost of their housing nor their income had changed, they could not keep up with housing costs. One in ten (10%) noted that they had been stolen from or the victim of a scam, and 10% noted that non-housing costs (such as healthcare, food costs, and unexpected expenses) had increased, leaving them unable to pay their rent. Eight percent each noted that their rent had increased, someone else in their household stopped contributing to rent, or their building had been foreclosed on or the primary leaseholders lost their lease.

Leaseholders were more likely to report various economic reasons than non-leaseholders (Figure 11). The economic reasons all point to the fact that, for most, the rent was too high for their income.

In addition to asking about reasons for losing housing, we asked about life events in the six months prior to homelessness. During this time period, 28% of participants had a decrease in work-related income (through job loss, decrease in hours, or decrease in pay). Eleven percent reported having been laid off, 10% reported having had their income reduced, 8% reported having been furloughed or had hours reduced, 5% reported having been fired, and 1% reported having retired. In the months prior to becoming homeless, 2% reported losing a rental subsidy. Some (22%) reported loss of their own, or a member of their household's, income due to the COVID-19 pandemic, either through job loss or a decrease in hours.

Participants discussed experiences of job loss resulting from the COVID-19 pandemic, seasonal employment, and others. As one participant shared: "The virus (COVID) screwed everything up. If the virus, if that wouldn't have never happened, I'd still have my job. And a place. I would have both of them." In many cases, economic and health reasons were intertwined. Participants reported job loss due to injuries (both work and non-work related), illness (their own or family members), the need to provide caregiving to family members, or deaths of household members. Some participants described losing jobs after contracting COVID, due to not having job protections when they missed work due to prolonged illnesses or the need to isolate or quarantine.



**FIGURE 9** Proportion of Participants Who Reported at Least One Economic, Social, or Health-Related Reason for Leaving Last Housing by Leaseholder Status

● Economic reasons  ● Health reasons
● Social reasons

**All**

| | |
|---|---|
| Economic | 47% |
| Health | 32% |
| Social | 63% |

**Non-leaseholder**

| | |
|---|---|
| Economic | 40% |
| Health | 31% |
| Social | 70% |

**Leaseholder**

| | |
|---|---|
| Economic | 58% |
| Health | 33% |
| Social | 53% |

DOJ-HUD-AR00790

CHAPTER 2: PATHWAYS TO HOMELESSNESS



**FIGURE 10** Economic Reasons for Leaving Last Housing, All Participants

Lost or reduced income — 22%

Housing costs were too high — 12%

Stolen from or was victim of scam — 10%

Non-housing costs increased — 10%

Building sold or foreclosed; owner/primary leaseholder change — 8%

Housing costs increased — 8%

Someone else stopped paying rent — 8%

Exchanged work for housing, and work ended — 3%

Lost rental assistance — 2%

Other economic reason — <1%

**FIGURE 11** Economic Reasons for Leaving Last Housing by Leaseholder Status

● Non-leaseholder   ● Leaseholder

Lost or reduced income — 15% / 35%

Housing costs were too high — 12% / 12%

Stolen from or was victim of scam — 9% / 13%

Non-housing costs increased — 7% / 14%

Building sold or foreclosed; owner/primary leaseholder change — 9% / 8%

Housing costs increased — 4% / 14%

Someone else stopped paying — 7% / 10%

Exchanged work for housing, and work ended — 5% / 2%

Lost rental assistance — 1% / 3%

Other economic reason — <1% / <1%

DOJ-HUD-AR00791

Some participants experienced housing precarity and eventual homelessness due to macro-level economic crises. One interview participant shared the lasting impact of the last economic recession: "We applied for a mortgage and financed a condo. That was in 2006 and in 2010 we had to leave the place because of the lack of money when the entire country went through an economic crisis. We were not able to make the $3,500 to pay the mortgage, so we had to leave the place. Since then, we have been homeless. We got divorced, and since then I have lived in my car." Participants who worked as farm workers and day laborers described challenges finding or keeping work during the off-season, which was particularly challenging during the pandemic as farmers were hiring fewer farm workers than they had in previous seasons.

