# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF WASHINGTON; STATE OF NEW YORK; STATE OF RHODE ISLAND; STATE OF ARIZONA; STATE OF CALIFORNIA; STATE OF COLORADO; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *ex rel*. ANDY BESHEAR, in His Official Capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF MINNESOTA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF OREGON; GOVERNOR JOSH SHAPIRO, in His Capacity as Governor of the Commonwealth of Pennsylvania; STATE OF VERMONT; and STATE OF WISCONSIN, | C.A. No. 1:25-cv-00626-MSM-AEM  **SECOND AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT; and ERIC SCOTT TURNER, in His Official Capacity as Secretary of the United States Department of Housing and Urban Development, | |
| Defendants. | |

## SECOND AMENDED COMPLAINT

## I.     INTRODUCTION

1.      Housing is essential to a person's well-being and their ability to work, pursue education, or care for their children and family. But in communities all across the United States, on a given night, hundreds of thousands of people are experiencing homelessness.

2.      The crisis is growing at an unprecedented rate. Each homeless person has a story of hardship and unmet needs, including children, families, veterans, and the elderly. Addressing the crisis requires urgent action from our communities, institutions, and government. But instead of investing in programs that help people stay safe and housed, the Trump Administration has embraced policies that risk trapping people in poverty and punishing them for being poor.

3.      The Continuum of Care (CoC) Program is the federal government's flagship program for funding housing and other services for individuals at risk of and experiencing homelessness. Through the CoC Program, the Department of Housing and Urban Development (HUD) distributes billions of dollars each year to state, local, and non-profit entities to provide housing and services to families and individuals facing homelessness, including people with disabilities, seniors, families with children, veterans, LGBTQ+ Americans, and others.

4.      Congress designed the program to preserve stability so providers can reliably serve people whose lives depend on it. And for decades now, the CoC Program has operated with the continuity and predictability mandated by statute, with the vast majority of funding directed to renewing permanent housing, rental assistance, and supportive service projects that have been shown to work.

5.      In November, however, the Trump Administration threw the CoC Program into chaos. In a new Notice of Funding Opportunity (NOFO) for Fiscal Year (FY) 2025, which replaced a prior NOFO for FY 2024 and 2025, HUD has adopted new policies that threaten to cancel thousands of existing projects, require providers to fundamentally reshape their programs on an impossible timeline, and essentially guarantee that tens of thousands of formerly homeless individuals and families will be evicted back into homelessness. This new FY 2025 NOFO (the

1

November NOFO) was issued just two months before many grants under the 2024-2025 NOFO were due for renewal. The belated issuance of the November NOFO, however, caused considerable confusion and virtually ensured gaps in funding for the projects funded by these grants.

6.      To prevent irreparable harm, Plaintiff States sued to challenge the November NOFO. Less than an hour before the hearing on Plaintiffs' then-pending temporary restraining order motion, HUD exacerbated this chaos to the CoC program by giving notice that it had withdrawn the November NOFO and would fashion yet another NOFO. HUD claimed this move mooted Plaintiffs' request for emergency relief, but its withdrawal of the November NOFO only compounded the harms caused by HUD's untimeliness. And after this Court entered its preliminary injunction, and just before midnight on December 19, Defendants issued yet another NOFO. The latest FY 2025 NOFO (the December NOFO) recycles largely the same infirmities of its predecessor and compounds the harms caused by HUD's untimeliness.

7.      HUD's eleventh-hour decisions to rescind and replace the FY 2024-2025 NOFO are unlawful. To preserve continuity, HUD is required to release CoC NOFOs within three months of a Congressional appropriation. HUD's decision to rescind and replace a NOFO eight months after Congress appropriated funding, only to then rescind and replace it again a month later, essentially guarantees gaps in funding. These funding gaps make it more difficult for CoC grantees to provide the necessary resources for homeless individuals and families to find stability and will place undue strain on states' homelessness response systems. In short, HUD has caused chaos and uncertainty to the very population the CoC program seeks to serve, and this is reason enough to enjoin the recission.

8.      The December NOFO is also substantively unlawful. With the new funding conditions, HUD is now holding these funds and the people they help hostage in three ways challenged here.

9.      First, HUD has adopted new policies, without any meaningful public input, that reverse the agency's longstanding support for Housing First policies and fundamentally undermine the goal of providing dependable housing. A Housing First model provides stable housing to

individuals without preconditions like sobriety or minimum income. It is a model that Congress, experts, and, until recently, HUD itself, have agreed improves housing stability and health while reducing costs. But without any explanation or even acknowledgment of its changed position, HUD has now implemented a new policy under which only thirty percent of CoC funds may be used for renewing existing permanent housing projects—down from nearly ninety percent for CoC funds set to expire in 2026. There is also a significant change to the point system used to award grants, which now favors applicants who require individuals to participate in services to receive housing. This change will threaten permanent housing and will disadvantage providers serving vulnerable people including survivors of domestic violence or sexual assault. And HUD has paired this with a new policy in which Tier 1 funding—essentially guaranteed funding for Continuums— is slashed from ninety percent of available funding to thirty percent, meaning projects will be canceled and formerly homeless individuals and families will be left without housing. These abrupt changes will jeopardize stable, long-term housing options for tens of thousands of our most vulnerable residents.

10.     Second, HUD has imposed an unlawful condition on CoC funds that threatens the funding of recipients who provide services consistent with a client's gender identity.

11.     Third, HUD is discriminating against localities whose approach to homelessness differs from this Administration's. The new NOFO does this by deducting points for applicants if they happen to be located in jurisdictions that do not enforce certain policies this Administration favors, like bans on public camping.

12.     These new conditions and policies are unlawful several times over.

13.     To start, Congress has not authorized Defendants to impose any of these new conditions. Indeed, each of these conditions is contrary to either the CoC's authorizing statute, HUD's regulations, or both.

14.     On top of that, these new conditions and policies are blatantly arbitrary and capricious. Defendants have made no effort whatsoever to explain their utter abandonment of Housing First policies and sudden cap on permanent housing, their cap on Tier 1 funding, their

3

ban on funding for organizations that serve transgender or gender-diverse Americans—a group that disproportionately experiences homelessness—or their plan to discriminate against localities with whose policies the Administration disagrees. This is particularly problematic in light of HUD's longstanding policy, reiterated as recently as last year, that explicitly encouraged CoC applicants to implement Housing First policies like permanent supportive housing and rapid rehousing and to meet the particular needs of populations with acute housing needs, including LBGTQ+ Americans. Making matters even worse, HUD's NOFO announcing these new policies makes no mention whatsoever of the downside of any of these policies—including the unavoidable fact that many of these projects will lose funding, resulting in tens of thousands of formerly homeless individuals and families being evicted back to homelessness.

15.     Finally, these new funding conditions run afoul of bedrock Separation of Powers principles. Congress makes laws and holds the power of the purse. The Administration cannot simply override Congress' clear intent and implement its own agenda.

16.     Individually, these conditions are unlawful and harmful. Together, they are a virtual death blow to the CoC Program as it has operated for decades and will lead to predictably disastrous results.

17.     For any and all of these reasons, this Court should hold unlawful, set aside, and enjoin the December NOFO, reinstating the FY 2024-2025 NOFO. Or at a minimum, the Court should hold unlawful, set aside, and enjoin these new conditions and policies to ensure that these critical funds can go to those whom Congress has directed.

## II.    JURISDICTION AND VENUE

18.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331. The Court has authority to grant declaratory, injunctive, and other relief pursuant 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702, 705, and 706.

19.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. The State of

Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

### III.    PARTIES

20.    Plaintiff the State of Washington, represented by and through its Attorney General, Nicholas W. Brown, is a sovereign state of the United States of America. The Attorney General of Washington is the chief legal advisor to the State and is authorized to act in federal court on behalf of the State on matters of public concern. Chapter 43.10 Wash. Rev. Code.

21.    Plaintiff the State of New York is a sovereign state in the United States of America. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

22.    Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

23.    Plaintiff the State of Arizona, represented by and through its Attorney General, Kristin K. Mayes, is a sovereign state of the United States of America. The Attorney General of Arizona is the State's chief law enforcement officer and is authorized to "[r]epresent this state in any action in a federal court[.]" Ariz. Rev. Stat. § 41-193(A)(3); see Ariz. Const. Art. V, § 1(A).

24.    Plaintiff State of California is a sovereign state of the United States of America. Attorney General Rob Bonta is the chief law enforcement officer for and brings this action on behalf of California.

25.    Plaintiff the State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

26.    Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong,

who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

27.     Plaintiff State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State[.]" *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

28.     Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

29.     Plaintiff State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. Under Illinois law, the Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, section 15. *See* 15 Ill. Comp. Stat. 205/4.

30.     Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky Const. § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. Ky. Const. § 228.

31.     Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

32.     Plaintiff the State of Maryland is a sovereign State of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

33.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

34.     Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

35.     Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

36.     Plaintiff the State of New Jersey is a sovereign State of the United States of America. The State of New Jersey is represented by Attorney General Matthew J. Platkin, who is the chief legal officer of New Jersey.

37.     Plaintiff the State of New Mexico, represented by and through its Attorney General Raúl Torrez, is a sovereign state of the United States of America. As the State's chief law enforcement officer, the Attorney General is authorized to act on behalf of the State of New Mexico in this matter.

38.     Plaintiff the State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

39.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed[.]" Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

40.     Plaintiff the State of Vermont, represented by and through its Attorney General, Charity R. Clark, is a sovereign state of the United States of America. The Vermont Attorney General is authorized to act on behalf of the State in this matter. *See* 7 V.S.A. § 152.

41.     Plaintiff State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to sue on behalf of the State.

42.     Defendant HUD is an agency and executive department of the United States government, 42 U.S.C. § 3532(a), and has responsibility for implementing the Continuum of Care Program. HUD is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

43.     Defendant Scott Turner is the United States Secretary of Housing and Urban Development and the federal official in charge of HUD. He is sued in his official capacity.

### IV.    FACTUAL AND LEGAL BACKGROUND

**A.    Congress Created the Continuum of Care Program to Address the Unprecedented Crisis of Homelessness by Funding Housing Solutions**

44.     In 1987, Congress passed the McKinney-Vento Homeless Assistance Act to address the "immediate and unprecedented crisis" of homelessness. 42 U.S.C. § 11301(a)(1). Through the Act, Congress aimed "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b)(3).

45.     The purpose of the CoC program is "to promote community-wide commitment to the goal of ending homelessness"; "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[]"; "to promote access to, and effective utilization of, mainstream programs" for individuals and families experiencing homelessness; and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

46.     As HUD puts it, the CoC program "provide[s] funding for efforts by nonprofit providers, states, Indian Tribes or tribally designated housing entities . . . and local governments to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness."[1]

47.     Congress has directed that CoC funding "shall be used to carry out projects that serve homeless individuals or families that consist of . . . eligible activities[,]" including permanent housing, permanent supportive housing for individuals with disabilities (including mental health and substance use issues), rapid rehousing, supportive services, the Homeless Management Information System, and homelessness prevention. *See* 42 U.S.C. § 11383; 24 C.F.R. § 578.37.

48.     These programs directly benefit individuals and families experiencing or at imminent risk of homelessness, as well as persons fleeing domestic violence, dating violence, sexual assault, and stalking.

49.     HUD issues grants to local coalitions—known as "Continuums of Care"—pursuant to a NOFO. Each Continuum represents a "geographic area," for example, a county or multi-county region within a state. 24 C.F.R. § 578.3.

50.     CoC funding is distributed among geographic areas via a hybrid of a formula and competitive process. By statute, the selection criteria for awards "shall . . . include the need within

---

[1] U.S. Department of Housing and Urban Development, *Continuum of Care Program*, https://www.hud.gov/hud-partners/community-coc (last visited Nov. 25, 2025).

the geographic area for homeless services, determined . . . by a formula, which shall be developed by the Secretary, by regulation[.]" 42 U.S.C. § 11386a(b). This formula, called the Preliminary Pro Rata Need, allocates certain percentages to each geographic area, based primarily on the Community Development Block Grant formula, with adjustments made to ensure, as far as possible, that all CoC projects eligible for renewal can be renewed. 24 C.F.R. § 578.17.

