# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF WASHINGTON, et al.,

                              Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, et al.,

                              Defendants.

C.A. No. 1:25-cv-00626-MSM-AEM

**PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.         INTRODUCTION .................................................................................. 1

II.       BACKGROUND ................................................................................... 4

      A.     Congress Created the Continuum of Care Program
to Address the Unprecedented Crisis of
Homelessness by Funding Housing Solutions ....................................... 4

      B.     Through the CoC Program, HUD Has Consistently
Promoted Permanent Housing as Part of a
Housing First Approach to Reducing Homelessness ............................... 7

      C.     Through the CoC Program, HUD Has Sought to
Address the Needs of the Diverse Population it Serves......................... 11

      D.     The Trump Administration Reverses
HUD's Decades-Long Policy of Housing First .................................... 13

      E.     The Administration Takes Actions to
Target So-Called "Gender Ideology"................................................. 14

      F.     HUD Upends the CoC Program by
Issuing a New Fiscal Year 2025 NOFO ............................................ 15

      G.     Defendants Issue Yet Another New NOFO that
Includes Unlawful Conditions and Policies
Concerning Permanent Supportive
Housing, Gender Identity, Public Safety, and Funding Amounts....................... 17

            1.  Ending Housing First ............................................................17

            2.  Tier 1 Cap .........................................................................21

            3.  Gender Ideology Conditions ..................................................21

            4.  Geographic Discrimination Conditions ......................................22

      H.     Plaintiff States Rely on Federal
CoC Funding to Address Homelessness ............................................ 24

III.      ARGUMENT ...................................................................................... 28

      A.     Legal Standard ................................................................................... 28

B.     HUD's Rescission of the FY 2024–2025 NOFO and Issuance of the December NOFO are Final Agency Actions ....................... 28

C.     HUD's Untimely Rescission of the FY 2024–2025 NOFO Was Unlawful ................................................................. 30

    1.  HUD's untimely rescission was contrary to statute ........................................30

    2.  HUD's untimely rescission was arbitrary and capricious ...............................33

D.     The December NOFO is Unlawful ....................................................... 36

    1.  The challenged conditions were adopted without notice-and-comment ..........36

    2.  The challenged conditions are contrary to law ................................................38

        a.    HUD lacked authority to implement its own conditions on congressionallyauthorized funding ............ 38

        b.    The Challenged Conditions violate the McKinney-Vento Act and HUD statutes and regulations in multiple respects ................ 40

    3.  HUD's adoption of the challenged conditions is arbitrary and capricious ......45

        a.    Defendants failed to consider the impacts of the Challenged Conditions on individuals who are likely to lose their housing ...................... 46

        b.    After initially refusing to provide any explanation for the Challenged Conditions, Defendants subsequently adopted post hoc rationalizations that fail to justify the Challenged Conditions ...................................... 47

        c.    Defendants relied on factors Congress did not intend them to consider .................................... 57

        d.    Defendants failed to consider reliance interests ........................... 58

    4.  The Challenged Conditions Violate Separation of Powers ............................61

E.     Plaintiffs are Entitled to Summary Judgment on their § 706(1) Claim ............... 63

F.     Plaintiffs are Entitled to the Full Suite of APA and Injunctive Relief ................. 68

    1.  The Court should vacate and set aside the unlawful rescission of the FY 2024-2025 NOFO ...........................................68

2.  The Court should vacate and set aside
    the December NOFO, including the Challenged Conditions..........................69

3.  The Court should enjoin Defendants
    from implementing the Challenged Conditions...............................................69

4.  The Court should enter an injunction that
    requires Defendants to process renewal applications
    and conduct the CoC competition under
    the terms of the FY 2024–2025 NOFO..........................................................74

IV.    CONCLUSION.................................................................................................. 75

# TABLE OF AUTHORITIES

## Cases

*AFL-CIO v. Chao*,
  496 F. Supp. 2d 76 (D.D.C. 2007) ............................................................................ 69

*Am. Acad. of Pediatrics v. U.S. Food & Drug Admin.*,
  330 F. Supp. 3d 657 (D. Mass. 2018) .......................................................... 64, 65, 67

*Am. Hosp. Ass'n v. Kennedy*,
  No. 2:25-CV-00600-LEW,
  2025 WL 3754193 (D. Me. Dec. 29, 2025) ............................................................. 61

*Bennett v. Spear*,
  520 U.S. 154 (1997) .................................................................................................. 28

*Bos. Redevelopment Auth. v. Nat'l Park Serv.*,
  838 F.3d 42 (1st Cir. 2016) ...................................................................................... 28

*Boston Bit Labs, Inc. v. Baker*,
  11 F.4th 3 (1st Cir. 2021) ......................................................................................... 43

*Brock v. Pierce County*,
  476 U.S. 253 (1986) ...................................................................................... 30, 31, 32

*Brown v. Ent. Merch. Ass'n*,
  564 U.S. 786 (2011) .................................................................................................. 50

*Castañeda v. Souza*,
  810 F.3d 15 (1st Cir. 2015) ...................................................................................... 31

*City and Cnty. of San Francisco v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ............................................................................ 61, 62

*City of Arlington v. FCC*,
  569 U.S. 290 (2013) .................................................................................................. 38

*City of Providence v. Barr*,
  385 F. Supp. 3d 160 (D.R.I. 2019) ...................................................................... 64, 66

*City of Providence v. Barr*,
  954 F.3d 23 (1st Cir. 2020) .......................................................................... 38, 39, 62

*City of Seattle v. Trump,*
  No. 2:25-cv-01435-BJR,
  2025 WL 3041905,
  (W.D. Wash. Oct. 31, 2025)...................................................................................... 39, 41

*Clinton v. City of New York,*
  524 U.S. 417 (1998) ................................................................................................ 39, 62

*Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.,*
  802 F.3d 413 (2d Cir. 2015) ........................................................................................ 44

*Comm. For Fairness v. Kemp,*
  791 F. Supp. 888 (D.D.C. 1992) ................................................................................. 37

*Connectu LLC v. Zuckerberg,*
  522 F.3d 82 (1st Cir. 2008) ......................................................................................... 43

*Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.,*
  603 U.S. 799 (2024) ..................................................................................................... 68

*Cox v. City of Bos.,*
  734 F. Supp. 3d 173 (D. Mass. 2024) .......................................................................... 53

*Cummings v. Premier Rehab Keller,*
  *PLLC,* 596 U.S. 212 (2022)........................................................................................ 38

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019) ..................................................................................................... 45

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ................................................................................................. passim

*Doe v. Noem,*
  778 F. Supp. 3d 1151 (W.D. Wash. 2025) ................................................................... 43

*eBay Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006) ..................................................................................................... 69

*Env't Def. Fund v. FERC,*
  2 F.4th 953 (D.C. Cir. 2021) ....................................................................................... 68

*FBI v. Fikre,*
  601 U.S. 234 (2024) ..................................................................................................... 43

*FCC v. Fox Television Stations, Inc.,*
  *556 U.S. 502 (2009)* ............................................................................................. 36, 40

*Fed. Commc'ns Comm'n v. Prometheus Radio Project,*
    592 U.S. 414 (2021) .................................................................................. 33, 45

*Gent v. CUNA Mut. Ins. Soc'y,*
    611 F.3d 79 (1st Cir. 2010) ............................................................................ 53

*Genuine Parts Co. v. E.P.A.,*
    890 F.3d 304 (D.C. Cir. 2018) ...................................................................... 53

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989) ...................................................................... 68

*Healey v. Spencer,*
    765 F.3d 65  (1st Cir. 2014) .......................................................................... 69

*Hous. Auth. of San Francisco v. Turner,*
    No. 4:25-cv-08859-JST,
    2025 WL 3187761,
    (N.D. Cal. Nov. 14, 2025) ............................................................................ 29

*Illinois v. Fed. Emergency Mgmt. Agency,*
    No. 1:25-cv-00206-WES-PAS,
    2025 WL 2716277
    (D.R.I. Sept. 24, 2025) ...................................................................... 30, 68, 69

*Illinois v. Noem,*
    No. 1:25-cv-00495-MSM-PAS,
    2025 WL 3707011
    (D.R.I. Dec. 22, 2025) .................................................................................. 68

*In re Core Commc'ns, Inc.,*
    531 F.3d 849, (D.C. Cir. 2008) .................................................................... 65

*Int'l Org. of Masters v. NLRB,*
    61 F.4th 169 (D.C. Cir. 2023) ...................................................................... 61

*Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.,*
    407 F.3d 1250 (D.C. Cir. 2005) .................................................................... 37

*Jewell v. United States,*
    749 F.3d 1295 (10th Cir. 2014) .................................................................... 31

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) ...................................................................................... 38

*Little Sisters of the Poor v. Pennsylvania,*
    591 U.S. 657 (2020) ...................................................................................... 58

*Littlefield v. U.S. Dep't of the Interior,*
   85 F.4th 635 (1st Cir. 2023) ................................................................ 28

*Loper Bright Enters. v. Raimondo,*
   603 U.S. 369 (2024) ......................................................................... 40

*Maine v. Thomas,*
   874 F.2d 883 (1st Cir. 1989) ............................................................... 43

*Martin Luther King, Jr. Cnty. v. Turner,*
   785 F. Supp. 3d 863 (W.D. Wash. 2025) ......................................... 39, 57

*Martin Luther King, Jr. Cnty. v. Turner,*
   798 F. Supp. 3d 1224 (W.D. Wash. 2025) ................................. 44, 48, 71

*McCuin v. Sec'y of Health & Hum. Servs.,*
   817 F.2d 161 (1st Cir. 1987) ............................................................... 42

*Melone v. Coit,*
   100 F.4th 21 (1st Cir. 2024) ............................................................... 48

*Michigan v. E.P.A.,*
   576 U.S. 743 (2015) ......................................................................... 46

*Modesto Irr. Dist. v. Gutierrez,*
   619 F.3d 1024 (9th Cir. 2010) ............................................................ 57

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
   463 U.S. 29 (1983) ..................................................................... passim

*N.H. Hosp. Ass'n v. Azar,*
   887 F.3d 62 (1st Cir. 2018) ............................................................... 37

*Nat'l All. to End Homelessness v. Turner,*
   No. 25-cv-00447-MSM-AEM,
   2025 WL 2638377,
   (D.R.I. Sept. 14, 2025) ................................................................ 38, 43

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) .......................................................... 70

*Nat'l Parks Conservation Ass'n v. Env't Prot. Agency,*
   788 F.3d 1134 (9th Cir. 2015) ............................................................ 52

*Nielsen v. Preap,*
   586 U.S. 392 (2019) ......................................................................... 30

*Norton v. S. Utah Wilderness All.*,
   542 U.S. 55 (2004) ...................................................................................... 64

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ........................................................................................ 63

*Penobscot Nation v. Frey*,
   3 F.4th 484 (1st Cir. 2021) ........................................................................ 45

*Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*,
   946 F.3d 1100 (9th Cir. 2020) ................................................................... 40

*Prometheus Radio*
   592 U.S. 414 (2021) .................................................................................... 36

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
   374 F.3d 1209 (D.C. Cir. 2004) ................................................................ 57

*R.I. Coal. Against Domestic Violence v. Kennedy*,
   C.A. No. 1:25-cv-00342-MRD-PAS,
   2025 WL 2988705
   (D.R.I. Oct. 23, 2025) ...................................................................... 29, 47, 48

*Ramirez v. U.S. Immigr. & Customs Enf't*,
   568 F. Supp. 3d 10 (D.D.C. 2021) ............................................................ 69

*Robbins v. Reagan*,
   780 F.2d 37 (D.C. Cir. 1985) .............................................................. 42, 44

*Sierra Club v. Babbitt*,
   69 F. Supp. 2d 1202
   (E.D. Cal. 1999) ......................................................................................... 33

*Snegirev v. Asher*,
   2:12-cv-01606-MJP,
   2013 WL 942607
   (W.D. Wash. Mar. 11, 2013) ..................................................................... 31

*South Dakota v. Dole*,
   483 U.S. 203 (1987) .................................................................................... 62

*Telecomms. Rsch. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ............................................................. 65, 67

*Town of Wellesley v. FERC*,
   829 F.2d 275 (1st Cir. 1987) ..................................................................... 65

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
    582 U.S. 449 (2017) ......................................................................... 43

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ......................................................................... 68

*U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*,
    578 U.S. 590 (2016) ......................................................................... 29

*United States v. Jacques*,
    784 F. Supp. 2d 59 (D. Mass. 2011) ............................................... 50

*United States v. Montalvo-Murillo*,
    495 U.S. 711 (1990) ......................................................................... 31

*Washington v. U.S. Dep't of Health & Hum. Servs.*,
    No. 6:25-cv-01748-AA,
    2025 WL 3002366
    (D. Or. Oct. 27, 2025) ..................................................................... 43

## **Statutes**

34 U.S.C. § 12351 ................................................................................. 20, 74

42 U.S.C. § 10408 ................................................................................. 20, 74

42 U.S.C. § 11301 ........................................................................................ 4

42 U.S.C. § 11360 ...................................................................................... 45

42 U.S.C. § 11381 ................................................................... 4, 45, 47, 58

42 U.S.C. § 11382 ................................................................. 7, 30, 32, 64

42 U.S.C. § 11383 ....................................................................................... 5, 8

42 U.S.C. § 11385 ...................................................................................... 9, 42

42 U.S.C. § 11386 ................................................................................ 6, 39, 41

42 U.S.C. § 11386a ................................................................................ passim

42 U.S.C. § 11386b ............................................................. 9, 41, 49, 58

42 U.S.C. § 11386c ................................................................................ passim

42 U.S.C. § 12711 ................................................................................ 23, 44

42 U.S.C. §11386b .................................................................................................... 6

5 U.S.C. § 553 ...................................................................................................... 36

5 U.S.C. § 703 ...................................................................................................... 69

5 U.S.C. § 706 ................................................................................................. passim

Consolidated Appropriations Act,
  2024 Pub. L. No. 118-42, 138 Stat. 9 (2024) ............................................... 7, 41

Full-Year Continuing Appropriations and Extensions Act,
  2025, Pub. L. No. 119-4, 139 Stat. 9 (2025) ......................................... 7, 16, 30

## **Rules**

Local Rule Cv 7 ..................................................................................................... 4

## **Regulations**

24 C.F.R § 578.13 ................................................................................................ 23

24 C.F.R § 578.3 ............................................................................................. 5, 45

24 C.F.R § 578.75 ................................................................................................ 19

24 C.F.R. § 10.1 ................................................................................................... 37

24 C.F.R. § 5.106 ........................................................................................... 11, 43

24 C.F.R. § 578.17 ..................................................................................... 5, 23, 44

24 C.F.R. § 578.37 ........................................................................................ 5, 8, 9

24 C.F.R. § 578.5 ................................................................................................. 23

24 C.F.R. § 578.73 ............................................................................................... 25

24 C.F.R. Part 578 ......................................................................................... 25, 26

24 C.F.R. § 578.75 ............................................................................................... 19

69 Fed. Reg. 27495 (May 14, 2004),
  https://archives.hud.gov/funding/2004/cocpsec.pdf ................................... 10

81 Fed. Reg. 48366 (July 25, 2016) ................................................................... 37

Exec. Ord. No. 14168
  90 Fed. Reg. 8615 (Jan. 20, 2025) .................................................................. 14, 62

Exec. Ord. No. 14321,
  90 Fed. Reg. 35817 (Jul. 24, 2025) ........................................................... 13, 14, 62

### Other Authorities

Alap Davé,
  *How one state almost solved America's homelessness problem*,
  Catalyst (2023),
  https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-
  problem..................................................................................................................... 7, 9

Grants.gov,
  Related Documents, *2021 Continuum of Care* (2021),
  https://grants.gov/search-results-detail/335322
  (last visited Nov. 25, 2025) ..................................................................................... 10

Grants.gov,
  Related Documents,
  *FY 2012 Notice of Funding Availability for Continuum of Care*,
  https://grants.gov/search-results-detail/206173 ........................................................ 12

Grants.gov,
  Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*,
  https://grants.gov/search-results-detail/265408
  (last visited Nov. 25, 2025) ..................................................................................... 10

Grants.gov,
  Related Documents, *FY 2019 Notice of Funding Opportunity for Continuum of Care*,
  https://grants.gov/search-results-detail/318022 (last visited Nov. 25, 2025)........................... 12

HUD,
  *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal
  Year (FY) 2018 Continuum of Care Program Competition* (2018),
  https://archives.hud.gov/funding/2018
  /FY18-CoC-NOFA.pdf ...................................................................................... 10, 12

HUD,
  *Office of Community Planning and Development Homeless Assistance Grants*,
  https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf
  (last visited Nov. 25, 2025) ..................................................................................... 10

HUD,
  *Secretary Scott Turner Halts Enforcement Actions of HUD's Gender Identity Rule*,
  https://www.hud.gov/news/hud-no-25-026#close (last visited Nov. 5, 2025)......................... 15

Jason Deparle,
  *Trump AdministrationProposes a Drastic Cut in Housing Grants*(Nov. 12, 2025),
  https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html.............. 18, 59

Josh Leopold & Mary K. Cunningham,
  *To end homelessness, Carson should continue Housing First approach*, Urban Institute
  (Jan. 19, 2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-
  housing-first-approach ......................................................................................................... 7, 9

Josh Leopold,
  *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (2019),
  https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance..... 9

Katherine Hapgood,
  *Trump admin looks at deep cuts to homeless housing program*, Politico(Sept. 29, 2025),
  https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-
  housing-program-00585770?nid=0000014f-1646-d88f-a1cf-
  5f46b7bd0000&nname=playbook&nrid=0000015d-4ff3-d6d3-a75d-4ff30bd80000 ........ 18, 19

National Academies of Sciences,
  Engineering, and Medicine, *Evidence of Effect of Permanent Supportive Housing on Health*
  (July 11, 2018), https://www.ncbi.nlm.nih.gov/books/NBK519591/ ....................................... 54

*Provisional Drug Overdose Death Counts*,
  U.S. Centers for Disease Control and Prevention, National Center for Health Statistics,
  https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm
  (last visited Jan 6, 2026)........................................................................................................ 53

*Recovery Residences*,
  Washington Health Care Authority,
  https://www.hca.wa.gov/free-or-low-cost-health-care/i-need-behavioral-health-
  support/recovery-residences (last visited Jan. 5, 2026)........................................................... 53

*S. Hum. Servs. Comm. Pub. Hr'g on ESSB 5599*
  (TVW, Feb. 6, 2023),
  https://tvw.org/video/senate-human-services-2023021142/?eventID=2023021142................. 11

Scott Turner (@SecretaryTurner),
  X (Mar. 13, 2025, 11:47AM),
  https://x.com/SecretaryTurner/
  status/1900257331184570703 ................................................................................................ 15

The Trevor Project,
*Homelessness and Housing Instability Among LGBTQ Youth*,
https://www.thetrevorproject.org/wp-
content/uploads/2022/02/Trevor-Project-
Homelessness-Report.pdf
(last visited Nov. 25, 2025) ...................................................................... 11

U.S. Department of Housing and Urban Development,
*Continuum of Care Program*,
https://www.hud.gov/hud-partners/community-coc (last visited Nov. 25, 2025)...................... 4

United States Interagency Council on Homelessness,
*Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation*,
3 n.1 (Sept. 2016), https://www.usich.gov/sites/default/files
document/Housing_First_Checklist_FINAL.pdf...................................................... 8

## PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT

### I.     INTRODUCTION

Congress created the Continuum of Care Program recognizing that homelessness is a crisis of instability, and that effective intervention requires immediate stabilization and uninterrupted support. For decades, the CoC Program has operated with the continuity and predictability mandated by statute: through the CoC Program, the Department of Housing and Urban Development distributes billions of dollars each year to state, local, and non-profit entities to provide housing and services to families and individuals facing homelessness, with the vast majority of funding directed to renewing permanent housing, rental assistance, and supportive service projects that have been shown to work. Congress designed the program to preserve stability so providers can reliably serve people whose lives depend on it.

