# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF WASHINGTON, et al.,

                Plaintiffs,

      v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, et. al.,

               Defendants.

C.A. No. 1:25-cv-00626-MSM-AEM

**PLAINTIFF STATES' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.         INTRODUCTION ................................................................................. 1

II.        ARGUMENT........................................................................................ 3

    A.    HUD's Untimely Rescission of the
2024-2025 NOFO Was Unlawful ..................................................... 3

        1.    HUD's rescission of the
2024-25 NOFO was contrary to law....................................3

        2.    HUD's rescission of the
2024-2025 NOFO was arbitrary and capricious .........................5

        3.    Plaintiff States appropriately challenge the
rescission of the 2024-25 NOFO and
seek relief under 5 U.S.C. § 706(2) ............................................7

    B.    Challenges to the Disability and
Gender Ideology Conditions in the
November NOFO are Not Moot .......................................................... 9

    C.    The Challenged Conditions are Unlawful........................................ 12

        1.    The Challenged Conditions are
contrary to law ................................................................12

            a.    Congress did not grant the
Secretary discretion to add the
Challenged Conditions................................................. 12

            b.    The Permanent Housing Cap
is contrary to law...................................................... 14

            c.    The Tier 1 Cap
is contrary to law...................................................... 16

            d.    The Service Requirement
Conditions are contrary to law..................................... 18

            e.    The Disability Condition
is contrary to law...................................................... 19

            f.    The Geographic Discrimination
Conditions are contrary to law..................................... 20

g.  The Gender Ideology Conditions
are contrary to law ........................................................................ 21

2.  The Challenged Conditions
are arbitrary and capricious........................................................22

a.  There is no record of any reasoning
by HUD until after this litigation
commenced ................................................................. 23

b.  The Challenged Conditions are
unsupported by Defendants'
post-hoc reasoning ..................................................... 24

3.  Notice-and-comment was required........................................29

4.  The Challenged Conditions are
contrary to constitutional right................................................31

D.  Plaintiffs Are Entitled to Summary Judgment
on Their Constitutional Claims............................................................ 31

E.  Plaintiffs Are Entitled to Summary Judgment
on their § 706(1) Claim...................................................................... 34

F.  The Remedies Plaintiff States Seek Are
Appropriate and Necessary For Complete Relief ................................. 35

1.  Plaintiff States are entitled to an
injunction in addition to vacatur ...............................................35

2.  This Court may also direct Defendants to
issue conditional awards and renewals
under 5 U.S.C. § 706(1)............................................................36

III.    CONCLUSION ................................................................................. 37

# TABLE OF AUTHORITIES

## Cases

*Ass'n of Am. Universities v. Dep't of Def.*,
   C.A. No. 1:25-cv-11740-BEM,
   2025 WL 2899765,
   (D. Mass. Oct. 10, 2025) ........................................................................ 16

*Atieh v. Riordan*,
   797 F.3d 135 (1st Cir. 2015) ........................................................... 25, 26

*Bayley's Campground, Inc. v. Mills*,
   985 F.3d 153 (1st Cir. 2021) ................................................................. 12

*Boston Bit Labs, Inc. v. Baker*,
   11 F.4th 3 (1st Cir. 2021) ............................................................... 10, 11

*Brock v. Pierce County*,
   476 U.S. 253 (1986) ........................................................................... 8, 9

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) ............................................................................. 27

*California v. U.S. Dep't of Transp.*,
   C.A. No. 25-cv-208-JJM-PAS,
   2025 WL 3072541
   (D.R.I. Nov. 4, 2025) ...................................................................... 35, 36

*Chicago Women in Trades v. Trump*,
   No. 1:25-cv-02005,
   2025 WL 1331743
   (N.D. Ill. May 7, 2025) ........................................................................ 32

*Citizens to Preserve Overton
   Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ............................................................................. 24

*City & Cnty. of San Francisco v. Trump*,
   897 F.3d 1225 (9th Cir. 2018) ............................................................... 22

*City & Cnty. of San Francisco v. Trump*,
   No. 3:25-cv-01350-WHO,
   2025 WL 2426858,
   (N.D. Cal. Aug. 22, 2025) .................................................................... 13

*City of Seattle v. Trump*,
    No. 2:25-cv-01435-BJR,
    2025 WL 3041905
    (W.D. Wash. Oct. 31, 2025)......................................................................... 13, 21

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ..................................................................................... 32

*Comm. For Fairness v. Kemp*,
    791 F. Supp. 888 (D.D.C. 1992) .................................................................. 30

*Connectu LLC v. Zuckerberg*,
    522 F.3d 82 (1st Cir. 2008) .......................................................................... 10

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................................. 31, 32

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020) ..................................................................................... 6, 26

*Env't Def. Fund v. FERC*,
    2 F.4th 953 (D.C. Cir. 2021) .......................................................................... 7

*FBI v. Fikre*,
    601 U.S. 234  (2024) ..................................................................................... 10

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ....................................................................................... 6

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ....................................................................................... 5

*Field v. Mans*,
    516 U.S. 59 (1995) ......................................................................................... 4

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ....................................................................................... 4

*Illinois v. FEMA*,
    801 F. Supp. 3d 75 (D.R.I. 2025)
    *appeal docketed*, No. 25-2131 (1st Cir. Dec. 1, 2025)......................... 11, 35

*Johnson v. Ocwen Loan Servicing, LLC*,
    C.A. No. 1:17-cv-11944-ADB,
    2020 WL 1063083,
    (D. Mass. Mar. 5, 2020) .......................................................................... 20, 34

*La. Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986) ......................................................................... 4

*Lindh v. Murphy,*
   521 U.S. 320 (1997) ......................................................................... 4

*Martin Luther King, Jr. County v. Turner,*
   785 F. Supp. 3d 863 (W.D. Wash. 2025) ....................................... 13, 15

*Martin Luther King, Jr. County,*
   798 F. Supp. 3d 1224 (W.D. Wash. 2025) ........................................ 27

*Melone v. Coit,*
   100 F.4th 21 (1st Cir. 2024) ......................................................... 7, 24

*Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.,*
   463 U.S. 29 (1983) ....................................................... 6, 24, 25, 28

*N.H. Hosp. Ass'n v. Azar,*
   887 F.3d 62 (1st Cir. 2018) .......................................................... 29, 30

*Nat'l All. To End Homelessness v. Turner,*
   C.A. No. 1:25-cv-00447,
   2025 WL 2638377
   (D.R.I. Sept. 14, 2025) .................................................................. 27

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.,*
   *Occupational Safety & Health Admin.,*
   595 U.S. 109 (2022) ......................................................................... 4

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
   567 U.S. 519 (2012) ........................................................................ 33

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) ....................................................... 35

*New York v. Trump,*
   769 F. Supp. 3d 119 (D.R.I. 2025) ................................................... 12

*New York v. U.S. Dep't of Health & Human Servs.,*
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ............................................... 33

*New York v. U.S. Dep't of Justice,*
   No. 1:25-cv-00345-MSM-PAS,
   2025 WL 2618023
   (D.R.I. Sept. 10, 2025) ................................................................. 17, 32

*Norton v. Southern Utah Wilderness Alliance,*
   542 U.S. 55 (2004) .................................................................................... 9

*Oxfam America, Inc. v. SEC,*
   126 F. Supp. 3d 168 (D. Mass. 2015) ..................................................... 9

*PFLAG, Inc. v. Trump,*
   769 F. Supp. 3d 405 (D. Md. 2025) ...................................................... 22

*R.I. Coal. Against Domestic Violence v. Kennedy,*
   C.A. No. 1:25-cv-00342-MRD-PAS,
   2025 WL 2988705
   (D.R.I. Oct. 23, 2025).......................................................................... 27, 28

*Ramirez v. U.S. Immigration & Customs Enf't,*
   568 F. Supp. 3d 10 (D.D.C. 2021) ........................................................ 35

*Rhode Island v. Trump,*
   C.A. No. 1:25-cv-00128-JJM-AEM,
   2025 WL 3251113
   (D.R.I. Nov. 21, 2025) ......................................................................... 31, 32

*Rodway v. U.S. Dep't of Agric.,*
   514 F.2d 809 (D.C. Cir. 1975) .............................................................. 30

*Sanjour v. U.S. E.P.A.,*
   7 F. Supp. 2d 14 (D.D.C. 1998) ........................................................... 35

*SEC v. Chenery Corp.,*
   318 U.S. 80 (1943) ................................................................................. 7

*Sierra Club v. Trump,*
   929 F.3d 670 (9th Cir. 2019)................................................................. 31

*South Dakota v. Dole,*
   483 U.S. 203 (1987) .............................................................................. 33

*Trinity Lutheran Church of Colombia, Inc. v. Comer,*
   582 U.S. 449 (2017) ........................................................................... 10, 11

*Trump v. Am. Fed'n of Gov't Emps.,*
   145 S. Ct. 2635 (2025) (mem.)............................................................. 22

*United States v. Williams,*
   553 U.S. 285 (2008) .............................................................................. 13

## Statutes

34 U.S.C. § 12351 ................................................................................................ 28

42 U.S.C. § 10408 ................................................................................................ 28

42 U.S.C. § 11381 .................................................................................................. 5

42 U.S.C. § 11382 ........................................................................................... 3, 4, 8

42 U.S.C. § 11385 ................................................................................................ 26

42 U.S.C. § 11386a ....................................................................................... passim

42 U.S.C. § 11386b ..................................................................................... 14, 15, 23

42 U.S.C. § 11386c ....................................................................................... passim

42 U.S.C. § 12711 ................................................................................................ 20

5 U.S.C. § 553 ...................................................................................................... 30

5 U.S.C. § 706 ............................................................................................... passim

Homeless Emergency Assistance and Rapid Transition
   to Housing (HEARTH) Act of 2009,
   Pub. L. No. 111-22, 123 Stat. 1632 (2009) ................................................. 23

## Regulations

24 C.F.R. § 10.1 ............................................................................................. 29, 30

24 C.F.R. § 578.17 ......................................................................................... 20, 21

Exec. Ord. No. 14168
   90 Fed. Reg. 8615 (Jan. 20. 2025) .............................................................. 21

Exec. Ord. No. 14321,
   90 Fed. Reg. 35817 (Jul. 24, 2025) .............................................................. 23

**PLAINTIFFS STATES' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.    INTRODUCTION

Defendants have upended the Continuum of Care (CoC) program by imposing radically different and destructive conditions that Congress never approved, solely based on this Administration's new "policy choices." In doing so, Defendants repeatedly violated the McKinney-Vento Act, the Administrative Procedures Act (APA), the Department of Housing and Urban Development's (HUD) own regulations, and the Constitution.

