# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

STATE OF WASHINGTON, et al.,

                              Plaintiffs,

         v.

UNITED STATES DEPARTMENT OF
HOUSING AND URBAN
DEVELOPMENT, et al.,

                          Defendants.

C.A. No. 1:25-cv-00626-MSM-AEM

**PLAINTIFF STATES' OPPOSITION TO DEFENDANTS' MOTION TO DISSOLVE**

## I.    INTRODUCTION

Defendants attempt to transform a Congressional rebuke into an opportunity to reinstate a Notice of Funding Opportunity (NOFO) that this Court found is likely to be unlawful. In passing the Transportation, Housing and Urban Development Consolidated Appropriations Act of 2026, Pub. L. No. 119-75, 140 Stat. 173 (the "2026 THUD Appropriations Act"), Congress added a provision to undo the chaos sown by Defendants' haphazard administration of the Continuum of Care (CoC) program. The new language affirms this Court's injunction against the wholesale dismantling of the CoC program and takes it one step further, unambiguously ordering Defendants to issue non-competitive renewals on a rolling basis to avoid disruptions to existing projects and to give assurance to homelessness service providers that they can keep the lights on through the calendar year.

Despite Congress's clear intent to restore continuity to the CoC program, Defendants now try to use this Congressional backstop as a lever to promulgate their unlawful December 2025 NOFO by asking this Court to dissolve the preliminary injunction. But their arguments against the injunction fare no better now than they did the first time. Allowing Defendants to reissue the December 2025 NOFO in the interim before the Court decides Plaintiffs' summary judgment motion would only sow further chaos and uncertainty, again inflicting the most immediate category of irreparable harm that the injunction was issued to staunch. And the 2026 THUD Appropriations Act, by its own terms, would not prevent the irreparable harm that would occur if Defendants are permitted to impose the unlawful Challenged Conditions in the second half of this year, as Defendants declare they seek to do.

This Court should reject that effort and deny the motion to dissolve.

## II.     BACKGROUND

In November, months after the applicable statutory deadline passed, HUD rescinded the CoC NOFO for Fiscal Year 2025 that had been issued the prior year (the "FY 2024-2025 NOFO"). In a new NOFO for fiscal year 2025 (the "November NOFO"), HUD adopted policies that threatened to cancel thousands of existing projects, required funding recipients to fundamentally reshape their programs on an impossible timeline, and essentially guaranteed that tens of thousands of formerly homeless individuals and families would be evicted back into homelessness. The NOFO sparked widespread panic among the nation's homelessness service providers. These actions violated the law, contravening Congress's clear direction for how to administer the program. That the November NOFO undermined Congress's intent is underscored by bipartisan outreach from members of Congress, who wrote to Secretary Turner to "urge [HUD] to renew all existing Continuum of Care (CoC) grants expiring in calendar year 2026 for one additional 12-month period." *See* Declaration of Zane Muller (Muller Decl.), Ex. 1 (Oct. 28, 2025 Ltr. to Sec. Turner from Republican members of Congress); Muller Decl., Ex. 2 (Nov. 24, 2025 Ltr. to Sec. Turner from Democratic members of Congress).

Less than an hour before the preliminary injunction hearing, HUD withdrew the challenged November NOFO. On December 19, this Court enjoined HUD's rescission of the FY 2024-2025 NOFO and the unlawful policies of the November NOFO from the bench. Hours later, Defendants published yet another NOFO that contained largely the same unlawful conditions that the Court had just enjoined (the "December NOFO"). ECF No. 66 (Notice of Publ'n of 2025 NOFO). Four days later, this Court entered an order compelling Defendants to, *inter alia*, "preserve the status quo ante that existed under the FY 2024-2025 NOFO, including by taking all steps necessary to process eligible renewals for FY 2025 CoC funding pursuant to the FY 2024-2025 NOFO."

ECF No. 68 (Order) at 2–3. The parties further agreed to expeditiously move towards summary judgment to facilitate an authoritative, final ruling from this Court. The parties' cross motions for summary judgment are now fully briefed.

