**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

|  |  |
|---|---|
| STATE OF WASHINGTON, et al.,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, et al.,<br><br>　　　　　　　　Defendants. | C.A. No. 1:25-cv-00626-MSM-AEM<br><br>PLAINTIFF STATES' MOTION FOR LEAVE TO FILE SUPPLEMENTAL COMPLAINT |

## I.    INTRODUCTION

For seven months now, the parties have been engaged in litigation stemming from Defendants' efforts to fundamentally reshape the Continuum of Care Program in alignment with the Administration's Anti-Homeless Order, Executive Order No. 14321, 90 Fed. Reg. 35817 (2025). In two Notices of Funding Opportunity published late last year, Defendants repudiated HUD's decades-long commitment to providing stable housing for individuals experiencing homelessness, including by capping the percentage of CoC funds that could be used for permanent housing. This cap, along with other unlawful policies strewn throughout the NOFO, would have devastated the program, left tens of thousands of formerly homeless Americans without stable shelter, and severely strained states' homeless response programs. To prevent this unlawful and irreparable harm, this Court preliminarily enjoined the FY 2025 NOFO. And while that preliminary injunction was pending, Congress stepped in, passing an appropriations act that required HUD to renew existing projects.

Nonetheless, on June 1, 2026, HUD published a new NOFO for FY 2026 that seeks to re-implement a cap on permanent housing. The FY 2026 NOFO does this through a purported $1.3 billion "set aside" for transitional housing and supportive service-only grants, i.e., non-permanent housing projects. By making this $1.3 billion unavailable for permanent housing, this "set aside" has the effect of capping permanent housing at around sixty-eight percent of CoC funds, well below the amount of CoC funds currently devoted to permanent housing (the De Facto Cap). And HUD buttressed this unlawful cap with a series of funding conditions designed to punish applicants who adhere to a Housing First model of service delivery (the 2026 Service Requirement Conditions).

1

The De Facto Cap and 2026 Service Requirement Conditions are unlawful for essentially the same reasons as the prior permanent housing cap and service conditions and will cause much the same harms—the difference is just one of degree. Consequently, to promote efficient resolution of the parties' dispute, conserve judicial resources (and the parties' as well), and avoid the risk of conflicting judgments, the Plaintiff States request this Court's leave to file a supplemental complaint challenging the FY 2026 NOFO. A copy of Plaintiffs' proposed Supplemental Complaint is attached hereto as Exhibit A.

## II.    BACKGROUND

### A.    The Parties Are Currently Litigating over HUD's Unlawful FY 2025 NOFO

Defendants have recently sought to cast aside HUD's longstanding commitment to Housing First policies and fundamentally and unlawfully undermine the CoC program. Most significantly, in two NOFOs published in November and December 2025, HUD purported to implement a thirty percent cap on CoC renewal funding going to permanent housing, as well as a thirty percent cap on "Tier 1" funding—essentially, funding that guaranteed renewals for existing projects, and stability for the people living in those projects. ECF No. 81 at 31-35. The FY 2025 NOFOs also included a host of unlawful conditions, including conditions that discriminated against transgender and gender-nonconforming folks and conditions that discriminated against certain localities based on the policy choices made by local voters and legislatures. *Id.* at 35-38.

Plaintiffs sued in November 2025, and this Court preliminarily enjoined HUD's FY 2025 NOFO, as well as the challenged conditions therein. In February 2026, while the parties were briefing summary judgment, the President signed into law the 2026 THUD Appropriations Act (the THUD Act). Transp., Hous. and Urb. Dev. Consol. Appropriations Act of 2026, Pub. L. No. 119-75, 140 Stat. 173. The THUD Act does at least two things relevant to this Motion.

