## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.,*<br><br>    Defendants.<br><br>NATIONAL ALLIANCE TO END HOMELESSNESS, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, *et al.*,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. Nos. 25-cv-626-MSM-AEM<br>            25-cv-636-MSM-AEM |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Before the Court are Plaintiffs' Motions for Summary Judgment and Defendants' Cross-Motions for Summary Judgment, 25-cv-626, ECF Nos. 81, 83; 25-cv-636, ECF Nos. 67, 68. This Memorandum and Order resolves two related-but-unconsolidated challenges to action undertaken by the United States Department of Housing and Urban Development ("HUD"). One brought by Plaintiff States, (25-cv-626), and a second brought by Plaintiff local governments and nonprofit

organizations, (25-cv-636).  Notwithstanding the separate sets of cross-motions for summary judgment, the Court will refer to all Plaintiffs in these cases as "Plaintiffs" and all Defendants as "HUD."  For the following reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motions for Summary Judgment and DENIES IN PART and GRANTS IN PART HUD's Cross-Motions for Summary Judgment.

## I.    BACKGROUND

This case arises out of the cascade of changes that administrative agencies have attempted to impose on various programs that provide federal grant funding for congressionally authorized programs throughout the United States.  Specifically, Plaintiffs have challenged HUD's November 2025 and December 2025 notices of its decision to drastically overhaul the manner in which HUD awards federal dollars to mitigate and address the harm cause by people experiencing homelessness throughout the country.  The statue underlying this particular dispute—42 U.S.C. § 11301—provides the touchstone for this Court's analysis.  Therefore, the Court will begin with an explanation of it first.

### A.  The McKinney-Vento Homeless Assistance Act and HUD's Role

Nearly forty years ago, Congress enacted the McKinney-Vento Homeless Assistance Act ("MVA"), which sought to address the homelessness crisis facing the nation at that time.  *See* 42 U.S.C. § 11301(a)(1).  Like other federal legislation, Congress authorized federal spending for programs designed to mitigate the homelessness crisis.  *Id.* § 11301(b)(3).  In particular, Congress specified that this

funding should address housing challenges faced by elderly individuals, those with disabilities, households with children, members of the Native American community, and those that have served in our armed forces. *Id.* Almost two decades ago, Congress revamped this legislation in an effort to better meet the needs of people experiencing homelessness. Specifically, Congress codified the Continuum of Care ("CoC") program—the heart of this dispute—to aid "nonprofit providers and State and local governments [in] quickly rehous[ing] homeless individuals and families while minimizing the trauma and dislocations caused by . . . homelessness." *Id.* § 11381(2). These updates to the MVA brought on the advent of HUD's "Housing First" approach to combatting homelessness, which constitutes an evidence-based, modern understanding of the way the government can effectively combat homelessness in America.[1]

With respect to the contours of the CoC program itself, HUD provides funding to local recipients to combat homelessness consistent with Congress's goals and its understanding of the best ways to mitigate the harm caused by this issue. *See id.* § 11383(a). While HUD may alter its approach, identify new goals, and award funds in support of achieving them, it may do so only after conducting research and

---

[1] As one may imagine, the Housing First approach prioritizes providing individuals experiencing homelessness with shelter *before* addressing other, orthogonal factors that may cause them to experience instability in different aspects of their lives. The Housing First approach displaced other programs, which required recipients to demonstrate stability in separate aspects of their lives (i.e., showing that they have a healthy relationship with drugs and alcohol or proving that they are employed) before the government will assist them in obtaining shelter.

undertaking a public notice and comment process. *Id.* § 11386b(d)(2)(C). Prior to the change in policy goals that brought on these actions, HUD dedicated the vast majority of its funding to supporting permanent housing programs, consistent with its Housing First approach. *See* ECF No. 12-1 at 19. Regarding the funding's logistics, Congress appropriates yearly funding to HUD so that, pursuant to a competitive process, HUD can distribute that funding to geographically defined groups of grantees consistent with the criteria set forth in the MVA. *See* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 362; *see also* 42 U.S.C. § 11386a(b)(2). Additionally, in an effort to presumably mitigate the tension between providing funding for housing on an annual basis and supplying permanent housing, the MVA also allows HUD to renew funding in a less arduous manner so as to prevent funding gaps that would create chaotic and uncertain timelines for the grantees themselves and the people they serve. *See id.* § 11386c(b).