In talking with non-leaseholders, we found that many had experienced an economic shock earlier that led to their entering a non-leaseholder housing situation. Their non-leaseholding housing situations were stressful and overcrowded. When the stress of these situations became too much, the participants exited into homelessness. When we asked for causes, they noted social causes, such as conflict with their hosts. However, an earlier economic shock underlay their downward trajectory.

## SOCIAL REASONS

Sixty-three percent of all participants noted at least one social reason for losing housing. As with economic and health reasons, there was substantial overlap between reasons. Due to the diversity of these experiences, we report them separately in Figure 12.

We know that people who have difficulty paying for housing costs—whether with or without leases—face overcrowded, suboptimal conditions. We see the impact of this throughout the social reasons for leaving. One third of participants noted that conflict between people staying in the house was a reason they left their last housing. When people struggle to make rent and housing is overcrowded, conflict may arise. In these situations, particularly for those without a lease, people can feel like they are imposing or in others' space. Almost a quarter noted that not wanting to impose and/or wanting their own

space contributed to why they left. Similarly, 16% noted that others in the household wanted more space and thus asked or encouraged the participant to move. Almost one in five (19%) reported a conflict with a property owner, which could reflect economic considerations. Other factors contributing to the decision to leave included violence in the household (13%), an issue with rules (12%), and substance use of others in the household (9%). Experiences of discrimination due to their race or other aspect of their identity contributed to 9% of participants leaving their last household. A similar proportion (8%) reported concerns about neighborhood safety or conflict with neighbors.

Non-leaseholders more frequently reported a social reason than leaseholders (Figure 13). Non-leaseholders were much more likely to report that their not wanting to impose (or wanting their own space) drove them to leave than did leaseholders (33% vs. 10%). Non-leaseholders were more likely to report an issue with rules (15% vs. 7%), reflecting the lack of agency that non-leaseholders have.

### Interpersonal Precursors

In in-depth interviews, participants discussed how interpersonal conflicts precipitated homelessness. As with other categories, there was overlap. For example, conflicts over money could lead to interpersonal conflict, as could disagreement about things like substance use. For people living under the constraints of poverty or struggling with health issues, tensions ran high. Conflicts could revolve around finances, rules, responsibilities, or expectations. Participants reported informal arrangements around splitting the cost of rent, utilities, and other household expenses with people they were living with, with resultant conflicts when their expectations were not met.

### Violence

Regardless of whether people reported violence or abuse as a reason for leaving, violence was common in participants' lives. In the six months prior to homelessness, one quarter (25%) of all participants experienced physical violence (27% cis-women, 24% cis-men) and 6% (8% cis-women, 5% cis-men) experienced sexual violence. Violence or abuse was a reason for leaving their last housing for 13% of participants (20% of all cis-women, 9% of cis-men).

DOJ-HUD-AR00792

CHAPTER 2: PATHWAYS TO HOMELESSNESS



**FIGURE 12** Social Reasons for Leaving Last Housing, All Participants

Conflict among residents
33%

Didn't want to impose/wanted own space
23%

Conflict with property owner
19%

Others needed more space
16%

Violence or abuse in the household
13%

Issue with rules
12%

Discrimination (race or identity)
9%

Substance use by others in the household
9%

Conflict with neighbors/concerns about neighborhood safety
8%

Other social reason
2%

**FIGURE 13** Social Reasons for Leaving Last Housing by Leaseholder Status

● Non-leaseholder  ● Leaseholder

Conflict among residents
38%  27%

Didn't want to impose/wanted own space
33%  10%

Conflict with property owner
20%  18%

Others needed more space
21%  10%

Violence or abuse in the household
14%  12%

Issue with rules
15%  7%

Discrimination (race or identity)
8%  9%

Substance use by others in the household
10%  7%

Conflict with neighbors/concerns about neighborhood safety
6%  10%

Other social reason
1%  3%

DOJ-HUD-AR00793

Participants who left due to violence spoke of leaving as a strategy to survive. Leaving due to interpersonal violence (IPV) affected those in both non-leaseholder and leaseholder housing, with a similar proportion reporting it as a reason for leaving. For some, IPV led to their leaving behind a housing subsidy. One participant stated: "I told my brother, 'Stay in the house, and don't let [my husband] come back... Because if he gets in the house, then he's not going to leave. And it's going to mess up my Section 8.'...my husband got out of jail and went there. And he wouldn't leave the house, and [my brother] couldn't get him out. Because it's his address, too. And so, they had an inspection, but I wasn't there to do the inspection. So, I lost my housing. If I came back there, he would've – he's almost killed me twice already." Some participants noted that pandemic-related conditions (including stay-at-home orders and related job loss) led to more time and stress (and thus more violence) with partners/perpetrators.