51.     HUD's rules make clear that this formula sets a mandatory floor for each geographic area. By regulation, "HUD will apply th[is] formula . . . to the amount of funds being made available under the NOF[O]." 24 C.F.R. § 578.17(a)(2).

52.     Additional statutory and regulatory provisions make clear that each geographic area is to receive CoC funding. For example, HUD regulations provide that "[r]epresentatives from relevant organizations within a geographic area shall establish a Continuum of Care for the geographic area to carry out the duties of" the CoC program, and that "[i]f HUD finds that the Continuum of Care for a geographic area does not meet the requirements of the Act or its implementing regulations, or that there is no Continuum for a geographic area, HUD may take remedial action to ensure fair distribution of grant funds within the geographic area," including designating a replacement continuum or directly funding organizations within a geographic area. 24 C.F.R. §§ 578.5, 578.13.

53.     The statute directs HUD to prioritize renewal of existing projects. It provides that "[t]he sums made available" under the CoC program "shall be available for the renewal of contracts in the case of tenant-based assistance, successive 1-year terms, and in the case of project-based assistance, successive terms of up to 15 years at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations, for rental assistance and housing operation costs[.]" 42 U.S.C. § 11386c(b). The HUD "Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . *the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary.*" *Id.* (emphasis added);

*see also id.* §11386b(a)(2) (requiring that "[i]n calculating the portion of" CoC funds for certain new permanent supportive housing, "the Secretary shall not count funds made available to renew contracts for existing projects under section 11386c").

54.    By prioritizing renewals of existing projects, Congress wrote the statute to ensure that programs can continue to provide stable housing to formerly homeless individuals, and that millions of formerly chronically homeless individuals and families are not evicted back to homelessness.

55.    On top of this formula funding and funding earmarked for renewals, CoC funding is competitive in two respects.

56.    First, HUD awards grants competitively to applicants within a Continuum. That is, when a Continuum applies to the NOFO, it will rank projects within its geographic area, and HUD will select projects for awards within each Continuum's application up to at least the formula amount.

57.    Second, HUD awards "bonuses [and] other incentives to geographic areas for using funding . . . for activities that have been proven to be effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals . . . set forth in" the CoC statutes. 42 U.S.C. §11386b(d)(1).

58.    The McKinney-Vento Act specifically instructs HUD on how CoC funds shall be awarded by including lengthy "Required Criteria" for assessing grant applications such as "the previous performance of the recipient regarding homelessness" with respect to the length of time individuals remain homelessness and related factors, whether the recipient will incorporate "comprehensive strategies for reducing homelessness" such as permanent supportive housing, and many other specific factors. 42 U.S.C. § 11386a.

59.    Importantly, the Act also already specifies what information HUD should require project sponsors to certify to receive CoC funding. *Id.* § 11386(b)(4). For example, this includes "certification from all project sponsors" regarding the confidentiality of certain records, certain privacy terms, and that children in family programs are enrolled in school and connected to certain

services. *Id.* Notably absent from these requirements are any of the funding conditions at issue in this litigation.

60.    Although the Secretary is empowered to require applicants to "comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner[,]" 42 U.S.C. §11386(b)(8), this does not give Defendants the unilateral authority to add whatever "substantively distinct and extraneous objective[]" they want, "untethered from the statutory purpose of ensuring efficient program administration." *City of Seattle v. Trump*, 2:25-cv-01435-BJR, 2025 WL 3041905, at *8 (W.D. Wash. Oct. 31, 2025).

61.    Funding for CoC grants comes from congressional discretionary appropriations. The McKinney Vento Act requires that HUD issue a notification of funding availability for CoC grants "for a fiscal year not later than 3 months after" Congress has enacted its yearly appropriations act. 42 U.S.C. § 11382(b). On March 15, 2025, the President signed H.R. 1968 authorizing the Full-Year Continuing Appropriations and Extensions Act, 2025 (Pub. L. No. 119-4, 139 Stat. 9) which makes approximately the same amount of CoC Program funding available for FY 2025 as the Consolidated Appropriations Act, 2024 (Pub. L. No. 118-42, 138 Stat. 25).

62.    In FY 2024, HUD provided $3.6 billion in CoC funding to all fifty states, the District of Columbia, Puerto Rico, Guam, and the Virgin Islands, to assist the most vulnerable Americans.

63.    HUD is required to proceed by notice-and-comment rulemaking for "matters that relate to . . . grants," "even though such matters would not otherwise be subject to rulemaking by law or Executive policy." 24 C.F.R. §§ 10.1, 10.2, 10.7-10.10. Although certain exceptions are listed, none apply here. *Id.* § 10.1.

**B.     Through the CoC Program, HUD Has Promoted a Housing First Approach to Reducing Homelessness**

64.     For at least two decades, HUD has implemented the CoC Program to further its stated policy of "implement[ing] a Housing First approach to reducing homelessness, and drive equitable community development."[2]

65.     According to HUD—defining the term in its FY 2024 NOFO—Housing First is "[a] model of housing assistance that prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services."[3]

66.     HUD adopted its Housing First approach in recognition of the fact that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success."[4]

67.     According to HUD's most recent strategic plan, a "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services."[5]

68.     Similarly, the United States Interagency Council on Homelessness has recognized that Housing First policy "is based on overwhelming evidence that people experiencing homelessness can achieve stability in permanent housing if provided with the appropriate level of services. Study after study has shown that Housing First yields higher housing retention rates, drives significant reductions in the use of costly crisis services and institutions, and helps people achieve better health and social outcomes."[6]

---

[2] HUD, *Fiscal Year 2022-2026 HUD Strategic Plan* 17 (2022), https://archives.hud.gov/reports/FY2022-2026HUDStrategicPlan.pdf.

[3] HUD, *Community Planning and Development* (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf.

[4] *See supra* note 2 at 25.

[5] *See supra* note 2 at 26.

[6] United States Interagency Council on Homelessness, *Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation 3 n.1* (2016), https://www.usich.gov/sites/default/files/document/Housing_First_Checklist_FINAL.pdf.

69.     The core Housing First intervention is "permanent housing"—including "permanent supportive housing" and "rapid rehousing"—in which individuals are provided stable housing "without a designated length of stay." 24 C.F.R. § 578.37(a)(1).

70.     With respect to permanent housing, CoC "funds may be used for acquisition, rehabilitation, new construction, leasing, rental assistance, operating costs, and supportive services." *Id.*

71.     Permanent supportive housing is available for "individuals with disabilities and families in which one adult or child has a disability[]" and couples housing with "[s]upportive services designed to meet the needs of the program participants[.]" 24 C.F.R. § 578.37(a)(1)(i).

72.     The McKinney-Vento Act defines "supportive services" to include, for example, a "child care services program for families experiencing homelessness;" "the establishment and operation of an employment assistance program, including providing job training;" "the provision of mental health services, trauma counseling, and victim services;" "the provision of . . . transportation services that facilitate an individual's ability to obtain and maintain employment;" and more. 42 U.S.C. § 11360(29).

73.     For rapid rehousing, CoC "funds may provide supportive services[]" and/or "tenant-based rental assistance . . . as necessary to help a homeless individual or family, with or without disabilities, move as quickly as possible into permanent housing and achieve stability in that housing." 24 C.F.R. § 578.37(a)(1)(ii).

74.     The McKinney-Vento Act specifically incorporates a Housing First approach. In 2009, the statute was amended via the HEARTH Act to "entrench federal support for Housing First and expand the availability of permanent housing" and "authorized funds for rapid re-housing assistance to help people move into permanent housing."[7]

75.     For example, as noted above, the law specifically directs that "[t]he Secretary shall provide bonuses or other incentives to geographic areas for using funding under this part for

---

[7] Josh Leopold, *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (2019), https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance.

activities that have been proven to be effective at reducing homelessness generally, reducing homelessness for a specific subpopulation, or achieving homeless prevention and independent living goals as set forth in section 11386a(b)(1)(F) of this title." 42 U.S.C. § 11386(b)(d)(1).

76.     And among the "activities that have been proven to be effective at reducing homelessness generally or reducing homelessness for a specific subpopulation," the Act explicitly includes "permanent supportive housing for chronically homeless individuals and families." 42 U.S.C. § 11386(b)(d)(2)(A).

77.     Likewise, the Act explicitly endorses as effective "rapid rehousing services, short-term flexible subsidies to overcome barriers to rehousing, support services concentrating on improving incomes to pay rent, coupled with performance measures emphasizing rapid and permanent rehousing." 42 U.S.C. § 11386(b)(d)(2)(B).

78.     With respect to the statute's reference to "achieving homeless prevention and independent living goals as set forth in section 11386a(b)(1)(F) of this title," § 11386a(b)(1)(F) specifically states that this involves "independent living in permanent housing" which "includ[es] assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment."

79.     Therefore, under the statute, the Secretary is required to provide bonuses and incentives for permanent supportive housing, rapid rehousing, and assistance to homeless families and individuals who are struggling to obtain employment or are experiencing substance addiction or mental health conditions. This directly reflects a Housing First approach that is centered on permanent housing, including permanent supportive housing, without preconditions regarding employment, sobriety, or the like.

80.     Congress re-emphasized these points in a recent Consolidated Appropriations Act, directing that the Secretary shall provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services. Consolidated Appropriations Act, 2024, Pub. L. No. 118-42 at 138.

81.     Similarly, with respect to the Continuum of Care Program, "[t]o the extent practicable, each project shall provide supportive services for residents of the project and homeless persons using the project[.]" 42 U.S.C. § 11385(a). Given that these services include, for example, "operating an employment assistance program," and "providing assistance in obtaining . . . mental health benefits, employment counseling, and medical assistance[]" (42 U.S.C. § 11385(c)), the statute again reflects a Housing First approach given that assistance will be offered to residents of the project rather than first requiring homeless individuals to meet certain criteria to obtain the housing.

82.     Consistent with these provisions of the McKinney-Vento Homeless Assistance Act and its amendments, HUD has employed a Housing First and permanent supportive housing approach since at least 2004.[8] As one recent HUD document explained: "For 20 years, HUD has prioritized permanent supportive housing, which serves people with the highest levels of housing and service needs, especially people experiencing chronic homelessness."[9]

83.     Specifically, prior NOFOs and Funding Opportunity Descriptions from 2004 to the present reflect HUD's longstanding commitment to "permanent supportive housing" to "meet the long-term needs of homeless individuals and families" and "Housing First" as one of HUD's "Policy Priorities."[10]

---

[8] Alap Davé, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

[9] HUD, *Office of Community Planning and Development Homeless Assistance Grants*, (https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf (last visited Nov. 25, 2025).

[10] *See, e.g.*, Continuum of Care Homelessness Assistance Programs, 69 Fed. Reg. 27495, 27498 (May 14, 2004), https://archives.hud.gov/funding/2004/cocpsec.pdf (Fiscal Year 2004 Continuum of Care Homeless Assistance Programs Funding Opportunity Description states that one of the "basic components" of the "CoC system" is "Permanent housing, or permanent supportive housing, to help meet the long-term needs of homeless individuals and families"); *see also, e.g.*, Grants.gov, Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*, https://grants.gov/search-results-detail/265408 (last visited Nov. 25, 2025) (Fiscal Year 2014 Notice of Funding Availability for Continuum of Care Program awards applications "up to 10 points" for following a "Housing First" model and defines "Housing First" as one of HUD's "Policy Priorities"); *see also, e.g.*, HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care*

84.     HUD's most recent strategic plan (for Fiscal Years 2022-2026) explicitly provides that HUD will "implement a Housing First approach to reducing homelessness."[11]

85.     Accordingly, HUD's recent CoC NOFO (for Fiscal Years 2024-2025) encourages applicants to "[u]se a Housing First Approach," explaining: "Housing First prioritizes rapid placement and stabilization in permanent housing and utilizes housing as a platform for providing supportive services that improve a person's health and well-being. CoC Program funded projects should help individuals and families move quickly into permanent housing without preconditions and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing. Additionally, CoCs should engage landlords and property owners to identify housing units available for rapid rehousing and permanent supportive housing participants, remove barriers to entry, and adopt client-centered service practices. HUD encourages CoCs to assess how well Housing First approaches are being implemented in their communities."[12]

86.     The Fiscal Year 2024-2025 NOFO also states that HUD would award "bonus projects" in part based on an applicant's "[c]ommitment to Housing First," providing "[u]p to 10 points based on the project application's commitment to follow a Housing First approach[.]"[13]

## C.     Through the CoC Program, HUD Has Sought to Address the Needs of the Diverse Population It Serves

87.     As HUD and many others have recognized, "LGBTQ+ people experience homelessness at rates significantly higher than their representation in the general population."[14]

---

*Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (Fiscal Year 2018 NOFO includes the same provisions); *see also, e.g.*, Grants.gov, Related Documents, *2021 Continuum of Care* (2021), https://grants.gov/search-results-detail/335322 (last visited Nov. 25, 2025) (Fiscal Year 2021 NOFO includes the same provisions).