But over the past two months, Defendants have thrown the CoC Program into chaos. In November, months after the statutory deadline passed, HUD rescinded the CoC Notice of Funding Opportunity for Fiscal Year 2025 that had been issued the prior year (the "FY 2024-2025 NOFO"). In a new NOFO for FY 2025 (the "November NOFO"), HUD adopted policies that threaten to cancel thousands of existing projects, require funding recipients to fundamentally reshape their programs on an impossible timeline, and essentially guarantee that tens of thousands of formerly homeless individuals and families will be evicted back into homelessness. Then, in a bid to avoid an injunction from this Court, HUD withdrew that November NOFO on the eve of a hearing. Eleven days later—just before midnight on December 19, and mere hours after this Court enjoined HUD's rescission of the FY 2024-2025 NOFO and the unlawful policies of the November NOFO—HUD published yet another NOFO that contained largely the same unlawful conditions that the Court had enjoined just that day (the "December NOFO").

Defendants' haphazard approach to this life-saving program has stoked chaos at every turn. Enough is enough. This Court should end the chaos by vacating HUD's rescission of the FY 2024-2025 NOFO, enjoining HUD from implementing the unlawful conditions that have permeated their two 2025-issued NOFOs, and ensuring that the CoC program is operated as Congress directed.

By now, Defendants' many legal failures are familiar to the Court. Defendants rescinded the FY 2024-2025 NOFO long after their statutory deadline to do so and failed to explain why. Defendants adopted an arbitrary and unexplained thirty percent funding cap on permanent housing, which renders nearly sixty percent of CoC projects set to expire in 2026 ineligible for funding, in derogation of Congress' explicit direction to prioritize permanent housing. This cap alone jeopardizes stable, long-term housing options for tens of thousands of our most vulnerable residents. HUD has paired this cap with a new policy in which Tier 1 funding—essentially guaranteed funding for renewals—is slashed from ninety percent of available funding to thirty percent, meaning projects that would otherwise be renewed will now be canceled and formerly homeless individuals and families left without housing. This, too, violates statutory requirements to renew funding for existing projects.

Defendants have also adopted a spate of new funding conditions and scoring criteria (some of which they now claim are moot) that push applicants to require program participants to engage in services in exchange for housing, that deny funding to any organization that fails to toe the Administration's line on so-called "gender ideology," and that punish applicants who are in a locality whose approach to homelessness differs from this Administration's. These changes to longstanding HUD policy were all adopted without the notice-and-comment procedure required by the APA. And none of them were authorized by Congress. Indeed, each of these conditions is

contrary to either the CoC's authorizing statute, HUD's regulations, or both. And as the administrative record in this matter reveals, each of these conditions is arbitrary and capricious because Defendants have failed to explain or justify their complete reversal of longstanding policies, have failed to consider the factors Congress directed them to, have failed to consider the reliance interests of CoC and applicants who have built their programs in reliance on HUD's longstanding policies, and have utterly and completely failed to address the undeniable fact that these policies would result in massive numbers of formerly homeless people being evicted back to homelessness.

Each of these policies is unlawful and harmful on its own. Taken together, they fundamentally upend the CoC program, with disastrous results. The Administration is now holding CoC funding hostage, threatening to cut off funds that provide housing for people with disabilities, seniors, families with children, veterans, LGBTQ+ people, survivors of domestic violence and sexual assault, and others facing homelessness, all to coerce states, local governments, and non-profits to adopt the Administration's preferred policies, in contravention of Congressional intent. Plaintiff States—as well as other states, localities, and non-profits—rely on CoC funding to house their residents. They have built programs over years based on HUD's longstanding, but now abandoned, guidance. These programs are now facing unprecedented upheaval, as providers are forced with the impossible choice of radically reshaping fundamental aspects of their programs on an impossible timeline or foregoing critical funding. All while facing a very real risk of interruption or loss of federal funding, with potentially catastrophic results for the States, service providers, and vulnerable residents. To avoid this irreparable harm caused by Defendants' unlawful actions, the Plaintiff States request that this Court grant summary judgment to Plaintiffs, vacate the rescission of the FY 2024-2025 NOFO and the unlawful conditions, and enjoin Defendants from

implementing either. Pursuant to Local Rule Cv 7, Plaintiffs respectfully request oral argument with thirty minutes provided for each side.

## II.    BACKGROUND

### A.    Congress Created the Continuum of Care Program to Address the Unprecedented Crisis of Homelessness by Funding Housing Solutions

Congress passed the McKinney-Vento Homeless Assistance Act to address the "immediate and unprecedented crisis" of homelessness. 42 U.S.C. § 11301(a)(1). Through the Act, Congress aimed "to provide funds for programs to assist the homeless, with special emphasis on elderly persons, handicapped persons, families with children, Native Americans, and veterans." 42 U.S.C. § 11301(b)(3). The purpose of the CoC program is "to promote community-wide commitment to the goal of ending homelessness"; "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[]"; "to promote access to, and effective utilization of, mainstream programs" for individuals and families experiencing homelessness"; and "to optimize self-sufficiency among individuals and families experiencing homelessness." 42 U.S.C. § 11381.

The CoC program "provide[s] funding for efforts by nonprofit providers, states, Indian Tribes or tribally designated housing entities . . . and local governments to quickly rehouse homeless individuals, families, persons fleeing domestic violence, dating violence, sexual assault, and stalking, and youth while minimizing the trauma and dislocation caused by homelessness."[1] To this end, Congress has directed that CoC funding "shall be used to carry out projects that serve homeless individuals or families[,]" including permanent housing, permanent supportive housing

---

[1]    U.S. Department of Housing and Urban Development, *Continuum of Care Program*, https://www.hud.gov/hud-partners/community-coc (last visited Nov. 25, 2025).

for individuals with disabilities (including mental health and substance use issues), rapid rehousing, supportive services, the Homeless Management Information System, and homelessness prevention. *See* 42 U.S.C. § 11383; 24 C.F.R. § 578.37.

HUD issues grants to local coalitions—known as "Continuums of Care"—pursuant to a NOFO. Each Continuum represents a "geographic area," for example, a county or multi-county region within a state. 24 C.F.R § 578.3. CoC funding is distributed among geographic areas via a hybrid of a formula and competitive process. By statute, the selection criteria for awards "shall . . . include the need within the geographic area for homeless services, determined . . . by a formula, which shall be developed by the Secretary[.]" 42 U.S.C. § 11386a(b). This formula, called the Preliminary Pro Rata Need, allocates certain percentages to each geographic area, based primarily on the Community Development Block Grant formula, with adjustments made to ensure, as far as possible, that all CoC projects eligible for renewal can be renewed. 24 C.F.R. § 578.17. "HUD *will* apply th[is] formula . . . to the amount of funds being made available under the NOF[O]." 24 C.F.R. § 578.17(a)(2) (emphasis added). The formula thus acts as a minimum allocation for each Continuum.

The statute additionally directs HUD to renew existing projects. It provides that "[t]he sums made available" under the CoC program "shall be available for the renewal of contracts . . . at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations[.]" 42 U.S.C. § 11386c(b). The HUD "Secretary shall determine whether to renew a contract for . . . a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary." *Id.* By prioritizing renewals of existing projects,

Congress wrote the statute to ensure that programs can continue to provide stable housing to formerly homeless individuals, and that tens of thousands of formerly chronically homeless individuals and families are not evicted back to homelessness.

On top of this formula funding and funding earmarked for renewals, CoC funding is competitive in two respects. First, HUD awards grants competitively to applicants within a Continuum. That is, when a Continuum applies to the NOFO, it will rank projects within its geographic area, and HUD will select projects for awards within each Continuum's application up to at least the formula amount. ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 12-17. Second, HUD awards "bonuses [and] other incentives to geographic areas for using funding . . . for activities that have been proven to be effective at reducing homelessness . . . or achieving homeless prevention and independent living goals . . . set forth in" the CoC statutes. 42 U.S.C. §11386b(d)(1).

The McKinney-Vento Act includes lengthy "Required Criteria" for assessing grant applications, such as "the previous performance of the recipient regarding homelessness" with respect to the length of time individuals remain homeless and related factors, whether the recipient will incorporate "comprehensive strategies for reducing homelessness" such as permanent supportive housing, and many other specific factors. 42 U.S.C. § 11386a. Similarly, the Act already specifies what information HUD should require project sponsors to certify in order to receive CoC funding. *Id.* § 11386(b)(4). For example, project sponsors must certify their compliance with certain confidentiality and privacy terms and that children in family programs are enrolled in school and connected to certain services. *Id.* Notably absent from these requirements are any of the funding conditions at issue in this litigation.

Funding for CoC grants comes from congressional discretionary appropriations. The McKinney Vento Act requires that HUD issue a notification of funding availability for CoC grants

"for a fiscal year not later than 3 months after" Congress has enacted its yearly appropriations act. 42 U.S.C. § 11382(b). On March 15, 2025, the President signed H.R. 1968 authorizing the Full-Year Continuing Appropriations and Extensions Act, 2025 (Pub. L. No. 119-4, 139 Stat. 9 (2025)) which makes approximately the same amount of CoC Program funding available for FY 2025 as the Consolidated Appropriations Act, 2024 (Pub. L. No. 118-42, 138 Stat. 9 (2024)). Accordingly, the deadline for HUD to issue a NOFO for FY 2025 was June 15, 2025.

## B. Through the CoC Program, HUD Has Consistently Promoted Permanent Housing as Part of a Housing First Approach to Reducing Homelessness

For at least two decades, HUD has implemented the CoC Program to further its stated policy of "implement[ing] a Housing First approach to reducing homelessness, and driv[ing] equitable community development." ECF No. 12-1 (Hughes Decl.), Ex. 1 (HUD FY 2022–2026 Strategic Plan) at 19; *see also* Alap Davé, *How one state almost solved America's homelessness problem*, Catalyst (2023), https://www.bushcenter.org/catalyst/the-fix/homes-for-the-unhoused-solving-homelessness-problem (George W. Bush Administration adopted Housing First program in 2004 as part of its goal to end homelessness); Josh Leopold & Mary K. Cunningham, *To end homelessness, Carson should continue Housing First approach*, Urban Institute (Jan. 19, 2017), https://www.urban.org/urban-wire/end-homelessness-carson-should-continue-housing-first-approach (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

In its FY 2024–2025 CoC NOFO, HUD described Housing First as "[a] model of housing assistance that prioritizes rapid placement and stability in permanent housing in which admission does not have preconditions (such as sobriety or a minimum income threshold) and in which housing assistance is not conditioned upon participation in services." ECF No. 12-2 (Hughes

Decl.), Ex. 2 (FY 2024–2025 NOFO) at 19. HUD adopted its Housing First approach in recognition of the fact that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 27. As detailed in HUD's most recent strategic plan, a "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." *Id.* at 27.

Similarly, the United States Interagency Council on Homelessness has highlighted the "overwhelming evidence" in support of Housing First policy because "people experiencing homelessness can achieve stability in permanent housing if provided with the appropriate level of services." United States Interagency Council on Homelessness, *Housing First Checklist: Assessing Projects and Systems for a Housing First Orientation*, 3 n.1 (Sept. 2016), https://www.usich.gov/sites/default/files/document/Housing_First_Checklist_FINAL.pdf.

The core Housing First intervention is "permanent housing"—including "permanent supportive housing" and "rapid rehousing"—in which individuals are provided stable housing "without a designated length of stay." 24 C.F.R § 578.37(a)(1). The McKinney-Vento Act supports permanent housing by providing that CoC funds may be used for, among other things, new construction, acquisition or rehabilitation of existing structures, leasing, rental assistance, operating costs, and supportive services, including for individuals or families in permanent supportive housing. 42 U.S.C. § 11383(a). Both the statute and HUD's regulations identify various options for permanent housing. For example, permanent supportive housing pairs housing with "[s]upportive services designed to meet the needs of the program participants" and is available for "individuals with disabilities and families in which one adult or child has a disability[.]"

24 C.F.R § 578.37(a)(1)(i). For rapid rehousing, CoC "funds may provide supportive services . . . and/or . . . tenant-based rental assistance . . . as necessary to help a homeless individual or family, with or without disabilities, move as quickly as possible into permanent housing and achieve stability in that housing." 24 C.F.R § 578.37(a)(1)(ii).

The McKinney-Vento Act specifically incorporates a Housing First approach. For example, as noted above, the law specifically directs HUD to fund "activities that have been proven to be effective at reducing homelessness," which the statute itself defines to include "permanent supportive housing for chronically homeless individuals and families" and "rapid rehousing services[.]" 42 U.S.C. § 11386b(d). The Act also makes clear in various provisions that sobriety, mental health treatment, employment, and the like are not to be treated as preconditions to permanent housing, but rather as issues to be addressed once individuals and families are stably housed. *See* 42 U.S.C. § 11385(a) ("To the extent practicable, each project shall provide supportive services for residents of the project and homeless persons using the project[.]"); 42 U.S.C. § 11386a(b)(1)(F) (noting that "independent living in permanent housing" can "includ[e] assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[.]"). Taken together, these provisions "entrench federal support for Housing First" by "expand[ing] the availability of permanent housing" and "authoriz[ing] funds for rapid re-housing assistance to help people move into permanent housing."[2]

Consistent with these provisions of the McKinney-Vento Act, HUD has employed a Housing First and permanent supportive housing approach for over two decades.[3] As one recent

---

[2] Josh Leopold, *Five Ways HEARTH Act Changed Homelessness*, Urban Institute (2019), https://www.urban.org/urban-wire/five-ways-hearth-act-changed-homelessness-assistance.

[3] Davé, *supra*, at 7; Leopold & Cunningham, *supra*, at 7 (As a result of the Bush administration's adoption of Housing First, there was a thirty percent reduction in chronic homelessness from 2005 to 2007, and the Obama Administration then continued this support for Housing First).

HUD document explained: "For 20 years, HUD has prioritized permanent supportive housing, which serves people with the highest levels of housing and service needs, especially people experiencing chronic homelessness."[4] Prior NOFOs and Funding Opportunity Descriptions from 2004 to the present reflect HUD's longstanding commitment to "permanent supportive housing" to "meet the long-term needs of homeless individuals and families" and "Housing First" as one of HUD's "Policy Priorities."[5] And HUD's current strategic plan, covering Fiscal Years 2022–2026, explicitly provides that HUD will "implement a Housing First approach to reducing homelessness." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 19.

Consistent with their FY 2022-2026 strategic plan and those congressionally-mandated priorities, HUD's CoC NOFO for FY 2024–2025 encourages applicants to "[u]se a Housing First Approach," explaining:

> Housing First prioritizes rapid placement and stabilization in permanent housing and utilizes housing as a platform for providing supportive services that improve a person's health and well-being. CoC Program funded projects should help individuals and families move quickly into permanent housing without preconditions and ensure that participants can choose the services they need to improve their health and well-being and remain in their housing. Additionally, CoCs should engage landlords and property owners to identify housing units available for rapid rehousing and permanent supportive housing participants, remove barriers to entry, and adopt client-centered service practices. HUD encourages CoCs to assess how well Housing First approaches are being implemented in their communities.

---

[4] HUD, *Office of Community Planning and Development Homeless Assistance Grants*, https://archives.hud.gov/budget/fy25/2025_CJ_Program_-_HAG.pdf (last visited Nov. 25, 2025).

[5] *See, e.g.*, *Continuum of Care Homelessness Assistance Programs*, 69 Fed. Reg. 27495, 27498 (May 14, 2004), https://archives.hud.gov/funding/2004/cocpsec.pdf (Fiscal Year 2004 Continuum of Care Homeless Assistance Programs Funding Opportunity Description states that one of the "basic components" of the "CoC system" is "Permanent housing, or permanent supportive housing, to help meet the long-term needs of homeless individuals and families"); *see also, e.g.*, Grants.gov, Related Documents, *FY 2014 Notice of Funding Opportunity of Continuum of Care*, https://grants.gov/search-results-detail/265408 (last visited Nov. 25, 2025) (Fiscal Year 2014 Notice of Funding Availability for Continuum of Care Program awards applications "up to 10 points" for following a "Housing First" model and defines "Housing First" as one of HUD's "Policy Priorities"); *see also, e.g.*, HUD, *Community Planning and Development Notice of Funding Availability(NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (Fiscal Year 2018 NOFO includes the same provisions); *see also, e.g.*, Grants.gov, Related Documents, *2021 Continuum of Care* (2021), https://grants.gov/search-results-detail/335322 (last visited Nov. 25, 2025) (Fiscal Year 2021 NOFO includes the same provisions).

ECF No. 12-2 (Hughes Decl.), Ex. 2 at 10. The FY 2024–2025 NOFO also states that HUD would award "bonus projects" in part based on an applicant's "[c]ommitment to Housing First," providing "[u]p to 10 points based on the project application's commitment to follow a Housing First approach[.]" *Id.* at 31-32.

## C.    Through the CoC Program, HUD Has Sought to Address the Needs of the Diverse Population it Serves

In addition to Housing First, HUD has also prioritized funding to address specific populations disproportionately impacted by homelessness, including LGBTQ+ people. As HUD and many others have recognized, "LGBTQ+ people experience homelessness at rates significantly higher than their representation in the general population." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 19.[6]

To that end, HUD's "Equal Access" regulation, which applies to the "Continuum of Care program," requires that funding recipients ensure that "[e]qual access to [Community Planning and Development] programs, shelters . . . services, and accommodations is provided to an individual in accordance with the individual's gender identity," that "[a]n individual is placed, served, and accommodated in accordance with the gender identity of the individual," that "[a]n individual is not subjected to intrusive questioning or asked to provide . . . evidence of the individual's gender identity[,]" and that "[p]lacement and accommodation of an individual in temporary, emergency shelters and other buildings . . . shall be made in accordance with the individual's gender identity." 24 C.F.R. § 5.106.