Defendants' cross-motion/opposition (ECF No. 83) fails to justify Defendants' untimely and unreasoned rescission of the FY 2024-2025 Notice of Funding Opportunity (NOFO). Defendants do not seriously engage with the statutory requirements. Instead, they argue that Congress never forbade HUD from releasing a NOFO "on time" and then rescinding and replacing it months later with a fundamentally different one. Accepting this argument would render statutory "deadlines" meaningless. And Defendants do not cite any reasoned analysis or consideration of reliance interests before HUD rescinded the NOFO, principally relying on a post-hoc memorandum drafted during litigation. This haphazard approach to administrative law is precisely what the APA is designed to prohibit.

In addition, the Challenged Conditions in the November and December NOFOs are contrary to law, arbitrary and capricious, unconstitutional, and were adopted without notice-and-comment. Defendants claim that Congress delegated unbounded discretion to HUD and the Secretary to set new conditions on CoC awards, but this is contradicted by the McKinney-Vento Act's detailed criteria that HUD must use when determining CoC awards. The Challenged Conditions violate specific statutory mandates, such as requirements that HUD

1

incentivize permanent supportive housing projects, make renewal funds available based on applicant certification of two identified criteria, and fund geographic areas based on a formula and not a jurisdiction's policies criminalizing homelessness. Defendants' arguments are contradicted by a plain reading of the law, multiple analogous court decisions, and HUD's own prior, longstanding views of its statutory obligations.

Defendants decline to engage meaningfully with Plaintiffs' arbitrary and capricious arguments, instead asking this Court to bless its post-hoc assurances that it considered everything. But the administrative record here contradicts, rather than justifies, Defendants' policy choices. And Defendants' analysis completely lacks any consideration of the *tens of thousands of individuals* who will become homeless (again) because of the Challenged Conditions. Defendants also entirely fail to grapple with the fact that the NOFOs' core assumption against Housing First is directly contrary to Congress' findings on the causes of homelessness and the response that works: rapid return of homeless individuals and families to permanent housing. Defendants might have avoided some of these pitfalls if they had engaged in the required notice-and-comment proceedings before adopting new policies to radically reshape the CoC program. But they did not, and this is another reason their actions here are invalid.

Plaintiffs are also entitled to summary judgment on their constitutional claims under the Spending Clause and separation of powers principles. Defendants are wrong that the Executive Branch is not bound by the constitutional limitations on the federal government's spending power, as many courts—including this one—have held. Defendants also may not grant themselves the authority to contravene the McKinney-Vento Act or impose new conditions that are completely unrelated to the federal interests in the CoC program.

Finally, Defendants challenge this Court's power to enjoin them from engaging in future unlawful conduct, but their arguments have been repeatedly rejected by courts in this District and across the country. Plaintiff States seek modest relief to stop HUD from repeating discrete, unlawful actions. And complete relief requires an injunction instructing Defendants to conduct the CoC competition in accordance with the 2024-2025 NOFO, which is the only way Defendants can meet their statutory obligations.

Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment.

## II.    ARGUMENT

### A.    HUD's Untimely Rescission of the 2024-2025 NOFO Was Unlawful

#### 1.    HUD's rescission of the 2024-25 NOFO was contrary to law

Defendants' untimely rescission of the 2024-2025 NOFO violated 42 U.S.C. § 11382(b)'s requirement that HUD "shall release" a NOFO for grants for a particular fiscal year (FY) "not later than 3 months after the enactment of the appropriate act making [the relevant] appropriations[.]" Thus, Defendants' purported rescission and replacement of the FY 2024-2025 NOFO is "not in accordance with" the timing and renewal provisions of the McKinney-Vento Act and is "in excess of statutory . . . authority" under the APA. 5 U.S.C. § 706(2)(A), (C); 42 U.S.C. § 11382(b); 42 U.S.C. § 11386c(b).

Defendants first attempt to defend their untimely and unlawful rescission of the 2024-2025 NOFO by relying on their supposedly "wide discretion . . . to devise and, if need be, revise and apply the criteria" for renewal funding. ECF No. 83 at 31. But this argument ignores the specific statutory provision HUD has violated and fails to engage with Plaintiffs' arguments that Defendants lacked statutory authority to rescind and replace (now twice over) the 2024-2025 NOFO several months *after* the deadline set by Congress. *See* ECF No. 81 at 44–47.

3

Whether the Secretary has discretion to devise and revise renewal criteria (discretion that is firmly bounded by statute, *see* Section I.C) is irrelevant to the deadline Congress set to release those criteria in the form of a lawful NOFO to ensure that renewals can be processed without disrupting programs and evicting formerly homeless Americans.

Defendants' next attempt to flip the argument upside-down by claiming, essentially, that even if Congress instructed HUD to release a NOFO within three months of an appropriation, it *never said* HUD could not release the NOFO on time and then rescind and release a new and radically different one well past the statutory deadline (twice over). ECF No. 83 at 32. This argument makes a mockery of the very notion of a deadline and violates the most basic principles of administrative law: that "an agency literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 357 (1986); *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) ("[A]gencies are creatures of statute. They accordingly possess only the authority that Congress has provided."). Defendants' "negative implication" argument (relying on inapposite precedents from bankruptcy, *see Field v. Mans*, 516 U.S. 59, 75 (1995), and criminal sentencing, *see Lindh v. Murphy*, 521 U.S. 320, 330 (1997), is therefore exactly wrong.

As Plaintiffs have explained, the timing provision of 42 U.S.C. § 11382(b) must be read in tandem with the renewal funding provision of 42 U.S.C. § 11386c(b), which requires that renewal funds "*shall* be available for the renewal of contracts" in "*successive* 1-year terms." *See* ECF No. 81 at 46–47 (emphasis added). Courts "must . . . interpret the statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation modified). HUD's course of action here has gravely undermined Congress's stated goal, "to

quickly rehouse homeless individuals and families while minimizing . . . trauma and dislocation[.]" 42 U.S.C. § 11381(2). Congress plainly did not greenlight slapdash, belated reversals of program requirements that throw the nationwide homeless response system into chaos. The fact that Congress explicitly authorized a two-year NOFO proves just the opposite (*cf.* ECF No. 83 at 20): Congress spelled out that it wants order and predictability in the distribution of CoC funds.

### 2.    HUD's rescission of the 2024-2025 NOFO was arbitrary and capricious

HUD's rescission of the 2024-25 NOFO was arbitrary and capricious because HUD has not shown and cannot show that the rescission was "reasonable and reasonably explained" at the time the rescission occurred. *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The paltry and largely post-hoc administrative record filed by Defendants makes this abundantly clear, and Defendants' efforts to wring any reasoning out of a handful of perfunctory, incomplete communications predating the rescission are unavailing.

The record plainly demonstrates that Defendants did not conduct any reasoning, analysis, or consideration of reliance interests in connection with the rescission, and their effort to cobble together any contemporaneous rationale relies on misleading sleight of hand. *See* ECF No. 83 at 35 (HUD's policy changed "Following [when?] the January 2025 change in administration . . ." [no citation]); *id.* ("as HUD explained in a later [i.e., post-rescission] memorandum . . ."); *id.* ("during that [which?] period . . ."). The only pre-rescission record that HUD has proffered that is even arguably relevant—the July 3, 2025 email to HUD listserv recipients—is bereft of anything resembling reasoning or analysis; it merely recites a few statistics on homelessness, notifies recipients that HUD "intends to publish a NOFO for 2025," "invites" applicants to focus on "treatment and recovery" and "increasing the earned income of participants," and notes that "HUD will seek to provide opportunities for new types of projects" and "encourages CoCs to evaluate

the effectiveness of their projects . . . ." *See* AR 18; *cf.* ECF No. 83 at 35 (characterizing that email as containing "justifications provid[ing] a reasoned basis."). It is simply not credible to assert that that document contains anything resembling the required "satisfactory explanation . . . including a 'rational connection between the facts found and the choice made.'" *Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).

Defendants pin the entirety of their argument that they considered reliance interests on a single sentence in that email "recogniz[ing the November 2025 NOFO] is a new application process." ECF No. 83 at 23. Such lip service does not even approach the APA's requirement that HUD engage in a process to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). HUD seems also to suggest that rhetorical pronouncements from Secretary Turner in various forums (including statements made prior to his confirmation as Secretary) provide the requisite reasoning and analysis to undergird HUD's "historic changes" to the CoC program. *See* ECF No. 83 at 22-23, 35. And while these may be fairly characterized as policy announcements, "of course the agency must show there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

Defendants mostly attempt to shoulder the load with the December 19, 2025 memorandum (the "December Memorandum"). However, Defendants filed the December Memorandum as part of the administrative record for the issuance of the December NOFO (not the issuance of the November NOFO, the separate agency action which purported to effect the rescission of the 2024-2025 NOFO). The Memorandum paints a retrospective picture of an agency supposedly hard

at work "weighing factors" and "me[eting] with stakeholders" to implement the President's orders. ECF No. 83 at —35-26 ("As HUD explained in a later memorandum . . . .") (citing AR 286–299). Conspicuously absent from the administrative record Defendants compiled, of course, is any shred of corroborating evidence of this activity from the period when it purportedly occurred. As such, Defendants' record amounts to nothing more than a classic post-hoc justification that fails as a matter of law. *Melone v. Coit*, 100 F.4th 21, 31 (1st Cir. 2024) (the Court "may consider only the agency's explanation given at the time the relevant decision was made"); *accord SEC v. Chenery Corp.*, 318 U.S. 80, 87–88 (1943).