On February 3, 2026, the President signed into law the 2026 THUD Appropriations Act, which contains relevant provisions governing the award of FY 2025 funds under the CoC program. In particular, Section 244 of that Act requires Defendant HUD, "prior to awarding any amounts through a notice of funding opportunity," to non-competitively renew for one year all CoC grants that are expiring or have expired in the first quarter of 2026 (i.e., between January 1, 2026 and March 31, 2026). Section 244 also requires HUD to non-competitively renew grants that expire in the second quarter of 2026 "if awards have not been made under a fiscal year 2025 notice of funding opportunity prior to April 1, 2026[.]" And HUD must non-competitively renew grants that expire in the remainder of 2026 "if awards have not been made under a fiscal year 2025 notice of funding opportunity prior to July 1, 2026[.]" *Id.* The goal of Section 244 couldn't be clearer: it aims to restore predictability and certainty where Defendants have sown chaos.

Defendants now seek to turn that goal on its head by dissolving this Court's preliminary injunction and reinstating the December NOFO.

## III.    LEGAL STANDARD

Initially, the party seeking a preliminary injunction bears the burden of proof. *See E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738, 742 (1st Cir. 1996). However, once a preliminary injunction is granted, "[a] party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013) (quoting *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)); *see Flag Fables, Inc. v. Jean Ann's Country Flags & Crafts,*

*Inc.*, 730 F. Supp. 1165, 1178 (D. Mass. 1989) ("The burden of proof that circumstances have changed sufficiently to support a motion to dissolve an injunction is on the movant.") (citing *Burkey v. Ellis*, 483 F. Supp. 897 (N.D. Ala. 1979)).

Dissolution of a preliminary injunction "should depend on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place . . . includ[ing] likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest." *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1225 (1st Cir. 1994) (denying motion to dissolve). "The likelihood of success on the merits . . . is the most important of the four factors." *Ollivierra v. Wilmington Sav. Fund Soc'y, FSB as Tr. for Pretium Mortg. Acquisition Tr.*, C.A. No. 1:17-cv-11271-MLW, 2018 WL 11432714, at *6 (D. Mass. Jan. 2, 2018). The First Circuit "measure[s] irreparable harm on a sliding scale, working in conjunction with a moving party's likelihood of success on the merits . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Lab'y, Inc. v. Citigroup Glob. Mkts., Inc.*, 622 F.3d 36, 42–43 (1st Cir. 2010) (citation modified).

## IV.    ARGUMENT

### A.    Dissolution of the Injunction is Unwarranted Because Plaintiffs are Likely to Succeed on the Merits

After this Court carefully evaluated the parties' briefing and argument on Plaintiffs' motion for preliminary injunction, the Court granted that motion and found that Plaintiffs are likely to succeed on the merits. Since the Court entered the preliminary injunction, nothing has changed that warrants a different result. As set forth above, it is *Defendants'* burden to establish a significant change in facts or law warrants revision or dissolution of the injunction. Defendants have failed to meet this burden. Although Defendants now seek to argue that the 2026 THUD Appropriations

Act indirectly supports some of their merits claims, the Act in no way renders the Challenged Conditions lawful and instead demonstrates Congress's commitment to ensuring timely and stable renewal funding—a goal that would be severely undermined by allowing the Challenged Conditions to take effect.

### 1.    Congress mandates renewals, consistent with this Court's injunction

Defendants' effort to dissolve the preliminary injunction and instate the December 2025 NOFO flies in the face of the 2026 THUD Appropriations Act and the statutes governing the CoC program. As explained in Plaintiff States' Motion for Summary Judgment, the McKinney-Vento Act requires that renewal funds for existing projects "shall be available for the renewal of contracts in the case of tenant-based assistance, successive 1-year terms[.]" *See* ECF No. 81 (Pls.' Mot. for Summ. J.) at 54 (citing 42 U.S.C. § 11386c(b)). That specific requirement serves the Act's general purposes: "to promote community-wide commitment to the goal of ending homelessness" and "to provide funding for efforts by nonprofit providers and State and local governments to quickly rehouse homeless individuals and families while minimizing the trauma and dislocation caused to individuals, families, and communities by homelessness[.]" *Id.* at 4 (citing 42 U.S.C. § 11381). The December 2025 NOFO, which incorporates the same thirty percent Tier 1 cap and similar thirty percent permanent housing cap from the November 2025 NOFO that this Court enjoined, would drastically cut funding for the renewals that are required by 42 U.S.C. § 11386c(b) and which Congress specifically instructed should proceed on a non-competitive basis under the status quo when it passed H.R. 7148. *See* 2026 THUD Appropriations Act. Indeed, since October, members of Congress from both parties have "respectfully urge[d] the Department . . . to renew all existing Continuum of Care (CoC) grants . . . to prevent service disruptions for individuals and families experiencing

homelessness." *See* Muller Decl., Ex. 1 (Oct. 28, 2025 Ltr. to Sec. Turner from Republican members of Congress). When Defendants refused, Congress passed Section 244 to ensure these automatic renewals on a rolling basis.