2

First, Section 244 of that Act required HUD, "prior to awarding any amounts through a notice of funding opportunity[,]" to non-competitively renew for one year all CoC grants that are expiring or have expired in the first quarter of 2026 (i.e., between January 1, 2026, and March 31, 2026). THUD Act § 244, 140 Stat. 173, 422. Section 244 also requires HUD to non-competitively renew grants that expire in the second quarter of 2026 "if awards have not been made under a fiscal year 2025 notice of funding opportunity prior to April 1, 2026[.]" And HUD must non-competitively renew grants that expire in the remainder of 2026 "if awards have not been made under a fiscal year 2025 notice of funding opportunity prior to July 1, 2026[.]" *Id.* Because HUD never developed a lawful NOFO for FY 2025, the THUD Act ultimately required HUD to non-competitively renew all CoC projects expiring in calendar year 2026. The process for renewing CoC projects remains ongoing.

Second, the THUD Act appropriated $4,010,000,000 for the CoC program for FY 2026. In appropriating that money, Congress explicitly directed that the HUD "Secretary shall select projects totaling not less than 60 percent of the annual renewal demand for each collaborative applicant based on rankings determined by the local continuum of care and consistent with 42 U.S.C. 11381 et seq." In other words, the THUD Act explicitly repudiated HUD's prior thirty percent Tier 1 Cap and instead required that HUD set Tier 1 at sixty percent of annual renewal demand at a minimum. That Tier 1 cap specifically affects Continuums' abilities to prioritize projects for funding. But it does not affect HUD's statutory obligation to make funds available for renewals, nor does it touch the underlying statutes that require the Secretary to treat Housing First programs as proven to be effective, while requiring notice and comment before proceeding with other strategies.

Moreover, the THUD Act included various set-asides among the broader $4.01 billion appropriation. For example, the Act specifically allocates $52,000,000 "for grants for new rapid re-housing projects and supportive service projects providing coordinated entry, and for eligible activities that the Secretary determines to be critical in order to assist survivors of domestic violence, dating violence, sexual assault, or stalking[.]" THUD Act, 140 Stat. 173, 399-400. Similarly, the Act specifically allocates $107,000,000 "to implement projects to demonstrate how a comprehensive approach to serving homeless youth, age 24 and under, . . . can dramatically reduce youth homelessness[.]" THUD Act, 140 Stat. 173, 400. The THUD Act does not, however, include any set-aside for transitional housing, supportive service-only grants, or other policies called for by the FY 2025 NOFOs. Nor does the THUD Act include any sort of cap, explicit or implicit, on permanent housing.

**B.      HUD Issues a New, FY 2026 NOFO that Includes Unlawful Conditions Concerning Permanent Housing**

On June 1, 2026, while the parties' cross-motions for summary judgment were pending, HUD issued a "FY 2026 Continuum of Care Competition and Youth Homelessness Demonstration Program Grants NOFO" with an application due date of August 26, 2026 (the "FY 2026 NOFO"). The FY 2026 NOFO is filed herewith as an Appendix to Exhibit A.

The FY 2026 NOFO lacks many of the egregiously unlawful conditions of the FY 2025 NOFOs. Nonetheless, like its predecessor, the FY 2026 NOFO again unlawfully attempts to reverse HUD's decades-long Housing First policy. Whereas the FY 2025 NOFOs attempted to do so by placing an unauthorized and arbitrary cap on the funding of permanent housing projects, the FY 2026 NOFO does so by purporting to create a $1.3 billion "set-aside . . . for new projects with a priority for Transitional Housing and Supportive Service Only projects." Ex. A, App. at 35-36.