Finally, HUD kicks off the award funding process by issuing a Notice of Funding Opportunity ("NOFO"). Critically, the MVA requires HUD to issue a NOFO no later than three months after Congress passes its annual appropriations bill. *Id.* § 11382(b). This deadline presumably exists because it takes a great deal of time and energy on behalf of grantees to apply for, and obtain, funding in a manner that complies with the MVA's requirements.

### B. The 2024-2025 NOFO

In March 2024, Congress provided HUD with the authorization to issue a two-year NOFO for fiscal years 2024 and 2025. Section 242, 138 Stat. at 386. Consistent

with Congressional authorization, HUD released a NOFO for fiscal years 2024 and 2025, which allowed grantees to receive renewal funding with less red tape so long as they sought to use funds in a manner consistent with their original response. *State v. HUD*, 171 F.4th 473, 481 (1st Cir. 2026). While HUD retained the authority to change its eligibility criteria for renewed applicants, it remained subject to the MVA's three-month deadline. 42 U.S.C. § 11382(b).

After Congress appropriated new funds for the CoC program on March 15, 2025, HUD declined to issue a new NOFO within the three-month deadline as mandated by the MVA. *State v. HUD*, 171 F.4th at 481-82. Nevertheless, after missing the statutory deadline, HUD circulated a July 3, 2025, email announcement of its intent to issue a *different* NOFO for the 2025 fiscal year at an unspecified, future date. (ECF No. 72-2 at 14.) Then, in November 2025, HUD issued a new NOFO seeking to alter the funding requirements for the 2025 fiscal year. *Id.* at 20. Overall, HUD's November 2025 NOFO marked its attempt to deviate from its prior Housing First mission and instead require grantees to implement programs that de-emphasize permanent housing programs. *See id.* The November 2025 NOFO also sought to incentivize programs that required beneficiaries to meet certain criteria before receiving housing. *See id.*

These lawsuits followed. Specifically, Plaintiffs brought these actions based on the chaos caused by HUD's issuance of the November 2025 NOFO. (ECF No. 1 ¶ 5.) In seeking the NOFO's invalidation as a violation of the Administrative Procedure Act ("APA"), other federal laws, and the Constitution, Plaintiffs' challenge to HUD's

5

actions sought redress from the chaos created by HUD with respect to: (1) the grantees' inability to navigate the funding gaps caused by HUD's untimely NOFO; and (2) the grantees' inability to immediately reshape the decades-long approach to combatting the homelessness crisis so as to immediately conform to the new NOFO's criteria. *See* ECF No. 1 ¶¶ 6-7, 13.

After Plaintiffs initiated these actions and moved for preliminary relief, HUD changed course a second time. Following a procedural nightmare created by HUD's withdrawal of the November 2025 NOFO, HUD issued a subsequent December 2025 NOFO retaining its earlier decision to overhaul its funding priorities and its rejection of the Housing First approach. Notwithstanding HUD's issuance of the December 2025 NOFO, this Court preliminarily enjoined HUD from displacing the original criteria set forth in the original, 2024-2026 NOFO. (ECF No. 68.) Thereafter, the parties cross-moved for summary judgment.[2]

## II.   SUMMARY JUDGMENT STANDARD

A court must grant a motion for summary judgment when a genuine dispute of material fact does not exist, and the movant demonstrates their entitlement to judgment as a matter of law. *Viscito v. Nat'l Plan. Cor.*, 34 F.4th 78, 83 (1st Cir. 2022). On cross-motions for summary judgment, the court reviews each motion

---

[2] After both parties filed their cross-motions for summary judgment, several now-irrelevant developments took place in this matter including Congress's passing of legislation impacting the interim funding gap and a brief visit to the First Circuit. Interested readers should refer to the First Circuit's detailed opinion for a deeper dive into the twists and turns that have taken place in this case. *See State v. HUD*, 171 F.4th 473 (1st Cir. 2026).

separately and will respectively draw both facts and inferences from the non-moving party. *Scottsdale Ins. v. United Rentals (N. Am.), Inc.*, 977 F.3d 69, 72 (1st Cir. 2020). Despite this familiar procedural vehicle, summary judgment works differently in the APA context. Specifically, summary judgment in the APA context serves as the mechanism to present a case for a more fulsome judicial review. *See Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016). Therefore, the reviewing court will not concern itself with identifying factual disputes; rather, it will review the administrative record and reach a determination on whether the agency's actions violated the APA. *Id.*