### Discrimination

Participants shared stories of discrimination that led to their housing loss either directly or circuitously. They experienced discrimination in the labor market based on disability, race, immigration status, and language. People encountered discrimination when trying to find work and experienced discrimination at work that led to reduced hours, reduced wages, lower pay than promised, being targeted for harsher and more frequent evaluations, or exclusion from raises and promotions. This made it harder for participants to find any work or work that paid a living wage, and contributed to their inability to pay for housing. One participant who used a wheelchair told us: "[I] do feel discriminated [against] because of…race, because of the disability I walk in a store and say, 'Are you hiring?' 'No, we're not hiring. Apply online.' You know? I get that a lot. Everywhere I go, I ask. I mean I've been all over with employment. It's difficult, especially with the disability and wheelchair. You know, I can fix and dress myself up nice. But, once they see the [wheelchair]– you know?"

Discrimination on the housing market can lead to homelessness. A participant shared that he had been renting a room in an apartment with a friend, who was the primary leaseholder. Their landlord was "not friendly to Black people" and one day told him to "get out now,' instead of giving me my 30 days. He's like a violent type, so he'll go against the law and not give me my 30 days." With no savings and minimal notice, he had no option but to check into a shelter as he searched for another room to rent. He shared that he searched for housing online and on social media, but people did not want to rent to him once they knew he was Black. Reflecting on searching for housing on social media, he shared: "[Social media] is hard…cause you gotta show your face. I would get a lot of 'no's or like, 'we're busy' or like 'we're not renting it yet', even though it says 'renting out now.' So, yeah. They didn't respond to me after I showed them a picture—after they asked for a picture of me, they didn't respond."

## HEALTH-RELATED REASONS

In both survey data and in-depth interviews, participants reported health problems—theirs and their family members—as a reason for entering homelessness. There were myriad types of health problems—physical health, mental health, substance use, COVID-19, pregnancy, and the need to become a caregiver. Like with economic and social issues, these problems interacted with others to increase the risk for homelessness. Health problems could lead to economic issues (through job loss or excessive non-housing costs) or social issues (for instance, a participant's substance use could cause conflict with others). Pregnancy and the post-partum period are known risk periods for homelessness. Of participants who were assigned female at birth and 18 to 44 years old , 11% were pregnant during the six months prior to homelessness (representing 2% of all participants). Overall, nearly one third of participants indicated at least one health-related reason as a cause of their homelessness.

Thirteen percent of participants noted that their use of substances was a factor in their leaving their last housing (Figure 14). Nearly as many (11%) noted that someone else's illness or death contributed to their becoming homeless, and 9% noted that their own health crisis was a reason for their housing loss.

DOJ-HUD-AR00794

CHAPTER 2: PATHWAYS TO HOMELESSNESS

Concerns about their—or others—health or safety related to COVID contributed to 5% leaving. A small percentage noted pregnancy as a reason.

Unlike economic and social reasons, we did not find much variation between leaseholders and non-leaseholders for health-related reasons (Figure 15).

## Physical Health

In many cases, physical health problems and housing loss were linked through employment. Participants reported that health crises (theirs or a household member's) led to job loss and then the loss of income caused them to lose housing. A participant described the impact of an injury and the COVID pandemic on his ability to work as a driver: "I got hurt…That's kind of making it bad for me because I really can't

do too much. They have me as disabled because of my back and my leg, so I really can't do all the things I used to do…I got hurt at work just before COVID. And when COVID came, it just messed up everything. That's how I became homeless." Another participant described how her pregnancy led to job loss, which led to homelessness: "I lost my job because I got pregnant, I got fired after working there for one year. I was not feeling well one day, and the supervisor didn't let me go home, so I left. The next day he told me that there was no longer work for me. So, the owner of the house gave me one month while I found another job, but it is not easy since I was pregnant. I found work for one or two days, so I couldn't make the money to pay the rent."