[11] *See supra* note 2 at 18.

[12] *See supra* note 3 at 8.

[13] *See supra* note 3 at 30.

[14] *See supra* note 2 at 18; *see also* Senate Hum. Servs. Comm. Pub. Hr'g on ESSB 5599 (Feb. 6, 2023), at 1:19:15-1:19:40, video recording by TVW, https://tvw.org/video/senate-human-services-2023021142/?eventID =2023021142 (legislative testimony noting LGBTQ+ youth account for at least forty percent of youth experiencing homelessness in King County, Washington); *see also* The Trevor Project, *Homelessness and Housing Instability Among LGBTQ Youth*, https://www.thetrevorproject.org/wp-content/uploads/2022/02/Trevor-Project-Homelessness-Report.pdf (last visited Nov. 25, 2025) (thirty-five to thirty-nine percent of transgender or nonbinary youth have experienced housing instability).

88.     HUD's "Equal Access" regulation, which applies to the "Continuum of Care program," requires that funding recipients ensure that "[e]qual access to CPD programs, shelters . . . services, and accommodations is provided to an individual in accordance with the individual's gender identity," that "[a]n individual is placed, served, and accommodated in accordance with the gender identity of the individual[,]" that "[a]n individual is not subjected to intrusive questioning or asked to provide . . . evidence of the individual's gender identity[,]" and that "[p]lacement and accommodation of an individual in temporary, emergency shelters and other buildings . . . shall be made in accordance with the individual's gender identity." 24 C.F.R. § 5.106.

89.     On February 7, 2025, HUD Secretary Scott Turner announced that HUD will stop enforcing this "Equal Access" rule,[15] but the regulation remains in effect.

90.     For over a decade, HUD's NOFOs for the Continuum of Care have consistently required that CoC funding recipients provide "Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity," and this requirement has been consistent across multiple presidential administrations.[16] Prior NOFOs have also regularly awarded points to CoC applicants for "Addressing the Needs of LGBT Individuals."[17]

91.     Consistent with this longstanding commitment to equal access, the FY 2024-2025 CoC NOFO emphasized the need to address the specific challenges of transgender and gender-diverse people. For example, its scoring system encouraged CoCs to "address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes," "ensure that all projects provide privacy, respect, safety, and access

---

[15] HUD, *Secretary Scott Turner Halts Enforcement Actions of HUD's Gender Identity Rule*, https://www.hud.gov/news/hud-no-25-026#close (last visited Nov. 5, 2025).
[16] *See, e.g.*, Grants.gov, Related Documents, *FY 2012 Notice of Funding Availability of Continuum of Care*, https://grants.gov/search-results-detail/206173 (last visited Nov. 25, 2025) (FY 2012 Notice of Funding Availability for Continuum of Care); *see also, e.g.*, Grants.gov, Related Documents, *FY 2019 Notice of Funding Opportunity for Continuum of Care*, https://grants.gov/search-results-detail/318022 (last visited Nov. 25, 2025) (FY 2019 Notice of Funding Opportunity for Continuum of Care).
[17] *See, e.g.*, Grants.gov, Related Documents, *FY 2018 Notice of Funding Availability Continuum of Care*, https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (last visited Nov. 25, 2025) (FY 2018 Notice of Funding Availability for Continuum of Care).

regardless of gender identity or sexual orientation," and "partner with organizations with expertise in serving LGBTQ+ populations."[18]

92.     The FY 2024-2025 NOFO further required that "[a]pplicants must identify the steps they will take to ensure that traditionally underserved populations," including "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons . . . will be able to meaningfully participate in the planning process" for projects.[19]

93.     Likewise, HUD's most recent strategic plan, which includes the current fiscal year (Fiscal Year 2026), specifically "focused on underserved populations to ensure equitable and fair access to housing and to Federal programs" and defined underserved populations to include, for example, "members of the lesbian, gay bisexual, transgender, and queer (LGBTQ+) community."[20]

**D.     The Trump Administration Advances Efforts to Reverse HUD's Decades-Long Policy of Housing First**

94.     The current Administration has worked heedlessly to reverse HUD's longstanding, statutorily grounded commitments to Housing First and equal access.

95.     On July 24, 2025, the President signed an Executive Order addressing homelessness. The Order is called "Ending Crime and Disorder on America's Streets," but here will be called by the more fitting Anti-Homeless Order. Exec. Order No. 14321, 90 Fed. Reg. 35817 (2025).

96.     The primary thrust of the Anti-Homeless Order is an effort to expand civil commitment of those experiencing homelessness—to incentivize states and local governments to adopt a "maximally flexible" approach to locking up people who lack a safe or reliable place to sleep. *See* EO 14321 §§ 1-2.

97.     Additionally, the Anti-Homeless Order directs HUD to "end[] support for 'housing first' policies that deprioritize accountability and fail to promote treatment, recovery, and

---

[18] Grants.gov, Related Documents, *FY 2024 and FY 2025 Continuum of Care Competition and Renewal of Youth Homeless Demonstration Program Grants* 9 (2025), https://grants.gov/search-results-detail/355762.

[19] *Id.* at 66.

[20] *See supra* note 2 at 20.

self-sufficiency." EO 14321 § 5(a). The Order further directs HUD to "take steps to require recipients of Federal housing and homelessness assistance to increase requirements that persons participating in the recipients' programs who suffer from substance use disorder or serious mental illness use substance abuse treatment or mental health services as a condition of participation." *Id.* § 5(b). This is directly contrary to HUD's conclusion—in its still-operative strategic plan—that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success."[21]

98.     The Anti-Homeless Order further directs the Attorney General, HHS, HUD, and the Department of Transportation to "[f]ight[] [v]agrancy" by "tak[ing] immediate steps to" to prioritize grants for "States and municipalities that actively . . . enforce prohibitions on open illicit drug use; []enforce prohibitions on urban camping and loitering; [and] enforce prohibitions on urban squatting." EO 14321 § 3.

99.     As detailed below, HUD has now taken steps to implement the Anti-Homeless Order.

**E.      The Administration Takes Actions to Target So-Called "Gender Ideology"**

100.     The Administration has likewise sought to reverse HUD's longstanding commitment to serving all populations by singling out particular populations for disfavored treatment.

101.     On January 20, 2025, the President's first day in office, he issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender Ideology Order). The purpose and effect of the Gender Ideology Order is to deny the existence of transgender individuals.

102.     The Gender Ideology Order declares "[i]t is the policy of the United States to recognize two sexes, male and female." EO 14168 § 2.

103.     Section 2(a) defines "sex" to mean "an individual's immutable biological classification as either male or female," which is "not a synonym for and does not include the

---

[21] *See supra* note 2 at 25.

concept of 'gender identity.'" Section 2(d) defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and Section 2(e) defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell." The Gender Ideology Order directs that these definitions "govern all Executive interpretation of and application of Federal law and administration policy." EO 14168 § 2.

104.    To effectuate the Gender Ideology Order, Section 3(e) directs federal agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) likewise commands that "[f]ederal funds shall not be used to promote gender ideology." Under the Order, "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.*

105.    The Gender Ideology Order purports to restrict funding of activities that promote "gender ideology."

106.    The Gender Ideology Order is rooted in anti-transgender animus and lacks any scientific basis.

107.    As detailed below, HUD has now taken steps to implement the Gender Ideology Order.

F.    **HUD Reissues Two Additional Fiscal Year 2025 NOFOs that Include Unlawful Conditions Concerning Permanent Supportive Housing, Gender Identity, Public Safety, and Funding Amounts**

108.    The Administration has now brought its anti-homeless and anti-transgender agendas together in an effort to fundamentally and unlawfully alter the CoC program.

109.    On November 13, 2025—nearly eight months after Congress appropriated FY 2025 funding for the CoC Program—HUD issued a "FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO" with an application due date of January 14, 2026.[22]

---

[22] Grant.gov, Related Documents, *FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO* (Nov. 13, 2025), https://www.grants.gov/search-results-detail/360861.

110.    This November NOFO stated that "FY 2025 CoC awards will be made through this NOFO." But HUD already issued the FY 2025 NOFO on July 31, 2024. That NOFO was a combined NOFO meant to cover FY 2024 and 2025.[23] This two-year NOFO was specifically "authorized by the Consolidated Appropriations Act, 2024 and any FY 2025 funding will be authorized by a FY 2025 Congressional Appropriation."[24]; *see also* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, Sec. 242.

111.    The FY 2024-2025 NOFO further stated that "CoCs are only required to submit one CoC application that will be applicable to the FY 2024 and FY 2025 funds . . . Projects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds."[25]

112.    The FY 2024-2025 NOFO established a deadline of October 30, 2024, for FY 2024 applications and a deadline of August 29, 2025, for FY 2025 applications in situations where an application for the FY 2024 funds would not also be applicable for FY 2025 funds, such as when CoC projects "wish to reallocate eligible renewal projects and create new projects."[26]

113.    In other words, HUD already committed, back in 2024, to funding FY 2025 projects along the lines laid out in its two-year NOFO. And as described in detail above, the FY 2024-2025 NOFO required and endorsed a Housing First approach and encouraged CoCs to address the specific needs of transgender, gender diverse, and non-binary individuals and families, among other requirements. It did not contain any of the Challenged Conditions.

114.    Despite CoCs undergoing a two-year planning process pursuant to the FY 2024-2025 NOFO and the CoC program requirements, HUD belatedly announced on July 3, 2025, that it intended to publish a new NOFO for 2025 CoC awards. This announcement came more than three months after Congress' March 15, 2025, continuing resolution appropriating

---

[23] Grants.gov, Related Documents, *FY 2024 and FY 2025 Continuum of Care Competition and Renewal of Youth Homeless Demonstration Program Grants*, https://www.grants.gov/search-results-detail/355762 (last visited Nov. 25, 2025).
[24] *See supra* note 23.
[25] *Id.*
[26] *Id.*

$3.544 billion for the Continuum of Care program and related programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12). In making this announcement, HUD merely stated that it would publish a NOFO for FY 2025 funds in the future and failed to provide any reasoned explanation as to why it was issuing a new FY 2025 NOFO when a NOFO for FY 2024-2025 had already been issued. Due to this announcement by HUD on July 3, 2025, no FY 2025 funds were awarded under the 2024-2025 NOFO before it was replaced by the November NOFO.

115.    The November NOFO claimed to "rescind[] and supersede[]" the prior NOFO with respect to FY 2025.[27] And in so doing, it added a passel of unlawful conditions pursuant to the Anti-Homeless and Gender Ideology EOs.[28] These new conditions were not authorized by Congress, are neither reasonable nor reasonably explained, and flout the significant reliance interests of CoC applicants. Plaintiff States thus filed suit, along with a motion for a temporary restraining order.

116.    On December 8, 2025, less than an hour before a hearing on Plaintiffs' motion for a temporary restraining order, Defendants filed a notice claiming that "HUD has withdrawn the 2025 NOFO in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." ECF No. 41. Although Defendants contended that this Notice "moot[ed]" Plaintiffs' then-pending request for preliminary injunctive relief, *id.*, they simultaneously stated that "The Department still intends to exercise [its] discretion and make changes to the previously issued CoC NOFO to account for new priorities." ECF No. 41-2.

117.    Just before midnight on December 19, 2025—after the Court orally entered a preliminary injunction enjoining Defendants' rescission of the FY 2024-2025 NOFO and the challenged conditions of the November NOFO—Defendants issued a new NOFO. ECF No. 66.[29]

---

[27] *See supra* note 22 at 15.
[28] *See supra* note 22 at 12 (noting that NOFO implements Anti-Homeless EO); *id.* at 108 (noting that NOFO implements Gender Ideology EO).
[29] *See also* HUD.gov, *FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO* (Dec. 19, 2025), https://www.hud.gov/sites/dfiles/CPD/documents/CoC/FY2025-Continuum-of-Care-YHDP-Renewal-NOFO.pdf.