---

[6] *See also S. Hum. Servs. Comm. Pub. Hr'g on ESSB 5599* at 1:19:15–1:19:40 (TVW, Feb. 6, 2023), https://tvw.org/video/senate-human-services-2023021142/?eventID=2023021142 (testimony noting LGBTQ+ youth account for at least forty percent of youth experiencing homelessness in King County, Washington); *see also* The Trevor Project, *Homelessness and Housing Instability Among LGBTQ Youth*, https://www.thetrevorproject.org/wp-content/uploads/2022/02/Trevor-Project-Homelessness-Report.pdf (last visited Nov. 25, 2025) (thirty-five percent to thirty-nine percent of transgender or nonbinary youth have experienced housing instability).

And for over a decade, HUD's NOFOs for the Continuum of Care have consistently required that CoC funding recipients provide "Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity."[7] Prior NOFOs have also regularly awarded points to CoC applicants for "Addressing the Needs of LGBT Individuals."[8] Most recently, the FY 2024–2025 CoC NOFO emphasized the need to address the specific challenges of transgender and gender-diverse people. For example, its scoring system encouraged CoCs to "address the needs of LGBTQ+, transgender, gender non-conforming, and non-binary individuals and families in their planning processes," "ensure that all projects provide privacy, respect, safety, and access regardless of gender identity or sexual orientation," and "partner with organizations with expertise in serving LGBTQ+ populations." ECF No. 12-2 (Hughes Decl.), Ex. 2 at 11. The FY 2024-2025 NOFO further required that "[a]pplicants must identify the steps they will take to ensure that traditionally underserved populations," including "lesbian, gay, bisexual, transgender, and queer (LGBTQ+) persons . . . will be able to meaningfully participate in the planning process" for projects. *Id.* at 66. Likewise, HUD's most recent strategic plan, which includes the current fiscal year (FY 2026), specifically "focused on underserved populations to ensure equitable and fair access to housing and to Federal programs" and defined underserved populations to include, for example, "members of the lesbian, gay bisexual, transgender, and queer (LGBTQ+) community." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 21.

---

[7] *See, e.g.*, Grants.gov, Related Documents, *FY 2012 Notice of Funding Availability for Continuum of Care* 22, https://grants.gov/search-results-detail/206173; *see also, e.g.*, Grants.gov, Related Documents, *FY 2019 Notice of Funding Opportunity for Continuum of Care*, https://grants.gov/search-results-detail/318022 (last visited Nov. 25, 2025).

[8] *E.g.*, HUD, *Community Planning and Development Notice of Funding Availability (NOFA) for the Fiscal Year (FY) 2018 Continuum of Care Program Competition* (2018), https://archives.hud.gov/funding/2018/FY18-CoC-NOFA.pdf (FY 2018 Notice of Funding Availability for Continuum of Care).

**D.      The Trump Administration Reverses HUD's Decades-Long Policy of Housing First**

Since the 2025 presidential inauguration, the Administration has worked to reverse HUD's longstanding commitments to Housing First and equal access.

On July 24, 2025, the President signed an Executive Order addressing homelessness. The Order is called "Ending Crime and Disorder on America's Streets" (hereafter, the "Anti-Homeless Order"). Exec. Ord. No. 14321, 90 Fed. Reg. 35817 (Jul. 24,2025). The primary thrust of the Anti-Homeless Order is an effort to expand civil commitment of those experiencing homelessness—to incentivize states and local governments to adopt a "maximally flexible" approach to locking up people who lack a safe or reliable place to sleep. *See* Anti-Homeless Order §§ 1-2.

In addition, the Anti-Homeless Order directs HUD to "end[] support for 'housing first' policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency[.]" Anti-Homeless Order § 5(a). The Order further directs HUD to "take steps to require recipients of Federal housing and homelessness assistance to increase requirements that persons participating in the recipients' programs who suffer from substance use disorder or serious mental illness use substance abuse treatment or mental health services as a condition of participation." *Id.* § 5(b). This is directly contrary to HUD's conclusion—in its still-operative strategic plan—that "[h]ousing is foundational to—not the reward for—health, recovery, and economic success." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 26.

The Anti-Homeless Order additionally directs the Attorney General, HUD, the Department of Health and Human Services, and the Department of Transportation to "[f]ight[] [v]agrancy" by "tak[ing] immediate steps" to prioritize grants for "States and municipalities that actively . . .

enforce prohibitions on open illicit drug use; . . . enforce prohibitions on urban camping and loitering; [and] enforce prohibitions on urban squatting." Anti-Homeless Order § 3.

As detailed below, HUD has now taken steps to implement the Anti-Homeless Order through the issuance of new NOFOs for the CoC program.

**E.    The Administration Takes Actions to Target So-Called "Gender Ideology"**

In addition to deprioritizing HUD's decades-long promotion of a Housing First policy, the Administration has likewise sought to reverse HUD's longstanding commitment to serving all people.

On January 20, 2025, the President's first day in office, he issued Executive Order 14168, titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" (Gender Ideology Order). The purpose and effect of the Gender Ideology Order is to deny the existence of transgender and gender-diverse individuals. The Gender Ideology Order declares "[i]t is the policy of the United States to recognize two sexes, male and female." EO 14168 § 2. The Order purports to set definitions to govern all administration policy. *Id.* Section 2(a) defines "sex" to mean "an individual's immutable biological classification as either male or female[,]" which is "not a synonym for and does not include the concept of 'gender identity.'" Section 2(d) defines "female" as "a person belonging, at conception, to the sex that produces the large reproductive cell," and Section 2(e) defines "male" as "a person belonging, at conception, to the sex that produces the small reproductive cell." To effectuate the Gender Ideology Order, Section 3(e) directs agencies to "take all necessary steps, as permitted by law, to end the Federal funding of gender ideology." Section 3(g) likewise commands that "[f]ederal funds shall not be used to promote gender ideology." Under the Order, "[e]ach agency shall assess grant conditions and grantee preferences and ensure grant funds do not promote gender ideology." *Id.*

14

To implement the Gender Ideology Order, on February 7, 2025, HUD Secretary Scott Turner announced that HUD will stop enforcing this "Equal Access" rule.[9] But the regulation remains in effect. Later, on March 13, 2025, Secretary Turner announced in a post on X that CoC funds "will not promote DEI, enforce 'gender ideology,' [or] support abortion." Scott Turner (@SecretaryTurner), X (Mar. 13, 2025, 11:47AM), https://x.com/SecretaryTurner/status/190025 7331184570703. In response, HUD began presenting CoC grantees with grant agreements requiring grantees to certify that they would not use grant funds to promote "'gender ideology,' as defined in" the Gender Ideology Order. ECF No. 1 (Complaint) at 20-21, *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-00814-BJR (W.D. Wash. May 2, 2025).

The Gender Ideology Order is rooted in anti-transgender animus and lacks any scientific basis. Nonetheless, as detailed below, HUD has now taken steps to implement the Gender Ideology Order through its recent NOFOs.

## F.    HUD Upends the CoC Program by Issuing a New Fiscal Year 2025 NOFO

The Administration has now brought its anti-homeless and anti-transgender agendas together in an effort to fundamentally alter the CoC program.

On November 13, 2025—nearly eight months after Congress appropriated FY 2025 funding for the CoC Program—HUD issued the November NOFO with an application due date of January 14, 2026 (the "November NOFO"). ECF No. 12-3 (Hughes Decl.), Ex. 3.

The November NOFO states that "FY 2025 CoC awards will be made through this NOFO." *Id.* at 16. But HUD already issued the FY 2025 NOFO on July 31, 2024, as part of a combined FY 2024–2025 NOFO. ECF No. 12-2 (Hughes Decl.), Ex. 2. As the FY 2024–2025 NOFO explained, "HUD's authority to issue a 2-year NOFO [is] authorized by the Consolidated Appropriations Act,

---

[9] HUD, *Secretary Scott Turner Halts Enforcement Actions of HUD's Gender Identity Rule*, https://www.hud.gov/news/hud-no-25-026#close (last visited Nov. 5, 2025).

2024 and any FY 2025 funding will be authorized by a FY 2025 Congressional Appropriation." *Id.* at 5-6. To streamline matters, the FY 2024–2025 NOFO told applicants that "[p]rojects that are awarded FY 2024 funds may be eligible for award of FY 2025 funds using their FY 2024 application submission and are not required to apply for renewal for FY 2025 funds." *Id.* at 6. As described above, the FY 2024–2025 NOFO required and endorsed a Housing First approach and encouraged CoCs to address the specific needs of transgender, gender non-conforming, and non-binary individuals and families, among other requirements.

Despite CoCs undergoing a two-year planning process pursuant to the FY 2024–2025 NOFO and the CoC program requirements, the November NOFO purported to "rescind[] and supersede[]" the prior NOFO with respect to FY 2025. ECF No. 12-3 (Hughes Decl.), Ex. 3 at 16. This purported rescission came more than three months after Congress' March 15, 2025, continuing resolution appropriating $3.544 billion for the Continuum of Care program and related programs. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12), 139 Stat. 9, 12 (2025). In making this announcement, HUD failed to provide any explanation as to why it was issuing a new FY 2025 NOFO when a NOFO for FY 2024–2025 had already been issued. Due to this announcement by HUD on July 3, 2025, no FY 2025 funds were awarded under the FY 2024–2025 NOFO before it was replaced by the November NOFO.

The November NOFO was untimely and added a passel of unlawful conditions pursuant to the Anti-Homeless and Gender Ideology EOs. ECF No. 12-3 (Hughes Decl.), Ex. 3 at 13 (noting that NOFO implements Anti-Homeless EO); 109 (noting that NOFO implements Gender Ideology EO); ECF No. 1 at ¶¶ 113-134 (detailing the Challenged Conditions). These new conditions were not authorized by Congress, are neither reasonable nor reasonably explained, and flout the significant reliance interests of CoC applicants.

As a result, Plaintiff States filed suit and moved for a preliminary injunction challenging the November NOFO, which the Court converted to a motion for temporary restraining order. ECF Nos. 1, 11. On December 8, less than an hour before a hearing on Plaintiffs' motion for a temporary restraining order, Defendants filed a Notice claiming that "HUD has withdrawn the 2025 NOFO in order to assess the issues raised by Plaintiffs in their suits and to fashion a revised NOFO." ECF No. 41. Not only did Defendants contend that this Notice "moot[ed]" Plaintiffs' then-pending request for preliminary injunctive relief, *id.*, they simultaneously stated that "The Department still intends to exercise [its] discretion and make changes to the previously issued CoC NOFO to account for new priorities." ECF No. 41-2; *see also* Dec. 19, 2025 Hr'g Tr. 56:22-57:18 (the Court stated that "I think that [Defendants] saying, well, we didn't waive anything and we might issue the exact same NOFO again, it is evading the Court's jurisdiction . . . or is an attempt to evade it").

**G.    Defendants Issue Yet Another New NOFO that Includes Unlawful Conditions and Policies Concerning Permanent Supportive Housing, Gender Identity, Public Safety, and Funding Amounts**

Just before midnight on December 19—after this Court orally entered a preliminary injunction enjoining Defendants' rescission of the FY 2024–2025 NOFO and the Challenged Conditions of the November NOFO—Defendants issued a new NOFO (the "December NOFO"). ECF No. 66. The December NOFO was, of course, promulgated long after the statutory three-month NOFO deadline had passed. Moreover, the December NOFO continues nearly all of the unlawful conditions from the November NOFO.

**1.    Ending Housing First**

First, the December NOFO reverses HUD's decades-long Housing First policy by placing an unauthorized and arbitrary cap on the funding of permanent housing projects. Using nearly the same language as the unlawful November NOFO, the December NOFO provides that "no more

than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the renewal of Permanent Housing projects, including PH-PSH, PH-RRH and Joint TH and PH-RRH projects" (the "Permanent Housing Cap"). ECF No. 66-1 at 24; *compare* ECF 12-3 (Hughes Decl.), Ex. 3 at 16 (November NOFO with nearly identical language).

The "Annual Renewal Demand" is defined in the NOFO as "[t]he total amount of all the CoC's projects that will be eligible for renewal in the CoC Program Competition, before any required adjustments to funding for leasing, rental assistance, and operating Budget Line Items . . . based on [fair market rent] changes." ECF No. 66-1 at 135. In other words, ARD is "the total amount of funds requested by eligible renewal projects in each FY funding opportunity." *Id.* at 135. "PH" here refers to Permanent Housing, "PSH" to Permanent Supportive Housing, and "RRH" to Rapid Rehousing. Thus, the Permanent Housing Cap mandates that only thirty percent of funding for project renewals may go to permanent housing.

If allowed to go into effect, the Permanent Housing Cap, will drastically cut funding for existing permanent housing projects. "Currently, 87 percent of all CoC program funds ending in 2026 are slated to support permanent housing in some capacity. Under the policy change, only 30 percent of the funds will be allowed to be used for that purpose." Katherine Hapgood, *Trump admin looks at deep cuts to homeless housing program*, Politico (Sept. 29, 2025), https://www.politico.com/news/2025/09/29/trump-admin-looks-at-deep-cuts-to-homeless-housing-program-00585770?nid=0000014f-1646-d88f-a1cf-5f46b7bd0000&nname=playbook&nrid=0000015d-4ff3-d6d3-a75d-4ff30bd80000.

This "shift" is the "most consequential in a generation." Jason Deparle, *Trump Administration Proposes a Drastic Cut in Housing Grants* (Nov. 12, 2025), https://www.nytimes.com/2025/11/12/us/politics/trump-homeless-funding.html.    "In    limiting

spending on long-term housing to just 30 percent of the $3.9 billion in aid—from about 90 percent this year—the [Permanent Housing Cap] could deal a crippling blow to" HUD's longstanding policy of "Housing First[.]" *Id.* According to the New York Times, the Permanent Housing Cap could "quickly place as many as 170,000 formerly homeless people at risk of returning to the streets." *Id.*

In addition to imposing the Cap, the December NOFO (like the November NOFO) reverses HUD's longstanding Housing First policy via new scoring criteria aimed at forcing applicants to require participants to enroll in services to receive housing (the "Service Requirement Conditions"). For example, the Challenged NOFOs award up to sixteen points (out of a maximum of 130) for "Availability of Treatment and Recovery Services" which includes substance abuse treatment services in which "program participants are *required* to take part in such services as a condition of continued participation in the program" and the demonstration of "the *requirement* for participation in substance abuse treatment." ECF No. 66-1 at 87(emphasis added); *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 78-79) (same language).

Likewise, the December NOFO (like the November NOFO) awards up to ten points if a CoC can "demonstrate that projects *require* program participants to take part in supportive services . . . in line with 24 C.F.R. 578.75(h)." ECF No. 66-1 at 88-89 (emphasis added); *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 79 (same language). Yet, 24 C.F.R § 578.75(h) only says that programs "may" require program participants to participate in services, not that they are required or incentivized to do so. Instead, the statute requires incentives for permanent supportive housing, as described above. And as recently as last year, HUD explicitly encouraged applicants *not* to require services as a condition for stable housing. *See* ECF No. 12-2 (Hughes Decl.), Ex. 2 at 89 (to receive full points, applicants "must [d]emonstrate at least 75 percent of all project

applications that include housing . . . are using the Housing First approach by providing low barrier projects that do not require preconditions to accessing housing nor participation in supportive services . . . and prioritize rapid placement and stabilization in permanent housing.").

The new scoring system effectively eliminates funding for rapid rehousing without supportive services. The scoring system establishes a "project quality threshold" such that "Permanent Housing projects must receive at least 6 out of the 8 points available" to be considered for funding. ECF No. 66-1 at 63-71.[10] Three of the available eight points are for "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)" and "[d]emonstrat[ing] that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment)[.]" *Id.* at 71-72; *see also id.* at 74 (providing that these thresholds apply to renewals as well as new projects). An applicant that does not earn the three points for providing supportive services cannot meet the six-point minimum threshold and cannot qualify for funding.

These changes particularly threaten providers serving survivors of domestic violence that also receive funding under Violence Against Women Act (VAWA) or the Family Violence Prevention Service Act (FVPSA), which prohibit grant recipients from imposing service participation requirements. *See* 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). These Conditions would place VAWA and FVPSA grantees who also rely on CoC funds at a severe disadvantage against other projects, as they would automatically surrender twenty-nine out of a possible 130 points against competing projects that impose service requirements.

---

[10] Confusingly, the NOFO says both that "projects must receive at least 6 out of the 8 points available for this project type" and that "projects that do not receive at least 4 points will be rejected." ECF No. 66-1 at 70.

### 2.    Tier 1 Cap

Second, HUD has further undermined the statutory and regulatory requirements prioritizing renewals by slashing the number of projects CoCs may designate as "Tier 1" projects. Historically, HUD has permitted CoCs to designate certain projects as Tier 1, meaning they were essentially guaranteed funding so long as they met threshold criteria. *See* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 92 ("HUD will . . . select all projects in Tier 1 that pass project quality and project eligibility thresholds[.]"). This ensured CoCs could budget around a steady stream of funding and ensured stability for individuals and families living in CoC-funded housing or receiving CoC-funded services. Tier 1 is set as a percentage of Annual Renewal Demand. And consistent with statutory and regulatory mandates for renewals, Tier 1 is generally set at a percentage commensurate with the amount of projects up for renewal. So, in FY 2024, "Tier 1 [wa]s set at 90 percent of the CoC's Annual Renewal Demand (ARD)." ECF No. 12-2 (Hughes Decl.), Ex. 2 at 6.

The December NOFO drastically slashes that amount. Using, again, the exact same language as the November NOFO, the December NOFO provides that "Tier 1 is set at 30 percent of the CoC's Annual Renewal Demand (ARD)." ECF No. 66-1 at 23; *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 16 (same language). Although the upshot of this new condition—the "Tier 1 Cap"—is not entirely clear (since HUD's obligation to fund renewals arises independently of the NOFO's tiering system), HUD put this condition under the heading "Increase in Competition[.]" ECF No. 66-1 at 24. It appears, then, that HUD intends to create a new national competition for previously renewed projects. Thus, the Tier 1 Cap is another effort by HUD to steer funding away from renewals, and stability, in violation of congressional directive and its own regulations.

### 3.    Gender Ideology Conditions

Third, as this Court is aware, the November NOFO provided that "[a]wards made under this NOFO [would] not be used to . . . conduct activities that rely on or otherwise use a definition

of sex as other than binary in humans." ECF No. 12-3 (Hughes Decl.), Ex. 3 at 109. Moreover, under that NOFO, "HUD reserve[d] the right to reduce or reject a project application" if it concludes there is any "evidence that the project has previously or currently . . . conduct[ed/s] activities that rely on or otherwise use a definition of sex other than as binary in humans," (the "Gender Ideology Conditions"). *Id.* at 66; *see also id.* at 56.