### 3. Plaintiff States appropriately challenge the rescission of the 2024-25 NOFO and seek relief under 5 U.S.C. § 706(2)

5 U.S.C. § 706(2) requires a court to "hold unlawful and set aside agency action" that is arbitrary and capricious, contrary to law, or in excess of statutory jurisdiction. HUD's untimely rescission of the 2024-25 NOFO was unlawful because it violated the McKinney-Vento Act and was arbitrary and capricious, and for the reasons discussed above and in Plaintiffs' opening brief, should be set aside under 5 U.S.C. § 706(2). *See Env't Def. Fund v. FERC*, 2 F.4th 953, 960–61 (D.C. Cir. 2021); ECF No. 81 at 81. Defendants' contrary arguments for why the Court should excuse that unlawful action are unavailing.

*First*, Defendants wrongly assert that "Plaintiffs challenge HUD's rescission of the FY 24-25 CoC NOFO as unreasonably delayed in violation of 5 U.S.C. § 706(1)" (ECF No. 83 at 37), and then argue that the rescission was not "unlawfully withheld or unreasonably delayed" under 5 U.S.C. § 706(1). As best Plaintiffs can tell, Defendants mistakenly infer a challenge to the rescission under 5 U.S.C. § 706(1) from Plaintiffs' Second Amended Complaint, which instead alleges unreasonable delay in Defendants' processing of grant renewals and unlawfully withheld FY 2025 conditional awards. *See* ECF No. 83 at 37–38 (citing

ECF No. 80 at 59–60 ¶¶ 273–78). But the only APA provision under which Plaintiff States have ever challenged the rescission of the 2024-2025 NOFO is 5 U.S.C. § 706(2). *See* ECF No. 81 at 82; ECF No. 80 at 47–51, 57–58.

Defendants' argument conflates untimeliness under the deadline set by 42 U.S.C. § 11382(b) with "delay" under 5 U.S.C. § 706(1). But as Defendants themselves note, Section 706(1) relief is available only to compel agency action that is "legally *required*." ECF No. 83 at 38 (emphasis in original). Missing from Defendants' chain of logic is any explanation of why the rescission of the 2024-2025 NOFO was "legally required" (it was not) or under what conceivable circumstances Plaintiffs would be moving to compel the very agency action that they filed this lawsuit to reverse. For the avoidance of doubt, Plaintiffs do not challenge the rescission of the 2024-2025 NOFO under 5 U.S.C. § 706(1). Plaintiffs seek relief under 5 U.S.C. § 706(2) to set aside the unlawful rescission of the 2024-2025 NOFO and seek relief under 5 U.S.C. § 706(1) to compel HUD to lawfully issue awards under the reinstated 2024-2025 NOFO. Plaintiff States can only attribute Defendants' statement that "Plaintiffs challenge HUD's rescission of the 2024-2025 NOFO as unreasonably delayed in violation of 5 U.S.C. § 706(1)" (ECF No. 83 at 37) and the arguments it marshals against that non-existent challenge (*id.* at 37–43) to Defendants' confusion, which requires no further argument.

Defendants next retread failed arguments from their preliminary injunction opposition brief in an effort to excuse their untimely rescission of the 2024-2025 NOFO. *See* ECF No. 55 at 51-52; ECF No. 83 at 47–48. But these argumuents fare no better on summary judgment. *Brock v. Pierce County*, 476 U.S. 253 (1986) dealt with a very different scenario in which the statutory deadline governed the agency's authority to audit individual grant recipients. There, the Supreme Court reversed a lower court holding that an agency's failure to adhere to a 120-day "procedural

8

requirement" for the resolution of a grant audit eliminated the agency's power to recover misused funds "when . . . there are less drastic remedies [other than the permanent foreclosure of an audit] available for failure to meet a statutory deadline." *Brock*, 476 U.S. at 260. The supposedly "less drastic remedy" Defendants offer here—forcing applicants to proceed under a NOFO that will necessarily disqualify hundreds of existing projects, require them to fundamentally reshape their programs, and prepare a radically revised collaborative application on an impossible timeline, with guaranteed gaps in funding that will result in increased homelessness—is no remedy at all. And contrary to Defendants' argument, HUD, unlike the appellant in *Brock*, would not be "prohibit[ed] . . . ever. . .  in the future" from taking otherwise lawful actions (*contra* ECF No. 83 at 48). Indeed, each appropriations cycle, HUD has a fresh opportunity to implement lawful policy choices for how to administer the CoC program within the parameters set by Congress. And in any event, *Brock* does not address whether the agency action in question was arbitrary and capricious, which HUD's untimely rescission of the 2024-2025 NOFO was in this case (*see supra* § II.A.2) Finally, *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) and *Oxfam America, Inc. v. SEC*, 126 F. Supp. 3d 168 (D. Mass. 2015) (cited at ECF No. 83 at 47) both dealt with challenges to agency action under 5 U.S.C. § 706(1) and are therefore not applicable to Plaintiffs' challenge to the untimely rescission, for reasons explained above.

**B.    Challenges to the Disability and Gender Ideology Conditions in the November NOFO are Not Moot**

Immediately before this Court's scheduled hearing on Plaintiffs' motion for a temporary restraining order on December 8, 2025, Defendants withdrew the November NOFO. ECF No. 55. In subsequently granting Plaintiffs' Motion for Preliminary Injunction, this Court declined to reward this gamesmanship and rejected Defendants' argument that the withdrawal of the

November 2025 NOFO renders Plaintiffs' challenges moot. *See* ECF No. 68 (staying and enjoining the November NOFO and the Challenged Conditions).

Defendants now press a more limited form of this argument, insisting that Plaintiffs' challenges are moot with respect to the two Challenged Conditions that they insist "have no counterpart in the" December NOFO: the Disability Condition and the Gender Ideology Condition. ECF No. 83 at 43–44. The Court should again reject Defendants' mootness arguments because Defendants have not shown that these conditions will not later be restored.

"The burden of establishing mootness rests with the party urging dismissal. This burden is a heavy one." *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 88 (1st Cir. 2008) (internal citations omitted). "[T]he voluntary-cessation doctrine exists to stop a scheming defendant from trying to immunize itself from suit indefinitely by unilaterally changing its behavior long enough to secure a dismissal and then backsliding when the judge is out of the picture[.]" *Boston Bit Labs*, *Inc. v. Baker*, 11 F.4th 3, 10 (1st Cir. 2021) (citation modified). "[V]oluntary cessation of a challenged practice does not moot a case unless 'subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Trinity Lutheran Church of Colombia*, *Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) (quoting *Friends of the Earth*, *Inc. v. Laidlaw Env't Servs. (TOC)*, *Inc.*, 528 U.S. 167, 189 (2000)); *see also FBI v. Fikre*, 601 U.S. 234, 241 (2024) (describing the voluntary cessation doctrine as a "formidable burden" for defendants).

Defendants have not met their formidable burden. With respect to the Gender Ideology Condition, the Court need look no further than the December NOFO, which provides that CoC funding recipients "must comply with . . . [EO] 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government)[.]" ECF No. 66-1 at 119.

10

Although the Gender Ideology EO places obligations solely on federal agencies rather than any funding recipients, HUD by all indications intends to implement the principles of the Gender Ideology Order by withholding funding from recipients who abide by HUD's longstanding Equal Access policies. And when Plaintiffs pointed this out in their Second Amended Complaint and Motion for Summary Judgment, ECF No. 80 at 30-31 ¶¶ 135–40, ECF No. 81 at 35–36, Defendants did not disclaim such an intention, *see generally* ECF No. 83.

With respect to the Disability Condition, even though the December NOFO has dropped the condition, Defendants have not carried their burden of making "absolutely clear" that they will not reimplement it again. *Trinity Lutheran Church of Colombia*, 582 U.S. at 457 n.1. All the record here shows is that Defendants withdrew the condition to avoid an inevitable injunction. Defendants never state they lack discretion to impose the Disability Condition in the future. This is a far cry from a case like *Boston Bit Labs*, in which intervening (and non-litigation-related) events— namely, the withdrawal of executive orders related to the COVID-19 pandemic—made it extremely unlikely for the challenged action to recur. *Boston Bit Labs*, 11 F.4th at 11. No similar circumstances exist here.

In recent months, this Court has repeatedly rejected similar attempts to avoid legal challenges to agency action through voluntary cessation. For example, in *Illinois v. FEMA*, this Court found that the defendants had not met their "formidable burden of showing [that] conduct cannot reasonably be expected to recur because [Defendants] preserved [their] discretion to reapply" challenged terms in grant awards. *Illinois v. FEMA*, 801 F. Supp. 3d 75, 87 (D.R.I. 2025) (internal quotation marks omitted), *appeal docketed*, No. 25-2131 (1st Cir. Dec. 1, 2025). So too here. And in *New York v. Trump*, this Court found that the agency's voluntary rescission of a directive did not moot the plaintiffs' claim, since the evidence suggested rescission was a litigation

tactic rather than an internal rethinking about the legality of the challenged directive. *New York v. Trump*, 769 F. Supp. 3d 119, 133-34 (D.R.I. 2025).