Defendants therefore could not be more wrong that that Act "provides intervening congressional support for two of Defendants' merits arguments." ECF No. 89 (Defs.' Mot. Dissolve) at 17 (*Cf.* ECF No. 81 (Pls.' Mot. for Summ. J.) at 17). To the contrary, by instructing that, in the absence of an effective, *lawful* NOFO for FY 2025 ("notwithstanding any inconsistent provisions in such Acts or in subtitle C of title IV of the McKinney-Vento Homeless Assistance Act", *see* 2026 THUD Appropriations Act), all existing grants are to be noncompetitively renewed, Congress reaffirmed that renewals under the Act take priority over HUD's discretion to implement policy. The 2026 THUD Appropriations Act's reference to "awards . . . made under *a* fiscal year 2025 notice of funding opportunity" (emphasis added) does not, as Defendants contend, override the statutory deadline to issue a lawful NOFO, grant HUD additional authority to deny project renewals, nor "envision[] HUD making awards for the 2025 CoC program" under Defendants' unlawful and late-issued NOFO rather than the lawfully-issued 2024-2025 NOFO. ECF No. 89 (Defs.' Mot. Dissolve) at 18 (*Cf.* ECF No. 81 (Pls.' Mot. for Summ. J.) at 17–18). "Congress [does not] typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 723 (2022) (quoting *MCI Telecommunications Corp. v. Am. Telephone & Telegraph Co.*, 512 U.S. 218, 229, (1994)). Here, at most, Congress's use of an indefinite article recognizes uncertainty in the face of this litigation—this Court may order the use of the FY 2024-2025 NOFO (as Plaintiffs request), may permit Defendants to use the December NOFO (as Defendants request), or may order partial relief like remand, in which case the auto-renewal provisions will control. But

if, as Defendants now assert, Congress intended to dramatically restructure of the CoC program, it would have said so. Furthermore, courts follow a "'stron[g] presum[ption]' that repeals by implication are 'disfavored' and that 'Congress will specifically address' preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (quoting *United States v. Fausto*,484 U.S. 439, 452, 453 (1998)); *see also Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992) (noting that "repeals by implication are especially disfavored in the appropriations context" but concluding that the statute at issue did modify existing law).

Rather, by instructing HUD to actually renew the same grants that this Court instructed Defendants to place itself in a position to promptly renew, Congress in effect affirmed and extended Paragraph 6 of this Court's order to HUD to "tak[e] all necessary steps to process eligible renewals for FY 2025 CoC funding." *See* ECF No. 68 (Order) at 2–3. If anything, Congress's intervening action to ensure renewals for existing projects has confirmed Plaintiffs' merits arguments concerning the McKinney-Vento Act's purpose and requirements.

### 2.    Plaintiffs are likely to succeed on the merits

For the reasons detailed in Plaintiffs' preliminary injunction motion and as ordered by the Court, Plaintiffs are likely to succeed on the merits. Likewise, as fully briefed by Plaintiffs in their summary judgment briefing, Plaintiffs will actually succeed on the merits. In seeking a dissolution of this injunction, Defendants have failed to show that rescission of the FY 2024-2025 NOFO was lawful or that the December 2025 NOFO is lawful in either its substance or in conformance with the APA's requirements. HUD's untimely rescission of the FY 2024-2025 NOFO was unlawful because it was contrary to law and arbitrary and capricious. *See* ECF No. 81 (Pls.' Mot. for Summ. J.) at 44–47 (contrary to law), 47–50 (arbitrary and capricious); ECF No. 84 (Pls.' Reply)