4

By making $1.3 billion unavailable for permanent housing, this set-aside amounts to a roughly sixty-eight percent cap on permanent housing.[1]

The De Facto Cap, if allowed to go into effect, will drastically cut funding for permanent housing projects. Well over eighty percent of CoC program funds currently go to support permanent housing. By capping permanent housing at sixty-eight percent, the De Facto Cap will cause programs to lose funding, which means residents losing housing. According to estimates from the National Alliance to End Homelessness, "**at least 97,000 residents** of CoC-funded permanent housing at risk of losing their housing." *Changes to HUD Policy Threaten Efforts to End Homelessness: At Least 97,000 People Could Lose Housing*, Nat'l All. to End Homelessness (Jun. 2, 2026), https://endhomelessness.org/resources/hud-policy-changes-threaten-efforts-to-end-homelessness/ (emphasis in original). In New York, for example, where approximately ninety-two percent of CoC funding goes to permanent housing, the De Facto Cap is estimated to strip CoCs within the state of over $129 million, causing over 8,700 people to lose their housing. *Id.* In Washington, some 2,900 people are at risk of losing stable housing due to the De Facto Cap. *Id.* And in California, it is a staggering 14,937 people. *Id.*

Congress has directed HUD to fund Housing First policies through various statutory provisions. *See* ECF No. 81 at 22-23. And it has directed HUD to prioritize renewals to ensure that individuals and families who have successfully exited homelessness are not evicted back into the streets. 42 U.S.C. § 11386c(b). The De Facto Cap ensures that much-needed projects will not be renewed.

In addition to imposing the De Facto Cap, the FY 26 NOFO reverses HUD's longstanding Housing First policy via the 2026 Service Requirement Conditions, new scoring criteria aimed at

---

[1] While Congress appropriated $4.01 billion for CoC funding for FY 2026, HUD has total CoC funding of approximately $4.04 billion for FY 2026. Ex. A, App. at 6.

forcing applicants to require participants to enroll in services to receive housing. For example, the FY 26 NOFO awards up to twenty points (out of a maximum of 200) for availability of "Treatment and Recovery Services[,]" including requirements that applicants "[d]escribe how the[y] . . . partner[] with, or ha[ve] projects that provide, outpatient treatment for mental health and substance use disorders[,]" "[d]emonstrate that for every 2 persons reporting chronic substance use in the CoC's most recent [point-in-time] count, there is at least 1 CoC-funded unit that requires program participant engagement in substance abuse treatment services as a condition of continued participation," and "[i]dentify at least one new or existing CoC project that operates sober housing." Ex. A, App. at 76-77. Similarly, the FY 26 NOFO awards up to eight points if a CoC can "demonstrate" that it "is investing adequately in supportive services by showing" it is either "providing supportive services with a value of 50% of the CoC's Annual Renewal Demand" or that "30% of their proposed CoC funding is used for supportive services relative to their Annual Renewal Demand." *Id.* at 78-79. Likewise, the FY 26 NOFO awards up to eight points if a CoC can "demonstrate that housing projects . . . require program participants to take part in supportive services . . . in line with 24 C.F.R. 578.75(h)." *Id.* at 79. Yet, 24 C.F.R. 578.75(h) only says that programs "may" require program participants to participate in services, not that they are required or incentivized to do so. Instead, the statute requires incentives for permanent supportive housing, as described above. And as recently as 2024, HUD was explicitly encouraging applicants not to require services as a condition for stable housing. *See* HUD, *Community Planning and Development* 87 (2025), https://www.hud.gov/sites/dfiles/CPD/documents/FY2024_FY2025_ CoC_and_YHDP_NOFO_FR-6800-N-25.pdf (to receive full points, applicants "must [d]emonstrate at least 75 percent of all project applications that include housing . . . are using the Housing First approach by providing low barrier projects that do not require preconditions to

accessing housing nor participation in supportive services . . . and prioritize rapid placement and stabilization in permanent housing."). Moreover, the new scoring system makes it extremely difficult for applicants to receive funding for rapid rehousing without supportive services. It does this through a "project quality threshold" in which "New Permanent Housing projects must receive at least 4 out of the 6 points available" to be considered for funding, but awarding two points for offering "supportive services and assistance . . . to program participants (e.g., case management, substance use treatment, mental health treatment, and employment assistance)." Ex. A, App. at 62, 67-68. Thus, an applicant who does not provide supportive services is heavily disfavored in meeting the minimum threshold for funding.