## III.   DISCUSSION

### A. The Cross-Motions for Summary Judgment

The Court's review of the record and the parties' arguments reveal that HUD's issuance of the November 2025 NOFO and the December 2025 NOFO constitutes arbitrary and capricious action in violation of the APA.[3] *See* 5 U.S.C. § 706(2)(A). To determine whether an agency's actions have violated the APA, courts must evaluate whether the agency "has examined the relevant data and articulated a 'satisfactory' explanation for [its] decision." *Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019). In assessing an agency's work, the reviewing court must also determine whether the

---

[3] Plaintiffs also challenge HUD's issuance of these NOFOs as violative of the Constitution and other federal laws. (ECF No. 1 at 1-3.) However, the Court determines that its resolution of Plaintiffs' APA claims addresses all of the harm Plaintiffs seek redress from. As a result, the Court limits its analysis to Plaintiffs' APA claims.

agency articulated a "rational connection between the facts [that it] found and the choices [that it] made." *Id.*

While a court may not substitute its judgment for the agency itself, it may still find that an agency engaged in arbitrary and capricious action "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*; *Motor Vehicle Mfrs. Ass'n. of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983).

The Court concludes that, before it issued either NOFO, HUD failed to consider the impact that its decision to eliminate the Housing First approach would have on the existing system created by Congress and HUD itself. Although HUD acknowledges the yearslong emphasis that it had placed on strengthening its commitment to public housing, it failed to substantively consider the impact that a rapid, untimely overhaul would have on the organizations that administer these programs and the individuals that rely upon them. *See* ECF No. 76 at 287-88.

Above all else, the administrative record demonstrates HUD's failure to consider the harm caused by the funding gaps it created when attempting to eliminate the Housing First approach on an accelerated timeline. While HUD concedes that the CoC grantees have navigated funding gaps in the past, it summarily concluded that the gaps it created would not pose an obstacle to grantees in this context. *Id.* at 14. This explanation does not withstand even the bare

minimum level of scrutiny.  Even ignoring the fact that HUD failed to substantively contend with this reality *prior to* issuing the November 2025 NOFO, the record reveals that HUD did not attempt to meaningfully forecast the harm caused by the disruption these NOFOs created at any point, most notably the instability faced by individuals who would undoubtedly experience homelessness because of this breakneck transition.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Moreover, HUD's explanation of its rationale behind the December 2025 NOFO gives little to no thought or analysis of the negative externalities created by its transition from a Housing First approach to one that mandates enrollment in various programs designed to address challenges other than a lack of stable housing. Relatedly, HUD failed to meaningfully balance its new emphasis on fostering a competitive environment for grantees to seek funding against HUD's prior concern with housing stability.  Even more significantly, HUD failed to meaningfully consider—during either its development of the November or the December 2025 NOFOs—the benefits it could have achieved from waiting to implement this new policy and rolling out its new priorities on a non-emergency basis.

Overall, the actions undertaken by HUD in attempting to hastily eliminate its Housing First approach serve as the hallmark of unreasoned decision making and HUD's attempt to retroactively backfill its impulsive decision making lacks a rational connection between any facts that it could have found and the choices that it ultimately made in issuing these NOFOs. *See Bos. Redevelopment Auth.*, 838 F.3d at 47.  As a result, the Court concludes that HUD violated § 706(2)(A) of the APA

when it issued both the November 2025 and the December 2025 NOFOs due to the arbitrary and capricious manner in which it shifted its existing approach to funding the CoC. *See* § 706(2)(A).

Notwithstanding the fact that the November 2025 NOFO violates the APA, HUD alternatively seeks to evade this Court's review by principally arguing that: (1) their rescission and replacement of the first NOFO with the December 2025 NOFO does not permit this Court to review it; and (2) the Court must review HUD's decision to rescind the November 2025 NOFO pursuant to 5 U.S.C. § 706(1). (ECF No. 83 at 30-45.) Neither rationale persuades this Court.

First, as the Court had addressed at an earlier stage of this litigation, HUD rescinded the November 2025 NOFO likely to buy itself more time and evade the Court's review of it last year. Based on HUD's actions and the Court's prior findings at the preliminary injunction stage of this case, the Court determines that it may review the November 2025 NOFO because HUD's evasive behavior fits within the voluntary cessation exception to the mootness doctrine. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 457 n.1 (2017) ("We have said that such voluntary cessation of a challenged practice does not moot a case unless subsequent events make it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.") (cleaned up).