**FIGURE 14** Health-Related Reasons for Leaving Last Housing, All Participants

Participant's substance use
13%

Someone else became sick, disabled, or died
11%

Participant became sick or disabled
9%

COVID-19 health and safety concerns
5%

Participant or partner became pregnant
<1%

Other health reason
<1%



**FIGURE 15** Health-Related Reasons for Leaving Last Housing by Leaseholder Status

● Non-leaseholder   ● Leaseholder

Participant's substance use
14%   11%

Someone else became sick, disabled, or died
10%   14%

Participant became sick or disabled
8%   10%

COVID-19 health and safety concerns
5%   4%

Participant or partner became pregnant
<1%   <1%

Other health reason
<1%   <1%

DOJ-HUD-AR00795

## Mental Health Conditions

The period prior to homelessness is frequently marked by multiple forms of stress. Decreased household income, difficulty paying for rent, physical health problems, conflict with others, and concerns about losing one's housing can precipitate or worsen mental health challenges. Similarly, having mental health challenges can make it difficult to maintain work and relationships and can contribute to housing loss. Mental health hospitalizations are known to be associated with future homelessness. In the six months prior to homelessness, 7% of all participants reported a mental health hospitalization. A higher proportion reported significant mental health challenges that did not require hospitalization: half of participants (50%) experienced significant depression, half experienced significant anxiety (51%), 13% experienced hallucinations, and a third (32%) experienced trouble understanding, concentrating, or remembering. Only a small proportion received formal help for these symptoms: 14% received outpatient treatment or counseling, and 20% were prescribed medication for mental health issues.

## Substance Use

Substance use disorders can increase vulnerability to homelessness. Thirteen percent of participants noted that their substance use was a reason for leaving their last housing. In the six months before homelessness, 29% used amphetamines, cocaine, or non-prescribed opioids regularly (at least three times a week). Nearly one quarter (24%) reported heavy regular drinking. One quarter (25%) of all participants reported that their substance use led to health, social, or legal problems in the six months prior to homelessness. One in eight (12%) received treatment or counseling for alcohol or substance use; however, 9% indicated that they wanted treatment but could not access it during this period.

In some instances, employment challenges, substance use, and mental health problems worked in synchrony to increase risk for homelessness. Participants described how these three factors contributed to their becoming homeless: "I was laid off. Went to unemployment and then as things progressed my depression set in more. It was just almost like a relationship that I lost through depression and drugs... these are the cycles that I go through."

Substance use and incarceration can interact to increase risk for homelessness. One participant shared: "In a broader sense maybe it was more of the addiction that led to the homelessness, that also led to the arrest... But being homeless definitely did put you out in the public to where you can be arrested."

Substance use can increase the precarity of already fragile housing situations, as was the case for those actively using substances and those who were seeking support to reduce or stop their substance use. Participants discussed how their substance use was a source of conflict within their household and contributed to their loss of housing or inability to stay with friends or family. In in-depth interviews, participants reported how infractions while in residential treatment programs resulted in housing loss. One participant reported: "I went into residential rehab for six months... And then I moved into their sober living environment when I graduated from the program. And then I relapsed after a couple months and they kicked me out. And I've been homeless ever since." Residential programs may decide to terminate residents for these infractions, leaving individuals at risk of homelessness.

## Caretaking and Health of Others

In addition to personal health crises, some reported that other's health crises contributed to their homelessness. Some participants described moving in with family members to serve as a caregiver (paid or unpaid) for a family member—and then losing their housing upon the hospitalization or death of their loved one. When participants were paid caregivers, they risked losing both their employment income and their housing when their family member died. In other cases, a household member's illness led to the household member's job loss and inability to contribute to housing costs, leading the entire household to be displaced. In other cases, the death of a household member led to housing loss—either because the decedent was the only one with their name on the lease, or because the loss of their income led to the household being unable to make rent. Still others spoke about complicated grief from the death of a loved one interfering with their ability to work.

DOJ-HUD-AR00796