Like the November NOFO, the December NOFO asserts "FY 2025 CoC awards will be made through this NOFO" and purports to "rescind[] and supersede[] any mention of awards of FY 2025 CoC funds in the FY 2024 and FY 2025 Continuum of Care Competition and Renewal or Replacement of Youth Homeless Demonstration Program Grants published on July 31, 2024."[30] The December NOFO was promulgated long after the statutory three-month NOFO deadline had passed. Moreover, despite Defendants' statement that they had withdrawn the November NOFO to address the issues raised by Plaintiffs, the December NOFO continues nearly all of the unlawful conditions from the November NOFO, which Plaintiff States challenged in prior complaints.

118.     These unlawful conditions, described in more detail below, will collectively be called the "Challenged Conditions."

### 1.     Ending Housing First

119.     First, the December NOFO abruptly reverses HUD's decades-long Housing First policy by placing an unauthorized and arbitrary cap on the funding of permanent housing projects. The December NOFO provides that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the <u>renewal</u> of existing Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects" (the "Permanent Housing Cap").[31]

120.     The "Annual Renewal Demand" is defined in the NOFO as "[t]he total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items . . . based on [fair market rent] changes."[32] In other words, ARD is "the total amount of funds requested by eligible renewal projects in each FY funding opportunity."[33] "PH" here refers to Permanent Housing, "PSH" to Permanent Supportive Housing, and "RRH" to Rapid Rehousing. Thus, the Permanent Housing Cap mandates that only 30 percent of funding for project renewals may go to permanent housing.

---

[30] *Supra* note 29 at 22.
[31] *See supra* note 29 at 23.
[32] *See supra* note 29 at 134.
[33] *Id.*

121.    The Permanent Housing Cap, if allowed to go into effect, will drastically cut funding for permanent housing projects. "Currently, 87 percent of all CoC program funds ending in 2026 are slated to support permanent housing in some capacity. Under the policy change, only 30 percent of the funds will be allowed to be used for that purpose."[34]

122.    This "shift" is the "most consequential in a generation."[35] "In limiting spending on long-term housing to just 30 percent of the $3.9 billion in aid—from about 90 percent this year—the [Permanent Housing Cap] could deal a crippling blow to a movement called Housing First, which once enjoyed bipartisan support and has guided federal grant making since at least 2009."[36]

123.    These drastic funding cuts "could potentially reexpose tens of thousands of people to homelessness."[37] The Permanent Housing Cap could "quickly place as many as 170,000 formerly homeless people at risk of returning to the streets."[38]

124.    According to news reporting, this change was not vetted by "HUD's attorneys to ensure it complied with the McKinney-Vento Homeless Assistance Act"; in fact, employees reported "they were forbidden from speaking with the agency's attorneys, and there is concern that the funding cap raises legal questions about its compliance with the law."[39] Quite so. Congress had directed HUD to fund Housing First policies through various statutory provisions. And it has directed HUD to prioritize renewals to ensure that individuals and families who have successfully exited homelessness are not evicted back into the streets. 42 U.S.C. § 11386c(b). The Permanent Housing Cap ensures that much-needed projects will not be renewed.

125.    In addition to imposing the Cap, the December NOFO reverses HUD's longstanding Housing First policy via new scoring criteria aimed at forcing applicants to require

---

[34] Katherine Hapgood, *Trump admin looks at deep cuts to homeless housing program*, Politico (Sept. 29, 2025), https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-housing-program-00585770?nid=0000014f-1646-d88f-a1cf-5f46b7bd0000&nname=playbook&nrid=0000015d-4ff3-d6d3-a75d-4ff30bd80000.

[35] Jason Deparle, *Trump Administration Proposes a Drastic Cut in Housing Grants* (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html.

[36] *Id.*

[37] *See supra* note 34.

[38] *See supra* note 35.

[39] *See supra* note 33.

participants to enroll in services to receive housing (the "Service Requirement Conditions"). For example, the December NOFO awards up to sixteen points (out of a maximum of 130) for "Availability of Treatment and Recovery Services" which includes substance abuse treatment services in which "program participants are *required* to take part in such services as a condition of continued participation in the program[]" and the demonstration of "the requirement for participation in substance abuse treatment."[40]

126.    Likewise, the December NOFO awards up to ten points if a CoC can "demonstrate that projects *require* program participants to take part in supportive services . . . in line with 24 C.F.R. 578.75(h)."[41] Yet, 24 C.F.R. 578.75(h) only says that programs "may" require program participants to participate in services, not that they are required or incentivized to do so. Instead, the statute requires incentives for permanent supportive housing, as described above. And as recently as last year, HUD was explicitly encouraging applicants not to require services as a condition for stable housing. *See* HUD, *Community Planning and Development* 87 (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_CoC_and_YHDP_NOFO_FR-6800-N-25.pdf (to receive full points, applicants "must [d]emonstrate at least 75 percent of all project applications that include housing . . . are using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing nor participation in supportive services . . . and prioritize rapid placement and stabilization in permanent housing.").

127.    The new scoring system effectively eliminates funding for rapid rehousing without supportive services. It does this through a "project quality threshold" in which "Permanent Housing projects must receive at least 6 out of the 8 points available" to be considered for funding, but awarding three points combined for offering "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)" and "[d]emonstrat[ing] that the proposed project will require

---

[40] *See supra* note 29 at 86 (emphasis added).
[41] *See supra* note 29 at 88-89 (emphasis added).

program participants to take part in supportive services (e.g. case management, employment training, substance use treatment)."[42] Thus, an applicant who does not provide supportive services cannot meet the minimum threshold for funding.

128.     The new scoring system also punishes housing providers that support survivors of domestic violence or sexual assault for merely following the law. The Violence Against Women Act (VAWA) and Family Violence Prevention and Service Act (FVPSA) fund housing support for survivors of domestic violence and sexual assault. The laws prohibit housing providers who receive grants under those statutes from requiring participants to take part in supportive services as a condition of receiving housing assistance; instead, those services must be voluntary. *See* 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). Housing providers serving these populations therefore are effectively forced to choose between funding sources under HUD's new criteria, despite many providers historically relying on both to make their operations viable.

### 2.     Tier 1 Cap

129.     Second, the December NOFO further undermines the statutory and regulatory guidelines prioritizing renewals by slashing the amount of projects CoCs may designate as "Tier 1" projects.

130.     Historically, HUD has permitted CoCs to designate certain projects as Tier 1, meaning they were essentially guaranteed funding so long as they met threshold criteria. *See* Grants.gov, Related Documents, *FY 2025 Continuum of Care Competition and Youth Homeless Demonstration Program Grants NOFO* 91 (Nov. 13, 2025), https://www.grants.gov/search-results-detail/360861 ("HUD will . . . select all projects in Tier 1 that pass project quality and project eligibility thresholds[.]"). This ensured CoCs could budget around a steady stream of funding and, perhaps more importantly, ensured stability for individuals and families living in CoC funded-housing or receiving CoC-funded services.

---

[42] *See supra* note 29 at 70, 71; *see also id.* at 73 (providing that these thresholds apply to renewals as well as new projects).

131.    Tier 1 is set as a percentage of Annual Renewal Demand. And consistent with statutory and regulatory mandates for renewals, Tier 1 is generally set at a percentage commensurate with the amount of projects up for renewal. So, in FY 2024, "Tier 1 [wa]s set at 90 percent of the CoC's Annual Renewal Demand (ARD)."[43]

132.    The December NOFO slashes that drastically. Under the NOFO, "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)."[44] Although the upshot of this new condition—the "Tier 1 Cap"—is not entirely clear (since HUD's obligation to fund renewals arises independently of the NOFO's tiering system), HUD put this condition under the heading "Increase in Competition."[45] It thus appears that the Tier 1 Cap is another effort by HUD to steer funding away from renewals, and stability, in violation of Congressional directive and its own statute.

### 3.    Geographic Discrimination Conditions

133.    Third, the December NOFO includes various score criteria purportedly related to "Public Safety." Broadly speaking, these conditions would put a thumb on the scale based on whether the state or local jurisdiction in which an applicant is located is, in this Administration's view, sufficiently tough on "vagrancy"—something the applicant has no control over (the "Geographic Discrimination Conditions"). Voters in each state select state legislators who have then enacted state policies. Now, the NOFO intends to use these policy choices to disadvantage the Plaintiff States. The Geographic Discrimination Conditions include:

a.    "CoCs must . . . [d]emonstrate . . . that the CoC's entire geographic area . . . [q]uickly clears tents and encampments on public property";

b.    "CoCs must . . . [d]emonstrate . . . that the CoC's entire geographic area . . . [d]oes not tolerate the public use of illicit drugs";

c.    CoCs must" demonstrate utilization of standards like "involuntary commitment," which are a matter of state and local law;

d.    "CoCs must" indicate that the state implements and is compliant with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); and

---

[43] *See supra* note 23 at 4
[44] *See supra* note 29 at 23.
[45] *Id.*

e.  "CoCs must" assist law enforcement in checking the location of homeless sex offenders, and cooperate with law enforcement in connecting violators of public camping or drug laws with services.[46]

134.  As detailed above, however, in creating the CoC program, Congress committed to funding *every* geographic area in America based on need and nothing else. *See* 42 U.S.C. § 11386a(b). HUD has adopted regulations further implementing this Congressional direction. 24 C.F.R. § 578.17; *see also id.* §§ 578.5, .13.

### 4.  Gender Ideology Conditions

135.  Fourth, the November and December NOFOs include conditions that purport to cut off funding for any applicant that addresses—or potentially ever has addressed—the particular needs of transgender and gender diverse-individuals (the "Gender Identity Conditions").

136.  The November NOFO previously provided that "[a]wards made under this NOFO will not be used to . . . conduct activities that rely on or otherwise use a definition of sex as other than binary in humans."[47] Moreover, under the NOFO, "HUD reserves the right to reduce or reject a project application" if it concludes there is any "evidence that the project has previously or currently . . . conduct[ed/s] activities that rely on or otherwise use a definition of sex other than as binary in humans."[48] Critically, these are threshold criteria, not scoring criteria. That is, any applicants who "rely on or otherwise" acknowledge the identities of transgender and gender-diverse Americans would be categorically barred from funding under the CoC program. The effect of this condition is simultaneously sweeping and vague.

137.  The December NOFO strips out this language. Nonetheless, under "Post-Award Requirements and Conditions," the NOFO provides that CoC funding recipients "must comply with . . . Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law or by a court of competent jurisdiction," including "[EO] 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government)[.]"[49]

---

[46] *See supra* note 29 at 94-96.
[47] *See supra* note 29 at 108.
[48] *See supra* note 29 at 65; *see also supra* note 29 at 55.
[49] *Supra* note 29 at 117-118.

138.    Because the Gender Ideology EO imposes obligations only on the federal government, and not on any funding recipient, it does not appear that this term imposes any obligations on Plaintiffs. Nonetheless, because the Gender Ideology EO directs agencies (including HUD) to "to end the Federal funding of gender ideology," the December NOFO at a minimum suggests that HUD will abide by the terms of the Gender Ideology Order by withholding funds from recipients who abide by HUD's longstanding Equal Access policies by providing services consistent with an individual's gender identity may find themselves ineligible for CoC funding—leaving their clients facing a loss of services or eviction.

139.    Seemingly anyone who provides shelter to transgender or non-binary individuals could flunk the Administration's test, as could any entity that conducts targeted outreach to meet the needs of transgender or gender diverse individuals. This would also potentially sweep in not only any applicant who provides (or has ever provided) shelter to transgender women in a women-only shelter, but also any applicant that asks a participant's gender identity or treats individuals consistent with their gender identity in any respect.

140.    As detailed above, this is a total reversal of HUD's prior, longstanding Equal Access policies. Moreover, as recently as last year, HUD was actively encouraging applicants to "[d]emonstrate efforts to address the needs of Lesbian, Gay, Bisexual, Transgender, and Queer . . . individuals and their families experiencing homelessness."[50] Now, any applicants who have listened to HUD and done so will apparently find themselves ineligible for CoC funding, leaving their clients facing a loss of services or eviction.