The December NOFO strips out this language. Nonetheless, under "Post-Award Requirements and Conditions," the NOFO provides that CoC funding recipients "must comply with . . . Presidential Executive Actions affecting federal financial assistance programs, as advised by the Department, unless otherwise restricted by law or by a court of competent jurisdiction," including "[EO] 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government)[.]" ECF No. 66-1 at 119. Because the Gender Ideology EO imposes obligations only on the federal government, and not on any funding recipient, it does not appear that this term imposes any obligations on Plaintiffs. Nonetheless, because the Gender Ideology EO directs agencies (including HUD) to "to end the Federal funding of gender ideology," the December NOFO at a minimum suggests that HUD will abide by the terms of the Gender Ideology Order by withholding funding from recipients who abide by HUD's longstanding Equal Access policies by providing services consistent with an individual's gender identity may find themselves ineligible for CoC funding—leaving their clients facing a loss of services or eviction.

### 4.    Geographic Discrimination Conditions

Fourth, the December NOFO carries forward unlawful conditions from the November NOFO under the guise of "public safety." Broadly speaking, these conditions would put a thumb on the scale based on whether the state or local jurisdiction in which an applicant is located is, by

this Administration's standards, sufficiently tough on "vagrancy"—something the applicant has no control over (the "Geographic Discrimination Conditions"). These include the following requirements, for which points are awarded:

a.  "CoCs must . . . [d]emonstrate . . . that the CoC's entire geographic area . . . [q]uickly clears tents and encampments on public property";

b.  "CoCs must . . . [d]emonstrate . . . that the CoC's entire geographic area . . . [d]oes not tolerate the public use of illicit drugs";

c.  CoCs must" demonstrate utilization of standards like "involuntary commitment," which are a matter of state and local law;

d.  "CoCs must" indicate that the state implements and is compliant with the registration and notification obligations of the Sex Offender Registry and Notification Act (SORNA); and

e.  "CoCs must" assist law enforcement in checking the location of homeless sex offenders, and cooperate with law enforcement in connecting violators of public camping or drug laws with services.

ECF No. 66-1 at 95-97; *compare* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 87-88 (same language).

These conditions discriminate against applicants based on where they are located and, more precisely, based on the policy preferences of local voters. As detailed above, however, in creating the CoC program, Congress committed to funding *every* geographic area in America based on need and nothing else. *See* 42 U.S.C. § 11386a(b). Up until 2025, HUD adopted regulations further implementing this Congressional direction. 24 C.F.R. § 578.17; *see also id.* §§ 578.5, .13. Moreover, these geographically discriminatory conditions are flatly inconsistent with 42 U.S.C. § 12711, which prohibits HUD from "establish[ing] any criteria for allocating or denying funds . . . based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law that is (1) adopted, continued, or discontinued in accordance with

the jurisdiction's duly established authority, and (2) not in violation of any Federal law."[11]

* * *

Taken together, the conditions set forth in this section (the "Challenged Conditions") radically reshape the CoC Program. Indeed, each of these changes is bad on its own, and together they appear tailor-made to destroy the CoC Program as it has existed for decades, with devastating consequences for the most vulnerable Americans. And this is all contrary to Congress's intent and HUD's own regulations and without any reasoned explanation, let alone an explanation sufficient to explain HUD's profound change in position on an untenable and chaotic timeline. These Challenged Conditions are currently enjoined by this Court. ECF No. 68. If allowed to go into effect, however, these Conditions will choke off services, leaving tens of thousands of Americans soon facing imminent risk of eviction back to homelessness.

## H.    Plaintiff States Rely on Federal CoC Funding to Address Homelessness

The Plaintiff States rely on the CoC Program as a principal source of federal funding and coordination for assistance with addressing homelessness. ECF No. 13-15 (ME-Squirrell Decl.) ¶¶ 10, 12, 15; ECF No. 13-25 (PA-Vilello Decl.) ¶¶ 4-6; *see also* ECF No. 13-29 (CA-CICH Marshall Decl.) ¶¶ 13-16; ECF No. 13-3 (NY-DSS Johns Decl.) ¶¶ 2, 49. Within each State, CoC regions are locally defined geographies created by community stakeholders and recognized by HUD, reflecting historical collaboration patterns. ECF No. 13-8 (CT-Navarretta Decl.) ¶¶ 4-7; ECF No. (MA-Byron Decl.) ¶¶ 3-5. Each CoC is organized around the specific housing and service needs of the population it serves, structuring its governance, priorities, and project portfolio in

---

[11] The November NOFO a new scoring system for transitional housing and permanent supportive housing that would have disadvantaged programs that provide supportive services for mental and substance-abuse-derived disabilities, as opposed to only physical disabilities by making one out of an available six points each for TH and PH-PSH projects is awarded to projects that "serve . . . individuals with a physical disability/impairment or a developmental disability . . . not including substance abuse disorder" (the "Disability Condition"). ECF No. 12-3 (Hughes Decl.), Ex. 3 at 62. The Disability Condition was not included in the December NOFO.

response to local factors such as homelessness patterns, provider capacity, geography, and demographic characteristics. ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 8-9, 11; ECF No. 13-3 (KY-Kaye Smith Decl.) ¶¶ 8-10; ECF No. 13-2 (NY-Umholtz Decl.) ¶¶ 6-7; ECF No. 13-26 (VT-Sojourner Decl.) ¶¶ 5-6. Washington, for example, is organized into several HUD-designated CoCs, some of which cover particular counties, and a Balance of State CoC that covers the thirty-four smaller counties in Washington. ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 5-6. Rhode Island is coterminous with the Rhode Island Statewide Continuum of Care Program (RI-500), which serves homeless individuals across the State. ECF No. 13-6 (RI Ventura Decl.) ¶¶ 4-6. Each CoC has a designated Collaborative Applicant under 24 C.F.R. Part 578, responsible for communitywide planning, project ranking, and application for competitive HUD funding. ECF No. 13-13 (KY-Kaye Smith Decl.) ¶¶ 13-15, 18-23; ECF No. 13-25 (PA-Vilello Decl.) ¶¶ 6-8; ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 5-8, 16-17. Through their respective CoCs, service organizations, agencies and local governments in the Plaintiff States receive funding to support permanent supportive housing, rapid rehousing, transitional housing, and coordinated entry systems across the state. ECF No. 13-11 (DC-Miné Decl.) ¶¶ 10-14; ECF No. 13-4 (NY-HPD Warren Decl.) ¶¶ 3-8; ECF No. 13-15 (ME-Squirrell Decl.) ¶ 4; ECF No. 13-18 (MI-Van Dam Decl.) ¶¶ 3-8; ECF No. 13-21 (NJ Winter Decl.) ¶¶ 4-12; ECF No. 13-26 (VT-Sojourner Decl.) ¶¶ 8-9.

CoC funds not only supply direct federal aid but also leverage hundreds of millions in additional public and philanthropic funds essential for operations at publicly funded housing sites. ECF No. 13-12 (IL-Haley Decl.) ¶ 6 ("Illinois increased funding . . . by 154% to support the work of Home Illinois."); ECF No. 13-20 (MN-Leimaile Ho Decl.) ¶¶ 8-10; ECF No. 13-4 (NY-HPD Warren Decl.) ¶ 22; *see, e.g.*, ECF No. 13-13 (KY-Kaye Smith Decl.) ¶¶ 11-12 (detailing CoC funded projects). 24 C.F.R. § 578.73 requires that every CoC-funded project must provide a

twenty-five percent match for all eligible costs other than leasing, and CoC grants provide the backbone of funding that is supplemented by other public and private sources. Projects with guaranteed annual CoC renewals are able to attract other sources of funding, including state Housing Trust Fund dollars, Low-Income Housing Tax Credit (LIHTC) investment, and foundation-backed predevelopment loans. ECF No. 13-12 (IL-Haley Decl.) ¶¶ 8-9; ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 20-23. The broader impact of federal cuts is therefore much greater than the direct funding loss alone.

In several Plaintiff States, state agencies operate as the Collaborative Applicant for the CoC. ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 4, 12-13; CO-Jaeckel Decl. ¶ 4; PA-Vilello Decl. ¶ 7; WA-Mondau Decl. ¶ 5. Agencies serving as the Collaborative Applicants are responsible for preparing and submitting the consolidated CoC Program application to HUD and ensuring that the application complies with all regulatory requirements under 24 C.F.R. Part 578. ECF No. 13-17 (MA-Byron Decl.) ¶¶ 6-7; ECF No. 13-16 (MD-Meister Decl.) ¶¶ 4-5; ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 5-8. They oversee system governance, establish required policies and procedures, and administer CoC grants on behalf of participating localities and service providers. ECF No. 13-15 (ME-Squirrell Decl.) ¶¶ 10, 12; ECF No. 13-2 (NY-Umholtz Decl.) ¶¶ 9-12. Collaborative applicants receive direct federal funding to administer the program locally. ECF No. 13-17 (MA-Byron Decl.) ¶ 6; ECF No. 13-25 (PA-Vilello Decl.) ¶ 9; ECF No. 13-1 (WA-Mondau Decl.) ¶ 9.

In addition to playing a direct role in CoCs, Plaintiff States organize their own homelessness responses around the CoC program. ECF No. 13-29 (CA-CICH Marshall Decl.) ¶¶ 2, 7; ECF No. 59 (CA-Buchanan Decl.) ¶¶ 5-7; ECF No. 13-12 (IL-Haley Decl.) ¶¶ 6, 14; ECF No. 37 (MA-McGeown Decl. ¶¶ 6-11); ECF No. 13-20 (MN-Leimaile Ho Decl.) ¶¶ 1-3, 7-10. For

example, California makes many of its homelessness and housing grants, such as Homekey and Homekey+ grants, Homeless Housing, Assistance and Prevention (HHAP) and Encampment Resolution Funding Program grants, available to CoCs and CoC grantees for the purpose of reducing homelessness and providing the most vulnerable populations in California with permanent supportive housing. ECF No. 13-28 (CA-Olmstead Decl.) ¶¶ 10-14. For instance, collectively, the forty-four CoCs in California have been awarded a total of $982,849,999 in state HHAP grant funding over five award rounds, including $198,431,534 for permanent supportive housing projects. *Id*. ¶ 11. Additionally, California's Homekey Program has invested $3,555,211,382 to help individuals and families transition from homelessness, emergency shelter and/or transitional housing to permanent supportive housing through CoCs or in partnership with local governments and nonprofit organizations. *Id*. ¶ 12. Some Homekey projects rely on CoC funding for ongoing operational costs. *Id*. ¶ 22.

Many states make substantial investments in homelessness and supportive housing that presuppose the existence of this CoC-funded capacity, using state dollars to supplement rental assistance, expand services, or meet match requirements that pair with federal awards. ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 7-10, 12-13; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 8-10; ECF No. 13-15 (ME-Squirrell Decl.) ¶ 19; ECF No. 60 (NM-Nair Decl.) ¶ 5 ("approximately $27 million in state funds appropriated specifically for homelessness"); ECF No. 13-27 (WI-Staff Decl.) ¶¶ 4-8. As a result, state and local expenditures rely on and are intertwined with the predictable funding, data systems, and structure of the federal CoC framework, and add up to billions of dollars' worth of investments over time based on expectations that the CoCs would continue to operate as Congress prescribed. ECF No. 13-7 (CO-Jaeckel Decl.) ¶¶ 8-9; ECF No. 60 (NM-Nair Decl.) ¶¶ 5,

7-8; ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 20-23; ECF No. 13-1 (WA-Mondau Decl.) ¶¶ 9-10; ECF No. 13-27 (WI-Staff Decl.) ¶ 9.

## III.    ARGUMENT

### A.    Legal Standard

In a case under the Administrative Procedure Act (APA), a motion for summary judgment "is simply a vehicle to tee up a case for judicial review[.]" *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). At summary judgment, the Court must "conduct a searching examination to ensure that the agency's decision is" lawful, including that it is "reasonably supported by the administrative record." *Littlefield v. U.S. Dep't of the Interior*, 85 F.4th 635, 643 (1st Cir. 2023). Defendants' rescission of the FY 2024–2025 NOFO and their implementation of the Challenged Conditions through their various FY 2025 NOFOs are procedurally improper, contrary to law, arbitrary and capricious, and unconstitutional. Accordingly, the Court should grant Plaintiff States' Motion for Summary Judgment.

### B.    HUD's Rescission of the FY 2024–2025 NOFO and Issuance of the December NOFO Are Final Agency Actions

Defendants' rescission of the FY 2024–2025 NOFO and issuance of the December NOFO with the Challenged Conditions are "final agency action" reviewable under the APA.

For agency action to be "final," it must (1) "mark the consummation of the agency's decisionmaking process" and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citation modified).

HUD's rescission of the FY 2024–2025 NOFO is a final agency action that is reviewable. This action marks the consummation of the agency's decisionmaking. Defendants announced and then rescinded the 2024–2025 NOFO to then purportedly replace it with the November 2025

NOFO (which Defendants then abruptly rescinded the morning of the TRO hearing in an improper attempt to moot this litigation). *See* DOJ-HUD-AR00002–00003 (AR). This rescission determines rights or obligations, in that it erased previously established criteria for federal funding, and HUD establish new criteria "instead of processing renewals . . . ." AR 2. As Courts addressing grant conditions cases have consistently found, such conditions (including NOFOs) set the rules of the game, including the lawful scope of activities permitted and may lead to denial of awards, terminations, and other legal consequences. *See, e.g.*, *R.I. Coal. Against Domestic Violence v. Kennedy*, C.A. No. 1:25-cv-00342-MRD-PAS, 2025 WL 2988705, at *5 (D.R.I. Oct. 23, 2025); *Hous. Auth. of San Francisco v. Turner*, No. 4:25-cv-08859-JST, 2025 WL 3187761, at *17 (N.D. Cal. Nov. 14, 2025). By rescinding the 2024–2025 NOFO, Defendants not only completely reversed these longstanding rules, but they also ensured that Plaintiffs and other funding recipients would see delays in receipt of critical federal funds. This clearly qualifies as final agency action under "the 'pragmatic' approach [courts] have long taken to finality." *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 578 U.S. 590, 599 (2016) (quoting *Abbot Laboratories v. Gardner*, 387 U.S. 136, 149 (1967)).

The issuance of the December NOFO too is reviewable final agency action because it marks the consummation of Defendants' decisionmaking process and represents a definitive legal position. *See R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *5 (challenged grant conditions were final agency action); *Hous. Auth. of the City & Cnty. of San Francisco v. Turner*, No. 25-cv-08859-JST, 2025 WL 3187761, at *16 (N.D. Cal. Nov. 14, 2025) (same). Should the December NOFO be given operative effect, Plaintiff States would effectively be prevented from participating in the application process and from receiving funding Congress has appropriated if Plaintiffs decline to abide by the Challenged Conditions. Moreover, the Challenged Conditions

change the lawful scope of activities permitted with the grants and may lead to the termination of awards/legal consequences. *See Illinois v. Fed. Emergency Mgmt. Agency*, No. 1:25-cv-00206-WES-PAS, 2025 WL 2716277, at *8 (D.R.I. Sept. 24, 2025) ("Both [*Bennett*] prongs are met here: the new terms mark the consummation of DHS's rulemaking process and impose legal obligations on states by conditioning FY 2025 funding on immigration enforcement compliance.").

## C.    HUD's Untimely Rescission of the FY 2024–2025 NOFO Was Unlawful

### 1.    HUD's untimely rescission was contrary to statute

Defendants' purported rescission and replacement of the FY 2024–2025 NOFO is "not in accordance with law" and is "in excess of statutory . . . authority" under the APA. 5 U.S.C. § 706(2)(A), (C). 42 U.S.C. § 11382(b) requires that HUD "shall release" a NOFO for grants for a particular fiscal year "not later than 3 months after the enactment of the act making the relevant appropriation." Congress made its appropriation for FY 2025 on March 15, 2025. *See* Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, § 1101(12), 139 Stat. 9, 10 (Mar. 15, 2025). At this point the FY 2024–2025 NOFO was already in effect. Therefore, the statutory deadline for issuance of a new NOFO for Fiscal Year 2025 was June 15, 2025. When that date came and went, the 2024–2025 NOFO remained in effect. As of the statutory deadline, HUD was and had been silent about any intention to rescind or replace the NOFO for FY 2025. ECF No. 55 at 18. Defendants therefore lacked the authority to rescind and replace that NOFO in November 2025, five months after the statutory deadline.

In their preliminary injunction opposition, Defendants sought to rely on cases in which courts have excused technical failures to meet procedural deadlines on the theory that "an official's crucial duties are better carried out late than never." *Nielsen v. Preap*, 586 U.S. 392, 411 (2019); *see also Brock v. Pierce County*, 476 U.S. 253, 260 (1986) ("We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent

agency action, especially when important public rights are at stake."); *United States v. Montalvo-Murillo*, 495 U.S. 711, 718 (1990) (similar). In other words, these cases all required the Court "to determine which mandatory obligation (the underlying obligation or the deadline) took precedence." *Jewell v. United States*, 749 F.3d 1295, 1299 (10th Cir. 2014).

Here, there is no such choice because HUD *did* issue a NOFO that was in effect within the statutory deadline: the FY 2024–2025 NOFO. Thus, "[t]his case is not like those in which enforcement of a time limit would require a court to fashion a coercive sanction . . . that would completely strip the government of authority 'to get [the]  . . . job done[.]'" *Castañeda v. Souza*, 810 F.3d 15, 40 (1st Cir. 2015) (Barron, J., for an equally divided *en banc* court) (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 160 (2003)). To the contrary, the action was already taken. Plaintiff States merely seek to prevent the government from undoing that action and fundamentally changing course, *months* after the deadline has passed, when doing so will lead to chaos and disruptions in critical services. Preventing the government from changing course long after the deadline for doing so has passed is precisely what is needed to get the job done. *See Snegirev v. Asher*, 2:12-cv-01606-MJP, 2013 WL 942607, at *4 (W.D. Wash. Mar. 11, 2013) (distinguishing *Brock* line of cases where relief sought by plaintiff "is not a 'sanction,' because Respondent retains the authority to act"); *see also Brock*, 476 U.S. at 262 n.9 ("We . . . do not[] hold that a statutory deadline for agency action can never bar later action unless that consequence is stated explicitly in the statute.").