Mootness only occurs "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome . . .[or] the court cannot give any effectual relief to the potentially prevailing party." *Bayley's Campground*, *Inc. v. Mills*, 985 F.3d 153, 157 (1st Cir. 2021). Because Defendants still reserve the right to include any of the Challenged Conditions in future NOFOs, Plaintiffs' requests to enjoin Defendants from implementing each of the Challenged Conditions remain a live issue for this Court's review.

**C.    The Challenged Conditions are Unlawful**

As set forth below, the Challenged Conditions in the November and December NOFOs are unlawful under the APA for four independent reasons: (1) the Conditions are contrary to law; (2) the Conditions are arbitrary and capricious; (3) notice and comment was required; and (4) Conditions are contrary to constitutional right.

**1.    The Challenged Conditions are contrary to law**

**a.    Congress did not grant the Secretary discretion to add the Challenged Conditions**

Defendants claim that Congress delegated to HUD essentially unbounded discretion to set new conditions on CoC awards that are wholly untethered to any statutory provision. This is flatly wrong, as the McKinney-Vento Act and case law make clear.

First, Defendants insist that Secretary Turner has this discretion because the statute provides that the Secretary awards funds "to recipients through a national competition between geographic areas based on criteria established by the Secretary." ECF No. 83 at 49 (citing 42 U.S.C. § 11386a(a)). However, Defendants neglect to mention that the statute then immediately provides that "[t]he criteria established" by the Secretary *shall include*" dozens of

highly specific criteria, including eight criteria related to the previous performance of the recipient regarding homelessness, five criteria concerning the contents of a recipient's plan, criteria related to a geographic area's need for homeless services and the formula for determining allocations among geographic areas, and other specific criteria. *See* 42 U.S.C. § 11386a(b) (emphasis added). Congress' extensive and specific enumeration of the specific criteria the Secretary "shall include" in making awards belies Defendants' claim that Congress intended to gift the Secretary a blank check to set whatever requirements he wanted. *See United States v. Williams*, 553 U.S. 285, 294 (2008) ("[T]he commonsense canon of *noscitur a sociis* . . . counsels that a word is given more precise content by the neighboring words with which it is associated.").

Second, Defendants argue that the Challenged Conditions are somehow authorized by HUD's authority to establish factors to carry out this part of the statute "in an effective and efficient manner." ECF No. 83 at 49 (citing 42 U.S.C. § 11386a(b)(1)(G)). However, many courts have *already rejected this exact argument* by HUD regarding similar conditions on CoC funds. *See, e.g.*, *Martin Luther King, Jr. County v. Turner*, 785 F. Supp. 3d 863, 886–87 (W.D. Wash. 2025) (rejecting argument that HUD may impose new conditions due to the "effective and efficient manner" provision because under the canon *ejusdem generis*, "[s]ubstantive conditions implicating controversial policy matters" are not "of the same kind" as the statute's enumerated conditions, nor would they relate to efficiency and effectiveness); *see also City & Cnty. of San Francisco v. Trump*, No. 3:25-cv-01350-WHO, 2025 WL 2426858, at *5 (N.D. Cal. Aug. 22, 2025) (same); *see also City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905, at *8 (W.D. Wash. Oct. 31, 2025) (finding that this "effective and efficient manner" provision does not grant Defendants unilateral authority to add whatever "substantively distinct and extraneous objective" they want, "untethered from the statutory purpose of ensuring efficient program

13

administration"). Rather than engaging with any of the case law cited in Plaintiffs' brief relating to HUD's lack of authority to impose similar conditions on CoC funding, ECF No. 81 at 52–54, Defendants merely cite an unrelated case involving a staute allowing a CIA director to "within his discretion" terminate any CIA employee's employment. ECF No. 83 at 49 (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988)). *Webster* is entirely inapposite. Nothing in the CoC statute gives the Secretary the discretion he claims to remake the program in his image.

### b.    The Permanent Housing Cap is contrary to law

Not only did Defendants lack the authority to adopt new conditions never approved by Congress, but the Conditions themselves are doubly unlawful because they violate the McKinney-Vento Act and HUD's own regulations.

The Permanent Housing Cap, for example, violates various provisions of the McKinney-Vento Act. *See* ECF No. 81 at 54–55. Defendants respond by focusing entirely on whether the McKinney-Vento Act includes a specific percentage of funds that must be allocated for permanent housing renewals, which misses the central issue: the Act *requires* that HUD evaluate projects based on "[r]equired criteria" including whether the recipient will "incorporate comprehensive strategies for reducing homelessness" like "*permanent supportive housing*" and "*rapid rehousing*[.]" 42 U.S.C. §§ 11386a(b)(1)(B)(iv); 11386b(d) (emphasis added). Defendants' arbitrary thirty percent Permanent Housing Cap on renewal funding violates this statutory mandate because, rather than evaluating whether a project meets this required criteria, Defendants will refuse to provide funding for otherwise qualified projects if they exceed this new thirty percent threshold.

Contrary to Defendants' argument, the statutory minimum for *new* permanent housing projects (*see* 42 U.S.C. § 11386b(a)(2)) is not relevant, as the Permanent Housing Cap that

Plaintiffs challenge relates to a CoC's *renewal* funding. *See* ECF No. 66-1 at 24 (the December NOFO stating that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the renewal of Permanent Housing projects . . ."). Plaintiffs do not seek a judgment mandating that permanent housing projects be renewed at a specific percentage point, as Defendants argue; instead, Plaintiffs merely seek that HUD evaluate applications based on statutorily required criteria rather than HUD's new, arbitrary funding cap that was never approved by Congress.

The Permanent Housing Cap is also inconsistent with other statutory requirements. For example, 42 U.S.C. § 11386b(d) dictates that "[t]he Secretary shall provide bonuses or other incentives to geographic areas for using funding under this part for activities that have been proven to be effective reducing homelessness generally, [or] reducing homelessness for a specific subpopulation" including "permanent supportive housing" and "rapid rehousing." Although Defendants seek to limit this language to only new permanent housing projects (rather than renewals), there is no statutory basis for doing so, as noted above. Additionally, the Permanent Housing Cap flatly violates statutory provisions requiring renewals--given that eighty-seven percent of eligible renewal funds are permanent housing projects. *See supra* Section II.A.1 (addressing Defendants' misreading of the renewal provisions).

Ultimately, the McKinney-Vento Act includes required criteria that HUD must use to determine CoC awards, and the Permanent Housing Cap is not one of them—indeed, it contradicts them. *See Martin Luther King, Jr., County*, 785 F. Supp.3d at 886 (W.D. Wash. 2025) (finding HUD's "new funding conditions" on CoC funds were not "explicitly authorized by the [McKinney-Vento] Homeless Assistance Act" and the law "does outline several conditions that grant recipients must agree to" but does not include the "new conditions Plaintiffs are

15

challenging"); *see also Ass'n of Am. Universities v. Dep't of Def.*, C.A. No. 1:25-cv-11740-BEM, 2025 WL 2899765, at *12–13 (D. Mass. Oct. 10, 2025) (granting Plaintiffs' summary judgment motion when agency violated statute because its statutory authorization to issue grants did not include the ability to cap reimbursement for certain costs at fifteen percent).

### c.     The Tier 1 Cap is contrary to law

The Tier 1 Cap—which arbitrarily limits the renewal of projects that are essentially guaranteed funding to thirty percent of a CoC's Annual Renewal Demand—is contrary to the statute's requirements that: (1) renewal funds for existing projects "*shall* be available for the renewal of contracts[,]" and (2) "[t]he Secretary shall determine whether to renew . . . *on the basis of certification by the collaborative applicant* . . . that (1) there is a demonstrated need for the project; and (2) the project complies with program requirements and appropriate standards of housing quality and habitability[.]" 42 U.S.C. § 11386c(b) (emphasis added).[1]

Defendants argue that 42 U.S.C. § 11386c permits them to suddenly cap Tier 1 renewals at thirty percent, but their argument is based on a misreading of the statute and contradicts HUD's own recent interpretation of this language. Defendants start by claiming that subsection (a) only says that the renewal of expiring contracts "may" be funded, and thus renewals are perforce discretionary. ECF No. 83 at 53. But this language merely refers to where the funding "may" come from, "either" the "appropriations account for this subchapter" or "the section 8" rental assistance account. 42 U.S.C. § 11386c(a). It surely does not give Defendants power to ignore the remainder of the statute.

---

[1] To the extent that the Tier 1 Cap results in permanent housing projects otherwise eligible for renewal losing funding, it also violates the above statutory provisions that address permanent housing.