at 11–13 (contrary to law), 13–15 (arbitrary and capricious). Further, Plaintiffs' challenges to the disability and gender ideology conditions in the December 2025 NOFO are not moot and judgment is necessary to prevent Defendants from reimplementing these conditions. *See* ECF No. 84 (Pls.' Reply) at 17–20. Indeed, the Challenged Conditions in the December 2025 NOFO are unlawful because they are contrary to law, arbitrary and capricious, non-compliant with the APA's notice-and-comment requirements, and contrary to the Constitutional separation of powers. *See* ECF No. 81 (Pls.' Mot. for Summ. J.) at 52–59 (contrary to law), 59–75 (arbitrary and capricious), 50–52 (adopted without notice-and-comment), 75–77 (constitutional violations); ECF No. 84 (Pls.' Reply) at 20–30 (contrary to law), 30–37 (arbitrary and capricious), 37–38 (adopted without notice-and-comment), 39 (constitutional violations).[1]

## B.    Dissolution of the Injunction Would Irreparably Harm Plaintiff States

A dissolution of the preliminary injunction would irreparably harm Plaintiffs. Dissolution would immediately grant HUD license to effectuate the December 2025 NOFO and restart the chaos that this Court rightly halted and which the parties' summary judgment motions will definitively resolve. Likewise, the 2026 THUD Appropriations Act would not prevent the devastating harm that would occur if Defendants implemented the December NOFO as to grants expiring during Q3 and Q4, which they seek to do absent any injunction. As set forth below, this is not a close question: Plaintiffs would face irreparable harm for many independent reasons, including the evisceration and closure of housing programs and services, organizations' decisions not to renew leases in preparation for a lack of funding, programs refusing to accept new referrals, hiring freezes on new program staff, programs devoting significant time and expenses towards

---

[1] The Plaintiff States expect that the 2026 THUD Appropriations Act, once implemented by Defendants, will moot Plaintiffs' request for relief under 5 U.S.C. § 706(1) (see ECF No. 81 (Pls.' Mot. for Summ. J.) at 77–81). Plaintiffs intend to dismiss that claim if and when Defendants issue renewals for FY 2025 grants expiring in 2026 by the deadlines required by the Act.

completely overhauling processes to prepare for new NOFO requirements, the traumatization of formerly homeless individuals who fear they may soon lose housing, the eviction of formerly homeless individuals from their housing, the injury and preventable death to individuals who are evicted, the enormous costs to state public services, and many other harms. *See infra* at pp. 9–13.

Defendants claim that "the 2026 THUD Appropriations Act has significantly mitigated" Plaintiffs' "irreparable harm" because it addresses gaps in funding for grantees whose grants are set to expire in Q1 and Q2. ECF No. 89 (Defs.' Mot. Dissolve) at 13. But all this means is that this Court no longer needs to award relief on a highly expedited timeline. Because even if Q1 and Q2 grantees are now safe, there is still significant irreparable harm coming down the pike for grantees whose grants expire in Q3 and Q4.

If the preliminary injunction were dissolved, Defendants' promised implementation of the December NOFO would cause immediate and irreparable injury. First, the December NOFO precludes renewals of many CoC funds expiring in the second half of 2026. The December NOFO drastically slashes permanent housing, cuts Tier 1 funding by two thirds, and scores applicants based on their jurisdiction's policies. ECF No. 81 (Pls.' Mot. for Summ. J.) at 31–38. Many programs know they will lose a significant portion of their funding under the December NOFO and will immediately be forced to act accordingly. *See, e.g.*, ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶ 14 ("even for the CoCs that are the most agile and capable of such an overhaul . . . the best score that any Michigan CoC could achieve is 75/130—historically too low a score to be funded."); *see also* ECF No. 13-20 (MN-Leimaile Ho Decl.) ¶ 16 ("Minnesota CoCs are unlikely to score competitively based on criteria under this NOFO.").

Therefore, many CoCs will immediately reduce services, fail to renew leases, decline new referrals of homeless individuals and families, and freeze hiring if they know funds are not coming

in Q3 and Q4. *See, e.g.*, ECF No. 13-10 (DE-Stucker Decl.) ¶ 14(c) (in order to "prepare for a loss" of funding "many organizations will have to stop providing services" and organizations "that enter into 12-month leases with landlords on behalf of clients are considering having to not renew leases"); ECF No. 13-17 (MA-Byron Decl.) ¶ 56 ("Already as a result of the FY 2025 NOFO, some BoS CoC subrecipients are not accepting new referrals as they are concerned they will not be able to comply with leasing requirements"); ECF No. 40 (AZ-Dhillon-Williams Decl.) ¶ 23 ("The sudden change to competing in 2025 will prevent programs from hiring staff and placing households in permanent housing, serving as a chilling effect for operational programs in the coming months").