To address HUD's continued efforts to unlawfully sabotage the CoC Program, Plaintiffs now seek leave to file a supplemental complaint challenging the FY 2026 NOFO.

### III.    ARGUMENT

**A.    Legal Standard**

Federal Rule of Civil Procedure 15(d) permits a party "[o]n motion and reasonable notice . . . to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." The purpose of Rule 15(d) is to "'promot[e] as complete an adjudication of the dispute between the parties as is possible.'" *U.S. ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 4 (1st Cir. 2015) (quoting 6A Charles Alan Wright et al., *Federal Practice and Procedure* § 1504, at 245 (3d ed. 2010)). It does so by "avoid[ing] pointless formality: although causes of action accruing after the institution of a lawsuit usually can be filed as separate actions, supplementation under Rule 15(d) is often a more efficient mechanism for litigating such claims." *Id.* Particularly when, as here, the government adopts a new policy in the face of ongoing litigation, "[t]he interest of judicial economy . . . militates in favor of allowing supplemental pleadings." *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 625

(6th Cir. 2016), *abrogated on other grounds as recognized by Tennessee Conference of Nat'l Ass'n for the Advancement of Colored People v. Lee*, 139 F.4th 557, 563 (6th Cir. 2025). "When a dispute is complicated and protracted, and a new complaint is the likely alternative, allowing supplemental pleadings before a court already up to speed is often the most efficient course." *Id.*

While "requests to supplement under Rule 15(d)" are treated "liberally," supplementation may be denied when it will "'cause undue delay or trial inconvenience'" or "'prejudice the rights of any of the other parties to the action.'" *Gadbois,* 809 F.3d at 4, 7 (quoting 6A Wright § 1504, at 258-59). Here, supplementation will undoubtedly promote judicial economy and a speedy resolution of a pressing issue and will not cause undue delay or any prejudice.

**B.      A Supplemental Complaint Will Promote Efficiency Without Prejudicing Defendants**

There is no doubt that filing a Supplemental Complaint—as opposed to an entirely new suit—will promote efficiency. Plaintiffs' proposed Supplemental Complaint concerns the same federal program, the same statutory scheme, and the same parties as the existing lawsuit. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) (finding abuse of discretion when district court denied motion to file a supplemental complaint that "related to" the original complaint and explaining "leave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading" and leave is "normally granted"). The claims in the Supplemental Complaint are essentially a subset of the claims in the existing lawsuit, focusing on Defendants' unlawful implementation of a cap on permanent housing. And this Court is already well familiar with these issues, such that it is uniquely positioned to rule quickly and efficiently on the claims in Plaintiffs' Supplemental Complaint. Not only that, but addressing Plaintiffs' new claims via a Supplemental Complaint avoids the risk of inconsistent judgments that otherwise might occur if Plaintiffs were forced to file a new lawsuit. Indeed, given the tight overlap

8

between the operative complaint (ECF No. 80) and Plaintiffs' Supplemental Complaint, if Plaintiffs were to bring these claims via a new case, that new case would almost certainly be related to this one, and the parties would be in effectively the same position as supplementation, except with all the hassle of opening a new lawsuit, serving new summons, paying a new filing fee, and on and on.

On the other hand, there is no prejudice to Defendants in proceeding via a Supplemental Complaint. Filing a supplemental complaint will not cause any prejudicial delay, particularly because the Plaintiff States intend to seek expedited relief (which this Court, with its singular familiarity with the issues, will presumably be in a good position to address in a timely manner). Even if a supplemental complaint—and supplemental motion for summary judgment—might slightly delay resolution of Plaintiffs' claims relating to the FY 25 NOFO, there is no prejudice to Defendants because Congress has already directed HUD to make renewals of projects expiring this year.

## IV.    CONCLUSION

Because efficiency plainly warrants supplementation of Plaintiffs' claims, the Plaintiff States respectfully request this Court grant their Motion for Leave to File a Supplemental Complaint.