Second, the Court rejects HUD's intellectually dishonest reading of Plaintiffs' decision to challenge the November 2025 NOFO under § 706(2)(A) and attempt to repackage Plaintiffs' action as a misguided challenge under § 706(1). As Plaintiffs

10

acknowledge in their Reply, they have never attempted to argue that HUD's actions violate § 706(1) as an unlawful delay of administrative action, and Plaintiffs' characterization of HUD's behavior in overhauling the CoC program does not require the Court to evaluate its behavior under § 706(1) of the APA. *See* ECF No. 84 at 15-17. Consequently, the Court determines that HUD violated § 706(2)(A) and acted in an arbitrary and capricious manner though its fraught implementation of the November 2025 and December 2025 NOFOs.[4]

Although the Court determines that it must vacate HUD's implementation of the November 2025 and December 2025 NOFOs, it rejects Plaintiffs' request for a permanent injunction on HUD's *future* implementation of the conditions contained within these NOFOs. Although HUD may undoubtedly attempt to issue a subsequent NOFO that contains these contested conditions, the speculative nature of this impending harm does not warrant the "drastic remedy" of a permanent injunction. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010) ("If a less drastic remedy (such as partial or complete vacatur of [an agency's] decision) [is] sufficient to redress respondent's injury, no recourse to the additional and extraordinary relief of an injunction [is] warranted.").

---

[4] Alternatively, the Court determines that HUD's issuance of both NOFOs exceeded its statutory authority in violation § 706(2)(C) of the APA. Specifically, the Court concludes that HUD's failure to issue either NOFO within three months after Congress passed its annual appropriations bill exceeded its statutory authority. *See* 42 U.S.C. § 11382(b). HUD's violation of the deadline contained within the MVA constitutes a separate and independent violation of the APA warrants vacatur of HUD's issuance of both NOFOs.

### A.  The Plaintiffs' Motion for Leave to File a Supplemental Complaint

Separately, the Court has reviewed Plaintiffs' Motions for Leave to File a Supplemental Complaint under Federal Rule of Civil Procedure 15(d).  (25-cv-626, ECF No. 112; 25-cv-636, ECF No. 97.)  Specifically, Plaintiffs seek to supplement their Complaint to include: (1) allegations of HUD's failure to issue grant funding in a timely manner and (2) an additional challenge to a NOFO that HUD issued in June 2026.  *Id.* at 1-2.  Rule 15(d) encourages parties to supplement their pleadings "when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to this action." *United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 4 (1st Cir. 2015) (citing 6A Wright et al., *Federal Practice and Procedure* § 1504, at 258-59).

The Court's review of the Plaintiffs' Motions in light of this Order reveals that a supplemental complaint is unnecessary.  The Court concludes that the Plaintiffs have made this Court sufficiently aware of their concerns with HUD's compliance with the Court's directives and determines that its requirement that HUD file weekly status reports on HUD's progress renders this supplemental filing unnecessary.  With respect to Plaintiffs' request to add a challenge to the June 2026 NOFO, the Court determines that adding this claim will unduly elongate the Court's resolution of the NOFOs at issue in this case and therefore denies the Plaintiffs' request to supplement their Complaint on this basis as well.  *See id.*  The Plaintiffs are undoubtedly free to

file a separate action challenging the conditions contained within the June 2026 NOFO should they choose to do so.

## IV.    CONCLUSION

Based on the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Plaintiffs' Motions for Summary Judgment and DENIES IN PART and GRANTS IN PART HUD's Cross-Motions for Summary Judgment. (25-cv-626, ECF Nos. 81, 83; 25-cv-636, ECF Nos. 67, 68.) As a result, this Court sets aside HUD's issuance of both the November 2025 NOFO and the December 2025 NOFO as violative of the APA. The Court, however, denies Plaintiffs' request for a permanent injunction. Finally, the Plaintiffs' Motions for Leave to File a Supplemental Complaint are DENIED. (25-cv-626, ECF No. 112; 25-cv-636, ECF No. 97.)


IT IS SO ORDERED.

_____

Mary S. McElroy
United States District Judge

June 29, 2026

13