### 5.    Disability Condition

141.    Fifth, Defendants' November NOFO included a new scoring system for transitional housing and permanent supportive housing that illegally and arbitrarily disadvantaged programs that provide supportive services for mental disabilities and substance use disorder, as opposed to only physical disabilities (the "Disability Condition"). Under the November NOFO, one out of an

---

[50] *See supra* note 23 at 85.

available six points each for TH and PH-PSH projects would be awarded to projects that "serve . . . individuals with a physical disability/impairment or a developmental disability . . . not including substance abuse disorder."

142.    But the McKinney-Vento Act explicitly defines the term "homeless individual with a disability" to include an individual who "has a disability that . . . is a physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse[.]" 42 U.S.C. § 10)(A)(i)(IV). HUD's own regulations incorporate this definition of disability into its definition of "chronically homeless." 24 C.F.R. § 578.3.

143.    Although HUD excised the Disability Condition from the December NOFO, Plaintiffs' challenge to this condition and the November NOFO remains live.

*    *    *

144.    Taken together, the Challenged Conditions radically reshape the CoC Program contrary to Congress' intent and without any reasoned explanation, let alone an explanation sufficient to explain HUD's profound change in position. As a result of the Challenged Conditions, services will be cut off and tens of thousands of Americans will soon face risk of eviction back to homelessness.

145.    On November 25, 2025, Plaintiffs filed this suit challenging the November NOFO and sought a preliminary injunction. That preliminary injunction motion was subsequently converted to a motion for a temporary restraining order and set for a hearing on December 8, 2025.

146.    On December 8, less than an hour before that hearing, Defendants filed a Notice claiming that "HUD has withdrawn the 2025 NOFO in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." ECF No. 41. Defendants contended that this Notice "moot[ed]" Plaintiffs' pending request for preliminary injunctive relief. *Id.*

147.    Defendants' voluntary withdrawal of the November NOFO in an express attempt to avoid Plaintiffs' request for preliminary relief, and issuance of yet another NOFO does not render the dispute over that NOFO—including the Disability Condition—moot. *See Fed. Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (describing the voluntary cessation doctrine as

a "formidable burden" for Defendants and explaining "a defendant's voluntary cessation of a challenged practice will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur" (citation modified)); *Illinois v. Fed. Emergency Mgmt. Agency*, C.A. No. 1:25-cv-00206-WES-PAS, 2025 WL 2716277, at *6 (D.R.I. Sept. 24, 2025) ("The doctrine is designed to prevent defendants from manipulating a court's jurisdiction to evade judicial review of a challenged practice."). Defendants have not disclaimed authority to reimpose the Challenged Conditions in a revised NOFO. Instead, in its withdrawal of the November NOFO, HUD stated that "The Department still intends to exercise [its] discretion and make changes to the previously issued CoC NOFO to account for new priorities." ECF No. 41-2.

148.    In the face of the Court's preliminary injunction, Defendants doubled down on their unlawful conditions through their December NOFO. Defendants recycled nearly all of the same conditions despite litigation already challenging those conditions.

149.    Defendants' withdrawal of the November NOFO and issuance of the December NOFO—combined with Defendants' stated position before the Court that this rescission does not reinstate the previous 2024-2025 NOFO—only exacerbates the timing-related harms and deepens the risk of funding gaps from delayed renewals. And Defendants' withdrawal of the November NOFO and issuance of the December NOFO are in violation of their statutory obligations to award and renew CoC funding.

## G.    The Challenged Conditions are Unlawful

150.    All the Challenged Conditions are unlawful for numerous independent reasons. At a high level, the conditions overstep the Executive Branch's authority by attempting to use funds authorized and appropriated by Congress to instead coerce States into adhering to the current administration's policy priorities. These conditions are also contrary to law and contradict the plain language of the statute, which already details how Continuum of Care funds should be distributed, which certifications are required from applicants, and how permanent supportive housing should be funded. Instead, HUD seeks to impose conditions that are unrelated to the statute's purpose of addressing homelessness directly contrary to Congressional direction. The conditions also reflect

a sharp and unjustified change in HUD's consistent practice of applying a Housing First model, addressing the unique challenges faced by transgender and gender-diverse Americans, and funding every geographic area based on needs, rather than agreement with the local jurisdiction's policy preference.

151.    In fact, courts around the country have already repeatedly held that similar conditions on CoC funding—including similar "gender ideology" conditions—are likely unlawful. *See Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 12242, 1248-51, 1255 (W.D. Wash. 2025) (enjoining HUD from enforcing Continuum of Care funding conditions related to immigration enforcement and promotion of "gender ideology"); *see also Nat'l All. to End Homelessness v. Turner*, No. 25-cv-00447-MSM-AEM, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025) (enjoining disbursement of Continuum of Care Builds funds due to conditions that the project be located in a jurisdiction that cooperates with federal immigration enforcement and that the applicant will not deny the sex binary or promote the notion that sex is a chosen or mutable characteristic); *City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905, at *6-9 (W.D. Wash. Oct. 31, 2025) (enjoining enforcement of Gender Ideology Order against plaintiff, including with respect to Continuum of Care funding); *City & Cnty. of San Francisco v. Trump*, No. 25-cv-01350-WHO, 2025 WL 2426858, at *3-6 (N.D. Cal. Aug. 22, 2025) (enjoining Continuum of Care funding condition that related to whether the recipient "promote[s]" or "shield[s]" illegal immigration).[51]

---

[51] The December NOFO likewise contains conditions purporting to require "compliance with immigration requirements." HUD, *General Administrative, National, and Departmental Policy Requirements and Terms for HUD's Financial Assistance Programs* (April 22, 2025), https://www.hud.gov/sites/default/files/CFO/documents/Administrative-Requirements-Addendum-FY2025.pdf (capitalization omitted). These include requirements that applicants: 1) "administer [any] award in accordance with all applicable immigration restrictions and requirements, including the eligibility and verification requirements that apply under title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, as amended (8 U.S.C. 1601-1646) (PRWORA) and any applicable requirements that HUD, the Attorney General, or the U.S. Citizenship and Immigration Services may establish from time to time to comply with PRWORA, Executive Order 14218, or other Executive Orders or immigration laws"; 2) a requirement that "[n]o state or unit of general local government that receives HUD funding under [sic] may use that funding in a manner that by design or effect facilitates the subsidization or promotion of illegal immigration or abets policies that seek to shield illegal aliens from deportation"; and 3) a requirement that, "[s]ubject to the exceptions provided by PRWORA, the recipient must use SAVE, or an equivalent verification system approved by the Federal government, to prevent any Federal public benefit from being provided to an ineligible alien who entered the United

152.    Furthermore, HUD's actions in rescinding NOFOs on two separate occasions violate statutory timing requirements and amount to unreasonable delay of agency action. HUD is required to announce conditional awards "within 5 months" after the application deadline. 42 U.S.C. § 11382(c)(2)(A). Given that the FY 2024-2025 NOFO's application deadline for any new or revised applications for FY 2025 funds was in August 2025, HUD will now almost certainly miss its deadline for announcing conditional awards.

***The Imposition of the Challenged Conditions Violates the APA***

153.    The Challenged Conditions violate the APA because they are in excess of HUD's statutory authority and contrary to law. Congress has not authorized HUD to implement any of the Challenged Conditions, meaning HUD categorically lacks the power to implement them. *See* 42 U.S.C. § 11386a (outlining which "Required Criteria" must be used when awarding CoC funds); *Id*. § 11386(b)(4) (outlining which "certification[s]" are required from project sponsors). Moreover, as set forth above in detail, the Challenged Conditions violate multiple provisions of the McKinney-Vento Act and HUD's CoC regulations. For example, the Permanent Housing Cap violates statutory provisions mandating that CoC funds "shall be available" for renewals "at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations[.]" 42 U.S.C. § 11386c(b). The Cap also violates statutory provisions that specifically instruct HUD to fund permanent housing. Similarly, the Gender Ideology Condition is contrary to HUD's Equal Access rule, which provides, among other things, requiring funding recipients to provide services "to an individual in accordance with the individual's gender

---

States illegally or is otherwise unlawfully present in the United States." *Id.* Since PRWORA's enactment in 1996, programs that provide "[s]hort-term shelter or housing assistance for the homeless" have been exempt from PRWORA's verification requirements. *See* 61 Fed. Reg. 45,985 (Aug. 30, 1996). And the Administration's recent attempt to lift this exemption has been preliminarily enjoined. *See New York v. U.S. Dep't of Justice*, No. 1:25-cv-00345-MSM-PAS, 2025 WL 2618023, at *25 (D.R.I. Sept. 10, 2025) (preliminarily enjoining DOJ from rescinding its prior notice excepting "[s]hort-term shelter or housing assistance for the homeless"); *see also Martin Luther King, Jr. Cnty.*, 798 F. Supp. 3d at n.9 (preliminarily enjoining federal agencies and officials, including Defendants, from imposing an immigration status verification requirement under PRWORA because PRWORA "does not require grant recipients to verify eligibility *until* the U.S. Attorney General has promulgated regulations[,]" which the Attorney General has yet to do). Thus, to the extent Defendants intend to condition Plaintiffs' eligibility for HUD CoC funds on their agreement to verify immigration status before offering people shelter, they are enjoined from doing so. *See New York*, 2025 WL 2618023, at *25.

identity[.]" 24 C.F.R. § 5.106. And the Geographic Discrimination Conditions cannot be squared with both statutory and regulatory provisions directing HUD to fund every geographic area based on need.

154.    The Challenged Conditions are also arbitrary and capricious. The APA requires that agencies' decisions be supported by a rational connection between the choice made and the facts underlying that choice, and that agencies consider the disadvantages of their policies. It also requires that a deviation from agency policy be acknowledged and supported by a reasoned explanation or justification. *See* 5 U.S.C. § 706(2)(C). HUD's imposition of the conditions is supported by neither. In the November NOFO, HUD failed to supply any rational explanation for newly proposed conditions that were entirely unrelated to (and in some cases even inhibit) the statutory purpose of addressing homelessness. HUD's post-hoc rationalizations, offered in December, likewise fail to provide a reasoned explanation. Indeed, HUD's proposed conditions are an extreme deviation from its long history (set forth in detail above) of applying a Housing First model, recognizing an individual's gender identity, and funding geographic areas based on need, not local politics. As just one example, the Gender Ideology Condition violates HUD's own regulation which requires that CoC funding recipients ensure "Equal access" is provided to individuals in accordance with the individual's gender identity and that an individual is placed and served in accordance with their gender identity, as described above. 24 C.F.R. § 5.106. As a result, the Challenged Conditions effectively punish applicants for listening to what HUD was telling them as recently as last year. Moreover, as detailed above, the Challenged Conditions mean that contracts will be cancelled and formerly homeless individuals left, again, without stable housing. But HUD has failed to consider this problem whatsoever. On top of that, the Challenged Conditions weigh factors Congress has not authorized HUD to consider. For example, the Geographic Discrimination Conditions penalize applicants based on state and local laws related to camping, drug use, and similar things—factors that appear nowhere in the McKinney-Vento Act.

155.    The Challenged Conditions are also unlawful because HUD failed to vet them through notice-and-comment rulemaking. The APA requires agencies to follow their own binding

regulations. HUD's regulations require it to proceed by notice-and-comment rulemaking for "matters that relate to . . . grants." 24 C.F.R. § 10.1. Nonetheless, HUD promulgated the Challenged Conditions without observing the notice-and-comment procedure required by its own rules. As a result, not only has HUD implemented rules that are substantively unlawful and unreasonable, but it has left applicants scrambling to fundamentally remake their programs in the new Administration's image in only sixty days or forego federal funding. This alone is reason enough to vacate and enjoin Challenged Conditions.

156.    All Challenged Conditions also independently violate the APA because they are contrary to constitutional right, power, privilege, and/or immunity, as set forth below.