Moreover, unlike the cases they previously relied on, Defendants' violation of the statutory deadline is not a mere technicality but has significant effects on the CoC Program itself. For example, in *Brock*, the Supreme Court reversed a lower court holding that an agency's failure to adhere to a 120-day "procedural requirement" for the resolution of a grant audit eliminated the

agency's power to recover misused funds "when . . . there are less drastic remedies available for failure to meet a statutory deadline." *Brock*, 476 U.S. at 260; *see* ECF No. 55 at 51-52. But the plaintiff in that suit "conced[ed] that the Secretary did not lose jurisdiction to make a determination after 120 days had passed, [but] argued that it had suffered prejudice because of the lengthy delay[,]" and the reasoned that because the treating the deadline as prohibiting further agency action would "would prejudice the rights of the . . . public" and because "the Secretary's ability to complete [an audit] within 120 days is subject to factors beyond his control[,]" Congress had not intended to "impose a jurisdictional limitation on the Secretary's enforcement powers" if he missed the deadline. *Brock*, 476 U.S.at 261-62

By contrast, the belated rescission at issue here, which was entirely within HUD's control, undermines the public interest at stake: to make renewal funds available to performing projects on an annual basis. Here, there are no "less drastic remedies" available than enjoining HUD's unlawful rescission to prevent the harm to the "important public rights" at issue in this case. *Id.* at 260. The Secretary's ability to perform his statutory obligation to implement the CoC program in accordance with the law is fully dependent on the timely issuance of a lawful NOFO. *See, e.g.*, 42 U.S.C. § 11382(c)(2)(A) (generally requiring the HUD Secretary to announce conditional awards "within 5 months" of a NOFO's application deadline). The inevitable consequence of this belated rescission is that HUD will be unable to adhere to the statutorily-mandated renewal process that Congress commands HUD to undertake each annual appropriations cycle. *See* ECF No. 11 at 8, 31-32; 42 U.S.C. § 11386c(b) ("The sums made available under subsection (a) [the appropriations account for this subchapter] shall be available for the renewal of contracts in the case of tenant-based assistance, successive 1-year terms[.]"). Defendants' flagrant disregard of the statutory deadline has prevented their compliance with the core purpose and provisions of the statute. Under

these circumstances, *Brock* does not provide cover for an agency that seeks to take a do-over on statutory action months after the deadline has passed. *See Sierra Club v. Babbitt*, 69 F. Supp. 2d 1202, 1252 (E.D. Cal. 1999) (distinguishing *Brock* where "an agency has egregiously violated a procedural planning requirement which is closely linked to the ability of the agency to" carry out its substantive functions).

### 2.    HUD's untimely rescission was arbitrary and capricious

Additionally, the purported rescission and replacement of the FY 2024–2025 NOFO was arbitrary and capricious because Defendants failed to provide any reasonable basis for doing so, particularly long after the statutory deadline passed. *See Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) ("[A]gency action [must] be reasonable and reasonably explained[.]"). Instead, in one sentence of the November NOFO (and subsequent December NOFO), HUD merely stated without explanation that the NOFO "rescinds and supersedes any mention of awards of FY 2025 CoC funds" in the FY 2024–2025 NOFO. ECF No. 12-3 (Hughes Decl.), Ex. 3 at 16. Defendants all but admitted the lack of reasoning that went into their rescission of the FY 2024–2025 NOFO when they abruptly yanked the November NOFO without explanation.

The purported rescission or replacement of the FY 2024–2025 NOFO is also arbitrary and capricious because Defendants did not consider Plaintiffs' significant reliance interests in the funding—and timeline for funding—that was promised by the FY 2024–2025 NOFO, which did not require FY 2024 applicants to reapply for FY 2025. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (where an agency is "not writing on a blank slate, it [is] required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns") (quotation omitted). The

November NOFO was issued just two months before many grants pursuant to the FY 2024–2025 NOFO were subject to renewal and the recipients of these grants had expected that the grants would be renewed pursuant to the FY 2024–2025 NOFO. The belated issuance of the November NOFO, however, caused considerable confusion and virtually ensured gaps in funding for the projects funded by these grants. Further, Defendants failed to consider the catastrophic disadvantages of rescinding the FY 2024–2025 NOFO, including that tens of thousands of formerly homeless individuals and families will be forced out of their housing and onto the streets. Defendants' recent withdrawal of the November NOFO on December 8, 2025—and their issuance of yet another, even later NOFO on December 19—compounds these harms and further necessitates reinstatement of the FY 2024–2025 NOFO. *See* ECF No. 49-1 (WA- Mondau Decl.) ¶¶ 8-14; ECF No. 49-2 ( Leone Decl.) ¶¶ 6-25.

Nowhere in the partial administrative record or their prior declaration is any evidence or explanation of how HUD "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation omitted). Indeed, the administrative record is bereft of any explanation whatsoever. It runs 279 pages, of which 257 pages—92.1%—is merely the FY 2024–2025 and November NOFOs. As already explained, those NOFOs contain no explanation whatsoever supporting Defendants' rescission. ECF No. 49 (Pls.' Mot. for Leave to Supp. Pls.' Mot. for Prelim. Inj.) at 3; ECF No. 58 (Pls.' Reply in Supp. of Mot. Prelim. Inj.) at 19-21. The remaining twenty-two pages include: four copies of a "Section 231 Notification letter" to congressional members detailing its plan to reallocate certain "recaptured funds," without explaining why or how those recaptured funds would be spent, plus a cover email (thirteen pages); a July 3 email sent to HUD listserv

recipients noting that HUD would be issuing a new NOFO, that was previously included as Exhibit 1 to the Declaration of Nicholas Mondau, ECF No. 13-1 at 15 (one page); two copies of an undated letter to members of Congress apparently responding to an inquiry, which inquiry itself is not included in the administrative record (five pages); and a November 13 email sent to HUD listserv recipients announcing the November NOFO (three pages). None of these documents acknowledge—let alone explain—the seismic shift to the CoC program represented by the December NOFO, or the fact that this new, fundamentally different NOFO was issued several months after the statutory deadline, so late to as virtually guarantee funding gaps and service interruptions. The closest any of these documents come is the November 13 email which lists, in bullet point, how "HUD intends to positively steward . . . valuable taxpayer resources[.]" AR 24. While that email lists some policy goals—such as "[p]romoting treatment and recovery"; "Welcoming Transitional Housing and Supportive Services projects including street outreach"; and "Increasing personal accountability through enhanced treatment requirements to combat the Fentanyl crisis"—the email makes no effort whatsoever to explain how or why the FY 2024–2025 NOFO allegedly fails to accomplish these goals, how the November NOFO accomplishes them, or why these goals require rescinding and replacing the FY 2024–2025 NOFO months after the statutory deadline. *Id.* And the email entirely ignores the significant downsides to the rescission, including the significant reliance interests at stake, or the fact that the very late rescission would essentially guarantee gaps in funding and services. This is a textbook example of unreasoned decisionmaking. *See Regents*, 591 U.S. at 30 (finding agency action arbitrary and capricious where the agency "entirely failed to consider [an] important aspect of the problem") (quotation omitted).

In opposing Plaintiff States' Motion for Preliminary Injunction, Defendants posited that because the FY 2024–2025 NOFO supposedly represented the Biden Administration's policies,

and the Trump Administration disagreed with some of those policies, it was perforce reasonable to rescind the NOFO. ECF No. 55 at 55-56. However, the APA requires more than the current president's purported "say so" to justify agency decisionmaking. *Id.* Defendants appear to argue that *any* "decision to rescind a NOFO premised on the prior Administration's policy directives" is "within the 'zone of reasonableness' under the APA," regardless of the substance of those decisions, the explicit Congressional purpose of the statute, or the impact of those decisions on relevant parties. *Id.* (citing *Prometheus Radio*, 592 U.S. at 423; *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009)). But that is not what the case law says: courts must "ensure[] that the agency has acted within a zone of reasonableness[.]" *Prometheus Radio*, 592 U.S. at 423 (emphasis added) (rejecting APA challenge where agency "thoroughly examin[ed] . . . record evidence" and "addressed the possible impact on minority and female ownership."); *Regents*, 591 U.S. at 30. While it is true that a change in policy need not be justified by "reasons more substantial than those required to adopt a policy in the first instance[,]" the agency must still "examine the relevant data and articulate a satisfactory explanation for its action." *Fox Television Stations, Inc.*, 556 U.S. at 513-514 (quoting *State Farm*, 463 U.S. at 43).

**D.    The December NOFO Is Unlawful**

**1.    The challenged conditions were adopted without notice-and-comment**

Under the APA, government agencies are required to publish "general notice of proposed rule making" and provide "interested persons an opportunity to participate in the rule making" by submitting comments on the proposed agency rule. 5 U.S.C. § 553(b), (c). The provisions of § 553 do not apply to matters relating to "public property, loans, grants, benefits, or contracts." 5 U.S.C. § 553(a)(2). But HUD's regulations have long "provide[d] for public participation in rulemaking with respect to *all* HUD programs and functions, *including* matters that relate to public property, loans, grants, benefits, or contracts *even though such matters would not otherwise be*

*subject to rulemaking* by law or Executive policy." 24 C.F.R. § 10.1 (emphasis added). Where notice-and-comment is required, "[f]ailure to abide by these requirements renders a rule procedurally invalid." *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

The Challenged Conditions represent a sharply consequential shift in how HUD will prioritize nearly $4 billion in federal funds for homelessness—shifting away from long-term housing and towards transitional housing that requires work and addiction treatment. This administration's serious change in priorities includes restricting CoC funds for renewal of permanent housing projects to thirty percent and imposing a host of conditions that override or are untethered to the statutory purpose of the program and HUD's own regulations. Such substantive changes to the HUD CoC program must be made through notice-and-comment rulemaking—as required by HUD's own regulations—which HUD wholly failed to do.[12] *Cf. Comm. For Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992) (HUD's changed methods for calculating subsidies for public housing authorities were substantive or legislative rules and violated notice-and-comment); 81 Fed. Reg. 48366 (July 25, 2016) (HUD's own practice in seeking additional comment on the formula used to allocate CoC funds).

This case shows exactly why notice-and-comment procedures are required before agencies adopt wholly new policies. "Notice requirements are designed . . . to ensure that agency regulations are tested via exposure to diverse public comment," and "to ensure fairness to affected parties," among other reasons. *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Here, Defendants' last-minute policy switches left CoC applicants in the totally untenable position of having to fundamentally remake their housing

---

[12] Notice and public procedures may be omitted if HUD determines that, in a particular case or class of cases, notice and public comment procedures are "impracticable, unnecessary[,] or contrary to the public interest." 24 C.F.R. § 10.1. But to counsel's knowledge, HUD has not stated such a determination.

programs in the new Administration's image in a matter of weeks or forego federal funding. *See* ECF No. 11 at 40-46. And they have resulted in substantive rules that are not only unworkable and unreasonable, but unlawful as well. This sort of unreasoned chaos is exactly what notice-and-comment requirements are designed to protect against.

HUD's failure to follow procedure means the Challenged Conditions can and should be held unlawful and set aside. *See* 5 U.S.C. § 706(2)(D).

### 2.    The challenged conditions are contrary to law

#### a.    HUD lacked authority to implement its own conditions on congressionally authorized funding

As an agency, HUD's "power to act and how [it is] to act is authoritatively prescribed by Congress[.]" *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Accordingly, Defendants have "no power to act . . . unless and until Congress confers power upon" them. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). This is especially true when it concerns federal funding, as the Constitution assigns Congress the power to "set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 596 U.S. 212, 216 (2022). "Any action that an agency takes outside the bounds of its statutory authority is ultra vires . . . and violates the Administrative Procedure Act[.]" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citations omitted); 5 U.S.C. § 706(2)(C).

Court after court has already concluded that HUD lacks the authority to add conditions like the ones challenged here to CoC funding. *See Nat'l All. to End Homelessness v. Turner*, No. 25-cv-00447-MSM-AEM, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025) (enjoining disbursement of Continuum of Care Builds funds due to conditions that the project be located in a jurisdiction that cooperates with federal immigration enforcement and that the applicant will not deny the sex binary or promote the notion that sex is a chosen or mutable characteristic);

*Martin Luther King, Jr. Cnty. v. Turner*, 785 F. Supp. 3d 863, 887 (W.D. Wash. 2025) (finding that HUD was likely "acting in excess of statutory authority" and "run[ning] afoul of the Separation of Powers doctrine" when it "impose[d] . . . new funding conditions on recipients of the CoC funds," including Gender Ideology conditions); *City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905, at *6-9 (W.D. Wash. Oct. 31, 2025) (enjoining enforcement of Gender Ideology Order, including with respect to CoC funding). This is because the McKinney-Vento Act details what "required criteria" HUD must use in awarding CoC funds, 42 U.S.C. § 11386a, and which "certification[s]" are required from project sponsors, 42 U.S.C. § 11386(b)(4), but does not grant HUD any authority to add additional terms, like a thirty percent cap on permanent housing, a ban on recognizing transgender people, or conditions discriminating based on the legislative and enforcement priorities of the locality in which a CoC sits. Although the Secretary is empowered to require applicants to "comply with such other terms and conditions as the Secretary may establish to carry out this part in an effective and efficient manner[,]" 42 U.S.C. § 11386, this does not give Defendants the unilateral authority to add whatever "substantively distinct and extraneous objective[]" they want, "untethered from the statutory purpose of ensuring efficient program administration." *City of Seattle*, 2025 WL 3041905, at *8. Rather, as the First Circuit has explained, an agency cannot "create qualification requirements unrelated to the [statutory] grant program simply to advance its own policy priorities." *Providence*, 954 F.3d at 39. Indeed, Defendants make no effort, anywhere in their NOFO, to identify a statutory basis for any of these conditions—because there is none. All they rely on are Executive Orders, but the President has no more power "to enact, to amend, or to repeal statutes" than do agencies. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

Accordingly, Defendants' efforts to add conditions are "in excess of statutory . . . authority[.]" 5 U.S.C. § 706(2)(C).

### b.    The Challenged Conditions violate the McKinney-Vento Act and HUD statutes and regulations in multiple respects

"An agency may not . . . simply disregard rules that are still on the books." *Fox Television Stations*, 556 U.S. at 515. 5 U.S.C. § 706(2)(A) requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024). The Challenged Conditions violate multiple provisions of the McKinney-Vento Homeless Assistance Act and its implementing regulations and should therefore be enjoined.

To begin with, the Permanent Housing Cap and the Tier 1 Cap are "irreconcilable" with various provisions of the statute that require the majority of CoC funds to be used for renewal of permanent housing projects. *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1113 (9th Cir. 2020) (enjoining funding conditions incompatible with statutory requirements as contrary to law). Because eighty-seven percent of existing project funds eligible for renewal are permanent housing projects, the Permanent Housing Cap would preclude renewal of nearly two-thirds of those funds in plain violation of 42 U.S.C. § 11386c(b), which requires that renewal funds for existing projects "*shall* be available for the renewal of contracts in the case of tenant-based assistance, *successive* 1-year terms[.]" (emphasis added). By further directing that "[t]he Secretary shall determine whether to renew . . . *on the basis of certification by the collaborative applicant* . . . that (1) there is a demonstrated need for the project; and (2) the project complies with program requirements and appropriate standards of housing quality and habitability," Congress made clear that HUD lacks

discretion to arbitrarily withhold funds that Congress directed it to spend on renewals. *Id.* (emphasis added).

The Permanent Housing Cap would also override HUD's evaluation of projects based on statutorily "[r]equired [c]riteria" including "the extent to which the recipient will . . . incorporate comprehensive strategies for reducing homelessness," which by statute includes strategies "proven to be effective at reducing homelessness" like "permanent supportive housing" and "rapid rehousing[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d)(2); *see also* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 363 (2024) ("[T]he Secretary shall provide incentives to create projects that coordinate with housing providers and healthcare organizations to provide permanent supportive housing and rapid re-housing services[.]"). To the extent that the Tier 1 Cap results in projects otherwise eligible for renewal losing funding through the competitive process, it also violates these provisions.

Defendants will no doubt argue that because 42 U.S.C. § 11386c(b)(2) allows the Secretary to determine "program requirements" that projects must meet to be renewed, HUD therefore has discretion to impose a "program requirement" in the form of the Permanent Housing Cap. But the CoC "program requirements" are spelled out at 42 U.S.C. § 11386, and the Secretary's discretion to implement "other terms and conditions as [he] may establish to carry out this part in an effective and efficient manner," 42 U.S.C. § 11386(b)(8), is plainly limited to the same type of prosaic administrative conditions explicitly detailed in the statute and does not license a wholesale revision of the Congressional mandate. *See City of Seattle*, 2025 WL 3041905, at *8.

Likewise, the Service Requirement Conditions conflict with the statutory project selection criteria that prioritize projects that demonstrate success with rapid and permanent rehousing. "When Congress limits the purpose for which a grant can be made, it can be presumed that it

intends that the dispersing agency make its allocations based on factors solely related to the goal of implementing the stated statutory purposes in a reasonable fashion, rather than taking irrelevant or impermissible factors into account." *Robbins v. Reagan*, 780 F.2d 37, 48 (D.C. Cir. 1985) (per curiam). Under the selection criteria codified at 42 U.S.C. § 11386a(b)(1), HUD "shall" evaluate projects based on "previous performance" of service providers, as measured by, *inter alia*, "(i) the length of time individuals and families remain homeless; (ii) the extent to which individuals and families who leave homelessness experience additional spells of homelessness; (iii) the thoroughness of grantees in the geographic area in reaching homeless individuals and families; [and the] (iv) overall reduction in the number of homeless individuals and families[.]" Congress thereby made its instructions clear: projects are to be evaluated by how quickly they can get people housed and the extent to which they keep them housed. "In interpreting statutes and regulations, courts must try to give them a harmonious, comprehensive meaning, giving effect, when possible, to all provisions." *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 168 (1st Cir. 1987). Related provisions instruct that services and treatment are to be a complement, rather than a precondition, to housing placement. *See* 42 U.S.C. § 11385(a) ("*To the extent practicable*, each project shall provide supportive services for residents of the project and homeless persons using the project[.]") (emphasis added); 42 U.S.C. § 11386a(b)(1)(F) ("independent living in permanent housing" can "*includ[e]* assistance to address" issues like "mental health conditions, substance addiction . . . or multiple barriers to employment[]") (emphasis added).

The Gender Ideology Conditions, like the Service Requirement Conditions, disrupt the Congressionally mandated project selection criteria and are likewise contrary to the statutory

scheme.[13] And they are also unlawful because they violate HUD's own Equal Access regulation, which requires CoC funding recipients to provide services and accommodation in accordance with an individual's gender identity. *See* 24 C.F.R. § 5.106; *Maine v. Thomas*, 874 F.2d 883, 890 (1st Cir. 1989) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures.") (quoting *Morton v. Ruiz,* 415 U.S. 199, 235, (1974)); *see also Doe v. Noem*, 778 F. Supp. 3d 1151, 1160 (W.D. Wash. 2025) (holding that agency action is "contrary to law" if it "disregard[s]" the agency's "own regulations and policies"). Courts have been quick to discard similarly misplaced ideological appendages to statutory grant conditions. *See, e.g.*, *Washington v. U.S. Dep't of Health & Hum. Servs.*, No. 6:25-cv-01748-AA, 2025 WL 3002366 (D. Or. Oct. 27, 2025) (enjoining gender-ideology-related grant conditions that "run counter to statutory authority and directly undermine congressional purpose"); *Nat'l All. to End Homelessness*, 2025 WL 2638377, at *1 (enjoining disbursement of CoC Builds funds due to, *inter alia*, gender ideology conditions). HUD seems to have conceded that the Gender Ideology Conditions as explicated in the November NOFO were indefensible and seeks instead to smuggle them in by reference in the December NOFO (*see* ECF No. 66-1 at 119), but they should be rejected in all their forms.