And on that point, Defendants also misinterpret subsection (b)'s requirement that:

The sums made available under subsection (a) *shall be available for the renewal of contracts* in the case of tenant-based assistance, successive 1-year terms, and in the case of project-based assistance, successive terms of up to 15 years *at the discretion of the applicant or project sponsor and subject to the availability of annual appropriations*, for rental assistance and housing operation costs associated with permanent housing projects funded under this part, or under part C or F (as in effect on the day before the effective date of the Homeless Emergency Assistance and Rapid Transition to Housing Act of 2009). *The Secretary shall determine whether to renew a contract for such a permanent housing project on the basis of certification by the collaborative applicant for the geographic area that—*

> *(1) there is a demonstrated need for the project; and*
> *(2) the project complies with program requirements and appropriate standards of housing quality and habitability, as determined by the Secretary.*

42 U.S.C. § 11386c(b) (emphasis added).

Defendants argue that this provision only means that "some funds are available for renewals at the Secretary's discretion," ECF No. 83 at 53, which flips the meaning of "shall" on its head and ignores the word "successive." Defendants also try to claim that the language "at the discretion of the applicant or project sponsor" only modifies "successive terms of up to 15 years," but this would lead to absurd results. Under Defendants' reading, the phrase "and subject to the availability of annual appropriations" would then also only apply to the fifteen-year clause. As a result, the renewals of "tenant-based assistance" would not by subject to the availability of annual appropriations, which would be absurd. *See New York v. U.S. Dep't of Justice*, No. 1:25-cv-00345-MSM-PAS, 2025 WL 2618023, at *15 (D.R.I. Sept. 10, 2025) ("the last-antecedent rule . . . 'is not an absolute and can assuredly be overcome by other indicia of meaning.'") (quoting *Lockhart v. United States*, 577 U.S. 347, 352 (2016)). Additionally, Defendants' reading conflicts with the language immediately following this, in which the statute reiterates that renewals are determined on the basis of certification "*by the collaborative*

*applicant.*" 42 U.S.C. § 11386c(b) (emphasis added). In fact, HUD's own prior interpretation of the statute confirms that Defendants' reading is incorrect. For example, HUD's recent FY 2024-2025 NOFO explained that as part of the "CoC Priority Listing"—in which HUD processed applications "according to the rank assigned by the CoC" and with ninety percent of the Annual Renewal Demand under Tier 1—"Collaborative Applicants must certify there is a demonstrated need for all ranked (PH) renewal projects and these projects comply with program requirements and appropriate standards of housing quality and habitability on the Renewal Project Listing." ECF No. 12-2 at 32, 76–77; *compare* 42 U.S.C. § 11386c(b) (same language). In other words, HUD itself recently interpreted this certification as a basis for fast-tracking renewals (consistent with the statutory language), not as an indication of the Secretary's ultimate discretion.

Finally, Defendants argue that subsection (c) provides discretion because it states that "[n]othing in this section shall be construed as prohibiting the Secretary from renewing contracts under this part in accordance with criteria set forth in a provision of this part other than this section." But this merely preserves the Secretary's discretion to award renewals that might not otherwise meet the requirements of subsection (b)—it does not give him discretion to deny or indefinitely withhold renewals that Congress otherwise directed Defendants to fund.[2]

### d. The Service Requirement Conditions are contrary to law

The Service Requirement Conditions conflict with the statute's description of supportive services and its instruction that HUD use other detailed criteria to assess CoC applicants.

---

[2] Defendants also claim that because CoC awards are competitive grants, Defendants should not be required to grant the majority of renewals each year. ECF No. 83 at 56 (citing 42 U.S.C. § 11382(a) ("[t]he Secretary shall award grants[] on a competitive basis")). But Defendants ignore that the statute consistently treats renewals differently than new applications, which are subject to a more rigorous competition. *Id*. § 11386c (addressing renewals separately).

Defendants try to downplay these conditions by claiming that the "NOFO merely favors—slightly—such service requirements." ECF No. 83 at 57–58. This is incorrect. In reality, the new scoring system effectively eliminates funding for rapid rehousing without supportive services. It does this through a project threshold in which "Permanent Housing projects must receive at least 6 out of the 8 points available" to be considered for funding, but awarding 3 points combined for offering "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)" and "[d]emonstrat[ing] that the proposed project will require program participants to take part in supportive services (e.g. case management, employment training, substance use treatment)." ECF No. 66-1 at 71–72. Thus, an applicant who does not provide supportive services cannot meet the minimum threshold for funding. Separately, the December NOFO's merit review also awards up to twenty-six points for requiring supportive services, which is twenty percent of all points available and is significant, especially when considered in the context of HUD's plan to defund the vast majority of permanent housing projects that apply. ECF No. 66-1 at 87–90.

Even for the less coercive service conditions, the fact remains that Defendants cannot add new criteria for CoC applicants concerning whether they require supportive services. Instead, Defendants must evaluate applicants solely based on the specific criteria set forth in 42 U.S.C. § 11386a, which relate to how quickly projects can get people housed and the extent to which they keep them housed. *See* ECF No. 81 at 56 (describing criteria). Defendants may not neglect these factors by suddenly inserting a significant new factor not included by Congress.

### e.    The Disability Condition is contrary to law

Defendants' brief fails to include *any* discussion of whether the Disability Condition in the November NOFO is lawful. Defendants merely claim that Plaintiffs' challenge is moot and then

discuss a new, separate provision challenged by the NAEH Plaintiffs. ECF No. 83 at 58–59. Therefore, given that Defendants have failed to address this issue, they have waived any argument against Plaintiffs' claim. *See* Dec. 19, 2025 Hr'g Tr. 47:11–48:24, (this Court stating that Defendants waived any objections to whether the 2025 NOFO conditions are unlawful because they did not address the legality of the conditions in their briefing); *see also Johnson v. Ocwen Loan Servicing, LLC*, C.A. No. 1:17-cv-11944-ADB, 2020 WL 1063083, at *10 (D. Mass. Mar. 5, 2020) ("Because Plaintiffs have failed to address any of Defendants' arguments concerning Plaintiffs' . . . claim, the Court will treat those arguments as conceded.") (citing *Astro-Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1, 19 (1st Cir. 2009)).

### f.    The Geographic Discrimination Conditions are contrary to law

Defendants do not seriously engage with the fact that the Geographic Discrimination Conditions violate multiple statutory provisions: (1) 42 U.S.C. § 12711, which prohibits HUD from "denying funds" to any jurisdiction "based on the adoption, continuation, or discontinuation by [that] jurisdiction of any public policy, regulation, or law"; and (2) 42 U.S.C. § 11386a(b), which provdes that CoC funding allocations among geographic areas shall be "determined . . . by a formula. *See also* 24 C.F.R. § 578.17(a) (describing formula for Preliminary Pro Rata Need for each geographic area).

In response, Defendants suggest that the NOFO focuses on CoC applicants' own policies rather than the jurisdictions' policies. ECF No. 83 at 59–60. The NOFO says otherwise. It requires applicants to "demonstrate, by providing evidence, *that the CoC's entire geographic area*" has the policies at issue, such as "[d]oes not tolerate the public use of illicit drugs." ECF No. 66-1 at 95-97 (emphasis added). This is geographic discrimination, pure and simple.

Defendants also entirely ignore Plaintiffs' argument concerning 42 U.S.C. § 11386a(b) and 24 C.F.R. § 578.17(a), which require HUD to fund every geographic area based on need. *See* ECF No. 81 at 58. These provisions plainly prohibit Defendants from punishing local jurisdictions based on political disagreement.. Because the Geographic Discrimination Conditions do just that, they are unlawful.

g.    **The Gender Ideology Conditions are contrary to law**

Like the Disability Condition, Defendants also fail to include *any* argument regarding whether the Gender Ideology Condition in the November NOFO is lawful. For the same reasons as above, Defendants have therefore waived any opposition to Plaintiffs' claim regarding the Gender Ideology Condition in the November NOFO.

Instead, Defendants only focus on Plaintiffs' claim related to the December NOFO's requirement that applicants comply with Executive Order (EO) 14168 (Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government). In their response, Defendants claim that this condition cannot be unlawful because the December NOFO states that EOs shall be complied with "unless otherwise restricted by law or by a court of competent jurisdiction." ECF No. 83 at 61–62. In other words, Defendants' argument is essentially circular: they claim that if EO 14168 is unlawful, then it will not be implemented under the December NOFO, so therefore this Court cannot find this condition unlawful. This defies common sense and Defendants cannot have it both ways, especially when Defendants have tried to reinsert this condition after prior courts already found its contents to be unlawful. This Court should follow the same approach of other courts who have analyzed this exact EO. *See City of Seattle*, 2025 WL 3041905, at *1 (enjoining enforcement of EO 14168 against Seattle, including with respect to Continuum of Care grants); *see also PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 423

(D. Md. 2025) (enjoining enforcement of EO 14168 with respect to gender-affirming medical care and explaining that "the *threat* of withholding federal funding, regardless of *which* funding or *how much* funding, was enough").[3]

Defendants fare no better in pointing to the savings clause in the EO itself. *Contra* ECF No. 83 at 62. "Savings clauses are read in their context, and they cannot be given effect when the Court, by rescuing the constitutionality of a measure, would override clear and specific language." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1239 (9th Cir. 2018). Here, any application of the EO would contradict HUD's own Equal Access regulations. "The Executive Order's savings clause does not and cannot override its meaning." *Id.* at 1240.

## 2.    The Challenged Conditions are arbitrary and capricious

The Challenged Conditions in the December 2025 NOFO are arbitrary and capricious several times over. ECF No. 81 at 59–75. Defendants (1) failed to explain or justify their complete reversal of longstanding policies; (2) failed to consider the factors Congress directed them to; (3) failed to consider the reliance interests of CoCs and applicants who built their programs in reliance on HUD's longstanding policies, and (4) failed to address the undeniable fact that these policies would result in massive numbers of formerly homeless people being evicted back to homelessness. Nothing in their Response cleans up this mess.