Likewise, even the applicants who are able to reshape existing programs pursuant to the December NOFO will need to immediately begin doing so, which will take months to complete. *E.g.*, ECF No. 13-16 (MD-Meister Decl.) ¶ 15 ("compliance with dramatically different conditions will require a complete overhaul of our processes and those of our applicants. This will require more time, money, and effort to comply" and will require many weeks to complete); *see also New York v. U.S. Dep't of Just.*, 804 F. Supp. 3d 294, 330 (D.R.I. 2025) (finding irreparable harm and citing months of preparation, extensive planning, and staffing hours).

The December NOFO will also immediately instill fear in and traumatize vulnerable populations at risk of eviction. *See* ECF No. 49-2 (NY-Supplemental Leone Decl.) ¶ 25 ("CoC program participants have all experienced homelessness or been at-risk of homelessness before. Communicating that their housing is at-risk could cause additional trauma"); *see also* ECF No. 13-15 (ME-Squirrell Decl.) ¶ 23 (explaining that a permanent supportive housing participant stated: "I feel alone abandoned by the government. I don't even have a car that I can live in . . . there's no way I will survive or stay sober").

Most importantly, thousands of individuals and families will soon be evicted and become homeless if HUD proceeds under the December 2025 NOFO. *See New York*, 804 F. Supp. 3d at 330 (in the case of "homelessness," it "practically goes without saying that there can be 'no do over and no redress' if services are unlawfully denied and someone suffers for it . . . *That of course constitutes irreparable harm*[]") (emphasis added) (quoting *League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (2016)); *see also* ECF No. 11 (Pls.' Mot. Prelim. Inj.) at 48-49 (collecting examples). Here, the "human toll will be immediate and severe" and it will "place lives in jeopardy." ECF No. 13-13 (KY-Kaye Smith Decl.) ¶ 36. Thousands of individuals and families will be "forcibly displaced, facing conditions that dramatically increase the risk of injury, illness, and preventable death." *Id*. "There has never been a threat as devastating and extreme to persons in poverty. Not only will this application fracture the homeless service delivery infrastructure, which has taken decades to build, but lives will be lost." ECF No. 13-19 (MI-MCAH Rennie Decl.) ¶ 15; *see also Martin Luther King, Jr. County v. Turner*, 798 F. Supp. 3d 1224, 1254 (W.D. Wash. 2025) (finding irreparable harm from loss of CoC funding such as "destabilization of immediate and future budgets, reductions in workforce, [and] hundreds of shelter-unstable families losing access to housing[]").

Statewide increases in homelessness will also shift enormous costs to other state public services. *See* ECF No. 11 (Pls.' Mot. Prelim. Inj.) at 46–47 (collecting examples). Plaintiffs' preliminary injunction motion further describes many other irreparable harms that remain applicable here. ECF No. 11 (Pls.' Mot. Prelim. Inj.) at 43–49 (describing how Challenged Conditions would, *inter alia*, harm states' investments, jeopardize the repayment of loans to states, undermine years-long efforts to build programs in alignment with past requirements, result in the

contraction or closure of housing programs, and require significant new resources responding to a new NOFO).

Defendants themselves highlight the imminence of these consequences, stating that HUD must "open the December 2025 NOFO by April 1, 2026 to have any chance of issuing third- and fourth-quarter awards pursuant to that NOFO." ECF No. 89 (Defs.' Mot. Dissolve) at 2. In other words, Defendants want it both ways: on the one hand, they request "expedited" relief on this motion so they can immediately open the December 2025 NOFO—with all its unlawful terms intact—no later than "April 1." *Id.* at 5. Yet at the same time, Defendants claim that Plaintiffs will not be imminently harmed by the implementation of the December 2025 NOFO, which would tee up action that will slash the vast majority of funding when it is about to expire. Both cannot be true. Defendants' cited authority is inapplicable here, as it involves harm that would only take effect many years later. *See Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 74 (1st Cir. 2004) (no preliminary injunction needed when plaintiff is "more than three years away" from needing relief). Here, Plaintiffs would face significant and irreparable harm as soon as the December NOFO is released and this harm would rapidly compound in the following weeks.