DATED this 26th day of June 2026.

9

Respectfully submitted,

**NICHOLAS W. BROWN**
Attorney General of Washington

*/s/ Andrew R.W. Hughes*
ANDREW R.W. HUGHES*
ZANE MULLER*
ALIANA KNOEPFLER*
ANDREA ALEGRETT*
Assistant Attorneys General
CRISTINA SEPE*
Deputy Solicitor General
800 Fifth Avenue, Suite 2000
P.O. Box TB-14
Seattle, WA 98104-3188
206-464-7744
Andrew.Hughes@atg.wa.gov
Zane.Muller@atg.wa.gov
Aliana.Knoepfler@atg.wa.gov
Andrea.Alegrett@atg.wa.gov
Cristina.Sepe@atg.wa.gov

*Attorneys for Plaintiff State of Washington*


**PETER F. NERONHA**
Attorney General of Rhode Island

*/s/ Jordan G. Mickman*
KATHRYN M. SABATINI (RI Bar No. 8486)
Chief, Civil Division
Special Assistant Attorney General
JORDAN G. MICKMAN (RI Bar No. 9761)
Unit Chief, Civil and Community Rights
Special Assistant Attorney General
LEONARD GIARRANO IV (RI Bar No. 10731)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
401-274-4400, Ext. 2079
Ksabatini@riag.ri.gov
Jmickman@riag.ri.gov
Lgiarrano@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**LETITIA JAMES**
Attorney General of New York

*/s/ Rabia Muqaddam*
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
STEPHEN C. THOMPSON*
Special Counsel
VICTORIA OCHOA*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
212-416-6183
Rabia.Muqaddam@ag.ny.gov
Colleen.Faherty@ag.ny.gov
Stephen.Thompson@ag.ny.gov
Victoria.Ochoa@ag.ny.gov

*Counsel for Plaintiff State of New York*


**KRISTIN K. MAYES**
Attorney General of Arizona

*/s/ William Y. Durbin*
HAYLEIGH S. CRAWFORD*
Deputy Solicitor General
WILLIAM Y. DURBIN*
Senior Litigation Counsel
Office of the Attorney General
2005 North Central Ave.
Phoenix, AZ 85004
602-542-3333
Hayleigh.Crawford@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Plaintiff State of Arizona*

10

**ROB BONTA**
Attorney General of California

/s/ Jarrell Mitchell
JARRELL MITCHELL*
Deputy Attorney General
MICHAEL L. NEWMAN*
Senior Assistant Attorney General
JOEL MARRERO
Supervising Deputy Attorney General
BRIAN BILFORD*
LAUREN GREENAWALT*
Deputy Attorneys General
Jarrell.Mitchell@doj.ca.gov
Brian.Bilford@doj.ca.gov
Lauren.Greenawalt@doj.ca.gov
Joel.Marrero@doj.ca.gov
Michael.Newman@doj.ca.gov

*Counsel for Plaintiff State of California*


**PHILIP J. WEISER**
Attorney General of State of Colorado

/s/ David Moskowitz
DAVID MOSKOWITZ*
Deputy Solicitor General
NORA PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, #10
Denver, CO 80203
720-508-6000
David.Moskowitz@coag.gov

*Attorneys for Plaintiff State of Colorado*


**KATHLEEN JENNINGS**
Attorney General of State of Delaware

/s/ Ian R. Liston
IAN R. LISTON*
Director of Impact Litigation
VANESSA L. KASSAB*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8899
Ian.Liston@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**WILLIAM TONG**
Attorney General of State of Connecticut

/s/ Andrew M. Ammirati
ANDREW M. AMMIRATI*
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
860-808-5090
Andrew.Ammirati@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**BRIAN L. SCHWALB**
Attorney General of District of Columbia

/s/ Samantha Hall
SAMANTHA HALL*
Assistant Attorney General
Office of the Attorney General
of the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
202-788-2081
Samantha.Hall@dc.gov