157.    Finally, the rescission of the FY 2024-2025 NOFO was both contrary to law and arbitrary and capricious because HUD is required by statute to issue a NOFO "not later than 3 months" after Congress appropriates CoC funding. 42 U.S.C. § 11382(b). At the time Congress appropriated funding for FY 2025 in March 2025, the 2024-2025 NOFO was in effect. Three months later, that NOFO remained in effect. Defendants' decision to rescind and replace that NOFO in November, eight months after Congress appropriated funds, was unlawful. And to top it all off, HUD has now suddenly withdrawn the November NOFO, adding further delay in violation of the APA. *See* 5 U.S.C. § 706 ("The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]")

### *The Imposition of the Challenged Conditions Is Unconstitutional*

158.    The Challenged Conditions are unconstitutional because they violate the Separation of Powers. An "agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). No statute gives HUD the power to impose the Challenged Conditions on CoC grants. Instead, HUD improperly seeks to condition duly appropriated funds on compliance with the President's policy agenda as expressed in his Executive Orders. But the President lacks "his own constitutional powers" to add new conditions to federal funds. *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1234 (9th Cir. 2018) (citation modified). Defendants' actions therefore usurp Congress's "power of the

purse" and violate the constitutional Separation of Powers. *Id.* at 1231. HUD identifies no statute that could plausibly be read to permit it to use billions of dollars in federal funds to force the states to require applicants to certify certain beliefs regarding gender identity, to cap funding for Housing First and permanent supportive housing at 30%, or to require states and local jurisdictions to adopt certain laws targeting the homeless. In fact, as discussed above, the statute not only does not authorize these new conditions, but it also prohibits them, such as by repeatedly providing for a Housing First approach and specifically stating what criteria should be used when awarding CoC funds.

159.    The Gender Ideology and Geographic Discrimination Conditions are also unconstitutional under the Spending Clause and the Tenth Amendment.

160.    First, federal funding conditions are illegitimate if they are unrelated to the purposes of the project to which they are attached. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987). The Gender Ideology and Geographic Discrimination fail this test, as none relate to the Continuum of Care's express statutory "purpose" "to promote community-wide commitment to the goal of ending homelessness[]"; "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[]"; "to promote access to, and effective utilization of, mainstream programs" for individuals and families experiencing homelessness; and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

161.    The Geographic Discrimination Conditions are also coercive in violation of the Spending Clause. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012). The States cannot merely move state money around to make up for the extreme loss of funds they face because of their state laws. The States need this funding, and they need it now in order for their programs to continue functioning. Yet, at grave risk to the unhoused people in their states, the States are forced to somehow get their state legislatures to implement a federal anti-homeless agenda or else forego significant federal funds that are needed to continue critical programs

37

162. Second, for these same reasons, the federal government is unconstitutionally commandeering the states into implementing federal programs against their will. *See Printz v. United States*, 521 U.S. 898, 925 (1997). If Congress wishes to upset the federal-state balance of power, as the Geographic Discrimination Conditions do, "it must make its intention to do so unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (citation modified). This must be especially so in the context of public safety, which is a quintessential state sovereign power. *See United States v. Morrison*, 529 U.S. 598, 618-19 (2000). Here, no statute even remotely confers upon HUD the power to do so, let alone a statute with a clear intent to do so.

163. Finally, when the federal government wishes to condition the receipt of federal funds, it "must do so unambiguously," *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981), such that Plaintiffs can "exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207. However, the Gender Ideology and Geographic Discrimination Conditions are ambiguous, vague, undefined, and unlimited in scope. For example, whether an applicant does or does not "conduct activities that rely on or otherwise use a definition of sex other than as binary in humans" is extremely ambiguous and vague. It is unclear whether applicants would be prohibited from receiving CoC funds by, for example, collecting information on gender identity to improve the quality of services or by merely permitting transgender, gender diverse, and/or intersex people to access their services. Likewise, whether a CoC is located in a jurisdiction that adequately "[e]nforces" prohibitions against public illicit drug use, camping, and loitering or whether a state "substantially implements and is compliant" with SORNA, among other conditions, is extremely ambiguous and vague.

## H.    The Challenged Conditions Harm the Plaintiff States and Their Residents

164. The Plaintiff States rely on CoC as a principal source of federal funding and coordination for assistance with addressing homelessness. The Challenged Conditions and the late decision to rescind and replace the FY 2024-2025 NOFO threaten to upend this intertwined system

of federal, state, and local funding, programming, and collaboration and seriously harm the Plaintiff States, their homelessness response systems, and their most vulnerable residents.

165.    Within each State, CoC regions are locally defined geographies created by community stakeholders and recognized by HUD, reflecting historical collaboration patterns. Each CoC is organized around the specific housing and service needs of the population it serves, structuring its governance, priorities, and project portfolio in response to local factors such as homelessness patterns, provider capacity, geography, and demographic characteristics.

166.    Washington, for example, is organized into several HUD-designated CoCs, including Seattle/King County (WA-500), Spokane City and County (WA-502), Tacoma/Lakewood/Pierce County (WA-503), and the Balance of State CoC (WA-501), which covers the thirty-four smaller counties in Washington. New York has 24 CoCs across the state, including the New York Balance of State CoC (NY-525) and the New York City CoC (NY-600). And Rhode Island is coterminous with the Rhode Island Statewide Continuum of Care Program (RI-500), which serves homeless individuals across the State. Each CoC has a designated Collaborative Applicant under 24 C.F.R. Part 578, responsible for communitywide planning, project ranking, and application for competitive HUD funding. Through their respective CoCs, service organizations, agencies and local governments in the Plaintiff States receive funding to support permanent supportive housing, rapid rehousing, transitional housing, and coordinated entry systems across the state.

167.    CoC funds not only supply direct federal aid, but also leverage hundreds of millions in additional public and philanthropic funds essential for operations at publicly funded housing sites. 24 C.F.R. § 578.73 requires that every CoC-funded project must provide a twenty-five percent match for all eligible costs other than leasing, and CoC grants provide the backbone of funding that is supplemented by other public and private sources. Projects with guaranteed annual CoC renewals are able to attract other sources of funding, including state Housing Trust Fund dollars, Low-Income Housing Tax Credit (LIHTC) investment, and foundation-backed

predevelopment loans. The broader impact of federal cuts is therefore much greater than the direct funding loss alone.

168.    State agencies take on various roles within their CoCs. In many Plaintiff States, state agencies operate as the Collaborative Applicant for the CoC. For example, the New York Office of Temporary and Disability Assistance serves as the Collaborative Applicant for the New York Balance of State CoC covering nine counties. The New York City Department of Social Services serves as the Collaborative Applicant for the New York City CoC. Agencies serving as the Collaborative Applicants are responsible for preparing and submitting the consolidated CoC Program application to HUD and ensuring that the application complies with all regulatory requirements under 24 C.F.R. part 578. They oversee system governance, establish required policies and procedures, and administer CoC grants on behalf of participating localities and service providers. Collaborative applicants receive direct federal funding to administer the program locally.

169.    In addition to playing a direct role in CoCs, Plaintiff States organize their own homelessness responses around the CoC program. Many Plaintiff States make substantial investments in homelessness and supportive housing that presuppose the existence of this CoC-funded capacity, using state dollars to fund acquisition or rehabilitation of housing, supplement rental assistance, expand services, or meet match requirements that pair with federal awards. As a result, state and local expenditures rely on and are intertwined with the predictable funding, data systems, and structure of the federal CoC framework, and add up to billions of investments over time based on expectations that the CoCs would continue to operate as Congress prescribed.

170.    For example, California invests millions of dollars annually through programs including the Homeless Housing, Assistance, and Prevention (HHAP) Program, Encampment Resolution Funding Program (ERF), Homekey+, the Behavioral Health Services Act (BHSA), and many other programs. As part of this system, California provides funding to local governments, public housing authorities, and non-profits for housing, emergency shelter, and supportive services

to reduce and end homelessness. California provides such funding to many CoC grantees including in projects that rely on CoC funding for continual operational cost.

171.    As another example, the New York City Department of Housing Preservation and Development uses CoC funding to anchor its own mixed-finance developments that leverage hundreds of millions of dollars in state and local capital subsidy, LIHCT, and private investment. The abrupt shift in stable CoC funding threatens to collapse decades of carefully structured financing, force already cash-strapped nonprofit providers facing exponential increases to their expenses to walk away from buildings they have operated for generations, and trigger widespread layoffs of direct service staff who have kept thousands of formerly homeless New Yorkers stably housed.

172.    The Challenged Conditions, the belated rescission of the FY 2024-2025 NOFO, and further delays in funding due to the late introduction and then withdrawal of the November NOFO and further belated introduction of the December NOFO will have significant negative impacts on the Plaintiff States, the CoCs in the States, the organizations they comprise, and the people they serve. States' investments in the real estate that houses formerly homeless individuals are threatened by the loss of expected federal funds. For example, in New York City alone, the NOFO will effectively eliminate 12% of the supportive housing stock. And the Illinois Housing Development Authority (IHDA) maintains a portfolio of affordable housing projects across the state, including fifteen permanent supportive housing sites in which IHDA has invested tens of millions of dollars. These fifteen sites operate in reliance on subsidized rental income from tenants who receive CoC rental assistance, in addition to CoC funding for operating costs and supportive services. Taking one of these buildings as an example, if each of the residents at a site with sixty-nine units were to lose their CoC rental subsidy because of the December NOFO, IHDA's community partner, which operates the site, would have to evict the residents who could no longer pay rent. IHDA's community partner would be left with three options: (1) flip the units, previously intended for the lowest-income Illinoisans who are at the highest risk of homelessness into units for higher-income, less vulnerable individuals who could afford to pay unsubsidized rent; (2) sell

the building, altogether displacing residents in need of affordable housing; or (3) search for a different funding source that could provide rental subsidies to fill sixty-nine units with individuals who are at the highest risk for homelessness. Currently, such funding does not exist.

173. Plaintiff States often make loans to operators of permanent supporting housing projects, and the Challenged Conditions threaten the repayment of those loans. For example, Oregon Housing and Community Services, the state agency that finances affordable housing, provides millions of dollars in state loans (via general obligation bond proceeds authorized by Article XI-Q of the Oregon Constitution, which requires the State to maintain an operating or ownership interest in any capital investments) to permanent supportive housing projects across the state. OHCS's decision to make these loans is based in part on whether projects leverage federal CoC funding for PSH rental assistance and services. If the Challenged Conditions cause those funds to dry up, Oregon's investments in outreach, shelter, rehousing, and homelessness prevention will be harmed and its loans less likely to be repaid.

174. Many of the harms flowing from the Challenged Conditions and funding delays are particularly acute for the more rural BoS CoCs given that their resources are spread across large, mostly rural geographic areas with limited infrastructure and institutional support relative to other CoCs. Many BoS providers operate permanent supportive housing programs with long-term lease commitments and service staffing models that depend on stable annual HUD renewals. These organizations will face unfunded rental obligations, service contracts, and personnel costs. Because providers in the BoS serve rural counties with limited local revenue or philanthropic support, they have little capacity to replace lost federal dollars.

175. The Challenged Conditions and funding delays also threaten to disrupt program structures that Collaborative Applicants and local partners built over years in alignment with HUD's prior emphasis on permanent supportive housing and Housing First approaches. For instance, Washington's statutory homelessness planning system (including Commerce's responsibilities under Wash. Rev. Code § 43.185C.045) relies on a predictable pipeline of federally supported permanent housing. If the Challenged Conditions take effect, or funding delays persist,

existing coordinated-entry policies, performance measures, and regional housing plans that were made in reliance on previously available federal resources will be thrown into disarray.

176.    As another example, the New York Balance of State CoC has spent years developing stakeholder interest, landlord relationships, and developing real permanent housing solutions for homeless individuals in accordance with long-standing Federal priorities. Prioritizing transitional housing over permanent housing will erode housing stability for current households in the program, likely resulting in households once again experiencing homelessness.

177.    Providers that developed permanent supportive housing capacity based on prior federal guidance, through multi-year leasing arrangements, case-management teams, and supportive-services partnerships, would face expensive operational adjustments and, in some areas, the contraction or closure of housing programs.

178.    The timing of the new NOFO has already created chaos in CoCs in Plaintiff States and across the country. Historically, HUD has given CoCs at least one year of notice of shifting priorities that allow time to adopt and implement. HUD's failure to give any notice of the drastic changes in priorities for CoC makes it nearly impossible to implement the programmatic changes needed before January 28, 2026—the deadline to apply to the December NOFO. Accordingly, CoCs in the Plaintiff States risk being unable to apply for funding at all. Collaborative Applicants, including Plaintiff State agencies, will be forced to devote untold staffing hours and costs to effectuate the changes needed to comply with the terms of the NOFO. The game of whack-a-mole HUD plays in introducing, withdrawing, and introducing new 2025 NOFOs only makes this worse, as CoC funds continue to rapidly dwindle and will begin to be exhausted as early as the end of January 2026.