---

[13] Defendants have asked this Court to declare that "Plaintiffs' challenges to the [November] 2025 NOFO have been rendered moot" by HUD's voluntary rescission of that NOFO on the eve of the TRO hearing. ECF No. 55 at 20. Even though the revised Gender Ideology Condition does not impose any obligations on the Plaintiffs, they do still potentially direct HUD to withhold funding to Plaintiffs. Moreover, the Court should reject any mootness arguments because Defendants have not shown that the challenged aspects of the 2025 NOFO will not later be restored. "The burden of establishing mootness rests with the party urging dismissal. This burden is a heavy one." *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) (internal citations omitted). Defendants cannot do that because they have made clear that the challenged aspects of the November NOFO are likely to and largely have recurred, putting this case squarely within the voluntary cessation doctrine. "[T]he voluntary-cessation doctrine exists to stop a scheming defendant from trying to immunize itself from suit indefinitely by unilaterally changing its behavior long enough to secure a dismissal and then backsliding when the judge is out of the picture[.]" *Boston Bit Labs, Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) (citation modified). "[V]oluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000)); *see also FBI v. Fikre*, 601 U.S. 234, 241 (2024) (describing the voluntary cessation doctrine as a "formidable burden" for defendants).

Furthermore, the Geographic Discrimination Conditions cannot be squared with both statutory and regulatory provisions directing HUD to fund every geographic area based on need. *See* 42 U.S.C. § 11386a(b) ("[T]he need within the geographic area for homeless services, [shall be] determined . . . by a formula, which shall be developed by the Secretary, by regulation[.]"); 24 C.F.R. § 578.17(a) (describing formula for Preliminary Pro Rate Need for each geographic area). The Geographic Discrimination Conditions "tak[e] irrelevant or impermissible factors into account[,]" *Robbins*, 780 F.2d at 48, thwarting Congress's design for the dispersal of funds first by region and then by demonstrated success according to statutory criteria. They likewise violate 42 U.S.C. § 12711, which prohibits HUD from "establish[ing] any criteria for allocating or denying funds made available under programs administered by the Secretary based on the adoption, continuation, or discontinuation by a jurisdiction of any public policy, regulation, or law." In doing so, HUD makes an attempt at "leveraging the Non-CoC HUD Plaintiffs' dependence on federal funding to coerce them into replacing their own local policies with the Trump Administration's political agenda." *Martin Luther King, Jr. Cnty. v. Turner*, 798 F. Supp. 3d 1224, 1250-51 (W.D. Wash. 2025); *see also Cnty. of Westchester v. U.S. Dep't of Housing and Urban Dev.*, 802 F.3d 413, 433 (2d Cir. 2015) ("HUD may not . . . *condition* funding on changes to local policies.") (emphasis in original).

Finally, the Disability Condition from the November NOFO (which HUD excised from the December NOFO) favor programs that support participants with physical disabilities to the exclusion of those experiencing mental or substance-abuse-derived disabilities is likewise contrary to the plain language of the Act. The McKinney-Vento Act explicitly defines the term "homeless individual with a disability" to include an individual who "has a disability that . . . is a physical, mental, or emotional impairment, including an impairment caused by alcohol or drug abuse[.]"

44

42 U.S.C. § 11360(10)(A)(i)(IV). HUD's own regulations incorporate this definition of disability into its definition of "chronically homeless." 24 C.F.R. § 578.3.[14]

Taken together, the Challenged Conditions would interfere with rather than promote "efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families" and therefore contravenes Congress's overall purpose in establishing the CoC program. 42 U.S.C. § 11381(2); *Penobscot Nation v. Frey*, 3 F.4th 484, 501 (1st Cir. 2021) ("[W]e cannot interpret . . . statutes to negate their own stated purposes." (quoting *King v. Burwell*, 576 U.S. 473, 493 (2015)). This Court should therefore enjoin those Conditions as contrary to law.

### 3.    HUD's adoption of the challenged conditions is arbitrary and capricious

The Challenged Conditions are also arbitrary and capricious. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). In doing so, the agency cannot rely on "factors which Congress has not intended it to consider[.]" *Id*. The "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Commerce v. New York*, 588 U.S. 752, 785 (2019).

---

[14] As noted in footnote 13, Plaintiffs' challenges to conditions excised from the November NOFO remain live.

In addition, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternative[s] that are within the ambit of the existing policy[,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted).

An action is also arbitrary and capricious if the agency "failed to consider . . . important aspects of the problem before" it. *Regents*, 591 U.S. at 25 (citation omitted); *see also id.* at 30. An agency must "pay[] attention to the advantages *and* the disadvantages" of its decision. *Michigan v. E.P.A.*, 576 U.S. 743, 753 (2015).

As set forth below, the Challenged Conditions are arbitrary and capricious for each of four independent reasons: (1) Defendants failed to consider important aspects of their decision including the disadvantages of the decision, namely, what would happen when states and housing providers suddenly lost federal funding; (2) Defendants failed to provide a reasoned basis or explanation for their new policies; (3) the Challenged Conditions are inconsistent with Congress' directives; and (4) Defendants reversed longstanding prior policies without weighing reliance interests.

### a. Defendants failed to consider the impacts of the Challenged Conditions on individuals who are likely to lose their housing

Defendants utterly failed to consider what is going to happen to the entities and, more importantly, people who will be cut off by the Challenged Conditions. *See Michigan*, 576 U.S. at 753 (an agency must "pay[] attention to the advantages *and* the disadvantages of [its] decisions").

There is simply no way around it: capping permanent housing renewals and Tier 1 funding at thirty percent, and denying funding to organizations that serve transgender individuals or exist in jurisdictions who don't enforce anti-vagrancy laws means that many organizations and projects

receiving funding, and that reasonably expected to continue receiving funding, will lose that funding. That loss of funding will have inevitable, obvious, and devastating effects on the vulnerable people living in the housing, many if whom will be evicted back into homelessness. Defendants entirely fail to address this. Nothing in the December NOFO or administrative record so much as considers the problem. *See* ECF No. 66-1 at 14-20; AR 293-97 (listing factors HUD considered). But almost certainly, tens of thousands of people, if not more, will end up being evicted back into homelessness. HUD's failure to consider, or even acknowledge, this basic reality is genuinely gobsmacking. The entire purpose of the Continuum of Care Program is to help those experiencing homelessness to find stable housing. 42 U.S.C. § 11381. In adopting policies that will evict untold number of Americans back into homelessness, Defendants have "entirely failed to consider an important aspect of the problem[.]" *State Farm*, 463 U.S. at 43; *see also R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *7 (finding that Defendants failed to consider "the harmful impact their decision would have on the Coalitions and the vulnerable populations they serve[]").

> **b.    After initially refusing to provide any explanation for the Challenged Conditions, Defendants subsequently adopted post hoc rationalizations that fail to justify the Challenged Conditions**

When Defendants first adopted the challenged conditions in the November NOFO, they utterly failed to provide any reasoned basis or explanation for the Challenged Conditions. Courts have previously analyzed this issue under very similar factual circumstances. For example, in a recent lawsuit challenging the imposition of CoC funding conditions—including those related to "gender ideology"—one court concluded that Defendants' actions were arbitrary and capricious because the "rote incorporation of executive orders—especially ones involving politically charged policy matters that are the subject of intense disagreement and bear no substantive relations to the

agency's underlying action—does not constitute 'reasoned decisionmaking.'" *Martin Luther King, Jr. Cnty.*, 798 F. Supp. 3d at 1252; *see also R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *7 (finding likelihood of success on merits of arbitrary and capricious claim with respect to gender ideology and other conditions on Continuum of Care grants due to a failure to provide an explanation).

That is all Defendants did in their November NOFO, however. They failed to provide any reasoned basis for the Challenged Conditions beyond glancingly mentioning that they are incorporating the Gender Ideology and Anti-Homeless Orders. *See* ECF No. 12-3 (Hughes Decl.), Ex. 3 at 13 (noting that NOFO implements Anti-Homeless EO); 109 (noting that NOFO implements Gender Ideology EO).

Now, after Plaintiffs already filed suit to enjoin these Challenged Conditions, Defendants have sought to explain their thinking and promulgated a memo—the December Memorandum—which tries to retroactively justify the very same Challenged Conditions. ECF No. 66-1 at 15-21; AR 286-99. But these *post hoc* rationalizations are insufficient as a matter of law. *See Regents*, 591 U.S. at 4 (finding agency action to be arbitrary and capricious because the agency's reasoning "consists primarily of impermissible '*post hoc* rationalization'") (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)); *see also Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) (when assessing whether agency action is arbitrary and capricious, the Court "may consider only the agency's explanation given at the time the relevant decision was made, as opposed to [a] post hoc rationale") (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943)). And while agencies may deal with problems "afresh" by taking new agency action, *Regents*, 592 U.S. at 21, HUD's recycling of the same Challenged Conditions in the middle of litigation—without complying with "the procedural requirements for new agency

48

action"—does not qualify as proper agency action and does not bless their post hoc justifications. *Id.*[15]

In any event, Defendants' post hoc rationalizations for the Challenged Conditions "run[] counter to the evidence before the agency[.]" *State Farm*, 463 U.S. at 43.

Start with the Permanent Housing and Tier 1 Caps. Defendants' argument that permanent housing is ineffective is dead on arrival because has explicitly found that "permanent supportive housing" and "rapid rehousing services" are among the "activities that have been proven to be effective at reducing homelessness[.]" 42 U.S.C. § 11386b(d)(2). Defendants lack the power to simply disregard these findings.

Defendants' change of heart also fails out of the gate because HUD's *own* recent analysis of data finds considerable support for a Housing First approach emphasizing permanent housing. For example, according to HUD's most recent strategic plan, "considerable research literature," including "[r]andomized controlled trials," demonstrates that "a Housing First approach . . . improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." ECF No. 12-1 (Hughes Decl.), Ex. 1 at 27.

By contrast, Defendants' recent about-face is entirely unsupported by the administrative record. The December NOFO and December Memorandum justify the Caps and the attendant Service Requirements by pointing to evidence that homelessness has increased in recent years (during which time CoC funding has largely gone to permanent housing). ECF No. 66-1 at 15-16; AR 287. And, tragically, it has. But Defendants do not point to *any* causal link between the increase

---

[15] Additionally, despite having been issued on December 19, 2025, the December Memorandum improperly purports to provide factors that HUD weighed no later than "mid-June" even when there is no other evidence (in the administrative record or otherwise) that this analysis ever occurred. AR 286.

in homelessness and HUD's longstanding commitment to fund permanent housing. *See Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 800 (2011) (explaining that studies "based on correlation, not evidence of causation," do not establish causation) (quotation omitted); *United States v. Jacques*, 784 F. Supp. 2d 59, 65 (D. Mass. 2011) ("Of course, without more, this statistic is virtually meaningless in light of the well-known principle that correlation does not imply causation.").

Defendants' reliance on the increase in homelessness is particularly weak because they cannot even show correlation. According to Defendants, "Permanent Supportive Housing beds began to skyrocket" "[b]y 2013" and "HUD has routinely renewed over 90% of CoC grants every year since 2013." AR 286, 288. But HUD's own data shows that homelessness *declined* after 2013, reaching a low of 549,928 in 2016. AR 596. And by 2022, the number of people experiencing homelessness was still well below where it was in 2007. *Id.* Homelessness in America only began its sharp increase following the COVID-19 pandemic:



Exhibit 1-1: PIT Estimates of People Experiencing Homelessness by Sheltered Status, 2007-2024

Note: The exhibit does not display the total count of people experiencing homelessness in 2021 or the count of all people experiencing unsheltered homelessness because of pandemic-related disruptions to counts. Estimates of the number of people experiencing sheltered homelessness at a point in time in 2021 should also be viewed with caution, as the number could be artificially (falsely) reduced compared with non-pandemic times, reflecting reduced capacity in some communities and safety concerns regarding staying in shelters.

*Id.* So what is the correlation between HUD's longstanding policy of funding permanent housing and the recent increase in homelessness? HUD does not say.

HUD's own analyses also contradict its newfound claim that permanent housing policies are responsible for increased homelessness. According to HUD's "2024 Annual Homelessness Assessment Report (AHAR) to Congress," published less than a year before the November NOFO, "[s]everal factors likely contributed" to the recent spike in homelessness, including "[o]ur worsening national affordable housing crisis, rising inflation, stagnating wages among middle- and lower-income households, . . . the persisting effects of systemic racism, . . . public health crises, natural disasters that displaced people from their homes, rising number of people immigrating to the U.S., and the end of homelessness prevention programs put in place during the COVID-19 pandemic[.]" AR 585. HUD's correlation-only analysis simply ignores these alternative explanations. Additionally, HUD's reporting suggests that some of the apparent increase in homelessness might simply reflect better data-gathering, which identified individuals who were not previously counted as homeless. *See, e.g.*, AR 616, 628, 636. Moreover, Defendants' suggestion that permanent housing contributes to homelessness ignores the fact that people in permanent housing are not included in HUD's count of individuals experiencing homelessness. AR 586. In other words, each person who moves into permanent housing is one person less who is homeless. So it simply does not make sense to suggest, as Defendants do, that permanent housing contributes to an increase in homelessness.

Instead, the AHAR provides evidence in support of permanent supportive housing, including feedback from various CoCs that: (1) increased permanent supportive housing capacity and new permanent supportive housing initiatives reduced "homelessness among veterans [and] suggests a broader positive trend in addressing homelessness within the community"; and (2) a

decline in veteran homelessness is due to "expedite[d] referrals to permanent housing" and placing veterans "into permanent housing." AR 644, 650. HUD's "internally inconsistent analysis is arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. Env't Prot. Agency*, 788 F.3d 1134, 1141 (9th Cir. 2015).

The December Memorandum also points to evidence that overdose deaths among individuals experiencing homelessness sharply increased between 2020 and 2023. AR 289. But here again, Defendants make no effort to show this increase had anything to do with any HUD policies. To the contrary, the San Francisco study they cite (and include in the AR) suggests that increased overdose mortality during the COVID-19 pandemic was likely "driven by the growing presence of fentanyl," combined with COVID-related disruptions in services and COVID mitigation policies that reduced contact between those at risk of overdose deaths and those who might have intervened. AR 852. And indeed, the study *specifically found* that "San Francisco's alternative shelter program," through which the City placed high-risk individuals in hotel rooms (without, apparently, requiring sobriety or other preconditions), "*did not appear* to be associated with increased overdose deaths among people experiencing homelessness[.]" *Id.* (emphasis added). Similarly, the December Memorandum cites a City of Seattle audit report that shows a 282% increase in overdose deaths between 2020 and 2023 for "people who are recently homeless and living in permanent supportive housing, subsidized housing, or recovery housing[.]" AR 863; *see also* AR 289. Except that this report undermines Defendants because as awful as that 282% increase is, it is much lower than the 436% increase in fatal overdoses "[f]or those living unsheltered or in emergency shelters[.]" AR 863. The City of Seattle report thus seems to show that those in permanent supportive housing saw much lower rates of overdose deaths than those

52

who were in emergency shelters.[16] More broadly, the City of Seattle report lends further support to the conclusion reached by the San Francisco study: that post-2020 increases in fatal overdoses were driven largely by fentanyl's relentless infiltration of the national drug supply, AR 859-60, not by any HUD policy. Defendants' decision "to rely on portions of studies in the record that support its position, while ignoring [information] in those studies that do[es] not" is arbitrary and capricious. *Genuine Parts Co. v. E.P.A.*, 890 F.3d 304, 313 (D.C. Cir. 2018).

Moreover, nationwide statistics bear out these studies' conclusions: overdose deaths sharply increased nationwide between 2020 and 2023 as fentanyl infiltrated the national drug supply. *Provisional Drug Overdose Death Counts*, U.S. Centers for Disease Control and Prevention, National Center for Health Statistics, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited Jan 6, 2026).[17] But since 2023, nationwide numbers have begun to fall even more sharply, such that April 2025 overdose deaths were actually lower than April 2020 overdose deaths—despite the fact that HUD maintained its Housing First priority unchanged during the entire time period. *Id.* In other words, Defendants cannot show even a correlation between permanent housing and overdose deaths.

Defendants' causation argument also fails a second way. Because on top of failing to show that funding permanent housing has increased homelessness or other pathologies, Defendants have failed to cite any evidence whatsoever that defunding permanent housing, and shifting funds to

---

[16] The City of Seattle report also does not explain what it means by "recovery housing," but looking outside the AR, it appears it refers to the type of sober housing that the December NOFO aims to encourage. *See Recovery Residences*, Washington Health Care Authority, https://www.hca.wa.gov/free-or-low-cost-health-care/i-need-behavioral-health-support/recovery-residences (last visited Jan. 5, 2026).

[17] The Court may take judicial notice of "information published on the website of the Centers for Disease Control and Prevention (CDC)" at the summary judgment stage because the accuracy of this information "cannot reasonably be questioned." *Cox v. City of Bos.*, 734 F. Supp. 3d 173, 177 n.1 (D. Mass. 2024); *see also Gent v. CUNA Mut. Ins. Soc'y*, 611 F.3d 79, 84 n.5 (1st Cir. 2010) (taking judicial notice of factual information on CDC's website at summary judgment).

things like transitional housing, would actually reduce homelessness or other problems. Again, HUD has previously found that providing permanent housing as a front-line intervention to address homelessness leads to better outcomes than other approaches. ECF No. 12-1 (Hughes Decl.), Ex. 1 at 26-27. For example, HUD's "landmark Family Options study found that families who received priority access to deep housing subsidies experienced major decreases in returns to homelessness and increases in family well-being relative to those offered usual care in shelters, and documented major cost savings of rapid rehousing and permanent housing relative to shelter and transitional options on a per-month basis." *Id.* at 25-26 (citing Daniel Gubits et al., *Family Options Study: 3-Year Impacts of Housing and Services Interventions for Homeless Families*, Office of Policy Development and Research (Oct. 26, 2016), https://www.huduser.gov/portal/publications/Family-Options-Study.html). HUD similarly cited to a bevy of "[r]andomized controlled trials evaluating PSH programs that use a Housing First approach show that it improves housing stability, physical and mental health, and a variety of quality-of-life measures while also yielding cost savings through reduced need for emergency health services." *Id.* at 27 (citing National Academies of Sciences, Engineering, and Medicine, *Permanent Supportive Housing: Evaluating the Evidence for Improving Health Outcomes Among People Experiencing Chronic Homelessness*, (Jul. 11, 2018) https://www.ncbi.nlm.nih.gov/books/NBK519597/#ref_000409).[18]

So how does the administrative record address these studies that HUD previously relied on to find that permanent housing improves outcomes, over and above other interventions? It doesn't.