Defendants' assertion that HUD "adequately and reasonably considered—and documented—all relevant aspects of the problem before it" is simply not supported by the administrative record. *Cf.* ECF No. 83 at 50. Most glaringly, Defendants entirely fail to grapple

---

[3] Defendants ignore cases involving this exact EO and instead discuss a different EO in *Trump v. Am. Fed'n of Gov't Emps.*, 145 S. Ct. 2635 (2025) (mem), but this analogy fails for many reasons, including that the Court in *Trump* analyzed solely the Executive Order itself and "express[ed] no views on the legality of any Agency . . . Plan" pursuant to the EO, whereas here HUD issued its funding plan for FY 2025 funds and incorporated the EO into its "Conditions." ECF No. 66-1 at 118-19. Additionally, although Defendants emphasize that the EO does not directly impose obligations on Plaintiffs themselves, this is irrelevant because the issue is that *HUD* will use the EO to withhold funding. *See* ECF No. 81 at 57 n.13.

with the fact that the core assumption underpinning the November and December NOFOs—that Housing First doesn't work—is directly contrary to Congress' explicit findings to the contrary. *See* Homeless Emergency Assistance and Rapid Transition to Housing (HEARTH) Act of 2009, Pub. L. No. 111-22, 123 Stat. 1632, 1663, Div. B § 1002 (2009) ("(a) Findings.—The Congress finds that—(1) a lack of affordable housing and limited scale of housing assistance programs are the primary causes of homelessness . . . (b) Purposes.—The purposes of this [Act] are— . . . (3) to establish a Federal goal of ensuring that individuals and families who become homeless return to permanent housing within 30 days."); *accord* 42 U.S.C. § 11386b(d)(2) (identifying permanent supportive housing and rapid rehousing as "activities that have been proven to be effective at reducing homelessness"). Nothing Defendants now say empowers them to overrule Congress. But even if they could, they have failed to make their case.

### a. There is no record of any reasoning by HUD until after this litigation commenced

The administrative record makes clear that the only pre-litigation bases for the imposition of the Challenged Conditions were executive orders, in particular the President's July 24, 2025 Executive Order directing HUD to "end[] support for 'housing first' policies that deprioritize accountability and fail to promote treatment, recovery, and self-sufficiency[.]" EO No. 14321, 90 Fed. Reg. 35817 (Jul. 24, 2025). As explained above, *see* Section II.A.2, only after this litigation commenced did HUD scramble to create a post-hoc record justifying its callous and haphazard implementation of the ideological imperatives contained in the President's order. *See* AR at 286–99.

Defendants acknowledge, as they must, that "the relevant portions of the administrative record" explaining HUD's rejection of its longstanding decades-long Housing First policies "were developed contemporaneously" with "the December 2025 NOFO." ECF No. 83 at 50; *id.* n. 11.

23

This is a problem because the November NOFO represented an unambiguous and unreasoned repudiation of "Housing First" policy. Not until the issuance of the December NOFO, which tweaked some of the conditions in the November NOFO but reaffirmed that NOFO's rejection of Housing First policy, is there any colorable record of administrative reasoning (such as it is). *See* ECF No. 83 at 13–14 (comparing the NOFOs). The withdrawal of the November NOFO and issuance of the December NOFO, along with the creation of the post-hoc rationalizations underpinning it, were plainly litigation-driven actions. *See* ECF No. 83 at 25 ("After Plaintiffs filed their lawsuits, however, HUD decided in good faith to make revisions to the NOFO . . ."). These facts alone are sufficient to find that the decision to repudiate Housing First, and each of the discrete conditions that follow from that repudiation, are arbitrary and capricious as a matter of law. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Melone*, 100 F.4th at 31 (When assessing whether agency action is arbitrary and capricious, the Court "may consider only the agency's explanation given at the time the relevant decision was made, as opposed to [a] post hoc rationale.").

### b.    The Challenged Conditions are unsupported by Defendants' post-hoc reasoning

The Challenged Conditions and HUD's implementation of them flow from the reasoning-free decision to repudiate Housing First policy, and are all tainted by that failure. Unsurprisingly, then, each set of conditions is individually justified by Defendants, if at all, by post-hoc rationales that post-date the filing of this case. And even where such justifications are offered, they "run[] counter to the evidence before the agency[.]" *State Farm*, 463 U.S. at 43; *see* ECF No. 81 at 49. Defendants' arguments to the contrary are unavailing.

***Permanent Housing and Tier 1 Caps.*** As explained in Plaintiffs' opening brief, Defendants cannot repudiate Congress's findings that permanent housing is proven to be effective

at reducing homelessness. ECF No. 81 at 49. Nor may Defendants get around Congress' clear findings by pointing to the statutory minimum for funding /*new* permanent housing projects. *Contra* ECF No. 83 at 65–66 (citing 42 U.S.C. § 11386b(a)(1)–(2)). This provision simply is irrelevant because the Permanent Housing Cap that Plaintiffs challenge relates to a CoC's *renewal* funding. *See* ECF No. 66-1 at 24 (the December NOFO stating that "no more than 30 percent of a CoC's Annual Renewal Demand (ARD) under this NOFO will fund the renewal of Permanent Housing projects . . .").

In their opposition brief, Defendants fail to engage with Plaintiffs' arguments (ECF No. 81 at 49–54) that the recent increase in homelessness that HUD relies on to justify its about-face is not correlated with, let alone caused by, HUD's decades-long emphasis on permanent housing. Defendants instead treat the complexity of the issue as an unabridged license to "pursue their chosen policy." ECF No. 83 at 66 (citing *Atieh v. Riordan*, 797 F.3d 135, 140 (1st Cir. 2015)). But where "a reasonable adjudicator would be compelled to reach a contrary conclusion" based on consideration of the "raw facts," an agency's determinations are not insulated from review. *Atieh*, 797 at 140 (quoting *Agyei v. Holder*, 723 F.3d 6, 13 (2013)); *accord State Farm*, 463 U.S. at 43. Simply put, this is not a case where the evidence supports competing inferences and the agency simply chooses one over the other; this is a case in which the evidence on which the agency purports to rely actively *undermines* its position, and so the agency simply chooses to ignore it. *See*, *e.g*., ECF No. 81 at 64 (explaining that the administrative record undermines HUD's argument of a correlation between Housing First and increased homelessness); *id.* at 66–67 (explaining that the administrative record, if anything, supported the notion that Housing First policies reduced overdose deaths); *id.* at 67–69 (explaining that HUD simply ignored voluminous evidence it had previously relied on to support Housing First Policies). And the external source HUD holds up to

validate its position does not consist of "raw facts" but rather is a partisan think tank publication from the former employer of the same HUD employee who prepared the post-hoc December Memorandum. *See* ECF No. 83 at 52 (citing AR 711–40).

Finally, the fact that Congress directed HUD to award some grants "on a competitive basis" does not mean that any departure from existing policy resulting in an "increase in competition" is therefore reasonable. *Cf.* ECF No. 83 at 67. Rather, when an agency "rescinds a prior policy," the agency must, at minimum, "consider the alternative[s] that are within the ambit of the existing policy[,]" "assess whether there were reliance interests," and "weigh any such interests against competing policy concerns." *Regents*, 591 U.S. at 30, 33 (internal quotation marks omitted). HUD plainly failed to do that with respect to the Permanent Housing Cap and Tier 1 Cap.

*"Application review" provisions.* Defendants' arguments in defense of the "Service Requirement Conditions" in Defendants' opposition, *see* ECF No. 83 at —68-76, fare no better.[4] Defendants begin by misstating the law: the statute contains no "explicit requirement that CoC projects provide supportive services for residents of *all* projects[,]" as Defendants claim (ECF No. 83 at 68, emphasis added), but rather requires only that projects provide services "*to the extent practicable*." 42 U.S.C. § 11385(a) (emphasis added). As with the caps, the reasoning and evidence HUD supposedly "relied on" in devising these conditions appears in the record only after this litigation commenced, including the post-hoc storytelling from the December Memorandum (AR 287) and language from the December 2025 NOFO itself (AR 1196-97, 1200-03, 1206-07, 1218-21). Yet again, evidence that HUD considered any "raw facts" (*Atieh*, 797 F.3d at 140) before making up its mind to impose these conditions is simply absent from the record, and claims from

---

[4] Defendants fail to provide *any* analysis regarding the November 2025 Disability Condition and therefore have waived any challenge to Plaintiffs' claim that the Condition was arbitrarily and capriciously implemented. *See* ECF No. 58 at 6. Defendants' discussion of the different disability language in the December NOFO is not relevant to the State Plaintiffs' claims.

the December Memorandum alone are not creditable as a basis for the contemporaneous reasoned decisionmaking that the APA requires. Defendants have produced "no findings and no analysis here to justify the choice made" until after these conditions were challenged. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167 (1962).

***"Post-award" conditions.*** Finally, Defendants' retreat from the Gender Ideology condition outlined in the November NOFO (a condition identical to one that this Court had previously enjoined HUD from implementing, *see Nat'l All. To End Homelessness v. Turner*, C.A. No. 1:25-cv-00447, 2025 WL 2638377, at *1 (D.R.I. Sept. 14, 2025) and attempt to smuggle it in to the December NOFO, through the incorporation of Executive Orders that are themselves unlawful should be rejected. Defendants' excuse for why the Court should refrain from enjoining these conditions-that "the provisions, which concern Executive Orders applicable to federal agencies that are to be implemented in accordance with applicable law, impose no independent obligations on any entity other than federal agencies and employees"—is beside the point so long as HUD intends to rely on the Executive Order to deny funding to any applicant. *See* AR at 1250. And of course, Defendants do not even pretend that there was any consideration by the agency of whether to incorporate the substance of these Orders. *Martin Luther King, Jr. County*, 798 F. Supp. 3d 1224, 1252 (W.D. Wash. 2025) ("rote incorporation of executive orders . . . does not constitute 'reasoned decisionmaking.'"); *see also R.I. Coal. Against Domestic Violence v. Kennedy*, C.A. No. 1:25-cv-00342-MRD-PAS, 2025 WL 2988705, at *7 (D.R.I. Oct. 23, 2025).