Defendants further ignore that other cases evaluating conditions on CoC funding have found that the "looming risk" of "budgetary uncertainty due to Defendants' unlawful actions is an injury in of itself" that qualifies as "irreparable harm." *See Martin Luther King, Jr. County*, 798 F. Supp. 3d at 1253–54; *see also City of Seattle v. Trump*, No. 2:25-cv-01435-BJR, 2025 WL 3041905, at *10 (W.D. Wash. Oct. 31, 2025). This has been repeatedly supported by Plaintiff States' evidence. *E.g.*, ECF No. 13-14 (ME-Payne Decl.) ¶ 20 ("[t]he organizations that had expected to receive funding for the coming year now have their staffing plans and budgets thrown into doubt").

Finally, Defendants argue, based on *Charlesbank Equity Fund II v. Blinds to Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004), that Plaintiffs' irreparable harm should be "independent" of their merits claims. ECF No. 89 (Defs.' Mot. Dissolve) at 12-15 (citing *Charlesbank Equity Fund II*, 370 F.3d at 162). Plaintiffs' facts are easily distinguishable from *Charlesbank*, in which the movant argued only that conduct was unlawful as an attempt to show irreparable harm (and, in any event, the Court found that future money damages would be sufficient relief). *Charlesbank*, 370 F.3d at 162. Here, there is significant evidence of irreparable harm that is not purely monetary. Further, this irreparable harm exists regardless of whether the December NOFO itself is lawful.

For these reasons, Plaintiffs have met and exceeded the standard for showing irreparable harm, which does not require more than a threat of enforcement. *See New York*, 804 F. Supp. 3d at 330 ("And either way, even the threat of enforcement and the uncertainty that stems from that threat is likely sufficient" for irreparable harm); *see also Nat'l Educ. Ass'n-New Hampshire v. NH Att'y Gen.*, No. 1:25-cv-00293-LM, 2025 WL 2807652, at *23 (D.N.H. Oct. 2, 2025) ("Even without an actual loss of funding, the financial uncertainty faced by . . . plaintiffs hinders their ability to budget for the future" such that there is irreparable harm).

## C.    The Equities and Public Interest Favor Leaving the Injunction in Place

The balance of the equities and the public interest remain with the Plaintiff States. Defendants' argument that they are injured by their inability to implement a facially unlawful NOFO cannot stand against the extraordinary harms Plaintiffs and the CoCs will face resulting from the chaos of yet another reversal in the terms and conditions of the program to which the CoCs are applying.

As this Court has already ruled, "[e]nsuring lawful agency action, continuity of housing, and stability for vulnerable populations is clearly in the public interest." December 19, 2025 Hr'g

13

Tr. at 70:11-13. In contrast, Defendants circularly lament that "HUD cannot even begin the process of implementing the December 2025 NOFO." ECF No. 89 (Defs.' Mot. Dissolve) at 8. For all of the reasons already found by the Court and explained herein and in Plaintiffs' motion for summary judgment, Plaintiffs have demonstrated that the December 2025 NOFO was unlawful. Defendants, of course, are "not irreparably harmed by an injunction issued to parties with Article III standing that bars enforcement of" unlawful agency action. *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025); *see also Woonasquatucket River Watershed Council v. United States Dep't of Agric.*, 778 F. Supp. 3d 440, 476–77 (D.R.I. 2025) (McElroy, J) (explaining that "an agency is not harmed by an order prohibiting it from violating the law" and concluding that "the balance of the equities and the public interest weigh heavily in favor of injunctive relief"). Furthermore, this litigation is the latest in an ever-lengthening chain of cases in which grantees have been "left adrift as they scramble[] to make sense of the [Federal] Government's actions[.]" *Woonasquatucket*, 778 F. Supp. 3d at 476. The harm that would be caused by the confusion and chaos of the re-implementation of the unlawful December 2025 NOFO is not abstract. As detailed *supra* in Section IV(B), every CoC will be required to devote "more time, money, and effort to comply" with the illegally revamped requirements of the December 2025 NOFO. ECF No. 13-16 (MD-Meister Decl.) ¶ 15; *see also Woonasquatucket*, 778 F. Supp. 3d at 477 (plaintiffs "continue to face substantial uncertainty about whether the Government will comply with federal law").