*Attorneys for Plaintiff District of Columbia*


**KWAME RAOUL**
Attorney General of Illinois

/s/ Aleeza Strubel
ALEEZA STRUBEL*
Complex Litigation Counsel
ELENA S. METH*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. LaSalle St., 35th Floor
Chicago, IL 60603
773-914-3046
Aleeza.Strubel@ilag.gov
Elena.Meth@ilag.gov

*Counsel for Plaintiff State of Illinois*

11

**ANDY BESHEAR**
Governor of Commonwealth of Kentucky

/s/ S. Travis Mayo
S. TRAVIS MAYO*
General Counsel
LAURA C. TIPTON*
Deputy General Counsel
Office of the Governor
501 High Street
Frankfort, KY 40601
502-564-2611
Travis.Mayo@ky.gov
Laurac.Tipton@ky.gov

*Attorneys for Plaintiff Office of the Governor ex rel. Andy Beshear, in His Official Capacity as Governor of the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General of Maine

/s/ Katherine W. Thompson
KATHERINE W. THOMPSON*
Special Counsel
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel: 207-626-8455
Fax: 207-287-3145
Kate.Thompson@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General of Maryland

/s/ Virginia A. Williamson
JAMES C. LUH*
VIRGINIA A. WILLIAMSON
Assistant Attorneys General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
Vwilliamson@oag.maryland.gov

*Attorneys for Plaintiff State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

/s/ Michelle Pascucci
KATHERINE DIRKS*
Chief State Trial Counsel
MICHELLE PASCUCCI*
NITA KLUNDER*
State Trial Counsel
AARON DULLES*
LAUREN YAMAGUCHI*
Assistant Attorneys General
Office of the Massachusetts
Attorney General
1 Ashburton Place Boston, MA 02108
617-963-2255
Michelle.Pascucci@mass.gov

*Counsel for Plaintiff Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

/s/ Neil Giovanatti
NEIL GIOVANATTI*
Assistant Attorney General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
517-335-7603
GiovanattiN@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General of Minnesota

/s/ Brian S. Carter
BRIAN S. CARTER
Special Counsel
445 Minnesota Street, Suite 1400
St. Paul, MN 55101
651-300-7403
Brian.carter@ag.state.mn.us

*Counsel for Plaintiff State of Minnesota*

12

**JENNIFER DAVENPORT**
Attorney General of New Jersey

*/s/ Daniel Resler*
DANIEL RESLER*
Deputy Attorney General
33 Washington St., 9th Floor
Newark, NJ 07102
973-648-4726
Daniel.Resler@law.njoag.gov

*Attorney for Plaintiff State of New Jersey*


**DAN RAYFIELD**
Attorney General of Oregon

*/s/ Scott P. Kennedy*
SCOTT P. KENNEDY*
Senior Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel: 971-673-1880
Fax: 971-673-5000
Scott.Kennedy@doj.oregon.gov

*Attorneys for Plaintiff State of Oregon*


**CHARITY R. CLARK**
Attorney General of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
802-828-3171
Jonathan.Rose@vermont.gov

*Attorney for Plaintiff State of Vermont*


**RAÚL TORREZ**
Attorney General of New Mexico

*/s/ Anjana Samant*
ANJANA SAMANT*
Deputy Counsel
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
505-270-4332
Asamant@nmdoj.gov

*Attorneys for the State of New Mexico*


**JENNIFER C. SELBER**
General Counsel

*/s/ Jacob B. Boyer*
JACOB B. BOYER*
STEPHEN R. KOVATIS*
Deputy General Counsel
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
Jacobboyer@pa.gov
717-460-6786

*Attorney for Plaintiff Governor Josh Shapiro, in His Official Capacity as Governor of the Commonwealth of Pennsylvania*


**JOSHUA L. KAUL**
Attorney General of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, WI 53707-7857
608-264-9487
Faye.Hipsman@wisdoj.gov

*Counsel for Plaintiff State of Wisconsin*

13