179.    Further, the substantive changes in the December NOFO require more effort to address than prior NOFOs. The BoS CoC process for navigating annual NOFOs, described above, is structured under the reasonable expectation that NOFOs released by HUD align with HUD's own five-year strategic plan and will be relatively consistent year-to-year. For example, HUD's current strategic plan for FY 2022-2026 emphasizes that HUD will "implement a Housing First

approach to reducing homelessness." Forcing CoCs and their partners to fundamentally restructure their programs will lead to significantly increased burden for Plaintiff State agencies involved in the CoC process.

180.    Even where Plaintiff State agencies do not play a formal role in CoCs, the impact of the Challenged Conditions and funding delays will harm States by leading to statewide increases in homelessness. Any such increase in homelessness could in turn impact other state-run programs, forcing Plaintiff States to divert funds from other state resources to fund emergency shelters and other critical services for residents who will no longer have access to permanent housing.

181.    The reduction in permanent supportive housing capacity would shift significant costs to other public services in the Plaintiff States. Individuals with complex behavioral-health needs who previously stabilized in permanent supportive housing will experience increased housing instability and higher rates of crisis service use. For example, all participants in the New York City CoC struggle with disabilities, HIV/AIDS, mental health, substance abuse issues, family trauma, and/or other challenges. This escalation places new burdens on emergency medical systems, state- and federally funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs serving unhoused families. Rural counties in the BoS CoC—already operating with limited behavioral-health and emergency-response infrastructure— will see disproportionate impacts and increased need for state funds. As a result, the challenged conditions will not only destabilize existing housing programs but will also increase expenditures and operational pressures across multiple state and local agencies within the Plaintiff States.

182.    An increase in homelessness would also have significant fiscal impacts to Plaintiff States' health systems. Individuals enrolled in permanent supportive housing programs have significantly lower health care costs, including lower needs for inpatient and emergency department services.[52]

---

[52] *See* Blue Cross Blue Shield of Mass. Foundation, *Study: Supportive Housing Programs for Chronically Homeless Lower Health Care Costs* (Dec. 22, 2020), https://www.bluecrossmafoundation.org/about-us/news-updates/study-supportive-housing-programs-chronically-homeless-lower-health-care; Nat'l Low Income Housing

183.    Creating and prolonging homelessness among families with school-aged children has additional consequences for State-funded public education. Children who experience homelessness are more likely to struggle in school and to require additional supportive services, many of which are paid for in part with State funds, which will further increase the harm to the Plaintiff States.

184.    Plaintiffs face irreparable harm with the dilemma of either acceding to the unlawful Challenged Conditions or forgoing millions in critical CoC funding. Even if providers were to accede to the Challenged Conditions (which themselves slash the amount of available funding), these Challenged Conditions directly contradict other federal funding conditions that providers must follow. For example, projects that receive housing grants under VAWA or FVPSA are prohibited from requiring beneficiaries to participate in supportive services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). Therefore, these providers are now faced with the impossible choice of whether to greatly disadvantage their CoC applications under the December NOFO— which favors applicants who require participation in supportive services—or forego critical funding under VAWA and FVPSA.

185.    In sum, the NOFO's Challenged Conditions and its breakneck implementation timeline threaten to destabilize established housing portfolios, disrupt long-term contractual and financial commitments, and force CoCs into rapid restructuring that could undermine the continuity and effectiveness of their homelessness response systems, all with potentially severe and wide-ranging negative consequences for the Plaintiff States.

---

Coalition, *New Research Provides Stronger Evidence that Housing First Leads to Health Care Savings* (Jan. 16, 2024), https://nlihc.org/resource/new-research-provides-stronger-evidence-housing-first-leads-health-care-savings?utm_source.

## V.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violation of the Administrative Procedure Act–In Excess of Statutory Authority/Contrary to Law**

186.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

187.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" 5 U.S.C. §706(2)(C), or "otherwise not in accordance with law[,]" *id.* §706(2)(A).

188.    In reviewing agency action, a court cannot accept "the agency's policy judgments . . . if they conflict with the policy judgments that undergird the statutory scheme." *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *see Brown & Williamson Tobacco Corp. v. FDA*, 153 F.3d 155, 176 (4th Cir. 1998), *aff'd*, 529 U.S. 120 (2000) (explaining that "federal agencies" cannot "substitute their policy judgments for those of Congress[]").

189.    Defendants lack the statutory authority to impose the Challenged Conditions. No provision of HUD's authorizing statutes authorizes the agency to impose these terms, nor do the statutes specifically authorizing the CoC Program.

190.    In imposing the Challenged Conditions, Defendants exceeded the statutory authority granted to HUD by Congress. The Challenged Conditions therefore must be set aside under the APA.

191.    The Challenged Conditions are also contrary to statute and regulation in several respects.

192.    Congress has directed that funds made available under the CoC Program "shall be available" to renew contracts "at the discretion of the applicant or project sponsor[,]" so long as "there is a demonstrated need for the project[] and . . . the project complies with program requirements and appropriate standards of housing quality and habitability[.]" 42 U.S.C.

§ 11386c(b). The Permanent Housing Cap and Tier 1 Cap, however, make funds categorically unavailable for the vast majority of projects otherwise subject to renewal.

193.    Further, the McKinney-Vento Act includes "[r]equired [c]riteria" for HUD to evaluate in awarding grants, including "the extent to which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," which by statute includes strategies "proven to be effective at reducing homelessness" like "permanent supportive housing" and "rapid rehousing[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv), 11386b(d)(2). Both the Permanent Housing Cap and the Service Requirement Conditions contradict these clear statutory commands.

194.    The McKinney-Vento Act also specifies what information HUD should require project sponsors to certify in order to receive CoC funding, such as "certification from all project sponsors" regarding the confidentiality of certain records, certain privacy terms, and more. *Id.* § 11386(b)(4). Therefore, the McKinney-Vento Act has already instructed HUD what information project sponsors should certify to receive funding.

195.    And, contrary to HUD's illegal preference for programs that support homeless individuals with physical disabilities only, the McKinney-Vento Act specifically instructs HUD to consider mental and substance-abuse-derived disabilities as well. 42 U.S.C. § 11360(10)(A)(i)(IV).

196.    The Geographic Discrimination Conditions plainly contravene both statutory provisions and HUD regulations requiring HUD to distribute CoC funding to every geographic area based on need—without regard to whether some local jurisdictions have particular laws or enforcement priorities. By limiting funding based on local jurisdictions' alignment (or not) with the Trump Administration's policy preferences, the Geographic Discrimination Conditions are contrary to law.

197.    And the Gender Ideology Condition, for its part, flouts HUD's own regulations. The Equal Access regulation requires CoC funding recipients to provide services and accommodations in accordance with an individual's gender identity. 24 C.F.R. § 5.106. But the Gender Ideology Condition would forbid providers from doing just that.

198.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Challenged Conditions violate the APA.

199.    Plaintiff States are also entitled to vacatur of the Challenged Conditions pursuant to 5 U.S.C. § 706, a stay of the Challenged Conditions pursuant to 5 U.S.C. § 705, and a preliminary and permanent injunction preventing the Challenged Conditions' implementation.

## SECOND CAUSE OF ACTION
### Violation of the Administrative Procedure Act–Arbitrary and Capricious Agency Action

200.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

201.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

202.    An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted).

203.    That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019). Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id.*

204.    An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 25 (2020) (citation omitted); *see also id.* at 30. An agency must "pay[] attention to the advantages and the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015)

48

205.    In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the 'alternatives' that are within the ambit of the existing policy[,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33.

206.    The Challenged Conditions are arbitrary and capricious because these Defendants failed to provide a reasoned basis or explanation, and their stated reasoning is conclusory, particularly in light of Defendants' changed positions.

207.    For decades now, HUD has promoted a Housing First approach, urging applicants to invest in permanent housing, including permanent supportive housing and rapid rehousing. So too, HUD has incentivized applicants to address the particular needs of transgender and gender-diverse individuals and their families. But now, without explaining why, Defendants have completely reversed their position, with the apparent result that a huge number of projects—and perhaps the majority of projects eligible for renewal—will now be terminated, and program participants left without services or housing.

208.    These Challenged Conditions are also arbitrary and capricious because the Defendants failed to consider the consequences of their actions, including the disadvantages of their decisions.

209.    For years, Continuums, applicants, and services providers developed their programs along the lines that HUD repeatedly urged them. Now, suddenly, these entities will be forced to fundamentally reshape their programs in only the two months Defendants have given to respond to the NOFO—or forego this critical funding. Many programs are likely to lose out on funding, with their clients bearing the worst of it. But the December NOFO spares not a single word about the challenges or disadvantages of adopting these new funding conditions with little warning.

210.    By the same token, these Challenged Conditions are arbitrary and capricious because they fail to take into account important reliance interests.

211.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Challenged Conditions violate the APA.

212.    Plaintiff States are also entitled to vacatur of the Challenged Conditions pursuant to 5 U.S.C. § 706, a stay of the Challenged Conditions pursuant to 5 U.S.C. § 705, and a preliminary and permanent injunction preventing the Challenged Conditions' implementation.

### THIRD CAUSE OF ACTION
### Violation of the Administrative Procedure Act–Procedural Violation

213.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

214.    The APA requires courts to "hold unlawful and set aside agency action[]" found to be "without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D). This includes agency actions that are contrary to an agency's own regulations.

215.    HUD's regulations require it to proceed by notice-and-comment rulemaking for "matters that relate to . . . grants." 24 C.F.R. § 10.1. Although certain exceptions are listed, there is no exception for substantive rules. *Id*.

216.    Nonetheless, HUD promulgated the Challenged Conditions without observing the notice-and-comment procedure required by its own rules.

217.    The Challenged Conditions fundamentally change eligibility requirements for federally funded programs providing services to millions of residents of Plaintiff States, by purporting to condition funding—in whole or in part—on state and local jurisdictions' adherence to the Administration's new policy preferences and by severely capping funding that has been and should be directed to permanent housing.

218.    Because the Challenged Conditions are substantive rules for which Defendants failed to undergo the notice-and-comment procedure, they are invalid.

219.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the Challenged Conditions violate the APA.

220.    Plaintiff States are also entitled to vacatur of the Challenged Conditions pursuant to 5 U.S.C. § 706, a stay of the Challenged Conditions pursuant to 5 U.S.C. § 705, and a preliminary and permanent injunction preventing the Challenged Conditions' implementation.

## FOURTH CAUSE OF ACTION
### *Ultra Vires* Agency Action

221.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

222.    An executive agency "has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n*, 476 U.S. at 374.

223.    Defendants may exercise only that authority which is conferred by statute. *See City of Arlington v. FCC*, 569 U.S. 290, 297 (2013) (federal agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, no less than when they act beyond their jurisdiction, what they do is ultra vires[]").

224.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015). Indeed, the Supreme Court has repeatedly allowed equitable relief against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

225.    Defendants lack the statutory authority to impose the Challenged Conditions. No provision of HUD's authorizing statutes authorizes the agency to impose these terms, and the statutes authorizing Defendants to administer specific grant programs also preclude their imposition.

226.    Plaintiff States are entitled to a declaration that the Challenged Conditions constitute ultra vires agency action.

227.    Plaintiff States are also entitled to a preliminary and permanent injunction preventing the Challenged Conditions' implementation.

## FIFTH CAUSE OF ACTION
### Separation of Powers

228.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

229.    The Constitution vests Congress with the spending power, not the President. U.S. Const. art. I § 8, cl. 1.

230.    The Constitution vests Congress with the authority to condition spending, not the President. U.S. Const. art. I § 8, cl. 1.

231.    The Constitution vests Congress with the appropriation power, not the President. U.S. Const. art. I § 9, cl. 7.

232.    The Constitution provides "a single, finely wrought and exhaustively considered, procedure[]" through which "the legislative power of the Federal government [may] be exercised[,]" *I.N.S. v. Chadha*, 462 U.S. 919, 951 (1983), namely, through majority votes of both chambers of Congress and the signature of the President. U.S. Const. art. I § 7.