---

[18] Another study cited in the December NOFO (ECF No. 66-1 at 16-17) similarly finds that Housing First contributes to numerous quality-of-life improvements. *See* National Academies of Sciences, Engineering, and Medicine, *Evidence of Effect of Permanent Supportive Housing on Health* (July 11, 2018), https://www.ncbi.nlm.nih.gov/books/NBK519591/. It notes, for example, that "[s]everal studies have demonstrated that individuals experiencing homelessness who are also chronically ill who are randomized to PSH spend significantly fewer days homeless than those who receive usual care"; "that providing PSH to individuals with high medical needs who are also experiencing homelessness decreases emergency department use and hospital stays"; and "that supportive housing improves the housing status of individuals suffering from homelessness, mental illness, and substance abuse." *Id.*

The administrative record includes no evidence to show that, for example, transitional housing, or service requirements, or service-only approaches lead to better outcomes. And it utterly fails to address HUD's prior conclusions, or the evidence on which those conclusions rested. *See State Farm*, 463 U.S. at 43 (requiring the agency to "examine the relevant data and articulate a satisfactory explanation for its action").

To be sure, the administrative record does include reports from the Manhattan Institute and the Discovery Institute—two partisan thinktanks—that critique HUD's longstanding focus on permanent housing and housing first policies. AR 698, 711. In some respects, these reports raise perhaps legitimate challenges facing permanent housing projects. *See, e.g.*, AR 703-704 (addressing challenges in upkeep of permanent housing units), 704-704 (addressing potential opposition to permanent supportive housing projects amongst neighbors). But whatever the merits of these critiques, the December Memorandum does not consider them. *See* AR 286-98. Instead, the December Memorandum relies on the report solely for the flawed argument that the increase in homelessness is somehow proof that permanent housing does not work. *See* AR 287 (citing Manhattan Institute report for the proposition that "[c]hronic homelessness . . . has increased by 74.5% since 2015 . . . despite a 24.7% increase nationwide in Permanent Supportive Housing beds during the same time."). In any event, even crediting all their conclusions, nothing in these reports justifies HUD's draconian, inflexible thirty percent Permanent Housing Cap or its thirty percent cap on renewals. As a matter of fact, the Manhattan Institute report notes that "PSH will continue to play an important role in government's response to homelessness" and offers recommendations

to "consolidate[e] and improv[e] current [permanent supportive housing] programs[.]" AR 698, 707-709.[19]

In contrast to these highly partisan reports, Defendants' AR includes a June 2023 report from UCSF's Benioff Homeless and Housing Initiative called "Toward a New Understanding" that aims to "provide[] evidence to shape programs and policy responses to the homelessness crisis." AR 752, 757. That report noted that, "[i]n in-depth interviews" with individuals experiencing homelessness, "participants expressed an eagerness to obtain permanent housing, because they felt permanent housing would offer needed stability to seek employment and address physical and behavioral health issues. They explained that permanent housing would provide personal safety, security for belongings, access to meal preparation, and protection from the elements." AR 826. To achieve this goal, the Benioff Report offered numerous recommendations centered on low-barrier permanent housing, including that "[p]ermanent supportive housing *should be aligned with Housing First principles*," AR 839 (emphasis added); that localities should "[c]reate permanent supportive housing responsive to the needs of older adults," *id.*; and that localities should "[r]educe carceral response to homelessness . . . . Following encampment resolution best practices, including supporting access to low barrier housing, can reduce trauma, loss of documents, and support better health outcomes," AR 840. The December Memorandum simply ignores these and similar recommendations.

Similar logical gaps infect Defendants' justifications for the remaining Challenged Conditions. For example, in support of their Geographic Discrimination conditions, they point to the experience of Austin, Texas, writing: "[T]wo years after the City of Austin reinstated a ban on

---

[19] As a matter of fact, despite its vociferous disagreement with Housing First policies (largely untethered to any factual citations), the Discovery Institute report recommends a sixty percent cap on "housing vouchers, i.e., *twice* the 30% Permanent Housing Cap Defendants seek to implement. AR 716.

public camping, unsheltered homelessness decreased by one-third." AR 291. But the article they cite for this, which they include in the AR, begins: "Austin's unsheltered homeless population *is growing*, spreading out farther from the city center and living in more secluded areas, *a trend that's likely a result of the city's 2-year-old ban on public camping.*" AR 1103 (emphasis added). As the article explained, Austin's public camping ban has apparently caused homeless Austinites to disburse to "less visible places . . . making it harder to find homeless residents and connect them with supportive services and shelter or housing." AR 1105. At best, Defendants misunderstood the data. At worst, they are actively misrepresenting it.

Finally, Defendants make no effort whatsoever to defend the Gender Ideology or Disability Conditions, and nothing in the AR even plausibly justifies them. Like the other Challenged Conditions, they are arbitrary and capricious. *See Modesto Irr. Dist. v. Gutierrez*, 619 F.3d 1024, 1034 (9th Cir. 2010) ("Courts will not assume an agency has engaged in reasoned decision making when it implicitly departs from its prior precedent and provides no explanation for doing so." (citation modified)); *Martin Luther King Jr., Cnty.*, 785 F. Supp. 3d at 888-89 ("rote incorporation" of federal law in grant agreements, "does not constitute 'reasoned decisionmaking'").

### c.  Defendants relied on factors Congress did not intend them to consider

Defendants compounded their failure to provide a reasoned explanation by relying on factors which "Congress ha[d] not intended it to consider," *State Farm*, 463 U.S. at 43, and "neglect[ing] to consider a statutorily mandated factor[.]" *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1216 (D.C. Cir. 2004).

As noted above, there is perhaps no more glaring example of this than Defendants' blithe rejection of Congress' explicit finding that "permanent supportive housing" and "rapid rehousing services" are among the "activities that have been proven to be effective at reducing

homelessness[.]" 42 U.S.C. § 11386b(d)(2). The statute directs that Defendants "*shall* provide bonuses or other incentives to" CoCs that implement these strategies. 42 U.S.C. § 11386b(d)(1) (emphasis added). Defendants are not at liberty to overrule Congress on this point.

Moreover, as again discussed above, the McKinney-Vento Act already describes the "Required Criteria" that must be used to assess grant applications, directs HUD to fund every geographic area based on need, and explains which information HUD should require project sponsors to certify. Yet, rather than following these statutorily mandated and highly detailed criteria, Defendants have imposed the new Challenged Conditions. For example, the December NOFO favors CoCs that are located in a state or local jurisdiction that enacted and enforces policies related to illicit drug use, public camping and loitering, and other "public safety" matters, which CoCs have no control over. These conditions are arbitrary and capricious, as Defendants did not "look to" nor "discuss" statutory "requirements" while imposing them. *Little Sisters of the Poor v. Pennsylvania*, 591 U.S. 657, 682 (2020). Rather than addressing any of the above statutory requirements, the December NOFO's section on the Geographic Discrimination Conditions merely cites to the statute's general purposes, such as providing funding for efforts "to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[.]" 42 U.S.C. § 11381. The December Memorandum makes no effort to close that gap. AR 290-292. The statute's purposes do not include the specific requirements imposed by the Geographic Conditions, nor do such general purposes justify Defendants' imposition of these Conditions.

### d. Defendants failed to consider reliance interests

Defendants also acted arbitrarily and capriciously by rescinding prior policies without considering alternatives within the ambit of the existing policies, assessing whether there were

reliance interests, and weighing any such interests against competing policy concerns. The Challenged Conditions are an extreme deviation from HUD's long history of applying a Housing First model, prioritizing renewals, recognizing an individual's gender identity, and ensuring that all geographic areas are funded based on need, not politics. But Defendants "failed to address whether there was 'legitimate reliance' on" the existing funding landscape—which there was. *Regents*, 591 U.S. at 30 (quoting *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735 (1996)).

For years, Continuums, applicants, and service providers developed their programs along the lines that HUD repeatedly urged. Per HUD's guidance, applicants have built Housing First and gender-inclusive programs to provide long-term, stable housing and services for individuals and families to exit homelessness. Now, suddenly, these entities will be immediately forced to fundamentally reshape their programs or forego this critical funding. Programs providing stable housing to formerly homeless individuals cannot simply turn on a dime to become transitional housing or suddenly develop relationships with service providers sufficient to meet the Service Requirement Conditions. Nor have Defendants apparently given any thought to whether there is sufficient supportive service capacity in any (let alone all) CoC geographic areas to even meet HUD's new requirements. Given that it would be extremely difficult for programs to quickly implement these abrupt shifts, many programs are likely to lose out on funding, with their clients bearing the worst of it. Indeed, according to the New York Times, the Permanent Housing Cap could "quickly place as many as 170,000 formerly homeless people at risk of returning to the streets." DeParle, *supra*, at 18; *see also* ECF No. 13-6 (RI-Ventura Decl.) ¶ 18; ECF No. 13-23 (OR-Jolin Decl.) ¶ 34; ECF No. 13-12 (IL-Haley Decl.) ¶ 21. The cuts in the Challenged NOFO would be "catastrophic" and "local governments and charities could not make up the aid." DeParle, *supra*, at 18; *see also* ECF No. 13-5 (NY-SHNNY Leone Decl.) ¶¶ 15, 34-42; ECF No. 13-19

(MI-MCAH Rennie Decl.) ¶ 15; ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 27-28. But neither the December NOFO, nor the December Memorandum, breathes a word about the challenges or disadvantages of adopting these new funding conditions with little warning.

Moreover, it would also be impossible for many programs to comply with the Challenged Conditions because some conditions are beyond the applicants' control. The Geographic Discrimination Conditions punish applicants based solely on whether the jurisdictions in which they happen to sit adopt and/or enforce certain laws. Defendants not only failed to "weigh" these substantial interests "against competing policy concerns"; they "ignored" them altogether. *Regents*, 591 U.S. at 30-33.

Similarly, Defendants failed to consider the reliance interests of states who rely on CoC-funded projects as part of the homelessness response systems. Most notably the Permanent Housing and Tier 1 Caps threaten to destabilize existing CoC-funded permanent housing projects that receive state funding or other support. These projects rely on the availability of both CoC and state funding to remain viable and serve participants. Further, HUD fails to consider how the disruption to and potential failure of these jointly funded projects will increase the population of unsheltered homeless persons, increase utilization of State-funded healthcare, crisis response, and shelter-avoidance systems. In turn, these increases will inevitably place financial strains that they are not prepared to absorb and cannot readily address. Defendants fail to address or even mention these interests and the likely impacts of these caps on Plaintiff States homelessness response systems. This failure is even more problematic given that States reasonably relied on HUD's prior federal directives promoting the development of permanent housing and rapid rehousing when developing their own homelessness response systems.

Defendants' recent December Memorandum fails to consider Plaintiffs' reliance interests in this continued funding under the FY 2024-2025 NOFO. Instead, Defendants brush this away, inaccurately stating that "the proposed revision . . . allows CoCs to slowly transition their project from one component to another over the course of a year," AR 297-98 and focusing on reliance on the terms of the *November 2025* NOFO instead, AR 295. Defendants also claim that they indicated their intention to publish a new FY 2025 NOFO before doing so, AR 294-95, but "[n]oting a change in [the] program's operation is not the same as recognizing that the change" will have "detrimental" impacts and does not qualify as a consideration of "reliance interests." *Am. Hosp. Ass'n v. Kennedy*, No. 2:25-CV-00600-LEW, 2025 WL 3754193, at *6 (D. Me. Dec. 29, 2025).[20]

Because the Challenged Conditions were adopted "with no regard for the [States'] reliance interests[,]" and Defendants "did not acknowledge—much less justify—[their] adoption" of the new conditions, they must be vacated "for want of reasoned decision making." *Int'l Org. of Masters v. NLRB*, 61 F.4th 169, 180 (D.C. Cir. 2023).

### 4.    The Challenged Conditions Violate Separation of Powers

The Challenged Conditions also independently violate the Administrative Procedure Act as contrary to a constitutional right—and the Constitution—because they violate the separation of powers. The United States Constitution "exclusively grants the power of the purse to Congress, not the President." *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). "Congress may," of course, "attach conditions on the receipt of federal funds, and has repeatedly

---

[20] Even if the December Memorandum adequately considered Plaintiffs' reliance interests (which it does not), Defendants cannot retroactively consider reliance interests after HUD already decided to include the Challenged Conditions, nor would HUD's after-the-fact summary suffice when no other administrative record document indicates these considerations occurred. *Am. Hosp. Ass'n*, 2025 WL 3754193, at *6 (rejecting Defendants' assertion that reliance interests were considered because "Defendants are left only to rely on post-hoc rationalizations in the [declaration], which cannot substitute for the contemporaneous record").

employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)). But "[t]here is no provision in the Constitution that authorizes the President"—or the agencies beneath him—"to enact, to amend, or to repeal statutes." *Clinton*, 524 U.S. at 438. Meaning: "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of San Francisco*, 897 F.3d at 1235; *see also Providence*, 954 F.3d at 39 (an agency cannot "create qualification requirements unrelated to the grant program simply to advance its own policy priorities[]").

The Challenged Conditions do just that. The Permanent Housing and Tier 1 Caps seek to withhold funding from projects that Congress has explicitly directed Defendants to fund—permanent housing and renewals (which amount to much the same thing)—to effectuate the Administration's goal of "ending support for 'housing first' policies[.]" Anti-Homeless Order § 5(a). Same with the Service Requirement Conditions. The Gender Ideology Condition, for its part, would blacklist certain service providers and force the termination of contracts not because of any law Congress passed, but to execute the President's fiat that "[f]ederal funds shall not be used to promote gender ideology." Gender Ideology Order § 3(g). And the Geographic Discrimination Conditions likewise chokes funding from geographic areas, over Congress's explicit direction, to coerce states and localities into, as the Administration puts it, "fighting vagrancy on America's streets." Anti-Homeless Order § 3 (capitalization omitted).

None of these conditions are authorized by Congress. Indeed, just as in *San Francisco*, Defendants do not even attempt to identify any federal law permitting them to impose the Challenged Conditions, resting instead entirely on the President's Executive Orders. But these are

not law. And no such law exists, much less in unambiguous terms required for a valid exercise of congressional spending power. The Supreme Court has likened Congress's power to condition federal funds as "much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The "legitimacy" of such conditions "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* (citations omitted). As such, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*

Congress did not do so. To the contrary, as detailed above, these conditions violate Congress's statutory directives and the overarching Congressional directive that agencies not act in a manner that is "arbitrary[ and] capricious." 5 U.S.C. § 706(2)(A). By attaching conditions to federal funding that were not only unauthorized by Congress but that contravene Congress's directions, the Challenged Conditions usurp Congress's spending and legislative power. This Court should vacate the Challenged Conditions and enjoin their implementation and enforcement. *See* 5 U.S.C. § 706(2)(B).

**E.    Plaintiffs Are Entitled to Summary Judgment on their § 706(1) Claim**

Plaintiffs are also entitled to summary judgment on their claim that Defendants unreasonably delayed agency action by failing to make CoC renewal funding available for FY 2025. The APA provides that the court "shall . . . compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1). To prevail on a claim under § 706(1), a plaintiff must show that (1) the action in question is "a discrete agency action that it is required to take,"

and (2) the agency failed to take, or unreasonably delayed in taking, that action. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004). Both criteria are satisfied here.

First, renewing FY 2025 CoC funding is a discrete, required agency action. By statute, Defendants "*shall*" make funding "available for the renewal of contracts . . . at the discretion of the applicant or project sponsor and subject to the availability of annual appropriation," and "[t]he Secretary *shall* determine whether to renew a contract . . . on the basis of certification by the collaborative applicant for the geographic area that . . . there is a demonstrated need for the project; and . . . the project complies with program requirements and appropriate standards of housing quality and habitability[.]" 42 U.S.C. § 11386c(b) (emphasis added). These straightforward provisions reflect discrete and required agency action. *See City of Providence v. Barr*, 385 F. Supp. 3d 160, 164-65 (D.R.I. 2019) (explaining that "because [the statute] requires that 'the Attorney General *shall . . . allocate*' . . . funding, there exist a mandatory duty on the DOJ to pay the funds as soon as possible"), *aff'd*, 954 F.3d 23 (1st Cir. 2020).

Second, Defendants have unreasonably delayed renewals of FY 2025 CoC funding.[21] Unlike when an agency unlawfully withholds action (which requires that Congress imposed a "date-certain deadline"), unreasonable delays occur when there is no "concrete deadline" imposed by Congress; instead, agencies are subject to the APA's requirement that they conclude matters "within a reasonable time." *Am. Acad. of Pediatrics v. U.S. Food & Drug Admin.*, 330 F. Supp. 3d 657, 663 (D. Mass. 2018).

---

[21] Separate from Defendants' unreasonable delay in granting renewals, Defendants also unlawfully withheld the issuance of a FY 2025 NOFO by repeatedly rescinding and replacing the NOFO after the statutory deadline. 42 U.S.C. § 11382(b). Additionally, Defendants are almost certainly about to unlawfully withhold the issuing of conditional awards, which is subject to a specific statutory deadline of January 29, 2026. *See* 42 U.S.C. § 11382(c)(2) (conditional awards are due five months after NOFO application deadline); *see also* ECF No. 12-2 (Hughes Decl.), Ex. 2 at 4 (FY 2024–2025 NOFO provides application deadline of August 29, 2025 for FY 2025 funds for new projects and certain other categories).

To determine whether there is unreasonable delay, courts ordinarily look to the six so-called "TRAC factors." *Town of Wellesley v. FERC*, 829 F.2d 275, 277 (1st Cir. 1987) (applying *Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) (*TRAC*)). The *TRAC* factors are: "(1) the time agencies take to make decisions must be governed by a 'rule of reason'; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC*, 750 F.2d at 80 (citations omitted). Not all factors need to be present. *See e.g.*, *In re Core Commc'ns, Inc*., 531 F.3d 849, 855-57 (D.C. Cir. 2008) (explaining that the factors are not "ironclad" and treating the first factor as "most important" and "decisive here").

Here, the *TRAC* factors demonstrate that Defendants have unreasonably delayed CoC renewals for FY 2025. The first factor (whether the time the agency took comports with a "rule of reason") and the second factor (a statutory timetable or indication of speed informs the "rule of reason") are often considered together. *See. e.g.*, *Am. Acad. of Pediatrics*, 330 F. Supp. 3d at 666. Here, Defendants' delay fails to comport with any rule of reason. Rather than awarding renewals for FY 2025, Defendants belatedly rescinded the FY 2024–2025 NOFO after the deadline and released new FY 2025 NOFOs that drastically slash renewal funding and impose new unlawful terms on renewals. The statute indicates a reasonable timeline and straightforward process by

instructing Defendants to make renewal funding available "at the discretion of the applicant or project sponsor and subject to the availability of annual appropriation," which occurred in March 2025. 42 U.S.C. § 11386c(b). However, rather than processing and awarding renewals under the terms of the FY 2024–2025 NOFO as required, Defendants created extreme delays and uncertainty by repeatedly rescinding and reissuing late FY 2025 NOFOs that contain only a small percentage of guaranteed renewal funding at an unknown future date. *See City of Providence*, 385 F. Supp. 3d at 164-65 (granting plaintiffs' summary judgment motion and explaining that allocating funding should be completed as soon as possible, such that there was "unreasonable delay" under § 706(1)).