***Failure to consider reliance interests and "negative effects."*** In defending each set of Challenged Conditions, Defendants continue to simply ignore the human toll of their actions and fail to respond to Plaintiffs' arguments on this score. ECF No. 81 at 60–61. Nothing in the administrative record reflects any consideration of what will happen to the people living in

suddenly defunded programs. Defendants claim (without any record citation) to have "adequately considered the effects of changing such policies . . . and determined that the negative effects of those changes were outweighed by the benefits," ECF No. 83 at 64, but no identification or admission of any euphemistically-termed "negative effects" from HUD's about-face (let alone any careful weighing of the same against purported benefits) can be found anywhere in the administrative record or Defendants' briefing. And to repeat: those "negative effects" consist of tens of thousands of formerly homeless American individuals and families being evicted from the homes that Congress instructed HUD to help provide. Apart from conclusory protestations, Defendants do not rebut that they have "entirely failed to consider an important aspect of the problem[.]" *State Farm*, 463 U.S. at 43; *see also R.I. Coal. Against Domestic Violence*, 2025 WL 2988705, at *7 (finding that Defendants failed to consider "the harmful impact their decision would have on the Coalitions and the vulnerable populations they serve") (internal quotation marks omitted). Defendants are silent in response to Plaintiffs' examples of the significant reliance interests that these conditions gravely undermine. *See, e.g.,* ECF No. 81 at 34 (describing impact of Service Requirement condition on providers serving survivors of domestic violence that also receive funding under Violence Against Women Act (VAWA) or the Family Violence Prevention Service Act (FVPSA), which prohibit grant recipients from imposing service participation requirements). *See* 34 U.S.C. § 12351(b)(3) (VAWA); 42 U.S.C. § 10408(d)(2) (FVPSA)).

Defendants gesture at the existence of "Transition Grants" as characterized in the post-hoc December Memorandum as their best evidence that they considered the effects of the caps on the providers, individuals, and families who rely on CoC renewal funding for permanent housing. ECF No. 83 at 64 (citing AR 297–98, 1157, 1184–85.) But the "Transition Grants" available in

28

both the November and December NOFOs require that any "renewal project transitioning to a new component must be fully eliminated through reallocation." AR 199; *see also* AR 1157 ("To create a transition grant through the reallocation process, the CoC must wholly eliminate one or more projects and use those funds."). Transition grants, therefore, merely help effectuate the Permanent Housing Cap rather than "ameliorating" its consequences, *cf.* ECF No. 83 at 65 (describing Transition Grants as "all [HUD] could do."). In sum, each of the Challenged Conditions is arbitrary and capricious.

### 3. Notice-and-comment was required

Defendants' November and December NOFOs adopted an entirely new suite of policies that reversed decades of HUD policy and contradicted existing regulations and governing statutes. By HUD's own regulations, these changes required the safeguards of notice-and-comment procedure. 24 C.F.R. § 10.1; *see* ECF No. 81 at 50–51. HUD's refusal to abide by its own notice-and-comment requirements renders the Challenged Conditions invalid, full stop. *N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018).

HUD responds with a bevy of half-formed arguments, but none grapple with its central failure to engage the public before fundamentally altering the CoC Program. First, Defendants insist that requiring the agency to engage in notice-and-comment "every time it issued any change to a funding solicitation, no matter how minor . . . would entirely ossify administration of the program[.]" ECF No. 83 at 77. Instead, they ask the Court to treat the December NOFO as little more than "a general statement of policy" about how grants will be awarded. *Id.* at 77–76. As discussed above, the new conditions are not "minor"; many effectively establish strict prerequisites for funding.

Defendants next contend that they are not required to attend to the safeguards of notice-and-comment because their own regulations providing for notice-and-comment "with respect to all HUD programs and functions," 24 C.F.R. § 10.1, actually "do[] not establish any substantive obligation" but merely reflect "a general statement of policies related to public participation in HUD programs and functions," ECF No. 83 at 79. This argument is frivolous. While 5 U.S.C. § 553(a)(2) exempts matters "relating to . . . grants, benefits, or contracts" from notice-and-comment, where, as here, an agency adopts its own notice-and-comment regulation, "that validly issued administrative regulation[] ha[s] the force and effect of law" and "fully b[i]nd[s] the Secretary to comply . . . with the procedural demands of the APA." *Rodway v. U.S. Dep't of Agric.*, 514 F.2d 809, 814 (D.C. Cir. 1975). Accordingly, "HUD is subject to the rulemaking requirements of the Administrative Procedure Act[.]" *Comm. For Fairness v. Kemp*, 791 F. Supp. 888, 893 (D.D.C. 1992) (citing 24 C.F.R. Part 10). When it adopts substantive rules for its programs, HUD "must first afford interested persons general notice of the proposed action and an opportunity to comment." *Id.*

Defendants are not required to go through notice-and-comment "every time [they] issue[] a NOFO related to the CoC program." ECF No. 83 at 78. But if they want to change the rules governing the program like they did here, notice and comment is required. Because they failed to undertake notice-and-comment before adopting new policies that fundamentally alter the CoC program, the Challenged Conditions are invalid and should be set aside. *N.H. Hosp. Ass'n*, 887 F.3d at 70.

4.      **The Challenged Conditions are contrary to constitutional right**

Finally, since Plaintiffs have demonstrated that Defendants have violated separation of powers principles, the Spending Clause, and the Tenth Amendment (*see* Section II.D below), Plaintiffs are entitled to summary judgment on their claim that Defendants have acted contrary to constitutional right in violation of the APA. ECF No. 80 at 57–58 ¶¶ 257–66.

D.      **Plaintiffs Are Entitled to Summary Judgment on Their Constitutional Claims**

As detailed in Plaintiffs' opening brief, Plaintiffs prevail on their Fifth through Eighth Causes of Action claiming constitutional violations by Defendants. ECF No. 81 at 61-63; ECF No. 80 at 52-57 ¶¶ 221-60. Defendants' opposition is, first and foremost, a technical critique following from a faulty premise: that Plaintiffs' constitutional claims are duplicative of Plaintiffs' APA claims.[5] ECF No. 83 at 80-83. Not so.

First, *Dalton v. Specter*, 511 U.S. 462 (1994), is inapplicable to cases "where the President acted in the '*absence* of *any* statutory authority,' as opposed to 'a claim that the President acted in excess of such authority.'" *Rhode Island v. Trump*, C.A. No. 1:25-cv-00128-JJM-AEM, 2025 WL 3251113, at *16 (D.R.I. Nov. 21, 2025) (McConnell, C.J.) (quoting *Dalton*, 511 U.S. at 473) (emphasis in original).[6] Here, as in *Rhode Island*, Plaintiffs have demonstrated that Defendants have done more than exceed any grant of discretion by Congress to Defendants in administering the CoC program—instead, Defendants have acted unilaterally by "attaching conditions to federal

---

[5] Plaintiffs' *ultra vires* Cause of Action, Count Four in the Second Amended Complaint (ECF No. 80 at 52 ¶¶ 221-27), is alternative relief requested by Plaintiffs in the unlikely event that the Court determines that review of Defendants' actions is unavailable under the APA. Since Defendants concede that APA review is available, the Court does not need to reach the merits of Plaintiffs' *ultra vires* challenge.

[6] Moreover, the *Dalton* Court did not say "that action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim. Statutory and constitutional claims are not mutually exclusive." *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019) (holding that *Dalton* did not foreclose a constitutional cause of action as "Plaintiffs claim that to the extent Defendants did not have statutory authority to reprogram the funds, they acted in violation of constitutional separation of powers principles because Defendants lack any background constitutional authority to appropriate funds—making Plaintiffs' claim fundamentally a constitutional one.").

funding that were not only unauthorized by Congress but that contravene Congress's directions," thus "usurp[ing] Congress's spending and legislative power." ECF No. 81 at 77; *see also supra* Section II.C; *Rhode Island*, 2025 WL 3251113, at *16 (holding that "the President has no statutory authority to cancel appropriations passed by Congress"); *see also Chicago Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 1331743, at *5 (N.D. Ill. May 7, 2025) (rejecting the applicability of *Dalton* and explaining, "[t]he Executive Branch must respect congressional appropriations; it does not retain discretion to condition the payment of grants based on its political priorities absent a congressional delegation of such authority."). Plaintiff States do not "simply alleg[e] that the [Secretary] has exceeded his statutory authority" in issuing the Challenged Conditions. *Dalton*, 511 U.S. at 473. Instead, here, Defendants *contravened* Congress and thus lacked authority to issue the Challenged Conditions. *See* ECF No. 81 at 53. These are constitutional claims, which the Court should decide in Plaintiff States' favor.

Second, Defendants are wrong that the Executive Branch is not bound by the constitutional limitations on the federal government's spending power. ECF No. 83 at 69–70. As this Court recently held, the requirements of the Spending Clause "apply as well to federal agencies when adopting or enforcing spending conditions." *New York v. U.S. Dep't of Justice*, 2025 WL 2618023, at *20 (citing *New York v. U.S. Dep't of Health & Human Servs.*, 414 F. Supp. 3d 475, 572 (S.D.N.Y. 2019)).

As to the merits, Plaintiffs have demonstrated their entitlement to relief. With respect to Plaintiffs' separation of powers claim, Defendants have attmepted to arrogate to themselves the authority granted to Congress alone by the Constitution "to enact, to amend, or to repeal statutes" by attempting to write out of the CoC organic statutes the requirement to fund and renew permanent housing projects. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). As explained

in Plaintiffs' opening brief (ECF No. 81 at 40) and *supra*, Section II.A.1, Congress mandated that funds for the renewal of projects "*shall* be available." 42 U.S.C. § 11386c(b) (emphasis added). Defendants' attempts to water down this clear mandate with a selectively edited quote from § 11386c(a) should be rejected—when read in its entirety, it is clear that subsection (a) is identifying the two possible *sources* of renewal funding (from either (1) the CoC appropriations account, or (2) the section 8 project-based rental assistance account) while subsection (b) provides the Congressional mandate for *when and whether* projects *shall* be renewed.