Finally, and most critically, the harms that Plaintiffs will suffer in terms of the unlawfulness of the December 2025 NOFO and the implementation thereof, while sufficient in and of themselves, pale in comparison to the public interest at stake in this matter: the safety and security of the individuals and families who stand to lose their homes if the December 2025 NOFO is permitted to proceed. *E.g.*, ECF No. 13-13 (KY-Kaye Smith Decl.) ¶ 36. Defendants' bureaucratic

complaints cannot equitably be weighed against the real human suffering that this litigation seeks to avert.

For all of these reasons, and as articulated in Plaintiffs' motion for summary judgment, the public interest and the balance of equities both weigh unmistakably in Plaintiffs' favor.

**D.      Plaintiffs do Not Oppose an Expedited Ruling on Summary Judgment**

As Defendants informed the Court, Plaintiff States take no position on Defendants' alternative request for expedited resolution of the parties' pending cross-motions for summary judgment. ECF No. 89 (Defs. Mot. Dissolve) at 7. Plaintiffs are entitled to summary judgment on their APA and constitutional claims, and permanent relief is still necessary to address the harms HUD would inflict on Plaintiffs, their agencies, and partners under the unlawful December 2025 NOFO and to address any attempt by Defendants to reimpose the Challenged Conditions in the future. By preserving the status quo, this Court's injunction, coupled with the renewals guaranteed by the 2026 THUD Appropriations Act, together serve to mitigate the urgency that prompted Plaintiffs' original request for expedited relief.

## V.      CONCLUSION

The Court should deny Defendants' Motion to Dissolve the Preliminary Injunction.

DATED this 23rd day of February 2026.

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ZANE MULLER*
ALIANA KNOEPFLER*
ANDREA ALEGRETT*
Assistant Attorneys General
CRISTINA SEPÉ*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Zane.Muller@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Andrea.Alegrett@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
VICTORIA OCHOA*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov

*Counsel for Plaintiff State of New York*

**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

16

**ROB BONTA**
Attorney General of California

*/s/ Jarrell Mitchell*
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for Plaintiff State of California*


**PHILIP J. WEISER**
Attorney General of State of Colorado

*/s/ David Moskowitz*
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov

*Attorneys for Plaintiff State of Colorado*


**WILLIAM TONG**
Attorney General of State of Connecticut

*/s/ Andrew M. Ammirati*
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**BRIAN L. SCHWALB**
Attorney General of District of Columbia

*/s/ Samantha Hall*
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov

*Attorneys for Plaintiff District of Columbia*

**KATHLEEN JENNINGS**
Attorney General of State of Delaware

*/s/ Ian R. Liston*
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
ROSE GIBSON*
Assistant Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

*/s/ S. Travis Mayo*
S. TRAVIS MAYO*
General Counsel
TAYLOR PAYNE*
Chief Deputy General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Taylor.Payne@ky.gov
Laurac.Tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor
ex rel. Andy Beshear, in His Official Capacity
as Governor of the Commonwealth of Kentucky*


**KWAME RAOUL**
Attorney General of Illinois

*/s/ Aleeza Strubel*
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*


**AARON M. FREY**
Attorney General of Maine

*/s/ Katherine W. Thompson*
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-6411
Jluh@oag.maryland.gov

*Attorney for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

*/s/ Michelle Pascucci*
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
ESME CARAMELLO
Director, Housing Affordability Unit
AARON DULLES*
LAUREN YAMAGUCHI*
Assistant Attorneys General
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for Plaintiff Commonwealth
of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

*/s/ Neil Giovanatti*
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

*/s/ Brian S. Carter*
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.carter@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

**JENNIFER DAVENPORT**
Acting Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER*
Deputy Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
Asamant@nmdoj.gov

*Attorneys for the State of New Mexico*

19

**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*

**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
Jacobboyer@pa.gov
717-460-6786

*Attorney for Plaintiff Governor Josh Shapiro, in His Official Capacity as Governor of the Commonwealth of Pennsylvania*

**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov

*Attorney for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*