233.    None of the Challenged Conditions have been imposed by Congress. In fact, as detailed above, the Challenged Conditions violate federal law in several respects.

234.    And no provision of the Constitution authorizes the Executive Branch to enact, amend, or repeal statutes, including appropriations approved and signed into law. The President cannot directly and unilaterally amend or cancel appropriations Congress has duly enacted, nor can he order federal agencies to do so.

235.    The Challenged Conditions effect an unconstitutional usurpation of the spending power of Congress, an unconstitutional effort to amend Congressional appropriations by attaching conditions not contemplated by Congress, a nullification of duly enacted federal statutes, and a violation of the separation of powers. *See San Francisco*, 897 F.3d at 1245; *City of Providence v. Barr*, 954 F.3d 23, 39 (1st Cir. 2020).

236.    Plaintiff States are entitled to a declaration that the Challenged Conditions violate the Separation of Powers.

237.    Plaintiff States are also entitled to a preliminary and permanent injunction preventing the Challenged Conditions' implementation.

## SIXTH CAUSE OF ACTION
### Violation of the Spending Clause of the U.S. Constitution

238.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

239.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-327.

240.    The Constitution vests the spending power in Congress, not the President or any executive agency. U.S. Const. art. I § 8, cl. 1.

241.    Congress has not delegated the authority to Defendants to impose the Gender Ideology and Geographic Discrimination Conditions.

242.    Even if Congress had delegated the authority to Defendants to impose the Gender Ideology and Geographic Discrimination Conditions, the U.S. Constitution prohibits imposing conditions on federal grant programs that are wholly unrelated to the purpose of the programs. *Dole*, 483 U.S. at 207-08. The U.S. Constitution also permits only unambiguous federal funding conditions. *Id.* at 207. These limits "ensur[e] that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system[,]" *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 577 (2012), as embodied in the Tenth Amendment.

243.    The Gender Ideology and Geographic Discrimination Conditions are not related to the federal interest in the projects to which they are attached—namely, Congress's commitment to house and provide services for Americans experiencing homelessness. *See Dole*, 483 U.S. at 207-08.

244.    Finally, the Gender Ideology Condition—and specifically, the requirements that funding recipients not "rely on or otherwise use a definition of sex other than as binary in

humans"—is impermissibly vague. *See Pennhurst*, 451 U.S. at 17. Likewise, the Geographic Discrimination Conditions are impermissibly vague.

245.    Further, the Geographic Discrimination Conditions are coercive in violation of the Spending Clause. *Nat'l Fed'n of Indep. Bus.*, 567 U.S. at 581. The States cannot merely move state money around to make up for the extreme loss of funds they face because of their state laws. The States need this funding, and they need it in the ordinary course, for their programs to continue functioning. Due to these Conditions, the States are forced to somehow get their state legislatures to implement a federal anti-homeless agenda or else forego significant federal funds that are needed to continue critical programs.

246.    Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 327. Plaintiff States are "entitled to invoke the equitable jurisdiction to restrain enforcement[]" of unconstitutional acts by federal officials, including "executive orders." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 414 (1935).

247.    As a direct and proximate result of Defendants' action, Plaintiffs will be required either to accept the unlawful and unconstitutional Gender Ideology Condition and Geographic Discrimination Conditions or forego receiving grant funds that are necessary to support critical homeless services in Plaintiff States.

248.    Plaintiff States are entitled to a declaration that the Gender Ideology Condition and Geographic Discrimination Conditions violate the Spending Clause of the U.S. Constitution.

249.    Plaintiff States are also entitled to a preliminary and permanent injunction preventing the Gender Ideology Condition and Geographic Discrimination Conditions' implementation.

**SEVENTH CAUSE OF ACTION**
**Violation of Tenth Amendment of the U.S. Constitution**

250.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

251.    The Tenth Amendment provides that "[t]he Powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

252.    The Amendment forbids the federal government from commandeering the states to enact or enforce federal laws or regulatory programs against their will. *Printz*, 521 U.S. at 925. Yet, the Geographic Discrimination Conditions attempt to do exactly that by requiring states to implement numerous policies favored by the Administration against their will, in order obtain federal funds.

253.    The coercion the States face is significant. The States cannot merely move state money around to make up for the extreme loss of funds they face because of their state laws. The States need this funding, and they need it on schedule, in order for their programs to continue functioning. The States are forced to somehow get their state legislatures to implement the Administration's federal anti-homeless agenda (if that is even possible) or else forego significant federal funds that are needed to continue critical programs.

254.    "[I]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute." *Gregory*, 501 U.S. at 460 (internal quotation omitted; alteration in original). This is especially so in the context of public safety, which is a quintessential state sovereign power. *See Morrison*, 529 U.S. at 618-19. Here, HUD purports to upset that balance by strongarming Plaintiffs into passing and/or heavily enforcing criminal anti-vagrancy laws favored by the Administration, but there is no statute empowering HUD to do so, and certainly none that is "unmistakably clear."

255.    Plaintiff States are entitled to a declaration that the Geographic Discrimination Conditions violate the Tenth Amendment of the U.S. Constitution.

256.    Plaintiff States are also entitled to a preliminary and permanent injunction preventing the Geographic Discrimination Conditions' implementation.

## EIGHTH CAUSE OF ACTION
**Violation of Administrative Procedure Act–Agency Action Contrary to Constitutional Right**

257.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

258.    The APA requires that a court set aside agency action that is "contrary to constitutional right, power, privilege, or immunity[.]" 5 U.S.C. § 706(2)(B).

259.    The Challenged Conditions violate the Separation of Powers, Spending Clause, and Tenth Amendment for the reasons set out above.

260.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that Defendants lack authority to impose the Challenged Conditions, and a permanent injunction preventing the Defendants from putting those conditions into effect.

## NINTH CAUSE OF ACTION
**Violation of the Administrative Procedure Act–Contrary to Law–Delay**

261.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

262.    The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[,]" 5 U.S.C. § 706(2)(C), or "otherwise not in accordance with law[,]" *id.* § 706(2)(A).

263.    Congress has directed that Defendants "shall release a notification of funding availability for grants awarded under [CoC] for a fiscal year not later than 3 months after the date of the enactment of the appropriate Act making appropriations for the Department of Housing and Urban Development for such fiscal year." 42 U.S.C. § 11382(b).

264.    Congress appropriated FY 2025 funding for CoC on March 15, 2025. At that time, the 2024-2025 NOFO was in effect. Three months later, that NOFO remained in effect. Defendants

thus lacked the authority to rescind and replace that NOFO in November, eight months after Congress appropriated funds.

265.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the recission of the FY 2024-2025 NOFO violated the APA.

266.    Plaintiff States are also entitled to vacatur of the December NOFO pursuant to 5 U.S.C. § 706, a stay of the Challenged Conditions pursuant to 5 U.S.C. § 705, and a preliminary and permanent injunction preventing Defendants from implementing the December NOFO or any subsequent NOFO covering FY 2025.

**TENTH CAUSE OF ACTION**
**Violation of the Administrative Procedure Act–Arbitrary and Capricious Agency Action–Delay**

267.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

268.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

269.    Defendants' action in rescinding the FY 2024-2025 NOFO nearly five months after the statutory deadline for doing so is arbitrary and capricious in multiple respects. Defendants entirely failed to explain this late rescission. They failed to consider how this late rescission would create funding gaps, resulting in service disruption, up to and including eviction for individuals living in CoC-funded housing. And they failed to account for applicants' reasonable reliance on the FY 2024-2025 NOFO.

270.    Defendants' withdrawal of the November NOFO issuance of yet another, even later December NOFO further punctuates how their actions are arbitrary and capricious.

271.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff States are entitled to a declaration that the rescission of the FY 2024-2025 NOFO violated the APA.

272.    Plaintiff States are also entitled to vacatur of the December NOFO pursuant to 5 U.S.C. § 706, a stay of the Challenged Conditions pursuant to 5 U.S.C. § 705, and a preliminary

and permanent injunction preventing Defendants from implementing the December NOFO or any subsequent NOFO covering FY 2025.

## ELEVENTH CAUSE OF ACTION
### Violation of the Administrative Procedure Act–Unlawful Withholding and/or Unreasonable Delay of Agency Action

273.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

274.    The APA authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted); *see id.* at 63 n.1.

275.    By statute, Defendants are required to issue a NOFO as part of a national CoC competition. *See* 42 U.S.C. § 11386a(a) ("The Secretary shall award funds to recipients through a national competition between geographic areas based on criteria established by the Secretary."); 42 U.S.C. § 11382(b) ("The Secretary shall release a [NOFO] for grants awarded under this part for a fiscal year not later than 3 months after" an appropriations act.).

276.    Moreover, as detailed above, Defendants "shall" make funding "available for the renewal of contracts . . . at the discretion of the applicant or project sponsor and subject to the availability of annual appropriation," and "[t]he Secretary shall determine whether to renew a contract . . . on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability[.]" 42 U.S.C. § 11386c(b).

277.    Defendants have unreasonably delayed in undertaking these required tasks. Indeed, by suddenly withdrawing the November NOFO as late as December 8, 2025 and issuing an even later NOFO in the face of a preliminary injunction on December 19—mere weeks before projects in the Plaintiff States are facing renewal deadlines—Defendants are making these delays worse.

278.    For the foregoing reasons, Plaintiffs are entitled to an order, and to a preliminary and permanent injunction, compelling Defendants to undertake these unreasonably delayed actions.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare that the Challenged Conditions are contrary to the Constitution and laws of the United States;

b.    Pursuant to 5 U.S.C. § 706(2), enter an order holding unlawful and setting aside the December NOFO and reinstating the FY 2024-2025 NOFO;

c.    Pursuant to 5 U.S.C. § 706(2), enter an order holding unlawful and setting aside the Challenged Conditions;

d.    Pursuant to 5 U.S.C. § 705, enter an order staying the December NOFO;

e.    Pursuant to 5 U.S.C. § 705, enter an order staying the Challenged Conditions;

f.    Pursuant to 5 U.S.C. § 705, enter an order staying the rescission of the FY 2024-2025 NOFO;

g.    Temporarily restrain and enjoin Defendants from implementing the December NOFO and ordering Defendants to reinstate the FY 2024-2025 NOFO;

h.    Temporarily restrain and enjoin Defendants from implementing or enforcing the Challenged Conditions;

i.    Preliminarily and permanently enjoin Defendants from implementing the December NOFO and ordering Defendants to reinstate the FY 2024-2025 NOFO;

j.    Preliminarily and permanently enjoin Defendants from implementing or enforcing the Challenged Conditions;

k.    Enter a preliminary and permanent injunction compelling Defendants to process renewals in accordance with 42 U.S.C. § 11386c;

l.    Award Plaintiffs their costs and reasonable attorney's fees; and

m.    Award such additional relief as the interests of justice may require.

DATED this 14th day of January 2026.

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ZANE MULLER*
ALIANA KNOEPFLER*
ANDREA ALEGRETT*
Assistant Attorneys General
CRISTINA SEPÉ*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Zane.Muller@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Andrea.Alegrett@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
VICTORIA OCHOA*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov

*Counsel for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for Plaintiff State of California*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov

*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov

*Attorneys for Plaintiff District of Columbia*

**KATHLEEN JENNINGS**
Attorney General of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov
Laurac.Tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor
ex rel. Andy Beshear, in His Official Capacity as
Governor of the Commonwealth of Kentucky*


**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*


**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ James C. Luh
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6411
Jluh@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ Michelle Pascucci
KATHERINE DIRKS*
 Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
ESME CARAMELLO
Director, Housing Affordability Unit
AARON DULLES*
LAUREN YAMAGUCHI*
Assistant Attorneys General
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

/s/ Brian S. Carter
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.carter@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

/s/ Daniel Resler
DANIEL RESLER*
Deputy Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

/s/ Anjana Samant
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
Asamant@nmdoj.gov

*Attorneys for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of Oregon

/s/ Scott P. Kennedy
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

/s/ Jacob B. Boyer
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
Jacobboyer@pa.gov
717-460-6786

*Attorney for Plaintiff Governor Josh Shapiro, in His Official Capacity as Governor of the Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

/s/ Jonathan T. Rose
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov

*Attorney for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

/s/ Faye B. Hipsman
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*