Further, funding that is *renewed* in "*successive*" terms necessarily means the funding does not lapse but instead is timely renewed so that there is continuous funding. 42 U.S.C. § 11386c(b) (emphasis added). Yet, CoC applicants' funding has begun lapsing without any guarantee of future renewal funding.[22] *See, e.g.*, ECF No. 49-1 (WA- Mondeau Decl.) ¶ 13; ECF No. 49-2 (Leone Decl.) ¶ 4. And despite this Court's explicit order that Defendants take "all steps necessary to process eligible renewals for FY 2025 CoC funding pursuant to the FY24-25 NOFO" that does not require new renewal applications (ECF No. 68 at 2-3), Defendants already indicated an intent to violate this order by imposing a new renewal application process and maintaining their prior insistence that awards will not be announced until May 2026. ECF No. 74-1 at 2.

The remaining *TRAC* factors also show that Defendants' delay is unreasonable. The third factor (whether human health and welfare are at stake) and fifth factor (nature and extent of

---

[22] In prior years, HUD recognized its obligation to grant renewals in almost all cases by designating most or all of an applicant's renewal funding as "Tier 1" funding that was "safe from potential cuts." *E.g.*, ECF No. 13-2 (NY_Umholtz Decl.) ¶ 22. Applicants were therefore assured ahead of time that they would receive consistent funding. In fact, Defendants themselves admit that CoC grantees with grant expiration dates in 2026 "are accustomed to having their grants *automatically* renewed with a period of performance *start date immediately following the expiration of their previous grant*." AR 297 (emphasis added).

prejudice) are also often considered together. *E.g.*, *Am. Acad. of Pediatrics*, 330 F. Supp. 3d at 666. Here, there is significant human health and welfare at stake, as tens of thousands of formerly homeless individuals and families may be evicted back onto the streets, and "it is well known that homelessness has devastating consequences for individuals' physical and mental health." ECF No. 13-12 (IL-Haley Decl.) ¶ 28. This will result in enormous burdens on state public services including "emergency medical systems." *Id*. Plaintiffs will be severely prejudiced by these continuing delays, which will result in unfunded contractual and rental obligations, harm to states' investments and loans, increased legal and administrative costs, and more. *See* ECF No. 11 at 43-39. With respect to the fourth factor, Defendants have failed to identify any higher or competing agency priorities that would be affected by expediting this agency action. *See* ECF No. 55 at 37 (failing to identify any specific agency priorities when discussing the fourth factor); *see also Am. Acad. of Pediatrics*, 330 F. Supp. 3d at 667 (finding no higher priorities and referring to the priorities "dictated by Congress"). Finally, with respect to the sixth factor, the court need not "find any [agency] impropriety" when finding an unreasonable delay. *TRAC*, 750 F.2d at 80 (quoting *Pub. Citizen Health Research Group v. Comm'r, Food & Drug Admin.*, 740 F.2d 21 (D.C. Cir. 1984)) However, given that this Court has already acknowledged Defendants' impropriety, Plaintiffs have far exceeded this standard. *See* Dec. 19, 2025 Hr'g Tr. 57:17-18 ("[I]t does appear to be an intentional evasion of the Court's jurisdiction by the agency").

For each of the above reasons, Plaintiffs respectfully request that the Court compel Defendants to grant renewals of CoC funding pursuant to the terms of the FY 2024–2025 NOFO.

**F.      Plaintiffs Are Entitled to the Full Suite of APA and Injunctive Relief**

**1.      The Court should vacate and set aside the unlawful rescission of the FY 2024-2025 NOFO**

The APA directs that a "reviewing court shall . . . hold unlawful and set aside agency action" found to be unlawful. 5 U.S.C. § 706(2). "The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur" of unlawful agency actions. *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring). "When a federal court sets aside an agency action, the federal court vacates that order—in much the same way that an appellate court vacates the judgment of a trial court." *Id.* at 830. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989); *see Illinois v. Noem*, No. 1:25-cv-00495-MSM-PAS, 2025 WL 3707011, at *17 (D.R.I. Dec. 22, 2025) ("[E]xisting Supreme Court and First Circuit precedent affirms vacatur to be appropriate under the remedy."); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 847 n.10 (2025) (acknowledging the continuing vitality of this rule); *Illinois v. FEMA*, 2025 WL 2716277, at *15 (explaining that "[t]he holding in *Trump v. CASA* restricted universal injunctions, but the Court expressly left unaffected the APA's command to 'set aside' unlawful agency action").

Under §706(2), a court must "hold unlawful and set aside agency action" an agency action that is arbitrary and capricious, contrary to law, or in excess of statutory jurisdiction. Because the rescission of the FY 2024–2025 NOFO violated those standards, for the reasons discussed above, it should be vacated. *See Env't Def. Fund v. FERC*, 2 F.4th 953, 960-961 (D.C. Cir. 2021) (explaining that "vacatur is the normal remedy" under the APA, and vacating approval of a pipeline that had since entered operation (citation modified)).

68

### 2.  The Court should vacate and set aside the December NOFO, including the Challenged Conditions

Similarly, because the December NOFO along with its Challenged Conditions violates the APA, it should be vacated. "[W]hen a court vacates agency action, it nullifies the action and removes its legal force." *Illinois v. FEMA,* 2025 WL 2716277, at *15; *see also AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 85 (D.D.C. 2007) ("[T]he effect of . . . vacatur . . . is to take the rule off the books and reinstate the prior regulatory regime."). By vacating the December NOFO, the Court removes any force of Defendants' unlawful NOFO and ensures renewals, awards, and allocations properly resume under the 2024–2025 NOFO.

### 3.  The Court should enjoin Defendants from implementing the Challenged Conditions

Plaintiff States are also entitled to permanent injunctive relief to effectuate the vacatur of the Challenged Conditions and to protect Plaintiff States from future irreparable harm. In general, courts issue permanent injunctive relief where "(1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and (4) the public interest would not be adversely affected by an injunction." *Healey v. Spencer*, 765 F.3d 65, 74 (1st Cir. 2014); *see also eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

The APA expressly authorizes "actions for . . . prohibitory or mandatory injunction" in addition to vacatur. 5 U.S.C. § 703. "[C]ourts use this broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021). The D.C. Circuit has held that, in the APA context, "once the court reache[s] the conclusion that the rule was indeed illegal (i.e., not merely that the plaintiffs had a reasonable probability of success on the merits, as would be necessary for a preliminary injunction), there [is]

no separate need to show irreparable injury, as that is merely one possible 'basis for showing the inadequacy of the legal remedy.'" *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting 11A Wright & Miller's *Federal Practice & Procedure: Federal Rules of Civil Procedure* § 2944 (2d ed. 1995)). This principle alone suffices to support the issuance of permanent injunctive relief against implementation of the Challenged Conditions against Plaintiff States. Regardless, as discussed below, examining the equitable factors in greater detail leads to the same result for each of the unlawful actions taken by defendants.

An injunction enjoining the Challenged Conditions would effectively redress Defendants' unlawful actions and prevent Plaintiff States from suffering irreparable injury. State agencies and their partners have spent years building programs in alignment with HUD's prior emphasis on permanent housing and Housing First approaches. ECF No. 13-11 (DC-Miné Decl.) ¶¶ 5, 10-14; ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 14-19, 23; ECF No. 13-7 (CO-Jaeckel Decl.) ¶¶ 9-10, 17-19; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 4-5, 19-34; *see, e.g.,* ECF No. 13-22) (NJ-NJHMFA Brewster Decl.) ¶¶ 5-7, 12-16 (detailing development of a Homeless Management Information System (HMIS) consistent with HUD requirements); ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 5-33 (same). The Challenged Conditions would blow a hole through these carefully built structures. New York City CoC alone stands to lose approximately $106 million just due to the Permanent Housing Cap. ECF No. 13-3 (NY-Johns Decl.) ¶ 23. Other jurisdictions likewise face crippling losses. *See also* ECF No. 13-7 (CO-Jaeckel Decl.) ¶ 29 (estimating a $26 million reduction in PH funding); ECF No. 13-12 (IL-Haley Decl.) ¶ 14 (estimating a loss of $106 million in permanent housing resources); ECF No. 13-25 (PA-Vilello Decl.) ¶ 30 (estimating a loss of over $100 million in PH funding); ECF No. 13-26 (VT-Sojourner Decl.) ¶¶ 15-17, 23-27.

The Challenged Conditions will harm Plaintiff States across the board by leading to statewide increases in homelessness, shifting enormous costs to other state public services. ECF No. 59 (CA-Buchanan Decl.) ¶ 13 (estimating that "nearly 27,000 Californians could lose their housing due to the Administration's decision to decrease funding for permanent housing."); ECF No. 13-9 (DE-Heckles Decl.) ¶¶ 36-38; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 5, 10, 56-62; ECF No. 13-14 (ME-Payne Decl.) ¶¶ 22, 29; ECF No. 13-16 (MD-Meister Decl.) ¶ 18; ECF No. 13-21 (NJ-Winter Decl.) ¶¶ 31-34; ECF No. 13-3 (NY-DSS Johns Decl.) ¶¶ 23-27; ECF No. 13-2 (NY-Umholtz Decl.) ¶¶ 19-21; ECF No. 13-27 (WI-Staff Decl.) ¶¶ 12-16; ECF No. 13-28 (CA-Olmstead Decl.) ¶ 29; ECF No. 13-29 (CA-CICH Marshall Decl.) ¶¶ 16-19; *see, e.g.*, *Martin Luther King, Jr. Cnty.*, 798 F. Supp. 3d at 1254 (finding that plaintiffs demonstrated irreparable harm from loss of CoC funding due to unlawful funding conditions, such as "destabilization of immediate and future budgets, reductions in workforce, [and] hundreds of shelter-unstable families losing access to housing[]"). As just one example, Kentucky is at a high risk of losing seventy percent of its current $15 million in funding for permanent housing in a matter of months due to the Challenged Conditions. Putting Kentucky's permanent housing projects that are already funded under the FY 2024 award will put nearly 700 households at risk of returning to homelessness, including families with children, seniors, and people with disabilities. Approximately 1,200 people would lose their current housing during the next year. ECF No. 13-13 (KY-Kaye Smith Decl.) ¶ 29; *see also* ECF No. 37 (MA-McGeown Decl.) ¶¶ 18, 22 (explaining that the loss of permanent supportive housing would result in the loss of Housing Stability Support services for over 500 households).

This escalation places new burdens on emergency medical systems, state-funded behavioral-health providers, long-term inpatient facilities, local jails, and child-welfare programs

serving unhoused families. ECF No. 13-12 (IL-Haley Decl.) ¶ 28; ECF No. 13-13 (KY-Kaye Smith Decl.) ¶¶ 33-47; ECF No. 37 (MA-McGeown Decl.) ¶¶ 12-14; ECF No. 13-21 (NJ-Winter Decl.) ¶¶ 24, 32-34; ECF No. 60 (NM-Nair Decl. ¶¶ 12-13); ECF No. 13-5 (NY-SHNNY Leone Decl.) ¶ 33; ECF No. 13-23 (OR-Jolin Decl.) ¶¶ 15-16; ECF No. 13-24 (PA-Meyer Decl.) ¶ 9-13; ECF No. 13-6 (RI-Ventura Decl.) ¶¶ 18-19; ECF No. 13-27 (WI-Staff Decl.) ¶¶ 11-13, 15. Individuals with complex behavioral health needs who previously stabilized in permanent supportive housing will experience increased housing instability and higher rates of crisis service use. ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 18-19, 28-31; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 59, 62; ECF No. 13-21 (NJ-Winter Decl.) ¶ 21 ("approximately 3,300 New Jerseyans— including medically fragile individuals, people with disabilities, survivors of domestic violence, children, seniors and veterans—will be displaced within one year"); ECF No. 13-2 (NY-Umholtz Decl.) ¶ 22(e); ECF No. 13-24 (PA-Meyer Decl.) ¶ 15 ("Nearly 48% of Medicaid-enrolled adults experiencing homelessness have a diagnosed serious mental illness"); *see, e.g.,* ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶¶ 5-15; ECF No. 13-4 (NY-Warren Decl.) ¶ 9.

Creating and prolonging homelessness among families with school-aged children has additional consequences for State-funded public education. ECF No. 13-7 (CO-Jaeckel Decl.) ¶ 23; *see also* ECF No. 13-4 (NY-HPD Warren Decl.) ¶¶ 3, 8-9, 20-23 (discussing impact on families and children). Children who experience homelessness are more likely to struggle in school and to require additional supportive services, many of which are paid for in part with State funds, which will further increase the harm to the Plaintiff States. *See, e.g.*, ECF No. 13-24 (PA-Meyer Decl.) ¶¶ 20-23 (discussing impact of CoC changes to child welfare services).

Accepting the terms of the Challenged Conditions in order to receive funding would significantly impede the ability of States and their service providers to engage and serve people

experiencing homelessness. ECF No. 13-8 (CT-Navarretta Decl.) ¶¶ 1-20; ECF No. 13-11 (DC-Miné Decl.( ¶ 7-8; ECF No. 13-17 (MA-Byron Decl.) ¶¶ 58-62; *see, e.g.,* ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶ 14 ("even for the CoCs that are the most agile and capable of such an overhaul . . . the best score that any Michigan CoC could achieve is 75/130-historically too low a score to be funded."); ECF No. 13-20 (MN-Leimaile Ho Decl.) ¶ 16 ("Minnesota CoCs are unlikely to score competitively based on criteria under this NOFO."); ECF No. 13-26 (VT-Sojourner Decl.) ¶ 11 ("The loss of these programs will put hundreds, if not thousands, of people at risk of returning to the streets and without the support they need to exit homelessness."). These conditions require CoCs and providers to overhaul intake processes, retrain staff, and redesign coordinated-entry workflows on an extremely short timelines, disrupting the delicate outreach relationships needed to reach individuals who are already distrustful of service systems. ECF No. 13-7 (CO-Jaeckel Decl.) ¶ 24 ("the sudden termination of project funding will force the State and providers to undertake expensive and rapid operational adjustments, including significant staff layoffs"); ECF No. 13-11 (DC-Miné Decl.) ¶¶ 30-32; ECF No. 13-5 (NY-SHNNY Leone Decl.) ¶¶ 28-32; ECF No. 13-1 (WA-Mondau Decl.) ¶ 27 ("It is not clear that it is even possible to provide services in the manner laid out in this NOFO.").

Collectively, these new conditions threaten to destabilize the service network that the Continuum of Care model created and depends on, directly undermining providers' ability to identify, engage, and safely house the people with the greatest needs. ECF No. 13-11 (DC-Miné Decl.) ¶ 32; ECF No. 13-9 (DE-Heckles Decl.) ¶ 17 ("The NOFO requires our COC to . . . decide—based on new arbitrary and capricious rules—that some Delawareans' housing-and, indeed, their lives-mater more than others."); ECF No. 13-17 (MA-Byron Decl.) ¶ 58 ("Beyond the re-traumatization and destabilization the NOFO's knock-on effects will have on impacted individuals

and families, people may end up on the streets, as nighttime temperatures . . . fall below freezing on most nights. Others—like survivors of domestic violence-may face the impossible choice of returning to an abuser or enduring unsheltered homelessness."); *see, e.g.*, ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶ 15 ("Through over thirty-five years of operation and expertise, MCAH has never encountered a threat as devastating and extreme to persons in poverty. Not only will this application fracture the homeless service delivery infrastructure, which has taken decades to build, but lives will be lost.").

Plaintiffs also face irreparable harm from the Hobson's choice of either acceding to the unlawful Challenged Conditions or forgoing millions in critical CoC funding. Even if providers were to accede to the Challenged Conditions (which themselves slash the amount of available funding), these Challenged Conditions directly contradict other federal funding conditions that providers must follow. For example, projects that receive housing grants under the Violence Against Women Act (VAWA) or the Family Violence Prevention Service Act (FVPSA) are prohibited from requiring beneficiaries to participate in supportive services as a condition of receiving housing assistance; those services must be voluntary. 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA). Therefore, these providers are now faced with the impossible choice of whether to greatly disadvantage their CoC applications under the December NOFO— which favors applicants who require participation in supportive services—or forego critical funding under VAWA and FVPSA.

### 4. The Court should enter an injunction that requires Defendants to process renewal applications and conduct the CoC competition under the terms of the FY 2024–2025 NOFO

For the foregoing reasons, Plaintiffs are entitled permanent injunctive relief requiring Defendants to process renewal applications and conduct the CoC competition in accordance with

the FY 2024–2025 NOFO. Without such relief, Plaintiffs will suffer irreparable harm, including gaps in funding and disruption of long terms projects that will have lasting impacts. ECF No. 13-13 (KY-Smith Decl.) ¶ 33 ("KHC is hearing urgent and widespread concern . . . regarding funding gaps that are all but inevitable"); ECF No. 60 (NM-Nair Decl.) ¶ 24. "Across New York State, at least 2,878 households are living in CoC-funded housing that has a contract expiring on May 31, 2026, or before." ECF No. 57-1 (Leone Decl.) ¶ 4. Without an order requiring the applications to be processed and the competition to be run under the terms of the FY 2024–2025 NOFO, these households are at high risk of becoming homeless again. ECF No. 57-1(Leone Decl.) ¶ 5; *see also* ECF No. 57 (Mondau Decl.) ¶ 13 ("The longer HUD takes, the more homelessness will increase."); ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶¶ 28-32; ECF No. 59 (CA-Buchanan Decl.) ¶ 12 ("[I]t will likely fall on the state and state social service agencies to fill these service gaps.")

A permanent injunction would ensure stability for providers and the communities they serve, allowing CoC programs to operate predictably, rather than leaving them vulnerable to delays, uncertainty, or the loss of renewals altogether. *See supra* pp. 70-71.

## IV.   CONCLUSION

The Court should grant Plaintiff States' motion for summary judgment.

DATED this 14th day of January 2026.

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ZANE MULLER*
ALIANA KNOEPFLER*
ANDREA ALEGRETT*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Zane.Muller@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Andrea.Alegrett@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*


**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*


**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
VICTORIA OCHOA*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov

*Counsel for Plaintiff State of New York*


**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for Plaintiff State of California*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov

*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov

*Attorneys for Plaintiff District of Columbia*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov
Laurac.Tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor*
*ex rel. Andy Beshear, in His Official Capacity as*
*Governor of the Commonwealth of Kentucky*

**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*


**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6411
Jluh@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
ESME CARAMELLO
Director, Housing Affordability Unit
AARON DULLES*
LAUREN YAMAGUCHI*
Assistant Attorneys General
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*


**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*


**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.carter@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*


**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER*
Deputy Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*


**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
Asamant@nmdoj.gov

*Attorneys for the State of New Mexico*

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*


**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov

*Attorney for Plaintiff State of Vermont*


**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
Jacobboyer@pa.gov
717-460-6786

*Attorney for Plaintiff Governor Josh Shapiro, in His Official Capacity as Governor of the Commonwealth of Pennsylvania*


**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*