Defendants have independently violated the Spending Clause and Tenth Amendment[7] by attaching the Geographic Discrimination Conditions and the Gender Ideology Condition to CoC funding. To satisfy the Spending Clause, conditions imposed on spending by the federal government (1) must be unambiguous, (2) "must not be 'impermissibly coercive,'" (3) "must relate 'to the federal interest in the project and to the over-all objectives thereof,'" and (4) "'may not be used to induce the States to engage in activities that would themselves be unconstitutional.'" *New York v. U.S. Dep't of Health and Human Servs.*, 414 F. Supp. 3d at 566 (quoting *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580 (2012) (NFIB), and *South Dakota v. Dole*, 483 U.S. 203, 208, 210 (1987)).

Both the Geographic Discrimination Conditions and the Gender Ideology Condition are completely unrelated "to the federal interest in" the CoC program "and to the over-all objectives thereof." *Dole*, 483 U.S. 203, 208 (quoting *Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 295 (1958)). With respect to the Geographic Discrmination Conditions, Defendants do not and cannot point to any provision in the CoC statutes suggesting that the criminalization of

---

[7] Defendants incorrectly suggest that Plaintiffs have not moved for summary judgment with respect to Plaintiffs' Tenth Amendment Cause of Action. ECF No. 83 at 87 n.14. But Plaintiffs' Spending Clause and Tenth Amendment Causes of Action are part and parcel with one another, as coercive conditions on funding may exceed the federal government's spending power and violate state sovereignty. *See NFIB*, 567 U.S. at 579–81.

homelessness was one of Congress's objectives in creating the CoC program. Similarly, nowhere in the CoC statutes or in any other law did Congress express an intent for the federal government to condition CoC funding on grant recipients' agreement to discriminate against transgender individuals.

**E.       Plaintiffs Are Entitled to Summary Judgment on their § 706(1) Claim**

In light of their apparent confusion (*supra* Section II.A.3), Defendants entirely fail to respond to Plaintiffs' main assertion under § 706(1): that Defendants unreasonably delayed making CoC renewal funding available for FY 2025. *See* ECF No. 81 at 77–81. Therefore, Defendants have waived any challenge to this argument. *Johnson*, 2020 WL 1063083, at *10 ("Because Plaintiffs have failed to address any of Defendants' arguments concerning Plaintiffs' . . . claim, the Court will treat those arguments as conceded.") (citing *Astro-Med, Inc. v. Nihon Kohden America, Inc*., 591 F.3d 1, 19 (1st Cir. 2009).

Separately, Defendants respond to Plaintiffs' assertion that conditional awards have been unlawfully withheld under § 706(1) merely by arguing that the deadline for conditional awards (i.e., January 29, 2026) does not exist because Defendants withdrew the FY 2024-2025 NOFO. But Defendants' response misses the point: Defendants never validly withdrew and replaced the FY 2024-2025 NOFO, so the only lawful and valid NOFO for HUD to proceed under is the 2024-2025 NOFO. *See* Dec. 19, 2025 Hr'g Tr. 69:1–15, (Court granting preliminary injunction and finding that "the record plausibly shows that HUD's rescission of the two-year NOFO and issuance of the 2025 NOFO conflicts with the statutory mandates of the McKinney Vento Act" and involved substantive and procedural violations of the APA).

**F.    The Remedies Plaintiff States Seek Are Appropriate and Necessary For Complete Relief**

**1.    Plaintiff States are entitled to an injunction in addition to vacatur**

Defendants concede that vacatur of the 2024-2025 NOFO Rescission and the December 2025 NOFO are appropriate remedies, should this Court rule in Plaintiffs' favor. ECF No. 83 at 94. But they claim this Court lacks the power to enjoin them from engaging in future unlawful conduct-including, apparently, issuing a new, even more untimely NOFO, or reinstating the Challenged Conditions. *Id.* at 93–96. This is poppycock.

"The APA authorizes 'writs of prohibitory or mandatory injunction' in addition to vacatur." *California v. U.S. Dep't of Transp.*, C.A. No. 25-cv-208-JJM-PAS, 2025 WL 3072541, at *12 (D.R.I. Nov. 4, 2025) (quoting 5 U.S.C. § 703). Courts have "broad remedial power to issue permanent injunctive relief for APA violations." *Ramirez v. U.S. Immigration & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021) (collecting cases); *see also Illinois*, 801 F. Supp. 3d at 96 (vacating the contested conditions and permanently enjoining against any future implementation of the contested conditions against the plaintiff states); *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1410 (D.C. Cir. 1998) (affirming permanent injunction against unlawful agency action); *Sanjour v. U.S. E.P.A.*, 7 F. Supp. 2d 14, 17 (D.D.C. 1998) ("[C]ourts frequently enjoin the enforcement of regulations ultimately held to be invalid."). Plaintiffs here are not asking this Court to unduly interfere with agency decisionmaking on remand, but merely to prohibit HUD from repeating discrete, unlawful actions, i.e., untimely rescission of the FY 2024-2025 NOFO and implementation of the Challenged Conditions. Contrary to Defendants' suggestion, when, as here, a plaintiff successfully shows that agency actions and policies are unlawful, a plaintiff need not meet some heightened burden to obtain an injunction against those actions and policies. *Contra* ECF No. 83 at 94. Rather, it is sufficient for the plaintiff to meet the familiar four-factor

35

test of 1) success on the merits, 2) irreparable harm, 3) balance of equities, and 4) public interest. *California*, 2025 WL 3072541, at *12 (quoting *Asociacion de Educacion Privada de Puerto Rico, Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007)). Here, Defendants do not even address the non-merit factors. *See* ECF No. 83 at 92–99. Thus, should this Court rule for Plaintiffs on the merits, an injunction prohibiting rescission of the FY 2024-2025 NOFO and imposing the Challenged Conditions is plainly appropriate. *See* ECF No. 81 at 82–88.

Defendants' grasping toward the severance clause of the December NOFO avails them nothing. *See* ECF No. 83 at 95–96. To start, the December NOFO is unlawful in its entirety because the rescission of the FY 2024-2025 NOFO was unlawful. Defendants can't nip-and-tuck their way out of that. Moreover, as detailed in the States' Motion, complete relief requires an injunction requiring Defendants to process renewal applications and conduct the CoC competition in accordance with the FY 2024-2025 NOFO. *See* ECF No. 81 at 88–89. Indeed, it is the only way Defendants can meet their statutory obligations to renew projects to ensure that formerly homeless individuals are not evicted back into homelessness. *Supra* Section II.A.1. Defendants have issued a lawful NOFO—the FY 2024-2025 NOFO—and this Court can and should direct them to proceed under that NOFO.

### 2. This Court may also direct Defendants to issue conditional awards and renewals under 5 U.S.C. § 706(1)

Section 706(1) of the APA also provides a basis for this Court to order Defendants to act under the FY 2024-2025 NOFO. As detailed in Plaintiff States' Motion for Summary Judgment, Defendants have unreasonably delayed FY 2025 renewals and unlawfully withheld FY 2025 conditional awards. ECF No. 81 at 77–81. And as Defendants admit, should this Court agree with Plaintiffs, "the proper remedy would be to order HUD to proceed with the CoC competition and issuing grants expeditiously[.]" ECF No. 83 at 98. That relief is exactly what the States request

here: because Defendants' untimely rescission of the FY 2024-2025 NOFO and haphazard approach to program implementation have unreasonably delayed processing renewals and unlawfully withheld conditional awards, this Court can and should order Defendants to proceed expeditiously with awarding FY 2025 program funds under the lawful FY 2024-2025 NOFO. Specifically, Plaintiffs request that the Court order Defendants to: (1) announce FY 2025 conditional awards for renewal projects that already received FY 2024 funding under the FY 2024-2025 NOFO (such that no new application for FY 2025 is required) by March 2, 2026 or one week after the Court's order, whichever is later; and (2) announce all other FY 2025 conditional awards by March 31, 2026 or one week after the Court's order, whichever is later. This is more than reasonable considering that, by statute, Defendants should have announced conditional awards by January 29, 2026, which has already passed. *See* ECF No. 81 at 78 n.21. Plaintiffs reserve the right to later challenge Defendants' review process to the extent that Defendants undertake unnecessary or improper review steps that cause undue delay or harm Plaintiffs.

### III.    CONCLUSION

The Court should grant Plaintiff States' Motion for Summary Judgment.

DATED this 30th day of January 2026.

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ZANE MULLER*
ALIANA KNOEPFLER*
ANDREA ALEGRETT*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Zane.Muller@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Andrea.Alegrett@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*


**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*


**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
VICTORIA OCHOA*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov

*Counsel for Plaintiff State of New York*


**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for Plaintiff State of California*

**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov

*Attorneys for Plaintiff State of Colorado*

**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov

*Attorneys for Plaintiff District of Columbia*

39

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov
Laurac.Tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor
ex rel. Andy Beshear, in His Official Capacity
as Governor of the Commonwealth of Kentucky*


**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*


**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6411
Jluh@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
ESME CARAMELLO
Director, Housing Affordability Unit
AARON DULLES*
LAUREN YAMAGUCHI*
Assistant Attorneys General
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.carter@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

**JENNIFER DAVENPORT**
Acting Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER*
Deputy Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
Asamant@nmdoj.gov

*Attorneys for the State of New Mexico*

41

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
Jacobboyer@pa.gov
717-460-6786

*Attorney for Plaintiff Governor Josh Shapiro, in His Official Capacity as Governor of the Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov

*Attorney for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*